# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

JULIAN KEIPPEL, Individually and On
Behalf of All Others Similarly Situated,

               Plaintiff,

vs.

HEALTH INSURANCE INNOVATIONS,
INC., GAVIN SOUTHWELL, and
MICHAEL D. HERSHBERGER,

               Defendants.

CASE NO. 8:19-CV-00421-WFJ-CPT

CLASS ACTION

JURY TRIAL DEMANDED

**CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................ 2

II.    PARTIES ............................................................................................ 6

    A.    Plaintiffs ................................................................................6

    B.    Defendants .............................................................................7

    C.    Relevant Nonparties............................................................8

III.   JURISDICTION AND VENUE ......................................................... 10

IV.   SUMMARY OF THE ACTION ........................................................ 11

    A.    HIIQ Sells Its "Health Insurance Products" In A Highly
          Regulated Market................................................................11

    B.    Unknown To Investors, HIIQ's Business Was Built On
          Consumer Fraud.................................................................13

          1.    Simple Health Was Critical To HIIQ's Financial
               Success ...................................................................... 15

          2.    HIIQ And Simple Health Teamed Up To Deceive
               Consumers................................................................. 18

          3.    Former Employees And HIIQ's Own Internal
               Documents Establish That HIIQ Received Thousands
               Of Complaints Each Year About Simple Health ............... 27

          4.    HIIQ Closely Monitored And Documented The
               Intentional Deception Of Customers ................................... 38

          5.    HIIQ's Senior-Most Executives Internally
               Acknowledged Being "Bombarded" With Customer
               Complaints Due To Simple Health's "Widespread" and
               "Out of Control" Deception ................................................. 42

          6.    The Deceptive Sale Of HIIQ's Products Caused
               Enormous Harm To Consumers.......................................... 46

    C.    The FTC Revealed That Simple Health Was A "Sham" But
          Defendants Continued To Mislead Investors While Reaping
          Millions of Dollars From Insider Stock Sales....................................49

1. The FTC Announced Its Extraordinary Enforcement Action And Shuttering Of Simple Health ........................................... 49

2. Securities Analysts Issued A Scathing Research Report On HIIQ ........................................... 53

3. Defendants' Misrepresentations Continued As They Reaped Millions Through Insider Stock Sales.................................... 55

4. Congress Launched An Investigation Of HIIQ's "Junk Plans" ........................................... 56

5. Court Filings In The FTC Action Revealed HIIQ's Intimate Knowledge Of The Deceptive Sales Practices .................... 58

6. A Court-Appointed Receiver Concluded That Simple Health's Business Was "A Classic Bait-And-Switch Scam" And "Never Legally Viable".................................. 60

D. Post-Class Period Events ................................................. 62

V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS ............................. 64

A. September 2017 Investor Presentation And Press Release............................ 66

B. November 2017 Press Release, Conference Call, And Investor Presentation................................................................. 68

C. December 2017 Press Release ....................................... 73

D. March 2018 Investor Conference Call And Presentation ............................... 74

E. May 2018 Investor Conference Call And Presentation ................... 75

F. August 2018 Investor Conference Call And Presentation .............................. 77

G. October 2018 Investor Conference Call ........................... 79

H. November 2018 And December 2018 Press Releases.................... 80

I. December 2018 Investor Presentation ........................... 81

J. January 2019 Investor Presentation .......................... 82

K. March 2019 Investor Conference Call............................ 82

VI. ADDITIONAL SCIENTER ALLEGATIONS........................................... 83

VII. LOSS CAUSATION................................................ 88

VIII.   CLASS ACTION ALLEGATIONS ............................................................. 91

IX.   UNDISCLOSED ADVERSE FACTS ........................................................ 93

X.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD
ON THE MARKET DOCTRINE ............................................................... 94

XI.   NO SAFE HARBOR ................................................................................. 96

XII.   COUNTS.................................................................................................... 96

XIII.   PRAYER FOR RELIEF ........................................................................... 100

XIV.   JURY DEMAND ...................................................................................... 101

Lead Plaintiffs Oklahoma Municipal Retirement Fund and City of Birmingham Retirement and Relief System (collectively, "Lead Plaintiffs") bring this action under the federal securities laws, individually, and on behalf of all persons or entities that purchased or otherwise acquired Health Insurance Innovations, Inc. ("HIIQ" or the "Company") common stock during the period September 25, 2017 through April 11, 2019, inclusive (the "Class Period"), and who were damaged thereby (the "Class") seeking to pursue remedies under the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, *et seq.* (the "Exchange Act").

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based on the independent investigation of their undersigned counsel. This investigation includes review and analysis of (i) HIIQ's public filings with the Securities and Exchange Commission (the "SEC"); (ii) research reports by securities analysts; (iii) transcripts of HIIQ's conference calls with analysts and investors; (iv) presentations, press releases, and reports; (v) news and media reports concerning the Company and other facts related to this action; (vi) data reflecting the pricing of HIIQ common stock; (vii) interviews with former HIIQ employees; (viii) consultation with an insurance industry expert; (ix) materials and court rulings filed in the action *Federal Trade Commission vs. Simple Health Plans LLC, et al.*, Case No. 18-62593-DPG (S.D. Fla.) and other legal and regulatory proceedings; and (x) other material and data concerning the Company, as identified herein. Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by the Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## I.      __INTRODUCTION__

1.      HIIQ develops, distributes, and sells short-term "medical discount plans," "limited benefit indemnity plans," and other "health insurance products."  The products that HIIQ distributes are not comprehensive health insurance and do not comply with the Affordable Care Act ("ACA").  Instead, they are supplemental products that, at best, merely defray a fraction of a consumer's out-of-pocket medical costs.  These products represent less than 1% of the health insurance marketplace and their sale and administration are subject to strict regulation by state and federal authorities.  As HIIQ acknowledged in its public filings with the SEC, the Company's business practices and those of its licensed third-party call centers were "heavily regulated by each state in the United States and various federal agencies."  As a result, it was critical for the Company and its network of call centers to adhere to responsible sales practices and follow strict standards of compliance.

2.      Throughout the Class Period, Defendants falsely assured investors that HIIQ and its call centers adhered to purportedly exceptional compliance standards and experienced "***incredibly low***" rates of consumer complaints—"***an absolutely tiny, tiny number.***"  Indeed, Defendants claimed a complaint rate of "***0.00%***" on HIIQ policies and specifically attributed this exceptional performance to their "laser focus" on customer service and compliance.

3.      Moreover, at every opportunity, Defendants highlighted their purportedly extensive compliance controls and "outstanding compliance performance," and emphasized that such "outstanding compliance" extended to their external call centers, which they repeatedly represented were "highly compliant" with HIIQ's own procedures.  HIIQ, which was purportedly "upholding the highest standards" in compliance, published multiple investor presentations asserting that the Company's "Best-in-Class Compliance" was so strong that it

was a "significant barrier to entry" to current and potential competitors.  The Company's executives underscored that their insurance products were built on "objective and measurable" data, and assured investors that "every data point indicates that our customer satisfaction is market-leading."  Defendants further assured investors that HIIQ maintained strict control over its external call centers' compliance performance, claiming that these call centers underwent a comprehensive "process of training, of meeting and constantly hitting our compliance matrix, our market leading compliance."

4.      All of these statements, and many more detailed below, were false and misleading.  Unbeknownst to investors at the time, a significant portion of HIIQ's business depended on—and stemmed from—a complete and utter fraud.  An extraordinary enforcement action by the FTC and related federal court receivership proceedings have recently revealed that HIIQ's most lucrative call center, called "Simple Health"—which was responsible for as much as 50% of the Company's revenue—was "a ***classic bait-and-switch scam*** whereby unwitting consumers are falsely led to believe that they are purchasing a Preferred Provider Organization medical insurance policy ('PPO') that is compliant with the Affordable Care Act ('ACA'), but in reality are sold limited benefit indemnity plans that are not compliant with the ACA."  Indeed, as the FTC action revealed, Simple Health "***was never legally viable and cannot be viable in the future***" because "***deception permeated the … entire business relationship with the[] customers***."  Simple Health's multitude of fraudulent sales practices preyed on unsuspecting consumers in search of comprehensive health insurance through deceptive advertising, boiler room sales tactics, and outright lies.

5.      The truth began to emerge on November 2, 2018, when the FTC announced its enforcement action aimed at completely shuttering Simple Health's operations.   The FTC

3

found that Simple Health, through its sales of HIIQ products, had perpetrated a "deceptive scheme" by "preying on Americans in search of health insurance, selling these consumers worthless plans that left tens of thousands of people uninsured" and "st[icking consumers] with thousands of dollars in unpaid medical bills." As was ultimately revealed, for years, thousands upon thousands of consumers had complained to HIIQ regarding its call centers' deceptive sales practices. The FTC promptly obtained a court order shutting down Simple Health's operations and freezing its assets, shocking HIIQ's investors and sending HIIQ's stock price to a more than 20% free fall.

6.      FTC disclosures, Lead Plaintiffs' investigation, and additional sources have revealed an extensive record establishing that HIIQ was at all times fully aware of Simple Health's fraudulent business operations. Indeed, HIIQ coordinated with Simple Health at virtually every step of the sales process and continuously monitored the endemic sales deception. The companies were so closely intertwined that while the consumer fraud was ongoing, HIIQ designated Simple Health a "***related party***" in its SEC filings. The companies joined forces to create misleading "lead generation" websites; HIIQ loaned Simple Health millions of dollars to fund its operations; and HIIQ recruited and trained Simple Health's sales agents. In addition, HIIQ continuously monitored Simple Health's compliance failures by listening to calls of Simple Health's agents preying on consumers; reviewing, editing and approving fraudulent sales scripts; and fielding the seemingly endless flood of customer complaints. Moreover, as Simple Health's now-disgraced owner, Steven Dorfman, averred to a federal district judge in the Southern District of Florida, HIIQ "***regularly audited*** [Simple Health]'s employee training and sales and verification processes" and even "***verified that [Simple Health] trains its employees using materials provided by HII***." The companies were

4

so close that HIIQ executives even attended Dorfman's wedding.

7.      HIIQ's own internal emails further show that Defendants were fully aware of the consumer fraud underpinning the Company's business and, by the start of the Class Period, had already compiled a massive record of Simple Health's customer complaints.  For example, only one month into the start of the Class Period, senior HIIQ executives—including the Company's Vice President of Operations (the third most senior executive and a member of the Company's senior management team) and HIIQ's Customer Service Supervisor—internally acknowledged that "***the incorrect information being given by Simple Health to members is getting out of control***," and that HIIQ's customer service representatives were "***getting bombarded with calls***" from consumers complaining that Simple Health misrepresented HIIQ's policies as comprehensive health insurance.

8.      Many of HIIQ's former employees, interviewed as part of Lead Plaintiffs' investigation, have confirmed that the Company's Customer Service department fielded a daily barrage of consumer complaints.  Consumers complained in droves to HIIQ that telemarketers in Simple Health's licensed call centers had sold them limited medical discount plans and ancillary products by falsely representing that they were purchasing comprehensive health insurance.  As the former employees attest, such customer complaints were "endemic" at HIIQ during the Class Period, with thousands upon thousands of customers demanding refunds once they learned the truth about HIIQ's virtually worthless products.  The complaints were compiled for HIIQ's executives in daily and weekly reports and comprehensive databases that documented in meticulous detail widespread compliance failures.  Given the undisclosed truth about the "rampant" customer complaints inside HIIQ, these former employees characterized Defendants' Class Period statements to investors asserting "best-in-class compliance" and

"0.00%" complaint rates as "*absurd*," "*completely asinine*," and a "*bold-faced lie*."

9.      After the FTC shuttered Simple Health in November 2018, a series of subsequent disclosures through April 12, 2019 further detailed HIIQ's and Simple Health's deceptive scheme and the falsity of Defendants' prior assurances to investors.  In total, these disclosures wiped out nearly $550 million in shareholder value, as HIIQ's stock price plummeted from its Class Period high of $63.13 per share, to a low of $23.85 per share—a decline of more than 60%.  HIIQ's stock price has not recovered since, and currently hovers around $22.  The fallout from the fraud continues to this day, as a Congressional investigation into Defendants' fraudulent conduct is currently pending.

10.      As a result of Defendants' violations of the federal securities laws, investors who purchased HIIQ common stock at artificially inflated prices during the Class Period have suffered substantial losses.  This action seeks redress on behalf of such aggrieved shareholders.

## II.    PARTIES

### A.    Plaintiffs

11.      Lead Plaintiff Oklahoma Municipal Retirement Fund ("Oklahoma Municipal") is a public pension fund that manages retirement funds of current and retired employees in the State of Oklahoma.  As of the start of the second quarter of 2019, Oklahoma Municipal oversaw more than $800 million in assets for more than 12,200 members.  As set forth in the attached certification, Oklahoma Municipal bought HIIQ common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

12.      Lead Plaintiff City of Birmingham Retirement and Relief System ("City of Birmingham") is a public pension fund that manages retirement funds of current and retired civil service employees, elected officials, and appointed employees in the City of Birmingham,

6

Alabama.   As of the start of the second quarter of 2019, City of Birmingham oversaw approximately $1 billion in assets for more than 7,300 members.   As set forth in the attached certification, City of Birmingham bought HIIQ common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

      **B.**    **Defendants**

     13.    Defendant Health Insurance Innovations, Inc. sells and distributes health and life insurance products.   HIIQ is incorporated in Delaware and maintains its headquarters in Tampa, Florida.   HIIQ's common stock is traded on the NASDAQ under the ticker symbol "HIIQ."   As stated in HIIQ's public securities filings, HIIQ is a holding company whose only material asset is ownership of a 100% economic interest in Health Plan Intermediaries Holdings, LLC ("HPIH"), in which HIIQ is the sole managing member, and HIIQ has "100% of the voting rights and control" over HPIH.   HIIQ's consolidated, wholly-owned subsidiaries also include HealthPocket, Inc., d/b/a AgileHealthInsurance ("HealthPocket" or "Agile Health Insurance").   References to "HIIQ" herein include HIIQ's subsidiaries, including those referenced herein.

     14.    Defendant Gavin Southwell has served as HIIQ's Chief Executive Officer ("CEO") since November 2016 and has served as its President since July 2016.   During the Class Period, Defendant Southwell certified the Company's periodic financial reports on Forms 10-Q and 10-K, and regularly spoke with investors and securities analysts about the Company during investor conference calls and presentations to investors.

     15.    Defendant Michael D. Hershberger has served as HIIQ's Chief Financial Officer ("CFO") since September 2015.   Previously he served as CFO from October 2011 to November 2013, Senior Vice President of Finance from November 2013 to July 2014, Interim

CFO from July 31, 2014 to September 2, 2014 and from March 30, 2015 to September 16, 2015. During the Class Period, Defendant Hershberger certified the Company's periodic financial reports on Forms 10-Q and 10-K, and regularly spoke with investors and securities analysts about the Company during investor conference calls and presentations to investors.

16.     Defendants Southwell and Hershberger are collectively referred to herein as the "Individual Defendants." Throughout the Class Period, the Individual Defendants possessed the power and authority to control the contents of HIIQ's reports to the SEC, as well as its press releases and presentations to investors and securities analysts, money and portfolio managers and institutional investors, including those found on HIIQ's website, www.hiiq.com. Each Individual Defendant, while serving as a senior executive of HIIQ, was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information and were the result of the collective actions of the Individual Defendants.

### C.     Relevant Nonparties

17.     Steven J. Dorfman ("Dorfman") was an owner, officer, member or manager of Simple Health Plans, HBO, HCM, ICC, SIL and SBO (as defined below). These entities— which were responsible for roughly half of HIIQ's sales during much of the Class Period—

conducted business from the State of Florida through interrelated companies with common ownership, officers, managers and business functions.   According to the FTC, Dorfman absconded with millions of dollars in cash from Simple Health to spend on luxuries.   In addition, Dorfman has personally been linked to a violent gang of criminals that he allegedly used to intimidate Simple Health's employees.

18.    Simple Health Plans LLC ("Simple Health Plans") is a Florida limited liability company with its principal place of business in Hollywood, Florida.

19.    Health Benefits One LLC ("HBO") is a Florida limited liability company with its principal place of business in Hollywood, Florida. HBO also did business as Health Benefits Center, Simple Health, Simple Health Plans, Simple Insurance, Simple Insurance Plans, Simple Auto, Simple Home, Simple Home Plans, Simple Care, Simple Life and National Dental Savings.

20.    Health Center Management LLC ("HCM") is a Florida limited liability company with its principal place of business in Hollywood, Florida.

21.    Innovative Customer Care LLC ("ICC") is a Florida limited liability company with its principal place of business in Hollywood, Florida.

22.    Simple Insurance Leads LLC ("SIL") is a Florida limited liability company with its principal place of business in Hollywood, Florida. As HIIQ reported in its SEC filings, SIL was formed by HIIQ and its "third-party joint venture partner [Simple Health] in June 2013." HIIQ sold its interest in SIL to Simple Health in 2015.

23.    Senior Benefits One LLC ("SBO") is a Florida limited liability company with its principal place of business in Hollywood, Florida.

24.    Simple Health Plans, HBO, HCM, ICC, SIL and SBO are referred to herein as

"Simple Health" or the "Dorfman Entities."  At all times relevant to the claims asserted herein, the Simple Health entities advertised, marketed, distributed and/or sold HIIQ's limited benefit plans and medical discount plans to consumers throughout the United States.  Judge Darrin P. Gayles of the United States District Court for the Southern District of Florida has shut down, and frozen the assets of, all of the Simple Health entities, as described further below.

## III.   <u>JURISDICTION AND VENUE</u>

25.   The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

26.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

27.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District.  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  Additionally, the principal executive offices of HIIQ are located within this District at 15438 N. Florida Avenue, Suite 201, Tampa, FL 33613.

28.   In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone calls, and the facilities of a national securities exchange.

IV.     **SUMMARY OF THE ACTION**

    A.     **HIIQ Sells Its "Health Insurance
       Products" In A Highly Regulated Market**

    29.     Defendant HIIQ is a developer, distributor, and administrator of web-based individual "health insurance products," including limited medical indemnity plans and medical discount plans.  These limited medical indemnity plans and medical discount plans make up the lion's share of the Company's revenues.  In addition, HIIQ offers "supplemental products" which, according to the Company's SEC filings, "include a variety of additional insurance and non-insurance products that are frequently purchased as supplements" to the limited medical indemnity plans and medical discount plans.

    30.     HIIQ is not an insurer and does not process or pay claims.  Instead, the Company works with third-party insurance companies to develop products for HIIQ's target market.  These products are underwritten by the insurance carriers, and the Company assumes no underwriting, insurance, or reimbursement risk.

    31.     HIIQ principally derives its revenues by marketing and selling its products through external distributors, also known as "call centers," "brokers" or sales "agents."  HIIQ also earns revenues by selling products through its internal distribution channel consisting of HIIQ-owned websites and subsidiaries.  Customers pay HIIQ premiums and an enrollment fee, and HIIQ pays its brokers substantial commissions for selling HIIQ products.

    32.     Both before and during the Class Period, HIIQ experienced rapid revenue and profit growth because its external sales agents sold increasing numbers of the Company's products.  HIIQ's external sales agents were responsible for far more Company revenues and profits than HIIQ's internal distribution channel.

    33.     HIIQ operates in highly regulated insurance markets across the country.  As

HIIQ stated in its Forms 10-K filed with the SEC, HIIQ's "business practices and the business practices of [its] third-party licensed distributors and carriers are heavily regulated by each state in the United States and various federal agencies."  As such, it was critical for HIIQ and its distributors to adhere strictly to applicable insurance laws and regulations.

