# EXHIBIT 1

10-K 1 form10-k.htm

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549

## FORM 10-K

[X]    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2016

[ ]    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

COMMISSION FILE NUMBER 001-35811

# Health Insurance Innovations, Inc.
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **46-1282634** |
| (State or other jurisdiction of | (IRS Employer |
| incorporation or organization) | Identification No.) |

**15438 North Florida Avenue, Suite 201**
**Tampa, Florida 33613**
(Address of principal executive offices) (zip code)

Registrant's telephone number, including area code:
(877) 376-5831

### SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Class A common stock, par value $0.001 per share | NASDAQ Global Market |

### SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes [ ] No [X]

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act. Yes [ ] No [X]

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

### Risks Relating to Our Business and Industry

***Our business practices and the business practices of our third-party distributors and carriers are currently being reviewed by various state insurance regulators and the results of such reviews may adversely affect our business and results of operations.***

Our business practices and the business practices of our third-party distributors and carriers are heavily regulated by each state in the United States and various federal agencies. State regulators require that we and our third-party distributors adhere to sales, documentation, and administration practices specific to each state. We are currently subject to several state regulatory examinations and actions as further described below and in "Legal Proceedings" in Part I, Item 3 of this report.

The Indiana Department of Insurance has commenced a multistate examination providing for the review of an insurance company whose products we previously distributed, the examination of which will include a review of our activities and whether our practices are in compliance with Indiana insurance law and the similar laws of other states participating in the examination. The Indiana Department of Insurance is serving as the managing participant of the multistate examination, and the examination includes, among other things, a review of whether the insurance company (and our Company) has engaged in any unfair or deceptive acts or insurance business practices. As of March 1, 2017, forty-two states have joined the multistate examination.

In addition to the multistate examination, the Office of the Montana State Auditor, Commissioner of Securities and Insurance ("CSI") has initiated an administrative action against us. We were among more than two dozen separate parties named by the CSI in a Notice of Proposed Agency Action on May 12, 2016, that alleges potential violations of the Montana Insurance Code. The Notice, directed to us as well as a large pool of third-party respondents ranging from very large companies to individual insurance agents, indicated that the CSI was concerned with the possibility of unfair trade practices, potentially unlicensed insurance practices, or agents that were not properly appointed to the insurance carriers for whom products were being offered. Seventeen of the named parties, including our Company, requested a hearing before the CSI to contest the state's allegations and, in addition to reviewing our own data, we have requested certain materials, data, and information from the CSI in order to do so. Pending the resolution of the matter, the CSI summarily suspended our license to conduct business in Montana. The state formally granted our request to be heard on the issues, and a neutral Hearing Officer, experienced in the insurance industry, has been appointed to hear the matter. We have been cooperative with the CSI, and we have begun the routine exchange of information attendant to the hearing process so we can properly measure and gauge the potential of the allegations. Additional requests for information are ongoing as we work to understand the CSI's concerns. While it is too early to assess whether the CSI's notice and the investigation of these organizations and individuals will have a material impact on us, based on the nature of the allegations and evidence provided by the CSI during the third and fourth quarters of 2016 and settlement discussions with the CSI in early 2017, we believe that a loss arising from the future assessment of a civil penalty against us in the range of $100,000 to $315,000 is probable but may vary based on the early stages of this matter.

We have also received notification of a civil investigative demand from the Massachusetts Attorney General's Office ("MAG"). As part of the MAG's regulatory oversight of the Massachusetts health care system and its corresponding authority to request documents from market participants, the MAG has requested that we provide certain information and documents. The information requested will be used to review our sales and marketing practices, and ensure we are in compliance with Massachusetts laws and regulations. Additionally, our materials and sales and marketing practices will be evaluated in order to ensure that they are neither deceptive nor do they constitute unfair trade practices. We have provided all requested documents and materials and continue to cooperate with the MAG in order to bring the matter to an agreeable conclusion. Based on the nature of the allegations raised by the MAG and based on discussions with them, we believe a loss arising from the future assessment of a civil penalty against the Company is possible however, we have not received any formal settlement offer from the state. We have begun preliminary discussions with the MAG concerning resolution options to avoid the need and cost of a continuing inquiry, and the MAG has indicated it is willing to discuss such options; however, there is no guarantee that we will reach a mutually agreeable resolution. Any formal settlement proposal would need to be approved by the management of the MAG before it is presented to us and as such, the MAG will likely want to engage in additional discovery prior to doing so, and it is too early in the process to estimate a potential range of loss.

