# EXHIBIT 2

10-Q 1 hiiq_63017x10q.htm 10-Q

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 10-Q

**(Mark One)**

**[X]  QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended June 30, 2017**

**or**

**[ ]  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

**Commission File Number: 1-35811**

# Health Insurance Innovations, Inc.

**(Exact name of registrant as specified in its charter)**

| **Delaware** | **46-1282634** |
|---|---|
| **(State or other jurisdiction of** | **(I.R.S. Employer** |
| **incorporation or organization)** | **Identification No.)** |

**15438 N. Florida Avenue, Suite 201**

**Tampa, FL 33613**

**(Address of Principal Executive Offices)**

**(813) 397-1187**

**(Registrant's telephone number, including area code)**

**N/A**

**(Former name, former address and former fiscal year, if changed since last report)**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes [X] No [ ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act:

| Large accelerated filer | [ ] | Emerging growth company | | [X] | Accelerated filer | [ ] |
|---|---|---|---|---|---|---|
| Non-accelerated filer | [ ] | (Do not check if a smaller reporting company) | | | Smaller reporting company | [X] |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. [ ]

Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b-2). Yes [ ] No [X]

As of August 1, 2017, the registrant had 12,600,418 shares of Class A common stock, $0.001 par value, outstanding and 3,841,667 shares of Class B common stock, $0.001 par value, outstanding.

**Legal and Other Contingencies**

The Company is subject to legal proceedings, claims, and liabilities that arise in the ordinary course of business. Regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources and other factors. The Company accrues losses associated with legal claims when such losses are probable and reasonably estimable. If the Company determines that a loss is probable and cannot estimate a specific amount for that loss, but can estimate a range of loss, the best estimate within the range is accrued. If no amount within the range is a better estimate than any other, the minimum amount of the range is accrued. Estimates are adjusted as additional information becomes available or circumstances change. Legal defense costs associated with loss contingencies are expensed in the period incurred.

## ITEM 3—QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

This item is not applicable for smaller reporting companies.

## ITEM 4—CONTROLS AND PROCEDURES

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer (principal executive officer) and our Chief Financial Officer (principal financial officer), evaluated the effectiveness of our disclosure controls and procedures as of June 30, 2017. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the Company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure. Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on the evaluation of our disclosure controls and procedures as of June 30, 2017, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were effective.

**Changes in Internal Control over Financial Reporting**

There were no changes in the Company's internal control over financial reporting during the quarter ended June 30, 2017 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

## PART II—OTHER INFORMATION

## ITEM 1—LEGAL PROCEEDINGS

We are currently a party to multiple litigation proceedings. From time to time, we may be a party to litigation and subject to claims incident to the ordinary course of business, including claims from consumers alleging misrepresentation and material omissions in connection with their purchase of our products. Except as described below, we do not believe that any pending legal proceedings are material. Regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources and other factors.

### State Regulatory Examinations

From time to time the Company receives information and document requests from state insurance regulators concerning the business practices of the Company and/or third-party distributors of the Company's products. Except as otherwise described below, it is too early to determine whether any of these regulatory examinations will have a material impact on the Company. The Company's policy is to proactively communicate and cooperate with all such requests.

### Indiana Multistate Market Conduct Examination

The Company received notification in April 2016 from the Indiana Department of Insurance that a multistate examination had been commenced providing for the review of HCC Life Insurance Company's ("HCC") short-term medical plans, Affordable Care Act compliance, marketing, and rate and form filing for all products. In May 2016, the Company received notice that the

Market Actions Working Group of the National Association of Insurance Commissioners determined that the examination would become a multistate examination. As the Company was a program manager of HCC products at that time, the notification indicated that the multistate examination will include a review of the activities of the Company and a review of whether the Company's practices are in compliance with Indiana insurance law and the similar laws of other states participating in the examination. The Indiana Department of Insurance is serving as the managing participant of the multistate examination, and the examination includes, among other things, a review of whether HCC (and the Company) has engaged in any unfair or deceptive acts or non-compliant insurance business practices. At present, forty-two states have joined the multistate examination. On June 1, 2016, the Company responded to an initial document production request in this matter. The Company received notice on March 16, 2017 that Indiana may expand the scope and time period of the examination to include a review of the Company's marketing, sales, and administration of insurance products for all parties with whom HII conducted business. This notice was provided through an additional "warrant" which is similar to an investigatory subpoena. Additional discussions with the lead investigators took place on March 29, 2017, in which the Company sought modifications to the scope of any potential expansion, and offered to provide additional information on a voluntary basis, but in the meantime, the Company has nevertheless focused on providing the information requested by the expanded warrant. In addition to the multistate examination led by Indiana, we are aware that several other states, including Florida and South Dakota are reviewing the sales practices and potential unlicensed sale of insurance by independently owned and operated licensed-agent call centers utilized by the Company.

