# EXHIBIT 4

10-K 1 hiiq-2017x12x31x10k.htm 10-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, DC 20549**

## FORM 10-K

[X]    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended December 31, 2017**

[ ]    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

**COMMISSION FILE NUMBER 001-35811**

# Health Insurance Innovations, Inc.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **46-1282634** |
| (State or other jurisdiction of | (IRS Employer |
| incorporation or organization) | Identification No.) |

**15438 North Florida Avenue, Suite 201**
**Tampa, Florida 33613**
(Address of principal executive offices) (zip code)

Registrant's telephone number, including area code:
**(813) 397-1187**

**SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Class A common stock, par value $0.001 per share | NASDAQ Global Market |

**SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes [ ] No [X]

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act. Yes [ ] No [X]

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes [X] No [ ]

## ITEM 1A. RISK FACTORS

In addition to the other information set forth in this report, you should carefully consider the following factors, which could materially affect our business, financial condition or results of operations in future periods. The risks described below are not exhaustive and are not the only risks facing our Company. Additional risks not currently known to us or that we currently deem to be immaterial also may materially adversely affect our business, financial condition or results of operations in future periods.

### Risks Relating to Our Business and Industry

*Our business practices and the business practices of our third-party licensed distributors and carriers are currently being reviewed by various state insurance regulators and the results of such reviews may adversely affect our business and results of operations.*

Our business practices and the business practices of our third-party licensed distributors and carriers are heavily regulated by each state in the United States and various federal agencies. State regulators require that we and our third-party licensed distributors adhere to sales, documentation, and administration practices specific to each state. As a result, we are currently subject to several state regulatory examinations and actions as further described in Note 12 "Commitments and Contingencies" in Part IV, Item 15 of this report. These examinations and actions include a multistate examination being led by the Indiana Department of Insurance and a civil investigative demand from the Massachusetts Attorney General's Office, as further described in Item 15 of this report. An adverse finding or result in one or more of these matters could result in significant liability, additional state insurance licensing requirements or the revocation of licenses in a particular jurisdiction, which could significantly reduce our revenues, increase our operating expenses, prevent us from transacting health insurance business in a particular jurisdiction and otherwise harm our business, results of operations and financial condition. Moreover, an adverse regulatory action in one jurisdiction could result in penalties and adversely affect our license status or reputation in other jurisdictions due to the requirement that adverse regulatory actions in one jurisdiction be reported to other jurisdictions. Even if the allegations in any regulatory or other action against us are proven false, any surrounding negative publicity could harm member, distributor or health insurance carrier confidence in us, which could significantly damage our reputation

*The market for health insurance in the United States is rapidly evolving, which makes it difficult to forecast demand for our products.*

The market for health insurance in the United States is rapidly evolving. Accordingly, our future financial performance will depend in part on growth in this market and on our ability to adapt to emerging demands in this market. We believe demand for our products has been driven in large part by regulatory changes, broader use of the internet and advances in technology. It is difficult to predict with any precision the future growth rate and size of our target market. The rapidly evolving nature of the market in which we operate, as well as other factors that are beyond our control, reduce our ability to evaluate accurately our long-term outlook and forecast performance or other operating results. A reduction in demand for our products caused by lack of acceptance, technological challenges, competing offerings or other factors would result in a lower revenue growth rate or decreased revenue, either of which could negatively impact our business and results of operations.

*A substantial portion of our business is concentrated in a small number of carriers, and such concentration could make our business more vulnerable to adverse changes in our relationships with carriers.*

We typically enter into contractual agency relationships with insurance carriers that are non-exclusive and terminable on notice by either party for any reason. Insurance carriers may be unwilling to underwrite our health insurance plans or products or may amend our agreements with them for a variety of reasons, including for competitive or regulatory reasons. Insurance carriers may decide to rely on their own internal distribution channels, including traditional in-house agents, insurance carrier websites or other sales channels, or to market their own plans or products, and, in turn, could limit or prohibit us from marketing their plans or products. Insurance carriers may decide not to underwrite insurance plans or products in the individual health insurance market in certain geographies or altogether. Our carrier relationship could also be affected by lawsuits and regulatory actions against our carriers relating to the products sold by us, as such carriers may seek indemnification or reimbursement from us or may seek to otherwise adversely change their relationship with us. Carriers can be, and two of our carriers have been, subject to lawsuits and regulatory actions of which we could, and have been, named parties. The termination or amendment of our relationship with an insurance carrier could reduce the variety of health insurance plans or products we offer. We also could lose a source of, or be paid reduced commissions for, future sales. Our business could also be harmed if we fail to develop new insurance carrier relationships or are unable to offer members a wide variety of health insurance plans and products.

