# EXHIBIT 8

10-K 1 hiiq-2018x12x31x10k.htm 10-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, DC 20549**

# FORM 10-K

[X]    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2018**

[ ]    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

**COMMISSION FILE NUMBER 001-35811**

HEALTH®
INSURANCE
INNOVATIONS

# Health Insurance Innovations, Inc.
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **46-1282634** |
| **(State or other jurisdiction of incorporation or organization)** | **(IRS Employer Identification No.)** |
| **15438 North Florida Avenue, Suite 201, Tampa, Florida** | **33613** |
| **(Address of principal executive offices)** | **(zip code)** |

**Registrant's telephone number, including area code:**
**(813) 397-1187**

**SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Class A common stock, par value $0.001 per share | NASDAQ Global Market |

**SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes [ ] No [X]

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act.    Yes [ ] No [X]

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such

Our internet address is http://www.hiiq.com. We make available free of charge on our website our annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments to those reports as soon as reasonably practicable after we electronically file such material with, or furnish it to, the SEC. Information contained on our website is not incorporated by reference into this annual report on Form 10-K, and you should not consider information contained on our website to be part of this annual report on Form 10-K, unless specifically noted otherwise.

## ITEM 1A. RISK FACTORS

In addition to the other information set forth in this report, you should carefully consider the following factors, which could materially affect our business, financial condition or results of operations in future periods. The risks described below are not exhaustive and are not the only risks facing our Company. Additional risks not currently known to us or that we currently deem to be immaterial also may materially adversely affect our business, financial condition or results of operations in future periods.

### Risks Relating to Our Business and Industry

*Our business practices and the business practices of our third-party licensed distributors and carriers are currently being reviewed by various state insurance regulators and the results of such reviews may adversely affect our business and results of operations.*

Our business practices and the business practices of our third-party licensed distributors and carriers are heavily regulated by each state in the United States and various federal agencies. State regulators require that we and our third-party licensed distributors adhere to sales, documentation, and administration practices specific to each state. As a result, we are currently subject to several state regulatory examinations and actions as further described in Note 14 "Commitments and Contingencies" in Part IV, Item 15 of this report. These examinations include, but are not limited to, a civil investigative demand from the Massachusetts Attorney General's Office, as further described in Item 15 of this report. An adverse finding or result in one or more of these matters could result in significant liability, additional state insurance licensing requirements or the revocation of licenses in a particular jurisdiction, which could significantly reduce our revenues, increase our operating expenses, prevent us from transacting health insurance business in a particular jurisdiction and otherwise harm our business, results of operations and financial condition. Moreover, an adverse regulatory action in one jurisdiction could result in penalties and adversely affect our license status or reputation in other jurisdictions due to the requirement that adverse regulatory actions in one jurisdiction be reported to other jurisdictions. Even if the allegations in any regulatory or other action against us are proven false, any surrounding negative publicity could harm member, distributor or health insurance carrier confidence in us, which could significantly damage our reputation.

*The market for health insurance in the United States is rapidly evolving, which makes it difficult to forecast demand for our products.*

The market for health insurance in the United States is rapidly evolving. Accordingly, our future financial performance will depend in part on growth in this market and on our ability to adapt to emerging demands in this market. We believe demand for our products has been driven in large part by regulatory changes, broader use of the internet and advances in technology. It is difficult to predict with any precision the future growth rate and size of our target market. The rapidly evolving nature of the market in which we operate, as well as other factors that are beyond our control, reduce our ability to evaluate accurately our long-term outlook and forecast performance or other operating results. A reduction in demand for our products caused by lack of acceptance, technological challenges, competing offerings or other factors would result in a lower revenue growth rate or decreased revenue, either of which could negatively impact our business and results of operations.

*Changes and developments in the health insurance system in the United States, in particular Healthcare Reform, could harm our business.*

Our business depends upon the private sector of the U.S. insurance system, its role in financing healthcare delivery, and insurance carriers' use of, and payment of commissions to, agents, brokers and other organizations for the marketing and sale of health insurance plans and products.

Healthcare Reform contains provisions that have changed and will continue to change the industry in which we operate in substantial ways. In addition, state governments have adopted, and will continue to adopt, changes to their existing laws and regulations in light of Healthcare Reform and related regulations. Future changes may, or may not, be beneficial to us, and may differ in significant ways from current Federal and state rules.

Certain key members of Congress continue to express a desire to withhold the funding necessary for Healthcare Reform or the desire to repeal or amend all or a portion of Healthcare Reform. Any partial or complete repeal or amendment of Healthcare

unavailability of reinsurance, and failure of business strategy or otherwise. Should our dependence on a smaller number of insurance carriers increase, whether as a result of the termination of insurance carrier relationships, further insurance carrier consolidation, business failure, bankruptcy or any other reason, we may become more vulnerable to adverse changes in our relationships with our insurance carriers, particularly in states where we offer health insurance plans and products from a relatively small number of insurance carriers or where a small number of insurance carriers dominate the market. The termination, amendment or consolidation of our relationships with our insurance carriers could harm our business, results of operations and financial condition.

