# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

|  |  |
|---|---|
| JULIAN KEIPPEL, Individually and On Behalf of All Others Similarly Situated, | CASE NO. 8:19-CV-00421-WFJ-CPT |
|  | CLASS ACTION |
| Plaintiff, |  |
| vs. |  |
| HEALTH INSURANCE INNOVATIONS, INC., GAVIN SOUTHWELL, and MICHAEL D. HERSHBERGER, | JURY TRIAL DEMANDED |
| Defendants. |  |

## LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

I.    INTRODUCTION ......................................................................................... 1

II.   SUMMARY OF THE COMPLAINT............................................................. 3

     A.    Defendants Promoted HIIQ's Purported Compliance Record
          As The Key To The Company's Performance................................................ 4

     B.    In Truth, HIIQ Orchestrated An Intentional Consumer Fraud
          That Flooded HIIQ With Complaints ............................................................ 5

     C.    The Truth Emerged In A Series Of Partial Disclosures................................. 7

III.  ARGUMENT.................................................................................................. 7

     A.    Defendants Made False And Misleading Statements And
          Omissions....................................................................................................... 8

     B.    Defendants' Various "Falsity" Contentions Fail ........................................... 10

     C.    The Complaint Adequately Alleges Scienter.................................................. 14

          1.    The Complaint Raises A Strong Inference That
               Defendants Knowingly Or Recklessly Misled Investors .................... 14

          2.    Given The Overwhelming Evidence Of Intentional
               Fraud, Defendants Cannot Raise Any Non-Culpable
               Inference ............................................................................................. 17

     D.    The Complaint Adequately Alleges Loss Causation ..................................... 18

IV.  CONCLUSION............................................................................................... 20

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bach v. Amedisys, Inc.*,
  2016 WL 4443177 (M.D. La. Aug. 19, 2016) ...............................................9, 10

*Bellocco v. Curd*,
  2005 WL 2675022 (M.D. Fla. Oct. 20, 2005).............................................10, 11

*Broadway Gate Master Fund, Ltd. v. Ocwen Fin. Corp.*,
  2016 WL 9413421 (S.D. Fla. June 29, 2016) ......................................................10

*Bros. v. Saag*,
  2014 WL 838890 (N.D. Ala. Mar. 4, 2014)..........................................................12

*Carvelli v. Ocwen Fin. Corp.*,
  934 F.3d 1307 (11th Cir. 2019)...........................................................................11

*City of Sterling Heights Gen. Employees' Ret. Sys. v. Hospira, Inc.*,
  2013 WL 566805 (N.D. Ill. Feb. 13, 2013)..........................................................10

*Coker v. Norfolk S. Corp.*,
  2019 WL 398704 (N.D. Ala. Jan. 31, 2019) ........................................................17

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) .............................................................................................19

*FindWhat Inv'r Grp. v. FindWhat.com*,
  658 F.3d 1282 (11th Cir. 2011).......................................................8, 9, 12, 13, 18

*Freudenberg v. E*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010)..................................................................10

*Gebhardt v. ConAgra Foods, Inc.*,
  335 F.3d 824 (8th Cir. 2003)..................................................................................9

*Grand Lodge of Pa. v. Peters*,
  550 F. Supp. 2d 1363 (M.D. Fla. 2008) ...............................................................18

*HCM High Yield Opportunity Fund, LP v. Skandinaviska Enskilda Banken AB*,
  2001 WL 36186526 (S.D. Fla. Dec. 14, 2001) ....................................................17

ii

*Hubbard v. BankAtlantic Bancorp, Inc.*,
  2009 WL 3261941 (S.D. Fla. May 12, 2009) ......................................................................17

*In re Banc of California Sec. Litig.*,
  2017 WL 3972456 (C.D. Cal. Sept. 6, 2017).......................................................................20

*In re Carter's, Inc. Sec. Litig.*,
  2012 WL 3715241 (N.D. Ga. Aug. 28, 2012).......................................................................15

*In re Catalina Mktg. Corp. Sec. Litig.*,
  390 F. Supp. 2d 1110 (M.D. Fla. 2005) ...............................................................................17

*In re Equifax Inc. Sec. Litig.*,
  357 F. Supp. 3d 1189 (N.D. Ga. 2019) .................................................................................10

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013)...................................................................................13

*In re Faro Techs. Sec. Litig.*,
  534 F. Supp. 2d 1248 (M.D. Fla. 2007) ...............................................................................18

*In re Flowers Foods, Inc. Sec. Litig.*,
  2018 WL 1558558 (M.D. Ga. Mar. 23, 2018) ...........................................................12, 16, 20

*In re Friedman's, Inc. Sec. Litig.*,
  385 F. Supp. 2d 1345 (N.D. Ga. 2005) ...................................................................................8

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
  791 F.3d 90 (D.C. Cir. 2015) ................................................................................................13

*In re HD Supply Holdings, Inc. Sec. Litig.*,
  341 F. Supp. 3d 1342 (N.D. Ga. 2018) .....................................................................17, 19, 20

*In re Immucor Inc. Sec. Litig.*,
  2006 WL 3000133 (N.D. Ga. 2006).......................................................................................16

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
  78 F. Supp. 3d 1215 (N.D. Cal. 2015) ..................................................................................20

*In re Netbank, Inc. Sec. Litig.*,
  2009 WL 2432359 (N.D. Ga. Jan. 29, 2009) ........................................................................18

*In re Paincare Holdings Sec. Litig.*,
  541 F. Supp. 2d 1283 (M.D. Fla. 2008) .......................................................................8, 14, 16

iii

*In re Petrobras Sec. Litig.*,
　116 F. Supp. 3d 368 (S.D.N.Y. 2015) ...............................................................10

*In re PSS World Med., Inc. Sec. Litig.*,
　250 F. Supp. 2d 1335 (M.D. Fla. 2002) ............................................................17

*In re Sci. Atlanta, Inc. Sec. Litig.*,
　754 F. Supp. 2d 1339 (N.D. Ga. 2010) .............................................................10

*In re Sensormatic Elecs. Corp. Sec. Litig.*,
　2002 WL 1352427 (S.D. Fla. 2002)............................................................16, 17

*In re Spear & Jackson Sec. Litig.*,
　399 F. Supp. 2d 1350 (S.D. Fla. 2005).......................................................16, 17

*In re Sykes Enters. Inc. Sec. Litig.*,
　2001 WL 964160 (M.D. Fla. 2001) ....................................................................7

*In re TECO Energy, Inc. Sec. Litig.*,
　2006 WL 845161 (M.D. Fla. 2006) .....................................................................8

*Lapin v. Goldman Sachs Grp.*,
　506 F. Supp. 2d 221 (S.D.N.Y. 2006)..................................................................9

