UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

|  |  |  |
|---|---|---|
| JULIAN KEIPPEL, | ) ) | |
| Plaintiff, | ) ) | Case No. 8:19-cv-00421-WFJ-CPT |
| v. | ) ) | |
| HEALTH INSURANCE INNOVATIONS, INC. et al., | ) ) | |
| Defendants. | ) ) ) | |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS

Plaintiffs in their Opposition ("Opp.") to Defendants' Motion to Dismiss ("Mot.") fail to respond to and have thus conceded a wide swath of Defendants' arguments. Plaintiffs largely ignore the Eleventh Circuit precedent Defendants cited requiring dismissal, for example, relying solely on the *Ocwen* district court decisions. Plaintiffs do not even mention 32 of the 39 cases Defendants cited. Plaintiffs also ignore the main thrust of the Motion, that far from presenting only a rosy picture of "near perfect compliance" (Opp. at 11) – which Defendants never said – Defendants disclosed in detail that HII was being investigated by 43 states and that HII and Simple were being sued by Montana for consumer fraud, as to which HII disclosed a loss is "probable." Mot. at 1-2, 4, 7. Plaintiffs do not even mention this, or the dismissal of a prior securities fraud claim over this. Mot. at 2. The standard here is not whether Simple committed consumer fraud; it is whether HII's CEO or CFO lied to HII investors. Plaintiffs admit that HII's statements are "technically true" (¶ 214) but allege that HII presented a misleadingly incomplete picture; however, it is Plaintiffs who present an incomplete picture with cherry-picked phrases they take out of context and distort, e.g.:

| **Plaintiffs' Opp.** | **What the Cited Source Documents Actually Say** |
|---|---|
| "HIIQ assured investors that while there had, in the past, been complaints about its representations to customers, *the complaints had been 'resolved'* … and HIIQ had *now* achieved 'market-leading' compliance." Opp. at 4.[1] | In disclosing the Montana consumer fraud case, HII's "probable" loss, complaints, and investigations by 43 states, Ex. 1 at 3, 9-11, which had not been resolved and still remained pending when the FTC shut down Simple in November 2018, HII said: "Although in the past we have resolved these complaints without significant financial cost, we cannot guarantee that we will be able to do so in the future." *Id.* at 8. |
| "Defendants falsely assert that Simple Health 'evaded'" recording, because "Simple used sales scripts *drafted by HIIQ*, which provided for truthful 'on recording' representations and false and deceitful *'off recording'* statements." Opp. at 6 n.2. | The Complaint does not allege that *HII* drafted any off-recording scripts, but rather that "*Simple Health* maintained an 'on recording'" and "'off recording' rebuttal script." ¶ 69. Plaintiffs also misrepresent the FTC receiver as alleging that HII drafted deceptive sales scripts, when the receiver only alleged that "Simple Health's management" drafted deceptive sales scripts, not HII. Ex. A at 12 n.8. |
| "HIIQ's most senior officers exchanged emails showing that complaints from SH were '*out of control*' and '*bombard[ing]*'" them. Opp. at 11 (emphasis in original). | HII's CEO and CFO – HII's most senior officers and the only ones whose scienter counts – are not alleged to have known of this. Plaintiffs omit that HII told Simple in these emails it was "[v]ery, very important that this gets corrected immediately." Ex. B. |
| "Hershberger, as the CFO, clearly knew that nearly half of HIIQ's revenues were derived from the SH fraud. ¶¶53, 114." Opp. at 16. | The cited paragraphs refer to Hershberger's name on a 2013 SIL operating agreement (¶ 53) and Hershberger receiving an email in 2016 about National Brokers of America, Inc. ("NBOA") (¶ 114). |

**Falsity.** Plaintiffs do not plead with the particularity required by the PSLRA, Rule 9(b), and Eleventh Circuit case law a material false or misleading statement of fact made by HII's CEO or CFO and why it was false or misleading. Plaintiffs fail to distinguish the Eleventh Circuit's first "reported securities-fraud case" to recognize the puffery defense,

---

[1] Except as otherwise noted, all emphasis in this brief is added.  References and definitions are the same herein as in footnote 2 to the Motion. References to numerical exhibits ("Ex.1") are to the Valiente Declaration (Dkt. 40), while references to alphabetical exhibits ("Ex. A") are to the Second Valiente Declaration filed herewith.

