# EXHIBIT A

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 18-CV-62593-GAYLES

FEDERAL TRADE COMMISSION,

     Plaintiff,

vs.

SIMPLE HEALTH PLANS LLC, et al,

     Defendants.

_____/

### RECEIVER'S FIRST INTERIM REPORT

Michael I. Goldberg, the Court-appointed receiver (the "Receiver") over Defendants Simple Health Plans LLC ("Simple Health"), Health Benefits One LLC ("HBO"), Health Center Management LLC, Innovative Customer Care LLC, Simple Insurance Lead LLC ("SIL"), Senior Benefits One LLC, and each of their subsidiaries, affiliates, and successors (collectively, the "Receivership Entities"), respectfully submits this First Interim Report and states as follows:

### I.    Introduction and Procedural Background

Plaintiff Federal Trade Commission ("FTC") filed the above-captioned action, under seal, on October 29, 2018 against the Receivership Entities and Steven Dorfman ("Dorfman" and with the Receivership Entities, the "Defendants"), under Section 13(b) of the Federal Trade Commission Act (the "FTC Act"), 15 U.S.C. § 53(b) and the Telemarketing and Consumer Fraud and Abuse Act, 15 U.S.C. §§ 6101-6108, alleging the Defendants violated Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a) and the FTC's Telemarketing Sales Rule, 16 C.FR Part 310, as amended.

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

CASE NO. 18-CV-62593-GAYLES

On the same date, the FTC filed under seal an *Ex Parte* Motion for a Temporary Restraining Order with Asset Freeze, Appointment of a Temporary Receiver, and Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue ("Motion for TRO") [ECF No. 3], along with a Memorandum in Support of the Motion for TRO [ECF No. 12]. On October 31, 2018, this Court entered, under seal, an *Ex Parte* Temporary Restraining Order with Asset Freeze, Appointment of a Temporary Receiver, and Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue (the "TRO") [ECF No. 15], which, among other things, appointed Michael I. Goldberg receiver over the Receivership Entities with full powers of a temporary receiver in an equity receivership.

The TRO reflects the Court's finding that good cause existed to appoint a temporary receiver over the Receivership Entities, for purposes of, among other things, to take exclusive custody, control and possession of all assets of, or in the possession, custody or under the control of any Receivership Entity, wherever situated and to conserve, hold, manage and prevent the loss of all assets of the Receivership Entities and perform all acts necessary or advisable to preserve the value of those assets pending future Court orders. See TRO, Section XII.

On November 1, 2018, the Receiver took possession of the leased premises where the Defendants operated their business and presented the TRO to Mr. Dorfman.[1] The TRO provided for a hearing to take place on November 14, 2018 at which time Defendants shall appear before the Court to show cause, if there is any, why the Court should not enter a preliminary injunction, pending final ruling on the Complaint against Defendants. Upon the request of the FTC and the Defendants, the Court continued that hearing to December 6, 2018 [ECF No. 18]. In the interim, the Court extended the asset freeze and other restrictions set forth in the TRO. *Id*.

---

[1] The Defendants were also formally served with Summons. *See* ECF No. 32 – 38.

**AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999**

CASE NO. 18-CV-62593-GAYLES

In light of discovery motions and a request for a continuance filed by Mr. Dorfman, the Court rescheduled the hearing on the preliminary injunction to January 16, 2019 and extended the TRO [ECF No. 55]. On December 31, 2018, at the request of the FTC, due to the shutdown of the federal government, the Court temporarily stayed the case, including but not limited to, any scheduled proceedings, hearings, and/or discovery and briefing dates, until appropriations to the FTC were restored [ECF No. 59]. The deadlines were extended commensurate with the length of the stay. On January 29, 2019, the Court lifted the temporary stay and reopened the case [ECF No. 68]. The hearing on the preliminary injunction was rescheduled for April 16, 2019. Although the Court offered Dorfman the opportunity to have the preliminary injunction hearing take place sooner, Dorfman never took the Court up on that offer.

This Report is submitted in compliance with Section XII of the TRO, which directs that the Receiver report on the following topics prior to the Preliminary Injunction hearing: (1) the steps taken by the Receiver to implement the terms of the TRO; (2) the value of all assets and sum of all liabilities of the Receivership Entities; (3) the steps the Receiver intends to take in the future to protect receivership assets, recover receivership assets from third parties, and adjust receivership liabilities; (4) the Receiver's opinion on whether any portion of the business of any of the Receivership Entities can continue to operate legally and profitably; and (5) any other matters that the Receiver believes should be brought to the Court's attention. The Receiver's findings and conclusions with respect to these matters are set forth below.[2]

---

[2] This report contains preliminary assessments and observations, subject to change as the Receiver and his professionals conduct discovery and continue to investigate and analyze the affairs of the Receivership Entities.

48591883;2

- 3 -

**AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999**

Case 8:19-cv-00421-WFJ-CPT   Document 50-1   Filed 10/28/19   Page 5 of 43 PageID
674
Case 0:18-cv-62593-PG   Document 122   Entered on FLSD Docket 04/12/2019   Page 4 of 42

## II.      Steps Taken by the Receiver to Implement the TRO

### A.      Preparation for and Taking Possession of Business Premises

The Defendants operated their businesses at three locations: 2 Oakwood Blvd., Suite 100, Hollywood, Florida ("Hollywood Office"); 9105 NW 25th Street, Doral, Florida ("Doral"); and 12005 Ford Road, Suite 800, Dallas Texas ("Dallas").  The Receiver coordinated with the FTC and law enforcement to concurrently take possession of each of the premises.  The Receiver went to the Hollywood Office and dispatched two of his Akerman LLP partners to Doral and Dallas.

#### i.      Hollywood

On the morning of November 1, 2018, the Receiver, along with representatives from the FTC and police officers from the Broward County Sheriff's Office Joint Money Laundering Taskforce arrived at the Hollywood office to secure the office and serve the TRO on Defendants. Upon arrival, the police officers who were to take entry first encountered a locked door.  The police officers announced their purpose and requested entry, but when the person at the front desk refused entry, the officers broke the lock and entered the premises.  The Receiver announced the purpose of his arrival, while the officers secured the premises. Mr. Dorfman, several managers, and approximately 60 other employees were located at the premises. Mr. Dorfman and the employees were cooperative.  Each of the employees were required to turn in their employee badge, provide photo identification and complete a questionnaire prepared by the Receiver which included their position and contact information.

Mr. Dorfman gave the Receiver keys to his vehicles, including the Range Rover, Lamborghini and Rolls Royce. The Receiver also encountered a few second-shift employees later that day and also required those individuals to surrender their employee badge and complete a

questionnaire. Representatives from the FTC, with the Receiver's approval, imaged the computers. The Receiver engaged a locksmith to change the locks in order for the Receiver to secure the premises. The Receiver also contacted the landlord to inform it that he had taken possession of the premises pursuant to the TRO. The premises currently remain under the control of the Receiver and he and/or his professionals access the premises, from time to time, to obtain documents or access the computers. The landlord for this office has been granted entry (under the supervision of the Receiver's staff) to show the premises to prospective new tenants.

### ii. Doral

The Receiver's counsel, along with representatives of the FTC and the Miami-Dade Police Department went to the Doral Office at the same time the Receiver and the FTC went to the Hollywood office. Upon arrival at the Doral office, the police officers entered the premises and encountered a locked door in the reception area. The reception area was unattended. An individual who identified herself as the Human Resources manager opened the door to inquire about what was taking place. The police officers explained what was about to take place to the employee. After that brief exchange, the Receiver's counsel and the police officers entered the call center area where employees were working. The police officers asked that all employees step away from their computers immediately and form a line on either side of the call center. The Receiver's counsel announced the purpose of the visit while the police officers secured the premises and ensured that all employees were on the main call center floor. Thereafter, representatives from the FTC were invited into the call center.

The Receiver's staff asked each employee to complete a questionnaire, which included, among other things, their position and contact information. Aside from the Human Resources Manager, no other management staff was on site. Representatives from the FTC, with the

permission of the Receiver, took images of the computers on the premises as well as hard-copy documents. The FTC's technical representatives informed the Receiver's counsel that none of the Simple Health servers were located in the Doral Office.

