UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JULIAN KEIPPEL, Individually and
on behalf of all others similarly
situated,

              Plaintiff,

                                         Case No. 8:19-cv-421-02CPT

v.

HEALTH INSURANCE INNOVATIONS,
INC., GAVIN SOUTHWELL, and
MICHAEL D. HERSHBERGER,

              Defendants.

_____/

## ORDER

Plaintiffs Oklahoma Municipal Retirement Fund and City of Birmingham Retirement and Relief System (collectively "Lead Plaintiffs" or "Plaintiffs") filed a Consolidated Class Action Complaint against Defendant Health Insurance Innovations, Inc. and its executives Defendant Gavin Southwell and Defendant Michael D. Hershberger (collectively "Defendants") for alleged violations of federal securities laws. This matter is before the Court on Defendants' Motion to Dismiss the Consolidated Complaint (Dkt. 41), Lead Plaintiffs' response in opposition (Dkt. 47), and Defendants' reply (Dkt. 49).[1] After careful review of the pleadings and for

_____

[1] The Court permits written replies without leave of court if filed within 7 days of the date of the response. Defendants filed a reply on October 28, 2019 (Dkt. 49), which was three weeks after Plaintiffs' response. The reply counters a number of the factual allegations and argues that

the reasons stated below, the Court finds that the Defendants' motion to dismiss (Dkt. 41) is due to be denied.

## I. Procedural and Factual Background[2]

Plaintiffs' Consolidated Class Action Complaint (the "Complaint") asserts a securities fraud class action on behalf of all purchasers of the common stock of Health Insurance Innovations, Inc. ("HIIQ")[3] between September 25, 2017 and April 11, 2019, inclusive (the "Class Period"). Dkt. 30. HIIQ is a Delaware corporation with headquarters in Tampa, Florida, that sells and distributes health and life insurance products. *Id.* ¶ 13. Defendant Gavin Southwell ("Southwell") has served as HIIQ's president since July 2016 and its chief executive officer ("CEO") since November 2016. *Id.* ¶ 14. Defendant Michael D. Hershberger ("Hershberger") served as HIIQ's chief financial officer ("CFO") since September 2015. *Id.* ¶ 15. Plaintiffs allege that throughout the Class Period, Southwell and Hershberger (collectively "Individual Defendants") controlled the contents of HIIQ's reports to the Securities and Exchange Commission ("SEC"), as well as press releases and presentations to investors, analysts, and portfolio managers. *Id.* ¶ 16.

---

Plaintiffs fail to plead with the required particularity. Notwithstanding the untimeliness, the Court has considered the reply and concludes that, because the Court must accept all factual allegations of the Complaint as true and construe them in a light most favorable to the Plaintiffs, the motion to dismiss is due to be denied at this juncture.

[2] Unless stated otherwise, the facts are taken from the Lead Plaintiffs' Consolidated Complaint. Dkt. 30. The Court accepts all well-pled allegations as true in ruling on the instant motion. *See Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008) (citation omitted).

[3] HIIQ's common stock is listed and trades on the National Association of Securities Dealers Automated Quotations ("NASDAQ") under the ticker symbol HIIQ. Dkt. 30 ¶ 13.

Steve Dorfman ("Dorfman") was an owner, member or manager of Simple Health Plans LLC ("Simple Health Plans"), Health Benefits One LLC ("HBO"), Health Center Management LLC ("HCM"), Innovative Customer Care LLC ("ICC"), Simple Insurance Leads LLC ("SIL"), and Senior Benefits One, LLC ("SBO") (collectively "Simple Health"). *Id.* ¶¶ 17–23. Simple Health advertised, marketed, distributed, and/or sold HIIQ's limited benefit and medical discount plans to consumers throughout the United States. *Id.* ¶ 24. The plans are not comprehensive health insurance and do not comply with the Affordable Care Act ("ACA"). *Id.* ¶ 1.

Plaintiffs allege that, throughout the Class Period, Defendants falsely assured investors that HIIQ and its call centers adhered to exceptional compliance standards and experienced low rates of consumer complaints. *Id.* ¶ 2. Defendants claimed a complaint rate of nearly 0.0% on HIIQ policies and attributed their performance to outstanding customer service and compliance. *Id.* ¶¶ 2–3.

