UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| JULIAN KEIPPEL, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> HEALTH INSURANCE INNOVATIONS, INC. n/k/a BENEFYTT TECHNOLOGIES, INC. et al., <br><br> Defendants. | Case No.   8:19-cv-00421-WFJ-CPT |

**DEFENDANTS' OPPOSITION TO LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION OF AN EXPANDED CLASS PERIOD AND INCORPORATED MEMORANDUM OF LAW**

4848-2033-9905.7

**TABLE OF CONTENTS**

**PAGE**

**TABLE OF AUTHORITIES** ....................................................................................................... ii

**INTRODUCTION** .................................................................................................................... 1

**BACKGROUND** ..................................................................................................................... 3

I.     Standard of review. ........................................................................................... 7

II.    The class period should end on November 27, 2018. ....................................... 8

    A.     The Court should rule on the proper end date of the class period at the class certification stage and should end the class period after disclosures that put investors on inquiry notice of the misstatements alleged, not after further bad news that does not disclose new and corrective information. ...................................... 8

    B.     The class period should end no later than November 27, 2018. ......... 11

    C.     The 2019 Post-Complaint Disclosures did not reveal new corrective facts. .................................................................................... 14

    D.     At the very least, the class period should end on February 18, 2019, the date this case was filed. ....................................................... 17

III.   The *Affiliated Ute* presumption of reliance cannot apply in this case. ........... 19

IV.    The class may include only purchasers, not those who otherwise acquired shares. ......................................................................................... 20

**CONCLUSION** ..................................................................................................................... 20

4848-2033-9905.7

# TABLE OF AUTHORITIES

**Cases**                                                                                                   **Page(s)**

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972)...............................................................................1, 19, 20, 21

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013)...............................................................................................9

*Aranaz v. Catalyst Pharm. Partners Inc.*,
    302 F.R.D. 657 (S.D. Fla. 2014)........................................................................20

*Bacon v. Stiefel Labs., Inc.*,
    275 F.R.D. 681 (S.D. Fla. 2011)........................................................................20

*Brown v. Electrolux Home Prod., Inc.*,
    817 F.3d 1225 (11th Cir. 2016) ...........................................................................7

*Catogas v. Cyberonics, Inc.*,
    292 F. App'x 311 (5th Cir. 2008).......................................................................16

*City of Sunrise Gen. Employees' Ret. Plan v. FleetCor Techs., Inc.*,
    2019 WL 3449671 (N.D. Ga. July 17, 2019).......................................................7

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013).................................................................................................8

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011)...............................................................................................9

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014)...............................................................................................9

*Heffner v. Blue Cross & Blue Shield of Ala., Inc.*,
    443 F.3d 1330 (11th Cir. 2006) .........................................................................7, 8

*In re Am. Italian Pasta Co. Sec. Litig.*,
    2007 WL 927745 (W.D. Mo. Mar. 26, 2007).........................................9, 10, 16

*In re CMS Energy Sec. Litig.*,
    236 F.R.D. 338 (E.D. Mich. 2006) ....................................................................18

*In re Data Access Sys. Sec. Litig.*,
    103 F.R.D. 130 (D.N.J. 1984)............................................................8, 9, 10, 14

4848-2033-9905.7

*In re Fed. Nat. Mortg. Ass'n Sec., Derivative & "ERISA" Litig.,*
   247 F.R.D. 32 (D.D.C. 2008)..............................................................................10, 11, 13, 14

*In re Health Ins. Innovations Sec. Litig.*
   2019 WL 3940842(M.D. Fla. June 28, 2019)...........................................................3

*In re Lehman Bros. Sec. & ERISA Litig.,*
   2013 WL 5730020 (S.D.N.Y. Oct. 22, 2013) ..........................................................20

*In re Netbank, Inc. Sec. Litig.,*
   259 F.R.D. 656 (N.D. Ga. 2009).............................................................................7

*In re Novatel Wireless Sec. Litig.,*
   2010 WL 11470156 (S.D. Cal. May 12, 2010).........................................................18

*In re Recoton Corporation Securities Litigation,*
   248 F.R.D. 606 (M.D. Fla. 2006)............................................................................14

*In re Ribozyme Pharm., Inc. Sec. Litig.,*
   205 F.R.D. 572 (D. Colo. 2001) ........................................................................9, 11

*Kirkpatrick v. J.C. Bradford & Co.,*
   827 F.2d 718 (11th Cir. 1987) ................................................................................20

*Levitt v. J.P. Morgan Sec., Inc.,*
   710 F.3d 454 (2d Cir. 2013)....................................................................................7

*Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions*
   *Fin. Corp.,*
   762 F.3d 1248 (11th Cir. 2014) ..............................................................................8

*Meyer v. Greene,*
   710 F.3d 1189 (11th Cir. 2013) ..............................................................................16

*Teggerdine v. Speedway, LLC,*
   2018 WL 2451248 (M.D. Fla. May 31, 2018)..........................................................7

*W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.,*
   325 F.R.D. 280 (D. Minn. 2018)...............................................................8, 9, 10, 17, 19

*Wal-Mart Stores, Inc. v. Dukes,*
   564 U.S. 338 (2011)................................................................................................7

**Statutes and Rules**

Fed. R. Civ. P. 23(c)(1)(B) .....................................................................................7