34.    Leading up and during the Class Period, HIIQ assured investors that it was "focus[ed] on compliance" and that while the Company had previously "received complaints that the information [HIIQ] provided" in selling its products was "not accurate or was misleading," HIIQ had "resolved these complaints without significant financial cost" and the "consumer experience" was a "compliance area" in which HIIQ had "invested significant resources."  Indeed, the Company repeatedly touted its "outstanding" and "market-leading" compliance, and claimed that its compliance efforts afforded it a competitive advantage in the industry.  HIIQ also made clear that such purported "outstanding compliance controls" extended to the Company's external call centers such as Simple Health, stating that the Company was "laser-focused on" and "facilitated our third-party distributors' compliance."  Moreover, Defendants repeatedly assured investors that HIIQ had "leading compliance" due to consumer complaints of "less than 0.01%" of policies in force.

35.    Throughout the Class Period, Defendants repeatedly touted HIIQ's "record" financial results due to third-party call center sales and continued to assure investors that HIIQ was "laser focused" on customer satisfaction and compliance, both internally and with respect to its network of call centers, including Simple Health.  In nearly twenty investor presentations, analyst conference calls, press releases, and securities filings during the Class Period, Defendants touted HIIQ's "best-in-class" and "market leading" compliance and customer service, as well as its "highly compliant" licensed agent call centers.  Defendants told investors

that HIIQ was "upholding the highest standards" in compliance and customer service, which was purportedly so strong that it was a "significant barrier to entry" to current and potential competitors.   Defendants highlighted the Company's purportedly "incredibly strong" and "market-leading" "control environment."

36.     Defendants underscored to investors that "insurance is built on data" that is "objective and measurable," and "every data point indicates that our customer satisfaction is market-leading."  In particular, Defendants pointed to HIIQ's "incredibly low number of customer complaints," which was purportedly so low that it was "nearly impossible to improve" upon.  Defendants quantified the percentage of "HIIQ-specific" complaints that were "upheld" by the DOI as a percentage of policies in force in a given quarter—which, Defendants repeatedly stated, was "less than 0.01%" or "0.00%."

### B.     Unknown To Investors, HIIQ's Business Was Built On Consumer Fraud

37.     Defendants' Class Period representations obscured a shocking truth inside HIIQ:  Since at least 2013, HIIQ's most lucrative and important distributor, Simple Health, coordinated with HIIQ to boost HIIQ's financial performance through rampant consumer fraud.  Significantly, Defendants' fraudulent practices have been substantiated by various legal proceedings and regulatory investigations, including the FTC's civil enforcement, as well as in-depth third-party research reports and Lead Plaintiffs' independent investigation.

38.     Using classic boiler room tactics of fear, intimidation, misdirection, and outright lies, Simple Health deceptively sold HIIQ's short-term products and discount programs to consumers while falsely telling them that they were buying comprehensive health insurance offered by major national insurance carriers.  As the court-appointed Receiver for now-shuttered Simple Health summarized in April 2019, Simple Health was "*largely a classic*

*bait-and-switch scam whereby unwitting consumers are falsely led to believe that they are purchasing a Preferred Provider Organization medical insurance policy ('PPO') that is compliant with the Affordable Care Act ('ACA'), but in reality are sold limited benefit indemnity plans that are not compliant with the ACA*."[1]  As the Receiver succinctly stated, Simple Health's "*business was never legally viable* and cannot be viable in the future," as "*deception permeated the … entire business relationship with their customers*."

39.     Simple Health's basic fraud was to prey upon unsuspecting customers by convincing them HIIQ's products provided comprehensive health insurance that would cover preexisting medical conditions, prescription drug medications, primary and specialty care treatment, inpatient and emergency hospital care, surgical procedures, and medical and laboratory testing.  In reality, HIIQ's self-described "health insurance products" were far from comprehensive health insurance and did not provide consumers with the promised benefits.

40.     The fraud left HIIQ's and Simple Health's customers unknowingly bearing virtually all healthcare-related costs, including catastrophic medical bills.  Customers were shocked when, after accessing medical services based on the representations of HIIQ's and its call centers' sales agents that they had bought comprehensive health insurance, they were instead stuck with devastating medical bills that HIIQ's products did not cover.  Even customers who did not access major medical services faced serious consequences from the sales deception.  Customers bought HIIQ products in part because Simple Health told customers that by doing so they would avoid government penalties for not having ACA-compliant policies.  But because HIIQ products were not ACA-compliant, customers who bought the Company's policies were still penalized.

---

[1] Unless otherwise noted, all emphasis herein is added.

41.     A wealth of evidence, including internal HIIQ documents exposed in the ongoing FTC enforcement action and cross-corroborating statements by HIIQ's former employees, amply demonstrates that Defendants were at all times fully aware of Simple Health's deceptive practices.   Simply put, HIIQ knew of, enabled, financed, and directly participated in Simple Health's undisclosed and deceptive sales practices.

### 1.     Simple Health Was Critical To HIIQ's Financial Success

42.     During the Class Period, Simple Health was HIIQ's largest call center, with securities analysts calculating that Simple Health alone accounted for up to half of HIIQ's revenues.   The companies were extremely close.   Indeed, HIIQ developed the Simple Health distribution channel through which tens of thousands of consumers were defrauded.   As discussed below, HIIQ loaned Simple Health millions of dollars to fund its operations; trained Simple Health's sales agents; monitored Simple Health's sales calls; reviewed and edited the fraudulent scripts that Simple Health's telemarketers used to sell HIIQ's products; provided customer service to customers following those sales (including fielding tens of thousands of customer complaints); collected monthly premiums from those customers; administered and distributed the commissions and other proceeds of those sales; and directed Simple Health to use Defendants' online platform to quote and sell HIIQ products.

43.     The relationship between HIIQ and Simple Health was so close that HIIQ reported Simple Health as a related party in its SEC filings.   Under SEC regulations and Generally Accepted Accounting Principles ("GAAP"), and specifically FASB Accounting Standards Codification 850-10-20 ("ASC 850"), companies are required to disclose in their financial statements "related party transactions," including the nature of the relationship involved.   Under GAAP, designated something as a related party means that the reporting

entity "controls or can significantly influence the management or operating policies of the other to the extent that [it] might be prevented from fully pursuing its own interest."  ASC 850.

44.      HIIQ's strategic partnership with Simple Health was formed in March 2013, when the companies entered into a Management General Agent Agreement ("MGAA") and a Master Commission Advance Agreement ("MCAA").  These agreements, which were put in place only one month after HIIQ went public, financed Simple Health's business and authorized Simple Health to promote and sell various HIIQ-developed products.

45.      Pursuant to the MGAA, Simple Health agreed to exclusively sell HIIQ products.  HIIQ, in turn, directed and performed a variety of services for Simple Health.  HIIQ processed customer enrollment forms, collected millions of dollars in monthly payments from Simple Health customers, provided fulfilment documents to customers, and fielded customer service calls.  Under the MCAA, HIIQ also financed Simple Health's business by advancing commissions prior to Simple Health earning them.  In essence, the MCAA served as a revolving credit facility from HIIQ to Simple Health whereby HIIQ repaid itself by withholding payments on future Simple Health commissions.  As collateral, Simple Health granted HIIQ a security interest in Simple Health's assets, including future commissions and accounts receivable.  Simple Health's principals, including Dorfman, also provided HIIQ with personal guarantees.  HIIQ exercised a high amount of control over Simple Health pursuant to the MCAA.  For example, if in any given month Simple Health did not generate enough revenue in order to offset the advanced commissions from HIIQ, HIIQ had unilateral power to suspend all commission advances unless Simple Health paid the full amount within five days of HIIQ's demand.

46.      Simple Health, fueled by its financing arrangement and close coordination of

operations with HIIQ, rapidly grew from a small call center a few hours away from HIIQ's headquarters in Tampa, Florida, to a large operator of call centers across the State of Florida. By 2015, Simple Health was responsible for almost all of HIIQ's limited benefit indemnity policy sales.  And without HIIQ's support, Simple Health would not have been able to operate.

47.     By the start of the Class Period, HIIQ's profits from Simple Health's sales (and thus HIIQ's payments of commissions to Simple Health) were rising rapidly.  For example, HIIQ's wholly-owned subsidiary, HPIH, paid Simple Health ***$145 million*** in cash commissions from January 2016 to April 2018, as revealed in court filings in the FTC enforcement action.  This ***$145 million*** represented a staggering ***49%*** of the $294.2 million in total third-party commissions that HIIQ's SEC filings state the Company paid out during this approximate timeframe.  Thus, as securities analysts at Aurelius Value later determined, Simple Health's sale of HIIQ products "was responsible for ***roughly half*** of HIIQ's sales." *See* ¶130, *infra*.



**Source: Declaration of Emil George, FTC Forensic Accountant**

48.     HIIQ's executives also had close personal relationships with Dorfman.  For example, according to Simple Health co-founder Matthew Spiewak ("Spiewak"), both Amy Brady, HIIQ's Vice President of Sales, and Gary Raeckers, HIIQ's Chief Operations Officer, attended Dorfman's wedding in March 2018.  Given their personal relationships with Dorfman and the importance of Simple Health's business to HIIQ, the Company's executives refused to cut ties with Dorfman even though Dorfman had violent tendencies and affiliations with gang members.  According to Spiewak, Dorfman "associated with known violent gang members and provided them cash when they needed it."  Dorfman "used his affiliation with those gang members to threaten [Spiewak] and other [Simple Health] employees."  Spiewak asserts that Dorfman "had an extreme temper and entered into violent fits of rage, especially when he could not have his way with the business or business operations."  Dorfman additionally used threats of physical violence against Spiewak and his father (who co-founded Simple Health with Spiewak) to "have his way with corporate assets and control."  Spiewak has accused Dorfman of "text[ing] threats of physical violence" to Spiewak, "either directly or by gang members," and that Dorfman's threats caused Spiewak to become "fearful for his own life."

## 2.     HIIQ And Simple Health Teamed Up To Deceive Consumers

49.     Both before and during the Class Period, HIIQ and Simple Health worked together to lure vulnerable consumers in search of comprehensive health insurance into purchasing HIIQ's limited medical benefit and discount plans.  These deliberate and coordinated deceptive sales practices, through which HIIQ and Simple Health each reaped millions of dollars, included creating and financing misleading "lead generation" websites, recruiting and training Simple Health's salespeople to sell HIIQ's "health insurance products,"

and implementing the fraudulent sales practices through misleading sales scripts and classic telemarketing scams.

50.     Simple Health's deceptive sales process began with a series of misleading "lead generation" websites.  Some of these websites were owned, in whole or in part, by HIIQ or its authorized sales agents.   In other instances, HIIQ or its authorized sales agents paid lead generators for leads generated through third-party sites.  The websites used various deceptive methods to lure to HIIQ's products customers who were searching for comprehensive health insurance plans, including government-sponsored policies like those offered under the ACA. For example, Simple Health paid search engines to direct consumers searching for ACA-compliant plans—using terms associated with the ACA, such as "Obamacare," "Obama Health Care," "Obama Insurance," "Obama Care Insurance," and "Obamacare Marketplace"—toward one or more of Simple Health's approximately 130 lead generation websites.  The names of the lead generation websites—such as "www.myobamacareapplication.com," "www.Obamacare-plans.com," "www.Obamacare-healthquotes.com," "www.official-plans.com"—were also designed to mislead consumers into believing they were shopping for ACA-compliant policies.

51.     Beyond their web addresses and names, the lead generation websites themselves misled investors in a variety of additional ways.  For example, Simple Health's main website falsely claimed that its "one objective" was to "help consumers through the complexities of the Affordable Care Act."  Simple Health's lead generation websites also featured logos of large, well-known insurance carriers like Blue Cross, Anthem Blue, Blue Shield, Aetna and Cigna, which further implied the sale of reliable and comprehensive health insurance.  However, Simple Health's HIIQ products were not ACA-compliant and had no

affiliation with Blue Cross, Blue Shield, and many other of these large insurance carriers.

52.     Simple Health also used the ACA as an employee recruitment tool, shamelessly promising in cartoonish help-wanted ads that prospective salespeople "WILL HAVE MONEY THROWN AT YOU" during "open enrollment."   As set forth below, Simple Health's job posting for sales agents stated, beneath an image of a cigar-smoking man in a top hat tossing a wad of cash into the air, "[i]f you are not making money hand over first [sic] this open enrollment you are not making the most of your time left on this earth.  Well guess what … here is your golden opportunity to MAKE THAT MONEY!"



53.     HIIQ worked directly with Simple Health to create misleading and deceptive

lead generation websites.  For example, in October 2013, HIIQ and Simple Health formed a company known as "SIL" to generate "sales leads" for customers to buy HIIQ products.  The operating agreement for SIL listed Defendant Hershberger as HIIQ's contact person.  HIIQ and Simple Health each owned 50% of SIL until 2015, when HIIQ sold its interest to Simple Health.  HIIQ made multiple capital contributions to SIL.  As with other Simple Health lead generation websites described above, SIL targeted consumers to prey upon by paying millions of dollars to internet search engines, including Google, to direct users to SIL's lead generation websites or display Simple Health advertisements when users searched for keywords (or "AdWords") associated with traditional health insurance or the ACA, such as "Obama Care," "Obamacare Texas," "Obama Health Care," "Obama Insurance," "Obama Care Insurance," "individual health insurance plan," and "Blue Cross Blue Shield."  SIL paid millions of dollars for these advertisements even though HIIQ did not distribute products that were compliant with the ACA.  These efforts to deceive consumers paid off, as SIL's deceptive advertisements led to nearly 850,000 clicks and 230,000 inbound telephone calls.

54.    Significantly, HIIQ was not only involved in creating the lead generation websites that funneled potential customers to Simple Health, but was also involved in finding the salespeople to staff Simple Health's boiler rooms.  As explained by Confidential Witness 1 ("CW 1"),[2] Gerod Vernon, Amy Brady, and Casey, who were all employees of HIIQ, recruited

---

[2] Former HIIQ employees are referred to herein as Confidential Witness "CW __" and are referenced in the feminine form to protect their confidentiality.

agents for the call centers who sold HIIQ products nationwide.[3]  CW 2[4] similarly stated that the sales managers "Amy [Brady,] Jared [sic] Vernon and Casey" were responsible for identifying the third-party call centers.  CW 1 stated that HIIQ's representatives, including Vernon and Casey, were traveling "all the time" to train call centers' salespeople.

55.    CW 3[5] described how Simple Health would sell HIIQ products, yet in so doing list HIIQ as the call center of record.  She stated that "it was explained to us … that HII[Q] had many DBAs and others working for them."  When a customer called regarding such a policy— which, she said, occurred about three or four times per day—CW 3 could see on the system that the policy had been sold by Simple Health yet listed HIIQ as the call center of record.

56.    Next, using contact information provided through the lead generation sites, HIIQ's authorized sales agents at Simple Health engaged in both outbound and inbound telemarketing with consumers.  The scale of the call centers' operations was enormous. According to the FTC, Simple Health's "boiler rooms" alone "handled over 62 million calls with consumers."

57.    HIIQ's sales agents at Simple Health provided their telemarketers with

---

[3] CW 1 was HIIQ's full-time licensing specialist from October 2017 until March 2018.  She reported to Wilma Orozco, who reported to Dan Garavuso, HIIQ's Vice President of Compliance.  Her responsibilities included reviewing sales agent contracts and licenses.

[4] CW 2 was employed at HIIQ on two separate occasions.  From 2015 through the end of 2016, she worked in HIIQ's Customer Service department.  From 2017 until March 2019, she worked first as a customer service representative, responding to emails from customers requesting changes or refunds, and then as an Administrative Assistant to Susan Adcock, HIIQ's Customer Service Supervisor.  CW 2 worked full-time out of HIIQ's North Florida Avenue office.  In her customer service roles, she worked mostly on escalation issues.

[5] CW 3 was a Customer Service representative at HIIQ's Tampa, Florida office from October 2015 to April 2016.  In that role, she directly fielded customer complaints, and worked alongside 30-40 other people in the Customer Service department.  She reported to HIIQ's Call Center Director, Heidi Hanstein.

carefully crafted scripts that were reviewed and edited by HIIQ and designed to mislead consumers into believing they were being offered ACA-compliant insurance.  Telemarketers were directed to follow the misleading sales scripts exactly.  Simple Health's policies provided that any deviation from the scripts could be grounds for termination.

58.     In calls with consumers, Simple Health's sales representatives stated that for a modest one-time enrollment fee ranging from approximately $60 to $175 and a monthly payment ranging from approximately $40 to $700, the consumer could receive a "PPO" health insurance plan. Telemarketers would tell consumers that, like comprehensive health insurance, HIIQ's plans would cover preexisting medical conditions, prescription medications, hospitalization, lab work and access to primary care physicians, specialists, and other healthcare providers for a nominal copayment.  HIIQ's authorized telemarketers often referred to the consumer's monthly payments as "premiums" and misleadingly used other established insurance terms in their sales pitches, such as "copay," "deductible," "preexisting condition," and "coverage"—even though such terms had no relevance whatsoever to HIIQ's limited benefit plans and discount medical plans.

59.     HIIQ's authorized sales agents employed a variety of other deceptive sales practices in calls with potential consumers.  For example, their telemarketers falsely represented to consumers that HIIQ's purported "PPO" health insurance plan was widely accepted by physicians in the consumers' geographic area, and the vast majority of doctors nationwide.  The telemarketers also would falsely state that HIIQ's purported "PPO" health insurance plan was a qualified health plan under the ACA.  If consumers asked for written information about HIIQ's plan before agreeing to buy it, the telemarketers would often refuse, claiming that they were either incapable or prohibited from doing so.  Additionally, the

telemarketers often falsely claimed to consumers that a given HIIQ "PPO" health insurance plan was at least as good as comprehensive health insurance because it offered comparable coverage at a lower price, and with no deductibles.

60.     Contrary to the false and misleading telemarketer scripts, HIIQ's plans were not PPOs. The plans had no "preferred" network of providers with favorable co-insurance or copays that apply toward a deductible. HIIQ, Simple Health, and additional authorized sales agents were selling limited benefit indemnity plans and discount medical plans that, unlike PPOs, provided for certain preset discounts only. The networks of health care providers that had signed up to participate in HIIQ's limited benefit indemnity plans and discount plans did not agree to provide plan "members" with insurance, did not administer the plans, and did not pay claims to doctors or providers within the network. The plans merely provided a discount, the level of which was not even known to the consumer prior to receiving care, which made it impossible for the consumer to make informed choices about her or his medical care.

61.     Continuing to follow the carefully crafted sales scripts, the telemarketers collected personal information from potential customers and pretended that they were searching for health plans that were custom suited to the consumers. For example, the sales scripts instructed agents to say "Ok, I know exactly what you're looking for," and "I am going to submit your application" and "search" for the best plan.

62.     Agents were told to falsely caution customers that they might not be approved for the recommended plan even though they were certain to be "approved" for the HIIQ plans. Pursuant to a paragraph in a sales script entitled "***Fear of God***," agents were instructed to warn consumers that "most insurance companies are VERY DISCRIMINATORY against pre-existing health conditions" and "I may not be able to get you approved for anything right now."

The script concealed that, no matter what their circumstances, consumers would be offered a limited benefit indemnity plan from HIIQ that would all but certainly be approved, and that for the first 12 months of the policy, preexisting conditions were not covered.

63.     The sales scripts then instructed agents to place the consumer on a brief hold, in order to pretend that the agents were searching for different options.  The scripts told agents to tell consumers that after the hold "we'll go over all of your options, if there are any, and make sure we find you the best plan for the best price."  But the agents were not searching for different insurance options.  Instead, the agent was simply stalling to give the appearance that she or he was deliberating between various plans.  Notably, the FTC, in its investigation of Simple Health, recorded sales agents chatting with one another socially while the customer was on hold.