In September 2016, the Texas Department of Insurance ("TDI") notified us that it has instituted an enforcement action to investigate alleged violations of advertising rules and third-party administrator license requirements in connection with the sale of our products. In connection with the investigation, the TDI requested certain information, records, and explanations from us, and we delivered a response and the requested information and records in November 2016. Following such date, the TDI has not taken any action, and the TDI has only communicated that it is continuing to review the matter. Our Company's position is that there have been no violations of the advertising or third-party administrator statutes in Texas, although there is no assurance that the TDI will agree with position.

In addition to the above, the states of Florida, Ohio, and South Dakota are reviewing the Company and the sales practices and potential unlicensed sale of insurance by our third-party distributor call centers. While we are aware of these states' reviews, as of

March 1, 2017, we have not been presented with any formal administrative action by any of these states, although South Dakota has offered to enter into a consent judgment whereby we would admit to no wrongdoing and pay a civil fine of $55,000. We are not aware of any examination into the sales practices of our owned call center in these states, although we cannot be certain that no such investigation is occurring or will occur.

We are proactively communicating and cooperating with all regulatory agencies involved in the above-described examinations and actions and we have recently developed and enhanced our compliance and control mechanisms. However, it is too early to determine whether any of these regulatory matters will have a material impact on our business. Any adverse finding could result in significant penalties or other liabilities and/or a requirement to modify our marketing or business practices and the practices of our third-party distributors, which could harm our business, results of operations or financial condition. Moreover, an adverse regulatory action in one jurisdiction could result in penalties and adversely affect our license status or reputation in other jurisdictions due to the requirement that adverse regulatory actions in one jurisdiction be reported to other jurisdictions. For additional information regarding our current state regulatory matters, see "Legal Proceedings" in Part I, Item 3 of this report.

13

***Our business could be harmed if we lose our relationships with independent distributors, fail to maintain good relationships with independent distributors, become dependent upon a limited number of third-party distributors or fail to develop new relationships with third-party distributors.***

We depend upon licensed third-party distributors, in addition to our internal distribution network, to sell our products. We typically enter into contractual agency relationships with independent distributors that are non-exclusive and terminable on short notice by either party for any reason. In many cases, these distributors also have the ability to amend the terms of our agreements unilaterally on short notice. Third-party distributors may be unwilling to sell our health insurance plans or products or may amend our agreements with them for a variety of reasons, including for competitive or regulatory reasons. For example, these independent distributors may decide to sell plans and products that bring them a higher commission than our plans and products or may decide not to sell IFP plans at all. Because we rely on a diverse distributor network to sell the products we offer, any loss of relationships with independent distributors or failure to maintain good relationships with independent distributors could harm our business, results of operations and financial condition. We have terminated, and could continue to terminate relationships, with distributors for their failure to follow our compliance standards or their otherwise engaging in problematic business practices. In 2016, we terminated two of our largest distributors for failure to comply with our standards. Further, we believe that we must grow our third-party distributor network in order to achieve our growth plans. If we are unable to grow our independent distributor network and develop new relationships with third-party distributors, our revenue could be adversely impacted.

***We depend on relationships with third-parties for certain services that are important to our business. An interruption or cessation of such services by any third-party could have a material adverse effect on our business.***

We depend on a number of third-party relationships to enhance our business. For instance, state regulations may require that individuals enroll in group programs or associations in order to access certain insurance products, benefits and services. We have entered into relationships with certain associations in order to provide individuals access to our products. For example, we have an agreement with Med-Sense, a non-profit association that provides membership benefits to individuals and gives members access to certain of our products. Under the agreement, we primarily market membership in the association and collect certain fees and dues on its behalf. In return, we have sole access to its membership list, and Med-Sense exclusively endorses the insurance products that we offer. Members of the association are given access to a wide variety of our products that are otherwise unavailable to non-members. We also have affiliations with other associations offering similar benefits as alternatives to Med-Sense. Med-Sense has the right to cancel its agreement with us at any time by providing 120 days' prior written notice. While we believe we could replace Med-Sense with other group programs or associations, there can be no assurance that any of our other association affiliations could replace Med-Sense or if we could find another association to replace Med-Sense on a timely basis or at all. If we were to lose our relationship with Med-Sense and were unable to find another group program or association on a timely basis or at all, this would have a material adverse effect on our business.