The Company is aware of and managing additional claims and inquiries in other states that, except for the inquiries described below, the Company does not believe are material at this time. Except as otherwise described below, it is too early to determine whether any of these regulatory examinations will have a material impact on the Company. The Company is proactively communicating and cooperating with all applicable regulatory agencies, and has provided a detailed action plan to regulators that summarizes the Company's enhanced compliance and control mechanisms.

### *Montana Regulatory Action*

The Company also received notification from the Office of the Montana State Auditor, Commissioner of Securities and Insurance ("CSI") that an administrative action had been initiated against it. The Company was among more than two dozen separate parties named by the CSI in a Notice of Proposed Agency Action on May 12, 2016, that alleges potential violations of the Montana Insurance Code. The Notice, directed to the Company as well as a large pool of third-party respondents ranging from very large companies to individual insurance agents, indicated that the CSI was concerned with the possibility of unfair trade practices, potentially unlicensed insurance practices, or agents that were not properly appointed to the insurance carriers for whom products were being offered. Seventeen of the named parties, including the Company, requested a hearing before the CSI to contest the state's allegations and, in addition to reviewing its own data, the Company has requested certain materials, data, and information from the CSI in order to do so. Pending the resolution of the matter, the CSI summarily suspended the Company's license to conduct business in Montana. The state formally granted the Company's request to be heard on the issues, and a neutral Hearing Officer, experienced in the insurance industry, was appointed to hear the matter. The Company has been cooperative with the CSI, and both parties have exchanged information attendant to the hearing process.

On March 2, 2017, Montana indicated it was exploring the possibility of consolidating its own investigation with the Indiana Multistate Market Conduct Examination and conversations with the lead investigators on March 29, 2017 indicate such will occur. The Company expects that the Montana investigation will be consolidated into the above-described multi-state inquiry, and the Company is awaiting confirmation from the involved parties. While waiting for that confirmation, the hearing examiner assigned to the matter unexpectedly passed away, and the case has been temporarily stayed pending the appointment of a new hearing examiner. As a result of the anticipated consolidation of the CSI action with the multi-state examination, the Company no longer believes that a loss arising from the CSI action is probable, and the Company has no reasonable basis for estimating the impact, if any, that the CSI action (as an independent action separate from the multi-state examination) might have on the Company.

### *Massachusetts Regulatory Action*

The Company also received notification of a civil investigative demand from the Massachusetts Attorney General's Office ("MAG") on June 16, 2016. As part of the MAG's regulatory oversight of the Massachusetts health care system and its corresponding authority to request documents from market participants, the MAG has requested certain information and documents from the Company. The information requested will be used to review the Company's sales and marketing practices, and ensure the Company is in compliance with Massachusetts laws and regulations. Additionally, the Company's materials and sales and marketing practices will be evaluated in order to ensure that they are neither deceptive nor do they constitute unfair trade practices.

The Company continues to provide all requested documents and materials requested by the MAG, and is in the process of assembling some additionally-requested information. The Company continues to cooperate with the MAG in the interest of bringing the matter to an agreeable conclusion. While the MAG has indicated it is amenable to exploring all available options, and it is still

too early to assess whether the MAG's investigation will result in a material impact on the Company, the Company believes that based on the nature of the allegations raised by the MAG during the fourth quarter of 2016, a loss arising from the future assessment of a civil penalty against the Company is probable. Notwithstanding, due to the relatively procedural stage of the investigative process, the recent settlement of another party (a carrier) for the same set of allegations, and the fact that the Company has neither requested nor received evidentiary material from the MAG, the Company is currently unable to estimate the amount of any potential civil penalty or determine a range of potential loss. It is possible there may be no financial loss, a nominal or minimal loss, or some other mutually satisfactory resolution reached with the MAG.