The private health insurance industry in the United States has experienced substantial consolidation over the past several years. As a result of this trend, it may become necessary for us to offer insurance plans and products from a reduced number of

insurance carriers or to derive a greater portion of our revenue from a more concentrated number of insurance carriers as our business and the health insurance industry evolve. Each of these insurance carriers may terminate our agreements with them. In addition, one or more of our insurance carriers could experience a failure of its business due to a decline in sales volumes, unavailability of reinsurance, and failure of business strategy or otherwise. Should our dependence on a smaller number of insurance carriers increase, whether as a result of the termination of insurance carrier relationships, further insurance carrier consolidation, business failure, bankruptcy or any other reason, we may become more vulnerable to adverse changes in our relationships with our insurance carriers, particularly in states where we offer health insurance plans and products from a relatively small number of insurance carriers or where a small number of insurance carriers dominate the market. The termination, amendment or consolidation of our relationships with our insurance carriers could harm our business, results of operations and financial condition.

*Our business could be harmed if we lose our relationships with independent distributors, fail to maintain good relationships with independent distributors, become dependent upon a limited number of third-party distributors or fail to develop new relationships with third-party distributors.*

We depend upon licensed third-party distributors, in addition to our internal distribution network, to sell our products. We typically enter into contractual agency relationships with independent distributors that are non-exclusive and terminable on short notice by either party for any reason. In many cases, these distributors also have the ability to amend the terms of our agreements unilaterally on short notice. Third-party distributors may be unwilling to sell our health insurance plans or products or may amend our agreements with them for a variety of reasons, including for competitive or regulatory reasons. For example, these independent distributors may decide to sell plans and products that bring them a higher commission than our plans and products or may decide not to sell IFP plans at all. Because we rely on a diverse distributor network to sell the products we offer, any loss of relationships with independent distributors or failure to maintain good relationships with independent distributors could harm our business, results of operations and financial condition. We have terminated, and could continue to terminate relationships, with distributors for their failure to follow our compliance standards or their otherwise engaging in problematic business practices.

*We depend on relationships with third-parties for certain services that are important to our business. An interruption or cessation of such services by any third-party could have a material adverse effect on our business.*

We depend on a number of third-party relationships to enhance our business. For instance, state regulations may require that individuals enroll in group programs or associations in order to access certain insurance products, benefits and services. We have entered into relationships with certain associations in order to provide individuals access to our products. For example, we have an agreement with Med-Sense, a non-profit association that provides membership benefits to individuals and gives members access to certain of our products. Under the agreement, we primarily market membership in the association and collect certain fees and dues on its behalf. In return, we have sole access to its membership list, and Med-Sense exclusively endorses the insurance products that we offer. Members of the association are given access to a wide variety of our products that are otherwise unavailable to non-members. We also have affiliations with other associations offering similar benefits as alternatives to Med-Sense. Med-Sense has the right to cancel its agreement with us at any time by providing 120 days' prior written notice. While we believe we could replace Med-Sense with other group programs or associations, there can be no assurance that any of our other association affiliations could replace Med-Sense or if we could find another association to replace Med-Sense on a timely basis or at all. If we were to lose our relationship with Med-Sense and were unable to find another group program or association on a timely basis or at all, this would have a material adverse effect on our business.

Our ability to offer our services and operate our business is therefore dependent on maintaining our relationships with third-party partners, particularly Med-Sense, and entering into new relationships to meet the changing needs of our business. Any deterioration in our relationships with such partners, or our failure to enter into agreements with partners in the future could harm our business, results of operations and financial condition. If our partners are unable or unwilling to provide the services necessary to support our business, or if our agreements with such partners are terminated, our operations could be significantly disrupted. We may also incur substantial costs, delays and disruptions to our business in transitioning such services to ourselves or other third-party partners. In addition, third-party partners may not be able to provide the services required in order to meet the changing needs of our business.