*Our business could be harmed if we lose our relationships with independent distributors, fail to maintain good relationships with independent distributors, become dependent upon a limited number of third-party distributors or fail to develop new relationships with third-party distributors.*

We depend upon licensed third-party independent distributors, in addition to our internal distribution network, to sell our products. We typically enter into contractual agency relationships with independent distributors that are non-exclusive and terminable on short notice by either party for any reason. In many cases, these distributors also have the ability to amend the terms of our agreements unilaterally on short notice. Third-party distributors may be unwilling to sell our health insurance plans or products or may amend our agreements with them for a variety of reasons, including for competitive or regulatory reasons. For example, these independent distributors may decide to sell plans and products that bring them a higher commission than our plans and products or may decide not to sell IFP plans at all. We rely on a diverse distributor network to sell the products we offer, but any loss of relationships with independent distributors or failure to maintain good relationships with independent distributors could nevertheless harm our business, results of operations and financial condition. We have terminated, and could continue to terminate relationships, with distributors for their failure to follow our compliance standards or their otherwise engaging in problematic business practices.

*We depend on relationships with third-parties for certain services that are important to our business. An interruption or cessation of such services by any third-party could have a material adverse effect on our business.*

We depend on a number of third-party relationships to enhance our business. Our ability to offer our services and operate our business is therefore dependent on maintaining our relationships with third-party partners and entering into new relationships to meet the changing needs of our business. Any deterioration in our relationships with such partners, or our failure to enter into agreements with partners in the future could harm our business, results of operations and financial condition. If our partners are unable or unwilling to provide the services necessary to support our business, or if our agreements with such partners are terminated, our operations could be significantly disrupted. We may also incur substantial costs, delays and disruptions to our business in transitioning such services to ourselves or other third-party partners. In addition, third-party partners may not be able to provide the services required in order to meet the changing needs of our business.

For example, state regulations may require that individuals enroll in group programs or associations in order to access certain insurance products, benefits and services. We have entered into relationships with certain associations in order to provide individuals access to our products. For example, we have an agreement with a non-profit association that provides membership benefits to individuals and gives members access to certain of our products. This non-profit has the right to cancel its agreement with us at any time by providing 120 days' prior written notice. While we believe we could replace this non-profit with other group programs or associations, there can be no assurance that any of our other association affiliations could do so. If we were to lose our relationship with our non-profit associations and were unable to find another group program or association on a timely basis or at all, this would have a material adverse effect on our business.

*We rely on third-party vendors to develop, host, maintain, support and enhance our technology platform.*

We are party to agreements with BimSym pursuant to which BimSym provides various professional services relating to our core technology platform, including hosting, support, maintenance and development services. Our ability to offer our services and operate our business is therefore dependent on maintaining our relationships with third-party vendors, particularly BimSym, and entering into new relationships to meet the changing needs of our business. Any deterioration in our relationships with such vendors, or our failure to enter into agreements with vendors in the future could harm our business, results of operations and financial condition. If our vendors are unable or unwilling to provide the services necessary to support our business, or if our agreements with such vendors are terminated, our operations could be significantly disrupted. We may also incur substantial costs, delays and disruptions to our business in transitioning such services to ourselves or other third-party vendors. In addition, third-party vendors may not be able to provide the services required in order to meet the changing needs of our business.

15

https://www.sec.gov/Archives/edgar/data/1561387/000156138719000004/hiiq-2018x12x31x10k.htm                                                    22/140

*If we or our independent distributors fail to comply with the numerous laws and regulations that are applicable to our business, our business and results of operations could be harmed.*

The health insurance industry is heavily regulated by each state in the United States. For instance, state regulators require us to maintain a valid license in each state in which we transact health insurance business and further require that we adhere to sales, documentation and administration practices specific to each state. In addition, each distributor who transacts health insurance business on our behalf must maintain a valid license in each state in which it negotiates, sells or solicits the sale of insurance. As we do business in the majority of states and the District of Columbia, compliance with health insurance-related laws, rules and regulations is difficult and imposes significant costs on our business. Each jurisdiction's insurance department typically has the power, among other things, to:

- grant, suspend, and revoke licenses to transact insurance business;

- issue provisional or conditional licenses for probationary periods;

- conduct inquiries into the insurance-related activities and conduct of agents and agencies;

- require and regulate disclosure in connection with the negotiation, sale or solicitation of health insurance;

- authorize how, by which personnel and under what circumstances insurance premiums can be quoted and published and an insurance policy can be sold;

- determine under what circumstances entities can be paid commissions from carriers;

- regulate the content of insurance-related advertisements, including web pages;

- approve policy forms, require specific benefits and benefit levels and regulate premium rates;

- impose fines and other penalties;

- otherwise require changes to, or impose conditions, on how we or our distributors conduct business in their respective jurisdictions.

Due to the complexity, periodic modification and differing interpretations of insurance laws and regulations and the number of third parties with which we have relationships, we may not have always been, and we and/or our independent distributors may not always be, in compliance with such laws and regulations. Failure to comply could result in significant liability, additional state insurance licensing requirements or the revocation of licenses in a particular jurisdiction, which could significantly reduce our revenue, increase our operating expenses, prevent us from transacting health insurance business in a particular jurisdiction and otherwise harm our business, results of operations and financial condition. Moreover, an adverse regulatory action in one jurisdiction could result in penalties and adversely affect our license status or reputation in other jurisdictions due to the requirement that adverse regulatory actions in one jurisdiction be reported to other jurisdictions. Even if the allegations in any regulatory or other action against us are proven false, any surrounding negative publicity could harm member, distributor or health insurance carrier confidence in us, which could significantly damage our reputation. Because some members, distributors and health insurance carriers may not be comfortable with the concept of purchasing health insurance using the internet, any negative publicity may affect us more than it would others in the health insurance industry and could harm our business, results of operations and financial condition.