*Matrixx Initiatives, Inc. v. Siracusano*,
　563 U.S. 27 (2011) .........................................................................................8, 14

*Mazzeo v. Nature's Bounty, Inc.*,
　2015 WL 1268271 (S.D. Fla. Mar. 19, 2015) ...................................................12

*McIntire v. China MediaExpress Holdings, Inc.*,
　927 F. Supp. 2d 105 (S.D.N.Y. 2013)................................................................12

*Meyer v. Greene*,
　710 F.3d 1189 (11th Cir. 2013).........................................................................20

*Mizzaro v. Home Depot, Inc.*,
　544 F.3d 1230 (11th Cir. 2008)....................................................................15, 18

*Omnicare, Inc. v. Laborers Dist. Council Constr. Pension Fund*,
　135 S. Ct. 1318 (2015) ......................................................................................12

iv

*Owl Creek I, L.P. v. Ocwen Fin. Corp.*,
  2018 WL 4844019 (S.D. Fla. Oct. 4, 2018) ...................................................9, 10, 15, 16

*Phillips v. Scientific-Atlanta, Inc.*,
  374 F.3d 1015 (11th Cir. 2004) ......................................................................................14

*Pirnik v. Fiat Chrysler Autos., N.V.*,
  2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016) ...............................................................9, 18

*Primavera Inv'rs v. Liquidmetal Techs., Inc.*,
  403 F. Supp. 2d 1151 (M.D. Fla. 2005) .........................................................................16

*Reina v. Tropical Sportswear Int'l*,
  2005 WL 846170 (M.D. Fla. Apr. 4, 2005) ..............................................................13, 15

*Richman v. Goldman Sachs Grp., Inc.*,
  868 F. Supp. 2d 261 (S.D.N.Y. 2012) .............................................................................10

*Robb v. Fitbit Inc.*,
  2017 WL 219673 (N.D. Cal. Jan. 19, 2017) ...................................................................18

*SEC v. Ginsburg*,
  362 F.3d 1292 (11th Cir. 2004) ......................................................................................10

*SEC v. Monterosso*,
  768 F. Supp. 2d 1244 (S.D. Fla. 2011) ...........................................................................10

*Skypoint Advisors v. 3 Amigos Productions*,
  2019 WL 4600409 (M.D. Fla. Sept. 23, 2019) ...........................................................8, 18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ........................................................................................................14

*Utesch v. Lannett Co., Inc.*,
  385 F. Supp. 3d 408 (E.D. Pa. 2019) ..............................................................................20

*Vancouver Alumni Asset Holdings Inc. v. Daimler AG*,
  2017 WL 2378369 (C.D. Cal. May 31, 2017) .................................................................11

*Virginia Bankshares, Inc. v. Sandberg*,
  501 U.S. 1083 (1991) ......................................................................................................10

v

## I.   **INTRODUCTION**

This is a securities fraud class action against a health "insurance" provider whose business was grounded in what the FTC and a court-appointed Receiver have concluded was a "***never legally viable***" "***classic bait-and-switch scam***" where "***deception permeated the … entire business relationship with … customers***."   HIIQ distributes supplemental health insurance products that, at best, defray a fraction of consumers' out-of-pocket medical costs. Throughout the Class Period, HIIQ and its senior executives repeatedly assured investors that, because of HIIQ's purportedly industry-leading compliance systems and controls, HIIQ and its third-party call centers had an impeccable compliance and customer service record.   In Defendant Southwell's own words, HIIQ "facilitated our third-party distributors' compliance," "held [HIIQ's] distributors to our compliance standards," and maintained at all times "highly compliant third-party call center[s]."   Indeed, Defendants emphasized to investors that HIIQ's compliance platform not only gave the Company a competitive advantage, but it also provided "a significant barrier to entry" to current and potential competitors.

These statements were utterly false.  As much as **50%** of HIIQ's revenues came from its funding and management of an interrelated group of call centers known as Simple Health ("SH") that, as the FTC concluded, operated as a "scam whereby unwitting consumers [were] falsely led to believe that they [were] purchasing a [PPO insurance policy] that [was] compliant with the Affordable Care Act ('ACA'), but in reality [were] sold limited benefit indemnity plans that [were] not compliant with the ACA."   The illicit business flooded HIIQ with complaints and has now been shuttered by the FTC.  When the truth about HIIQ's dependence on a blatant consumer scam and the resulting complaints was revealed in a series of corrective

1

disclosures, HIIQ's stock price collapsed, plummeting over *60%*.

As the Complaint pleads in extraordinary detail, Defendants at all times had direct knowledge of, and in fact orchestrated, the SH fraud. HIIQ directly funded SH's operations through millions of dollars in loans, recruited SH's sales agents, trained them with sales scripts that were "replete with deceptive statements and high-pressure sales tactics" – and, to "protect business," constantly supervised SH with on-site visits where the company "regularly documented [its] transgressions." SH's now-disgraced CEO, Steven Dorfman, has personally affirmed in court filings that HIIQ "regularly audited [SH's] employee training and sales and verification processes" and even "verified that [SH] train[ed] its employees using materials provided by [HIIQ]." And, in what is remarkable evidence at this early stage of the litigation, the Complaint describes internal Company emails in which HIIQ's senior-most executives – including HIIQ's third-highest ranking officer – explicitly *admitted* that the SH fraud was "*out of control*" and HIIQ was "*bombarded*" with complaints about SH's fraudulent practices.

In response to these highly detailed allegations, Defendants have moved to dismiss the Complaint. Defendants' main contention is that, notwithstanding the fact that a highly material percentage of HIIQ's revenue was indisputably the product of blatant consumer fraud, Defendants' statements about the Company's best-in-class compliance and customer service were mere "puffery." This is manifestly wrong and the exact *opposite* of what Defendants told investors during the Class Period: namely, that HIIQ's purportedly strong compliance was so important that it was the "foundation" of the Company and "a significant barrier to entry" in the industry. Moreover, Defendants' representations are the exact type of concrete factual assertions that courts repeatedly hold are material to investors, particularly in highly regulated

2

industries.  The Complaint establishes that Defendants falsely represented that HIIQ and its distributors maintained "outstanding compliance" and received "an absolutely tiny, tiny number" of complaints, when in reality – and as analysts emphatically stated at the end of the Class Period – Defendants were "aware of problematic sales practices … since at least 2014," yet "promot[ed] the (fictitious) narrative that virtually no HIIQ customers complain."

Defendants also wrongly contend that the Complaint does not raise a strong inference of scienter.  In truth, the Complaint includes a host of allegations demonstrating Defendants' integral role in implementing and orchestrating the consumer fraud, and fielding the rampant complaints, including an extensive record of documentary evidence and percipient witness accounts from the FTC's enforcement action, internal HIIQ documents, and Lead Plaintiffs' independent investigation.  All of these corroborating sources point to one conclusion: Defendants were at all times fully aware of the SH fraud and the tens of thousands of complaints that HIIQ inevitably received – directly contradicting their Class Period statements.