2

*Carvelli v. Ocwen*, 934 F.3d 1307, 1319 (11th Cir. 2019), which negates the prior cases

Plaintiffs cite refusing to dismiss on this basis (none of which are Eleventh Circuit cases in

any event, and all of which are distinguishable).[2] Plaintiffs quote only a sentence from

*Carvelli* stating what "[t]he district court reasoned" (Opp. at 11, citing 934 F.3d at 1321),

rather than anything the Eleventh Circuit said in that opinion, such as deeming insufficient

allegations that Ocwen said it has "effective controls in place to ***ensure*** compliance" while

internally saying it was non-compliant and "an absolute train wreck." *Id*. at 1314.[3]

     *Carvelli* requires dismissal on the basis of puffery, opinions, and forward-looking

statements, *see* Mot. at 10-13, and Plaintiffs cannot evade this by asserting that "Defendants

stated unequivocally that HIIQ had already achieved near perfect compliance" (Opp. at 11),

which the Complaint nowhere alleges.[4] In addition to citing only the district court opinion in

*Carvelli v. Ocwen*, Plaintiffs rely on two other pre-*Carvelli* district court opinions addressing

---

[2] All of the cases Plaintiffs cite (all of which are pre-*Carvelli*) involved objective statements of fact alleged to be the opposite of the true objective facts, such as in *Bellocco v. Curd*, No. 8:02-cv-1141-T-27TBM, 2005 WL 2675022, at *2-3 (M.D. Fla. Oct. 20, 2005), in which the defendant said it "began shipping HB-LEDs" when in fact it "was incapable of commercial production of HB-LEDs." In *In re Flowers Foods, Inc. Sec. Litig.*, No. 7:16-CV-222 (WLS), 2018 WL 1558558 (M.D. Ga. Mar. 23, 2018), "Defendants were informed by legal counsel" that their business model did not comply with the law and the CFO "repeatedly warned" of this but was told to "pipe down," yet the company said it "was materially compliant with the law." *Id*. at *8, 15, 20.

[3] Plaintiffs incorrectly assert that HII statements about "continuing" conduct are not forward-looking, Opp. at 12-13, ignoring both *Carvelli* (934 F.3d at 1329) and this Court's ruling in *Bhatt v. Tech Data Corp.*, No. 8:17-CV-02185T02, 2018 WL 6504375, *3 (M.D. Fla. Dec. 11, 2018), that statements of "ongoing" efforts are inactionable forward-looking statements. Plaintiffs also criticize HII's cautionary statements (Opp. at 13), but as in *Carvelli*, "[i]t was no secret that [HII] faced ongoing regulatory action," 934 F.3d at 1327, *see, e.g.*, Ex. 1, which is "sufficient to warn an investor 'of risks of a significance similar to that actually realized.'" 934 F.3d at 1327. This also defeats Plaintiffs' omission claims. *Bhatt*, 2018 WL 6504375, at *5 (a plaintiff "cannot premise its omission claims on risks that were disclosed"). This case is unlike *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1299 (11th Cir. 2011), where FindWhat "disclosed nothing to indicate even potential weaknesses."

[4] "Near perfect" is inactionable anyway. The case law Plaintiffs cite says that only "perfectly" is "subject to an objective verification." *In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F. Supp. 3d 1342, 1360 (N.D. Ga. 2018).

3

the same allegations against Ocwen as were dismissed by the Eleventh Circuit, which are no longer good law after *Carvelli*. Opp. at 9, 10, 15, 16 (citing *Owl Creek I, L.P. v. Ocwen Fin. Corp.*, No. 18-80506, 2018 WL 4844019, at *8 (S.D. Fla. Oct. 4, 2018) (contrary to *Carvelli*, rejecting puffery defense as to Ocwen statements that it was "careful to assure … strong compliance" while internally saying it was "an absolute train wreck"), and *Broadway Gate Master Fund, Ltd. v. Ocwen Fin. Corp.*, No. 16-80056, 2016 WL 9413421, *8 (S.D. Fla. June 29, 2016) (same).[5] Plaintiffs' efforts to tie Simple and HII together (Opp. at 5-7) are irrelevant under *Carvelli*, as in *Carvelli* the government sued the defendant itself. Mot. at 11.