During the visit, the Receiver's attorney learned that a second shift of employees would arrive in the early afternoon. The Receiver's attorney made a second announcement to employees arriving for the second shift and asked those employees to also complete the questionnaire. Simple Health used Suite 260 as a call center and employee training area in addition to this location being the office for the company's Human Resources manager. Approximately 60 workstations occupied the main call center floor and approximately 20 workstations occupied the training room, not including two additional workstations that were used by the employees who were responsible for supervising the call center shift. The Receiver's attorney contacted the on-premises property manager and asked to have to locks changed. Locks were changed that day. The Receiver's attorney also informed the property manager that the company had been placed in receivership and that the Receiver was now in control of the premises. The Human Resources manager's office contains various files regarding Simple Health's employees, including files regarding sales agents' compliance with insurance licensure requirements for their respective states. There are two empty offices situated directly next to the Human Resource Manager's office.

### iii.    Dallas

The Receiver's counsel, along with representatives of the FTC and the Dallas County Constable originally went to 5720 LBJ Freeway, Suite 610, Dallas, Texas. When they arrived at the office, they noticed that there was no signage, the lights were off and the office appeared to be vacant. There were two whiteboards in the room indicating that Simple Health had moved to 12005 Ford Road, Suite 800, Dallas Texas. After speaking with building management, Receiver's

counsel learned that Simple Health had sublet the space from American First Finance and that Simple Health had vacated the premises at the end of September. Counsel for American First Finance agreed to work together with the Receiver to sort out who owned the cubicles and furniture in the office.

The Receiver's counsel traveled directly to 12005 Ford Road and discovered that that Suite 810 was abandoned, but the lights were on in Suite 800. Counsel confirmed that Simple Health sublet Suite 800 and 801 from Credit Protection Association, LP ("CPA"), but had moved out in mid-October. Simple Health used Suite 800 as a call center and Suite 810 as administrative offices. There were about 78 call center work stations still set up and evidence that another 70 or so had been recently disassembled. There was also a training room set up. The administrative offices were largely cleaned out but still contained furniture and computers. There was also a box containing 30 unlabeled hard drives. Counsel previewed a sample of the call center computers but found nothing of interest. Based on their review of the call center computers, it appears that all of the software used in the call center was cloud based and that data was not stored on the local machines. Counsel did not preview any of the computers found in boxes.

CPA informed counsel that it owned all of the desks, tables, cubicles and lockers in the offices and some of the chairs, but disclaimed ownership of any of the computers or monitors in the office.

A complete list of the furniture, fixtures and equipment located at each of the Receivership Entities' business premises is attached hereto as **Composite Exhibit "A".**

B. **Securing of the Receivership Entities Bank Accounts**

Immediately upon his appointment, the Receiver and his professionals, in coordination with the FTC, took steps to secure the Receivership Entities' bank accounts. To do this, the

48591883;2

- 7 -

Receiver and his staff reviewed records located at the Receivership Entities' offices and interviewed employees in order to learn where the Receivership Entities maintained banking relationships. Once a bank was identified, the Receiver caused a copy of the TRO to be served on the bank and requested the bank to freeze the Receivership Entities' account(s). Attached hereto as **Exhibit "B"** is a list detailing the Receivership Entities bank accounts and the approximate $3,186,655.48 that has been frozen to date by the financial institutions pursuant to the TRO.[3]

### C.    Non-Business Related Assets[4]

#### i.    *Automobiles*

Upon his appointment, the Receiver, with Dorman's cooperation, took control of three automobiles all titled in the name of the Receivership Entities - - (i) a 2013 Land Rover Range Rover; (ii) a 2012 Lamborghini Aventador, and (iii) a 2015 Rolls-Royce Wraith. The Receiver secured these vehicles in an air conditioned, secure storage facility in Fort Lauderdale. The Receiver later learned that the Lamborghini was leased, and in his business judgment, determined that the lease should be terminated to avoid unnecessarily continuing to incur large monthly lease payments. The Receiver reached agreements with the leasing company to return the vehicle in return for the leasing company waiving any deficiency. The Receiver filed a motion with the Court to terminate the lease of the Lamborghini [D.E. 70]. By Order dated February 21 2019, [D.E. 82], the Court granted the motion and the Receiver returned the Lamborghini to the leasing company.

---

[3]  The total amount frozen does not include the approximate $200,000 believed to be held at Banco Popular in the Dominican Republic and the difference of fair market value of the securities held at UBS as of October 31, 2018. The Receiver has sought Dorfman's consent to liquidate the securities at UBS, however, he has not yet consented. Due to the fact that the Receiver is a temporary receiver charged with maintaining the status quo, the Receiver has not yet sought the Court's authorization to liquidate the securities, but will do so if a preliminary injunction is entered. This also does not include the approximate $4.5M that the Receiver received in March 2019 from HII. Moreover, the Receiver is aware that Dorfman and the Receivership Entities engaged in international business in such locations as the Dominican Republic and Panama. The Receiver continues to research banking connections in these locations.

[4] These are assets not used in the operation of the Receivership Entities' businesses, but paid with funds from the Receivership Entities' bank accounts.

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

Case 8:19-cv-00421-WFJ-CPT   Document 50-1   Filed 10/28/19   Page 10 of 43 PageID
Case 0:18-cv-62593-DPG   Document 122   Entered on FLSD Docket 04/19/2019   Page 9 of 42
679

CASE NO. 18-CV-62593-GAYLES

The Receiver continues to maintain possession of the Range Rover and Rolls Royce in a special air-conditioned storage facility pending the outcome of the preliminary injunction hearing.

### ii.     Jewelry

Upon his appointment, the Receiver worked with Dorfman and his counsel to obtain the turnover of the jewelry listed in the TRO.  Dorfman was cooperative, and through his counsel, delivered 13 pieces of jewelry to the Receiver, including all of the items listed in the TRO. Attached hereto as Composite **Exhibit "C"** is a list and photos of such items.  The Receiver has secured each of these pieces of jewelry in a vault pending further order of the Court.

### iii.    Sports Memorabilia

The Receiver discovered an extensive sports memorabilia collection in Dorfman's office at the time of his appointment.  There appear to be numerous notable pieces which are itemized on pages 22 through 24 of the Receiver's Inventory of the Hollywood office attached hereto as part of Composite Exhibit A.   The memorabilia is being secured by the Receiver pending the outcome of the preliminary injunction hearing.

### iv.     Real Property

To the best of the Receiver's knowledge, Dorfman does not own any real property in Florida and rents an apartment in Miami where he resides with his wife.  The only real property the Receiver is aware of that Dorfman has an interest in is an expensive, developable residential lot located in Las Vegas, Nevada.  Dorman paid $2,900,000 for this lot in May 2018 financing the purchase price by taking out a margin loan against securities held in the Receivership Entities' account at UBS.  UBS claims a lien on this account in the amount of the margin loan.[5]   The

---

[5] The Receiver has received the documents related to the UBS loan and it appears to be a valid lien.

48591883;2

- 9 -

**AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL  33301-2999**

CASE NO. 18-CV-62593-GAYLES

Receiver has filed the TRO in the chain of title to the Las Vegas property to prevent it from being transferred pending further order of the Court.

## III. Preliminary Investigation of the Receivership Entities' Business Operations

### A. Introduction

Since the date of his appointment, the Receiver and his professionals have spent a great deal of time analyzing the Defendants' business practices in an effort to determine if the allegations made by the FTC are accurate. In short, the FTC is correct. The Defendants' business model is largely a classic bait-and-switch scam whereby unwitting consumers are falsely led to believe that they are purchasing a Preferred Provider Organization medical insurance policy ("PPO") that is compliant with the Affordable Care Act ("ACA"), but in reality are sold limited benefit indemnity plans that are not compliant with the ACA.

The difference between these two products is stark – the PPO is traditional medical insurance whereas the limited benefit indemnity plan simply provides consumers with reduced prices from those medical providers that accept the plan along with a small cash benefit. Under a typical PPO or traditional major medical insurance policy, after payment of a premium, a deductible and a co-payment, the risk of large medical bills shifts to the insurance company. There is no shifting of the risk under a limited indemnity plan. Instead, to the extent the plan is honored by a medical provider, consumers are simply able to purchase certain medical services at pre negotiated discounted rates and those consumers receive a small cash benefit under the plan. Unlike traditional medical insurance, under the limited indemnity plan the ultimate risk of catastrophic medical bills falls on the consumer and in many cases this has led to devastating financial consequences to the Defendants' unwitting customers.

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

A review of each step of the Defendants' sales process illustrates how the entire process, as a whole, was carefully crafted to lead customers into purchasing a limited benefit plan along with other add-on "health benefits," which they understandably and incorrectly believed to be a full benefit PPO or traditional major medical insurance plan compliant with the ACA.