In general, Plaintiffs allege a widespread fraudulent scheme in which agents at HIIQ's distributor call centers (Simple Health) preyed on consumers in search of comprehensive health insurance and sold them essentially worthless policies in a classic bait-and-switch scam. *Id.* ¶ 4–5. Unwitting consumers were duped into believing they were purchasing a Preferred Provider Organization medical insurance policy ("PPO") that is compliant with the ACA, but instead were sold a limited

3

benefit indemnity plan that was not ACA-compliant and resulted in consumers being stuck with thousands of dollars of unpaid medical bills and penalties for not having ACA-compliant insurance. *Id.* ¶¶ 5, 40. The FTC ultimately obtained a court order shutting down Simple Health's operations and freezing its assets. *Id.*

HIIQ's partnership with Simple Health was formed in March 2013. *Id.* ¶ 44. Simple Health exclusively sold HIIQ products, and in turn HIIQ directed and performed a variety of services for Simple Health, including processing enrollment forms, collecting payments, and financing Simple Health's business by advancing commissions. *Id.* ¶ 45. By 2015, Simple Health had call centers across the State of Florida and was responsible for almost all of HIIQ's limited benefit indemnity policy sales. *Id.* ¶ 46. From January 2016 to April 2018 Simple Health received $145 million from one of HIIQ's wholly-owned subsidiaries. *Id.* ¶ 47. This amount represented 49% of the total third-party commissions paid by HIIQ during the approximate same time frame. *Id.* Simple Health was HIIQ's largest call center and accounted for up to half of HIIQ's revenues during the Class Period. *Id.* ¶ 42.

Plaintiffs allege that HIIQ and Simple Health teamed up to deceive consumers by creating misleading "lead generation" websites and implementing fraudulent sales practices using misleading sales scripts and classic telemarketing scams. *Id.* ¶¶ 49–54. The misleading websites used terms associated with the ACA such as "Obamacare," "Obama Health Care," and "Obama Marketplace" to lure prospective

4

customers to Simple Health call centers in the anticipation of shopping for ACA-compliant policies. *Id.* ¶ 50. In addition to creating the lead generation websites, HIIQ was responsible for finding and training salespeople to staff the Simple Health call centers and providing them with carefully crafted scripts designed to mislead consumers into believing they were being offered ACA-compliant policies. *Id.* ¶¶ 54–57. Sales agents employed numerous deceptive tactics falsely representing that the policies were a PPO health insurance plan, that the plan qualified under the ACA, that the insurance plan was widely accepted by physicians in the customer's geographic area, and that there were no limitations for pre-existing conditions. *Id.* ¶¶ 59, 68. In fact, the HIIQ plans were not PPOs, nor were they insurance, but rather the plans merely provided a discount for medical care, the level of which was unknown prior to receiving the care. *Id.* ¶ 60.

Both before and during the Class Period, HIIQ received thousands of customer complaints that its call centers, including Simple Health, misrepresented the nature and material terms of the plans sold. *Id.* ¶ 70. Despite the excessive number of customer complaints, HIIQ, Southwell, and Hershberger represented in investor presentations, conference calls, press releases and SEC filings that HIIQ enjoyed excellent customer service and a low level of complaints. *Id.* ¶¶ 157–202.