4848-2033-9905.7

Defendants Health Insurance Innovations, Inc. n/k/a Benefytt Technologies, Inc., ("HIIQ"), Gavin Southwell, and Michael D. Hershberger (collectively, "Defendants") oppose Lead Plaintiffs Oklahoma Municipal Retirement Fund's ("OMRF") and City of Birmingham Retirement and Relief System's ("BRRS") (collectively, "Lead Plaintiffs") Motion for Class Certification (ECF 70, "Motion") that attempts to extend the class period from the originally-pleaded class period of February 28, 2018 through November 27, 2018 (the "Original Class Period") to an unsupported expanded class period of September 25, 2017 through April 11, 2019 (the "Proposed Expanded Class Period").[1]

## INTRODUCTION

Lead Plaintiffs bear the burden to support certification of the class period they seek. But they provide *zero* support anywhere in their Motion or filings for their attempt to extend the end of their proposed class period from November 27, 2018 as originally pleaded (ECF 1 ¶ 1) and as they asserted in their Motion for Appointment as Lead Plaintiffs (ECF 6 at 1) to April 11, 2019, long after the alleged truth correcting alleged misstatements was revealed in November 2018 and nearly two months *after* this case was filed on February 18, 2019.

Despite Defendants repeatedly informing Lead Plaintiffs that the Proposed Expanded Class Period is improper (*e.g.*, ECF 71 Ex. D ¶¶ 5, 6), nowhere in Lead Plaintiffs' Motion or any of their submitted exhibits do Lead Plaintiffs even mention their new proposed April 11, 2019 class period end date beyond simply asserting that is the end date (Motion at 3). Lead

---

[1] Although Defendants contest only the end date of the class period at this stage and do not oppose certification with a class period ending on November 27, 2018 (other than no non-purchasers and no *Affiliated Ute* presumption as set forth in Sections III and IV below) or appointment of Lead Plaintiffs as Class Representatives or Saxena White as Class Counsel, Defendants do not waive any later arguments or defenses.

1

Plaintiffs' class certification expert was ████████████████████████████ ██████████ and ██████████████████████████████████ "████████" from Lead Plaintiffs' counsel Saxena White. (Ex. A, Coffman, 248:8-249:16).[2] Likewise, Lead Plaintiff OMRF, which bought the bulk of its HIIQ stock *after* this case was filed, was told by Lead Plaintiffs' counsel, "Saxena White provided notification that the class action period has been expanded" so that it "will now include the purchases made" after this case was filed. (Ex. B, OMRF, Dep. Ex. 26).

While Lead Plaintiffs provide no evidentiary support, legal authority, or argument to justify their Proposed Expanded Class Period, certifying their Proposed Expanded Class Period would give plaintiffs an unwarranted windfall of increasing potential damages to many times what they would be if the class period ended on November 27, 2018, by taking advantage of stock price drops in 2019 after this case was filed that followed three new alleged corrective disclosures that disclosed no new information correcting any of Defendants' alleged misstatements. Tellingly, Lead Plaintiffs' Motion does not even mention what they now assert was a corrective disclosure on March 13, 2019 when a Congressional committee announced an investigation of alleged "junk" short-term medical plans and listed 12 companies that received letters including HIIQ, which did not correct any statement at all by Defendants, much less any of the misstatements Lead Plaintiffs allege in this case. This one new addition to the case alone is alleged to have caused $82 million in market capitalization losses (ECF 30 ¶ 224), a whopping addition to alleged losses against a

---

[2] Defendants' Opposition is supported by the Declaration of Lauren Valiente filed herewith that attaches Exhibits A through N. Citations to these exhibits are referenced herein as "Ex. _" and in the case of deposition transcripts, also as "[witness] [page:line]," and in the case of deposition exhibits, also as "Dep. Ex. _."

2

company that Lead Plaintiffs say has $9 million in cash and cash equivalents. (ECF 54 at 6.)

At a minimum, the class period should end no later than February 18, 2019 when this case was filed, because purchases of HIIQ stock after this case was filed could be disguised purchases of a lawsuit, which is impermissible.

## BACKGROUND

HIIQ provides a technology platform that allows third-party insurance carriers and third-party distributors to market and sell health and life insurance products. (ECF 30 ¶¶ 13, 30-31, 177.) As Lead Plaintiffs concede, for years HIIQ has disclosed to investors that it "received complaints that the information [HIIQ] provided in selling its products was 'not accurate or was misleading.'" *Id.* ¶ 34. Indeed, HIIQ repeatedly disclosed numerous consumer regulatory proceedings against it and its third-party distributors by forty-three states as well as other government investigations and enforcement actions, including a May 2016 enforcement action against HIIQ third-party distributor Simple Health/Health Benefits One ("Simple") (*id.* ¶ 19) and others for allegedly misleading consumers, as to which Judge Kovachevich dismissed earlier securities fraud claims. *In re Health Ins. Innovations Sec. Litig.*, No. 8:17-CV-2186-T-17SPF, 2019 WL 3940842, at *32 (M.D. Fla. June 28, 2019).