64.     Once the artificial hold was lifted, Simple Health's scripts instructed agents to congratulate customers on their approval.  Agents told customers that "I have some great news for you!  Based upon your application, I was able to get you approved …."  After giving congratulations, agents were told to represent to customers that the approval was by an "'A Rated' carrier and a PPO," ensuring that "you can choose your own doctors and hospitals, and you don't need a referral to see a specialist."  The script continued, "[n]ow, you can go to any doctor in the country" and "your insurance can be used at virtually ANY inpatient, or outpatient facility in the NATION."  These statements were false.  As discussed above, HIIQ's limited benefit indemnity plans and discount medical plans were not accepted by virtually every doctor in the country, nor were they accepted in most facilities.  Nor were they comprehensive medical insurance or a "PPO" from an "A Rated carrier."

65.     Simple Health's script also packaged dental and vision coverage in the

consumer's plan, seemingly without any additional charge.  The script also went on to include "additional insurance benefits" in the consumer's package, such as accidental death and dismemberment ("AD&D") and accidental medical expense ("AME") plans, again, purportedly without any additional cost.  In truth, consumers were charged significant fees and premiums for this "included" coverage.

66.     Once consumers were "approved" for HIIQ's purported "PPO" health insurance plan, HIIQ's authorized sales agents arranged for payment by credit card or debit card, including via HIIQ's web-based payment platform.  According to HIIQ's 2018 Annual Report on Form 10-K, the Company's sales agents, including Simple Health, used HIIQ's web-based platform to make payment and complete the enrollment process, taking "credit card and Automated Clearing House ('ACH') payments directly from members at the time of sale."

67.     After taking consumers' payment information via HIIQ's web-based platform, telemarketers transferred consumers to a different employee to guide consumers through the "post close" portion of the script.  The post-close script was designed to dull the customer to the ensuing "verification" process.  The "verification" process contained some truthful statements about the HIIQ products that consumers were purchasing, but, before transferring consumers to "verification," the telemarketers often instructed them to disregard any statements in the "verification" process that indicated that comprehensive health insurance would not be provided.

68.     The post-close script also instructed telemarketers to mislead customers into believing that there were no limitations on coverage for preexisting conditions and pressured customers into accepting the verification or being forced to start the process anew.  During verification, consumers were asked to confirm a series of complex, lengthy statements that

were either read by the verification employee or transmitted directly to the consumer by email or text message.  Immediately before telemarketers transferred consumers from the post-close phase to verification, they stressed to consumers that they should remain silent and withhold any questions until after the verification process was complete.  As a result, consumers would feel pressure to agree with all of the verification statements, even if they conflicted with representations made by the sales representative or if the consumers do not understand or actually agree with them.

69.    If a question was asked, the verification agent would simply turn off the recording before responding.  Here, yet another layer of deception was baked into the misleading sales scripts.  Agents used "verification rebuttal" scripts to provide different and conflicting responses to customers' questions depending on whether the verification was on the record, or off the record.  For example, Simple Health maintained an "on recording" rebuttal script describing HIIQ's limited benefit indemnity plan as "not health insurance," and a corresponding "off recording" rebuttal script that stated precisely the opposite, *i.e.*, "this is health insurance."  By proceeding in this fashion, the sales agents could obtain "clean" recordings of a verification script (*i.e.*, that were inconsistent with what the customer had just been read in the sales script and post-close script) even though, off the record, the sales agents were blatantly lying to the customers about the products they were selling.

### 3.    Former Employees And HIIQ's Own Internal Documents Establish That HIIQ Received Thousands Of Complaints Each Year About Simple Health

70.    Both before and during the Class Period, HIIQ regularly received thousands upon thousands of customer complaints that HIIQ's licensed call centers, including Simple Health, were misrepresenting the nature and material terms of HIIQ's products.   HIIQ

developed an elaborate scheme to prevent customers from complaining, but, faced with the torrent of complaints, was ultimately forced to refund thousands of customers' payments due to sales agent misrepresentations.

71.    HIIQ engaged in deceptive practices to artificially suppress customer complaints.  As CW 4[6] explained, HIIQ instructed Customer Service personnel not to email customers their policy terms when the customers asked for them to be emailed.  "They only sent it via mail or fax," CW 4 stated.  She confirmed that she thought HIIQ was using mail to avoid an email trail, and stated that "[e]verything else besides the policies, they would email to the members."

72.    If customers did succeed in ultimately learning the true terms of their policies— whether by discovering that they were stuck with massive medical bills, or by reviewing the policy terms—HIIQ attempted to rebuff customers by denying their requests for refunds as a matter of Company policy.  As CW 5[7] stated, many HIIQ customers would first complain about broker misrepresentations to the HIIQ broker that sold them the policies.  However, according to CW 5, "[n]ine times out of ten [the customer] would get the runaround" from the broker and "[t]he broker wouldn't refund money to the members they had deceived."  "The members would call the agents and the agents wouldn't return their calls or they would tell them 'Sorry, you signed it, you can't get your money back.'"  CW 5 clarified that one time out of ten the broker would say they would cancel the policy, but they would not.

---

[6] CW 4 was an Insurance Support Specialist at HIIQ from February 2017 through June 2017. In that role, she directly received email complaints from customers who sought to cancel their HIIQ policies.  She reported to Call Center Director Heidi Hanstein.

[7] CW 5 worked in HIIQ's Escalations department from March 2018 until March 2019.  She was directly responsible for fielding customer complaints.  She reported to Theresa Mills Snyder, who reported to Brian Gamlen.

73.     As CW 5 explained, a certain percentage of the still dissatisfied customers would then complain to HIIQ by calling the Company's Customer Service telephone number. Inbound customer complaints to HIIQ were first routed to the Company's Customer Service call center in the Philippines.[8]  CW 3 explained that the HIIQ representatives in the Philippines were not licensed, so for any customer who wanted to make changes to their policy or cancel their policy, they had to then be transferred to the representatives in HIIQ's offices in Florida. CW 5 confirmed representatives in the Philippines could not make certain changes to customer policies and explained that transferred customers first went to HIIQ's Retention department, and Escalations saw only a percentage of the complaints.

74.     The number of people who nonetheless succeeded in reaching HIIQ's headquarters and lodging complaints with the Customer Service or Escalations was still extraordinarily high.  The complaints about call center misrepresentations were pervasive and widely known inside HIIQ.  For example, CW 3 stated that she learned early on while working at HIIQ that "[p]eople were being misled.  I realized that the brokers and sales representatives would lie."  She specified that 60% of the calls she received each day regarded "***gross misrepresentation or cancellation calls***" due to customers not understanding the policies, and the other representatives had the same volume of such calls.  As she stated, "[t]hese policies don't cover pretty much anything.  You go to the ER, you pay thousands.  These people were paying hundreds a month for insurance and then only getting $750 covered [of the ER visit]. ***It was very obvious that the brokers and sales representatives were not being forthcoming***"

---

[8] CW 3 noted that HIIQ opened its customer service call center in the Philippines at the end of 2015 because there was an increase in complaints, as "a lot of th[e policies] were sold under the guise that they were ACA-compliant, when they're not."  She noted that the "call volume was so huge—up to 90-minute waits."

so that "[m]ore often than not, people were not aware what they were purchasing." She added, "*[p]retty much anytime someone complained about a policy—90% of the time—it was a misrepresentation*." CW 3 stated that "it kind of wears on… your conscience when the company you work for and its partners are *trying to do everything in their power to destroy the customers* you are trying to support."

75.     CW 4 agreed that customer complaints about misrepresentations by brokers were "*endemic*" and "*rampant*" at HIIQ. CW 5 stated that such complaints were "absolutely" "endemic" and "rampant" at HIIQ, and pointed to weekly reports that HIIQ management received compiling the extensive complaints (*see* ¶99, *infra*). CW 5 stated that the customer complaints about misrepresentations by brokers were still endemic after Simple Health was shut down in 2018 because "*other agents … were doing the same thing*."

76.     CW 6[9] similarly stated that it was "early on" during her employment at HIIQ— in approximately the first month—that she realized there was a problem with policies being sold by Simple Health. "A lot of the time [customers] were being told they were major medical policies when they were not. A lot of them would call and express their feeling that they had been misled," she added. CW 6 added that "I wasn't happy having to deal with these customers who were pretty much *being taken advantage of a lot of the time and with Simple Health all of the time*."

77.     CW 3 explained that most calls she received from customers were about misrepresentations, and that "not only were [customers] being told they had major medical, the [HIIQ policies] were also not ACA-compliant, so [customers were] hit with a penalty." She

---

[9] CW 6 worked as a Customer Service Specialist in HIIQ's Customer Service department from February 2015 until March 2018. In that role, she handled customers' issues directly by phone as well as through email correspondence.

specified that "a lot of the [customer complaint] calls came in during tax time when [customers] were waiting for their [tax form related to insurance coverage]." The call centers lied by promising customers they would not be penalized by the government, and "were especially predatory on people that never had to buy insurance, or on people with families." CW 2 similarly stated that HIIQ customers told her that sales agents had lied to them, telling them that "they were associated with Blue Cross Blue Shield or Aetna, when they weren't."

78.   HIIQ consistently received the same complaints over and over again from customers about HIIQ's brokers misrepresenting HIIQ's products. As CW 5 stated, customers would say "[t]hey told me it was full medical, or they told me I could cancel in thirty days," when in fact customers only had ten days to cancel the HIIQ policies. Customers complained that brokers told them "[i]t's a full-coverage policy; ignore the disclaimers," and that they were getting the same coverage they would get under the ACA. CW 5 explained that this conduct occurred throughout her employment with HIIQ. CW 5 believed that sales agents could be characterized as "abusive." CW 4 similarly explained that she received numerous complaints from customers who believed they were getting a major PPO plan due to broker misrepresentations, with "the majority" of customers dissatisfied. As CW 4 explained, customers would call for refunds when they "would find out that it was absolute crap; it wasn't actually covering anything." CW 4 added, "I would never buy [HIIQ's] policies—***they were useless. It seemed like people were paying for nothing***." CW 4 agreed that the Company was a "***scam***" and that it was important for the public to learn the truth about how HIIQ treated customers: "It means a lot to me [to reveal the truth about HIIQ]. I don't want them to be treating other people poorly." Asked if she would buy any of the health insurance products that HIIQ sold, CW 3 similarly replied, "***God no***." CW 1 confirmed that she, too, would not

31

buy health insurance from HIIQ.

79.     Most of the complaints about HIIQ and its brokers misrepresenting what they were selling were complaints about Simple Health.   CW 5 stated that "80-90%" of the complaints she handled consistently concerned "the same agents," *i.e.*, the same brokers, and noted that Simple Health and Assurance IQ, Inc. ("Assurance IQ") were a particularly bountiful source of complaints.   CW 5 recounted how "[y]ou get to the point where you get so many calls everyday.   They're the same agencies over and over again."   CW 2 noted that the majority of the complaints were about Simple Health, and CW 6 estimated that Simple Health was responsible for 80-85% of all the complaints that HIIQ received.   CW 4 stated that while the customer complaints about not receiving what they thought they had bought "was a widespread problem," the "main one [she] dealt with was Simple Health."   CW 7[10] singled out HBO and Simple Health as the two brokerages she was especially concerned about.

80.     The rampant misrepresentations by Simple Health agents were so well known at HIIQ that, according to CW 1, HIIQ had a special policy of secondary screening of former

---

[10] CW 7 joined HIIQ in 2013 and worked as a Chargeback Specialist until February 2017.  In that role, CW 7 was tasked with preventing dissatisfied customers from clawing back money that they had already paid to HIIQ through their banks or credit cards.  In February 2017, CW 7 became a Compliance Escalations Specialist.  In that role, she spoke directly with customers who were unhappy with the HIIQ products that they had purchased.  It was in this role when CW 7's "knowledge broadened" regarding why she had fielded so many chargeback requests as a Chargeback Specialist, because customers discovered that the policies they thought they had bought had very little to do with the policies they had actually bought.  CW 7 resigned from HIIQ because of what she perceived as greed and wrongdoing by HIIQ and Simple Health.  "The policies that were being sold to them [the customers] were garbage -- literally garbage.  That is why I resigned.  I could not take it anymore," she said.  CW 7 stated that in her exit interview, she told HIIQ's Head of Human Resources that the Company would be destroyed if it did not stop working with Simple Health and its record of pushing customers to buy policies that did not cover what the customers believed they covered.   "In the exit interview, I told [HIIQ's Head of Human Resources] that they needed to get rid of those companies in particular, because it was not going to end well for [HIIQ] otherwise."

Simple Health sales agents who wished to sell HIIQ policies for a different broker.  CW 5 explained that when Simple Health became the subject of scrutiny, *HIIQ management "told us, 'we're going to have to pay a lot of money.  Just keep your mouth shut.  Say you didn't know anything about Simple Health*.'"

81.    The misrepresentations by HIIQ's brokers were not limited to Simple Health.  CW 3 confirmed that misrepresentations were a problem with all of HIIQ's brokers, and she could not recall any good brokers.  CW 5 stated that there were other HIIQ agents besides Simple Health that were problematic, including Assurance IQ and Health Benefits Group, and that when she started at HIIQ in March 2018, she was told that the majority of the calls she would be dealing with were going to be for Simple Health, Assurance IQ, "and brokers like that."  She estimated that about 80% of the calls she received in Escalations concerned between three to five of the agencies HIIQ used.[11]

82.    HIIQ representatives were trained to rebuff customer requests for cancellation as a matter of company policy.  For instance, CW 2 stated that she was instructed that she should not agree with customers when they made complaints over the phone.  CW 5 stated that, the entire time she worked at HIIQ, when disgruntled customers would call HIIQ, "our job would be to try to *not give them their money back*."  CW 7 stated that HIIQ's approach was to "*blam[e] the customers who are being taken advantage of*" and "not do[] anything about it because [HIIQ] care[d] more about the money than … about people's lives."  CW 7

---

[11] CW 3 noted that she received complaints about Agile Health's representatives making misrepresentations about the policies, and that she was directed to pass those calls directly to Agile Health for them to handle.  CW 3 added that Agile Health employees were in the back corner of the Customer Service office when she started working at HIIQ, and "we were told to just leave them alone."  CW 3 noted that sales agents working directly for HIIQ were also seated near her.

said that the motive behind such behavior was "greed."  CW 3 similarly stated that the "***blame was always placed on the customers for not understanding***" even though the agents "scare[d] people using the law dealing with tax obligations" and were "***very predatory***."  As CW 6 put it, "[w]hen there is a lot of money to be made a lot of people change their belief system."

83.     Given the high volume of requests for refunds, HIIQ was forced to issue refunds to many customers who had learned the truth about the policies.  As CW 4 explained, "[i]t got to the point where they had a lot of refunds all the time" and "there were a lot of refunds going out."  "Charge backs" were a problem, she stated.  "People bought the insurance, then realized it was bullshit, so they went to their bank and said 'don't pay them.'"  HIIQ tried to avoid chargebacks.  CW 7, who began her employment at HIIQ handling chargeback requests, estimated that in her first year alone she saved HIIQ $730,000 by disputing chargebacks on HIIQ's behalf.  HIIQ managed to send its stock price so high, CW 7 stated, "because they treated their employees like crap and they treated their members [*i.e.*, customers] like crap."  CW 3 similarly stated that HIIQ "***prioritized profits over compliance***."

84.     Significantly, HIIQ's internal documentation, Simple Health's internal data, and the statements of HIIQ's former employees all cross-corroborate the fact that HIIQ experienced a very high volume of customer complaints about HIIQ's brokers misrepresenting HIIQ products during the Class Period.

85.     For example, CW 4 explained that she received approximately 30 email complaints per day in which customers complained that the policies were not what they thought they had bought.  CW 4 stated that seven additional representatives worked alongside her in "Customer Service," and it was her understanding that they each received the same quantity of such complaints on a daily basis.

86.     CW 5, who worked in Escalations, noted that the complaints handled by Escalations were just a fraction of the customer complaints made in a given day to HIIQ, as customer complaints also went to the separate areas of "Retention," "Claims," and "Customer Service."   CW 5 stated that there were, depending on the day, three to four people on her Escalations team who each handled on "average ten to twenty tickets apiece per rep per day" dealing with agents misrepresenting HIIQ's policies when selling them.

87.     Based on CW 4's statement that eight people in Customer Service each received about 30 such complaints per day, and based on CW 5's statement that there were three to four Escalations representatives fielding on average 10-20 customer complaints per day regarding agent misrepresentation, HIIQ's Customer Service department received approximately 1,200 complaints per week regarding agent misrepresentations, or 60,000 per year (assuming a 50-week work year), and HIIQ's Escalations department received approximately 30-80 such complaints per week regarding agent misrepresentations, or 1,500-4,000 per year (assuming a 50-week work year).

88.     HIIQ's internal data, which it provided to the FTC as part of the FTC's enforcement action, corroborates these accounts and shows that HIIQ received thousands of complaints specifically about Simple Health agent misrepresentations during the Class Period. HIIQ stated that in 2017, for example, customer complaints concerning Simple Health resulted in approximately 2,335 "escalations" at HIIQ.   Of these, 1,880, or more than 80%, regarded misrepresentations by Simple Health's sales agents.   HIIQ's pre-Class Period data also showed similarly high numbers of customer complaints about Simple Health misrepresenting HIIQ's products.   Between 2014 and 2016, customer complaints about Simple Health resulted in approximately 2,250 "escalations" at HIIQ.   As with the complaints to HIIQ about Simple

Health in 2017 and 2018, the vast majority of complaints between 2014 and 2016 concerned misrepresentations by Simple Health's sales agents.

89.     The overwhelming complaints about Simple Health's deceptive sales practices continued in 2018.  According to an internal Simple Health presentation, *__HIIQ flagged over 2,000 escalations from customers concerning Simple Health in the six-month period between January 1, 2018 and June 27, 2018__*.  Most of these escalations were "labeled as [a]gent [m]isrep."  In addition to complaints forwarded by HIIQ, Simple Health received 2,000 to 3,000 Customer Service calls a day, virtually all of which were complaints from consumers that they were misled about the benefits they would receive from the HIIQ products.

90.     Given the rampant complaints about sales misrepresentations at HIIQ, CW 5 exclaimed regarding HIIQ's statements during the Class Period that it had a 0.01% rate of complaints being "upheld" by the Department of Insurance: "*__Oh my God, that's a bold-faced lie__*."  CW 3 stated that HIIQ's citation of the "0.01%" rate was "*__[c]ompletely asinine.  They were obviously not in compliance__* …."  CW 3 added that HIIQ's claim that it had "best-in-class compliance" was "*__[v]ery wrong__*" and CW 5 agreed that it was "*__absurd__*."

91.     Moreover, as explained by Robert M. Willis, a former Commissioner of the Department of Insurance, Securities and Banking (DISB) for the District of Columbia with over forty years of experience in the insurance industry, HIIQ's representations regarding the purported rate of customer complaints "upheld" by the DOIs is false on its face and highly misleading for two additional reasons.

92.     First, the former Insurance Commissioner explained that "*__DOIs do not 'uphold' consumer complaints__*."  Instead, the DOIs review consumer complaints with two goals in mind: (1) to determine whether an insurer has violated any contractual rights of the

consumer; and (2) to determine if the complaint is related to a pattern or practice of complaints filed against the same company in other states.  In each of these regulatory practices, the former Insurance Commissioner emphasized, "*the DOI does not administratively uphold a complaint for the consumer, or for or against a company.  In cases where a consumer complaint is found to be unsubstantiated or baseless, the DOI does not make a formal administrative decision*."

93.     Moreover, as a former Insurance Commissioner who supervised staff responsible for resolving consumer complaints, Mr. Willis described multiple instances where staff recommended corrective actions to address a consumer complaint, and, in the majority of cases, "the company complied with the proposed corrective action to avoid a formal administrative action that could result in suspension or revocation of its license."