Our ability to offer our services and operate our business is therefore dependent on maintaining our relationships with third-party partners, particularly Med-Sense, and entering into new relationships to meet the changing needs of our business. Any deterioration in our relationships with such partners, or our failure to enter into agreements with partners in the future could harm our business, results of operations and financial condition. If our partners are unable or unwilling to provide the services necessary to support our business, or if our agreements with such partners are terminated, our operations could be significantly disrupted. We may also incur substantial costs, delays and disruptions to our business in transitioning such services to ourselves or other third-party partners. In addition, third-party partners may not be able to provide the services required in order to meet the changing needs of our business.

***We rely on third-party vendors to develop, host, maintain, support and enhance our technology platform.***

We are party to agreements with BimSym pursuant to which BimSym provides various professional services relating to our A.R.I.E.S. technology platform, including hosting, support, maintenance and development services. Our ability to offer our services and operate our business is therefore dependent on maintaining our relationships with third-party vendors, particularly BimSym, and entering into new relationships to meet the changing needs of our business. Any deterioration in our relationships with such vendors, or our failure to enter into agreements with vendors in the future could harm our business, results of operations and financial condition. If our vendors are unable or unwilling to provide the services necessary to support our business, or if our agreements with such vendors are terminated, our operations could be significantly disrupted. We may also incur substantial costs, delays and disruptions to our business in transitioning such services to ourselves or other third-party vendors. In addition, third-party vendors may not be able to provide the services required in order to meet the changing needs of our business.

15

*If we or our independent distributors fail to comply with the numerous laws and regulations that are applicable to our business, our business and results of operations could be harmed.*

The health insurance industry is heavily regulated by each state in the United States. For instance, state regulators require us to maintain a valid license in each state in which we transact health insurance business and further require that we adhere to sales, documentation and administration practices specific to each state. In addition, each distributor who transacts health insurance business on our behalf must maintain a valid license in one or more states. Because we do business in the majority of states and the District of Columbia, compliance with health insurance-related laws, rules and regulations is difficult and imposes significant costs on our business. Each jurisdiction's insurance department typically has the power, among other things, to:

- grant suspend, and revoke licenses to transact insurance business;

- issue provisional or conditional licenses for probationary periods;

- conduct inquiries into the insurance-related activities and conduct of agents and agencies;

- require and regulate disclosure in connection with the sale and solicitation of health insurance;

- authorize how, by which personnel and under what circumstances insurance premiums can be quoted and published and an insurance policy can be sold;

- determine which entities can be paid commissions from carriers;

- regulate the content of insurance-related advertisements, including web pages;

- approve policy forms, require specific benefits and benefit levels and regulate premium rates;

- impose fines and other penalties;

- impose continuing education requirements on agents and employees; and

- otherwise require changes to or impose conditions on how we or our distributors conduct business in their respective jurisdictions.

Due to the complexity, periodic modification and differing interpretations of insurance laws and regulations and the number of third parties with which we have relationships, we may not have always been, and we and/or our independent distributors may not always be, in compliance with such laws and regulations. Failure to comply could result in significant liability, additional state insurance licensing requirements or the revocation of licenses in a particular jurisdiction, which could significantly reduce our revenue, increase our operating expenses, prevent us from transacting health insurance business in a particular jurisdiction and otherwise harm our business, results of operations and financial condition. Moreover, an adverse regulatory action in one jurisdiction could result in penalties and adversely affect our license status or reputation in other jurisdictions due to the requirement that adverse regulatory actions in one jurisdiction be reported to other jurisdictions. Even if the allegations in any regulatory or other action against us are proven false, any surrounding negative publicity could harm member, distributor or health insurance carrier confidence in us, which could significantly damage our reputation. Because some members, distributors and health insurance carriers may not be comfortable with the concept of purchasing health insurance using the internet, any negative publicity may affect us more than it would others in the health insurance industry and could harm our business, results of operations and financial condition.

Because we depend in part on independent third-party distributors for the sale of our products, the failure of our distributors to comply with applicable laws and regulations could have an adverse effect on our business. For example, the actions or omissions of our independent third-party distributors could result in an investigation or regulatory action against our Company.