### Texas Regulatory Action

In September 2016, the Texas Department of Insurance ("TDI") notified the Company that it has instituted an enforcement action to investigate alleged violations of advertising rules and third-party administrator license requirements in connection with the sale of the Company's products. In connection with the investigation, the TDI requested certain information, records, and explanations and the Company delivered a response and the requested information and records in November 2016. Following such date, the TDI took no action, and communicated only that it was continuing to review the matter. In May 2017, the TDI communicated a series of additional requests for information, and the results were provided two weeks later. Since that time, there has been no additional communication from the TDI. The Company's position is that there have been no violations of the advertising or third-party administrator statutes in Texas, although there is no assurance that the TDI will agree with position. This action has developed slowly, and accordingly the Company has not determined any potential loss to be probable. Additionally, due to the early stage of the matter any potential loss is not reasonably estimable. Accordingly, no loss or range of loss has been recorded or disclosed.

### Miscellaneous

#### TPA Licensure

Many states have statutes that require the licensure of third-party insurance administrators ("TPA"). The statutes and applicable regulations vary from state-to-state with respect to the nature of the business activities that may require licensure. Where the Company believes that statutes are unclear or open to interpretation, it takes the prudent approach of applying for a TPA license. Therefore, the Company applied for a TPA license with the Florida Office of Insurance Regulation ("OIR"). In June 2017, the OIR denied the Company's application based on its determination that the Company had not yet provided all information required to process the application. In June 2017, the Company appealed the denial with the Florida Division of Administrative Hearings. A final hearing on the matters has been scheduled for October 17-20, 2017, but the Company is working with the OIR to reach a mutually agreeable resolution of the matter prior to the hearing, including discussing whether the OIR will require the Company to hold such a license at all.

#### Telephone Consumer Protection Act

The Company has received a number of private-party claims relating to alleged violations of the federal Telephone Consumer Protection Act (TCPA) by its independently owned and operated licensed-agent distributors, alleging that their marketing activities were potentially unlawful. The Company has been named as a defendant in multiple lawsuits relating to alleged TCPA matters, including claims styled, but not yet certified, as class actions. The Company is presently reviewing these matters and reviewing distributor compliance, and enhancing existing compliance. While these types of claims have previously settled or resolved without any material effect on the Company, there is a possibility in the future that one or more could have a material effect. The Company requires that its independently owned and operated licensed-agent distributors reimburse or indemnify it for any such settlements.

#### Other

The Company has previously received inquiries but no claims, litigation, or findings of violation relating to alleged data loss and/or privacy breaches relating to affiliated companies. Each allegation is investigated upon receipt and handled promptly to resolution.

The Company has received claims relating to customer service and claims handling issues arising from a prior carrier relationship of the Company. Some of these matters have been styled as, but not yet certified, class actions. Recently, in one of the matters known as the "Azad case," the Company sought and received dismissal from the matter without prejudice. The Company has filed its own lawsuit against that same carrier. The Company has received demands for indemnification from this carrier but no lawsuit has been filed against us from said carrier. The Company has received claims from insureds relating to lack of carrier coverage, claims handling, and alleged deceptive sales practices relating to these carriers. In each of these individual insureds' claims, the Company attempts to dismiss, challenge or resolve the claims as quickly as possible.

**ITEM 1A—RISK FACTORS**

There were no material changes to the risk factors disclosed in our Annual Report on Form 10-K for the year ended December 31, 2016.

34

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

HEALTH INSURANCE INNOVATIONS, INC.

August 4, 2017                                                    */s/ Gavin D. Southwell*

**GAVIN D. SOUTHWELL**
**PRESIDENT AND CHIEF EXECUTIVE OFFICER**
**(PRINCIPAL EXECUTIVE OFFICER)**

August 4, 2017                                                    */s/ Michael D. Hershberger*

**MICHAEL D. HERSHBERGER**
**CHIEF FINANCIAL OFFICER, SECRETARY AND TREASURER**
**(PRINCIPAL FINANCIAL OFFICER)**

37