14

the cost of qualifying health insurance policies, or our policies are otherwise perceived as inferior to qualifying insurance policies by potential members, our business, revenues and results of operations could be materially harmed.

*If we or our independent distributors fail to comply with the numerous laws and regulations that are applicable to our business, our business and results of operations could be harmed.*

The health insurance industry is heavily regulated by each state in the United States. For instance, state regulators require us to maintain a valid license in each state in which we transact health insurance business and further require that we adhere to sales, documentation and administration practices specific to each state. In addition, each distributor who transacts health insurance business on our behalf must maintain a valid license in one or more states. Because we do business in the majority of states and the District of Columbia, compliance with health insurance-related laws, rules and regulations is difficult and imposes significant costs on our business. Each jurisdiction's insurance department typically has the power, among other things, to:

- grant suspend, and revoke licenses to transact insurance business;

- issue provisional or conditional licenses for probationary periods;

- conduct inquiries into the insurance-related activities and conduct of agents and agencies;

- require and regulate disclosure in connection with the sale and solicitation of health insurance;

- authorize how, by which personnel and under what circumstances insurance premiums can be quoted and published and an insurance policy can be sold;

- determine which entities can be paid commissions from carriers;

- regulate the content of insurance-related advertisements, including web pages;

- approve policy forms, require specific benefits and benefit levels and regulate premium rates;

- impose fines and other penalties;

- otherwise require changes to or impose conditions on how we or our distributors conduct business in their respective jurisdictions.

Due to the complexity, periodic modification and differing interpretations of insurance laws and regulations and the number of third parties with which we have relationships, we may not have always been, and we and/or our independent distributors may not always be, in compliance with such laws and regulations. Failure to comply could result in significant liability, additional state insurance licensing requirements or the revocation of licenses in a particular jurisdiction, which could significantly reduce our revenue, increase our operating expenses, prevent us from transacting health insurance business in a particular jurisdiction and otherwise harm our business, results of operations and financial condition. Moreover, an adverse regulatory action in one jurisdiction could result in penalties and adversely affect our license status or reputation in other jurisdictions due to the requirement that adverse regulatory actions in one jurisdiction be reported to other jurisdictions. Even if the allegations in any regulatory or other action against us are proven false, any surrounding negative publicity could harm member, distributor or health insurance carrier confidence in us, which could significantly damage our reputation. Because some members, distributors and health insurance carriers may not be comfortable with the concept of purchasing health insurance using the internet, any negative publicity may affect us more than it would others in the health insurance industry and could harm our business, results of operations and financial condition.

Because we depend, in part, on independent third-party distributors for the sale of our products, the failure of our distributors to comply with applicable laws and regulations could have an adverse effect on our business. For example, while we are not culpable for the actions or omissions of our independent third-party distributors, their actions or omissions could result in an investigation or regulatory action against our Company.

In addition, we have received and may in the future receive inquiries from state insurance regulators regarding our marketing and business practices and the practices of our independent third-party distributors and carriers. We may modify our practices in connection with any such inquiry, and we may require our distributors to change their practices, or we may be forced to terminate distributors. In 2016, we terminated two of our largest independent distributors for their failure to comply with our compliance

17

standards. Any modification, or penalty for noncompliance, of our marketing or business practices in response to regulatory inquiries could harm our business, results of operations or financial condition.

For additional information regarding our current state insurance regulatory matters, see Note 12 "Commitments and Contingencies" in Part IV, Item 15 of this report.

*Regulation of the sale of health insurance is subject to change, and future regulations could harm our business and results of operations.*

The laws and regulations governing the offer, sale and purchase of health insurance are subject to change, and future changes may be adverse to our business. For example, once health insurance pricing is set by the insurance carrier and approved by state regulators, it is fixed and not generally subject to negotiation or discounting by insurance companies or agents. Additionally, state regulations generally prohibit insurance carriers, agents and brokers from providing financial incentives, such as rebates, to their members in connection with the sale of health insurance. As a result, we do not currently compete with insurance carriers or other agents and brokers on the price of the health insurance products offered on our distribution platform. We currently base our revenue structure on various commissions and fees, including commissions from insurance premiums and enrollment, monthly administrative fees and discount benefit fees. However, future laws and regulations could negatively adjust the commissions and fees we receive. If current laws or regulations change, we could be forced to reduce prices, commissions and fees or provide rebates or other incentives for the health insurance products sold through our online platform, which could harm our business, results of operations and financial condition.