We depend, in part, on independent third-party distributors for the sale of our products. The failure of any of our independent third-party distributors to comply with applicable laws and regulations could have an adverse effect on our business. For example, while we are not culpable for the actions or omissions of our independent third-party distributors, their actions or omissions could result in an investigation or regulatory action against our Company.

In addition, we have received and may receive in the future inquiries from state insurance regulators regarding our marketing and business practices, the practices of our independent third-party distributors and our insurance carriers. We may modify our practices in connection with any such inquiry, and we may require our distributors to change their practices, or we may be forced to terminate distributors based on such practices. In 2016 we terminated two of our largest independent third-party distributors. Again in 2018, we terminated one of our largest independent third-party distributors for failure to comply with our compliance standards. Any modification, or penalty for noncompliance based on our marketing or business practices in response to regulatory inquiries could harm our business, results of operations or financial condition.

16

For additional information regarding our current state insurance regulatory matters, see Note 14 "Commitments and Contingencies" in Part IV, Item 15 of this report.

***Changes in the quality and affordability of the health insurance plans and products that insurance carriers offer to us for sale through our technology platform could harm our business and results of operations.***

The demand for health insurance marketed through our technology platform is affected by, among other things, the variety, quality and price of the health insurance plans and products we offer. If health insurance carriers do not continue to allow us to sell a variety of high-quality, affordable health insurance plans and products in our markets, or if their offerings are limited or terminated as a result of consolidation in the health insurance industry, changes in Healthcare Reform or otherwise, our sales may decrease and our business, results of operations and financial condition could be harmed.

***If individuals or insurance carriers opt for more traditional or alternative channels for the purchase and sale of health insurance, our business could be harmed.***

Our success depends, in part, upon continued growth in the use of the internet as a source of research on health insurance products and pricing, as well as willingness for individuals to use the internet to request further information or contact the distributors directly or indirectly that sell the products we offer. Individuals and insurance carriers may choose to depend more on traditional sources, such as individual agents, or alternative sources may develop, including as a result of Healthcare Reform. Our future growth, if any, will depend in part upon:

- the growth of the internet as a commerce medium generally, and as a market for individual health insurance plans and services specifically;

- individuals' willingness and ability to conduct their own health insurance research;

- our ability to make the process of purchasing health insurance online an attractive alternative to traditional and new means of purchasing health insurance;

- our ability to successfully and cost-effectively market our services as superior to traditional or alternative sources for health insurance to a sufficiently large number of individuals; and

- insurance carriers' willingness to use us and the internet as a distribution channel for health insurance plans and products.

If individuals and carriers determine that other sources of health insurance and health insurance applications are superior, our business will not grow, and our results of operations and financial condition could be harmed.

***Any legal liability, regulatory penalties, or negative publicity for the information on our platform or that we otherwise distribute or provide could likely harm our business and results of operations.***

We provide information on our platform, through our independent third-party distributors, and in other ways, regarding health insurance in general and the health insurance plans and products we market and sell. Such information includes insurance premiums, coverage, benefits, provider networks, exclusions, limitations, availability, plan and premium comparisons, and insurance company ratings. A significant amount of both automated and manual effort is required to maintain the considerable amount of insurance plan information contained on our platform. We regularly provide health insurance plan information in the scripts used by our independent third-party distributors. The information we provide on our platform, through our independent third-party distributors, and otherwise may be construed as not accurate or misleading. If it is construed that we have not properly assisted individuals and businesses in purchasing health insurance, consumers, insurance carriers and others could attempt to hold us liable for damages. If such is the case, our relationships with insurance carriers could be terminated. Regulators also could attempt to subject us to penalties, revoke our licenses to transact health insurance business in a particular jurisdiction, and/or compromise the status of our licenses to transact health insurance business in other jurisdictions. Such action could result in loss of our commission revenue. In the ordinary course of operating our business, we have received complaints that the information we provided was not accurate or was misleading. We cannot guarantee that we will be able to resolve these complaints without significant financial cost. In addition, these types of claims could be time-consuming and expensive to defend, could divert our management's attention and other resources and could cause a loss of confidence in our services. As a result, these types of claims could harm our business, results of operations and financial condition.

17

https://www.sec.gov/Archives/edgar/data/1561387/000156138719000004/hiiq-2018x12x31x10k.htm                    25/140

Additionally, we are subject to various federal and state telemarketing regulations, including the Telephone Consumer Protection Act ("TCPA") and the FCC's implementing regulations, as well as various state telemarketing laws and regulations. We, our independent third-party distributors, and our insurance carriers have been, and continue to be, the subject of allegations of TCPA violations. We could be responsible for some of the costs incurred by these independent third-party distributors and/or carriers who are the subject of allegations of TCPA violations. Any violation of these regulations could expose us to damages for monetary loss, statutory damages, fines, penalties and/or regulatory inquiries. The Company has received a number of private-party TCPA claims relating to independently owned and operated third-party licensed-agent distributors, alleging that their marketing activities were potentially unlawful. The Company has been named as a defendant in multiple lawsuits relating to alleged TCPA matters, including claims styled, but not yet certified, as class actions.