Finally, Defendants' loss causation argument is meritless, and the Complaint easily satisfies Rule 8.  HIIQ's stock price plummeted over 20% when the FTC announced its enforcement action in November 2018.  The series of subsequent disclosures through April 2019 further detailed HIIQ's and SH's deceptive scheme, the falsity of Defendants' assurances to investors, and Defendants' intimate knowledge of the SH consumer fraud.

For these reasons, Defendant's motion to dismiss should be denied in its entirety.

## II.    SUMMARY OF THE COMPLAINT

In their Motion's "Background" section, Defendants omit and distort the Complaint's actual allegations and create their own contradictory "facts" for a transparent reason: setting

3

forth the actual allegations shows that the Complaint easily states claims for securities fraud.

### A.    Defendants Promoted HIIQ's Purported Compliance Record As The Key To The Company's Performance

HIIQ sells short-term "health insurance products" with limited benefits that represent less than 1% of health insurance policies.  As HIIQ acknowledged, it was critical that HIIQ's call centers be truthful in selling the products due to their limited utility and heavy scrutiny by regulators.  Thus, customer complaints were a "key metric" for investors.[1]

By the start of the Class Period, HIIQ assured investors that while there had, in the past, been complaints about its representations to customers, the complaints had been "resolved … without significant financial cost" and HIIQ had now achieved "market-leading" compliance. ¶34.  Defendants repeatedly stressed that HIIQ's stringent compliance standards were the key to the Company's positive financial results.  *E.g.*, ¶¶34-36, 166, 171, 176, 192, 202.  They specifically cited HIIQ's call center (or "distributor") compliance, stating that HIIQ "facilitated [its] distributors' compliance"; worked only with "leading third-party distributors"; and had achieved best-in-class" and "market-leading" compliance that was so valuable that it was the "foundation" of HIIQ and a "significant barrier to entry" to competitors.  ¶¶34-35, 158-203.

Defendants quantified their purported compliance by touting extraordinarily low numbers of customer complaints.  *Id.*  Defendants emphatically assured investors that there was a "very low," "incredibly low," and "absolutely tiny, tiny number" of complaints" about HIIQ's "leading third-party distributors," that was "nearly impossible to improve" because the call centers "are very good at explaining these products."  ¶¶36, 187-89, 192-93.  Defendants

---

[1] ¶¶29-36, 164, 192.  Unless otherwise noted, all "¶__" references are to the Complaint (ECF No. 30); defined terms have the same meanings as in the Complaint; all internal citations and punctuation are omitted; all emphasis is added; and Defendants' Motion to Dismiss (ECF No. 41) is referred to as the "Motion" or "Mot."  Case citations in this document are hyperlinked to Westlaw for the Court's convenience.

4

underscored that HIIQ's exceptionally low numbers of complaints were "clearly, and beyond any doubt, measurable evidence of our outstanding compliance controls" as compared to even the largest and most reputable insurers.  ¶¶181-84.  They stressed that hardly any complaints had merit, as only "*0.01%*" or "*0.00%*" were "upheld" by the Department of Insurance.  ¶¶34, 36, 158-61, 165, 167, 169, 172-73, 176-80, 185-86, 190-91, 197, 199-201.

**B.      In Truth, HIIQ Orchestrated An Intentional
Consumer Fraud That Flooded HIIQ With Complaints**

All of these statements by Defendants, and many more, were false and misleading when made.  Unbeknownst to investors, HIIQ had for years directed and choreographed a blatant consumer fraud through its most lucrative call center, SH.  ¶¶37-153, 204-19.  As an FTC enforcement action and related federal receivership proceedings have revealed, and as HIIQ well knew, SH – which accounted for up to half of HIIQ's revenues – was "a classic bait-and-switch scam."  ¶¶37-41, 146-53, 122-29.  The fraud left HIIQ's and SH's customers with catastrophic medical bills and penalties.  ¶¶40, 77, 115-20.  As the FTC action revealed, SH "*was never legally viable*" because "*deception permeated the … entire business relationship with … customers*."  ¶150.

HIIQ was heavily involved in every significant aspect of the SH fraud.  In March 2013, one month after HIIQ's IPO, HIIQ partnered with SH and financed its rapid growth.  ¶¶43-46.  To lure customers, HIIQ and SH co-founded a deceptive lead generation company in October 2013 – the same month that the SH fraud began.  ¶¶22, 49-53, 205, 210.  Then, HIIQ itself recruited and trained SH salespeople to use misleading sales scripts and aggressive, boiler room sales tactics.  ¶¶54-69, 107, 140, 148-50.  As the FTC found, the HIIQ/SH sales scripts were "replete with deceptive statements and high-pressure sales tactics."  ¶107.  SH and HIIQ

were so intertwined that SH's telemarketers listed "HIIQ" as their call center. ¶55.

HIIQ monitored and controlled the SH scam. For example, HIIQ maintained SH's recordings of customer calls, and reviewed them daily (¶142); as early as March 2016, HIIQ was receiving SH's "escalated complaint" summaries (¶114); SH sent HIIQ customer call logs (¶143); and senior HIIQ employees received HIIQ employees' reports on SH calls (¶¶98-100, 103). To "protect its business," HIIQ "regularly audited [SH]'s employee training and sales and verification processes" and made frequent "site visits" to SH, where SH "regularly documented [its] transgressions." ¶¶105-08, 140-44. HIIQ's and SH's "compliance departments" were "always in constant contact" and HIIQ admittedly had a full "understanding of [SH's] current sales practices." *Id.* Indeed, HIIQ and SH were so close that HIIQ reported SH as a "related party" and its executives attended the wedding of SH's owner. ¶¶43, 48, 206.

Further, as HIIQ's most senior officers were well aware, throughout the Class Period a torrent of complaints flooded HIIQ. ¶¶70-114, 140-44. In October 2017, one month into the Class Period, HIIQ senior executives recognized internally that HIIQ was being "bombarded" with customer complaints due to "widespread" deceit. ¶¶109-10. About 90% of complaints concerned call center deception – with over 80% of those focusing on SH. ¶¶74-81. Amid "endemic" and "rampant" complaints, HIIQ had a policy of falsely "blaming the consumers" and doing "everything in their power to destroy the customers." ¶¶72-77, 82, 119. After the FTC shut down SH, complaints continued as other HIIQ agents perpetrated the same fraud.[2]

---

[2] ¶75; *see also* ¶¶79, 81 & n.11, 114 (referencing other deceitful HIIQ brokers, including HIIQ subsidiary Agile Health). Defendants falsely assert that Simple Health "evaded HII-mandated recording of all … calls." Mot. at 7. In truth, Simple used sales scripts ***drafted by HIIQ***, which provided for truthful "on recording" representations and false and deceitful "off recording" statements. ¶¶57-69, 107, 143, 148-50. HIIQ was aware of each aspect of Simple's deceit and, as for the post-close verification process, told Simple to "post close however [it] want[s]" while knowing that Simple's sales process was laced with lies. ¶114; *see also* ¶113 ("HIIQ had a role in Simple Health's intentional deception of the Better Business Bureau and government regulators.").