Plaintiffs also do not comply with the Eleventh Circuit's direction that statements that are not "mutually exclusive" of the truth are not false or misleading as a matter of law, *Carvelli*, 934 F.3d at 1330 n.13, which is critical here. Plaintiffs assert that HII falsely assured investors that HII had "very low" complaints, referring specifically to ***DOI*** complaints. (Opp. at 8; ¶ 36.)[6] In the very next sentence, Plaintiffs immediately acknowledge that HII told investors it had terminated distributors – actually (¶ 164), not "hypothetically" (Opp. at 8) – because of "***too many calls*** to ***customer service***." *Id*. These are not "mutually exclusive" as *Carvelli* requires. HII never told investors that HII had a very low number of

---

[5] Plaintiffs cite *SEC v. Ginsburg*, 362 F.3d 1292 (11th Cir. 2004), to argue that "the trier of fact" decides this, but that was a post-trial insider trading case, not a PSLRA puffery case. *In re Sci.-Atlanta Sec. Litig.*, 754 F. Supp. 2d 1339 (N.D. Ga. 2010), is not a puffery case, and Plaintiffs' purported quote from it is not in that case.

[6] Plaintiffs' "upheld" allegation is a non-issue because Plaintiffs do not dispute that they have not pleaded how the difference between the slightly smaller numbers such as "3" DOI upheld complaints versus "12" overall DOI complaints could possibly be materially false or misleading to investors, versus "over a million people covered." ¶ 187. (The Complaint never alleges that HII said "that hardly any complaints had merit" (Opp. at 5) – the percentages referenced are not percentages of complaints upheld, but of overall policies. ¶¶ 36, 158, 165.) Plaintiffs' expert's opinion that "DOIs do not 'uphold' complaints" is a legal opinion, not a fact. If anything, the Court should look to the law on this, stating, to the contrary, that the "Department of Insurance upheld" health insurance complaints. *Thompkins v. BC Life and Health Ins. Co.*, 414 F. Supp. 2d 953, 957 (C.D. Cal. 2006).

calls to customer service, and no reasonable investor would believe that a company with hundreds of customer service representatives fielded only a handful of customer complaints a year (HII never said there were few complaints "for agents to field," Opp. at 18 n.17).[7]  Nor would a reasonable investor ignore the context of 43 states investigating and Simple and HII being sued by Montana for consumer fraud, an action HII said it would probably lose (Mot. at 4-7). Plaintiffs say HII never "came clean" about this, Opp. at 14, but saying that a loss is "probable" is about as clean as a company can get.

Plaintiffs' arguments about Simple accounting for less than 10% of HII policies in 2018 fail for the same reason, that such statements are not "mutually exclusive" (*Carvelli, 934 F.3d at 1330, n.13*) of the different metrics and different time periods asserted by Plaintiffs. Mot. at 15-16. Plaintiffs say that "about half" of HII's revenue came from Simple "including in November 2017" (Opp. at 13), citing paragraphs 47 and 216 of the Complaint, which say "January 2016 to April 2018."  Plaintiffs also mix different metrics in alleging the percentage of HII's revenue from Simple in 2018 versus the percentage of policies, and their citation of a recent SEC filing is not in the Complaint and does not tie revenue to Simple.

**Scienter.**  As set forth above on page 2, a 2013 SIL agreement and 2016 NBOA email are a far cry from pleading a "strong inference" that Hershberger "clearly knew that nearly half of HIIQ's revenues were derived from the SH fraud," and neither Hershberger nor Southwell are alleged to have known about the "bombarded with calls"/"out of control" email,

---

[7] Plaintiffs' claim that HII customer service received 60,000 complaints in 2017 is based on unsupported extrapolation by low-level confidential witnesses (¶ 87) and is contradicted by Plaintiffs' own Complaint (¶ 211, citing "over 5,000" complaints total over 5 years). Plaintiffs have not shown that the number was not still low compared to other companies (¶ 181), especially considering coverage of over a million people. Mot. at 15.