**i.      Deceptive search words direct consumers to SIL's Simple's lead generation websites.**

SIL pays Google a fee so that when consumers run Google searches utilizing specific words ("AdWords")[6] they will be directed to SIL's lead generation websites.  Some of the AdWords SIL pays for are "Obama Care," Obamacare Texas," Obama Health Care," "Obama Insurance," and Obama Care Insurance." These are just a few of the many AdWords SIL pays for.   It is apparent from these terms that consumers running searches utilizing these terms are specifically looking to purchase "Obamacare" ACA compliant policies.  It is also apparent from these terms that SIL knows this, yet they pay to have these customers unwittingly directed to their websites so that they can mislead them into purchasing non-ACA compliant limited benefit plans.

**ii.      The Websites themselves build on the fraud by suggesting that the products are ACA compliant**

The websites customers are directed to themselves are also designed to deceive customers into believing that they are inquiring about ACA compliant plans.  Upon taking control of the Defendants' businesses, the Receiver discovered that the Defendants controlled approximately 129 lead generating websites.  A complete list of these websites is attached hereto as **Exhibit "D".**[7]

---

[6] AdWords is one of several lead generation services relied on by SIL. SIL's specific use of AdWords combined with its ownership of domain names clearly intended to generate leads from customers looking for ACA complaint plans or traditional major medical insurance supports the FTC's allegations.

[7] The Receiver has redirected these websites to the master receivership website so that any individual accessing the Defendants' websites would be directed to information concerning the receivership.

48591883;2

Case 0:18-cv-62593-DPG   Document 122   Entered on FLSD Docket 04/12/2019   Page 12 of 42

A quick review of some of the websites controlled by the Defendants for the purpose of generating customer leads indicates that the website addresses themselves wrongfully suggest that the Defendants sell health insurance plans that comply with the ACA.  For instance, "Obamacare-healthquotes.com,"  "obamacarehealthquotes.org,"  "myobamacareapplication.com," "healthinsurance2017deadline.com" and "healthinsurancedeadline2018.com" all seem to suggest to consumers that policies procured through these websites will somehow be compliant with the ACA.  The ACA is routinely referred to as "Obamacare" and has specified enrollment periods and annual deadlines.

Moreover, numerous websites controlled by the Defendants, such as "Americanhealthinsure.com," "basicinsurancequote.com," and "individualhealthinbsurance.us" wrongfully imply that the Defendants sell traditional major medical insurance.  In fact, the logos of several nationally-recognized health insurance carriers appear on these websites deceiving potential customers into believing that Simple Health represents these reputable insurers thereby wrongfully providing legitimacy to Simple Health.  Potential customers are asked to provide their contact information or are provided a number to call to contact Simple Health.

### iii.     Sales Script[8]

The Defendants operate large sales centers to which consumers are directed by one of the lead generating sources.  Potential consumers who submit their contact information to one of the lead generation sites are thereafter contacted by Simple Health's telemarketers. Salespersons at the call centers follow carefully crafted sales scripts that are designed to mislead.  A different sales script existed for each type of policy with each carrier. A review of some of the sales scripts

---

[8] During an interview with a former Simple Health employee, the Receiver learned that all call center employees were required to abide by the sales scripts, which were drafted and approved by Simple Health's management.  Simple Health's policy called for any employee who deviated from the sales script to be terminated.

**AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999**

CASE NO. 18-CV-62593-GAYLES

provides an understanding of how the sales process was designed to deceive consumers into believing that they were purchasing PPO insurance or traditional major medical policies compliant with the ACA.[9]  Attached hereto as **Exhibit "E"** is a copy of a sales script that the Receiver discovered at the Hollywood business office on November 1, 2018.  The sales script, which the Receiver understands was crafted by Simple Health's management with Dorfman's knowledge and/or participation, provides sales personnel with the specific script to follow when trying to sell limited benefit plans to customers as well as specific sales tactics designed to consummate the sale.  A detailed review of the sales script is essential to understand its misleading nature.

At the very beginning of the sales script, the sales person is instructed to inform the prospective customer that Simple Health represents "most of the major A Rated carriers" in their state.  When you combine this statement, with the fact that many of the AdWords keywords used to generate leads (i.e. …BlueShield," "BlueCross" and "Anthem Blue,") give the impression that Simple Health is affiliated with reputable carriers such as Blue Cross, and the fact that many reputable company's logos appear on the websites, the deception becomes apparent.  In the first line of the script, the salesperson states "I am going to be helping you with your online application that you recently submitted for an affordable health quote."  Although not by itself, but taken with the misleading nature of the lead generation websites and other parts of the script, the use of the word "affordable" is highly suggestive that the Defendants are selling policies compliant with the "*Affordable* Care Act."  The use of the term "carrier" in the second paragraph of the script also indicates that the Defendants are selling traditional insurance because the word "carrier" is indicative of an insurance carrier.

---

[9]  The Receiver found many scripts for different products at the Hollywood office.  An analysis of each script is beyond the scope of this report.  Rather, this report only contains an analysis of the scripts associated with Legion Limited Medical.  The Receiver chose this script because it was the product sold to Customer 2 whose case file is one of the cases highlighted in this report.

48591883;2

- 13 -

**AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999**

Next, the salesperson starts to ask the consumer if they are "currently insured" and if so, with what "insurance company" and if their current rates led them to search online. The salesperson also asks "Have you ever been denied for health insurance." These questions about insurance and rates suggest that the Defendants are trying to help the consumer purchase traditional health insurance—not a limited benefit plan. Nowhere in the sales call does the agent state that what the customer is actually being sold is a limited benefit plan as opposed to traditional medical insurance. This material omission, along with the descriptions given to the customer of the proposed plan benefits, logically leads the customer into believing that they are purchasing traditional medical insurance.

Although the sales script does not mention the ACA, some of the terms used therein and innuendos contained in the script appear to be designed to lead the customer to believe that they are purchasing an insurance policy that is ACA compliant. For example, in the first paragraph of the script, the sales person is directed to state "I am going to be helping you with your application for an *affordable health insurance* quote." The significance of this use of words cannot be understated when one is aware that the initial leads used to attract the customer and many of the lead generating websites contain words associated with or related to the ACA (see other sections herein discussing lead generating words and websites).

The script is also designed to lead the customer into believing they are buying traditional major medical insurance coverage as opposed to a limited benefit plan. First, the script specifically states that they are going to be given an "insurance quote." It also uses words such as "insurance," "carrier," "coverage," "benefits" and "PPO," which are terms typically associated with traditional major medical insurance as opposed to the limited benefit plans that Simple Health actually sold.

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

Again, nowhere in the script is it disclosed that the customer is actually being sold a limited benefit plan or something other than a comprehensive medical insurance policy.

The script is also deceptive because it is designed to lead the customer into believing that the company is actually shopping for the most suitable insurance plan to meet the customer's specific needs.   In reality, however, the sales person already knows what plan he or she is attempting to sell the customer from the beginning of the call regardless of the customer's best interest.   For instance, the script states that Simple represents "most of the MAJOR 'A Rated' CARRIERS in the state of _____ … So I'm able to give all of your options, and find you the BEST PLAN out there for the BEST PRICE!" (emphasis in original).   The script also instructs the sales person to ask specific questions concerning the customer's needs to lead the customer into believing that they are taking the customer's specific needs into consideration in selecting the best policy for the customer.   This is a demonstrably false and misleading because the script is already "pre-wired" to sell the customer a limited benefit plan from a specific carrier—in this case Legion Limited Medical.

After obtaining the customer's personal information, the script also directs the sales person to inform the customer "ok, I know exactly what you are looking for" and I am going to "submit your application" and perform a "search" for the best plan at the best price for them in their state. Unknown to the customer, the script instructs the sales person to "place the customer on hold for about a minute." Again, this brief pause in the sales process is designed to have the customer believe that the sales person is actually researching the best policy for them.   In reality, a review of the script and audio recordings examined by the Receiver indicate that this brief pause is nothing more than a sales tactic.   In many instances, the recordings have captured sales associates bantering among themselves during the pause discussing such irrelevant things as where to eat lunch.