A. *Alleged False and Misleading Statements by HIIQ*

**1. 2017 Statements**

In a September 25, 2017 HIIQ investor presentation with the SEC, HIIQ stated it had "best-in-class compliance" which was a "significant barrier to entry" for competitors. HIIQ claimed customer complaints to the Department of Insurance ("DOI") were less than 0.01% of policies in force as of June 30, 2017. *Id.* ¶ 158. In a press release published on September 27, 2017, HIIQ represented that it had unparalleled customer service. *Id.* ¶ 162. A November 1, 2017, press release stated HIIQ engaged in "secret shopping" of its external call centers to ensure compliance and claimed that it previously terminated distributors that did not meet compliance benchmarks. *Id.* ¶ 164. HIIQ claimed its investment in compliance has generated a strong customer experience. *Id.* ¶ 165. In a November 2, 2017, investor conference call, Southwell attributed the company's "record performance" to providing consumers with insurance that meets their needs. *Id.* ¶ 166. Southwell represented that HIIQ's technology holds HIIQ's distributors to high standards in customer service and compliance. *Id.* ¶ 167. In the call, Southwell stated that no third-party call center represented more than 16% of sales. *Id.* ¶ 168. A November 8, 2017 investor presentation asserted that customer complaints upheld by the DOI were 0.0% of policies in force as of September 2017. *Id.* ¶ 172. In a December 15, 2017 press release and SEC report, HIIQ announced the formation of a new risk and compliance committee to further strengthen the company's market-leading compliance. *Id.* ¶ 174.

## 2. 2018 Statements

In a March 1, 2018, investor conference call, Southwell stated that HIIQ's third-party licensed agent call centers drove the year-over-year increases in HIIQ's business and that HIIQ's improved compliance and customer service resulted in a less than 0.01% DOI complaint ratio. *Id.* ¶ 176. Hershberger stated the high customer service was driven by the company's technology platform. *Id.* ¶ 177. Southwell stated that too many calls to customer service due to a call center's misconduct would result in HIIQ turning off the link to its system so as to maintain its high level of customer satisfaction. *Id.* On March 13, 2018, HIIQ published an investor presentation that stated customer complaints upheld by the DOI were 0.0% of policies in force since December 2017. *Id.* ¶ 179. In a May 3, 2018, investor conference call, Southwell stated that HIIQ had outstanding compliance performance and highly compliant third-party call centers. *Id.* ¶ 181. Southwell compared HIIQ's complaint ratio to ACA carriers, claiming the ACA carriers have 14 to 37 times more complaints than HIIQ. *Id.* He stated that while the ACA carriers' complaints have risen significantly, HIIQ's complaints plummeted 56% over the same period from 2016 to 2017. *Id.* ¶ 182. In a May 8, 2018 presentation, HIIQ again represented that customer complaints upheld by the DOI are 0.01% of policies in force as of March 2018. *Id.* ¶ 184. In an August 2, 2018, investor conference call, Southwell touted HIIQ's record revenue and performance, attributing the success to

low levels of customer complaints upheld by the DOI and HIIQ's commitment to customer service. *Id.* ¶ 187. In an October 30, 2018, investor conference call, Southwell states that HIIQ works with leading third-party distributors to ensure that customers are offered a product that meets their demands and needs. *Id.* ¶ 192. In promoting HIIQ's high compliance standards and high customer satisfaction, Hershberger stated he wanted investors to have all the facts. *Id.* Southwell claimed that HIIQ had a very happy consumer base, very low number of complaints, and very high customer satisfaction. *Id.* In November and December 2018 press releases, HIIQ downplayed the relationship between HIIQ and Simple Health, claiming that Simple Health was the agency of record for less than 10% of HIIQ's submitted policies. *Id.* ¶ 194. These statements were made following the FTC's press release on November 2, 2018, announcing the commencement of an enforcement action against Simple Health and Dorfman. *Id.* In a December 20, 2018, investor presentation, HIIQ highlighted the reduced number of DOI and Better Business Bureau ("BBB") complaints about HIIQ. *Id.* ¶ 197. The presentation sought to minimize the importance of Simple Health and the percentage of submitted policies from it. *Id.* ¶ 198.

### 3. 2019 Statements

On January 7, 2019, HIIQ filed a report with the SEC that was signed by Hershberger and included an investor presentation stating that Health Benefit One

was 8.2% of submitted applications through October 2018 and that complaints were down. *Id.* ¶ 200. The presentation stated there were 4 upheld DOI complaints in 2017 and 3 DOI complaints upheld in 2018. *Id.* In a March 6, 2019, investor conference call, Southwell recapped the amount of time, energy and investment spent over the last few years on creating best-in-class compliance and customer care. *Id.* ¶ 202. He emphasized that the strength of the business is attributable to HIIQ's technology, customer experience, and compliance. *Id.*