Lead Plaintiffs in this case allege "material misrepresentations and omissions to investors that HIIQ and its third-party call centers had impeccable compliance and customer service records due to HIIQ's purportedly industry-leading compliance systems and controls" (Motion at 1), which Lead Plaintiffs contend were revealed to be false by a November 2, 2018 Federal Trade Commission ("FTC") announcement publicizing and linking to court filings including Judge Darrin Gayles' temporary restraining order shutting down Simple

3

because it "sold limited benefit plans and medical discount memberships to consumers by misrepresenting that such products are comprehensive health insurance . . . or are qualified health insurance plans under the Patient Protection and Affordable Care Act ("ACA" or "Affordable Care Act"), 42 U.S.C. § 18001 et seq."  (Motion at 4-5; Exs. C, D at ¶ B). The FTC asserted that Simple misled consumers in a "classic bait-and-switch scam" (*id.*) and that HIIQ paid Simple $145 million in commissions from January 2016 to April 2018, which was 49% of all third-party commissions paid by HIIQ during that approximate timeframe. (ECF 30 ¶ 47, citing 10/17/18 E. George Decl. filed in FTC litigation, ECF 12-7 ¶ 9, Case No. 18-cv-62593 (S.D. Fla.) (Ex. E).)

The FTC's filings that became public on November 2, 2018 also revealed that there were "two- to three-thousand calls per day" to customer service, and that an estimated "95%" of those thousands of daily calls "were complaints from consumers who had been misled about the benefits they would receive, typically people who were under the impression that they had purchased major medical insurance." (Ex. F, 10/24/18 L. Seraphin Decl., ECF 12-11 ¶¶ 17, 33, Case No. 18-cv-62593 (S.D. Fla.).) In addition, these FTC filings disclosed that HIIQ sent its representatives to Simple "for compliance monitoring and to provide training," including that HIIQ reviewed Simple's "sales script" and "recordings of sales calls." (Ex. F, ¶¶ 33-36.) On November 5, 2018, the *New York Times* published an article about the FTC's claims that Simple's "scheme" "generated 'well over $150 million.'" (ECF 30 ¶ 126; Ex. G.)

On November 13, 2018, all of Lead Plaintiff BRRS's HIIQ stock was sold. BRRS's corporate representative testified the stock was sold then "███████████████

███████████████████████

4

██████████████████████████████████████." (Ex. H, BRRS, 94:23-95:6.)

On November 27, 2018, short-seller Aurelius Value issued a report reiterating that Simple's fraud "has been responsible for as much as half of HIIQ's revenues" from January 2016 to April 2018, which allegedly contradicted a November 2, 2018 HIIQ representation that Simple was responsible for less than 10% of HIIQ's policies for 2018 to date. (ECF 30 ¶¶ 47, 128, 130.) The Aurelius report also said that contrary to Defendants' statements to investors that HIIQ has "high levels of compliance and consumer satisfaction," misleading sales tactics were used to "dupe thousands of people into purchasing HIIQ policies" and HIIQ received "hundreds of complaints from angry customers." (Ex. I at 1-16.) The next day, on November 28, 2018, plaintiff's counsel began soliciting plaintiffs for potential securities fraud litigation against HIIQ, citing the above assertions from the FTC filings and the Aurelius report. (Ex. J, 11/28/2018 PR Newswire, "HIIQ Losses Alert: Bernstein Liebhard LLP Announces First Investigation of Health Insurance Innovations, Inc. – HIIQ".)

This action was then filed on February 18, 2019. (ECF 1.) The Complaint alleged a class period from February 28, 2018 to November 27, 2018 and alleged two corrective disclosures: (1) the FTC court filings and TRO publicly announced on November 2, 2018, and (2) the November 27, 2018 Aurelius report. (ECF 1 ¶¶ 5, 25, 29.) The next day, notice of the Complaint was published in *Business Wire*, notifying investors they could move to be appointed as lead plaintiff. (ECF 7 at Ex. A). On ████████████, Lead Plaintiffs OMRF and BRRS ███████████████████████, now counsel for Lead Plaintiffs, ██████████ ██████. (Ex. H, BRRS, 58:23-59:17; Dep. Ex. 4); (Ex. B, OMRF, 222:4-223:24; Dep. Ex. 27.)

On April 22, 2019, BRRS and OMRF moved the Court to be appointed Lead Plaintiffs of a class with the Original Class Period of February 28, 2018 to November 27, 2018. (ECF 6 at 1.) After the Court appointed BRRS and OMRF Lead Plaintiffs on May 13, 2019, Lead Plaintiffs filed the Consolidated Complaint on July 19, 2019. (ECF 30.) Saxena White then notified OMRF "that the class period has been expanded" so that it "will now include the purchases made" after this case was filed. (Ex. B, OMRF Dep. Ex. 26.)

The Consolidated Complaint retains the original two corrective disclosures, the FTC filings and the Aurelius report, but also alleges three new corrective disclosures, all of which occurred after the filing of this case on February 18, 2019 (collectively, the "Post-Complaint Disclosures"): (1) a Congressional committee's March 13, 2019 announcement of an investigation of alleged "junk" short-term health policies, listing 12 companies (expanded to 14 companies a few days later) that received letters, including HIIQ (ECF 30 ¶ 224; Ex. K); (2) former Simple principal Steven Dorfman's March 25, 2019 filing in the FTC action, which discussed HIIQ's visits to Simple for audits of employee training and of sales and verification processes and scripts (ECF 30 ¶¶ 140-44; Ex. L at 20-21, ex. A at ¶ 65) – the same HIIQ audits referenced above in the FTC's November 2, 2018 publicly announced filings (*see* Seraphin Decl., *supra*); and (3) the April 12, 2019 receiver's report in the FTC action asserting that the FTC's allegation in its court filings publicly announced on November 2, 2018 that Simple engaged in a "classic bait-and-switch scam" is correct – though the receiver's report is not alleged to include any new information about HIIQ other than HIIQ offsetting what Simple owed HIIQ against customer payments and potentially providing notifications to customers, nothing corrective of HIIQ's alleged misstatements to

6

investors. (Ex. M; ECF 30 ¶¶ 146-152.)