94.     Second, Mr. Willis explained that based on his forty years of experience in the field, including as a former Insurance Commissioner, senior manager with a major national insurer, member of the board of directors of both a life insurer and a health insurer, insurance consultant and lobbyist, and insurance law practitioner, the vast majority of consumers do not even know that they can file a complaint with DOIs.  "In most instances," Mr. Willis stated, "if consumers have a complaint about an insurance product, they simply register their concerns with the agent who sold them the product."  A consumer complaint to the agent could result in a policy being cancelled without filing a complaint at a higher level, such as with the insurance carrier or regulatory authority.  "Moreover, due to the relatively small premium associated with limited benefit products," Mr. Willis added, "many consumers just suffer their loss and do not file a complaint with an insurer or DOI."  "In fact," Mr. Willis emphasized, "*most consumers are unaware they have the right to file a complaint with DOI*."

### 4.   HIIQ Closely Monitored And Documented
### The Intentional Deception Of Customers

95.     HIIQ kept extensive and comprehensive records of the complaints it received

regarding broker misrepresentations, including by Simple Health.

96.     First, the Company maintained a proprietary product, distribution, and customer

management platform known as Automated Real-Time Integrated E System or "A.R.I.E.S."

CW 8,[12] who built HIIQ's A.R.I.E.S. database, stated that everything was logged into

A.R.I.E.S., including compliance information and all information available on customer

retention and customer complaints.  CW 2 stated that while she worked in HIIQ Escalations,

she would receive emails from members complaining about their policy, identify the sales

agent involved, and then retrieve the relevant phone call, if it was available.  CW 2 said that

she would enter relevant information into A.R.I.E.S.  "Everything went into A.R.I.E.S.,"

including personal customer information and notes from previous representatives that the

customer might have spoken with.  CW 2 stated that when she got complaints about sales

agents, she would enter that information into A.R.I.E.S.  CW 6 similarly confirmed that

A.R.I.E.S. was HIIQ's main platform for processing all data, stating that "[w]hen a customer

would call in we would call up all their information from that system."  CW 6 stated that all

cancellation and refund requests would be processed using information from A.R.I.E.S.

97.     As CW 8 stated, "every phone call that comes in is recorded in A.R.I.E.S."

CW 1 similarly confirmed that HIIQ recorded all of its calls, and CW 5 also confirmed that all

---

[12] CW 8 was HIIQ's Senior Vice President of Quality Assurance from January 2009 until her
retirement in July 2018.  She was, and worked directly with, HIIQ's senior management,
including HIIQ founder Mike Kosloske and Defendant Southwell.  She stated that she helped
form Agile Health at its inception and "built" HIIQ's A.R.I.E.S. system along with "the
programmers" over a period of years.

of HIIQ's escalation calls were recorded.   CW 8 stated that HIIQ required its own sales personnel to record every customer call and upload every conversation to HIIQ servers on a daily basis.  A.R.I.E.S.' detailed data included a system of 30 different codes, each of which is assigned to each call to describe the reason for the call.  Management "can look at the actual numbers," she stated.  CW 5 pointed out that HIIQ kept its recorded calls "for several years on several different systems."

98.     CW 8 stated that A.R.I.E.S. enabled HIIQ to pull data that was then passed on to top management every single week.  "***Management got a report every week***," she said.  The Compliance department received its own report every week and then "***Compliance had to report every single week to top management***."  CW 8 stated that Southwell received this report and, indeed, the weekly reporting discipline was initiated by Southwell.  "Gavin started all of that" and "knows everything."  She explained that if one particular call center is generating an unusual number of complaints, HIIQ management will quickly see it, and that there are "averages" for the occurrence of different kinds of complaints, each with their own code, and HIIQ keeps an eye on the averages.

99.     CW 5 similarly explained that senior management reviewed compliance data through weekly reports from the Escalations department.  The reports told HIIQ's senior management "which agency we got the most complaints about, which ones we had to issue the most refunds."  CW 5 stated that Theresa Mills Snyder, who created the weekly reports, "absolutely" knew that brokers were deceiving HIIQ's members, and complained to CW 5 that Defendant Southwell and Brian Gamlen "know and they're not doing anything" about the reports.  Senior management "chose to ignore it—those complaints went nowhere."  CW 5 added that senior management knew about the problems with Simple Health because "they got

the reports every week."  CW 2 also personally informed Customer Service Supervisor Susan Adcock of customer complaints.

100.    CW 4 explained that there were also daily reports.  Every day she and her colleagues documented in a spreadsheet all of the customer complaints and sent it to their supervisor.  CW 6 similarly stated that she logged in an Excel spreadsheet every time that she made a customer refund, and the Excel spreadsheet was generated daily.  CW 4 noted that everything she did was documented in A.R.I.E.S. and in email.

101.    HIIQ was also aware of deceitful sales tactics by its brokers, including Simple Health, due to additional various monitoring mechanisms.  For example, CW 5 stated that, working in HIIQ's Escalations department, she was in contact with Simple Health's representatives and could ask for Simple Health's agents' sales call notes.

102.    CW 8 explained that Defendant Southwell was aware of the complaints against Simple Health, and that in early 2017, Southwell hired people to "pose[] as customers" and call the third-party agents to witness the agents' sales practices first-hand.  Dorfman was of special concern to HIIQ and HIIQ was "watching him very closely" because "he was very important" due to his "volume and value."  CW 6 similarly stated that in Spring 2017, HIIQ began grading Simple Health agents on their communications with customers.  As part of the grading, she and other HIIQ employees listened to recordings of numerous calls that Simple Health representatives had with Simple Health customers.  She explained that the calls were graded first based on whether the customer was "saved" or persuaded not to cancel HIIQ products.  But then they were graded additionally on whether the agent had been honest or dishonest in keeping the client on the books.

103.    CW 6 listened to and graded about ten or twelve of these calls every day.  Very

often, CW 6 said, the Simple Health agents were entirely dishonest.  Most commonly, she said,

they would falsely state that 70% or 80% of treatment and hospital visits would be covered by

the insurance company.  They would "let the customer believe that it was major medical" when

it was not. "They kept reiterating the 80/20 split.  That was dishonest. They were not 80/20 or

70/30 policies whatsoever."  CW 6 added that the Simple Health agents were "very creative"

in making it seem like the policies equated to just a 30 percent cost to the customer when that

was "nowhere near the truth."  Often, therefore, customers were "saved but with lies."  CW 6

pointed out that after listening to such conversations, HIIQ employees including CW 6 would

write up their reports on the calls and enter them in an Excel spreadsheet that was put on a hard

drive for more senior HIIQ employees to review.  Such reports included the false statements

made by Simple Health, pinpointing at what time in the recording the statements were made.

104.    CW 8 explained that by mid-2017, worries about Dorfman had set in at HIIQ.

The Company did not cut ties with Dorfman, CW 8 stated, "because of all the business we had

on the books, that we had done with him already," and "he also owed [HIIQ] money."  CW 9[13]

similarly stated HIIQ chose not to cut ties with Simple Health because the Company knew that

losing the Dorfman Entities would be a "significant financial hit" for HIIQ.  CW 9 pointed out

that she heard at least one year before the FTC shut down Simple Health that the Dorfman

Entities were engaged in non-compliant activity, and "*we knew what they were doing

marketing-wise [at Simple Health] was extremely illegal*."

---

[13] CW 9 was a Director of Senior Marketing at American Service Insurance Agency, an HIIQ
broker and a subsidiary of HIIQ, from 2014 until early 2018.  In early 2018, she transitioned
to the position of sales agent at the same company, where she remained until August 2018
when she left the company.

**5. HIIQ's Senior-Most Executives Internally Acknowledged Being "Bombarded" With Customer Complaints Due To Simple Health's "Widespread" and "Out of Control" Deception**

105. Recent revelations in the FTC's enforcement action have filled the public domain with an extensive record, which shows that HIIQ executives were fully aware of the deceptive sales practices and compliance failures at Simple Health.

106. Filings in the FTC action show that HIIQ conducted frequent "site visits" at Simple Health, where HIIQ was given access to Simple Health's files and able to personally inspect Simple Health's deceptive sales practices. *See* ¶¶140-44, *infra*. For example, and as the FTC explained, at Simple Health "written evaluations regularly documented examples of telemarketers deceptively assuring consumers that they would only pay relatively low fixed amounts (often falsely described as 'copays') for doctor visits, prescription medications, hospitalization, or other medical care, similar to a traditional comprehensive health insurance policy." Although Simple Health "regularly documented these transgressions, [Simple Health] typically allowed problem telemarketers to continue selling." By contrast, telemarketers who told the truth were fired for making statements such as "we're lying to people around here."

107. Extensive documentation filed by the FTC in its enforcement action details the sales scripts used by Simple Health—which, as explained above, Simple Health had drafted in concert with HIIQ. The FTC has noted that the scripts "***are replete with deceptive statements and high-pressure sales tactics***." These tactics included: "1) pretending that Defendants can provide the highest quality comprehensive health insurance plans and then scaring consumers into thinking they may not qualify for these plans; 2) 'legitimizing' Defendants' products by grossly misstating their benefits and coverage; and 3) 'omitting critical information about the products.'" The FTC additionally stated that "the intent of the scripts is unmistakable—to

leave consumers with the impression that they were purchasing comprehensive health insurance or its equivalent." And as the FTC has explained, "[s]cores of documents—including 'quality assurance' reports, Defendants' customer database, sales recordings, and internal communications" showed how, in addition to using misleading scripts, Simple Health's agents regularly used "***unsanctioned, outright falsehoods***" in selling HIIQ products to customers.

108.    As the FTC explained, Simple Health maintained extensive documentation of its misconduct, as it "maintained dozens of servers containing hundreds of thousands, possibly millions, of [its] recorded sales calls." Moreover, the FTC has filed publicly internal HIIQ emails showing that HIIQ executives were clearly well-aware of the "widespread" and "out of control" deceptive practices that they orchestrated.

109.    For example, on October 5, 2017, just ten days after the start of the Class Period, Christine Gillis ("Gillis"), Agency Compliance Manager at HIIQ, emailed Amy Brady and Dan Garavuso, HIIQ's Vice President of Compliance, detailing "***widespread***" misrepresentations by Simple Health. Specifically, the email stated: "***We still have inaccurate information being presented along with agents speaking to subjects they have no visibility on, namely claims processing procedure and status***." The email additionally documented how HIIQ knew that Simple Health sales agents were grossly distorting how much purported coverage the "insurance" they were selling provided. Alluding to Simple Health's practice of falsely telling customers that the "insurance" would cover 70% of claimed expenses, Gillis wrote that "[t]he communication of 70% has been a consistent challenge for Simple and, we know from experience, ***these communications result in escalations and complaints***." The Simple Health/HIIQ script dissuaded customers from calling the carrier and included the false

and misleading pitch of 70% coverage, stating "the PPO network will take your entire hospital bill, and re-price the bill up to the FIRST 70% off…. The whole idea of this plan is to make your out of pocket expenses as low as possible, without you EVER having to meet a deductible first."

110.    Another email dated October 5, 2017, from HIIQ Customer Service Supervisor Susan Adcock to Gillis and HIIQ's Vice President of Operations, Brian Gamlen—who was the third most senior employee and a member of HIIQ's senior management team along with Defendants Southwell and Hirschberger—described "*out of control*" deceptive practices at Simple Health, where sales agents were falsely representing which company they were working for ("telling [customers] they are ACI when giving benefit information") and Customer Service agents were "*getting bombarded with calls from members advising they are being told the benefits pay 70/30*." As the October 5, 2017 email summarized, "*the incorrect information being given by Simple Health to members is getting out of control….*" Another email, dated March 11, 2016, showed that HIIQ's executives were aware of "misleading" statements by Simple Health and showed that the Simple Health customer calls were assembled in HIIQ's own digital files.

111.    Recently revealed emails further show that, in the face of customer complaints, Simple Health falsified public reviews of itself. A September 18, 2017 email chain showed Steven Dorfman asking "who is working" on the fact that Simple Health was "still sitting with a D rating" with the Better Business Bureau ("BBB"). Shawn Gibson, Simple Health's Chief Operations Officer, responded that several employees and a "new reputation management company" were all working on "undo[ing] the D rating." Dorfman then responded by urging them to "*create[e] fake positive reviews*" to "help with the ratio" of positive reviews to

negative reviews.  Another email chain, dated May 8, 2018, confirms that Simple Health was "submitting 2 positive reviews each week."   According to Simple Health, there were "*countless complaints*."

112.   In addition to "creating fake positive reviews" to deceive the BBB, Simple Health also lied to the DOI to cover up its misconduct.  An April 19, 2016 email string revealed in the FTC's filing shows that Simple Health "change[d] the answer" it gave to the DOI regarding a complaint inquiry to obscure a "bad question and answer" given to a customer, in which Simple Health had told the customer that the product it was selling was "ObamaCare." A September 6, 2018 email revealed that Simple Health used a string of false and misleading representations to lie to potential customers about the products they were purchasing, complete with side-by-side comparisons of what the agents would say while the calls were being recorded, and then the misrepresentations they would make "off recording."  A script emailed on July 26, 2018 showed that Simple Health's sales tactics included trying to put the "*Fear of God*" in consumers.

113.   Now-public emails indicate that HIIQ had a role in Simple Health's intentional deception of the Better Business Bureau and government regulators.  An email dated August 9, 2017, from HIIQ's Chief Risk Officer, Nick Marley ("Marley"), to Simple Health's Chief Compliance Officer, Candida Girouard ("Girouard"), discussed Simple Health's lead generation website Trumpcarequotes.com, which Marley found "*misleading*."   Marley reminded Girouard that HIIQ was still helping Simple Health with the costs of government investigations, stating "*we're still covering the MT investigation costs for you (and others)*. We'll keep doing this (although will keep it under review) but at some point I'll give you an idea of the run rates so you can see why I'm keen to avoid new issues where ever possible."

114.    Now-public internal HIIQ emails also reveal that HIIQ was not only aware of Simple Health's rampant misconduct during the Class Period, but had been for years beforehand.    A March 12, 2016 email from Girouard to Dorfman stated that HIIQ's Compliance department was "secret shopping" Simple Health multiple times per day and Girouard "got [her] ass chewed for 4 hours by [HIIQ Compliance Manager Amy Brady] yesterday," whom Girouard had "never heard … curse so much."   Girouard stated, however, that despite HIIQ knowing of Simple Health's compliance failures at the time, HIIQ nonetheless authorized Simple Health to "post close however we want" with customers. Similarly, recently revealed documents show that as of March 2016, HIIQ was receiving Simple Health "escalated complaint" summaries.   In April 2016, Defendant Hershberger received an email stating that another troubled HIIQ broker, National Brokers of America, Inc. ("NBOA"), was found to be "misrepresenting plan benefits and more."

### 6.    The Deceptive Sale Of HIIQ's Products Caused Enormous Harm To Consumers

115.    The deceptive business practices designed and deployed by HIIQ and its network of authorized sales agents harmed tens of thousands of people throughout the United States.  These consumers paid significant enrollment fees and hefty monthly payments for what had been marketed as comprehensive health insurance.   In reality, consumers received relatively worthless limited benefit indemnity plans and discount plans that do not provide the insurance they were promised, and often cannot be used at all for healthcare services typically covered by health insurance.  Consumers frequently did not realize they were uninsured until after incurring substantial medical expenses which, contrary to the representations made by HIIQ and its authorized sales agents, were not covered by HIIQ's products.

116.    The FTC has recently revealed ample evidence of the great number of deceived

46

consumers, and several victims of Defendants' deceptive business practices have filed lawsuits against HIIQ.  As of the filing of this Complaint, no less than a half dozen consumer class action lawsuits have been filed against HIIQ and related parties asserting claims for damages as a result of the Company's deceptive business practices.  These complaints assert claims for, *inter alia*, violations of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), Florida's RICO Act, fraud, aiding and abetting fraud, conspiracy to commit fraud, aiding and abetting breaches of fiduciary duty, unjust enrichment, and violations of the Telephone Consumer Protection Act.

117.    For example, Elizabeth Belin is a named plaintiff in a consumer class action pending in the Southern District of Florida.  As detailed in the *Belin* complaint, Ms. Belin had been recently divorced, without insurance, and suffering from a preexisting knee injury in early 2016 when she began looking for ACA-compliant healthcare.  Ms. Belin found one of Simple Health's dozens of websites, which, as described in ¶¶50-51 above, had highly misleading names.  Simple Health's sales agent told Ms. Belin that he was shopping among numerous PPOs of "A-rated carriers," and would find the best one for Ms. Belin at the best price.  Reading from a script, the sales agent's misrepresentations and omissions led Ms. Belin to believe she was buying comprehensive medical insurance.  Instead, and unbeknownst to her at the time, she was charged for a limited benefit indemnity plan and medical discount plan, as well as AD&D insurance that she never requested.  She paid an enrollment fee of $150 and a monthly premium of $238.77.  Ms. Belin later had knee replacement surgery, only to learn that the surgery was not covered.  Ms. Belin was shocked to receive bills in excess of $48,000, which was more than her annual salary.

118.    Chris Mitchell is also a named plaintiff in the *Belin* class action.  An advocate

for the homeless, Mr. Mitchell's employer did not offer health insurance benefits.  Mr. Mitchell purchased a limited indemnity plan and medical discount plan from Simple Health in early 2016 after listening to a sales agent read from the sales script that Simple Health read to Belin and other class members.  Mitchell paid a $155 enrollment fee and a $206.90 monthly premium.  In early 2018, Mr. Mitchell was diagnosed with an aggressive form of cancer and was immediately scheduled for surgery.  Just days before that surgery, Mr. Mitchell's hospital told him that he had no insurance coverage.  Mr. Mitchell was surprised, and scrambled to come up with a down payment for the surgery, but ultimately received bills exceeding $40,000.  He described the difficulties caused by Simple Health and HIIQ as oftentimes more difficult than fighting cancer.

119.    Lead Plaintiffs' investigation has confirmed countless other instances of Americans being badly harmed by HIIQ and its call centers' deceptive practices.  For example, CW 6 recalled a particularly egregious case in which a mother had to pay for her 17-year-old son's brain surgery, then found out that the surgery was not at all covered by the HIIQ product she bought through Simple Health.  CW 6 was disgusted by the event, and still remembers the boy's name.  She added, "I am sure [the mother] had made [Simple Health] aware why she was buying the insurance and they sold it to her anyway," even though it did not cover surgeries of any kind.  "Simple Health had no business selling that policy to her…. It was useless…. I wasn't happy having to deal with these customers who were pretty much being taken advantage of a lot of the time and with Simple Health all of the time."

120.    "It was story after story," CW 7 similarly explained.  HIIQ customers "went to the hospital or they went to the ER" and discovered that the policies they thought they had bought had very little to do with the policies they had actually bought.  CW 7 recalled speaking

to grandmothers crying on the phone with her because they had taken their grandchildren to the doctor or to the ER, some with life-threatening conditions, only to discover that none of what they thought they had purchased in health coverage actually existed. She would hear people "cry and cry," she said. "It was horrible, it was horrible."

### C. The FTC Revealed That Simple Health Was A "Sham" But Defendants Continued To Mislead Investors While Reaping Millions of Dollars From Insider Stock Sales

121. Beginning in November 2018, the truth began to emerge through a series of partial disclosures. As the partial disclosures progressed, Defendants continued to make false and misleading statements concerning HIIQ's compliance, customer complaints, and the impact of revelations regarding Simple Health's deceptive sales practices on HIIQ's business.

### 1. The FTC Announced Its Extraordinary Enforcement Action And Shuttering Of Simple Health

122. On November 2, 2018, the FTC issued a press release announcing its enforcement action against Dorfman and Simple Health. The press release, entitled "***FTC Halts Purveyors of Sham Health Insurance Plans***," revealed that Simple Health, through its sales of HIIQ products, had "collected more than $100 million by preying on Americans in search of health insurance, selling these consumers worthless plans that left tens of thousands of people uninsured" and "st[icking consumers] with thousands of dollars in unpaid medical bills." The FTC explained that "consumers were misled into thinking they had purchased comprehensive health insurance, but when they needed to rely on that insurance, they learned they had none of the promised benefits."