In addition, we have received and may in the future receive inquiries from state insurance regulators regarding our marketing and business practices and the practices of our independent third-party distributors and carriers. We may modify our practices in connection with any such inquiry, and we may require our distributors to change their practices, or we may be forced to terminate distributors. In 2016, we terminated two of our largest independent distributors for their failure to comply with our compliance standards. Any modification, or penalty for noncompliance, of our marketing or business practices in response to regulatory inquiries could harm our business, results of operations or financial condition.

8/27/2019                                https://www.sec.gov/Archives/edgar/data/1561387/000149315217002078/form10-k.htm

For additional information regarding our current state insurance regulatory matters, see the Risk Factor above titled "Our business practices and the business practices of our third-party distributors are currently being reviewed by various state insurance regulators and the results of such reviews may adversely affect our business and results of operations" and "Legal Proceedings" in Part I, Item 3 of this report.

18

https://www.sec.gov/Archives/edgar/data/1561387/000149315217002078/form10-k.htm                                                    28/138

- individuals' willingness and ability to conduct their own health insurance research;

- our ability to make the process of purchasing health insurance online an attractive alternative to traditional and new means of purchasing health insurance;

- our ability to successfully and cost-effectively market our services as superior to traditional or alternative sources for health insurance to a sufficiently large number of individuals; and

- insurance carriers' willingness to use us and the internet as a distribution channel for health insurance plans and products.

If individuals and carriers determine that other sources of health insurance and health insurance applications are superior, our business will not grow and our results of operations and financial condition could be harmed.

*Any legal liability, regulatory penalties, or negative publicity for the information on our platform or that we otherwise distribute or provide could likely harm our business and results of operations.*

We provide information on our platform, through our call center partners and in other ways regarding health insurance in general and the health insurance plans and products we market and sell, including information relating to insurance premiums, coverage, benefits, provider networks, exclusions, limitations, availability, plan and premium comparisons and insurance company ratings. A significant amount of both automated and manual effort is required to maintain the considerable amount of insurance plan information on our platform. We also regularly provide health insurance plan information in the scripts used by our customer call center partners. If the information we provide on our platform, through our customer call center partners or otherwise is not accurate or is construed as misleading, or if we do not properly assist individuals and businesses in purchasing health insurance, members, insurance carriers and others could attempt to hold us liable for damages, our relationships with insurance carriers could be terminated and regulators could attempt to subject us to penalties, revoke our licenses to transact health insurance business in a particular jurisdiction, and/or compromise the status of our licenses to transact health insurance business in other jurisdictions, which could result in our loss of our commission revenue. In the ordinary course of operating our business, we have received complaints that the information we provided was not accurate or was misleading. Although in the past we have resolved these complaints without significant financial cost, we cannot guarantee that we will be able to do so in the future. In addition, these types of claims could be time-consuming and expensive to defend, could divert our management's attention and other resources and could cause a loss of confidence in our services. As a result, these types of claims could harm our business, results of operations and financial condition. Additionally, we are subject to various federal and state telemarketing regulations, including the Telephone Consumer Protection Act ("TCPA") and the FCC's implementing regulations, as well as various state telemarketing laws and regulations. We, our distributors, and our carriers have been, and may continue to be, the subject of allegations of TCPA violations, and we could be responsible for some of the costs incurred by distributors or carriers who are the subject of allegations of TCPA violations. Any violation of these regulations could expose us to damages for monetary loss, statutory damages, fines, penalties and/or regulatory inquiries.

In the ordinary course of our business, we have received, and may continue to receive, inquiries from state regulators relating to various matters or in the future become involved in litigation. Also from time to time, we may be a party to litigation and subject to civil claims incident to the ordinary course of business, including claims from consumers alleging misrepresentation and material omissions in connection with their purchase of our products. For information regarding our current regulatory matters, see the Risk Factor above titled "Our business practices and the business practices of our third-party distributors are currently being reviewed by various state insurance regulators and the results of such reviews may adversely affect our business and results of operations" and "Legal Proceedings" in Part I, Item 3 of this report. If we are found to have violated laws or regulations, we could lose our relationship with insurance carriers and be subject to various fines and penalties, including revocation of our licenses to sell insurance, and our business, results of operations and financial condition would be materially harmed. We could also be harmed to the extent that related publicity damages our reputation as a trusted source of information relating to health insurance and its affordability. It could also be costly to defend ourselves regardless of the outcome. As a result, inquiries from regulators or our becoming involved in litigation could adversely affect our business, results of operations and financial condition.