Because we use the internet as our distribution platform, we are subject to additional insurance regulatory risks. In many cases, it is not clear how existing insurance laws and regulations apply to internet-related health insurance advertisements and transactions. To the extent that new laws or regulations are adopted that conflict with the way we conduct our business, or to the extent that existing laws and regulations are interpreted adversely to us, our business, results of operations and financial condition would be harmed.

*Changes in the quality and affordability of the health insurance plans and products that insurance carriers offer to us for sale through our technology platform could harm our business and results of operations.*

The demand for health insurance marketed through our technology platform is affected by, among other things, the variety, quality and price of the health insurance plans and products we offer. If health insurance carriers do not continue to allow us to sell a variety of high-quality, affordable health insurance plans and products in our markets, or if their offerings are limited or terminated as a result of consolidation in the health insurance industry, the implementation of Healthcare Reform or otherwise, our sales may decrease and our business, results of operations and financial condition could be harmed.

*If individuals or insurance carriers opt for more traditional or alternative channels for the purchase and sale of health insurance, our business could be harmed.*

Our success depends in part upon continued growth in the use of the internet as a source of research on health insurance products and pricing, as well as willingness for individuals to use the internet to request further information or contact directly or indirectly the distributors that sell the products we offer. Individuals and insurance carriers may choose to depend more on traditional sources, such as individual agents, or alternative sources may develop, including as a result of Healthcare Reform. Our future growth, if any, will depend in part upon:

- the growth of the internet as a commerce medium generally, and as a market for individual health insurance plans and services specifically;

- individuals' willingness and ability to conduct their own health insurance research;

- our ability to make the process of purchasing health insurance online an attractive alternative to traditional and new means of purchasing health insurance;

- our ability to successfully and cost-effectively market our services as superior to traditional or alternative sources for health insurance to a sufficiently large number of individuals; and

- insurance carriers' willingness to use us and the internet as a distribution channel for health insurance plans and products.

18

If individuals and carriers determine that other sources of health insurance and health insurance applications are superior, our business will not grow and our results of operations and financial condition could be harmed.

***Any legal liability, regulatory penalties, or negative publicity for the information on our platform or that we otherwise distribute or provide could likely harm our business and results of operations.***

We provide information on our platform, through our call center partners and in other ways, regarding health insurance in general and the health insurance plans and products we market and sell, including information relating to insurance premiums, coverage, benefits, provider networks, exclusions, limitations, availability, plan and premium comparisons and insurance company ratings. A significant amount of both automated and manual effort is required to maintain the considerable amount of insurance plan information on our platform. We also regularly provide health insurance plan information in the scripts used by our customer call center partners. If the information we provide on our platform, through our customer call center partners or otherwise is not accurate or is construed as misleading, or if we do not properly assist individuals and businesses in purchasing health insurance, members, insurance carriers and others could attempt to hold us liable for damages, our relationships with insurance carriers could be terminated and regulators could attempt to subject us to penalties, revoke our licenses to transact health insurance business in a particular jurisdiction, and/or compromise the status of our licenses to transact health insurance business in other jurisdictions, which could result in our loss of our commission revenue. In the ordinary course of operating our business, we have received complaints that the information we provided was not accurate or was misleading. Although in the past we have resolved these complaints without significant financial cost, we cannot guarantee that we will be able to do so in the future. In addition, these types of claims could be time-consuming and expensive to defend, could divert our management's attention and other resources and could cause a loss of confidence in our services. As a result, these types of claims could harm our business, results of operations and financial condition.

Additionally, we are subject to various federal and state telemarketing regulations, including the Telephone Consumer Protection Act ("TCPA") and the FCC's implementing regulations, as well as various state telemarketing laws and regulations. We, our distributors, and our carriers have been, and may continue to be, the subject of allegations of TCPA violations, and we could be responsible for some of the costs incurred by distributors or carriers who are the subject of allegations of TCPA violations. Any violation of these regulations could expose us to damages for monetary loss, statutory damages, fines, penalties and/or regulatory inquiries. The Company has received a number of private-party TCPA claims relating to independently owned and operated third-party licensed-agent distributors, alleging that their marketing activities were potentially unlawful. The Company has been named as a defendant in multiple lawsuits relating to alleged TCPA matters, including claims styled, but not yet certified, as class actions.