In the ordinary course of our business, we have received, and may continue to receive, inquiries from state regulators relating to various matters or in the future become involved in litigation. Also, from time to time, we may be a party to litigation and subject to civil claims incident to the ordinary course of business, including claims from consumers alleging misrepresentation and material omissions in connection with their purchase of our products. For information regarding our current regulatory matters, see Note 14 "Commitments and Contingencies" in Part IV, Item 15 of this report. If we are found to have violated laws or regulations, we could lose our relationship with insurance carriers and be subject to various fines and penalties, including revocation of our licenses to sell insurance, and our business, results of operations and financial condition would be materially harmed. We could also be harmed to the extent that related publicity damages our reputation as a trusted source of information relating to health insurance and its affordability. It could also be costly to defend ourselves regardless of the outcome. As a result, inquiries from regulators or our becoming involved in litigation could adversely affect our business, results of operations and financial condition.

*Advance commission arrangements between us and some of our third-party distributors could expose us to the credit risks of such distributors, which could in turn have an adverse effect on our business, financial condition, and results of operations.*

We make advance commission payments to many of our independent distributors in order to assist them with the cost of lead acquisition and provide working capital. As of December 31, 2018, we had outstanding advanced commissions of approximately $29.9 million under such arrangements of which approximately $12.3 million is with three distributors. In most cases where we make advance commission payments, we receive security interests in collateral, as well as personal and entity-level guarantees. At a minimum, our collateral includes a claim against all future compensation owed to the distributor for all products sold. As a result, our claims for such payments would usually be considered secured claims. Depending on the amount of future compensation owed to the distributor, we could be exposed to the credit risks of our third-party distributors in the event of their insolvency or bankruptcy. Where the amount owed to us exceeds the value of the collateral, our claims against the defaulting distributors would rank below those of certain other secured creditors, which could undermine our chances of obtaining the return of our advance commission payments. We may not be able to recover such advance payments and we may suffer losses should the independent distributors fail to fulfill their sales obligations under the contracts. Accordingly, any of the above scenarios could harm our business, results of operations and financial condition.

*Seasonality could cause fluctuations in our financial results.*

Our business of marketing IFP and supplemental plans is subject to seasonal fluctuations that we believe have been impacted by Healthcare Reform. Under Healthcare Reform, the PPACA open enrollment period was open in the fourth quarter of 2018, at which time individuals could enroll in ACA compliant individual insurance programs. During the times that the open enrollment period is closed, we have the capability to sell our IFP products as an alternative health insurance option for consumers who are ineligible for plans offered by PPACA. Other seasonality trends may develop and the existing seasonality and consumer behavior that we have experienced may change as the enforcement of Healthcare Reform continues and our markets continue to change. Any seasonality that we experience could cause fluctuations in our financial results.

*If we are unable to successfully introduce new technology solutions or services or fail to keep pace with advances in technology, our business, financial condition and results of operations could be adversely affected.*

Our business depends on our ability to adapt to evolving technologies and industry standards and introduce new technology solutions and services accordingly. If we cannot adapt to changing technologies, our technology solutions and services may become obsolete, and our business would suffer. Because the healthcare insurance market is constantly evolving, our existing technology may become obsolete and fail to meet the requirements of current and potential members. Our success will depend, in part, on our ability to continue to enhance our existing technology solutions and services, develop new technology that addresses the increasingly sophisticated and varied needs of our members, and respond to technological advances and emerging industry standards and practices on a timely and cost-effective basis. The development of our online platform entails significant technical and business risks. We may not be successful in developing, using, marketing, or maintaining new technologies effectively or adapting our technology to evolving customer requirements or emerging industry standards, and, as a result, our business and reputation could

by an assumed tax rate equal to the highest marginal effective federal, state and local income tax rate applicable for an individual or corporation taking into account any allowable deductions. Additional amounts may be distributed to us if needed to meet our tax obligations and our obligations pursuant to the TRA.

During the year ended December 31, 2018, HPIH paid cash distributions of $2.9 million for these entities related to estimated federal and state income taxes, pursuant to the operating agreement entered into by HPIH and HPI. Of these cash distributions, $638,000 was related to amounts accrued for at December 31, 2017 and included in due to member account on the consolidated balance sheet. As of December 31, 2018, there was $6.7 million of declared but unpaid distributions to its members reported in due to member on the consolidated balance sheet. For the years ended December 31, 2017, and 2016, $5.5 million, and $2.0 million in cash distributions were made for estimated federal and state income taxes.

Pursuant to the operating agreement of HPIH, we determine when distributions will be made to the members of HPIH and the amount of any such distributions, except that HPIH is required by the operating agreement to make certain pro rata quarterly distributions to each member of HPIH on the basis of the assumed tax liabilities of the members.