6

Numerous former HIIQ employees also attest that Defendants misled investors.  They specifically confirm that Defendants' claims of "best-in-class" compliance, and assertions that "0.00%" or "0.01%" of complaints were "upheld" by the DOI, were "[v]ery wrong" and "absurd" "bold-faced lies" as HIIQ was "obviously not in compliance."  ¶90.

### C.      The Truth Emerged In A Series Of Partial Disclosures

The truth emerged through a series of partial corrective disclosures.  ¶¶121-53.  On November 2, 2018, the FTC announced its extraordinary enforcement action against SH for selling HIIQ's "sham health insurance," and that the FTC had already obtained a TRO shutting down SH.  ¶¶122-29.  HIIQ's stock plummeted by over 20%.  *Id.*  A series of four further corrective disclosures revealed HIIQ's active role in the SH fraud and the nature of Defendants' "highly misleading" statements to investors.  ¶¶130-53.  All told, HIIQ's stock price fell from $63 per share to $24 – more than 60% – as over $550 million in equity was wiped out.  *Id.*

In the wake of the revelations, multiple securities analysts found that Defendants' Class Period statements were knowingly false and misleading.  ¶¶211-15.  Citing the same statements alleged here, analysts concluded that Defendants were "aware of problematic sales practices … since at least 2014," yet, through "a series of misleading statements" they "promot[ed] the (fictitious) narrative that virtually no HIIQ customers complain."  *Id.*  The analysts were crystal clear:  Defendants "misle[d] investors about the true nature of [HIIQ's] business."  *Id.*

### III.    ARGUMENT

"A motion to dismiss merely tests the sufficiency of the complaint; it does not decide the merits of the case."  *In re Sykes Enters. Inc. Sec. Litig.*, 2001 WL 964160, at *2 (M.D. Fla. 2001).  At this stage, a court "accepts as true all well-pleaded allegations" and "construes all

7

reasonable inferences therein in the light most favorable to the plaintiff." *In re Paincare Holdings Sec. Litig.*, 541 F. Supp. 2d 1283, 1288 (M.D. Fla. 2008). "The PSLRA did not alter the required presumption that the court give Plaintiffs … the benefit of every favorable inference …." *In re TECO Energy, Inc. Sec. Litig.*, 2006 WL 845161, at *2 (M.D. Fla. 2006).

### A.   Defendants Made False And Misleading Statements And Omissions

"Rule 10b-5 prohibits not only literally false statements, but also any omissions of material fact "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011) (citing 17 C.F.R. §240.10b-5(b)). A plaintiff "need only allege enough facts to state a claim to relief that is plausible on its face." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011); *see Skypoint Advisors v. 3 Amigos Productions*, 2019 WL 4600409, at *8 (M.D. Fla. Sept. 23, 2019) ("the allegations … are not implausible"). Dismissal is warranted only "if no reasonable investor could conclude public statements, taken together and in context, were misleading." *In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1358 (N.D. Ga. 2005).

The Complaint easily satisfies the pleading standards. Throughout the Class Period, Defendants falsely assured investors that HIIQ and its call centers adhered to exceptional compliance standards, giving HIIQ a critical competitive advantage. ¶¶157-203. As further proof of compliance, Defendants cited "objective and measurable" data, stating that "every data point indicates that our customer satisfaction is market-leading," including "very low" complaints. *E.g.*, ¶¶36, 176, 178, 192. HIIQ was purportedly so adamant about compliance that if, hypothetically, there were to be "too many calls to customer service" regarding a call

8

center, then HIIQ would "turn off the links" to halt the center's sales of HIIQ products.  ¶177.

Defendants' statements were unquestionably false and materially misleading.  Nearly half of HIIQ's revenues depended on an illicit consumer fraud that federal regulators and a court-appointed Receiver emphatically denounced as a "classic bait-and-switch scam" that "was never legally viable," and where "deception permeated the … entire business relationship with … customers."  ¶¶130-32, 146-50, 196, 216-18.  These facts – none of which Defendants dispute – show that Defendants' statements were demonstrably false.  Indeed, the true facts are the exact opposite of what Defendants repeatedly told investors.  These detailed allegations easily satisfy the requirements for alleging misrepresentations about compliance.[3]

In addition to making affirmative misstatements, Defendants misled investors by concealing material facts.  "By voluntarily revealing one fact about its operations, a duty arises for the corporation to disclose such other facts, if any, as are necessary to ensure that what was revealed is not so incomplete as to mislead."  *FindWhat*, 658 F.3d at 1305.  Here it cannot seriously be disputed that once Defendants chose to tout the purportedly exceptional compliance and customer service profile of HIIQ and its distributors, Defendants had a duty to disclose the SH fraud and rampant customer complaints, but failed to do so.[4]

---

[3] *E.g.*, *Owl Creek I, L.P. v. Ocwen Fin. Corp.*, 2018 WL 4844019, at \*8 (S.D. Fla. Oct. 4, 2018) (upholding statement of "strong compliance" where company operated in a heavily regulated industry); *Pirnik v. Fiat Chrysler Autos., N.V.*, 2016 WL 5818590, at \*5 (S.D.N.Y. Oct. 5, 2016) (court "easily concludes" that statements about being "substantially in compliance" were false given "widespread noncompliance"); *Lapin v. Goldman Sachs Grp.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) ("[I]t defies logic to suggest that … an investor would not reasonably rely on a statement" about "dedication to compl[iance]….").

[4] *See Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 829-30 (8th Cir. 2003) (that senior officers were "in league with the deceptive management of [a subsidiary]" would "probably be important to investors"); *Bach v. Amedisys, Inc.*, 2016 WL 4443177, at \*9 (M.D. La. Aug. 19, 2016) (Rule 10b-5 imposes "a duty to speak the full truth" and "investors have the *right* to assume that their financial future does not hinge upon the continuation of a fraud") (emphasis in original); *Lapin*, 506 F. Supp. 2d at 238 (company's disclosures were "a far cry from raising awareness of anything akin to the widespread fraud and improper influence alleged").

9

**B.    Defendants' Various "Falsity" Contentions Fail**

Defendants nevertheless ask the Court to find at the pleading stage that their misstatements misled no one and omitted nothing. Defendants' scattershot arguments fail.