4834-2833-3226.4

nor would that support a "strong inference" of scienter in any event (just as the "train wreck" email did not support scienter in *Carvelli*[8]). Plaintiffs ignore that the CEO's and CFO's knowledge of "the fraud" must be of the company's **securities** fraud, such as artificial inflation of financial statements as in *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1235 (11th Cir. 2008), not of a third party's **consumer** fraud.[9] Plaintiffs' only other mention of Southwell's or Hershberger's alleged knowledge of securities fraud is that they "had extensive data supporting their (mis)statements" (Opp. at 15-16, citing ¶¶ 36, 164, 176, 192, 202), but those paragraphs do not allege their scienter of misstatements.[10]

Plaintiffs argue that they need not plead facts specific to Southwell or Hershberger (Opp. at 17), but on the very next page they admit that *Mizzaro* requires the Court to look only to "the state of mind of the individual corporate official or officials who make or issue the statement … or who furnish information or language" for alleged misstatements (Opp. at 18 n.18, citing *Mizzaro*, 544 F.3d at 1254) – i.e., Southwell and Hershberger.[11] Plaintiffs say

---

[8] As set forth above, *Owl Creek I, L.P. v. Ocwen*, 2018 WL 4844019, is contrary to the Eleventh Circuit's ruling on the same facts in *Carvelli* that plaintiff "failed to allege facts with particularity that give rise to a strong inference" of scienter. 934 F.3d at 1323. Moreover, in *Owl Creek*, the "Defendants admitted" in a 2014 consent order that their backdating scheme had been going on "for years." 2018 WL 4844019, at *11.

[9] Cases involving restatements or false financial statements are distinguishable. For example, *In re Carter's, Inc. Sec. Litig.*, No. 1:08-CV-02940-AT, 2012 WL 3715241, *2 (N.D. Ga. Aug. 28, 2012), involved "tidal waves of accounting fraud" leading to criminal indictments and restatements of "18 successive quarters" of the company's financial statements. *In re Catalina Marketing Corp. Sec. Litig.*, 390 F. Supp. 2d 1110 (M.D. Fla. 2005), involved scienter allegations far beyond "access to internal forecasts and data" as Plaintiffs say (Opp. at 17 n.16), including that "Catalina admitted" to non-GAAP accounting and massively false financial statements and "the named Defendants … were confronted by employees about the misstatements." *Id*. at 1113-15.

[10] The opinion that their "misstatements were 'bold faced lie[s]'" is attributed to CW 5, who is not alleged to have had any contact with them, unlike CWs who placed the CEO and CFO "at daily meetings … in which the [fraud] scheme was discussed" in *Grand Lodge of Pa. v. Peters*, 550 F. Supp. 2d 1363, 1370 (M.D. Fla. 2008).

[11] Even the cases Plaintiffs cite recognize that PSLRA plaintiffs "may not rely on group pleading" to plead scienter. *Primavera Inv'rs v. Liquidmetal Techs., Inc.*, 403 F. Supp. 2d 1151, 1158 (M.D. Fla. 2005) (citing

that Defendants "concoct" a requirement that Southwell or Hershberger "order or encourage" the company's securities fraud (Opp. at 18), but this is directly from *Mizzaro* (Mot. at 20) which controls over the out-of-circuit district court precedent Plaintiffs cite, and Plaintiffs' stated theory is that Defendants "orchestrated" Simple's consumer fraud (Opp. at 2, 5, 16).[12]

Plaintiffs criticize as "spin" (Opp. at 18 n.17) Defendants' invocation of *Mizzaro*'s statement that pursuing "legitimate ways to reduce" non-compliance "is good management; it is not fraud," 544 F.3d at 1257, but Plaintiffs' own Complaint supports this "plausible, nonculpable" opposing inference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007). Southwell is accused of hiring "people to 'pose[] as customers' and call the third party agents" (¶ 102), starting "weekly reporting" of complaints (¶ 98), and terminating distributors "for not meeting compliance metrics" (¶ 164), all of which are "legitimate" compliance efforts, not acts furthering fraud. In any event, at most such allegations would relate only to alleged knowledge of consumer fraud, not securities fraud.

Regarding stock sales, Plaintiffs fail to address, and therefore concede, that given the stock sales took place more than two months *after* the alleged "bad news" (the FTC case and the Aurelius short-seller report) became public in November 2018, these sales *negate* an inference of scienter. Mot. at 21-22.[13] Plaintiffs also fail to plead any facts supporting that

---

*Phillips v. Sci.-Atlanta, Inc.*, 374 F.3d 1015, 1017 (11th Cir. 2004)); *In re Netbank, Inc. Sec. Litig.*, 1:07-CV-2298, 2009 WL 2432359, *11-15 (N.D. Ga. Jan. 9, 2009) (applying group pleading, but not as to scienter).