48591883;2

- 15 -

**AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999**

Case 8:19-cv-00421-WFJ-CPT Document 50-1 Filed 10/28/19 Page 17 of 43 PageID 686
Case 0:18-cv-62593-DPG Document 122 Entered on FLSD Docket 04/12/2019 Page 18 of 42

CASE NO. 18-CV-62593-GAYLES

The script also contains outright lies about the type of benefits the customer will get if he or she purchases the plan. For instance, the script states "we want to find you a PPO, that way you can keep your own doctors and hospitals. I want to get you prescription coverage and lab coverage for your preventative care and maintenance … " In reality, the plans sold are not traditional medical insurance at all and offer very few of the benefits of traditional comprehensive health insurance that the customer is led to believe they are purchasing.

At the conclusion of the sales call, the customer provides full payment information to the sales agent and pays both the enrollment fee and their first monthly premium. After this is done, the customer is **then** transferred to the "verification" department, but this verification process is also designed to defraud the customer by attempting to disclaim everything the customer was just led to believe in making their decision to purchase.

#### iv.     *The Post Close Script*

After the customer has provided payment information, the sales agent is next instructed to utilize another script—the Post Close script. The Post Close script starts out with the sales person stating "Congratulations on your new insurance policy!!" This is important for two reasons. First, it indicates that the customer has already made the purchase decision.[10] Second, it also reinforces the customer's belief that they just purchased a traditional medical insurance policy as opposed to a limited benefit plan.

The Post Close script is designed, in part, to desensitize the customer to the upcoming verification process, which process is purposely designed to attempt to "walk back" and negate many of the representations just made to the customer pursuant to the sales script. The Defendants seek to do this by basically lessening the validity and relevance of the verification process. For

---

[10] This script also instructs the agent to read the script slowly to prevent "cancels." The use of the word "cancels" also indicates that the purchase has already taken place.

Case 8:19-cv-00421-WFJ-CPT   Document 50-1   Filed 10/28/19   Page 18 of 43 PageID 42
Case 0:18-cv-62593-DPG   Document 122   Entered on FLSD Docket 04/12/2019   Page 19 of 42
687

CASE NO. 18-CV-62593-GAYLES

instance, the Post Close script instructs the sales agent to inform the customer that he or she will soon be transferred to the corporate verification department where an agent will go over the plan that was just purchased. The customer is told "some of the information will apply to you, and some of which will not apply to you. I just want you to know what parts affect you, and what don't; because they read the same script to everyone."

The sales person then goes on to state:

[n]ow fortunately for you, this is a guaranteed issue health insurance plan. Because of the open enrollment in your state, you're approved today, regardless of your conditions. On the verification, they will state there is a 12/12 preexisting clause that applies to your hospital and surgical benefits for any preexisting diagnosis you've had within the past 12 months. Now, because of open enrollment, you're approved today, regardless of these conditions. The only waiting period you'd have is on your cash benefits in the hospital for your preexisting conditions. You will still get the First Health contracted rate, even for surgery or hospitalization from day one.

This use of the term "open enrollment" once again insinuates that this plan is somehow ACA compliant.

The Post Close script also instructs the sales person to tell the customer "Remember, I work with virtually every plan available in your state, so if I thought there were anything out there that was more beneficial for you than this plan, then that is what I'd be offering you!" As discussed above, this is a blatant lie. The sales person does not in any way search for the best policy for the customer nor has the Receiver found evidence of any ability on the Defendants' part to perform such a search. The sales person knows exactly which plan they will try to sell to the potential customer from the inception of the call—even before they hear the customer's needs.

The script then instructs the sales person to state "they also will tell you that this is not a major medical plan or a discount plan. Obviously this isn't a discount plan. This is insurance." Finally, the customer is told "if you have any questions during the verification, do me a favor, if you can, and just hold them until the end, because they only give us a few minutes of tape time,

CASE NO. 18-CV-62593-GAYLES

and if they don't finish—they have to do it all over again from the beginning, so you can call me back, okay?" Simply put, this statement is solely designed to attempt to prevent the customer from asking questions so that a "clean" recorded verification can be obtained—even though many statements in the verification script are inconsistent with what the sales person has told the customer in obtaining the sale.

### v. The Verification Process

It is the Receiver's belief that the verification process is designed to obtain "legal cover" by walking back from many of the previous misleading statements made by sales representatives during the sales process. For instance, the verification process is the first time that customers are informed that what they just purchased and paid for is a "limited benefit" plan which is not traditional medical insurance and not compliant with ACA. However, as discussed, this process occurs only after the Customer has made the purchase decision and provided payment information and the sales representative has attempted to neutralize the import of the verification process by informing the customer that the verification process includes information that will not apply to the policy that customer purchased because the script is merely repeated to every customer. Based on his review of applicable case law, the Receiver does not believe that the verification process exculpates the Defendants from the previous fraudulent conduct.[11]

### vi. Intentional Delay Past 30 Days to Avoid Refund

Certain plans, such as GETMED360, bar the policy holder from receiving refunds for cancellations made after the policy was in effect for more than 30 days. Call recordings obtained by the Receiver indicate that in many instances customers complained and sought to cancel their

---

[11] Verifiers are also provided a script of how to respond to commonly asked questions. Curiously, they are instructed that some "rebuttals" should be recorded, while other rebuttals should not be recorded. If the customer asks "Is this not health insurance?" the verifier is instructed to respond and state "this is health insurance." However, they are instructed not to record this statement.

48591883;2

- 18 -

**AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999**

plans, however, the 30-day period elapsed because Simple Health's customer service department intentionally delayed contacting complaining customers before the expiration of the 30-day period.

### vii. Better Business Bureau Scheme

Dorfman is also directly responsible for concocting a scheme to make Simple Health appear more legitimate to customers by creating a false impression about the company with the Better Business Bureau (the "BBB"). Upon entry into the Hollywood location, the Receiver discovered 20 "pay-as-you-go" cell phones, often referred to as "burner phones," that were being stored in Dorfman's assistant's desk. The Receiver learned that the purpose of these phones was so that individuals posing as customers of Simple Health could contact the BBB to file false reports regarding their positive experience with the company to offset any negative experiences reported by actual customers. The burner phones were utilized so that the BBB would have no real way of tracking the source of the calls, thereby allowing Dorfman and the individuals he enlisted to call in and provide these false positive reports to go undetected.

## IV. Specific Examples of the Fraud

The best way to demonstrate the fraud is to focus on a few specific sales calls.

### A. Customer 1[12]

On June 30, 2017, the customer called a lead generator looking for health insurance and his call was promptly transferred to an insurance sales agent at Simple Health. The insurance agent first asked the customer if he currently had health insurance. The customer replied that he was "trying to get insurance." After getting some preliminary personal information, the insurance agent then told the customer that she needed to conduct a search for what plans were available to him in the state of New Jersey and placed him on hold for a couple of minutes. As discussed,

---

[12] In the interest of privacy, the Receiver is not specifying the customer's name in this report. However, the Receiver will supply them to the Court along with the backup audio recordings.

Case 0:18-cv-62593-DPG Document 122 Entered on FLSD Docket 04/12/2019 Page 20 of 42

CASE NO. 18-CV-62593-GAYLES

placing the customer on hold is pre-scripted and purposefully designed to lead the customer into believing that the sales agent is researching specific plans for the customer's needs for the State of New Jersey. In reality, the recording indicates that the agent was not researching anything, but was engaging in frivolous office banter with a co-worker concerning the quality of a hamburger at a local restaurant.

When the sales agent returned to the call a few minutes later, she stated that she had "excellent, excellent news" and "based on your application I was able to get you approved into a plan through the State of New Jersey" through an "A-rated carrier" with "a PPO insurance plan." This is a blatant lie carefully crafted to lead the customer into believing that the agent specifically researched the best plan for him in the State of New Jersey, when in reality, the agent did nothing other than engage in irrelevant office banter and simply come back to the call offering the customer a pre-determined limited benefits package.

Next, the sales agent proceeded to glowingly describe the proposed plan to the customer. According to the agent, the customer could choose his own doctors and hospitals and did not need a referral to see a specialist. The program "does not discriminate against pre-existing medical conditions" and utilizes "one of the largest [networks] in the country" "with over a million healthcare providers under contract so finding a provider to accept your insurance plan is not going to be a problem for you at all." The sales agent then stated that with this plan the customer would get his "typical doctor visits, diagnostic testing for blood and lab work, prescription, medical, surgical and hospital coverage with absolutely zero deductible to meet." The sales agent also explained that the plan included vison and dental as well "with two free cleanings per year and one free eye exam."