B.    *Additional Allegations of Scienter*

HIIQ loaned to Simple Health tens of millions of dollars in working capital that allowed Simple Health to grow. *Id.* ¶ 205. HIIQ co-founded with Simple Health the lead generation websites. *Id.* HIIQ recruited and trained Simple Health sales agents. *Id.* The receiver for the FTC concluded that Simple Health was a classic bait-and-switch scam and that the business was never legally viable and deception permeated the entire business relationship with customers. *Id.* ¶ 159. At the same time HIIQ was telling investors that HIIQ had no complaints, its own senior officers acknowledged in emails that HIIQ was being bombarded with complaints about Simple Health and that customer complaints were "out of control." *Id.* ¶ 161. HIIQ's documents revealed it received thousands and thousands of complaints about Simple Health every year from 2014 through 2018. *Id.* HIIQ's technology, a proprietary data management platform, documented all of the Simple Health customer complaints

and indicated that customer satisfaction was exceptionally poor. *Id.* HIIQ emails and other HIIQ evidence revealed that HIIQ was aware of Simple Health's sales misconduct for years dating back to 2014. *Id.* ¶¶ 208, 211. Simple Health accounted for 49% of the third-party commissions paid by HIIQ in the January 2016 to April 2018 time frame. *Id.* ¶ 216. The Individual Defendants engaged in insider trading each selling unusually large amounts of their HIIQ stock in February 2019 prior to several disastrous disclosures that resulted in a significant decline in the stock price. *Id.* ¶ 219. The sale of stock was far out of line with the Individual Defendants' prior trading practices in that Southwell had never previously sold any shares of HIIQ stock and Hershberger did not sell any stock during the Class Period prior to the February 2019 sales. *Id.* A March 25, 2019 filing by Dorfman in connection with the FTC enforcement action revealed extensive evidence of HIIQ's involvement in Simple Health's business and HIIQ's awareness of Simple Health's fraudulent activities. *Id.* ¶ 225.

C. *Allegations of Loss Causation and Reliance*

Plaintiffs allege HIIQ common stock fell from $63.13 per share in October 2018 to $23.85 per share by the end of the Class Period. *Id.* ¶ 221. On November 2, 2018, the FTC published its enforcement action against Simple Health, Dorfman, and related entities, accusing the brokers of misleading consumers to whom they sold HIIQ policies by misrepresenting to the consumers that they were purchasing

comprehensive health insurance. *Id.* ¶¶ 122, 222. This partial disclosure resulted in a decline of HIIQ's stock price. *Id.* ¶ 222. A subsequent report on November 27, 2018, by the research firm Aurelius Value titled: "HIIQ Boiler Rooms, 'Worthless' Policies and Defrauded Families," resulted in a further stock price decline. *Id.* ¶ 223. Subsequent reports and press releases in March 2019 that identified additional disclosures of Simple Health's fraudulent activities and HIIQ's awareness of same resulted in further decline in HIIQ's stock price. *Id.* ¶¶ 224, 225.

Plaintiffs allege that HIIQ's material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of HIIQ, its financial well-being and its prospects, resulting in the stock price being overvalued and artificially inflated. *Id.* ¶ 236. HIIQ is a publicly traded company whose stock was listed and actively traded on the NASDAQ. *Id.* ¶ 237. HIIQ was required to file periodic reports with the SEC and the NASDAQ. *Id.* HIIQ regularly communicated with public investors through frequent dissemination of press releases and through other wide-ranging public disclosures. *Id.* As a result, Plaintiffs allege that the market for HIIQ's common stock digested the publicly available and unknowingly false information and reflected such information in the stock price. *Id.* ¶ 238. In purchasing HIIQ stock, Plaintiffs relied on the integrity of the market price of the stock. *Id.* ¶ 233. Plaintiffs assert that a presumption of reliance applies because all purchasers of the common stock during the Class Period suffered similar injury

due to artificially inflated prices. *Id.* Plaintiffs also assert they are entitled to a presumption of reliance because Defendants failed to disclose material adverse information regarding HIIQ's business practices, operations and financial performance, legal compliance, and customer satisfaction. *Id.*¶ 239.