After the Court denied Defendants' motion to dismiss on November 4, 2019 (ECF 51), the parties engaged in discovery, and Lead Plaintiffs filed this Motion. (ECF 70).

**ARGUMENT**

I.     <u>**Standard of review.**</u>

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011), and "the presumption is against class certification" of the class proposed by plaintiffs. *Brown v. Electrolux Home Prod., Inc.*, 817 F.3d 1225, 1233 (11th Cir. 2016); *see also City of Sunrise Gen. Employees' Ret. Plan v. FleetCor Techs., Inc.*, Case No. 1:17-CV-02207-LMM 2019 WL 3449671, at *2 (N.D. Ga. July 17, 2019). Before any suit may proceed as a class action, plaintiffs must go beyond their "mere pleading" and "affirmatively demonstrate" and "prove" compliance with Rule 23. *Wal-Mart*, 564 U.S. at 350.

"Plaintiff bears the burden" of supporting the proposed class, *Teggerdine v. Speedway, LLC*, No. 816CV03280T27TGW, 2018 WL 2451248, at *2 (M.D. Fla. May 31, 2018), which must be subjected to "rigorous analysis" because "actual, not presumed, conformance" with Rule 23 is "indispensable." *Wal-Mart*, 564 U.S. at 350-51; *In re Netbank, Inc. Sec. Litig.*, 259 F.R.D. 656, 662–63 (N.D. Ga. 2009); Fed. R. Civ. P. 23(c)(1)(B) (any order certifying a class action "must define the class"). Moreover, "the district court is required to make a definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues." *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 464-65 (2d Cir. 2013); *accord Heffner v. Blue Cross & Blue Shield of Ala., Inc.*, 443 F.3d 1330, 1337 (11th

7

Cir. 2006); *Comcast Corp. v. Behrend*, 569 U.S. 27, 28 (2013) ("By refusing to entertain arguments . . . that bore on the propriety of class certification, simply because those arguments would also be pertinent to the merits determination, the Court of Appeals ran afoul of our precedents requiring precisely that inquiry.").

**II.     The class period should end on November 27, 2018.**

Lead Plaintiffs' Motion contains no argument, evidence, or authority to satisfy their burden to extend the originally-pleaded class period end date from November 27, 2018 to April 11, 2019. To try to justify their Proposed Expanded Class Period, Lead Plaintiffs added three new alleged corrective disclosures to the Consolidated Complaint that post-date the filing of this action and that do not reveal any new information correcting or revealing the untruth of any of Defendants' alleged misstatements. The class period should end on November 27, 2018.

      **A.     The Court should rule on the proper end date of the class period at the class certification stage and should end the class period after disclosures that put investors on inquiry notice of the misstatements alleged, not after further bad news that does not disclose new and corrective information.**

In ruling on a motion for class certification, courts "must evaluate some aspects of the merits of plaintiffs' proposed class period to determine the appropriate endpoints," and "have regularly examined the date of corrective disclosure at the class-certification stage in order to decide whether the class period should be modified." *W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 325 F.R.D. 280, 293 (D. Minn. 2018) (shortening class period) (quoting *In re Data Access Sys. Sec. Litig.*, 103 F.R.D. 130, 143 (D.N.J. 1984) (shortening class period)); *Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1261 (11th Cir. 2014) ("Regions's argument about the end date for the period is well taken . . . . individuals who purchased their shares on January

8

20, 2009 should likely be excluded from the class. This is because Regions's corrective disclosure on January 20 was made before the market opened for trading."). "In a securities class action, the class period ends 'when curative information is publicly announced or otherwise effectively disseminated to the market.'" *Medtronic*, 325 F.R.D. at 291 (quoting *In re Ribozyme Pharm., Inc. Sec. Litig.*, 205 F.R.D. 572, 579 (D. Colo. 2001)); *In re Data Access Sys.*, 103 F.R.D. at 143; *In re Am. Italian Pasta Co. Sec. Litig.*, No. 05-0725-CV-WODS, 2007 WL 927745, at *4 (W.D. Mo. Mar. 26, 2007) (shortening class period). This is so because the corrective or "curative" information "retracts or dispels the alleged misinformation, or puts the investor on inquiry notice of the alleged fraud, making further reliance on the original statements by investors unreasonable." *Alaska Elec. Pension Fund v. Pharmacia Corp.*, No. 03–1519, 2007 WL 276150, *3 n. 7 (Jan. 25, 2007 D.N.J.); *In re Data Access Sys.*, 103 F.R.D. at 143 (when curative information is disclosed "it [is] not reasonable for individuals or the market to rely on" the alleged misrepresentations).[3]

The case law makes clear that class periods must end after new disclosures that correct the misrepresentations alleged in the litigation, not after additional bad news that piles on but does not offer new information or information that corrects the misrepresentations alleged by the plaintiffs. An alleged "corrective disclosure" is not corrective when it merely "reiterate[s] and reinforce[s] the [earlier] [corrective disclosure], but d[oes] not provide any

---

[3] Determining the class period end date at the class certification stage is not contrary to recent Supreme Court precedent. *See Medtronic, Inc.*, 325 F.R.D. at 294 ("*Amgen* and *Halliburton I* do not change courts' longtime practice of considering the date of corrective disclosure at the class-certification stage for purposes of determining the end of the class period.  The Supreme Court's most recent decision in *Halliburton II* affirms the Court's conclusion that the Court may modify the class period during the class-certification stage.") (referring to *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013); *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014)).