123. The FTC's press release detailed Simple Health's "deceptive scheme." The FTC stated that Simple Health and the other Dorfman Entities had "falsely held themselves out as experts on and providers of government-sponsored health insurance policies." For

example, the FTC revealed how the Dorfman Entities used deceptive websites, such as those developed with HIIQ, to "lure" customers by "misleadingly featur[ing] the logos of the AARP or well-known insurance carriers, such as Blue Cross Blue Shield plans, when in fact the defendants were not affiliated with such entities." Next, customers were led to believe they purchased a PPO insurance plan that "was widely accepted by doctors in the consumers' geographical areas," while in reality the plan left them essentially "uninsured." The FTC further stated that "[o]n top of that, because the defendants' limited benefit plans and discount memberships do not qualify as health insurance under the Affordable Care Act, some people who enrolled were subject to a fee imposed on those who can afford health insurance, but choose not to buy it." The FTC asserted that these practices impacted "tens of thousands of consumers," and "[i]n the past three years alone, Defendants' scheme has generated over $100 million in revenue."

124. The FTC's press release further revealed that the agency had obtained a temporary restraining order ("TRO") freezing the Dorfman Entities' assets, appointing a Receiver to manage the seized assets, and halting any further selling of HIIQ products by the Dorfman Entities. The press release contained a weblink to the previously sealed TRO, signed by United States District Judge Darrin P. Gayles. In granting the TRO, Judge Gayles reviewed extensive evidence submitted by the FTC after a lengthy investigation and concluded that, "[a]s demonstrated by the consumer complaints and declarations, expert witness testimony, records of undercover purchases, corporate banking and payment processing records, as well as testimony from former employees, *the FTC has established a likelihood of success in showing that Defendants have made false and misleading statements in connection with the advertising, marketing, promoting, offering for sale, or sale of their limited benefit plans*

*and medical discount memberships*." The court held that there was good cause to believe that restraining and enjoining Simple Health was necessary to prevent "immediate and irreparable harm" to consumers:

> "There is good cause to believe that, in numerous instances, Defendants have sold limited benefit plans and medical discount memberships to consumers by *misrepresenting that such products are comprehensive health insurance*, or the equivalent of such insurance, or are qualified health insurance plans under the Patient Protection and Affordable Care Act ('ACA' or 'Affordable Care Act'), 42 U.S.C. § 18001, et seq. . . . *Defendants have, in numerous instances, falsely represented* that they are experts on, or providers of, government-sponsored health insurance policies, such as those offered pursuant to the ACA, and are affiliated with the Blue Cross Blue Shield Association or AARP."

125.   Newspapers and other publications immediately reported the news of the FTC's enforcement action. On November 2, 2018, the *South Florida Sun Sentinel* published an article entitled, "*Feds shut down Hollywood-based 'sham' health insurance marketer*." The article revealed prior allegations of the same misconduct by Simple Health, including "numerous complaints" made directly to Florida's Attorney General's Office that Simple Health misrepresented the coverage it was selling, and then "wouldn't mail policy information after withdrawing customers' money." The article also detailed several emails from customers defrauded by Simple Health. As one customer stated, "[t]he phone sales agents are very misleading. Several company names were given during our discussion. I really could not define what company I was dealing with." As another defrauded customer cogently stated, "[t]his outfit pretends to sell health insurance, but it's all a con." The customer implored the FTC to "prosecute this scam operation with all due speed." The article pointed out that all of the Dorfman Entities sued by the FTC were personally owned by Dorfman, and that the TRO had authorized the seizure of "more than $1 million from bank accounts controlled by the defendants, about $100,000 in jewelry, and three luxury cars including a Lamborghini, Range

Rover, and Rolls-Royce."

126.    Similarly, on Monday, November 5, 2018, *The New York Times* published an article entitled "***Federal Officials Shut Down Sales of 'Ruinous' Health Insurance Plans***." The article cited Judge Gayles's TRO and reported that "federal authorities have shut down a network of Florida companies that they say used aggressive, deceptive tactics to sell skimpy health insurance products that skirt requirements of the [ACA] and left tens of thousands of people around the country with unpaid medical bills."   The article further reported that the FTC's decision to take action against Simple Health was unanimous amongst the three Republicans and two Democrats on the trade commission.   The article noted that the FTC had learned about the unlawful "boiler room" sales practices from consumer complaints and undercover telephone calls made by FTC investigators, among other evidence.

127.    HIIQ's share price plunged in response to these revelations.   After closing at $50.74 on November 1, 2018, HIIQ's share price fell by 21.9% over the next two trading days, falling to $39.62 on November 5, 2018, wiping out over $160 million in market capitalization. On November 5, *Investor's Business Daily* published an article noting that HIIQ was the day's "biggest loser" on large-volume trading.

128.    In the wake of these revelations, HIIQ attempted to comfort investors by purporting to distance the Company from Simple Health and minimizing the importance of their relationship.   HIIQ immediately issued a press release on November 2, 2018, responding to the news of the FTC's enforcement action, which assured investors that "HIIQ maintains an active internal compliance team," "HIIQ closely monitors all sales of HIIQ products by each agency" selling its products, and,"[f]or 2018 to date, Simple Health was the agency of record for less than 10% of HIIQ's submitted policies."

129.     Securities analysts credited HIIQ's continued misrepresentations.  For example, Cantor Fitzgerald issued a November 4, 2018 report stating that while "[w]e assume the FTC announcement probably was the reason for the share weakness on Friday," HIIQ "[m]anagement has consistently spoken about how it has improved its broker distribution channel to higher-quality entities."  The same day, securities analysts at Canaccord Genuity issued a report accepting HIIQ's assertion that "Simple Health accounted for less than 10% of HIIQ's submitted policies," which noted that the analysts had spoken with management following the FTC's November 2 disclosure and that HIIQ "stands by its compliance processes" and "did not notice any irregularities" with Simple Health.

### 2.     Securities Analysts Issued A Scathing Research Report On HIIQ

130.     On November 27, 2018, Aurelius Value, a securities research firm, published a scathing report on HIIQ titled, "***HIIQ: Boiler Rooms, 'Worthless' Policies, and Defrauded Families***."  The Aurelius Value research report further revealed to the market the deep ties between HIIQ and Simple Health, and sharply criticized HIIQ's November 2, 2018 press release as "misleading … [for] suggesting that Dorfman was responsible for less than 10% of HIIQ's business."  The Aurelius Value report warned that "***many HIIQ investors have not yet recognized the significance of the FTC's action because HIIQ issued [its] highly misleading press release … that attempted to downplay HIIQ's relationship with Dorfman***" and Defendants' press release "leads investors to believe that the Dorfman Group is immaterial to HIIQ's business."  But, as Aurelius Value reported, "[p]reviously sealed documents gathered by the FTC ***directly undermine management's claims*** and prove that a large boiler room operation recently shuttered by the government for a massive alleged fraud was responsible for ***roughly half*** of HIIQ's sales."  The report cited "previously unpublished bank records

reveal[ing] that HIIQ has paid at least *$145 million in cash* to Dorfman's companies, representing about *half of the third-party commissions paid out by HIIQ* over this approximate period."[14]

131.   Relying on such newly disclosed facts and an extensive documentary record, the Aurelius Value report concluded that "*the deceptive sales tactics described by the FTC appear endemic across HIIQ's broker network*" and "*[a] material portion of HIIQ's 377,000 policies in force may … be contaminated by insurance fraud*."  The report summarized that HIIQ's "*business model relies on a classic boiler room scam*" in which "more than 60% of the money paid by consumers goes to HIIQ's brokers."  The report cited testimony to the FTC by a Simple Health manager that "approximately 95% of the *two to three thousand customer service calls received by [Simple Health] each day* consisted of complaints from consumers who had been misled about the benefits they would receive."

132.   Following the publication of the November 27, 2018 Aurelius Value research report, HIIQ's stock price declined swiftly.  On November 27, 2018, the Company's share price fell 5.8% from its November 26, 2018 closing price, on unusually high trading volume of over 4.2 million shares—nearly 10 times the stock's average trading volume over the prior year, and the highest traded volume for HIIQ shares in over a year.  *SeekingAlpha* noted that the Company's stock was "down 6%" in reaction to the Aurelius Report, which connected "fraudster Steve Dorfman" to "half of [HIIQ's] revenues."

---

[14] Aurelius Value's report was based on its thorough investigation and detailed analysis of numerous relevant documents, including Florida UCC filings, the California Insurance License Database, and previously sealed documents related to the FTC enforcement action.  As for the documents related to the FTC enforcement action, Aurelius Value stated that some of the documents underlying its November 27, 2018 report were "apparently … too voluminous to have uploaded to PACER" in that action.

### 3.    Defendants' Misrepresentations Continued As
### They Reaped Millions Through Insider Stock Sales

133.    By late December 2018, as a direct result of the revelations about Simple Health and Dorfman, HIIQ stock was trading at roughly $26.50 per share, approximately half the price it was trading at on November 1, 2018, the day before the announcement of the FTC enforcement action.  As a result, Defendants embarked on another scheme—one designed to artificially inflate the stock price, and allow them to sell millions of dollars of their personal holdings of HIIQ stock.  Beginning in late December and continuing in January, Defendants issued a series of statements that falsely attempted to minimize the impact of Simple Health on HIIQ's business, as well as HIIQ's extensive knowledge and involvement in Simple Health's operations.  In particular, Defendants claimed that Simple Health accounted for "only" 8.2% of submitted policies through October 2018, when Defendants knew that Simple Health accounted for a substantially larger portion of HIIQ's revenue and profits.  In addition, Defendants repeatedly defended the Company's compliance efforts.

134.    As a result, HIIQ's stock increased to $40 per share by early February and Defendants took full advantage.  Between February 1 and February 13, 2019, Defendant Southwell sold $3.22 million worth of HIIQ common stock.  These sales were strategically timed to maximize Southwell's profits, as they were made at prices of up to $40.31 per share, at near-term highs for HIIQ's stock price in mid- and late-February, and before several corrective disclosures sank HIIQ's stock price as low as $23.85 at the end of the Class Period. Southwell's stock sales were also far out of line with his prior trading.  Previously, Southwell had never sold *any* shares of HIIQ stock.[15]

---

[15] Based on SEC filings, Southwell's February 2019 sales appear to have represented 13% of his non-derivative HIIQ stock holdings at the time.

135.   Defendant Hershberger also made suspiciously timed HIIQ stock sales that were far out of line with his prior sales.   Between February 1 and February 13, 2019, Hershberger sold over $2 million worth of stock, reducing his holdings of non-derivative HIIQ securities by 56%.   As with Southwell's February 2019 sales of HIIQ stock, Hershberger's large insider sales were made close to a near-term high for HIIQ's stock price.   These trades were also far out of line with Hershberger's prior trading history.   In the 10 months prior to the Class Period, Hershberger had a pattern of selling relatively consistent amounts of HIIQ stock nearly every month (for instance, Hershberger sold stock each month between February 2017 and September 2017).   However, during the Class Period, Hershberger sold HIIQ stock *only* in February 2019, near the near-term peak in HIIQ's artificially inflated stock price.

### 4.      Congress Launched An Investigation Of HIIQ's "Junk Plans"

136.   On March 13, 2019, the U.S. House of Representatives Committee on Energy & Commerce ("House E&C Committee") issued a press release entitled "***E&C Launches Investigation Into Companies That Sell Or Broker Junk Health Insurance Plans***."   The House E&C Committee announced that it was investigating HIIQ and Agile Health Insurance as part of "an investigation into the concerning practices of Short-Term, Limited Duration Insurance (STLDI) health care plans and insurance brokers," *i.e.*, those "that either sell or assist consumers in signing up for these ***junk plans***."   The press release stated that the "Committee's initial examination of these plans has yielded disturbing information" and "we are troubled that consumers who sign up for these plans are being misled about the nature of the coverage they are purchasing."[16]

---

[16] According to HIIQ's 2018 Form 10-K, AgileHealthInsurance.com is HIIQ's "direct-to-consumer insurance website," that "allows consumers to … purchase [individual and family health insurance plans]."

137. A March 13, 2019 press release issued by Congresswoman Dianna DeGette described the insurance policies at issue, stating: "They're called 'junk' health care plans because they don't comply with the [ACA]. They don't provide coverage for prescription drugs or maternity care or people with pre-existing conditions. And while they may be cheaper than more traditional health insurance plans, the coverage they actually provide to consumers is little to none - hence them being called 'junk.'" A March 13, 2019 article by *Healthcare Dive* noted that Simple Health "exemplif[ied]" Congressional concerns "after selling what the Federal Trade Commission deemed 'worthless' plans to thousands of patients, leaving them saddled with major medical expenses." *Healthcare Dive* additionally stated that Congress was looking into, among other things, "what percentage of applicants are denied coverage and why, how the plans are marketed, [and] how much commission agencies and brokers are paid."

138. As a result of the news regarding the House E&C Committee's investigation, HIIQ's stock price declined by $6.62, or 17.2%, to close at $31.77 on March 13, 2019, on unusually high trading volume of nearly 5 million shares—approximately eight times the average trading volume over the prior year. The decline eliminated over $82 million in shareholder value.

139. Analyst and media reports easily connected HIIQ's stock price decline to the news of the Congressional investigation. For example, CNBC stated that "[s]hares of … Health Insurance Innovations—dropped sharply after the news" of the investigation. A report issued by securities analysts at Canaccord Genuity stated: "Shares of HIIQ are trading off ~20% on a tweet… reporting that the U.S. House of Representatives is expected to open an investigation into short-term medical (STM) insurance. The tweet further stated that companies are misleading consumers and insinuated that they are siphoning consumers away

from the more comprehensive but more expensive ACA market."

**5.      Court Filings In The FTC Action Revealed HIIQ's
Intimate Knowledge Of The Deceptive Sales Practices**

140.    On March 25, 2019, a voluminous filing by Steven Dorfman in the FTC action

revealed substantial evidence of HIIQ's extensive involvement in Simple Health's business

and Defendants' awareness of Simple Health's fraudulent activities.  Dorfman stated that HIIQ

"***regularly audited [Simple Health]'s employee training and sales and verification***

***processes***" and that HIIQ "***verified that [Simple Health] trains its employees using materials***

***provided by HII and insurers***."

141.    The filing included copies of multiple reports documenting HIIQ "***site visits***" at

Simple Health from 2015 through August 31, 2018.  The "site visit" documents showed that

HIIQ "***examin[ed] … [Simple Health's] sales verifications, sales productions, consumer***

***complaints and consumer escalations***, for the period January 1, 2017 to May 31, 2018,"

among others.   The documents detailed how, as part of the site visits, HIIQ reviewed

"complaints and escalations data," "BBB Consumer complaints," and "DOI inquiries," and

obtained a thorough "understanding of the organization['s] current sales practices and … how

compliance responsibilities are carried out."   The audit documents showed that HIIQ was

closely monitoring "the various ways that complaints come into HII," including "DOI, BBB

and Non-Regulatory Complaints."

142.    The Company documents also showed that HIIQ had additional reporting

methods and systems available to remain constantly vigilant over Simple Health's deceptive

sales practices.  As the "site visits" stated, customer sales call "[v]erifications are saved and

stored to [HIIQ's] server, [t]hen, uploaded to HII's FTP site"; Simple Health's customer

"[c]alls are reviewed daily by [HIIQ's] quality assurance department"; "[o]nce a call is

received, the customer service representative addresses any questions or concerns" and "notates[,] if applicable, in HII's Retention Queue"; and Simple Health "conduct[ed] secret shopping of [its] own agents and ke[pt] a log."  The reports underscored that Simple Health's compliance department "*is always in constant contact with HII[Q]'s compliance department*."

143.    Next, the reports revealed Simple Health's policy of boosting sales and preventing cancellations by making it difficult for customers to learn the terms of the insurance policies they had purchased, stating that Simple Health "does not provide members with any product information by means of email or text."  One HIIQ audit specifically noted Simple Health's pitch of "a PPO group plan" as "misleading."  As Dorfman's filings underscored, HIIQ was well-aware of Simple Health's conduct and policies in sales calls, as Simple Health's script "was periodically reviewed by HII" and "[e]ach [Simple Health] representative takes on a daily basis an average of approximately 40-60 calls per day and all calls are logged in their CRM system as well HII's Back Office (A.R.I.E.S.)."

144.    Critically, the site visits were designed "to monitor agent performance and *protect business*."  As the March 25, 2019 filing shows, rather than reflecting any critical review of Simple Health's (mis)conduct, the *pro forma* reports did little more than parrot and outright copy the representations that Simple Health made to HIIQ about its own practices, with little if any independent analysis by HIIQ.

145.    Following the revelations of HIIQ's years-long involvement in Simple Health's business practices via "site visits," HIIQ's stock price fell 7.4% on March 26, 2019, on elevated trading volume, wiping out over $32 million in shareholder value.

**6.     A Court-Appointed Receiver Concluded That
Simple Health's Business Was "A Classic Bait-
And-Switch Scam" And "Never Legally Viable"**

146.    On April 12, 2019, Michael I. Goldberg (the "Receiver"), the court-appointed

Receiver over Simple Health, filed the "Receiver's First Interim Report" ("Receiver's Report")

in the FTC enforcement action—the result of over five months of investigation.   The

Receiver's Report stated that the "Receiver and his professionals have spent a great deal of

time analyzing [Simple Health]'s business practices in an effort to determine if the allegations

made by the FTC are accurate.   ***In short, the FTC is correct.   [Simple Health's] business***

***model is largely a classic bait-and-switch scam*** whereby unwitting consumers are falsely led

to believe that they are purchasing a Preferred Provider Organization medical insurance policy

('PPO') that is compliant with the Affordable Care Act ('ACA'), but in reality are sold limited

benefit indemnity plans that are not compliant with the ACA."

147.    Over the course of the 229-page Receiver's Report (including exhibits), the

Receiver chronicled the various tools of deception that Simple Health systematically utilized

to "scam" people looking to buy legitimate comprehensive health insurance, including

deceptive sales scripts, "deceptive search words direct[ing] customers" to Simple Health, and

websites that "build on the fraud."

148.    The Receiver's Report first found that the sales script used by Simple Health

was "designed to lead the customer into believing they are buying traditional major medical

insurance coverage as opposed to a limited benefit plan."   The report stated that the "script is

also deceptive because it is designed to lead the customer into believing that the company is

actually shopping for the most suitable insurance plan to meet the customer's specific needs,"

adding that "[i]n reality… the sales person already knows what plan he or she is attempting to

sell the customer from the beginning of the call regardless of the customer's best interest."  The Receiver noted that the "script also contains ***outright lies*** about the type of benefits the customer will get if he or she purchases the plan."  For example, the script states "we want to find you a PPO, that way you can keep your own doctors and hospitals.  I want to get you prescription coverage and lab coverage for your preventative care and maintenance…"  The Receiver's Report added that "[i]n reality, the plans sold are not traditional medical insurance at all and offer very few of the benefits of traditional comprehensive health insurance that the customer is led to believe they are purchasing."

149.    The Receiver's Report similarly found that Simple Health's verification process and use of a "Post Close" sales script were deceptive.  The Receiver stated that the "***verification process is also designed to defraud the customer by attempting to disclaim everything the customer was just led to believe in making their decision to purchase***."  The Receiver noted that the "Post Close script is designed, in part, to desensitize the customer to the upcoming verification process, which process is purposely designed to attempt to 'walk back' and negate many of the representations just made to the customer pursuant to the sales script."  The Receiver further noted that the sales agents at Simple Health told customers to hold their questions until after the verification process, citing limited "minutes of tape time."  The Receiver stated "[s]imply put, this statement is solely designed to attempt to ***prevent the customer from asking questions so that a 'clean' recorded verification can be obtained***— even though many statements in the verification script are inconsistent with what the sales person has told the customer in obtaining the sale."