*If we do not continue to attract new individual customers, we may not achieve our revenue and premium equivalents projections, and our results of operations could be harmed.*

In order to grow our business, we must continually attract new independent distributors and individual customers. Our ability to do so depends in large part on the success of our sales and marketing efforts. Potential individual customers may seek out other options for purchasing insurance. Therefore, we must demonstrate that our products provide a viable solution for individual customers to obtain high quality coverage at an attractive price and provide a valuable business opportunity to our distributors. If we fail to provide high quality solutions and convince individual customers and independent distributors of our value proposition, we may not be able to

*We are an "emerging growth company" and we cannot be certain if the reduced disclosure requirements applicable to emerging growth companies will make our Class A common stock less attractive to investors.*

We are an "emerging growth company," and we benefit from certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies" including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act, which may increase the risk that weaknesses or deficiencies in our internal control over financial reporting go undetected, and reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, which may make it more difficult for investors and securities analysts to evaluate our Company. In addition, we have elected under the JOBS Act to delay adoption of new or revised accounting pronouncements applicable to public companies until such pronouncements are made applicable to private companies. As a result of this election, our financial statements may not be comparable to companies that comply with public company effective dates. If some investors find our Class A common stock less attractive as a result, there may be a less active trading market for our Class A common stock and our stock price may be more volatile. We may take advantage of these reporting exemptions until we are no longer an "emerging growth company," which in certain circumstances could be up to five years.

## ITEM 1B. UNRESOLVED STAFF COMMENTS

None.

## ITEM 2. PROPERTIES

As of December 31, 2016, we leased facilities in four different cities throughout the U.S. All properties are leased with various expiration dates. Our locations are summarized as follows:

| Location | Approximate Square Footage | Type of Interest | Expiration of lease |
|---|---|---|---|
| Tampa, FL | 15,700 | Leased | December 2019 |
| Mountain View, CA | 1,100 | Leased | October 2018 |
| Waxahachie, TX | 2,000 | Leased | December 2017 |
| Haltom City, TX | 3,300 | Leased | Month-to-month |

We believe that our properties are generally in good condition, well maintained and suitable and adequate to carry out our business at expected capacity for the foreseeable future. Should additional capacity become necessary in the future, we believe that suitable additional or alternative space will be available on commercially reasonable terms to accommodate our foreseeable future expansion.

## ITEM 3. LEGAL PROCEEDINGS

We are currently a party to multiple litigation proceedings. From time to time, we may be a party to litigation and subject to claims incident to the ordinary course of business, including claims from consumers alleging misrepresentation and material omissions in connection with their purchase of our products. Regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources and other factors.

*State Regulatory Examinations*

From time to time the Company receives information and document requests from state insurance regulators concerning the business practices of the Company and/or third-party distributors of the Company's products. The Company's policy is to proactively communicate and cooperate with all such requests.

*Indiana Multistate Market Conduct Examination*

The Company received notification in April 2016 from the Indiana Department of Insurance that a multistate examination had been commenced providing for the review of HCC Life Insurance Company's ("HCC") short-term medical plans, Affordable Care Act compliance, marketing, and rate and form filing for all products. In May 2016, the Company received notice that the Market Actions Working Group of the National Association of Insurance Commissioners determined that the examination would become a multistate examination. As the Company was a distributor of HCC products at that time, the notification indicated that the multistate examination will include a review of the activities of the Company and a review of whether the Company's practices are in compliance with Indiana insurance law and the similar laws of other states participating in the examination. The Indiana Department of Insurance is serving as

the managing participant of the multistate examination, and the examination includes, among other things, a review of whether HCC (and the Company) has engaged in any unfair or deceptive acts or insurance business practices. At present, forty-two states have joined the multistate examination. On June 1, 2016, the Company responded to an initial document production request in this matter. In addition to the multistate examination led by Indiana, we are aware that several other states, including Florida, Ohio, and South Dakota are reviewing the sales practices and potential unlicensed sale of insurance by third-party distributor call centers utilized by the Company. The Company is not aware of any examination into the sales practices of the Company-owned call center, although the Company cannot be certain that no such investigation is occurring or will occur, and the Company is aware of and managing additional claims and inquiries that it does not believe are material at this time. Except as otherwise described below, it is too early to determine whether any of these regulatory examinations will have a material impact on the Company. The Company is proactively communicating and cooperating with all applicable regulatory agencies, and has provided a detailed action plan to regulators that summarizes the Company's newly developed and enhanced compliance and control mechanisms.