In the ordinary course of our business, we have received, and may continue to receive, inquiries from state regulators relating to various matters or in the future become involved in litigation. Also from time to time, we may be a party to litigation and subject to civil claims incident to the ordinary course of business, including claims from consumers alleging misrepresentation and material omissions in connection with their purchase of our products. For information regarding our current regulatory matters, see Note 12 "Commitments and Contingencies" in Part IV, Item 15 of this report. If we are found to have violated laws or regulations, we could lose our relationship with insurance carriers and be subject to various fines and penalties, including revocation of our licenses to sell insurance, and our business, results of operations and financial condition would be materially harmed. We could also be harmed to the extent that related publicity damages our reputation as a trusted source of information relating to health insurance and its affordability. It could also be costly to defend ourselves regardless of the outcome. As a result, inquiries from regulators or our becoming involved in litigation could adversely affect our business, results of operations and financial condition.

19

itself. The TRA became effective upon completion of the IPO and will remain in effect until all such tax benefits have been used or expired, unless HIIQ exercises its right to terminate the TRA for an amount based on the agreed payments remaining to be made under the agreement or HIIQ breaches any of its material obligations under the TRA in which case all obligations will generally be accelerated and due as if HIIQ had exercised its right to terminate the agreement. Any potential future payments will be calculated using the market value of our Class A common stock at the time of the relevant exchange and prevailing tax rates in future years and will be dependent on us generating sufficient future taxable income to realize the benefit. Payments are generally due under TRA within a specified period of time following the filing of our tax return for the taxable year with respect to which payment of the obligation arises.

Exchanges of Series B Membership Interests, together with an equal number of shares of our Class B common stock, for shares of our Class A common stock, are expected to increase our tax basis in our share of HPIH's tangible and intangible assets. These increases in tax basis are expected to increase our depreciation and amortization deductions and create other tax benefits and therefore may reduce the amount of tax that we would otherwise be required to pay in the future. As of December 31, 2017, Series B Membership Interests, together with an equal number of shares of Class B common stock have been exchanged for a total of 4,825,000 shares of Class A common stock subsequent to the IPO. See Note 7 for further information on these issuances of Class A common stock.

As a result of the exchanges noted above, we have recorded a liability of $16.2 million pursuant to the TRA as of December 31, 2017. The TRA liability was significantly impacted by the Tax Act which resulted in an $11.8 million decrease in the liability as a result of revaluing the related deferred tax asset at the lower enacted corporate tax rates expected to be in effect at time of realization. We have determined that this TRA amount is probable of being paid based on our estimates of future taxable income. This liability represents the share of tax benefits payable to the entities beneficially owned by Mr. Kosloske, if we generate sufficient taxable income in the future. As of December 31, 2016, management reversed the deferred tax asset valuation allowance relating to the TRA. This decision was based on historical earnings, and the outlook of future earnings. The exchange transactions created a tax benefit to be shared by the Company and the entities beneficially owned by Mr. Kosloske.

As of December 31, 2017, we have made $1.2 million of cumulative payments under the TRA. See Note 9 for further information on the income tax implications of the TRA.

*Legal Proceedings*

The Company is subject to legal proceedings, claims, and liabilities that arise in the ordinary course of business. The Company accrues losses associated with legal claims when such losses are probable and reasonably estimable. If the Company determines that a loss is probable and cannot estimate a specific amount for that loss, but can estimate a range of loss, the best estimate within the range is accrued. If no amount within the range is a better estimate than any other, the minimum amount of the range is accrued. Estimates are adjusted as additional information becomes available or circumstances change. Legal defense costs associated with loss contingencies are expensed in the period incurred.