*Tax Receivable Agreement*

On February 13, 2013, we entered into a TRA with the holders of the HPIH Series B Membership Interests, which holders are beneficially owned by Michael W. Kosloske, our founder. The TRA requires us to pay to such holders 85% of the cash savings, if any, in U.S. federal, state and local income tax we realize (or are deemed to realize in the case of an early termination payment, a change in control or a material breach by us of our obligations under the TRA) as a result of any possible future increases in tax basis and of certain other tax benefits related to entering into the TRA, including tax benefits attributable to payments under the TRA itself. This is HIIQ's obligation and not an obligation of HPIH. HIIQ will benefit from the remaining 15% of any realized cash savings. For purposes of the TRA, cash savings in income tax is computed by comparing our actual income tax liability with our hypothetical liability had we not been able to utilize the tax benefits subject to the TRA itself. The TRA became effective upon completion of the IPO and will remain in effect until all such tax benefits have been used or expired, unless HIIQ exercises its right to terminate the TRA for an amount based on the agreed payments remaining to be made under the agreement or HIIQ breaches any of its material obligations under the TRA in which case all obligations will generally be accelerated and due as if HIIQ had exercised its right to terminate the agreement. Any potential future payments will be calculated using the market value of our Class A common stock at the time of the relevant exchange and prevailing tax rates in future years and will be dependent on us generating sufficient future taxable income to realize the benefit. Payments are generally due under TRA within a specified period of time following the filing of our tax return for the taxable year with respect to which payment of the obligation arises.

Exchanges of Series B Membership Interests, together with an equal number of shares of our Class B common stock, for shares of our Class A common stock, are expected to increase our tax basis in our share of HPIH's tangible and intangible assets. These increases in tax basis are expected to increase our depreciation and amortization deductions and create other tax benefits and therefore may reduce the amount of tax that we would otherwise be required to pay in the future. As of December 31, 2018, Series B Membership Interests, together with an equal number of shares of Class B common stock have been exchanged for a total of 6,125,000 shares of Class A common stock subsequent to the IPO. See Note 8 for further information on these issuances of Class A common stock.

As a result of the exchanges noted above, we have recorded a liability of $27.0 million pursuant to the TRA as of December 31, 2018, of which, $1.3 million was included in due to member within current liabilities and $25.7 million was included in due to member within long-term liabilities on the accompanying consolidated balance sheet. As of December 31, 2017, there was $16.2 million payable pursuant to the TRA, of which $1.1 million was included in current liabilities and $15.1 million was included in long-term liabilities on the accompanying consolidated balance sheet. See Note 11 for discussion surrounding the impact of the Tax Act on the TRA.

As of December 31, 2018, we have made $2.4 million of cumulative payments under the TRA.

*Legal Proceedings*

The Company is subject to legal proceedings, claims, and liabilities that arise in the ordinary course of business. The Company accrues losses associated with legal claims when such losses are probable and reasonably estimable. If the Company determines that a loss is probable and cannot estimate a specific amount for that loss, but can estimate a range of loss, the best estimate within the range is accrued. If no amount within the range is a better estimate than any other, the minimum amount of the range is accrued. Estimates are adjusted as additional information becomes available or circumstances change. Legal defense costs associated with loss contingencies are expensed in the period incurred. In addition to ordinary-course litigation that the Company does not believe to be material, the Company is a party to the proceedings and matters described below:

*State Regulatory Examinations*

*Indiana Multistate Market Conduct Examination*

The Company was the subject of a previously disclosed multistate market conduct examination ("MCE"). Following discussions with the chief examiner and the lead state in the MCE, the Company determined that entering into a Regulatory Settlement Agreement ("RSA") to resolve the MCE was in its best interest. The Company and the five lead states signed the RSA on December 12, 2018. The RSA became binding on the Company and the signatory states once a total of 25 participating states signed. The Company was informed that the RSA became binding on January 28, 2019. Under the RSA, the Company agreed to make a payment of $3.4 million towards the cost of the examination, which has been accrued for in accounts payable and accrued expenses on the consolidated balance sheet at December 31, 2018. The Company is also implementing measures to improve its training and monitoring of agents as well as other compliance and licensing related issues.

*Massachusetts Regulatory Inquiry*

The Company received notification of a civil investigative demand from the Massachusetts Attorney General's Office ("MAG") on June 16, 2016. The MAG requested certain information and documents from the Company to review the Company's practices relating to its compliance with Massachusetts laws and regulations to ensure that they are neither deceptive nor constitute unfair trade practices.

The Company continues to cooperate with the MAG in the interest of bringing the matter to an agreeable conclusion. While the MAG has indicated it is amenable to exploring all available options, it is still too early to assess whether the MAG's investigation will result in a material impact on the Company. The Company believes that based on the nature of the allegations raised by the MAG, a loss arising from the future assessment of a civil penalty against the Company is probable. Notwithstanding, due to the procedural stage of the investigative process, the settlement of another party (a carrier) for the same set of allegations, and the fact that the Company has neither requested nor received evidentiary material from the MAG, the Company is currently unable to estimate the amount of any potential civil penalty or determine a range of potential loss under the MAG's investigation of the Company. It is possible there may be no financial loss, a nominal or minimal loss, or some other mutually satisfactory resolution.