First, Defendants' main contention is that many of their statements promoting compliance as a key competitive advantage were, as a matter of law, meaningless "puffery."[5] This is nonsense. Defendants repeated their compliance misstatements every quarter, some fifteen times during the Class Period and often multiple times a quarter, because – as they recognized – investors were keenly focused on what Defendants called HIIQ's "foundation" and "key" competitive strength in a highly regulated industry.[6] Courts have repeatedly found that when executives continually stress a record of exceptional corporate compliance and make clear it is key to a company's success, it is not puffery.[7] Moreover, Defendants' statements

---

[5] Mot. at 10-11. "The determination of materiality requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *SEC v. Ginsburg*, 362 F.3d 1292, 1302 (11th Cir. 2004); *see In re Sci. Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1360 (N.D. Ga. 2010) ("A statement can be dismissed as puffery as a matter of law *only* if it is immaterial because it is so exaggerated or so vague that a reasonable investor would not rely on it in considering the 'total mix' of facts available."); *Bellocco v. Curd*, 2005 WL 2675022, at *3 (M.D. Fla. Oct. 20, 2005) ("the Court cannot conclude that the alleged misstatements are merely general predictions and not material as a matter of law."). Moreover, "misrepresentations of existing facts" are not puffery. *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 189 (S.D.N.Y. 2010).

[6] *E.g.*, ¶¶33-34, 164, 166, 176, 192, 202; *see In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1224 (N.D. Ga. 2019) (noting that "the fact that these statements relate to a core aspect of [the] business" shows materiality); *SEC v. Monterosso*, 768 F. Supp. 2d 1244, 1264-65 (S.D. Fla. 2011) (five press releases on a topic showed a "repeated emphasis" of a topic, "support[ing] the conclusion that [the statements] were material").

[7] *E.g.*, *Owl Creek*, 2018 WL 4844019, at *8 (statement about being "careful to assure … strong compliance" is not puffery because "defendants are … in a heavily regulated industry"); *Broadway Gate Master Fund, Ltd. v. Ocwen Fin. Corp.*, 2016 WL 9413421, at *8 (S.D. Fla. June 29, 2016) ("[w]e consider our ... compliance ... [a] substantial competitive advantage" not puffery); *Amedisys*, 2016 WL 4443177, at *11 (statements that company "has long had stiff enforcement policies for compliance violations" not puffery); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (statements about "the highest ethical standards" not puffery because they "were made repeatedly … to reassure the investing public"); *City of Sterling Heights Gen. Employees' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at *24 (N.D. Ill. Feb. 13, 2013) (statement about "working … to make sure that we meet the highest level of compliance and quality" not puffery); *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 279-80 (S.D.N.Y. 2012) (statement that "we are dedicated to compl[iance]" not puffery, as a company "must not be allowed to pass off its repeated assertions … as mere puffery"); *see also Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093 (1991) ("indefinite and unverifiable … judgments can be uttered with knowledge of truth or falsity just like more definite statements").

10

are not puffery, but instead cold, hard statements of fact that Defendants claimed were based on "objective and measurable data" (¶176) – but were instead indisputably false. *Vancouver Alumni Asset Holdings Inc. v. Daimler AG*, 2017 WL 2378369, at \*12 (C.D. Cal. May 31, 2017) ("Statements … that are capable of objective verification are not 'puffery' …."); *accord Belloco*, 2005 WL 2675022, at \*2 (puffery statements are "merely general predictions").

Defendants' reliance on *Carvelli* is misplaced. *See Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307 (11th Cir. 2019). There, after the defendant company, Ocwen, suffered liability for violations of consumer finance laws, Ocwen made aspirational statements that it was "committed to correcting … deficiencies" and "improving" its systems. *Id.* at 1323, 1329. Plaintiffs filed suit, alleging that Ocwen should have disclosed "the specifics of its technological difficulties" while making aspirational statements. *Id.* at 1321. In dismissing the case, the court reasoned that the statements were not misleading because Ocwen "***never said it was in compliance***," and only "made vague statements about its efforts ***towards*** compliance." *Id.* Here, by contrast, Defendants stated unequivocally that HIIQ had already achieved near perfect compliance, with essentially no complaints. In truth, a material part of HIIQ's business was a "classic bait-and-switch scam."

Second, Defendants repeatedly asserted that HIIQ had essentially zero complaints, while at the same time HIIQ's most senior officers exchanged emails showing that complaints from SH were "***out of control***" and "***bombard[ing]***" them. ¶¶109-10; *see* ¶¶70-94.

It is difficult to imagine clearer evidence of falsity. In response, Defendants do not contest that their repeated claims of a "very low number of complaints" (*e.g.*, ¶192) were false and highly misleading. Instead, Defendants contend only that it was not literally "false" for

11

them to claim that only "0.01%" of customer complaints were "upheld" by the DOI.  Mot. at 13-14.  In fact, the statements were literally false because DOIs do not "uphold" complaints.[8] Moreover, "[t]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers." *FindWhat*, 658 F.3d at 1305.  Once Defendants chose to tout the purportedly low number of complaints they had received, they were obligated to disclose the highly material fact that complaints about their most important call center were "out of control."  *E.g.*, ¶¶70-94, 109-10.  It was clearly misleading to tout a "0.00%" or "0.01%" complaint rate at the DOI when HIIQ was continually "bombarded" with complaints of call center misrepresentations and outright deceit.  The statements are also clearly material, as multiple securities analysts found.[9]

Third, Defendants contend that a few statements touting "market-leading" compliance were "inactionable" opinions.  Mot. at 12.  Not so.  The Complaint amply alleges that Defendants did not actually believe the statements and omitted material facts that "conflict[ed] with what a reasonable investor would take from the statement itself" – *e.g.*, that a highly material portion of HIIQ's business relied on blatant fraud.  *Omnicare, Inc. v. Laborers Dist. Council Constr. Pension Fund*, 135 S. Ct. 1318, 1329 (2015); *see In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at *8 (M.D. Ga. Mar. 23, 2018).

Fourth, Defendants contend that five of their misstatements are protected by the

---

[8] ¶91-94.  Defendants ask that facts showing falsity be disregarded as "expert opinion."  Mot. at 14 n.10.  These facts, supplied by a former DOI Commissioner are "nonconclusory factual averments," not "expert opinion," and are thus "taken as true."  *Bros. v. Saag*, 2014 WL 838890, at *6 (N.D. Ala. Mar. 4, 2014); *see Mazzeo v. Nature's Bounty, Inc.*, 2015 WL 1268271, at *3 (S.D. Fla. Mar. 19, 2015) (courts consider "expert's *factual* statements").

[9] ¶¶211-15; *see McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 123-25 (S.D.N.Y. 2013) (analyst reports support allegations of material falsity).  Defendants' attempt to distract from the overwhelming number of customer complaints by referencing a smaller metric – the number of "escalations" (Mot. at 15) – is unavailing.  *See* ¶¶84-90 (HIIQ had approximately 60,000 complaints about intentional deception in 2017 alone).