[12] Unlike here, the "orchestrat[ing]" CEO in *In re Immucor Inc. Sec. Litig.*, 1:05-CV-2276, 2006 WL 3000133, *2, 18 (N.D. Ga. 2006) "was personally involved with a series of bribes" and his scienter was "not dispute[d]."

[13] In *In re Sensormatic Elecs. Corp. Sec. Litig.*, No. 018346, 2002 WL 1352427, at *7 (S.D. Fla. June 10, 2002), the stock sales took place "just weeks *before*" the announcement that led to the stock price drop. In *In re HD Supply*, 341 F. Supp. 3d at 1348, the CEO sold "virtually his entire stake" of stock "just one month after Defendants falsely assured investors" and two months *before* the corrective disclosure. *See* n.15, *infra*.

7

Southwell or Hershberger were aware of impending news or price drops after their sales.

**Loss Causation.**  Plaintiffs cite *FindWhat*, 658 F.3d at 1311-12, n.28, to assert that a corrective disclosure need only relate to "the same subject matter" as a prior misstatement, but this ignores the "corrective" element as set forth in the preceding sentence from *FindWhat*: "***so long as it 'reveal[s] to the market the falsity' of the prior misstatements***." *Id*. This is because Section 10(b) "only protects against losses attributable to a given misrepresentation." *Sapssov v. Health Mgmt. Assocs., Inc.*, 608 F. App'x 855, 862 (11th Cir. 2015) (citing *Meyer v. Greene*, 710 F.3d 1189, 1196 (11th Cir. 2013)). The issue here is not the fact or magnitude of stock price declines after disclosures (Opp. at 19), but whether those disclosures revealed the falsity of HII misrepresentations, which Plaintiffs have not shown.

Plaintiffs rely on "[a]nalysts" who they say "easily concluded" that "Defendants lied to investors" (Opp. at 19), but the one "analyst" they cite as a corrective disclosure is a short seller relying solely on publicly available information, which must be disregarded. *Meyer*, 710 F.3d at 1199; *Sapssov*, 608 Fed. App'x. at 863-64.[14] And, as set forth above, statements about "January 2016 to April 2018" do not correct HII statements about "2018 to date."[15]

The Complaint should be dismissed, with prejudice. *Bhatt*, 2018 WL 6504375, at \*6.

---

[14] Plaintiffs refer to "previously unpublished" or "previously sealed" materials "obtained directly from the FTC" (though the short seller does not say that, *see* Ex. 20), but the Eleventh Circuit in *Meyer* rejected the argument that documents obtained from county property appraisers are nonpublic. 710 F.3d at 1198 n.9.

[15] The corrective disclosure in *In re HD Supply*, 341 F. Supp. 3d at 1349, 1363-65, was that the CEO in June 2017 "***admitted** that, in **direct contrast**"* with his February 2017 statement that the "problems were 'behind us now,'" HD Supply did not begin to fix them until "May 2017 at the earliest." Also, Plaintiffs try to fit within *Meyer*'s exception of a "later finding of fraud or wrongdoing," 710 F.3d at 1201 n.13, but there were no FTC or U.S. House "findings" revealing the falsity of HII's CEO's or CFO's statements at issue here. *See* Ex. A. The House did not announce any "findings" or a "conclusion, ***after*** an investigation" as Plaintiffs contend (Opp. at 19-20). The announcement said "***Launches Investigation***" in its title, ¶ 136, and Plaintiffs assert that the cause of the stock price decline was a report that the U.S. House "is expected to open an investigation." ¶ 139.

4834-2833-3226.4

Dated:  October 28, 2019

Respectfully submitted,

*/s/ Michael P. Matthews*
Michael P. Matthews, FL Bar No. 063988
mmatthews@foley.com
Lauren L. Valiente, FL Bar No. 034775
lvaliente@foley.com
Foley & Lardner LLP
100 North Tampa Street, Suite 2700
Tampa, Florida 33602-5810
Tel: 813-229-2300
Fax: 813-221-4210
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 28, 2019, a copy of the foregoing was filed with the Clerk of the Court using the CM/ECF electronic notification system, which will send a notice of electronic filing to all parties of record.

*/s/ Michael P. Matthews*
Attorney

4834-2833-3226.4