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

Nowhere in the entire sales presentation did the sales agent ever disclose that the customer was actually being sold a limited benefit plan as opposed to traditional medical insurance.  To the contrary, the sales agent used terms associated with traditional medical insurance such as "PPO," "policy," "no-deductible" and "pre-existing conditions" all designed to make the customer believe he is purchasing traditional medical insurance.

After taking the customer's personal and payment information, the sales agent informed the customer that she would soon transfer his call to the verification department.  Importantly, prior to transferring the call, the sales agent specifically informed the customer that the people in the verification department were not licensed insurance agents and that they would be reading from a script, the same script they read to everyone they spoke with so that a lot of the things they would read to a customer were not applicable to him.  She next told the customer that the verification person will read a "12:12 pre-existing clause," but that he could ignore that because he had no pre-existing conditions—despite the fact that she already informed the customer in her sales pitch that the plan she just sold him did not discriminate against pre-existing conditions.  Then she informed the customer that the verification person will tell him that this is not a major medical plan and the only reason the plan she just sold him does not carry the major medical classification is because it does not cover maternity, substance abuse or mental health, however, it would cover "everything else."

The agent instructed the customer that if he had any question during the verification process to wait for the end of the lengthy script because if he interrupted the verifier they would have to start all over again from the beginning.  Finally, the agent congratulated the customer on the purchase of "his new insurance policy."  The legal importance of this is that it indicated that the

customer **had already** made the purchase decision and purchased an "insurance policy." The call was then transferred to the verification department.

Subsequent to the sale, the customer called Simple Health to complain. According to the customer, he attempted to use the so called insurance with his doctor, but soon realized that it was not traditional medical insurance. Thereafter, the customer contacted Simple Health several times and was assured that he had purchased medical insurance. On August 21, 2017, the customer called Simple Health to cancel his insurance and requested to be reimbursed. When asked why he wished to cancel, the customer replied that he wished to cancel because he was convinced that he had medical insurance, but what he purchased was not medical insurance. The customer service agent then responded "through verification they would have told you that it is a medical program and not health insurance." This statement shows that the customer service representative was fully aware of the design of the deceptive sales process—that the sales agent would never mention that what was being sold was not medical insurance, but the verification script would have attempted to disclaim any prior misrepresentations or omission of the sales agent. On this call, for the first time, the customer is told that what he actually purchased was a limited benefit plan and how it actually works. Incidentally, it was unlawful to sell limited indemnity policies in New Jersey. In response, the customer stated, "nobody told me that, as a matter of fact, they were very, very, very carefully and you are very well trained on how to deceive people." Further, the customer explained that during the sales call he was told that "he could choose his doctor, but they did not suggest that [this was a] negotiation service… that is not insurance." The customer insisted on a refund in addition to canceling his plan. The customer service representative informed him that she had no authority to refund his money past 30 days after the sale, but that she would have a compliance supervisor contact him.

Compliance personnel from Simple Health contacted the customer several times after he canceled his insurance to discuss his request for a refund. On one particular call, a compliance person [Robert C.] contacted the customer and described the true nature of the policy. The customer stated that everything that he signed was based on the assumption that this was medical insurance with medical benefits and that he believed he was deceived.

A couple of days later, the same customer service representative called the customer and informed him that a refund could be requested for part of the amount he paid. The customer questioned why it was only a partial refund as opposed to a full refund. He also explained to the compliance officer that because of the deception he was tricked into believing he had medical insurance and he was actually without medical insurance since July and now he was not allowed to get insurance in the State of New Jersey until January. He questioned why he was the one having to pay anything because of Simple Health's deception. The customer went on to explain that he had previously tried to cancel his plan with Simple Health and he was

> "repeatedly told that he does have medical insurance and that he could go to his doctor and he can choose your doctor and you only have to pay $20 or $30, but this is not true. What the truth is I will pay the negotiated full price not a deductible. Therefore, what I have is a negotiation talking the doctor down off his full fee and not a privilege to have insurance that will cover for my medication. I have a Master's Degree from Columbia University to understand the difference. The only difference which will make me make a different decision is deception. And that's what you have done, you have deceived me."

At the end of this call, the customer refused to take the partial offer and the call was concluded without resolution.

### B.    Customer 2

The first customer is not the only one that was deceived by Simple Health. On January 26, 2017, another customer contacted Simple Health to purchase health insurance. Similar to the customer's experience described above, this customer was also asked if they currently had health

48591883;2

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

insurance and how long have they been without coverage. She informed the sales agent that she previously had coverage with Blue Cross Blue Shield. This customer informed the sales agent that she was a type one diabetic and on insulin taken via an insulin pump and the only reason she was getting insurance is that she needed an insulin pump and "would die without insulin." The customer explained that the most important aspects of medical insurance to her was to make sure that her insulin pump, insulin and all of her supplies were covered by insurance. Thereafter, the sales representative stated he worked with "most A-rated carriers in the State of Virginia" and that he was going to research her options and place her on a brief hold.

After a several minute hold, the sales agent returned to the call and stated

"I have some good news for you, based upon your application I was able to get you approved into a plan in the State of Virginia. This is an A-rated carrier and a PPO. … You can choose your own doctors and you don't need a referral to see a specialist. …This plan works similar to you as getting insurance from your employer and they don't discriminate against any pre-existing conditions. …This program is one of the largest PPO networks in the country with over one million PPO providers under contract. You receive doctor visits, diagnostic testing for blood and lab work, surgical, medical and hospital coverage without deductible."

In selling the insurance, the sales agent also described how the plan would work in the event the customer had to visit the hospital, stating

"this plan will cover you from the moment you enter the hospital. The PPO network would pay your entire hospital bill repriced after the PPO network covers you your plan pays an additional insurance benefit to help you cover the rest. When it is all said and done at the end of the day you end up with pennies on the dollar if any costs at all. …The whole idea of our plan is to make your out of pocket expenses as low as possible without you having to meet any deductible. With this you will never incur any upfront costs on this PPO and your insurance can be used at virtually any inpatient or outpatient facility in the nation."

The customer then specifically inquired if she could pick up her insulin at the store in addition to mail order. The sales agent assured her that she had both options. The customer specifically asked what was the name of the insurance company providing her coverage and the sales person replied

Case 0:18-cv-62593-DPG   Document 122   Entered on FLSD Docket 04/12/2019   Page 25 of 42

"our insurance company is Simple Health."  Again, similar to the above-described call, not once did the sales agent state that what was being sold was actually a limited benefit plan and everything stated suggested what was being sold to the customer was a traditional medical plan. The callousness of these misrepresentations is especially cruel when one considers that the customer informed the sales person that she was a type one diabetic and would die without insulin.

At the conclusion of the sales pitch, the customer provided credit card payment information, and after a brief pause, the sales agent stated "On behalf of Simple Health and our participant carriers, I would like to be the first one to say congratulations on your new insurance policy."  This is doubly important because it indicates not only that the sale of the policy has occurred prior to the verification process, but it also confirms the customer's expectation that she was purchasing a traditional medical insurance policy as opposed to a limited benefit plan. Finally, as in all other calls, the sales agent informed the customers that he was going to transfer them to verification, but instructed them not to ask the verification agent any questions.   The sales agent specifically instructed the customer to ignore the verifier's statements and further stated "this is not a discount plan, this is insurance" and further discussed "additional insurance cash benefits."

### C.    Customer 3

On June 24, 2017, Customer 3 was contacted by Arthur from Simple Health in an attempt to sell customer a "health insurance plan."  Sales agent stated the plan was a PPO that allowed customer to "choose his own doctors and hospitals and does not need a referral to see a specialist." The sales agent explained that the plan utilized "the First Health Nationwide PPO network which is one of the largest PPO networks in the country with over one million health care providers under contract."  The sales agent represented that customer would get "doctors' visits, diagnostic testing for blood and lab work, free prescriptions for medication and medical, surgical and hospital

coverage with no deductibles." "You can go to any doctor in the country." The agent further explained, "for example, let's say your doctor charges you $200 for a regular visit, you don't have to pay that. You will receive an additional $80 off the remaining balance and thus in this situation you wind up spending just $20 on that $200 visit." The client then specifically asked the agent "if I go to the doctor and it cost $200, I pay how much?" The agent responded, "$20, that's the most you will pay every time you visit the doctor, just $20. The remaining balance the insurance company will cover everything else."