D.   *Applicability of Safe Harbor Provision*

Plaintiffs allege that the statutory safe harbor provision related to forward-looking statements would not apply because the false and misleading statements at issue relate to then-existing facts and conditions. *Id.* ¶ 240. To the extent that any of the misleading statements can be construed as forward-looking, Plaintiffs allege there were no accompanying cautionary statements, and regardless, Defendants would be liable because any forward-looking statements were approved by HIIQ's executive officers who knew the statements were false when made. *Id.* ¶¶ 240, 241.

## II.   Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). In considering the motion, the court accepts all factual allegations of the complaint as true and construes them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008) (citation omitted). Courts should limit their "consideration to the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters

judicially noticed." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004) (citations omitted).

In a securities fraud case, the court may consider securities filings alleged to contain misstatements. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999). A court may also look to documents incorporated by reference into the complaint if they are central to the plaintiff's claim and undisputed. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (citation omitted).

## III. Discussion

### A. *Violations of Section 10(b) of the Exchange Act*

In Count I of the Complaint, Plaintiffs assert a claim against all Defendants for violations of § 10(b) of the Exchange Act and SEC Rule 10b-5. Dkt. 30 ¶¶ 242–250. Section 10(b) prohibits any person:

> by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>
>> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement[,] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

Code of Federal Regulations, Rule 10b–5, provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

Plaintiffs allege that Defendants made false and misleading statements and omissions in promoting HIIQ's stock to investors. To establish a claim under § 10(b), a plaintiff must demonstrate "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called 'loss causation.'" *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236–37 (11th Cir. 2008) (citation omitted); *see also* 17 C.F.R. § 240.10b-5. A particular statement is a "misrepresentation" under § 10(b) and Rule 10b–5 if "in the light of the facts existing at the time of the [statement] . . . [a] reasonable investor, in the exercise of due care, would have been misled by it." *IBEW Local 595 Pension & Money Purchase Pension Plans v. ADT Corp.*, 660 F. App'x 850, 857 (11th Cir.

2016) (quoting *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011) (alterations in original)). To be actionable under the securities laws, misrepresentations and omissions must be "material." *See* 17 C.F.R. § 240.10(b). A statement is considered "material" if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *SEC v. Morgan Keegan & Co.*, 678 F.3d 1233, 1245 (11th Cir. 2012) (quoting *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

Such claims brought under § 10(b) and Rule 10b–5 must satisfy the federal notice pleading requirements and the heightened fraud pleading requirements of Fed. R. Civ. P. 9(b), *see Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001), as well as the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), *Phillips v. Scientific–Atlanta, Inc.*, 374 F.3d 1015, 1016 (11th Cir. 2004). Under the notice pleading standards, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006) (quoting *Bryant*, 187 F.3d at 1273 n.1). In pertinent part, Rule 9 provides:

> In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

Fed. R. Civ. P. 9(b). Rule 9(b) requires a complaint to specifically allege "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Ziemba*, 256 F.3d at 1202 (quoting *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997) (internal quotation marks omitted)). Courts have found that a failure to satisfy Rule 9(b) requires dismissal of a complaint. *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005).

Similarly, under the heightened pleading standards of the PSLRA, Plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed," and "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §§ 78u-4(b)(1)(B), (b)(2)(A). Upon review of Plaintiffs' detailed Complaint, the Court finds that Plaintiffs have adequately alleged that Defendants made misrepresentations and

omissions of material fact, *see* Dkt. 30 ¶¶ 157–202, and that such misrepresentations or omissions were made with the necessary mental state. *See id.* ¶¶ 157–219.

In their motion to dismiss, Defendants argue Plaintiffs' allegations constitute inactionable subjective puffery, opinions, or forward-looking statements. It is true that "'[r]easonable' investors do not base their investing decisions on corporate 'puffery'—generalized, non-verifiable, vaguely optimistic statements." *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1211 (M.D. Fla. 2014). However, courts recognize that "the level of specificity a statement must exhibit to cross the puffery threshold cannot be determined from a bright-line rule." *Id.* at 1212 (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39 (2011) (the determination whether a statement is material is 'inherently fact-specific' and requires consideration of a statement in its proper context)). And while certain statements might be considered puffery in one context, they may be found actionable in another, especially when defendants know or recklessly disregard facts contradicting their statements. *Mogensen*, 15 F. Supp. 3d at 1212. A review of the statements alleged here leads to the conclusion that Defendants' statements are more than mere puffery.