9

new information to the market or investors." *Am. Italian Pasta*, 2007 WL 927745, at *4 (shortening class period to exclude alleged corrective disclosure that "reiterated and reinforced the [earlier] announcement, but did not provide any new information to the market or investors"); *see also Medtronic*, 325 F.R.D. at 295 (shortening class period and rejecting later disclosure that merely "reiterated and reinforced" earlier disclosure, "but did not provide any new information to the market or investors").

In addition, even where a disclosure does offer new information, the disclosure is not corrective when it does not reveal the untruth of the "gravamen" of the misrepresentations alleged by the plaintiffs. *See, e.g., In re Data Access Systems*, 103 F.R.D. at 144. In *In re Data Access Systems*, for example, the court shortened the lead plaintiff's proposed class period and rejected the lead plaintiff's argument that the class period should "be extended" to the day before the company fired its auditor, because "[t]he alleged fraud in this case is that [the company] published false financial information, not that [the auditor] remained as its auditor for two months after it had discovered the misstated financial statements." *Id.* Furthermore, "curative information need not demonstrate fraud, it need only cause a reasonable investor to doubt the prior statements." *Alaska Elec.*, 2007 WL 276150 at *3 (shortening class period and rejecting plaintiffs' argument that class period should be extended to later statement allegedly made to "perpetuate defendants' fraud," because prior disclosure put "the investor on inquiry notice of the alleged fraud"). At the class certification stage, courts end class periods when "there is no substantial doubt as to the curative effect" of the alleged corrective disclosure, "even though additional information regarding the [fraud subsequently] came to light." *In re Fed. Nat. Mortg. Ass'n Sec., Derivative & "ERISA"*

10

*Litig.*, 247 F.R.D. 32, 39 (D.D.C. 2008) (shortening class period); *In re Ribozyme Pharm., Inc. Sec. Litig.*, 205 F.R.D. 572, 579 (D. Colo. 2001) (shortening class period).

**B.      The class period should end no later than November 27, 2018.**

In this case, there is no substantial doubt that the November 2018 disclosures revealed the allegedly curative information as to all three categories of misstatements alleged in this case and that none of the 2019 alleged corrective disclosures added to the case by Lead Plaintiffs disclosed new information that corrected any of those three categories of misstatements, which are: (1) assertions that HIIQ's compliance efforts were "best-in-class," "improved," and similar positive characterizations; (2) statements about the low number or percentage of HIIQ-specific upheld Department of Insurance ("DOI") and Better Business Bureau ("BBB") consumer complaints; and (3) statements regarding the low percentage of HIIQ policies attributable to Simple and its affiliates in 2018. (ECF 30 ¶ 157.)

Assuming *arguendo* for purposes of this response only that the FTC filings publicly announced on November 2, 2018 and the November 27, 2018 Aurelius report are corrective disclosures sufficient at this stage to certify a class,[4] to the extent that there is any information that is corrective of the three categories of misstatements alleged in this case, the information was out in November 2018. As to the first category of alleged misstatements, the Aurelius report explicitly repudiates Defendants' statements that HIIQ has "high levels of compliance and consumer satisfaction" starting in its very first line (Ex. I at 1, 6), alleging

---

[4] Defendants reserve the right to move for summary judgment and if necessary argue at trial that loss causation cannot be established at all in this case. Defendants also reserve the right to argue at a later stage that the Aurelius report in fact offered no new information that was not already public and instead simply recited information publicly filed in the FTC filings announced on November 2, 2018 and other public information.

11

facts showing that "misleading statements from company management have disguised the reality that the business appears to depend on boiler rooms that scam Americans using deceptive sales tactics." (Ex. I at 3, 7, 11, 14.) The November 2, 2018 FTC filings set forth in great detail the alleged fraudulent scheme to mislead consumers into thinking they were buying ACA-compliant policies when they were not (Ex. N at 2-41), and that HIIQ sent its representatives to Simple "for compliance monitoring and to provide training" and that HIIQ reviewed Simple's "sales script" and "recordings of sales calls." (Ex. F, ¶¶ 33-36.) This alleged "fraudulent scheme" by which HIIQ allegedly participated in training and overseeing call center agents who "misle[]d and deceive[d] consumers into purchasing HIIQ plans that consumers believed were ACA-compliant policies, but, in fact, were not" is the reason this Court held that claims that HIIQ's "best-in-class" compliance statements were false or misleading survived Defendants' motion to dismiss. (Order, ECF 51 at 18.)

As to the second category of alleged misstatements, the FTC filings publicized on November 2, 2018 revealed among other things that there were "two-to three-thousand calls per day" to customer service, and that an estimated "95%" of those thousands of daily calls "were complaints from consumers who had been misled about the benefits they would receive . . . ." (Ex. F, ¶¶ 17, 33.) The Aurelius report alleges misleading sales tactics that were used to "dupe thousands of people into purchasing HIIQ policies," and HIIQ received "hundreds of complaints from angry customers." (Ex. I at 4, 10.) This information that there were "thousands of consumer complaints" is precisely the information this Court held made Defendants' statements about the low number of DOI and BBB complaints "arguably misleading" in denying Defendants' motion to dismiss. (Order, ECF 51 at 19-20.)