150.    The Receiver concluded that Simple Health's "***business cannot be operated legally and/or profitably***" and that the "***business was never legally viable and cannot be viable***

*in the future*."   The "business model was largely based on deceiving consumers," which "deception *permeated [Simple Health's] entire business relationship with their customers* from the moment customers conducted Google searches all the way to post-sale customer relations."

151.    Significantly, the Receiver noted that after the TRO had been entered in 2018, HIIQ arguably violated it by continuing to collect money from Simple Health's victims.  HIIQ then "claimed that it was owed" more than $2.6 million and proceeded to "unilaterally offset this sum from the payments [HIIQ] collected from [Simple Health's] customers subsequent to the receivership."   The Receiver added that Simple Health's "relationship with HII was certainly complex" and that HIIQ had paid Simple Health approximately *$180 million* in commissions in *fewer than five years.*

152.    Finally, the Receiver's Report noted that because many of HIIQ's/Simple Health's customers "are not yet aware that they have been deceived," it had been suggested to HIIQ that it should "provide notice to customers of this potential issue with their insurance." As the Receiver noted, however, "HII has not yet done so."

153.    In response to the revelations in the Receiver's Report, HIIQ's stock price declined by 7.6% on April 12, 2019, on unusually high trading volume.

### D.    Post-Class Period Events

154.    On May 14, 2019, the court overseeing the FTC's enforcement action against Simple Health issued an order granting the FTC's preliminary injunction shutting down Simple Health's operations.   The court stated that "[t]hrough its evidence, the FTC gives a well-documented account of a classic bait and switch scheme," noting that the FTC established its case through, "approximately 43 exhibits—encompassing over 1000 pages of documents" and

live testimony of former Simple Health customers.  The court found that "a preliminary injunction is necessary to protect consumers, prevent future violations of the law, protect assets, and to preserve the status quo."  The order also permanently appointed Goldberg as the Receiver, granting him "full powers of an equity receiver."

155.    On June 13, 2019, the court overseeing the FTC's action against Simple Health issued an order instructing HIIQ to notify Simple Health victims that they were deceptively sold a limited indemnity plan and that they did not have comprehensive health insurance.  The court stated that there was "good cause" to believe that due to Simple Health's "deceptive sales practices," many customers that purchased an HIIQ policy "still believe that they purchased comprehensive health insurance or its equivalent."  The court also ordered that HIIQ put into escrow all payments made by existing Simple Health customers received by HIIQ after entry of the June 13 order.

156.    On June 26, 2019, Massachusetts Superior Court Justice Debra A. Squires-Lee penalized HIIQ's wholly-owned subsidiary, HPIH, for multiple instances of discovery misconduct aimed at avoiding exposure of its fraudulent business practices.  Starting in 2016, the Massachusetts Attorney General began investigating HIIQ regarding "the unlawful marketing and sale in Massachusetts of health insurance and discount health plans by HPIH, including, but not limited to, through its agents, NBOA and Health Benefits One, LLC."  On March 28, 2019, the Massachusetts Attorney General filed a petition to assess civil penalties against HPIH for its misconduct in attempting to avoid discovery of HPIH's illicit practices, including by "withholding (or destroying) responsive documents," "failing to give adequate testimony under oath," and "failing entirely to appear to give testimony under oath."  The June 26, 2019 Order granted the petition based on "egregious" discovery avoidance.

## V.      DEFENDANTS' FALSE AND MISLEADING STATEMENTS

157.   Defendants made materially false and misleading statements and omitted material facts when speaking to investors during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Among other things:

  i. Defendants represented to investors that HIIQ was "upholding the highest standards" in compliance and had "best-in-class compliance" and "market leading" compliance when, in reality, HIIQ's compliance standards and practices were highly deficient.   As numerous former HIIQ employees have confirmed, HIIQ suffered from systemic compliance failures and "endemic" misrepresentations to consumers.  Indeed, as the Receiver found, HIIQ's most significant distributor, Simple Health, was a "classic bait and switch scam" where business was "never legally viable" and where "deception permeated the … entire business relationship with the[] customers";

  ii. Defendants represented to investors that HIIQ was "upholding the highest standards" in customer service and had "best-in-class" and "market-leading" customer service when, in reality, the sale of HIIQ's health insurance products was predicated upon deceiving the consumer from the beginning to the end of the sales process, which resulted in thousands upon thousands of undisclosed customer complaints.  Moreover, Defendants worked hand-in-hand with HIIQ's distributors to develop and approve misleading "lead generation" websites and sales scripts, and conducted "site visits" which provided Defendants first-hand proof of the fraudulent sales practices, resulting in site visit reports.  Defendants received regular reporting of an overwhelming flood of customer complaints

and possessed still further detailed data points, including a "distributor performance scorecard" and a proprietary data management platform known as "A.R.I.E.S.," each of which meticulously documented consumer complaints and indicated that customer satisfaction was exceptionally poor;

iii.    Defendants represented to investors that the ratio of HIIQ customer complaints "upheld" by the DOI in a given time period was "0.00%" or "less than 0.01%" of policies in force, when, in reality, (i) Defendants concealed thousands upon thousands of rampant customer complaints that perpetually inundated the Company; (ii) DOIs do not administratively "uphold" complaints for or against a consumer, or for or against a company; (iii) Defendants ignored complaints to the DOI that HIIQ agreed to voluntarily resolve in customers' favor in order to avoid a formal administrative action that could result in suspension or revocation of HIIQ's license; and (iv) Defendants' statements rested on the false premise that most aggrieved consumers know that they can file a complaint with the DOI when in fact the opposite is true;

iv.    Defendants represented to investors that HIIQ was "laser focused" on the compliance of its third-party call centers and "continued to facilitate" call center compliance, when, in reality, HIIQ's most significant call center, Simple Health, was a "classic bait and switch scam" and HIIQ's own senior executives internally acknowledged in emails that HIIQ was being "bombarded" with an "out of control" number of complaints about Simple Health.  As HIIQ's own documents reveal, HIIQ received thousands and thousands of complaints about Simple Health every year from 2014 through 2018; and

v.   Defendants represented to investors that HIIQ's sales were not concentrated in any external call center, including any call center that made up more than 10% of sales in a given period when, in reality, the Company's largest external call center, Simple Health, was responsible for as much as half of the Company's revenues during the Class Period, as determined by securities analysts based on information uncovered in the FTC's enforcement action against Simple Health.

**A.   September 2017 Investor Presentation And Press Release**

158.   The Class Period begins on September 25, 2017, when HIIQ filed an investor presentation with the SEC on Form 8-K.  The presentation stated that HIIQ had "Best-in-Class Compliance," which was so strong that it was a "significant barrier to entry" positively distinguishing HIIQ from its current and potential competitors.  The presentation asserted that customer complaints to the DOI were "less than 0.01% of [policies in force]" as of June 30, 2017.

159.   The statements identified above in ¶158 were materially false and misleading, and omitted material facts when made.  Contrary to Defendants' representations regarding the Company's "Best-in-Class" compliance, HIIQ's compliance standards and practices were weak, deficient, and did not present a barrier to entry to current and potential competitors.  As the Receiver found, HIIQ's most significant distributor, Simple Health, was a "classic bait and switch scam" where business was "never legally viable" and where "deception permeated the … entire business relationship with the[] customers."  The sale of HIIQ's health insurance products was predicated upon deceiving the consumer from the beginning to the end of the sales process, which resulted in a flood of undisclosed customer complaints.  Rather than attempting to resolve legitimate customer complaints, the Company's policy and practice was

to rebuff complaints from the moment they were received and, even if escalated, avoid cancelling policies, extending coverage, or otherwise resolving complaints in favor of the consumer.   As numerous former HIIQ employees have confirmed, HIIQ suffered from systemic compliance failures and "endemic" misrepresentations to consumers.

160.    Defendants' statements regarding the number of consumer complaints to the DOI were highly misleading because the statements (i) concealed the thousands upon thousands of customer complaints that inundated the Company on an annual basis; (ii) created the false impression that virtually 100% of customer complaints were denied by the DOI within the given time period, when the DOI in fact did not make such denials; (iii) ignored complaints that HIIQ agreed to voluntarily resolve in the customer's favor in order to avoid a formal administrative action that could result in suspension or revocation of HIIQ's license; and (iv) rested on the false premise that most aggrieved consumers know that they can file a complaint with the DOI when, in reality, most consumers are unaware they have the right to file a complaint with the DOI.

161.    Indeed, at the exact same time HIIQ was telling investors that the Company essentially had no complaints, its own senior officers—including the VP of Operations—were internally acknowledging in emails that HIIQ was being "bombarded" with complaints about Simple Health, and that customer complaints were "out of control."  As HIIQ's own documents reveal, HIIQ received thousands and thousands of complaints about Simple Health every year from 2014 through 2018.   Moreover, Defendants worked hand-in-hand with HIIQ's distributors to develop and approve misleading sales tactics, and conducted "site visits" which provided Defendants first-hand proof of the fraudulent sales practices, resulting in site visit reports.   Defendants possessed still further detailed data points, including a "distributor

scorecard" or "distributor performance scorecard" and a proprietary data management platform known as "A.R.I.E.S.," each of which meticulously documented consumer complaints and indicated that customer satisfaction was exceptionally poor. The reference to "policies in force" is also misleading because it does not account for complaints about policies that were cancelled prior to the end of the referenced business cycle, including policies that were cancelled because customers complained they had been misled into purchasing them.

162. On September 27, 2017, HIIQ published a press release entitled "Health Insurance Innovations, Inc. Highlights Strength of Business." Purporting to provide an update regarding regulatory matters, Defendant Southwell represented in the press release that HIIQ had "unparalleled customer service."

163. The statement identified above in ¶162 was materially false and misleading, and omitted material facts when made for the reasons set forth above in ¶¶159-61. In addition, in contrast to Defendant Southwell's statement that HIIQ had "unparalleled customer service," HIIQ's customer service profile was poor and characterized by inherently deceptive sales practices, and thousands of customer complaints that HIIQ and its agents intentionally deceived HIIQ's customers. Defendants also had extensive documentation disproving Southwell's claim of "unparalleled customer service."

**B.      November 2017 Press Release, Conference Call, And Investor Presentation**

164. On November 1, 2017, Defendants published a press release, which was also filed with the SEC on a Form 8-K signed by Defendant Hershberger. The press release promoted HIIQ's purported "compliance metrics and benchmarks," highlighting HIIQ's "secret shopping" of its external call centers, which Defendants stated "ensure[d] adherence to HIIQ's best-in-class process and procedures." Defendants assured investors that HIIQ

"measures key metrics such as member complaints, escalations and chargebacks monthly," "[i]n 2016, the Company terminated two distributors for not meeting compliance metrics and benchmarks," and "HIIQ … continues to enforce the Company's policies and procedures with third-party distributors."

165.   The November 1, 2017 press release further asserted that the Company's "investment in compliance has generated a measuredly stronger customer experience," and that "[c]omplaints, specific to HIIQ, upheld by the Department of Insurance as a percentage of policies in force [were] 0.00% in Q3 2017, down from 0.01% in Q3 2016.  Additionally, HIIQ-specific Better Business Bureau complaints have reduced by 90% since Q1 2016.  In Q3 2017, HIIQ-specific complaints were effectively 0.00% of policies in force."

166.   On November 2, 2017, HIIQ held an investor conference call, in which Defendants Southwell and Hershberger participated.  During the call, Southwell attributed the Company's "record performance" to HIIQ's "proven strategy" of "focus[ing] on efficiently providing … consumers … insurance that meets their needs" through the "compliance of [its] third-party licensed agent call centers" and "laser focus[] on [its] best-in-class customer service."  Southwell represented that HIIQ "continued to facilitate our third-party distributors' compliance and improved our customer service, all while setting records for meeting our customers' needs for exceptional value health insurance," and noted that "[t]hird-party licensed agent call centers continued to be the growth leader this quarter."  Defendant Southwell stated that the Company's "technology holds [HIIQ's] distributors to our compliance standards throughout the process, and as part of the sales process, the consumer goes through a third-party verification process, either digitally or a recorded, affirmative call, confirming the insurance product is what the consumer expected."  Southwell underscored that HIIQ was

"upholding the highest standards in customer service and compliance."

167.   During the November 2, 2017 investor conference call, Defendant Southwell represented that the Company's "investment in compliance has generated a measurably stronger customer experience," noting that "Department of Insurance upheld complaints as a percentage of policies [were] 0.00% in the third quarter of 2017, down from 0.01% in the third quarter of 2016.  Additionally, HIIQ-specific Better Business Bureau complaints have reduced by 90% since the first quarter of 2016.  In Q3 2017, HIIQ-specific complaints were effectively 0.00% of policies in force."

168.   During the call, a securities analyst at Lake Street Capital Markets asked whether HIIQ had any concentration issues, such as any distributors that are more than 10% of sales.  Defendant Southwell responded that "in 2016, we terminated two large distributors, which was about 16% of sales.  And what I can confirm is that we don't have any third-party distribution as large as the guys we … terminated back in 2016."

169.   The statements identified above in ¶¶164-67 regarding the Company's compliance and customer service were materially false and misleading, and omitted material facts when made for the reasons set forth above in ¶¶159-61.  Defendants' statements on November 1 and 2, 2017, regarding the number of consumer complaints that were upheld by the DOI were false and misleading and omitted material facts when made for the reasons set forth in above in ¶¶160-61.  Indeed, in reality, such complaints were "***out of control***" as the Company was being "***bombarded***" with complaints from defrauded customers.  In addition, DOIs do not administratively "uphold" complaints for or against a consumer, or for or against a company.  In cases where a consumer complaint is found to be substantiated, DOI staff ordinarily recommends corrective actions to address each consumer complaint, which are

accepted by the company voluntarily in the vast majority of cases to avoid a formal administrative action that could result in suspension or revocation of its license.  In cases where a consumer complaint is found to be unsubstantiated or baseless, the DOI does not recommend corrective action or make any formal administrative decision.  Furthermore, most consumers are unaware they have the right to file a complaint with the DOI.  Defendants' reference to "HIIQ-specific complaints" is similarly misleading because it implies that consumer complaints about HIIQ's products were made only to HIIQ or explicitly referenced HIIQ, when, in reality, complaints were often made to or regarding the HIIQ brokers that deceptively sold HIIQ's products.

170.   Defendants' statements on November 1 and 2, 2017, regarding the compliance of the Company's third-party distributors were false and misleading and omitted material facts when made for the same reasons set forth above concerning HIIQ's statements about its own compliance and customer service.  In reality, HIIQ's most significant distributor, Simple Health, was a "classic bait and switch scam" where business was "never legally viable" and where "deception permeated the … entire business relationship with the[] customers."  In addition, rather than being "laser focused" on the "compliance of our third-party licensed agent call centers," HIIQ knew of, supported, and participated in distributors' undisclosed and deceptive sales practices.  Defendant Southwell's statements that HIIQ "continued to facilitate our third-party distributors' compliance" and that the Company's "technology holds [HIIQ's] distributors to our compliance standards throughout the process" were false and highly misleading because the Company did not, in fact, enforce critical compliance policies and procedures with respect to certain large third-party brokers, such as Simple Health. Defendants' statements assuring investors that HIIQ's sales were not concentrated in any

external broker were also false and misleading.  Contrary to Southwell's assertion that the Company did not have "any third-party distribution as large as the guys we… terminated back in 2016" (*see* ¶168) the Company's largest external broker, Simple Health, was responsible for as much as half of the Company's revenues, as determined by securities analysts based on information uncovered in the FTC's enforcement action.  Defendants' statements purporting to use BBB data as a comparable measure of insurer complaint activity were false and misleading because (i) the BBB does not have the insurance expertise to assess the basis of insurance complaints; and (ii) Simple Health attempted to manipulate the BBB rating system, including by submitting false reviews.

171.    Defendants' statements on November 1 and 2, 2017 that the Company's "record performance" was due to HIIQ's "proven strategy" of "focus[ing] on efficiently providing … consumers … insurance that meets their needs" through the "compliance of [its] third-party licensed agent call centers" and that Defendants had a "laser focus[] on [HIIQ's] best-in-class customer service" while HIIQ "continued to facilitate our third-party distributors' compliance and improved our customer service, all while setting records for meeting our customers' needs for exceptional value health insurance," were false and misleading and omitted material information when made for the reasons set forth in ¶¶159-61 above.  In addition, Defendants concealed the fact that the Company's financial performance largely depended on Simple Health, whose business according to the court-appointed Receiver in the FTC action was "never legally viable and cannot be viable in the future," as "deception permeated the … entire business relationship with … customers."

172.    On November 8, 2017, HIIQ published an investor presentation on the Company's website.  The presentation stated that HIIQ had "Best-in-Class

Compliance," which was so strong that it was a "significant barrier to entry" positively distinguishing HIIQ from its current and potential competitors.  The presentation asserted that customer complaints "upheld" by the DOI were "0.00% of [policies in force]," as of September 30, 2017.

173.    The statements identified above in ¶172 were materially false and misleading, and omitted material facts when made for the reasons set forth in ¶¶159-61, 169.

### C.    December 2017 Press Release

174.    On December 15, 2017, HIIQ filed a current report with the SEC on Form 8-K, which was signed by Defendant Hershberger.  The Form 8-K included a press release, also issued on December 15, 2017, announcing the Board's formation of a new Risk and Compliance Committee.  HIIQ asserted that the Risk and Compliance Committee "will further strengthen" the Company's "market-leading compliance and customer service."  Paul G. Gabos, Chairman of HIIQ's Board of Directors, is quoted in the press release as stating that HIIQ "uphold[s] the highest standards in customer service and compliance."

175.    The statements identified above in ¶174 were materially false and misleading, and omitted material facts when made for the reasons set forth above in ¶¶159-61.  In addition, the Company's formation of a new Risk and Compliance Committee at the board level was insufficient to address HIIQ's undisclosed compliance problems, which were systemic and pervasive within the Company and across its call centers.  The statements that the creation of this committee "will further strengthen" the Company's "market-leading compliance and customer service" and that HIIQ "uphold[s] the highest standards in customer service and compliance" were false and misleading because HIIQ's compliance and customer service were neither "market-leading" nor subject to the "highest standards."  To the contrary, a substantial

portion of the Company's revenues were the direct product of fraud.

**D.    March 2018 Investor Conference Call And Presentation**

176.    On March 1, 2018, HIIQ held an investor conference call, in which Defendants Southwell and Hershberger participated.  During the call, Southwell stated that HIIQ's "third-party licensed agent call centers drove the year-over-year increases" in HIIQ's business, and that HIIQ had "improv[ed] compliance" and "improved all aspects of customer service, with less than 0.01% DOI complaint ratio."  Southwell underscored that "we are laser focused on our best-in-class customer service," adding that HIIQ was even a "a consumer advocate." Southwell stated: "Insurance is built on data.  Data is objective and measurable.  And every data point indicates that our customer satisfaction is market-leading."  In response to a question from a securities analyst at Canaccord Genuity regarding compliance, Southwell acknowledged that "people are interested in what we're doing around our compliance areas," and assured investors that HIIQ had an "incredibly strong" and "market-leading" "control environment," and "high levels of consumer satisfaction."

177.    In response to a question from a securities analyst at Northland Capital Markets, Southwell represented that, if there are "too many calls to customer service, not even cancellations," due to a call center's conduct, HIIQ would "turn off the links" to HIIQ's products "in order to be able to maintain such a high level of customer satisfaction."  Defendant Hershberger referenced HIIQ's "best-in-class customer service and scalability, driven by our technology platform."