30

### *Montana Regulatory Action*

The Company also received notification from the Office of the Montana State Auditor, Commissioner of Securities and Insurance ("CSI") that an administrative action has been initiated against it. The Company was among more than two dozen separate parties named by the CSI in a Notice of Proposed Agency Action on May 12, 2016, that alleges potential violations of the Montana Insurance Code. The Notice, directed to the Company as well as a large pool of third-party respondents ranging from very large companies to individual insurance agents, indicated that the CSI was concerned with the possibility of unfair trade practices, potentially unlicensed insurance practices, or agents that were not properly appointed to the insurance carriers for whom products were being offered. Seventeen of the named parties, including the Company, requested a hearing before the CSI to contest the state's allegations and, in addition to reviewing its own data, the Company has requested certain materials, data, and information from the CSI in order to do so. Pending the resolution of the matter, the CSI summarily suspended the Company's license to conduct business in Montana. The state formally granted the Company's request to be heard on the issues, and a neutral Hearing Officer, experienced in the insurance industry, has been appointed to hear the matter. The Company has been cooperative with the CSI, and both parties have begun the routine exchange of information attendant to the hearing process so that the Company and the CSI can properly measure and gauge the potential of the allegations. Additional requests for information are ongoing as the Company works to understand the CSI's concerns.

While it is too early to assess whether the CSI's notice and the investigation of these organizations and individuals will have a material impact on the Company, based on the nature of the allegations and evidence provided by the CSI during the third and fourth quarters of 2016 and settlement discussions with the CSI in early 2017, the Company believes that a loss arising from the future assessment of a civil penalty in the range of $100,000 to $315,000 is probable but may vary based on the early stages of this matter. The Company and the CSI are in the process of attempting to reach a negotiated resolution and the Company will accrue funds for any settlement offers that it makes to the state. Both the Company and the CSI have expressed a willingness to explore amicable resolution options. To that end, the Company continues to regularly communicate, exchange information, and work closely with the CSI in furtherance of bringing the matter towards a mutually satisfactory resolution.

### *Massachusetts Regulatory Action*

The Company also received notification of a civil investigative demand from the Massachusetts Attorney General's Office ("MAG") on June 16, 2016. As part of the MAG's regulatory oversight of the Massachusetts health care system and its corresponding authority to request documents from market participants, the MAG has requested certain information and documents from the Company. The information requested will be used to review the Company's sales and marketing practices, and ensure the Company is in compliance with Massachusetts laws and regulations. Additionally, the Company's materials and sales and marketing practices will be evaluated in order to ensure that they are neither deceptive nor do they constitute unfair trade practices.

The Company has provided all requested documents and materials and continues to cooperate with the MAG in order to bring the matter to an agreeable conclusion. Based on the nature of the allegations raised by the MAG and based on discussions with them, the Company believes a loss arising from the future assessment of a civil penalty is possible however, the Company has not received any formal settlement offer from the state. The Company has begun preliminary discussions with the MAG concerning resolution options to avoid the need and cost of a continuing inquiry, and the MAG has indicated it is willing to discuss such options; however, there is no guarantee that the parties will reach a mutually agreeable resolution. Any formal settlement proposal would need to be approved by the management of the MAG before it is presented to the Company and as such, the MAG will likely want to engage in additional discovery prior to doing so, and it is too early in the process to estimate a potential range of loss.

### *Texas Regulatory Action*

In September 2016, the Texas Department of Insurance ("TDI") notified the Company that it has instituted an enforcement action to investigate alleged violations of advertising rules and third-party administrator license requirements in connection with the sale of the Company's products. In connection with the investigation, the TDI requested certain information, records, and explanations and the Company delivered a response and the requested information and records in November 2016. Following such date, the TDI has not taken any action, and the TDI has only communicated that it is continuing to review the matter. The Company's position is that there have been no violations of the advertising or third-party administrator statutes in Texas, although there is no assurance that the TDI will agree with position.

## ITEM 4. MINE SAFETY DISCLOSURES

Not applicable.