*State Regulatory Examinations*

*Indiana Multistate Market Conduct Examination*

The Company received notification in April 2016 from the Indiana Department of Insurance that a multistate examination had been commenced providing for the review of HCC Life Insurance Company's ("HCC") short-term medical plans, Affordable Care Act compliance, marketing, and rate and form filing for all products. In May 2016, the Company received notice that the Market Actions Working Group of the National Association of Insurance Commissioners determined that the examination would become a multistate examination of the Company, which included forty-three (43) states. As the Company was a program manager of HCC products at that time, the notification indicated that the multistate examination would include a review of the activities of the Company and a review of whether the Company's practices are in compliance with Indiana insurance law and the similar laws of other states participating in the examination. The Company received additional requests on March 16, 2017 in the form of an Expanded Warrant "subpoena" expanding the scope and time period of the examination to include a review of the Company's marketing, sales, and administration of insurance products for all parties with whom the Company conducted business. The Company has provided the information requested by the expanded warrant. On February 1, 2018, revised February 8, 2018, a letter request was provided to the Company requesting the same information covered by the previously issued warrant, but for carriers other than HCC, for a limited number of categories of previously requested information. The Company is currently providing the information sought in the letter request. The Company is now and has been cooperating fully with the examiners. To date, there have been no reported findings of any sort, no breaches and specifically, no findings of wrong doing against the Company. In addition to the multistate examination led by Indiana, we are aware that several other states, including Florida and

South Dakota are reviewing the sales practices and potential unlicensed sale of insurance by independently owned and operated third-party licensed-agent call centers utilized by the Company.

The Company is aware of and managing additional claims and inquiries in other states that, except for the inquiries described below, the Company does not believe are material at this time. Except as otherwise described below, it is too early to determine whether any of these regulatory examinations will have a material impact on the Company. The Company is proactively communicating and cooperating with all applicable regulatory agencies, and has provided a detailed action plan to regulators that summarizes the Company's enhanced compliance and control mechanisms.

*Montana Regulatory Action*

In May 2016, the Company received notification from the Office of the Montana State Auditor, Commissioner of Securities and Insurance ("CSI") that an administrative action had been initiated against it. On October 31, 2017, the Company was dismissed from the action. As a result, the Company's exposure related to this matter, if any, is solely tied to Montana's involvement in the multistate examination.

*Massachusetts Regulatory Action*

The Company received notification of a civil investigative demand from the Massachusetts Attorney General's Office ("MAG") on June 16, 2016. The MAG has requested certain information and documents from the Company which will be used to review the Company's sales and marketing practices to ensure the Company is in compliance with Massachusetts laws and regulations. Additionally, the Company's materials and sales and marketing practices are being evaluated in order to ensure that they are neither deceptive nor do they constitute unfair trade practices.

The Company continues to provide all requested documents and materials requested by the MAG. The Company continues to cooperate with the MAG in the interest of bringing the matter to an agreeable conclusion. While the MAG has indicated it is amenable to exploring all available options, it is still too early to assess whether the MAG's investigation will result in a material impact on the Company. The Company believes that based on the nature of the allegations raised by the MAG, a loss arising from the future assessment of a civil penalty against the Company is probable. Notwithstanding, due to the relatively procedural stage of the investigative process, the settlement of another party (a carrier) for the same set of allegations, and the fact that the Company has neither requested nor received evidentiary material from the MAG, the Company is currently unable to estimate the amount of any potential civil penalty or determine a range of potential loss under the MAG's investigation of the Company. It is possible there may be no financial loss, a nominal or minimal loss, or some other mutually satisfactory resolution reached with the MAG in connection with the MAG's investigation of the Company.

*Texas Regulatory Action*

In September 2016, the Texas Department of Insurance ("TDI") notified the Company that it has instituted an enforcement action to investigate alleged violations of advertising rules and third-party administrator license requirements in connection with the sale of the Company's products. In connection with the investigation, the TDI requested certain information, records, and explanations, to which the Company responded. On February 8, 2018, the TDI notified the Company that it had closed the investigation effective February 2, 2018. The TDI verbally indicated that the inquiry has been coded as an "internal inquiry and review that resulted in a finding of 'no violation' with no disciplinary action taken." The matter is considered resolved without penalty or fine from the TDI.

We are proactively communicating and cooperating with all regulatory agencies involved in the above-described examinations and actions and we have recently developed and enhanced our compliance and control mechanisms. However, it is too early to determine whether any of these regulatory matters will have a material impact on our business (except Texas, as described above). Any adverse finding could result in significant penalties or other liabilities and/or a requirement to modify our marketing or business practices and the practices of our third-party independent distributors, which could harm our business, results of operations or financial condition. Moreover, an adverse regulatory action in one jurisdiction could result in penalties and adversely affect our license status or reputation in other jurisdictions due to the requirement that adverse regulatory actions in one jurisdiction be reported to other jurisdictions.