*Florida Regulatory Inquiry*

On June 11, 2018, the Company received notice that the Florida Office of Insurance Regulation conducted an investigation as a result of allegations that the Company's subsidiary, HealthPocket, Inc. d/b/a AgileHealthInsurance, had advertised inducements in the solicitation of insurance products via an independently owned, third-party website and made allegedly material misstatements on an insurance agency application for licensure. The matter has been resolved with a stipulated Consent Order in which HealthPocket paid an administrative penalty of $10,000 along with agreed compliance terms.

*California Regulatory Action*

On August 29, 2018, the Company received an Order to Show Cause and Notice of Hearing from the California Department of Insurance alleging that the Company made misleading statements relating to health insurance policies. The Company is actively engaged with the Department to resolve the matter.

We are proactively communicating and cooperating with all regulatory agencies involved in the above-described actions as we continue to develop and enhance our compliance and control mechanisms. However, it is too early to determine whether any of these regulatory matters will have a material impact on our business. Any adverse finding could result in significant penalties or other liabilities and/or a requirement to modify our marketing or business practices and the practices of our third-party independent distributors, which could harm our business, results of operations, or financial condition. Moreover, an adverse regulatory action in one jurisdiction could result in penalties and adversely affect our license status or reputation in other jurisdictions due to the requirement that adverse regulatory actions in one jurisdiction be reported to other jurisdictions.

*Claims that involve independently licensed third-party insurance agencies and their agents, and independent insurance carriers, in which the Company is named as a co-defendant*

In a case styled as Charles M. Butler, III and Chole Butler v. Unified Life Ins. Co., et al., Case No. 17-cv-00050-SPW-TJC, U.S. District Court for the District of Montana (Billings Div.) ("Butler case"), in which allegations of misrepresentation and claims handling were made against an independent third-party insurance agency and an insurance carrier, the plaintiff also named the

Company as a party. The Company was served on May 11, 2017 and is vigorously asserting defenses against the claims. While it is possible that a loss may arise from this case, the amount of such loss is not known or estimable at this time.

In a case styled as Carter v. Companion Life Insurance Company et al., Case No. 18-cv-350, U.S. District Court for the District of Alabama ("Carter case"), in which allegations were made against an insurance carrier relating to the handling of claims where the plaintiff also named the Company as a party. The Carter complaint was received on March 20, 2018 and an Amended Complaint was subsequently filed on July 6, 2018. The Company has since moved to dismiss the Amended Complaint, and the parties are awaiting the Court's ruling. While it is possible that a loss may arise from this case, the amount of such loss is not known or estimable at this time.

In a case styled as David Diaz et al. v. Health Plan Intermediaries Holdings, LLC, et al., Case No. 18-cv-04240, U.S. District Court for the District of Arizona, the two plaintiffs allege misrepresentation relating to the sale of an insurance policy that later allegedly did not cover hospital bills. The insurance agent who sold the policy was an employee of the Company's wholly-owned subsidiary, American Service Insurance Agency ("ASIA") and that agent is also named as a co-defendant. The Company has moved to dismiss the complaint and is awaiting a ruling from the Court. While it is possible that a loss may arise from this case, the amount of such loss is not known or estimable at this time.

The Company has also received claims from insureds relating to lack of carrier coverage, claims handling, and alleged deceptive sales practices relating to carriers with which we do business. In each of these individual insureds' claims, the Company attempts to dismiss, challenge, or resolve the claims as quickly as possible.

*Other*

*Purported Securities Class Action Lawsuits*

In September 2017, three putative securities class action lawsuits were filed against the Company and certain of its current and former executive officers. The cases were styled Cioe Investments Inc. v. Health Insurance Innovations, Inc., Gavin Southwell, and Michael Hershberger, Case No. 1:17-cv-05316-NG-ST, filed in the U.S. District Court for the Eastern District of New York on September 11, 2017; Michael Vigorito v. Health Insurance Innovations, Inc., Gavin Southwell, and Michael Hershberger, Case No. 1:17-cv-06962, filed in the U.S. District Court for the Southern District of New York on September 13, 2017; and Shilpi Kavra v. Health Insurance Innovations, Inc., Patrick McNamee, Gavin Southwell, and Michael Hershberger, Case No. 8:17-cv-02186-EAK-MAP, filed in the U.S. District Court for the Middle District of Florida on September 21, 2017. All three of the foregoing actions (the "Securities Actions") were filed after a decline in the trading price of the Company's common stock following the release of a report authored by a short-seller of the Company's common stock raising questions about, among other things, the Company's public disclosures relating to the Company's regulatory examinations and regulatory compliance. All three of the Securities Actions contained substantially similar allegations to those raised in the short-seller report alleging that the Company made materially false or misleading statements or omissions relating to regulatory compliance matters, particularly regarding the Company's application for a third-party administrator license in the State of Florida, which was issued by the State on February 14, 2018.