12

"bespeaks caution" doctrine or the PSLRA's limited "safe harbor" for forward-looking statements. Mot. at 12-13. The statements, however, were assertions of present fact. *See FindWhat*, 658 F.3d at 1298 (safe harbor inapplicable to statements mixed with affirmation of present fact). Defendants referred to "***continuing***" conduct that they falsely told investors they were ***presently*** engaging in – such as having "highly compliant third-party call centers." None of the statements were accompanied by "meaningful" cautions. "To be 'meaningful,' a cautionary statement must discredit the alleged misrepresentations to such an extent that the risk of real deception drops to nil." *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 515 (S.D.N.Y. 2013). Defendants' "cautions" were boilerplate that did not disclose the SH fraud, or even mention SH or customer service.[10]

Fifth, Defendants assert that it was not literally "false" to respond to the FTC action by telling investors that "[f]or 2018 to date, [SH] was the agency of record for less than 10% of HIIQ's submitted policies." Mot. at 15-16; *see* ¶¶194-96. In truth, the statement, as well as the related November 2017 claim that no two distributors had as much as 16% of HIIQ's sales (¶¶168, 198), misrepresented the importance of SH's business to HIIQ and were misleading. It is undisputed that SH accounted for about ***half*** of HIIQ's revenues during the Class Period, including in November 2017 (¶¶47, 130, 216-18), and even after the FTC shut down SH, ***over 20%*** of HIIQ's revenues still came from SH (¶196).[11] The statement was also misleading

---

[10] *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 102 (D.C. Cir. 2015) (language "cannot be 'meaningful' if it is misleading in light of historical facts"); *Ocwen*, 934 F.3d at 1327 (same); *Reina v. Tropical Sportswear Int'l*, 2005 WL 846170, at *7 (M.D. Fla. Apr. 4, 2005) (rejecting safe harbor arguments because "the complaint sufficiently alleges that no reasonable basis existed for the forward-looking statements") (Merryday, J.).

[11] These allegations are further corroborated by HIIQ's recent reporting that its sales of health benefit insurance plans (known as "HBIP") and "supplemental" policies – which together comprised 74% of HIIQ's business in Q2 2018 – declined 39% from Q2 2018 to Q2 2019 (from $53.4 million to $32.5 million), after SH was shut down. *See* https://www.sec.gov/Archives/edgar/data/1561387/000156138719000010/hiiq_63019x10q.htm, at 20 (August 6, 2019 Form 10-Q) (last visited October 7, 2019).

because when SH made sales, it listed ***HIIQ*** as the "agency of record."  ¶55.

Finally, Defendants contend there are "no actionable omission[s]" because they mentioned certain state "regulatory proceedings" in SEC filings.  Mot. at 16.  This is a red herring.  Defendants ***never*** came clean about SH, and nothing Defendants point to revealed the truth about ***any*** of their misrepresentations.  Indeed, HIIQ denied wrongdoing and engaged in "egregious" discovery abuses to avoid discovery of their misconduct by state regulators.  ¶156.

### C.      The Complaint Adequately Alleges Scienter

Plaintiffs adequately allege scienter by raising a strong inference that defendants made misstatements with either "an intent to deceive manipulate or defraud" or "a severely reckless state of mind."  *Paincare*, 541 F. Supp. 2d at 1289.  A scienter inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the "most plausible of competing inferences."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  In assessing scienter, courts "constantly assume the plaintiff's allegations to be true" (*id.* at 326-27) and "aggregate" facts (*Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1017 (11th Cir. 2004)).  "Whether [plaintiffs] can ultimately prove their allegations and establish scienter is an altogether different question."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 49 (2011).

### 1.      The Complaint Raises A Strong Inference That Defendants Knowingly Or Recklessly Misled Investors

The Complaint is replete with facts showing that Defendants knew or recklessly disregarded that their statements to investors were false and misleading.

First, as SH's own CEO averred in federal court filings, HIIQ had full knowledge of, and even controlled, SH's sales function, as "HIIQ regularly audited [SH]'s employee training and sales and verification processes" and even "verified that [SH] trains its employees using

14

materials provided by HII[Q]." ¶140. HIIQ was intimately involved in every aspect of SH's operations. HIIQ funded SH; recruited its sales agents and trained them to use deceptive sales scripts; created misleading "lead generation" websites; closely monitored the deceptive sales and customer complaints; and regularly audited SH with "site visits" showing "misleading" sales as part of the "regular[] document[ation of] transgressions." ¶¶42-114, 140-44.

HIIQ's top executives, including Southwell and Hershberger, were fully informed of the SH fraud. HIIQ's Vice President of Compliance and its third-most-senior officer, the VP of Operations who reported directly to Southwell and Hershberger, were specifically informed that SH's deception was "widespread" and complaints about SH were an "out of control" "bombard[ment]." ¶¶109-10. It is absurd to suggest that the other individuals on the management committee, including Southwell and Hershberger, were not aware.[12]

While these allegations are more than sufficient to plead scienter,[13] the Complaint contains much more. Southwell and Hershberger were provided an enormous amount of data about deception at HIIQ distributors and the resulting complaints. ¶¶95-114. They had access to A.R.I.E.S. and received detailed weekly reports of complaints by agency, yet did not "do[] *anything*" to remediate. ¶¶98-99. Southwell and Hershberger claimed constant vigilance, repeatedly stating they were "laser focused" on compliance (*e.g.*, ¶¶34-35, 166, 176, 192); had "guid[ed]" compliance (¶202); had extensive data supporting their (mis)statements (*e.g.*, ¶¶36,

---

[12] *See Owl Creek*, 2018 WL 4844019, at *11 ("Although the Complaint does not specifically allege that [the] Vice President of Compliance conveyed the [information] to Erbey, given Erbey's status as a high level executive, there is a plausible inference that he was aware of the … scheme."); *Reina*, 2005 WL 846170, at *5 (scienter "strongly impl[ied]" where "[e]ach of the individual defendants held a controlling position" as CFOs and CEOs and complaint asserted facts suggesting that they knew their company's statements were false).

[13] Such damning internal documents (*see also* ¶¶88-89, 109-14) are rarely available at this stage. *In re Carter's, Inc. Sec. Litig.*, 2012 WL 3715241, at *1 n.5 (N.D. Ga. Aug. 28, 2012) (Plaintiffs typically raise a strong scienter inference through "circumstantial evidence alone," with no need for "direct evidence connecting the defendants to the alleged fraud.") (citing *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1249 (11th Cir. 2008)).