Next, the agent discusses how the plan has

"no deductibles that have you paying thousands out of your pocket before the insurance pays anything. This plan does not work that way. This is a first dollar coverage plan which means this plan covers you from the moment you enter the hospital. So the First PPO network would take care of the entire hospital bill and reprice. After the PPO network covers you your plan pays additional insurance benefits to help you cover the rest. When all is said and done you end with pennies on the dollar if anything at all. The whole idea of this plan is to make your out of pocket expenses as low as possible without you ever having to meet any deductible first."

After taking some personal information and payment information, the sales agent then stated "on behalf of Simple Health and all of our participating insurance carriers, let me be the first to say congratulations on your new insurance policy." The agent then informed the customer that he would transfer his call to the verification department and that "some of the information will apply to him and some will not. . . . Remember, your insurance company is A-rated so should you have any questions call me back I am a licensed agent. This is a guarantee issue health insurance plan because of the open enrollment in your state, you are approved today regardless of those conditions. . . . [The verification department] will tell you this is not a discount plan. Obviously this is not a discount plan, this is insurance."

The agent then stated,

"A major medical plan must have two things to be defined as a major medical plan. It must have a deductible and co-insurance. The beauty of your plan is that it has none of those. It has no deductibles, no annual or lifetime caps and no medical underwriting. Therefore it is called limited medical indemnity insurance plan and not a major medical plan. . . . Lastly, your new PPO plan will cover everything that you need and it is going to be affordable at the same time. This is absolutely the best plan that you will receive in your price range. Remember I review virtually every plan available in your state, so if I thought there was anything out there that was more beneficial than this plan than that's the plan that I would be offering you today. I take a lot of pride in what I do and I like to think that our relationship starts today."

The agent then stated, "[I]f you have any questions during the verification, do me a favor and hold them to the end because they only give us a couple of minutes of tape time and if they don't finish they have to do it all over again from the beginning. So you can call me back if you have any questions."

After signing up for the plan. The customer went to the doctor, but his doctor did not accept the plan. He thereafter called to cancel his plan and he requested a refund because he believed he was defrauded. On August 18, 2017, he received a call from Robert C. of Simple Health's compliance department. The customer stated

"the agent said [when he sold me the policy] "that I got full coverage and could go to any doctor you want anywhere fully covered and you have full benefits on your prescription. You have no money out of pocket and you can go to the emergency room any time you want no charge. …So we said ok, great, we will take it, under good faith we took it, but then we called the company before we went to the doctor to see if they would take this card … and the insurance company said yes, but then we get to the doctor's office and they said we won't take that card. …Now I have been to the doctor twice, I have already paid the doctor, I have paid you guys insurance, and I have been to the pharmacy and got three scripts and had to pay those because when I handed them the card they looked at me and laughed."

The foregoing three customers are just three out of thousands of customers to whom Simple Health sold limited benefit plans. It may be argued that these three cases are anomalies that are not indicative of Simple Health's business practices. However, such an argument is meritless when one understands that the underlying scripts used to sell the limited benefit plans were utilized in

thousands of sales calls. In short, these three cases are highly illustrative of Simple Health's deceptive sales practices.

**V.       The Value of the Receivership Entities' Assets and Sum of Their Liabilities**

**A.       Financial Information**

Shortly after the commencement of the receivership, the Receiver retained KapilaMukamal ("KM") as his forensic accountant and financial advisor in this matter. Since the receivership commenced, KM performed the following tasks in order to perform their forensic accounting investigation:

- On November 15, 2018, KM met with the Receiver's team at the Hollywood office for the purpose of obtaining QuickBooks files, bank statements, and other financial records for the Receivership Entities.

- KM also met with Monica Hidalgo, Senior Staff Accountant, to gain an understanding of the financial structure and condition of the Receivership Entities, identify the locations of the pertinent financial data, locate potential assets and identify accounting transactions which may require further investigation.

- On November 19, 2018 KM met with Yans Piniero, Senior Developer, at the Hollywood office, for the purpose of gaining an understanding of the computer applications utilized by the Receivership Entities and obtained an image of the SalesForce data which tracked the status of prospective customers and the plans enrolled for the purpose of determining the number of customers that may have been impacted by the Receivership Entities.

- Analyzed the Receivership Entities' general ledgers which are maintained in QuickBooks accounting software.

- Reviewed the bank records obtained from the site visits and from financial institution document productions.

- Prepared a reconstruction of the Receivership Entities' cash receipts and disbursements for the period from May 2013 to October 2018 using the QuickBooks accounting records.

- Analyzed the credit card charges on certain American Express credit card accounts maintained by the Receivership Entities.

- Analyzed the intercompany transfers and activity between and amongst the Receivership Entities.

**B.     Sales and Profitability**

The Receivership Entities primarily derived cash receipts from commissions for enrolling customers in limited medical and dental benefit plans offered by HII. Beginning in 2014 and through approximately October 2018, HII paid approximately $180 million in commissions to HBO which then disbursed the commissions to SIL, Soluciones Omfri, SRL, Health Benefits Center Corporation and other Receivership Entities.   During this period, the primary expenses of the Receivership Entities appear to be payments to American Express and payments to vendors for marketing and payroll related costs.

**Exhibit "F"** is a consolidated profit and loss statement for the Receivership Entities which include HBO, Health Center Management Corporation, Innovative Customer Care, LLC, Senior Benefits One, LLC and SIL.  The Receivership Entities reported gross revenues of approximately $271 million[13], cost of goods sold of approximately $215 million, expenses of $57 million and a cumulative net loss of approximately $ 1 million for the period from May 2013 to October 2018.

---

[13]  The revenues of $271 million are primarily comprised of revenues reported by HBO of $198 million and SIL of $71 million, although more than $60 million of SIL's revenues were actually derived from HBO.  See page 32 paragraph E.

The Receivership Entities were associated with a number of other affiliated entities as follows: Health Benefits Center Corporation, Soluciones Omfri, SRL, Venture Vocational Institute, Inc., HBC Direct, LLC, iVantage Insurance Solutions, LLC, NMS Insurance Agency, LLC d/b/a Essential Insurance Agency, Smart Health Programs, Inc.; Shift Health Solutions, LLC (collectively, "Affiliated Entities"). **Exhibit "G"** is the consolidated profit and loss statement for the Affiliated Entities for the period from May 2013 to October 2018. The Affiliated Entities reported gross revenues of $15.7 million, cost of goods sold and expenses of approximately $19.9 million and a net loss of approximately $4.2 million.

### C.  Balance Sheets

**Exhibit "H"** is a consolidated balance sheet derived from QuickBooks for the Receivership Entities as of October 31, 2018 ("Receivership Entities' Balance Sheet"). The Receivership Entities' Balance Sheet reflects assets including cash, vehicles, equipment, accounts receivable and loans receivable. The Receiver has frozen approximately $3,186,655.48[14] in cash as listed in Exhibit B. Of this money, the Receiver has spent approximately $102,000 through the date of this report on necessary expenses such as maintaining access to computer servers, maintaining and securing leased premises, and securing and storing other assets. The Receiver has also taken possession of a Range Rover, Lamborghini and Rolls Royce and all equipment located in the corporate office.[15] If the Receiver becomes a permanent receiver, the Receiver will investigate the collectability of any accounts or loans receivable due to the Receivership Entities.

---

[14] As noted above, this does not include the approximate $200,000 believed to be held at Banco Popular in the Dominican Republic, the difference of fair market value of the securities held at UBS as of October 31, 2018 and the approximate $4.5M that the Receiver received in March 2019 from HII.

[15] The Lamborghini was a leased vehicle and the lease has been terminated.

The Receivership Entities' Balance Sheet reflects a loan receivable in the amount of approximately $490,000 from Richard Dorfman, the brother of Steven Dorfman. The Receiver will investigate the collectability of this loan.

The liabilities include accounts payable of approximately $500,000, credit card payables of $350,000, a margin loan to UBS Bank in the amount of $2.9 million.[16] The Balance Sheet also reflects approximately $8.3 million in deferred revenue related to HII commissions.

**Exhibit "I"** is a consolidated balance sheet derived from QuickBooks for the Affiliated Entities as of October 31, 2018 ("Affiliated Entities' Balance Sheet"). The Affiliated Entities' Balance Sheet reflects only approximately $1.1 million in cash and no material other assets or liabilities.