While some of Defendants' vague, generalized descriptions of compliance or customer service that is "best-in-class" and "market-leading," standing alone, could be considered puffery that a reasonable investor would not necessarily rely upon, the Complaint does not end with those statements. Rather, the Complaint alleges an

ongoing fraudulent scheme in which HIIQ developed lead-generating websites that led consumers in search of comprehensive health care plans to call center agents that HIIQ hired and trained to mislead and deceive consumers into purchasing HIIQ plans that consumers believed were ACA-compliant policies, but, in fact, were not. Plaintiffs allege how Defendants emphasized and highlighted every quarter the importance of compliance and customer satisfaction as a competitive strength in their highly regulated industry. Courts have found that when key executives continually stress a record of corporate compliance as a key to company success, the statements are not considered puffery. *See, e.g., Owl Creek I, L.P. v. Ocwen Fin. Corp.*, No. 18-80506-CIV, 2018 WL 4844019, at *8 (S.D. Fla. Oct. 4, 2018) (statement that company had been "careful to assure . . . strong compliance" is a "verifiable and specific factual statement" and thus is more than mere puffery because defendants are in a "heavily regulated industry"); *SEC v. Monterosso*, 768 F. Supp. 2d 1244, 1264–65 (S.D. Fla. 2011) (five press releases repeatedly emphasizing company's revenue numbers to the public support the conclusion that the company's overstatements were material); *Bach v. Amedisys, Inc.*, No. CV 10-00395-BAJ-RLB, 2016 WL 4443177, at *10 (M.D. La. Aug. 19, 2016) (compliance-related statements touting the compliance program as being central to what the company does were not mere puffery); *City of Sterling Heights Gen. Emps' Ret. Sys. v. Hospira, Inc.*, No. 11 C 8332, 2013 WL 566805, at *24 (N.D. Ill. Feb. 13, 2013)

(statement about "working . . . to make sure that we meet the highest level of compliance and quality" was not puffery).

As for Defendants' argument that the safe harbor provision applies because the statements are forward-looking, a review of the allegations suggests otherwise. For example, Defendants' statements regarding zero or near zero percent complaints specifically were tied to a period of time immediately preceding the statement made and thus were not forward-looking. *See, e.g.,* Dkt. 30 ¶¶ 178, 184. Similarly, many of Defendants' statements about its happy customer base and its high levels of customer satisfaction and regulatory compliance directly related to the then current status and were not statements made about future conditions.

Defendants argue that its statements regarding low or declining numbers of DOI and BBB complaints were not misleading and that Plaintiffs' allegations to the contrary fail to consider that these reports were HIIQ-specific and that HIIQ distinguished in its materials DOI and BBB complaints from consumer complaint calls to customer service about distributors. Thus, Defendants do not appear to refute that there were thousands of consumer complaints, but instead argue that the reference to 0.01% of consumer complaints "upheld" by the DOI is not literally false. "Rule 10b–5 prohibits not only literally false statements, but also any omissions of material fact 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *FindWhat Inv'r Grp.,*

658 F.3d at 1305 (quoting 17 C.F.R. § 240.10b–5(b)). Defendants repeatedly highlighted a lack of consumer complaints. These statements are arguably misleading, in the face of internal HIIQ emails and other evidence revealing thousands and thousands of consumer complaints.

HIIQ asserts that it fully disclosed regulatory issues, including investigations by forty-three states. Plaintiffs claim that when the regulatory action against Simple Health was announced, Defendants falsely minimized the percentage of Simple Health's sales of HIIQ's policies even though the percentage of HIIQ commissions and revenues attributable to Simple Health was nearly 50%. Defendants respond that Plaintiffs' argument mixes apples and oranges by timeframes and different metrics, and thus is not actionable. These are disputes not appropriate on this motion. On the instant motion, the Court must accept all of Plaintiffs' well-pled allegations as true. The Court finds in a light favorable to the Plaintiffs, Plaintiffs have alleged the existence of material misrepresentations and omissions made by Defendants.