As to the third category of alleged misstatements, the Aurelius report repudiates HIIQ's allegedly "highly misleading" statement that Simple Health was "responsible for less than 10% of HIIQ's business" and asserts to the contrary that Simple's fraud "has been responsible for as much as half of HIIQ's revenues" (Ex. I at 3-5, 7-8) based on information in the FTC filings publicized on November 2, 2018 showing that HIIQ paid Simple $145 million in commissions from January 2016 to April 2018, which was 49% of all third-party commissions paid by HIIQ during that approximate timeframe. (Ex. E, ¶ 9.) Again, this Court denied Defendants' motion to dismiss as to this category, holding that Lead Plaintiffs stated a claim that these statements were materially misleading in light of the 49% figure disclosed in November 2018. (Order, ECF 51 at 10, 20; ECF 30 ¶ 196.)

To the extent there are any corrective disclosures in this case, there is no substantial doubt that they occurred in November 2018 when the FTC filings and the Aurelius report "retract[ed] or dispel[ed] the alleged misinformation," "contradicted" the Defendants' alleged misstatements," and "put[] the investor on inquiry notice of the alleged fraud, making further reliance on the original statements by investors unreasonable." *Alaska Electric*, 2007 WL 276150 at \*3; *see also In re Fed. Nat. Mortg. Ass'n Sec.*, 247 F.R.D. at 39. Moreover, Lead Plaintiff BRRS admits that "██████████████" from the "████████████" by Defendants was "██████" in ██████████. (Ex. H, BRRS, 94:23-95:6). The fact that plaintiffs' lawyers began advertising for plaintiffs to sue HIIQ on November 28, 2018 immediately following the Aurelius report, the fact that the initial Complaint in this action identified the November 27, 2018 Aurelius report as the final corrective disclosure ending the Original Class Period on November 27, 2018, and the fact that both Lead Plaintiffs' pursuit

13

of their securities fraud claims began prior to the three 2019 Post-Complaint Disclosures serve as further confirmation that investors were "on inquiry notice of the alleged fraud" in November 2018. *Alaska Elec.*, 2007 WL 276150, at *3 n. 7.[5]

The inquiry of the proper class period end date ends there – once allegedly corrective information has entered the public realm in November 2018, the class period ends, "even though additional information regarding the [fraud subsequently] came to light." *Fed. Nat. Mortg. Ass'n*, 247 F.R.D. at 39. Although the Court therefore need look no further at subsequent disclosures after November 2018, an examination of the three 2019 Post-Complaint Disclosures that Lead Plaintiffs added to the case confirms that the class period should end in November 2018, as none of the three supply information that is both new and corrective of the three categories of misstatements alleged in this case, as set forth below.

### C.      The 2019 Post-Complaint Disclosures did not reveal new corrective facts.

None of the 2019 Post-Complaint Disclosures supply information that is both new and corrective of any of the three categories of Defendants' alleged misstatements. *See, e.g., In re Data Access Sys.*, 103 F.R.D. at 144 (shortening class period and rejecting alleged disclosure that was not corrective of the "gravamen" of the alleged misrepresentations). The March 13, 2019 announcement of the Congressional committee investigation merely

---

[5] Although there are cases declining to shorten class periods, they are distinguishable and do not support Lead Plaintiffs' burden that the class period should end on their proposed end date of April 11, 2019. For example, in *In re Recoton Corporation Securities Litigation*, the plaintiffs' proposed class period ended nine months **before** they filed their complaint, and they did not try to extend it for two additional months after the action was filed, as Lead Plaintiffs are seeking to do in this case. 248 F.R.D. 606 (M.D. Fla. 2006); Compl., No. 6:03-cv-734-Orl-28KRS (ECF No. 1). Also, the court in *Recoton* declined to shorten the proposed class period because on defendants' proposed end date, defendants disclosed limited anticipated losses but then later made a much more substantial announcement that they had to write down over $12 million in obsolete inventory and had to reevaluate over $4 million in assets. The court selected the substantial new disclosure as the end date. *Id.* at 615, 623.  In contrast, all allegations about the true number of customer complaints, the true percentage of HIIQ's business attributable to Simple, and the true state of HIIQ's compliance were made public in November 2018.

14

announces an investigation into the short-term medical plan market, and the body of the announcement makes no mention of HIIQ. HIIQ is referenced for the first and only time within a list of 12 companies (later expanded to 14) that received a letter from the Committee requesting information. Although it is understandably bad news to have Congress announce that it is investigating your company's allegedly "junk" products, it is not in any way corrective of the three categories of misrepresentations alleged in this case – it reveals no new information to the market and certainly did not reveal information that in any way cured or even concerned HIIQ's alleged statements concerning the quality of HIIQ's compliance efforts, the number of customer complaints, or the percentage of HIIQ's policies sold by Simple in 2018, all of which were addressed in the November 2018 disclosures (nor does it matter what Congress would eventually report). It is unsurprising that neither BRRS nor OMRF could identify which of Defendants' alleged misstatements the March 2019 Congressional announcement revealed to be untrue and that the only " ███ " information BRRS and OMRF could identify was that "███████████████████████████ ████████████ (Ex. H, BRRS, 83:2-18); (Ex. B, OMRF, 245:2-6, 259:13-17.)