178.    The statements identified above in ¶¶176-77 were materially false and misleading, and omitted material facts when made for the reasons set forth above in ¶¶159-61, 171.  Southwell's statement that HIIQ would "turn off the links" if there were "too many calls

to customer service, not even cancellations" regarding new distributors was also false and misleading and omitted material facts because the Company did not, in fact, enforce critical compliance policies and procedures with respect to certain large third-party brokers, such as Simple Health.

179.    On March 13, 2018, HIIQ published an investor presentation on the Company's website.  The presentation stated that HIIQ had "Best-in-Class Compliance," which was so strong that it was a "significant barrier to entry" positively distinguishing HIIQ from its current and potential competitors.  The presentation asserted that customer complaints "upheld" by the DOI were "0.00% of [policies in force]," as of December 31, 2017.

180.    The statements identified above in ¶179 were materially false and misleading, and omitted material facts when made for the reasons set forth above in ¶¶159-61, 169.

**E.    May 2018 Investor Conference Call And Presentation**

181.    On May 3, 2018, HIIQ held an investor conference call to discuss recent Company performance, in which Defendants Southwell and Hershberger participated.  During the call, Southwell stated that HIIQ had "outstanding compliance performance" and "highly compliant third-party call center[s]."  Defendant Southwell stated that in a comparison between HIIQ and three of the largest ACA carriers, "complaints are significantly higher at the ACA carriers than here at HIIQ."  Southwell underscored that "[c]omparing the number of complaints versus the number of policies, the ACA carriers have 14x higher, 22x higher and 37x higher.  Or to put it another way, their complaints are 1,400%, 2,200% and 3,700% higher than here at HIIQ.  This theme is not just for larger carriers, there are many, many examples."

182.    During the May 3, 2018 investor conference, Defendant Southwell emphasized that the comparison between HIIQ and large ACA carriers was "clearly, and beyond any doubt,

measurable evidence of our outstanding compliance controls," stating:

> We have also identified that some ACA carriers have seen a large increase in complaints from 2016 to 2017. Whilst here at HIIQ, we have seen our complaints plummet 56% over the same period, as a direct result of continued investment in resource and technology. This outstanding compliance performance at HIIQ continues in 2018 with only 6 Department of Insurance complaints in the entire first quarter of 2018, including 0 complaints across all of the U.S. in February 2018, and out of a grand total of 6, there was a total of 1, DUI complaint upheld against the company, and this was relating to a refund that wasn't processed correctly.
>
> ….
>
> We continue to add resource to the compliance team and enhance our controls with the development and implementation of a new verification system to ensure 100% recording compliance and increased third-party site visits, secret shopping and product training webinars. And this has resulted in a level of compliance, which we believe leads our market. We feel this independent third-party data from the Department of Insurance and NAIC or National Association of Insurance Commissioners shows clearly, and beyond any doubt, measurable evidence of our outstanding compliance controls.

183.    In response to a securities analyst's question regarding HIIQ's performance compared to ACA carriers and where investors can find the data previously cited by HIIQ, Defendant Southwell stated:

> So the National Association of Insurance Commissioners has a section, where they kind of aggregate together all of the Department of Insurance complaints. So there is publicly available information. People can go on and find this. And yes, I think it's really just a fantastic illustration. We are not going to -- we don't need to kind of defend this business anymore around sort of regulatory compliance. We have proven beyond any reasonable doubt according to independent third-party data that we are outstanding at compliance because we have invested in it in terms of resource, controls and look at the comparisons. I mean, we're not just 10% or 20%. We are 3,700% better than some of larger ACA carriers.

184.    The statements identified above in ¶¶181-83 were materially false and misleading, and omitted material facts when made for the reasons set forth in ¶¶159-61, 169. In addition, Defendants' statements regarding HIIQ's "highly compliant third-party call center[s]" were false and misleading for the same reasons set forth above concerning HIIQ's statements about its own compliance and customer service.

185.    On May 8, 2018, HIIQ published an investor presentation on the Company's website.  The presentation stated that HIIQ had "Best-in-Class Compliance," which was so strong that it was a "significant barrier to entry" positively distinguishing HIIQ from its current and potential competitors.  The presentation asserted that customer complaints "upheld" by the DOI were "0.01% of [policies in force]," as of March 31, 2018.

186.    The statements identified above in ¶185 were materially false and misleading, and omitted material facts when made for the reasons set forth in ¶¶159-61, 169.

**F.    August 2018 Investor Conference Call And Presentation**

187.    On August 2, 2018, HIIQ held an investor conference call to discuss recent Company performance.  During the call, Defendant Southwell touted HIIQ's "record" revenue and earnings in the second quarter, as well as its "outstanding" compliance and "incredibly low" number of customer complaints, stating:

> We are committed to the highest standards in compliance and customer service, and maintaining a high level of consumer satisfaction.  We have previously released data to showcase our outstanding compliance performance, and I would like to provide a further update to reinforce our position as the market leader for consumer satisfaction and best practice compliance.  Previously, we talked about how, from 2016 to 2017, our Department of Insurance complaints plummeted 56% year-over-year, whilst ACA carriers often saw large increases in complaints over the same period.  We also explained how our Department of Insurance complaints versus a number of policies were dramatically lower than the main ACA carriers; in some cases 14x, 22x, or even 37x lower than an ACA carrier.

> I am pleased to update that in 2018, we continue to improve even further still, with a comparison of the first half of 2018 versus the first half of 2017 seeing a drop of another 45%, which is from 22 complaints to only 12.  Importantly, out of those 12 complaints, only 3 were upheld, a fantastic achievement for a business with a record 390,000 policies in force and over a million people covered.

> Although it is nearly impossible to improve on these statistics, as the numbers are so incredibly low, we continually are looking for ways to keep enhancing our control environment. And in the second quarter, we invested in a new software to enhance our call screening capabilities, further evidence of our continued investment in ensuring the consumer is always treated fairly and we are meeting their demands and needs.

188.    In response to a question from a securities analyst from Canaccord Genuity regarding negative sentiment in the media regarding the quality of short-term health insurance and the "true story" about whether HIIQ's products were "decent products" and not "skimpy insurance," Defendant Southwell dispelled any notion that HIIQ's products were not of high quality and that its consumers were not highly satisfied.  Specifically, Southwell stated that "people who are attacking this, they're not attacking it based on any data or any facts" and that "for us, educating the consumer is important… If we have an absolutely tiny, tiny number of complaints and we have high consumer satisfaction, it means we have distribut[ors] who are very good at explaining these products."

189.    The statements identified above in ¶¶187-88 regarding the Company's compliance and customer service were materially false and misleading, and omitted material facts when made for the reasons set forth in ¶¶159-61.  Defendants' statements regarding the compliance of the Company's third-party distributors were false and misleading for the same reasons set forth above concerning HIIQ's statements about its own compliance and customer service.  Contrary to Southwell's assertions that the Company had "distribution who are very good at explaining these products," and that distributors were "historically" not built into guidance until they pass "our compliance metrics," many of HIIQ's distributors engaged in a host of undisclosed and deceptive sales practices, such as misrepresenting the nature, terms, and coverage of HIIQ products.  This included Simple Health, the Company's largest distributor for much of the Class Period, which was a "classic bait and switch scam" where business was "never legally viable" and where "deception permeated the … entire business relationship with the[] customers."

190.    On August 31, 2018, HIIQ published an investor presentation on the

Company's website.   The presentation stated that HIIQ had "Best-in-Class Compliance," which was so strong that it was a "significant barrier to entry" positively distinguishing HIIQ from its current and potential competitors.  The presentation asserted that customer complaints "upheld" by the DOI were "0.01% of [policies in force]," as of June 30, 2018.

191.    The statements identified above in ¶190 were materially false and misleading, and omitted material facts when made for the reasons set forth in ¶¶159-61, 169.

### G.    October 2018 Investor Conference Call

192.    On October 30, 2018, HIIQ held an investor conference call to discuss recent Company performance.  During the investor call, Defendant Southwell touted HIIQ's "record revenue," and stated that HIIQ's "offering is built around our ability to be laser focused on the consumer and that is built on the vast amount of data we have access to, our technology, our customer experience and … compliance."  Southwell stated that the "strength of this business is the data we have access to, our technology, our customer experience, and our compliance," and that "[w]e work with leading third-party distributors to ensure that the consumers are offered a product which is right for them and meet their demands and needs.  And this is evident clearly by the fact our products are lasting longer and our customer satisfaction is market leading…  I want investors to have all the facts."  Defendant Hershberger promoted HIIQ's purportedly "rigorous compliance standards."  Defendant Southwell stated HIIQ had a "very happy consumer base," "very low number of complaints," and "very high number customer satisfaction."   Hershberger assured investors that the Company was "laser focused" on "training and compliance especially."

193.    The statements identified above in ¶192 were materially false and misleading, and omitted material facts when made for the reasons set forth in ¶¶159-61, 171.

### H.    November 2018 And December 2018 Press Releases

194.    On November 2, 2018, the FTC published a press release announcing the commencement of an enforcement action against Simple Health and Dorfman.  That same day, HIIQ published its own press release attempting to minimize the Company's relationship with Simple Health and Dorfman.  The press release reassured investors that:

> HIIQ maintains an active internal compliance team and works closely with state insurance agencies.  The company has relationships with over 100 independent insurance sales agencies, many of whom sell products for many different carriers, and HIIQ closely monitors all sales of HIIQ products by each agency.  For 2018 to date, Simple Health was the agency of record for less than 10% of HIIQ's submitted policies.

195.    On December 20, 2018, HIIQ issued another press release attempting to downplay the Company's relationship with Simple Health and Dorfman.  The December 20, 2018 press release stated that Simple Health and "all downlines and affiliates … represented only 8% of submitted policies year to-date through the date of their termination."

196.    The statements identified above in ¶¶194-95 were materially misleading and omitted material facts when made.  Contrary to Defendants' attempt to minimize the significance of the Company's relationship to Simple Health and Dorfman, Simple Health and the other Dorfman Entities were responsible for as much as half of HIIQ's revenues, as determined by securities analysts based on information uncovered in the FTC's enforcement action.  Even after the FTC shut down the Dorfman Entities, they continued to comprise a larger percentage of HIIQ's business than HIIQ represented, namely, over 20% of HIIQ's revenues for 2018.  Defendants' statements attempting to minimize the significance of the Company's relationship to Simple Health and Dorfman further misled investors because Defendants omitted to mention the close ties and significant history between the parties, including working together to develop, finance, and implement the deceptive sales practices.

I.     **December 2018 Investor Presentation**

197.    On December 20, 2018, HIIQ published a presentation on the Company's website in connection with HIIQ's Analyst and Investor Day.   In a section entitled "Compliance & Customer Experience: A Long-Term Focus," the presentation highlighted a purported "HIIQ Regulatory Complaint Reduction" and provided statistics regarding the number of complaints to the DOI and BBB.   Specifically, the presentation stated "DOI's Reduced 46% 2017 to 2018," and "BBB's Reduced 39% 2017 to 2018."   Additionally, the presentation stated that the Company had "0 Total HIIQ DOI (0.000%)" and "0 Upheld HIIQ DOI (0.000%)" complaints in November 2018.   The presentation also stated that total DOI complaints fell from 28 complaints against HIIQ in 2017 to 15 complaints in 2018, and total upheld DOI complaints fell from 4 in 2017 to 3 in 2018.

198.    The presentation attempted to minimize the importance of Simple Health and Dorfman's business to HIIQ, stating that "Health Benefit One (Simple / Dorfman) was 8.2% of submitted [policies] YTD through October" and had "[n]o material impact in Q4."

199.    The statements identified above in ¶¶197-98 were materially misleading and omitted material facts when made.   Defendants' statements regarding the Company's compliance and customer service were false and misleading for the reasons set forth in ¶¶159-61, 169.   Defendants' statements purporting to use BBB data as a comparable measure of insurer complaint activity were false and misleading for the reasons set forth in ¶170.   Defendants' statements attempting to minimize the significance of the Company's relationship to Simple Health and Dorfman were false and misleading for the reasons set forth in ¶196.

**J.      January 2019 Investor Presentation**

200.    On January 7, 2019, HIIQ filed a current report with the SEC on Form 8-K, which was signed by Defendant Hershberger.   The Form 8-K included an HIIQ "Investor Presentation."   The investor presentation stated that "Health Benefit One was 8.2% of submitted apps through October 2018" and purported to describe "Compliance & Customer Experience By The Numbers," by stating that "[c]omplaints are down."   The presentation stated that "Upheld Department of Insurance (DOI) Complaints Reduced YOY," noting that there were 4 "Upheld" DOI complaints in 2017 and 3 "Upheld" DOI complaints in 2018.

201.    The statements identified above in ¶200 regarding the Company's compliance and customer service were materially false and misleading and omitted material facts when made for the reasons set forth in ¶¶159-61, 169.   Defendants' statements attempting to minimize the significance of the Company's relationship to Simple Health and Dorfman were materially false and misleading and omitted material facts when made for the reasons set forth in ¶196.

**K.      March 2019 Investor Conference Call**

202.    On March 6, 2019, HIIQ held an investor conference call to discuss recent Company performance, in which Defendants Southwell and Hershberger participated.   During the call, Southwell stated that the Company had made "advancements … under [his] guidance … particularly in the compliance division," emphasizing that the Company had purportedly "prioritized" HIIQ's "foundation of compliance … since I became its President and CEO" and "in the last few years, we spent a tremendous amount of time, energy and investments to create best-in-class compliance, customer care, distribution and human capital."   Southwell added that "[t]he strength of this business is the data we have access to, our technology, our customer

experience and our compliance."

203.    The statements identified above ¶202 were materially misleading and omitted material facts when made for the reasons set forth in ¶¶159-61.

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

204.    Numerous facts raise a strong inference that Defendants knew or were severely reckless in disregarding the true facts concerning HIIQ's materially false and misleading statements listed above.  These facts include, in addition to the allegations set forth above, the following significant facts that were well-known to Defendants throughout the Class Period.

205.    HIIQ was intimately involved in every significant aspect of Simple Health's operations.  Since 2013 and throughout the Class Period, HIIQ was deeply involved in Simple Health's operations.  HIIQ loaned Simple Health tens of millions of dollars in working capital that allowed Simple Health to grow and carry out its fraudulent scheme.  HIIQ also co-founded with Simple Health, and provided funding to, SIL, the entity responsible for Simple Health's misleading "lead generation" websites used to lure customers looking for ACA compliant plans into purchasing non-ACA compliant HIIQ products.  HIIQ then recruited and trained Simple Health's sales agents.

206.    As Simple Health's CEO confirmed, HIIIQ also maintained continuous oversight of Simple Health through regular audits of Simple Health's business before and during the Class Period.  These audits included "site visits" and a review of "complaints and escalations data," "BBB Consumer complaints," and "DOI inquiries."  The audits stated that Simple Health's customer "[c]alls are reviewed daily by [HIIQ's] quality assurance department" and that Simple Health's compliance department "is always in constant contact with HII's compliance department."  The relationship between HIIQ and Simple Health was

so close that until March 2015, HIIQ reported Simple Health as a related party in its SEC filings.

207.   <u>Specific internal HIIQ documents reveal that HIIQ's executives were aware of</u> <u>"widespread" and "out of control" customer deception at HIIQ distributors.</u>  Internal emails among and between HIIQ executives summarized HIIQ's knowledge of the rampant misconduct at HIIQ's sales brokers, including Simple Health.  *See* ¶¶109-10, 114.  Indeed, just one month into the Class Period, in October 2017, HIIQ executives discussed "***widespread***" and "***out of control***" misrepresentations by Simple Health causing customer service agents to be "***bombarded***" with customer complaints.

208.   Now-public internal HIIQ emails reveal that HIIQ was not only aware of Simple Health's rampant sales misconduct during the Class Period, but had been for years.  A March 12, 2016 email from Girouard to Dorfman stated that HIIQ's Compliance department was "secret shopping" Simple Health multiple times per day and Girouard "got [her] ass chewed for 4 hours by [HIIQ Compliance Manager Amy Brady] yesterday," whom Girouard had "never heard … curse so much."  Girouard stated, however, that despite HIIQ knowing of Simple Health's compliance failures at the time, HIIQ nonetheless authorized Simple Health to "post close however we want" with customers.

209.   <u>HIIQ's internal reporting mechanisms provided executives with frequent and</u> <u>up-to-date reports documenting that HIIQ was receiving an overwhelming number of customer</u> <u>complaints.</u>  As described above, HIIQ systematically documented all relevant customer complaints regarding broker deception, including in the Company's proprietary A.R.I.E.S. software platform, and Defendants received regular daily and weekly reports detailing the customer complaints.  ¶¶96-100.  In addition, HIIQ's own internal documentation, which it

provided to the FTC, shows that Defendants were well aware of the ***thousands*** of complaint escalations that HIIQ received regarding Simple Health for each year between 2014 to 2018, with most customers complaining that sales agents misrepresented HIIQ's products.  HIIQ's data showed that the number of escalations HIIQ processed regarding Simple Health rose sharply in 2016 and 2017.  HIIQ categorized these escalations based on their nature and the vast majority of escalations concerned misrepresentations by brokers.

210.  <u>The sheer duration of Simple Health's fraudulent scheme makes it inconceivable that Defendants were not aware of the deceptive practices.</u>  According to the FTC, Simple Health has been using deceptive sales practices since "at least October 2013," the same month that HIIQ and Simple Health formed SIL.  Given HIIQ's intimate relationship with Simple Health and the fact that Simple Health's fraudulent conduct went on for over five years, it is inconceivable that Defendants were unaware of the fraud.

211.  <u>Securities analysts recognized that Defendants' misrepresentations were knowingly made.</u>  As securities analysts and the media have noted, the extensive public record shows that HIIQ was well aware of Simple Health's misconduct for years.  On April 9, 2019, securities research firm The Capitol Forum published a report entitled "Health Insurance Innovations: Evidence Submitted in Support of Preliminary Injunction Suggests that the Company Knew of Problematic Sales Practices by Dorfman Entities as Early as 2014."  The report noted that the "evidence submitted [by the FTC] indicates that Health Insurance Innovations (HIIQ) was aware of problematic sales practices by the Dorfman entities since at least 2014.  Despite this knowledge, Heath Insurance Innovations continued to allow the Dorfman entities to sell policies for the benefit of Health Insurance Innovations."  The report also noted that the FTC's filing included HIIQ's data showing that HIIQ received "over 5,000

complaints about [Simple Health] between 2014 and 2018," with the "most common complaint" being "agent misrepresentation."

212.    In addition to discussing evidence showing that HIIQ was aware of Dorfman's deceptive practices, the report stated that HIIQ misled investors regarding the Company's legal compliance and customer satisfaction.   Specifically, the report pointed to statements by Defendant Southwell discussing "the investment in compliance and reduction in complaints against the company" and asserting that HIIQ had "0.01%" and "0.00%" complaint rates with the DOI, and "reduced" complaints with the Better Business Bureau.   The report concluded that "it is not clear how these statements reconcile" with reality.

213.    On April 10, 2019, securities analysts at Aurelius Value issued a report entitled "HIIQ: The Big Deception."   After reviewing revelations by the FTC, the report concluded that "[w]e believe HIIQ management has made a series of misleading statements that conceal thousands of customer complaints that have not been disclosed to investors," and that "HIIQ management is misleading investors about the true nature of its business."

214.    The report highlighted that, contrary to the "thousands of customer complaints" HIIQ received, HIIQ management nonetheless "has consistently made statements to investors suggesting that HIIQ has received virtually no customer complaints and has 'market leading customer satisfaction.'"   The report specifically highlighted the following statements as particularly misleading: (1) in November 2017, Defendant Southwell stated that "HIIQ-specific complaints were effectively 0.00% of policies in force" during the quarter; (2) in August 2018, "Southwell again referenced 'an absolutely tiny, tiny number of complaints' and stated that 'people who are attacking this, they're not attacking it based on any data or facts'"; (3) in October 2018, "Southwell again touted that 'we can show them [regulators] a very happy

customer base, we can show them a very low number of complaints.'"  As Aurelius Value pointed out, "[b]y adding qualifiers when referring to complaint data such as 'HIIQ-specific' or 'Department of Insurance,' management may claim that its statements are technically true. But we find them highly misleading because they have failed to mention the thousands of complaints which have indisputably poured in from customers who say agents lied to them."