78

*Claims that involve independently licensed third-party insurance agencies and their agents, and independent insurance carriers, in which the Company is named as a co-defendant*

The Company has received claims from insureds relating to lack of carrier coverage, claims handling, and alleged deceptive sales practices relating to independent insurance carriers. In some situations, those claims also include third-party independent sales agencies with allegations relating to deceptive sales practices. In each of these individual insureds' claims, the Company attempts to dismiss, challenge or resolve the claims as quickly as possible. Recently, in the *Azad, et al. v. Tokio Marine HCC, et al.*, Case No. Case 3:17-cv-00618, U.S. District Court for the Northern District of California, ("Azad case"), the Company received a non-certified class action complaint alleging that an independent third-party agent and the independent insurance carrier misrepresented the type and availability of coverage and also was deficient in claims intake, handling, processing and payouts. The Company was named as an additional defendant in the case. The federal court dismissed the Company ruling that the alleged violations were issues for the independent agent and carrier to address, and not correctly pled against the Company. The Azad case dismissal on September 22, 2017 was with prejudice so the Company was relieved of liability in that regard. The Company independently filed its own lawsuit against that same carrier, HCC, seeking that the Court ascertain and declare the rights and obligations between the parties. That declaratory action was filed in Hillsborough County, Florida and is styled as *Health Insurance Innovations, Inc., et al. v. HCC Medical Insurance Services, LLC, et al.*, Case No. 17-CA-6679. This declaratory action was filed in response to indemnity demands that the Company received from HCC. No lawsuit has been filed against the Company by HCC, and on August 18, 2017, HCC sent a letter to the Company limiting the scope of its indemnification demand to the Montana administrative matter discussed above (that the Company has been dismissed from), the multistate review discussed above, and the Azad case. Following the Company's dismissal from the Azad case, on September 29, 2017 HCC sent an additional letter to the Company further limiting the scope of its indemnification demand by removing the Azad case.

In January 2018, the Company was named as a defendant in a non-certified class action complaint styled as *Aliquo, et al. v. HCC Medical Insurance Services, LLC, et al.*, Case No. 18-cv-18, U. S. District Court for the Southern District of Indiana ("Aliquo case"). While the matter is still in its earliest stages of being evaluated, similar to other cases involving the conduct of independent insurance carriers and independent sales agencies, the allegations revolve largely around the conduct of independent insurance carriers related to the claims handling, processing, and resolution process, though the complaint also alleges that potentially deceptive sales practices and unfair trade practices or misrepresentations may also have occurred. The Aliquo case, which largely attempts to bring claims under the RICO Act, seeks to link the Company's marketing efforts to the independent carriers' conduct of alleged improper claims handling, post-claims underwriting, and denials despite the Company being uninvolved in either the claims-handling aspect of the process. An additional claim for breach of contract is alleged solely against the independent insurance carriers. Similar to the Azad case described above, the Company will continue to assert that it doesn't engage in post-claims underwriting or claims handling as complained of in the case. While it is possible that a loss may arise from this case, the amount of such loss is not known or estimable at this time.

Similarly, in the *Sean McMaster and Kim McMaster v. Companion Life Ins. Co., et al.*, Case No. CV2017-006414, Superior Court for the State of Arizona in the County of Maricopa, there are allegations of denied and deficient claims handling relating to another insurance carrier in which the Company was also named as a defendant. The Company is asserting defenses against the claims not limited to that it doesn't adjudicate claims and made no misrepresentations to McMaster. While it is possible that a loss may arise from this case, the amount of such loss is not known or estimable at this time.

Similar again, is the *Charles M. Butler, III and Chole Butler v. Unified Life Ins. Co., et al.*, Case No. 17-cv-00050-SPW-TJC, U.S. District Court for the District of Montana (Billings Div.) ("Butler case"), in which allegations of misrepresentation and claims handling were made against the independent insurance agency and a carrier, and the plaintiff also named the Company as a party. The Butler case is in the procedural stage of discovery and motion practice. The Company is asserting defenses against the claims not limited to that it doesn't adjudicate claims and made no misrepresentations to Butler. While it is possible that a loss may arise from this case, the amount of such loss is not known or estimable at this time.