In November and December 2017, the Cioe Investments and Vigorito cases were transferred to the U.S. District Court for the Middle District of Florida, and on December 28, 2017, they were consolidated with the Kavra matter under the case caption, In re Health Insurance Innovations Securities Litigation, Case No. 8:17-cv-2186-EAK-MAP (M.D. Fla.). On February 6, 2018, the court appointed Robert Rector as lead plaintiff and appointed lead counsel, and lead plaintiff filed a consolidated complaint on March 23, 2018. The consolidated complaint, which dropped Patrick McNamee as a defendant and added Michael Kosloske as a defendant, largely sets forth the same factual allegations as the initially filed Securities Actions filed in September 2017 and added allegations relating to alleged materially false statements and omissions relating to the regulatory proceeding previously initiated against the Company by the Montana State Auditor, Commissioner of Securities and Insurance (the "CSI") which proceeding was dismissed on October 31, 2017. The complaint also adds allegations regarding insider stock sales by Messrs. Kosloske and Hershberger. The consolidated complaint alleges violations of Section 10(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), SEC Rule 10b-5, and Section 20(a) of the Exchange Act. According to the consolidated complaint, the plaintiffs in the action are seeking an undetermined amount of damages, interest, attorneys' fees and costs on behalf of putative classes of individuals and entities that acquired shares of the Company's common stock on periods ending September 11, 2017. The Company and co-defendants filed motions to dismiss all claims set forth in the complaint, and the motion has been fully briefed. The case is awaiting the court's decision on the motions. At this time, the Company cannot predict the probable outcome of this action, and, accordingly, no amounts have been accrued in the Company's consolidated financial statements for this action.

86

*Putative Derivative Action Lawsuits*

Two individuals, Ian DiFalco and Dayle Daniels, filed separate but similar derivative action complaints on April 5 and April 6, 2018, respectively, in the Delaware Court of Chancery naming most of the Company's directors and executive officers as defendants. The derivative complaints assert alleged violations of Section 14(a) of the Exchange Act, Section 10(b) of the Exchange Act and Rule 10b-5, and Section 20(a) of the Exchange Act, and claims for alleged breach of fiduciary duties, alleged unjust enrichment, alleged abuse of control, alleged gross mismanagement, and alleged waste of corporate assets. The factual allegations in the complaints are based largely on the allegations in the above-described securities class action consolidated complaint. The derivative suit includes additional allegations relating to misconduct by third-party call centers utilized by the Company in its operations. The plaintiffs are seeking declaratory relief, direction to reform and improve corporate governance and internal procedures, and an undetermined amount of damages, restitution, interest, and attorneys' fees and costs. On June 5, 2018, the court entered an order staying the litigation pending resolution of the above-described securities litigation (In re Health Insurance Innovations Securities Litigation). Defendants intend to vigorously defend against these claims. However, at this time, the Company cannot predict the probable outcome of these actions, and, accordingly, no amounts have been accrued in the Company's consolidated financial statements for this action.

On February 18, 2019, a putative class action lawsuit styled Julian Keippel v. Health Insurance Innovations, Inc., Gavin Southwell, and Michael D. Hershberger, Case No. 8:19-cv-00421, was filed against the Company, its chief executive officer, and chief financial officer in the U.S. District Court for the Middle District of Florida. According to the complaint, the plaintiff in the action is seeking an undetermined amount of damages, interest, attorneys' fees, and costs on behalf of a putative class of individuals and entities that acquired shares of the Company's common stock during the period February 28, 2018 through November 27, 2018. The complaint alleges that the Company made materially false and/or misleading statements and/or material omissions during the purported class period relating to the Company's relationship with third parties, particularly Health Benefits One LLC/Simple Health Plans and affiliates. The complaint alleges that, among other things, the Company failed to disclose to investors that a substantial portion of the Company's revenues were derived from third parties who allegedly used deceptive tactics to sell the Company's products and that regulatory scrutiny of such third parties would materially impact the Company's operations. The complaint alleges violations of Section 10(b) and Section 20(a) of the Securities Exchange Act and Rule 10b-5 promulgated under the Securities Exchange Act. The Company has not yet been served in the action and intends to vigorously defend against the claims if and when the Company is served.

*Telephone Consumer Protection Act*

The Company has received a number of private-party claims relating to telephonic-sales calls allegedly conducted by independent third-party distributors, who are only associated with the Company through use of our technology platform. Generally, these claims assert that the Company violated the Telephone Consumer Protection Act ("TCPA"), although we believe that the Company does not engage in any such activities. In fact, the Company maintains internal and external compliance staff and processes to monitor independent third-party distributor compliance. Historically, the Company has been successful at obtaining dismissals or settling the claims for immaterial amounts. The Company continues to vigorously defend itself in pending cases filed by what has been determined to be serial-professional plaintiffs such as those cases filed by Craig Cunningham and Kenneth Moser. In the Cunningham case, the Company has been successful at having the case dismissed twice. Mr. Cunningham refiled his case a third time and the Company has responded with another motion to dismiss. Moser, like Cunningham, has been a plaintiff in hundreds of similar cases against a variety of types of companies nationwide. The Company has received complaints for alleged TCPA violations from other claimants, the majority of which are not lawsuits. The Company believes many of these individuals to be professional plaintiffs and not common consumers. The Company maintains an internal legal department that, among other things, reviews these claims as they arise, coordinates the Company's response to such, and supports outside counsel when litigation defense is required. While these types of claims have previously settled, been dismissed, or resolved without any material effect on the Company, there is a possibility in the future that one or more could have a material effect. The Company commonly uses outside legal counsel to defend against such claims and requires that the independent third-party distributors who are related to any such claims provide indemnification and reimbursement to the Company for the costs associated with these Claims.