15

164, 176, 192, 202); and had a Board committee overseeing the matters (¶174).  Hershberger, as the CFO, clearly knew that nearly half of HIIQ's revenues were derived from the SH fraud. ¶¶53, 114.  Moreover, as regulators detailed, the SH fraud lasted for over five years and "was never legally viable."  The notion that the CEO and CFO were somehow blissfully unaware defies credibility.  *See Owl Creek*, 2018 WL 4844019, at *11 (the fact "that the … scheme had been going on for years is sufficient to infer that [the CEO] was aware of the scheme").

Such facts provide the "classic fact pattern giving rise to a strong inference of scienter," namely, that defendants had "possession of or has access to facts suggesting that the[ir] statement[s were] inaccurate, misleadingly, or incomplete."  *In re Sensormatic Elecs. Corp. Sec. Litig.*, 2002 WL 1352427, at *6 (S.D. Fla. 2002); *see In re Immucor Inc. Sec. Litig.*, 2006 WL 3000133, at *17-18 (N.D. Ga. 2006) ("orchestrat[ing]" unlawful behavior shows scienter); *Primavera Inv'rs v. Liquidmetal Techs., Inc.*, 403 F. Supp. 2d 1151, 1158 (M.D. Fla. 2005) ("unfettered access to internal adverse information" shows scienter) (Merryday, J.).

Second, SH was critical to HIIQ's financial performance.  Given (i) the extraordinarily close relationship between SH and HIIQ; (ii) the fact that SH was by far HIIQ's most significant call center, with nearly half of HIIQ's business; and (iii) the FTC's and Receiver's determination that SH was a fraud since its inception, Defendants' assertion that they were somehow unaware of the "classic bait and switch scam" is meritless.[14]

Third, Defendants failed to come clean even after the FTC documented the SH fraud in extraordinary detail.  Defendants' false denials that they did not know of "***any irregularities***"

---

[14] The misconduct was "too obvious to ignore."  *In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350, 1358-59 (S.D. Fla. 2005) (even assuming he was not "directing the wrongdoing, it stretches the imagination that a CEO would not have been at least suspicious"); *see Flowers Foods*, 2018 WL 1558558, at *14 (scienter alleged as facts regarded company's most significant segment); *Paincare*, 541 F. Supp. 2d at 1293 (defendants cannot "ignore the elephant in the room").

despite "close[] monitor[ing]" of SH (¶¶128-29) show they were "either familiar with the facts or reckless in denying the allegations." *Spear & Jackson*, 399 F. Supp. 2d at 1359. After the FTC action revealed the truth, analysts concluded Defendants acted with scienter. ¶¶211-15.

Finally, Southwell and Hershberger strategically timed over $5 million in insider stock sales. ¶¶133-35, 219. The sales, which were completely out of line with prior trading and, for Hershberger, a huge percentage of holdings, further show scienter.[15]

### 2. Given The Overwhelming Evidence Of Intentional Fraud, Defendants Cannot Raise Any Non-Culpable Inference

Faced with the Complaint's extensive direct and indirect evidence of scienter, Defendants assert that the facts either "must be disregarded" or show "good management." Mot. at 18-21. Defendants' attempts to minimize and distort the well-pleaded facts fail.

Defendants' main contention is that all allegations "must be disregarded" unless they specifically refer to "Southwell" and "Hershberger" by name. Mot. at 16-20. The assertion is baseless. The Complaint alleges in great detail that ***all*** of HIIQ's management, ***including*** Southwell and Hershberger, had access to and were provided a constant stream of detailed information contradicting their misstatements. Cases are legion finding a strong inference of scienter on such facts and rejecting Defendants' arguments here.[16] Moreover, contrary to

---

[15] ¶¶134-35, 219; *see Sensormatic*, 2002 WL 1352427, *7 (trading "dramatically out of line with prior trading" supports scienter). Defendants cite Exhibit 19 to assert that these sales were under a trading plan, but they cannot establish the truth of the matter. *Coker v. Norfolk S. Corp.*, 2019 WL 398704, at *5 (N.D. Ala. Jan. 31, 2019). Moreover, even if they exist, the purported plans are no defense as Defendants have not provided "any details" about them. *In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F. Supp. 3d 1342, 1362 (N.D. Ga. 2018); *see* 17 C.F.R. § 240.10b5-1 (trading plan no defense if entered in bad faith or while possessing material non-public facts).

[16] *See, e.g.*, *In re Catalina Mktg. Corp. Sec. Litig.*, 390 F. Supp. 2d 1110, 1115 (M.D. Fla. 2005) (scienter found where complaint "allege[d] that Defendants had access to internal forecasts and the company's financial data"); *Hubbard v. BankAtlantic Bancorp, Inc.*, 2009 WL 3261941, at *3 (S.D. Fla. May 12, 2009) (similar); *In re PSS World Med., Inc. Sec. Litig.*, 250 F. Supp. 2d 1335, 1345, 1350 (M.D. Fla. 2002) (similar); *see also HCM High Yield Opportunity Fund, LP v. Skandinaviska Enskilda Banken AB*, 2001 WL 36186526, at *9 (S.D. Fla. Dec. 14, 2001) (no need for "additional detail" about reports).

Defendants' assertions (Mot. at 16-22), and as explained above, the Complaint is replete with evidence that Southwell and Hershberger were *personally* aware of the undisclosed truth.[17] The Motion also ignores HIIQ's corporate scienter, which is well pled because a vast number of HIIQ officers and agents, including Southwell and Hershberger, were aware of the fraud.[18]

Defendants assert that none of the CW statements supports scienter.  Mot. at 19-20. This is absurd.  The CWs detail how the fraud was well-known throughout HIIQ, and, as a result, Southwell's and Hershberger's Class Period misstatements were "*bold-faced lie[s]*."[19] Defendants attempt to concoct a requirement that plaintiffs allege specific acts by executives to "order or encourage" the fraud (Mot. at 20), but the issue is whether Defendants were reckless or had access to facts undermining their statements.  *Pirnik*, 2016 WL 5818590, at *7 ("Plaintiffs do not need to show that the Individual Defendants were *personally involved* in each … violation or even aware of any particular violation.") (emphasis in original).

### D.   The Complaint Adequately Alleges Loss Causation

Rule 8 governs loss causation allegations.  *Skypoint*, 2019 WL 4600409, at *8. Plaintiffs satisfy Rule 8 by identifying a disclosure that "share[s] the same subject matter as [a] prior misstatement," and a stock price drop.  *FindWhat*, 658 F.3d at 1311-12 & n.28; *see*

---

[17] *E.g.*, ¶¶96-100, 102-04, 114.  Defendants attempt to twist the fact that HIIQ was "constantly vigilant" over Simple to mean that they were "pursuing legitimate ways to reduce non-compliance."  Mot. at 3, 21.  No facts support Defendants' attempted spin.  The Complaint adequately alleges how Defendants' oversight of Simple *furthered* the Simple fraud that had been ongoing *since 2013*.  HIIQ's hiring of sales agents (Mot. at 6) does not help Defendants, as Defendants denied any substantial number of complaints (*e.g.*, ¶¶188, 192) for agents to field.