### D.    Financial Accounts

The Receivership Entities maintained banking and brokerage accounts at numerous financial institutions including JP Morgan Chase Bank, N.A., IberiaBank, Wells Fargo Bank, N.A., TD Ameritrade, SunTrust, and UBS. A list of the known financial accounts is attached at Exhibit B. The Receiver is in the process of obtaining copies of the bank statements and supporting documents for each bank account to identify potential other assets of the Receivership Estate.

KM has analyzed the activity recorded in the Receivership Entities' cash accounts maintained in the general ledgers and prepared a reconstruction of the sources and uses of cash per the general ledger. **Exhibit "J"** is a list of the bank accounts included in the general ledger bank account reconstruction and **Exhibit "K"** is a summary of the total sources and uses of cash per the general ledger bank account reconstruction ("QuickBooks Cash Reconstruction"). The

---

[16] As stated elsewhere in this report, these funds were used to purchase the Las Vegas property and are secured by funds in the UBS account.

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

QuickBooks Cash Reconstruction indicates that the Receivership Entities received approximately $180 million from HII. The following are the primary uses of cash:

- Payments to American Express in excess of $60 million.[17]

- Payments to ADP and other payroll companies totaling in excess of $43 million.

- Payments in excess of $25 million to what appear to be marketing and lead generating companies.

The Receiver intends to investigate if any of these transfers are potentially recoverable.

Dorfman maintained bank accounts at Iberia Bank, TD Ameritrade and Wells Fargo. KM will analyze the activity in the Dorfman bank accounts to identify potential assets of the Receivership Estate

### E. Intercompany Transactions

There were significant sums of money transferred between the Receivership Entities. **Exhibit "L"** summarizes the dollar amount and number of transfers between the Receivership Entities during the period from May 2013 to October 2018. There were $115 million in transfers between the Receivership Entities and the Affiliated Entities. Approximately $92 million of these intercompany transfers occurred between the Receivership Entities and Affiliated Entities. This amount represents approximately 28% of the combined cash activity of the Receivership Entities. Some of these intercompany transfers appear to be circular in nature. The Receiver believes that Dorfman did not properly maintain the separateness of the various Receivership Entities, but rather transferred funds to and from entities as needed.

---

[17] To date, KM has analyzed $23.7 million in charges made on the American Express accounts in order to determine the purpose of the charge. KM is continuing to analyze the remaining American Express credit card statements to determine the purpose of the remaining $36 million in payments to American Express.

**AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999**

Case 8:19-cv-00421-WFJ-CPT Document 50-1 Filed 10/28/19 Page 34 of 43 PageID
703
Case 0:18-cv-62593-DPG Document 122 Entered on FLSD Docket 04/12/2019 Page 33 of 42

The Receivership Entities' profit and loss statements indicate that Health Benefits One, LLC ("HBO") was paying the following Receivership Entities for "processing" fees (Exhibit F):

- Simple Insurance Leads ("SIL")             $60.6 million

- Health Benefits Center Corporation ("HBCC")      $9.1 million

- Soluciones Omfri, SRL ("SOM")            $6.5 million

The Receivership Entities' balance sheets indicate that HBO also recorded "intercompany distributions" as follows (Exhibit "H"):

- Simple Insurance Leads ("SIL")             $17.6 million

- Health Benefits Center Corporation ("HBCC")      $4.6 million

- Soluciones Omfri, SRL ("SOM")            $9.1 million

The payment of such a significant amount of "processing fees" by HBO to SIL, HBCC and SOM indicate that each entity was providing a service to HBO.

The payment of "distributions" by HBO to SIL, HBCC and SQM indicate that each of these entities had an ownership interest in HBO. Yet the 2016 tax returns of HBO indicate only Dorfman had an ownership interest in HBO.

### F.    Dorfman - American Express Charges

SIL paid American Express more than $60 million. These payments to American Express would appear to be what comprised the majority of the lead costs. To date, KM analyzed the approximately $23.7 million in charges made on the American Express cards and noted more than $4 million in charges made by Dorfman appear to have been personal in nature including luxury goods and wedding expenses. **Exhibit "M"** summarizes the charges analyzed by category and **Exhibit "N"** summarizes the charges analyzed by category and payee. Notably, there were the following charges by Dorfman:

Case 0:18-cv-62593-DPG   Document 122   Entered on FLSD Docket 04/12/2019   Page 34 of 42

- Entertainment  $1.6 million

- Travel         $1.4 million

- Retail         $610,000

- Luxury goods  $347,000

- Wedding        $116,003

The Receiver also notes that Dorfman paid personal expenses, such as wedding payments, transfers of cash to casinos, purchases of large automobiles, and credit card payments for clearly personal items directly from the Receivership Entities' bank accounts.  In short, Dorfman utilized the Receivership Entities' cash as his own personal "piggy bank."  The Receiver will further report on this and the case progress as his forensic accountant's complete their analysis.

## VI.     Can the Businesses be Operated Legally and Profitably?

It is the Receiver's opinion that the business cannot be operated legally and/or profitably for two reasons.  First, immediately after the commencement of the receivership, HII terminated its relationship with the Defendants (see below).  HII is a public company and the majority of the Defendants revenue was based on its relationship with HII and the sale of HII's products.  Accordingly, based on HII terminating its relationship with the Defendants, it would be impossible for the Defendants to generate sufficient revenue to cover their operating costs without a complete restructuring.

Due to HII's decision to sever relations with the Receivership Entities and the fraudulent nature of the Receivership Entities' business practices, the Receiver was forced to completely discontinue the Receivership Entities' business operations.  To that end, the Receiver terminated all employees as of November 1, 2018.  Although it may be possible to rebuild the Receivership

Entities, it would be extremely difficult—even if HII decided to rekindle its relationship with the Receivership Entities, which is unlikely.

Second, and more importantly, as set forth above in this report, the Receiver believes that the Receivership Entities' business model was largely based on deceiving consumers. This deception permeated the Receivership Entities' entire business relationship with their customers from the moment customers conducted Google searches all the way to post-sale customer relations. It is highly doubtful that the Receivership Entities could sell enough limited benefit policies to cover their operating expenses without this deception. Accordingly, the Receiver is of the belief that the Receivership Entities' business was never legally viable and cannot be viable in the future.

## VII. The Steps the Receiver Intends to Take in the Future if the Injunction is Entered

As set forth above, the Receivership Entities operated out of multiple offices in Miami, Hollywood, Dallas (3 offices) and overseas. Immediately after the commencement of the receivership, HII terminated its relationship with the Receivership Entities thereby effectively putting them out of business. If the preliminary injunction is entered and the Receiver becomes permanent receiver, the Receiver will immediately seek the Court's authorization to terminate all leases and deliver possession of the leased premises to their respective landlords thereby limiting any claims they may have for unpaid rent.

In fact, the Receiver has been contacted by four landlords seeking to negotiate a return of the leased premises, however, the Receiver has not yet sought to formally terminate the leases and return the leased premises because the Defendant does not consent to the Receiver terminating the leases and because the role of a "temporary" receiver is to maintain the *status quo* pending the determination on the preliminary injunction. Dorfman's illogical refusal to consent to the termination of the leases is unnecessarily causing additional claims against the receivership estate

further damaging creditors. If the Receiver becomes the permanent receiver, his role will change from one of preserving the *status quo* pending the outcome of the preliminary injunction hearing to the role of maximizing the distribution to creditors. This change in role would allow the Receiver to utilize his business judgment, with the Court's approval, to terminate the leases and return the leased property to the landlords thereby decreasing the amount of claims.

In connection with terminating the leases for the business premises, the Receiver will seek the Court's authorization to dispose of the furniture, fixtures and equipment ("FF&E") located at each office. The Receiver will attempt to sell the FF&E to potential new tenants of the premises, but absent being able to do that, will seek authorization to conduct an auction to sell the FF&E.

With respect to the automobiles, the Receiver, with the Court's permission, has already terminated the lease for the Lamborghini. This has eliminated any claims against the estate with respect to such lease. If appointed permanent receiver, the Receiver will seek to immediately dispose of the Rolls Royce and the Range Rover as such vehicles are "wasting" assets and each month the receivership drags on these vehicles are depreciating in value.

The Receiver will not seek to dispose of the seized jewelry until the Court decides whether or not to enter a permanent injunction. The jewelry is not really considered to be a depreciating asset and the cost of storing the jewelry is negligible. Therefore, the Receiver believes the disposition of the jewelry can wait pending the ultimate outcome of the case.