Next, to satisfy the scienter requirement, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," which can be an "intent to deceive, manipulate, or defraud or severe recklessness." *Durgin v. Mon*, 415 F. App'x 161, 164, 166 (11th Cir. 2011) (citations and emphasis omitted). Severe recklessness is limited to "highly unreasonable omissions or misrepresentations that involve not merely simple or even

inexcusable negligence, but an extreme departure from the standards of ordinary care." *Id.* at 166 (citation and emphasis omitted).

Plaintiffs' Complaint alleges an elaborate scheme to deceive consumers in which Defendants were not only involved but, to a great extent, orchestrated. In the midst of repeated public representations regarding high customer satisfaction, Defendants were exchanging internal emails about "out of control" consumer complaints. Additionally, Plaintiffs alleged the Individual Defendants engaged in insider trading selling their personal stock shares before the stock prices plummeted on the disclosure of the alleged fraud. Such allegations are beyond simple negligence.

The Court finds Plaintiffs have adequately pled scienter. Additionally, Plaintiffs have pled reliance and injury caused by the material misrepresentations or omissions. *See* Dkt. 30 ¶¶ 220–227, 237–239. As discussed above, the Court further finds that Plaintiffs have pled such allegations to meet the strict pleading requirements imposed by the PSLRA and Rule 9. Accordingly, Defendants' motion to dismiss as to Count I is denied.

B.    *Violations of Section 20(a) of the Exchange Act*

Defendants move to dismiss Count II of the Complaint that alleges a claim against the Individual Defendants for violations of § 20(a) of the Exchange Act. A claim under § 20(a) against a "controlling person" requires that an entity violated

the securities laws and that the defendant "had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities law . . . [and] had the requisite power to directly or indirectly control or influence the specific corporate policy which results in the primary liability." *Brown v. Enstar Group, Inc.*, 84 F.3d 393, 396-97 (11th Cir. 1996) (alterations in original) (citation omitted). To state a claim under § 20(a), Plaintiffs must allege that: (1) HIIQ committed a primary violation of the securities laws; (2) the Individual Defendants had the power to control the general business affairs of HIIQ; and (3) the Individual Defendants "had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability." *Theoharous v. Fong*, 256 F.3d 1219, 1227 (11th Cir. 2001), *abrogated on other grounds by Merck & Co. v. Reynolds*, 559 U.S. 633 (2010) (citation omitted).

If a plaintiff fails to adequately plead a violation of § 10(b) and Rule 10b(5), a claim under § 20(a) necessarily fails. *See Garfield*, 466 F.3d at 1261. As discussed above, the Court finds that Plaintiffs have adequately pled a violation of § 10(b) and Rule 10b(5), and thus the Court must next consider whether the Individual Defendants had the power to control the general business affairs and influence the corporate policy resulting in the injury. A review of the Complaint reveals Plaintiffs have adequately pled their § 20(a) claim against Southwell and Hershberger. In their positions as CEO and CFO, the Individual Defendants had the authority and power

to direct the management and activities of HIIQ. *See* Dkt. 30 ¶ 253. The Individual Defendants had the power to and did direct the content, including the alleged misrepresentations, disseminated in SEC filings, investor presentations, and press releases. *Id.* ¶¶ 253, 254. The Individual Defendants were involved in the day-to-day operations of HIIQ and in its accounting and reporting functions. *Id.* ¶ 254. Plaintiffs allege that the Individual Defendants' misstatements and misconduct caused the damages suffered by Plaintiffs. *Id.* ¶¶ 256, 257. The Court finds Plaintiffs have adequately pled in Count II a cause of action against Defendants Southwell and Hershberger for violations of § 20(a) of the Exchange Act.

## IV. Conclusion

For the reasons stated, it is hereby

**ORDERED** that Defendants' Motion to Dismiss (Dkt. 41) is **denied**. Defendants shall file an answer to the Consolidated Complaint within 14 days of the date of this Order.

**DONE AND ORDERED** in Tampa, Florida on November 4, 2019.

**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

COPIES FURNISHED TO:
Counsel of Record