Likewise, the March 25, 2019 Dorfman court filing in the FTC case did not reveal any information that was both new and corrective of any misstatements alleged in this case. The Dorfman filing described HIIQ's visits to Simple for audits of employee training and of sales and verification processes and scripts (ECF 30 ¶¶ 140-44; Ex. L at 20-21, ex. A at ¶ 65) – the same HIIQ audits previously disclosed in the FTC's November 2, 2018 filings, including that HIIQ sent its representatives to Simple "for compliance monitoring and to

15

provide training" and that HIIQ reviewed "recordings of sales calls" by Simple. (Ex. F, ¶¶ 33-36.) Lead Plaintiff OMRF admitted that ████████████████████████ ████████, as its corporate representative repeatedly testified ████████████████████ ██████████████████████████. (Ex. B, OMRF 242:11-20). "[C]onfirmatory information—that information already known to the market—may not constitute such a corrective disclosure." *Catogas v. Cyberonics, Inc.*, 292 F. App'x 311, 314 (5th Cir. 2008); *see also Meyer v. Greene*, 710 F.3d 1189, 1197–98 (11th Cir. 2013) ("Corrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time."). The Dorfman filing is also not curative of any of the three categories of misrepresentations alleged in this case – Dorfman argued that HIIQ's compliance efforts were extensive and strong (Ex. L at 20-21, ex. B), Dorfman did not newly reveal anything about the number of customer complaints, and Dorfman also said nothing about the percentage of HIIQ's business attributable to Simple, much less anything revealing the untruth of Defendants' misstatements alleged in this case.

Finally, the April 12, 2019 FTC receiver's report echoing the FTC's November 2018 allegation that Simple engaged in a "classic bait-and-switch scam" (Ex. N at 10; ECF 30 ¶¶ 38, 146) "did not provide any new information" that is corrective of any of the three categories of misstatements alleged in this case, but merely "reiterated and reinforced" the November 2018 FTC filings. *Am. Italian Pasta*, 2007 WL 927745, at *4. The FTC receiver's report includes no new information about HIIQ, other than HIIQ offsetting what Simple owed HIIQ against customer payments and potentially providing notifications to customers,

16

nothing corrective of HIIQ's alleged misstatements to investors. (Ex. M at 40-41.)[6]

Lead Plaintiffs' addition to this case of alleged misstatements after November 27, 2018 (ECF 30 ¶¶ 195-203) also do not justify the extension of the class period beyond November 27, 2018. All of these post-November 2018 alleged misstatements fall into the same three categories discussed above.[7] Reliance on these post-November 2018 alleged misstatements, even if allegedly made to "perpetuate defendants' fraud," was unreasonable after the November 2018 FTC filings and Aurelius report, because investors were "on inquiry notice of the alleged fraud" for the same reasons stated above. *Alaska Elec.*, 2007 WL 276150 at *3. Also, as set forth above, the three Post-Complaint Disclosures do not reveal new information that corrects any of these additional alleged misstatements.

The class period should retain its original end date of November 27, 2018.[8]

> **D.     At the very least, the class period should end on February 18, 2019, the date this case was filed.**

While the class period should end on November 27, 2018 for the reasons set forth above, the Court should at the very least not allow Lead Plaintiffs to extend the class period beyond the filing of this case to include purchases of HIIQ stock after this case was filed. The filing of a securities fraud lawsuit is perhaps the most obvious indication that curative

---

[6] Lead Plaintiffs' Exhibits B and C to their Motion and other alleged evidence "confirming Plaintiffs' allegations" (Motion at 6) has no bearing on the class period analysis. Determining when the class period should end requires an analysis of the alleged corrective disclosures, *Medtronic*, 325 F.R.D. at 291, not inquiry into whether there is evidence supporting Plaintiffs' allegations of fraud.

[7] The post-November 2018 alleged misstatements that 8.2% of policies in 2018 were sold by Simple and had no material impact are no different than HIIQ's November 2, 2018 statement about Simple policies being less than 10% of policies in 2018. (ECF 30 ¶¶ 194-95, 198.) The other post-November 2018 alleged misstatements concern the number or percentage of HIIQ-specific DOI and BBB complaints (*id*. ¶¶ 197, 200) and HIIQ compliance (*id*. ¶ 202), just like the earlier alleged misstatements.

[8] A separate sub-class of purchases after November 27, 2018 would not be viable for the reasons stated above (for example, because the November 2018 disclosures put investors on inquiry notice).

information has reached the market. *In re CMS Energy Sec. Litig.*, 236 F.R.D. 338, 342 (E.D. Mich. 2006); *accord In re Novatel Wireless Sec. Litig.*, No. 08-CV-1689 H (RBB), 2010 WL 11470156, at *7 (S.D. Cal. May 12, 2010) ("[T]he appropriate class end date is September 15, 2008, when the alleged securities violations were disclosed through the commencement of this action."). In *CMS*, the court rejected the plaintiffs' attempt to extend the class period until after the case was filed, finding "no support for the theory that plaintiffs should be added to the Class *after the first complaint was filed* and [finding] persuasive defendants' argument that purchases of stock made after [the date of the first complaint] could be disguised purchases of a lawsuit." 236 F.R.D. at 342 (emphasis in original); *In re Novatel*, 2010 WL 11470156, at *7.[9]