215.   The Aurelius Report also pointed out how "[i]nvestors and Sell Side analysts have relied on management's representations to promote the (fictitious) narrative that virtually no HIIQ customers complain," citing in particular analysts' positive responses to Defendants' misrepresentations at "the closed-door December 2018 analyst day" regarding HIIQ's purported "stunningly limited number of complaints."

216.   <u>Simple Health was critical to the success of HIIQ's business, accounting for a substantial portion of the Company's revenues during the Class Period.</u>  Forensic analysis submitted by the FTC in its enforcement action shows that HIIQ paid Simple Health $145 million in cash from January 2016 to April 2018.  Securities analysts have pointed out that this amount represented a staggering 49% of the $294.2 million in third-party commissions that HIIQ's SEC filings state the Company paid out during this approximate timeframe, and that Simple Health's sales of HIIQ products were responsible for as much as half of HIIQ's total revenues.  The amount that HIIQ paid in commissions to Simple Health dwarfed HIIQ's net income during the same time frame.  HIIQ reported just $13.1 million, $26.5 million, and $18.9 million in net income in 2016, 2017, and 2018, respectively.

217.   Simple Health's significant value to HIIQ is corroborated by HIIQ's own SEC filings.  In its 2015 annual report, HIIQ represented that Simple Health comprised 62.8% of the Company's total advanced commission balance.  In subsequent SEC filings, HIIQ was less

transparent about what percentage of its business Simple Health represented.  However, in its 2016 annual report, HIIQ represented that "one distributor" (*i.e.*, Simple Health) comprised 65% of the Company's advanced commission balance and in its 2017 annual report, HIIQ stated that "one distributor" (*i.e.*, Simple Health) represented 35.8% of the Company's total advanced commission balance.

218.  The critical importance of this large revenue stream for HIIQ further raises the inference that Defendants were well aware of Simple Health's fraudulent and deceptive sales practices, and the attendant rampant complaints and compliance failures.

219.  The Individual Defendants' Insider Trading Further Demonstrates Their Scienter.  Defendants Southwell and Hershberger each sold unusually large amounts of their HIIQ stock during the Class Period, precisely at a time when they could maximize their insider profits before further partial disclosures regarding the fraud.  Between February 1 and February 13, 2019, Defendant Southwell sold $3.22 million, and Defendant Hershberger sold $2.01 million, of HIIQ common stock.  These sales were strategically timed to maximize the Individual Defendants' insider profits, as they were made at prices of up to $40.31 per share, at near-term highs for HIIQ's stock price, and before several disastrous corrective disclosures that sank HIIQ's stock price as low as $23.85 at the end of the Class Period.  In addition to being strategically timed to maximize profit, the stock sales were also far out of line with Defendants' prior trading, as explained further above.  *See* ¶¶134-35.  Indeed, prior to these stock sales, Southwell had never sold *any* shares of HIIQ stock.  Similarly, Hershberger did not sell *any* stock during the Class Period before the February 2019 sales.

## VII.  LOSS CAUSATION

220.  During the Class Period, Defendants' materially false and misleading

statements and omissions artificially inflated the price of HIIQ common stock and maintained inflation in the stock price.  A series of partial disclosures revealed the relevant truth and removed the artificial inflation from the stock price.  As a result of their purchases of HIIQ stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss.

221.   HIIQ's common stock reached a Class Period peak price of $63.13 on October 1, 2018, then lost approximately 62% of its value to close at $23.85 per share at the end of the Class Period.

222.   On November 2, 2018, the FTC published a press release announcing its extraordinary enforcement action against Simple Health, Dorfman, and five additional entities connected to Dorfman, accusing the brokers of misleadingly selling HIIQ policies to consumers that believed they were purchasing comprehensive health insurance.  The partial disclosures (*see* ¶¶122-26) caused HIIQ's stock price to decline.  On November 2, 2018, the stock price declined by $4.47 per share, or 8.81%, erasing over $64 million in market value on unusually high trading volume of over 1.2 million shares.  Investors continued to react to the news on the next trading day, November 5, 2018, and the stock price fell another $6.65, or 14.37%, per share, erasing an additional $95.8 million in market capitalization on unusually high trading volume of over 2.7 million shares, for a total decline of nearly 22% during the two trading days.

223.   On November 27, 2018, research firm Aurelius Value published a report titled "HIIQ: Boiler Rooms, 'Worthless' Policies, and Defrauded Families."  The partial disclosures (*see* ¶¶130-31) caused HIIQ's stock price to decline.  On November 27, 2018, the share price fell $1.93, or 5.8%, erasing $27.8 million in market capitalization on unusually high trading

volume of over 4.2 million shares—nearly 10 times the stock's average trading volume over the prior year, and the highest traded volume for HIIQ shares in over a year.

224.    On March 13, 2019, the U.S. House of Representatives Committee on Energy & Commerce issued a press release entitled "E&C Launches Investigation Into Companies That Sell Or Broker Junk Health Insurance Plans."  The partial disclosures (*see* ¶¶136-37) caused HIIQ's stock price to decline.  On March 13, 2019, the share price fell $6.62, or 17.2%, erasing over $82 million in market capitalization on unusually high trading volume of nearly 5 million shares.

225.    On March 25, 2019, a filing by Steven Dorfman in the FTC enforcement action revealed extensive evidence of HIIQ's involvement in Simple Health's business as well as Defendants' awareness of Simple Health's fraudulent activities.  The partial disclosures (*see* ¶¶140-44) caused HIIQ's stock price to decline.  On March 26, 2019, the share price fell $2.20, or 7.4%, erasing over $32 million in market capitalization.

226.    On April 12, 2019, the court-appointed Receiver over Simple Health filed the Receiver's Report in the FTC enforcement action.  The partial disclosures (*see* ¶¶146-52) caused HIIQ's stock price to decline.  On April 12, 2019, the share price fell $1.97, or 7.6%, to close at $23.85 per share, erasing over $28 million in market capitalization.

227.    The drastic and repeated declines in HIIQ's stock price were a direct result of the nature and extent of Defendants' misrepresentations finally being revealed to investors and the market.  The timing and magnitude of the declines in the Company's share price negate any inference that the losses suffered by Lead Plaintiffs and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' violations of the federal securities laws.  The following

graphic shows the performance of a $100 investment in HIIQ's stock price prior to the corrective disclosure period as compared to two market indexes:



## VIII.   CLASS ACTION ALLEGATIONS

228.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired HIIQ common stock between September 25, 2017 and April 11, 2019, inclusive, and who were damaged thereby (the "Class").   Excluded from the Class are Defendants, the officers and directors of HIIQ, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

229.   The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, HIIQ shares were actively traded on the

NASDAQ.  As of April 11, 2019, there were over 14.6 million shares of HIIQ common stock outstanding.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Throughout the Class Period, HIIQ common stock was actively traded on the NASDAQ, an open and efficient market, under the symbol "HIIQ."  Millions of HIIQ shares were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by HIIQ and/or its transfer agents and may be notified of the pendency of this action by mail, using a form notice similar to that customarily used in securities class actions.

230.   Lead Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

231.   Lead Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of fact and law common to the Class are:

(a)   Whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)   Whether Defendants participated in and pursued the common course of conduct complained of herein;

(c)   Whether documents, press releases, and other statements disseminated to the investing public and the Company's stockholders during the Class Period misrepresented material facts about the business, finances, and prospects of HIIQ;

(d)     Whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose facts about the business, finance, value, and performance of HIIQ;

(e)     Whether the market price of HIIQ common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

(f)     The extent to which the members of the Class have been damaged and the proper measure of damages.

232.     A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable.  Furthermore, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them.  There will be no difficulty in the management of this action as a class action.

## IX.     <u>UNDISCLOSED ADVERSE FACTS</u>

233.     The market for HIIQ common stock was an open, well-developed and efficient market at all relevant times. As a result of these materially false and misleading statements and omissions described herein, HIIQ common stock traded at artificially inflated prices during the Class Period.  Lead Plaintiffs and the other members of the Class purchased or otherwise acquired HIIQ shares relying upon the integrity of the market price of the Company's stock and market information relating to HIIQ, and have been damaged thereby.

234.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of HIIQ common stock and maintaining inflation in the stock price, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose

material adverse non-public information and misrepresented the truth about the Company, as well as its business and operations, as alleged herein.

235.   At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiffs and the other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about HIIQ's legal and regulatory compliance, financial well-being and prospects.

236.   These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's stock price to be overvalued and artificially inflated and/or maintained at artificially inflated levels at all relevant times.  Defendants' materially false and misleading statements made during the Class Period resulted in Lead Plaintiffs and the other members of the Class purchasing the Company's stock at artificially inflated prices, thus causing the damages complained of herein.

## X.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

237.   At all relevant times, the market for HIIQ's common stock was efficient for the following reasons, among others:

(a) HIIQ's stock met the requirements for listing, and was listed and actively traded, on the NASDAQ, a highly efficient and automated market;

(b) As a public company, HIIQ filed periodic reports with the SEC and the NASDAQ;

(c) HIIQ was followed by numerous securities analysts employed by major firms who wrote reports which were distributed to the sales force and certain customers of

94

their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

(d) HIIQ regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

238.    As a result of the foregoing, the market for HIIQ's common stock reasonably promptly digested current information regarding HIIQ from all publicly available sources and reflected such information in the price of HIIQ's common stock.  All purchasers of HIIQ common stock during the Class Period suffered similar injury through their purchases of HIIQ common stock at artificially inflated prices, and a presumption of reliance applies.

239.    A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose. As this action involves Defendants' failure to disclose material adverse information regarding HIIQ's business practices, operations and financial performance, legal compliance, and customer satisfaction — information that Defendants were obligated to disclose during the Class Period but did not — positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered such information important in the making of investment decisions.

## XI.   <u>NO SAFE HARBOR</u>

240.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

241.   In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of HIIQ who knew that the statement was false when made.

## XII.   <u>COUNTS</u>

**COUNT I**
**For Violations Of Section 10(b) Of The Exchange Act**
**And SEC Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

242.   Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

243.   This Count is asserted on behalf of all members of the Class against Defendants HIIQ, Southwell, and Hershberger for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

244.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

245.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of HIIQ common stock during the Class Period.

246.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of HIIQ common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and the other members of the Class, regarding, among other things, HIIQ's business and operations; (b) artificially inflate and maintain the market price of HIIQ common stock;

and (c) cause Lead Plaintiffs and the other members of the Class to purchase the Company's common stock at artificially inflated prices, and to suffer losses when the true facts became known.

247.    Defendants HIIQ, Southwell, and Hershberger are liable for all materially false and misleading statements made during the Class Period, as alleged above.

248.    As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with the intent to deceive, manipulate, or defraud, or with severe recklessness.  The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers of HIIQ stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

249.    Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for HIIQ common stock, which inflation was removed from its price when the true facts became known.  Lead Plaintiffs and the Class would not have purchased HIIQ common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

250.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of HIIQ common stock during the Class Period.

## COUNT II
### For Violations Of Section 20(a) Of The Exchange Act
### (Against the Individual Defendants)

251.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above as

if fully set forth herein.

252.    This Count is asserted on behalf of all members of the Class against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

253.    During their tenures as officers of HIIQ, each of these Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers of HIIQ, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of the public statements made by HIIQ during the Class Period, including its materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

254.    In their capacities as senior corporate officers of the Company, and as more fully described above, the Individual Defendants had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions.   The Individual Defendants signed the Company's SEC filings during the Class Period, and were directly involved in providing false information and certifying and approving the false statements disseminated by HIIQ during the Class Period.   As a result of the foregoing, Defendants Southwell and Hershberger as a group, and individually, were controlling persons of HIIQ within the meaning of Section 20(a) of the Exchange Act.

255.    As set forth above, HIIQ violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Amended Complaint.

256.     By virtue of their positions as controlling persons of HIIQ and as a result of their own aforementioned conduct, Defendants Southwell and Hershberger are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired HIIQ securities.  Moreover, as detailed above, during the respective times these Defendants served as officers of HIIQ, each of these Defendants culpably participated in the material misstatements and omissions made by HIIQ.

257.     As a direct and proximate result of these Defendants' conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of HIIQ common stock.

## XIII.   **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

(a)     Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)     Awarding all damages and other remedies available under the Exchange Act in favor of Lead Plaintiffs and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

(c)     Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' and experts' witness fees and other costs; and

(d)     Awarding such other relief as this Court deems appropriate.

## XIV.  **JURY DEMAND**

Lead Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  July 19, 2019

Respectfully Submitted,

**SAXENA WHITE P.A.**

*/s/ Maya Saxena*

Maya Saxena (FL Bar No. 0095494)
Joseph E. White, III (FL Bar No. 621064)
Lester R. Hooker (FL Bar No. 32242)
150 East Palmetto Park Road, Suite 600
Boca Raton, FL 33432
Tel: (561) 394-3399
Fax: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com

Steven B. Singer (*pro hac vice* forthcoming)
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com

David R. Kaplan (admitted *pro hac vice*)
Brandon Marsh (*pro hac vice* forthcoming)
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Tel: (858) 997-0860
Fax: (858) 369-0096
dkaplan@saxenawhite.com
bmarsh@saxenawhite.com

*Lead Counsel for the Class*

**ABRAHAM, FRUCHTER AND TWERSKY, LLP**
Mitchell M.Z. Twersky (admitted *pro hac vice*)
One Penn Plaza, Suite 2805
New York, NY 10119
Tel: (212) 279-5050
Fax: (212) 279-3655
MTwersky@aftlaw.com

*Additional Counsel*

101

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 19, 2019, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system.  This system will send electronic notice of filing to all counsel of record by operation of the Court's electronic filing system.


<u>/s/ *Maya Saxena*</u>
Maya Saxena

## CERTIFICATION AND AUTHORIZATION

I, Jodi S. Cox, on behalf of the Oklahoma Municipal Retirement Fund ("Oklahoma Municipal"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I have reviewed the consolidated class action complaint in this matter and I am authorized in my capacity as Executive Director & CEO of the Board of Trustees of Oklahoma Municipal to initiate litigation and to execute this Certification on behalf of Oklahoma Municipal. I have authorized Saxena White P.A. to file the complaint on Oklahoma Municipal's behalf.

2. Oklahoma Municipal did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3. Oklahoma Municipal is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Oklahoma Municipal's transactions in Health Insurance Innovations, Inc.'s securities are set forth in the attached "Schedule A."

5. Oklahoma Municipal has sought to serve and was appointed as lead plaintiff and/or representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification: *None*

6. Oklahoma Municipal has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff, was not appointed lead plaintiff or the lead plaintiff decision is still pending:

   *In re WageWorks, Inc. Securities Litigation*, Case No. 4:18-cv-01523 (N.D. Cal.)

7. Oklahoma Municipal will not accept any payment for serving as a representative party on behalf of the Class beyond Oklahoma Municipal's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of July, 2019.

Oklahoma Municipal Retirement Fund

Jodi S. Cox, Executive Director & CEO

**SCHEDULE A**
**Oklahoma Municipal Retirement Fund**
**Transactions in Health Insurance Innovations, Inc.**
**Period:  September 25, 2017 through April 11, 2019**

| Common Stock Purchases | | | | Common Stock Sales | | |
|---|---|---|---|---|---|---|
| Date | Shares | Price | | Date | Shares | Price |
| 09/12/18 | 400 | $51.22 | | 03/08/19 | 200 | $37.94 |
| 09/12/18 | 100 | $51.53 | | | | |
| 09/14/18 | 200 | $52.15 | | | | |
| 09/17/18 | 100 | $52.75 | | | | |
| 09/17/18 | 100 | $52.68 | | | | |
| 09/18/18 | 200 | $52.03 | | | | |
| 09/19/18 | 100 | $51.96 | | | | |
| 09/21/18 | 100 | $58.08 | | | | |
| 09/21/18 | 100 | $58.68 | | | | |
| 09/21/18 | 100 | $57.84 | | | | |
| 09/21/18 | 100 | $58.08 | | | | |
| 09/21/18 | 500 | $57.14 | | | | |
| 09/26/18 | 100 | $54.68 | | | | |
| 09/26/18 | 900 | $55.32 | | | | |
| 10/05/18 | 200 | $55.23 | | | | |
| 10/09/18 | 100 | $54.99 | | | | |
| 10/10/18 | 1,000 | $50.20 | | | | |
| 10/10/18 | 200 | $50.59 | | | | |
| 10/11/18 | 100 | $49.83 | | | | |
| 10/18/18 | 200 | $48.62 | | | | |
| 03/25/19 | 3,317 | $29.54 | | | | |
| 03/26/19 | 1,521 | $29.82 | | | | |
| 03/28/19 | 867 | $27.14 | | | | |
| 03/29/19 | 2,228 | $27.14 | | | | |

## CERTIFICATION AND AUTHORIZATION

I, James D. Love, on behalf of the City of Birmingham Retirement and Relief System ("Birmingham"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.    I have reviewed the consolidated class action complaint in this matter and I am authorized in my capacity as Assistant City Attorney of Birmingham to initiate litigation and to execute this Certification on behalf of Birmingham.  I have authorized Saxena White P.A. to file the complaint on Birmingham's behalf.

2.    Birmingham did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3.    Birmingham is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.    Birmingham's transactions in Health Insurance Innovations, Inc.'s securities during the class period as specified in the complaint are set forth in the attached "Schedule A."

5.    Birmingham has sought to serve and was appointed as lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

> *Westchester Putnam Counties v. Brixmor Prop. Group Inc.*, No. 1:16-cv-2400 (S.D.N.Y.)

> *Boynton Beach Firefighters' Pension Fund v. HCP, Inc.*, No. 3:16-cv-1106 (N.D. Ohio)

> *City of Birmingham Ret. and Relief Sys. v. Credit Suisse Group AG*, No. 1:17-cv-10014 (S.D.N.Y.)

> *In re BRF S.A. Sec. Litig.*, No. 1:18-cv-02213 (S.D.N.Y.)

> *City of Birmingham Firemen's and Policemen's Supplemental Pension Sys. v. Ryanair Holdings plc*, No. 1:18-cv-10330 (S.D.N.Y.)

6.    Birmingham has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff, was not appointed lead plaintiff or the lead plaintiff decision is still pending:

> *Ollila v. Babcock & Wilcox Enterprises, Inc.*, No, 3:17-cv-00109 (W.D.N.C.)

*Grodko v. Teva Pharmaceutical Indus. Ltd.*, No. 2:17-cv-03743 (E.D. Pa.)

*In re Nutanix, Inc. Securities Litigation*, No. 3:19-cv-01651 (N.D. Cal.)

*Koch v. Healthcare Services Group, Inc.*, No. 2:19-cv-1227 (E.D. Pa.)

7.    Birmingham will not accept any payment for serving as a representative party on behalf of the Class beyond Birmingham's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this *17* day of July, 2019.

                                              *City of Birmingham Retirement*
                                              *and Relief System*


                                              James D. Love, Assistant City Attorney

**SCHEDULE A**
**City of Birmingham Retirement and Relief System**
**Transactions in Health Insurance Innovations, Inc.**
**Period:  September 25, 2017 through April 11, 2019**

| Common Stock Purchases | | |
| --- | --- | --- |
| Date | Shares | Price |
| 08/21/18 | 11,751 | $54.65 |

| Common Stock Sales | | |
| --- | --- | --- |
| Date | Shares | Price |
| 11/13/18 | 11,751 | $41.61 |