79

*Other*

*Purported Securities Class Action Lawsuits*

In September 2017, three putative securities class action lawsuits were filed against the Company and certain of its current and former executive officers. The cases are styled *Cioe Investments Inc. v. Health Insurance Innovations, Inc., Gavin Southwell, and Michael Hershberger*, Case No. 1:17-cv-05316-NG-ST, filed in the U.S. District Court for the Eastern District of New York on September 11, 2017; *Michael Vigorito v. Health Insurance Innovations, Inc., Gavin Southwell, and Michael Hershberger*, Case No. 1:17-cv-06962, filed in the U.S. District Court for the Southern District of New York on September 13, 2017; and *Shilpi Kavra v. Health Insurance Innovations, Inc., Patrick McNamee, Gavin Southwell, and Michael Hershberger*, Case No. 8:17-cv-02186-EAK-MAP, filed in the U.S. District Court for the Middle District of Florida on September 21, 2017. All three of the foregoing actions (the "Securities Actions") were filed after a decline in the trading price of the Company's common stock following the release of a report authored by a short-seller of the Company's common stock raising questions about, among other things, the Company's public disclosures relating to the Company's regulatory examinations and regulatory compliance. All three of the Securities Actions, which are based substantially on the allegations raised in the short-seller report, contain substantially the same allegations and allege that the Company made materially false or misleading statements or omissions relating to regulatory compliance matters, particularly regarding to the Company's application for a third-party administrator license in the State of Florida. The Securities Actions allege violations of Section 10(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), SEC Rule 10b-5, and Section 20(a) of the Exchange Act. According to the filed complaints, the plaintiffs in the Securities Actions are seeking an undetermined amount of damages, interest, attorneys' fees and costs on behalf of putative classes of individuals and entities that acquired shares of the Company's common stock on periods ending September 11, 2017. The *Cioe Investments* and *Vigorito* cases have been transferred to the U.S. District Court for the Middle District of Florida, and on December 28, 2017, they were consolidated with the *Kavra* matter under the case caption, *In re Health Insurance Innovations Securities Litigation*, Case No. 8:17-cv-2186-EAK-MAP (M.D. Fla.). On February 6, 2018, the court appointed a lead plaintiff and lead counsel and ordered that lead plaintiff shall file and serve a consolidated complaint no later than 45 days after the order, that is, by March 23, 2018. The Company intends to vigorously defend against the claims. It is possible that similar lawsuits may yet be filed in the same or other courts that name the same or additional defendants.

*TPA Licensure*

On February 14, 2018, the OIR executed a consent order granting a Certificate of Authority to conduct business as a third-party insurance administrator in the State of Florida to HPIH. The consent order and Certificate of Authority were granted pursuant to an application submitted to the OIR by HPIH in October 2017. In the consent order, which sets forth terms and conditions associated with the license, the OIR assessed a fine of $140,000 as a result of a finding by the OIR (which HPIH did not contest) that HPIH conducted business as an insurance administrator in the State of Florida prior to HPIH's submission of the application.

*Telephone Consumer Protection Act*

The Company has received a number of private-party claims relating to alleged violations of the federal Telephone Consumer Protection Act ("TCPA") by its independently owned and operated licensed-agent distributors, alleging that their marketing activities were potentially unlawful. Additionally, the Company has been named as a defendant in multiple lawsuits relating to alleged TCPA matters, including claims styled, but not yet certified, as class actions. There are three primary cases filed in the courts by Plaintiffs Craig Cunningham, Kenneth Moser, and Amandra Hicks, each styled as a class action but not yet certified, and each Plaintiff alleging or seeking damages ranging from $160,000 to over $5,000,000. The Company is defending these claims and has filed motions to dismiss or the equivalent in each matter. On February 13, 2018, the Company successfully obtained a dismissal from the Cunningham case. The Company is presently reviewing the remaining matters and reviewing distributor compliance, and enhancing existing compliance. While these types of claims have previously settled, been dismissed, or resolved without any material effect on the Company, there is a possibility in the future that one or more could have a material effect. While it is possible that a loss may arise from these cases, the amount of such loss is not known or estimable at this time. The Company requires that its independently owned and operated licensed-agent distributors reimburse or indemnify it for any such settlements.

*Data and Privacy*

The Company has previously received inquiries but no claims, litigation, or findings of violation relating to alleged data loss and/or privacy breaches relating to affiliated companies. Each allegation is investigated upon receipt and handled promptly to resolution.

80