*Health Benefits One, LLC*

On November 1, 2018, the Company received notice that a lawsuit styled as Federal Trade Commission v. Simple Health Plans, et al. was filed against an independent third-party distributor and its principal, along with their related companies. The Company is not a party to this case. An injunction was granted by the United States District Court, Southern District of Florida, against Simple Health Plans, LLC appointing a Receiver and imposing other restrictions against the defendants in this case. On November 1, 2018, the Company terminated its relationship with all of the defendants, has been in communication with the appointed Receiver and is providing assistance where requested.

*Other matters*

We enter into agreements in the ordinary course of business that may require us to indemnify other parties for claims brought by a third-party. From time to time, we have received requests for indemnification. Presently the Company is managing and responding to both formal demands and informal requests for indemnification from a number of carriers related to the MCE, states' investigations into carriers relating to agent licensing, and the TCPA claims identified above. Management cannot reasonably estimate any potential losses, but these claims could result in a material liability for us.

*Data and Privacy*

The Company has previously received inquiries but no claims, litigation, or findings of violation relating to alleged data loss and/or privacy breaches relating to affiliated companies. Each allegation is investigated upon receipt and handled promptly to resolution.

**15.    Employee Benefit Plan**

We sponsor a benefit plan to provide retirement benefits for our employees, known as the Health Plan Int Holdings LLC 401(k) Profit Sharing Plan & Trust (the "Plan"). Participants may make voluntary contributions to the Plan from their annual base pre-tax compensation, cash bonuses, and commissions in an amount not to exceed the federally determined maximum allowable contribution amounts. For each of the years ended December 31, 2018 and 2017, the base maximum allowable contribution amount was $18,500 and $18,000, respectively. The Plan also permits for discretionary Company contributions. For each of the years ended December 31, 2018 and 2017, the Company accrued $59,000 and $56,000, respectively for discretionary matching contributions to participants.

**16.    Related-Party Transaction**

*Health Plan Intermediaries, LLC*

HPI and its subsidiary HPIS, which are beneficially owned by Mr. Kosloske, are related parties by virtue of their Series B Membership interests in HPIH, of which we are managing member. See Note 14 for further details regarding the Exchange Agreement.

*Tax Receivable Agreement*

On February 13, 2013, we entered into a tax receivable agreement with the holders of HPIH Series B Membership Interests, which are beneficially owned by Mr. Kosloske. See Note 14 for further details regarding the TRA.

*Reinsurance*

Insurance carriers with which we do business often reinsure a portion of their risk. From time to time, entities owned or affiliated with Michael Kosloske, serve as reinsurers for insurance carriers that offer products sold by HPIH.

**17.    Concentrations of Credit Risk and Significant Customers**

Accounts receivable, net were $828,500 and $1.3 million as of December 31, 2018 and 2017, respectively and is included as a component of accounts receivable, net, prepaid expenses, and other current assets in the accompanying consolidated balance sheets. As of December 31, 2018, we had two customers who made up approximately 40% of the net accounts receivable balance. As of December 31, 2017, we had two customers who made up approximately 56% of the accounts receivable, net balance.

Advanced commissions were $29.9 million and $39.5 million as of December 31, 2018 and 2017, respectively. For the year ended December 31, 2018, two distributors accounted for 31% of our advanced commissions balance compared to two distributors who accounted for 60% for the year ended December 31, 2017.

For the year ended December 31, 2018, two carriers accounted for 64% of our total collections whereas for the years ended December 31, 2017, and 2016, three carriers accounted for 54% and 60%, respectively, of our total collections. For the year ended December 31, 2018, Federal Insurance Company ("CHUBB") accounted for 40% and Lifeshield National Insurance Co accounted for 24% of our total collections. The Company anticipates that its total collections in 2019 will continue to be concentrated among a small number of carriers.

88

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

HEALTH INSURANCE INNOVATIONS, INC.

By:    */s/ Gavin D. Southwell*

Gavin D. Southwell
President and Chief Executive Officer
(Principal Executive Officer)
March 14, 2019

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| DATE | SIGNATURE | TITLE |
|---|---|---|
| March 14, 2019 | */s/ Gavin D. Southwell*<br>Gavin D. Southwell | President, Chief Executive Officer and Director<br>(Principal Executive Officer) |
| March 14, 2019 | */s/ Michael D. Hershberger*<br>Michael D. Hershberger | Chief Financial Officer, Secretary and Treasurer<br>(Principal Financial and Accounting Officer) |
| March 14, 2019 | */s/ Michael W. Kosloske*<br>Michael W. Kosloske | Director |
| March 14, 2019 | */s/ Paul G. Gabos*<br>Paul G. Gabos | Director |
| March 14, 2019 | */s/ Robert S. Murley*<br>Robert S. Murley | Director |
| March 14, 2019 | */s/ Paul E. Avery*<br>Paul E. Avery | Director |
| March 14, 2019 | */s/ Anthony J. Barkett*<br>Anthony J. Barkett | Director |
| March 14, 2019 | */s/ John A. Fichthorn*<br>John A. Fichthorn | Director |

93