[18] A plaintiff pleads the scienter of a corporate defendant by alleging scienter for at least one corporate agent.  *In re Faro Techs. Sec. Litig.*, 534 F. Supp. 2d 1248, 1262 (M.D. Fla. 2007); *see Mizzaro*, 544 F.3d at 1254 (scienter as to those "who furnish information"); *Robb v. Fitbit Inc.*, 2017 WL 219673, at *3 (N.D. Cal. Jan. 19, 2017) ("direct knowledge" unnecessary).  Contrary to Defendants' contentions (Mot at 18 n.11), the group pleading doctrine is relevant only to group-published HIIQ documents, courts within the Eleventh Circuit regularly apply the doctrine, and Southwell and Hershberger were responsible for HIIQ's false corporate statements.  ¶¶14-16; *In re Netbank, Inc. Sec. Litig.*, 2009 WL 2432359, at *15 (N.D. Ga. Jan. 29, 2009) (collecting cases).

[19] ¶90; *see Grand Lodge of Pa. v. Peters*, 550 F. Supp. 2d 1363, 1370 (M.D. Fla. 2008) (CWs may "satisfy the particularity requirements [and] may also form the basis on which an inference of scienter may be alleged").

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005) (a complaint need provide only "some indication of the loss and the causal connection that the plaintiff has in mind").

The Complaint clearly alleges loss causation.  Each of the corrective disclosures relates to core issues of HIIQ's customer deception, compliance failures, and dependence on SH. ¶¶121-153, 220-227.   After each disclosure, HIIQ's stock price plunged because the revelations contained material new information.  *Id.*

On November 2, 2018, the FTC announced an extraordinary enforcement action against SH, and that it had already obtained a TRO enjoining SH from selling HIIQ's "worthless plans." ¶¶122-29.  On November 27, 2018, securities analysts specifically detailed HIIQ's and SH's "boiler room" sales practices and explained how Defendants' statements to investors were "highly misleading." ¶¶130-31.  On March 13, 2019, Congress announced findings about HIIQ's "junk plans," and that an investigation was ongoing.  ¶¶136-39.  On March 25, 2019, a voluminous court filing detailed HIIQ's control over SH.  ¶¶140-45.  On April 12, 2019, the 229-page Receiver's Report set forth new facts, amassed through five months of investigation, detailing how SH's business was a fraud and HIIQ's sales scripts were intentionally deceptive. ¶¶146-53.  HIIQ's stock price plunged immediately after each corrective disclosure – by 21.9%, 5.8%, 17.2%, and 7.4%, and 7.6%, respectively – on some of its highest trading volume ever.  ¶¶127, 132, 138, 145, 153.  Analysts easily concluded that the disclosures caused investors' losses and Defendants lied to investors.  ¶¶132, 139, 211-15; *see HD Supply*, 341 F. Supp. 3d at 1364 ("analysts lost faith in management credibility," showing loss causation).

Defendants' assertion that all of these corrective disclosures fail to allege loss causation is absurd.  First, Defendants' contention that the disclosures do not "reveal[] the untruth of any

19

prior HII … statement" is obviously wrong, as explained above.  Mot. at 25.  In any event, disclosures need not "precisely mirror the earlier misrepresentation."[20]

Second, courts regularly find that allegations of announcements of governmental actions are sufficient where they are accompanied by additional information or followed by further disclosures.[21]  Here, the FTC's November 2, 2018, press release announced the findings of its investigation and that it had obtained a TRO from a federal district court halting any further SH sales of HIIQ products (¶124); and the March 13, 2019, disclosure revealed Congress's conclusion, *after* an investigation, that HIIQ's practices were "disturbing" and "concerning," and its products were "junk." (¶¶136-37).  Each disclosure revealed much more than the start of an investigation, and each was followed by still further "subsequent corrective disclosures."  *Utesch*, 385 F. Supp. 3d at 425.

Finally, Defendants' contention that the disclosures "revealed no new information" is baseless, as explained above.  Defendants assert, for example, that the November 27 analyst report "was solely already-public information."  Mot. at 24.  In truth, the disclosure was explicitly grounded in "previously unpublished" and "previously sealed" materials, including materials the securities analysts obtained directly from the FTC.  ¶130 & n.14.[22]

## IV.    CONCLUSION

The Court should deny Defendants' Motion to Dismiss in its entirety.

---

[20] *HD Supply*, 341 F. Supp. 3d at 1363-65; *In re Banc of California Sec. Litig.*, 2017 WL 3972456, at *10 (C.D. Cal. Sept. 6, 2017) ("[T]he 29% stock price drop that happened within 1 day of the publication of the [short seller] article … is enough for Plaintiff to plausibly allege [loss causation].").

[21] *Utesch v. Lannett Co., Inc*., 385 F. Supp. 3d 408, 425 (E.D. Pa. 2019) (collecting cases); *see In re Montage Tech. Grp. Ltd. Sec. Litig.*, 78 F. Supp. 3d 1215, 1227 (N.D. Cal. 2015) (report "did not announce an investigation; rather, it announced the *findings* of [the] investigation: fraudulent conduct"); *accord Meyer v. Greene*, 710 F.3d 1189, 1201 n.13 (11th Cir. 2013) ("investigation," "*standing alone*," insufficient).

[22] Because the Complaint adequately alleges Section 10(b) violations, the Section 20(a) claim should be sustained. *Flowers Foods*, 2018 WL 1558558, at *21.

20

Dated:  October 7, 2019

Respectfully Submitted,
**SAXENA WHITE P.A.**

*/s/ Maya Saxena*

Maya Saxena (FL Bar No. 0095494)
Joseph E. White, III (FL Bar No. 621064)
Lester R. Hooker (FL Bar No. 32242)
150 East Palmetto Park Road, Suite 600
Boca Raton, FL 33432
Tel: (561) 394-3399
Fax: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com

Steven B. Singer (*pro hac vice* forthcoming)
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com

David R. Kaplan (admitted *pro hac vice*)
Brandon Marsh (admitted *pro hac vice*)
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Tel: (858) 997-0860
Fax: (858) 369-0096
dkaplan@saxenawhite.com
bmarsh@saxenawhite.com

*Lead Counsel for the Class*

**ABRAHAM, FRUCHTER AND TWERSKY, LLP**

Mitchell M.Z. Twersky (admitted *pro hac vice*)
One Penn Plaza, Suite 2805
New York, NY 10119
Tel: (212) 279-5050
Fax: (212) 279-3655
MTwersky@aftlaw.com

*Additional Counsel*

21

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 7, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered users.

/s/ *Maya Saxena*
Maya Saxena

22