If he is appointed permanent receiver, the Receiver will also seek the Court's authorization to dispose of the Las Vegas property. The Las Vegas property has substantial carrying costs (i.e., taxes, insurance, association fees) and the Receiver believes it is doubtful, given Dorfman's current financial condition as represented to the Court, that he will be able to afford to maintain the

48591883;2

- 36 -

CASE NO. 18-CV-62593-GAYLES

property even if he is ultimately successful in this case. Accordingly, the Receiver will seek authorization to sell the property and hold the proceeds in escrow pending the outcome of the case.

Finally, the Receiver will investigate potential claims against third persons who may have liability with respect to the Receivership Entities' pre-receivership business dealings. The Receiver has not yet commenced an investigation of any such claims because, in the Receiver's opinion, such an investigation will be costly and is outside the scope of a temporary receiver's duties to maintain the *status quo*. If the Court enters the preliminary injunction and the Receiver becomes a permanent receiver, the Receiver will report on the results of any such investigations in future reports.

## VIII. Miscellaneous

### A. Shutting Down the Business

#### i. *Websites and Social Media Pages*

Simple Health maintained a public-facing website, *www.simplehealthplans.com*, along with approximately 129 third-party lead generation websites, discussed above. Each of these domains were operated through a single account with GoDaddy.com that was owned and controlled by Dorfman. The Receiver now controls the GoDaddy.com account, which was authorized by the TRO. The Receiver has directed the public-facing web address along with all of the third-party lead generation websites to the Receiver's website, *www.simplehealthreceivership.com*.

#### ii. *Securing ESI*

The Receiver has secured all of Simple Health's electronic records and has also produced copies of those records to Dorfman's attorneys in response to their requests. To accomplish this task, the Receiver has retained the services of two of Simple Health's former IT employees. The

48591883;2

- 37 -

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999

Receiver has secured, among other things, Simple Health's accounting and payroll records, employee files, and all of the data associated with the company's primary business operations. In addition to maintaining Simple Health's internal records, the Receiver is responsible for all of the cloud-based services previously utilized by Simple Health. These services include web hosting provided by Amazon and Simple Health's use of SalesForce.com to store customer data and call recordings. SalesForce.com is particularly important because this service was utilized by Simple Health to store information related to the company's interaction with its customers pre and post-sale. The Receiver has renegotiated the terms of Simple Health's license with SalesForce.com and has retained access to all of the historical information stored in the database. The Receiver has also made efforts to retain the services of Flexential, which houses servers that are property of Simple Health and supplies IT services related to those servers.

### iii. *Securing Other Receivership Property*

In addition to the Hollywood, Doral, and Dallas locations, the Receiver has also learned about an undeveloped parcel of residential land located at 1709 Enclave Court, Las Vegas, Nevada that was purchased with funds belonging to the Receivership Entities. In discussions with the property manager and counsel for the property manager, the Receiver has learned that because Dorfman failed to develop the property as required by the Covenants, Conditions and Restrictions for the Enclave Community Association (the "CCR"), the property has been assessed a monthly fee, as permitted under the CCR. Dorfman paid the fee for failing to develop the property prior to the Receiver's appointment. A payment demand has been made on the Receiver for $9,588.00, which was good through April 8, 2019.

48591883;2

- 38 -

### B.    Receivership Entities' Employees

The Receivership Entities employed sales agents, administrative personnel and managers at their various locations.  When the Receiver shut down the business, many of these individuals were owed wages and/or sales commission for the week preceding the shutdown.  If the Court enters the preliminary injunction, the receiver intends to file a motion with the Court seeking authorization to pay the back wages of non-managerial employees.  The Receiver will consider the propriety of paying the wages of managerial employees and the sales commissions due to sales agents who assisted in the deceptive sale of limited benefit plans to customers.  This is an open issue that will be brought before the Court.

The Receiver has endeavored to provide each employee with their W-2 and/or 1099 form on a timely basis.  To that extent, the Receiver utilized the services of Paycom and his accountants to perform the necessary accounting and paperwork.  The Receiver provided 540 employees of Health Benefits One, LLC with W-2s; 27 employees of Innovative Customer Care, LLC with W-2s; and 125 employees of Simple Insurance Leads, LLC with W-2s.  The Receiver also provided 183 sales agents of Health Benefits One, LLC with 1099s which represents commissions payable to these sales agents from January 1, 2018 through June, 2018, after which they were converted to W-2 employees.  Some of the W-2s and 1099s were for employees of the Boca Raton office which closed prior to the commencement of the receivership.

### C.    The Receivership Entities' relationship with HII

This case presents some interesting issues from a receivership perspective. More specifically, due to the nature of the product sold by the Receivership Entities, many consumers who unwittingly purchased limited benefit plans have not yet attempted to use them and make a claim.  Therefore, many customers are not yet aware that they have been deceived and they have

not yet incurred economic damage and are continuing to pay their monthly fees. It has been suggested to HII that it may be prudent to provide notice to customers of this potential issue with their insurance, but HII has not yet done so.  As of February, 2019, 59,308 customers were still making monthly payments.

HII provides the Receivership Entities with, among other services, billing and premium collection services whereby HII collects monthly payments from consumers on sales made by the Receivership Entities to customers.  In connection with these services, HII provides an accounting and splitting of customer payments between the carriers and the Receivership Entities.  As part of this service, HII distributes earned commissions to the Receivership Entities. HII also furnishes the Receivership Entities access to its on-line platform with the ability to quote and sell various products from carriers.  To that end, HII and HBO entered into a Managing General Agent Agreement ("MGAA") which permitted HBO to promote and sell various products. HII unilaterally terminated the MGAA on November 2, 2018.  Finally, HII also provides post-sale customer service in responding to customer inquiries concerning their policies.  HII has continued to provide these services post-receivership.

HII and HBO also entered into a Master Commission Advance Agreement ("MCAA") whereby HII would advance commissions to HBO prior to the commissions being earned.  The agreement was designed to advance HBO money, which essentially served as a loan to be paid back from future commissions earned by HBO.  To secure repayment of these advances, HBO granted HII a security interest in HBO's future commissions and accounts receivable.  HBO unilaterally terminated the MCAA on November 2, 2018.

Subsequent to the commencement of the receivership, HII claimed that it was owed $2,684,850.91.  HII unilaterally offset this sum from the payments it collected from the

Receivership Entities' customers subsequent to the receivership and the Receivership Entities no longer owe HII this sum.[18] Through February 28, 2019, HII collected an additional $4,609,452.65 (above the amount offset) on behalf of the Receivership Entities.[19]  In March, 2019, HII forwarded $4,528,452.65 to the Receiver representing commissions on business sold by Simple Health from November 2018 through February 28, 2019.[20]  These sums are held in trust.  The Receiver expects to collect an additional $2,007,814.76 for commissions earned for March 2019 by wire on April 15, 2019.

The Receivership entities relationship with HII was certainly complex and millions of dollars flowed between the companies.  In the event the preliminary injunction is entered and the Receiver becomes a permanent receiver, the Receiver plans to further investigate the relationship.

## IX.    Conclusion

The Receiver submits this report as required by the TRO.  The Receiver will continue to provide periodic updates to the Court as the case commences.

Respectfully submitted,

  /s/ Michael I. Goldberg
Michael I. Goldberg, Esq.
Florida Bar Number:  886602
Email:  michael.goldberg@akerman.com
*Court-Appointed Receiver*

AKERMAN LLP
Las Olas Centre II, Suite 1600
350 East Las Olas Boulevard
Fort Lauderdale, FL  33301-2999
Phone:  (954) 463-2700
Fax:  (954) 463-2224

---

[18]  This action was arguably in violation of the TRO.
[19]  This amount is based on HII's self-reporting. The receiver has not yet audited or otherwise verified the accuracy of this amount.
[20] The Receiver and HII agreed that HII could withhold $75,000 of the sum owed as security for potential credit card chargebacks.

48591883;2

Case 0:18-cv-62593-DPG   Document 122   Entered on FLSD Docket 04/12/2019   Page 42 of 42

CASE NO. 18-CV-62593-GAYLES

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on this

April 12, 2019 via the Court's notice of electronic filing on all CM/ECF registered users entitled

to notice in this case as indicated on the attached Service List and posted on the Receiver's website

www.simplehealthreceivership.com.

By:  ____*s/* Michael I. Goldberg_____
            Michael I. Goldberg, Esq.

AKERMAN LLP, LAS OLAS CENTRE II, SUITE 1600, 350 EAST LAS OLAS BOULEVARD, FORT LAUDERDALE, FL 33301-2999