The Complaint in this matter was publicly filed on February 18, 2019 and was followed by public notice to investors of their opportunity to seek appointment of lead plaintiff, thereby putting the investing public on express notice of this securities fraud action. Indeed, Lead Plaintiffs were contacted by ███████████████████████ ███████████████████████████████████. (Ex. H, BRRS, 58:23-59:17; Dep. Ex. 4); (Ex. B, OMRF, 222:4-223:24; Dep. Ex. 27.) The timing of Lead Plaintiff OMRF's participation in this lawsuit as compared to its continued purchases of HIIQ stock underscores this point. OMRF ████████████████████████████████, then

---

[9] The timing in this action mirrors the timing in both *CMS* and *Novatel*: an initial complaint was filed with a class period ending before the filing of the initial complaint, then lead plaintiffs later attempted to extend the class period beyond the initial filing of the action in an amended complaint. It is under these circumstances that purchases of stock made after the filing of the initial complaint that are later included in a proposed expanded class period "could be disguised purchases of a lawsuit," even if purchasers may not have known at the time of their purchases whether the class period may later be extended. *CMS*, 236 F.R.D. at 342.

18

made significant purchases of stock in March of 2019 – buying more stock than ever before – then moved to be appointed as a Lead Plaintiff, and then filed a Consolidated Complaint expanding the Class Period to include its own March 2019 purchases. A lead plaintiff in a securities class action should not be permitted to actively participate in the lawsuit while continuing to purchase HIIQ stock and then seeking to extend the class period to claim damages for its post-litigation purchases. The class period should not include purchases of HIIQ securities after the February 18, 2019 filing of this action. *CMS*, 236 F.R.D at 342.

Ending the class period at the very latest on the date this action was filed also avoids individualized issues as to whether a putative class member purchased HIIQ stock to participate in this action, which Lead Plaintiff BRRS admits would be ██████. (Ex. H, BRRS, 65:23:66:2) ("███████████████████████████████████████████████████████████████████████████████████████████████████ ██████"); *CMS*, 236 F.R.D at 342; *see also Medtronic,* 325 F.R.D. at 294 ("The Court sees no reason why defendants would not similarly be able to rebut the presumption with respect to a discrete portion of the class by introducing evidence that this portion of the class purchased the securities after the date of the corrective disclosure.").

The class period should end no later than the February 18, 2019 filing of this action.

**III.    The *Affiliated Ute* presumption of reliance cannot apply in this case.**

Lead Plaintiffs also claim entitlement to the *Affiliated Ute* presumption of reliance (Motion at 21-22, citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972)), but in cases like this one where a complaint "allege[s] mixed claims of misrepresentations and omissions . . . *Affiliated Ute's* presumption of reliance does not

19

apply." *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 722 (11th Cir. 1987); *Bacon v. Stiefel Labs., Inc.*, 275 F.R.D. 681, 698 (S.D. Fla. 2011) (same). "[T]he *Affiliated Ute* presumption applies only in circumstances in which there are no affirmative statements upon which plaintiffs could have relied." *In re Lehman Bros. Sec. & ERISA Litig.*, No. 09 MD 2017 LAK, 2013 WL 5730020, at *3 (S.D.N.Y. Oct. 22, 2013). In this case, as in *Bacon*, the Consolidated Complaint (ECF 30 at ¶¶157-203) is "rife with references to the misrepresentations purportedly made by" the Defendants, and the alleged omissions are "inextricably intertwined" with the alleged misstatements. 275 F.R.D. at 698. The Court should rule that the *Affiliated Ute* presumption does not apply here.

IV.     **The class may include only purchasers, not those who otherwise acquired shares.**

Lead Plaintiffs seek to define the class as "all those who purchased *or otherwise acquired* HIIQ common stock . . . ." (ECF 30 at ¶ 228 (emphasis added).) This is impermissibly overbroad, because "a person who did not make the decision to acquire a security could not have relied on a prior misrepresentation. Accordingly, the class definition will be limited to those who purchased [the] securities during the class period." *Aranaz v. Catalyst Pharm. Partners Inc.*, 302 F.R.D. 657, 664 (S.D. Fla. 2014). The phrase "or otherwise acquired" should be removed from any class definition in this case.

## CONCLUSION

For the foregoing reasons, to the extent the Court certifies a class, Defendants respectfully request that the Court: (1) end the class period on November 27, 2018, or alternatively, end it no later than February 18, 2019 when this case was filed; (2) rule that the *Affiliated Ute* presumption does not apply, and (3) limit any class definition to purchasers.

20

4848-2033-9905.7

Dated:  July 2, 2020                                      Respectfully submitted,


                                                        /s/ Michael P. Matthews
                                                        Michael P. Matthews, FL Bar No. 063988
                                                        mmatthews@foley.com
                                                        Lauren L. Valiente, FL Bar No. 034775
                                                        lvaliente@foley.com
                                                        Foley & Lardner LLP
                                                        100 North Tampa Street, Suite 2700
                                                        Tampa, Florida 33602-5810
                                                        Tel: 813-229-2300
                                                        Fax: 813-221-4210
                                                        *Counsel for Defendants*

21

4848-2033-9905.7

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 2, 2020, a copy of the foregoing was filed with the

Clerk of the Court using the CM/ECF electronic notification system, which will send a notice

of electronic filing to all parties of record.

*/s/ Michael P. Matthews*
Attorney

4848-2033-9905.7