UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JULIAN KEIPPEL,                )
                              )   8:19-cv-421-WFJ-CPT
          Plaintiff,          )   Tampa
                              )   August 25, 2020
          v.                  )   9:45 a.m.
                              )
OKLAHOMA MUNICIPAL            )
RETIREMENT FUND, ET AL.,      )
                              )
          DEFENDANTS.         )

TRANSCRIPT OF TELEPHONIC MOTION HEARING
BEFORE THE HONORABLE WILLIAM F. JUNG
UNITED STATES DISTRICT JUDGE

Court Reporter:        Tracey Aurelio, CRR, RMR, RDR
                       Federal Official Court Reporter
                       801 N. Florida Avenue, 15th Floor
                       Tampa, Florida 33602
                       (813) 301-5448

          Proceedings recorded by mechanical stenography,
transcript produced by computer.

APPEARANCES:

For Plaintiffs Oklahoma Municipal Retirement Fund and City of Birmingham Retirement and Relief System
     MR. LESTER R. HOOKER
     Saxena White, PA
     7777 Glades Road, Suite 300
     Boca Raton, FL 33434

For the Defendants:
     MR. MICHAEL P. MATTHEWS
     Foley & Lardner, LLP
     100 North Tampa Street, Suite 2700
     Tampa, FL 33602

     MS. CHRISTINA MARIE KENNEDY
     Foley & Lardner, LLP
     111 North Orange Avenue, Suite 1800
     Orlando, FL 32801

Also Present:
     MR. DOMENICK DiCICCO, Health Insurance Innovations, Inc.

_____

(Proceedings commenced at 9:45 a.m.)

THE COURT: Good morning. We are here on 19-cv-421, Keippel v. Oklahoma, et al, v. -- I will just call it Health Insurance Innovations, HII, and Southwell and Hershberger.

Can we have appearances first for the plaintiff and then defendant.

MR. HOOKER: Good morning, Your Honor. My name is Lester Hooker from the law firm of Saxena White on behalf of the plaintiffs.

THE COURT: All right. Good morning.

MR. MATTHEWS: And good morning, Your Honor. This is Mike Matthews with Foley & Lardner for the defendants. I'm also here with my colleague Christina Kennedy from Foley, and our client Domenick DiCicco who is the general counsel of HII, now known as Benefytt Technologies.

THE COURT: Well, thank you.

Any housekeeping matters before we get right to the plaintiffs' motion, Mr. Hooker or Mr. Matthews?

MR. HOOKER: This is Lester Hooker. And no housekeeping items for me, your Honor.

THE COURT: All right.

MR. MATTHEWS: This is Michael Matthews. None for us either, Your Honor.

THE COURT: All right. Well, thank you.

Now, Mr. Hooker, it looks like there was a mediation scheduled for next week.  Am I right on that?

MR. HOOKER:  Yes, that's correct.  That's scheduled for September 3.

THE COURT:  You know, it's always a question from a judge's perspective, you know, when are we going to get this order out?  How will it affect the case?  I will make an effort to tell y'all how I'm going to rule.  I don't think I will have a written work product out by then.

So it's Mr. Hooker's motion.  I have -- and sorry about the delay, everyone.  We kind of were thinking that there was another plaintiff that was going to call in, and we were sort of sitting here waiting, but thank you.  And I also appreciate very much the very high quality of lawyering that's on both sides.  So let's just -- Mr. Hooker, let me just talk to you for a second.

As I understand it, and if I'm wrong I'm sure Mr. Matthews can chime right in, but reading their response, we really have three things to discuss:  The ending date of the class period, and then I think the other point being made is they contend or argue that there should be no presumption of reliance under Affiliated Ute, that theory because these were not specific statements.  Because as I understand that point, and we will let Mr. Matthews explain it when he speaks, but the Affiliated Ute presumption of reliance should not

apply because these were specific affirmative statements, not just omissions.

The third point -- I probably stated that wrong, but I'll let him touch on it. The third point is that the class should include only purchasers, not "otherwise acquired." So I have read most of the cases, certainly the big ones. I have read the operative pleadings, the complaint, the motions, the response of reply.

So let me give the -- Mr. Hooker, let's turn -- I mean, you don't have to kind of tell me what happened and argue that this is an efficient market. I do believe it's an efficient market. They were quite a bit afloat and a large number of relatively -- Nasdaq, relatively large number of whatever you want to call it, analysts tracking the stock.

Let me -- Mr. Hooker, let's just talk about the ending date on the thing, on the period first. And let me just tell you, I understand your point. Your point is that, look, as we say, you know, at Paragraph 200 and 202 of our amended complaint, these alleged false statements -- I know you don't say alleged -- went well into the, you know, sort of around the horn into the new year, into 2019. Your 8-K, which you put out, your January 8-K was materially false. You made some verbal statements, maybe more, in March of 2019. So the false statements weren't removed and that's why we want this starting date. And we pled it. So we want the starting date

where we pled it, which I think is -- I'm sorry. The ending date is April 11 of 2019.

All right. So I understand that, Mr. Hooker. Here is what bothers me, and it bothers me quite a bit actually, so I want you to address it. And we will talk about the ending date first. I don't know whether Oklahoma had sold all of their stock or still had some, but one of the two main plaintiffs here bought a whole bunch of stock after this lawsuit in March. I don't know how much. I think there were several purchases. So well after this lawsuit was filed, you know, Oklahoma bought stock in March. And then in April -- in April, there's a motion to make Saxena White -- who I must say you're a very accomplished law firm. I was very impressed by your materials -- class counsel, which is fine, but make Oklahoma a plaintiff.

So it does -- you know, it does look a little bit like the March purchases were -- there is an inference, and of course they stress it, that the March purchases for the Oklahoma plaintiff, you know, kind of smelled like they were buying a lawsuit here. And lo and behold, maybe three weeks after they bought it, there's a motion to make them one of the big class, two class plaintiffs, which it's just hard to believe -- or it's not hard to believe, but there is an inference there that those purchases in March were not done, you know, by an Innocent Mage who was fooled in relying on

markets.

So let's talk about that ending date and why they're wrong on that.  Here's a personal question.  I'm sorry to verbal all these things out, but I'm just sharing with you my thoughts.

Mr. Hooker, whatever happened -- I'm just curious.  I used to be a federal prosecutor in Miami.  Whatever happened to Dorfman?  Did he ever get indicted?

MR. HOOKER:  Thank you for the kind words you said at the outset.

Yeah, Dorfman has -- the legal proceedings with Simple Health continue.  There has been a garnishment and a seizure of assets related to Simple Health, Dorfman's web of other companies.  So it's still firmly proceeding through the legal quagmire that has happened as a result of the misconduct.

And I did just want to address real quick your initial question about Oklahoma's purchases because --

THE COURT:  Yeah.  That really bothers me.  Go ahead.

MR. HOOKER:  Sure.  And it's really derived from a fundamental misunderstanding on the part of the defendants on how institutional investors like Oklahoma Municipal Retirement Fund conduct their investment activities.  You know, the motion that the class period should be shortened because Oklahoma Municipal made these four purchases of shares after

an individual plaintiff, Mr. Keippel, filed his complaint, but those purchases were made before the end of the class period -- I think defendants used the terminology they bought into it, they bought into the fraud or the lawsuit, there's really no merits to that contention.

If we take a step back, it's simply illogical. Oklahoma, like most institutional investors across the country which we represent on a regular basis, they employed outside investment managers to make their transactions.  Oklahoma's outside investment manager here made these four purchases in March of 2019.  The deadline for lead plaintiff motions in this case was not until late in April, and Oklahoma wasn't appointed lead plaintiff until May.

THE COURT:  Didn't you move to have them appointed in April?

MR. HOOKER:  Yes.  In late April, yes.

THE COURT:  So within, say, three weeks, they're in your, whatever you want to call it, on your team.  So they, unbeknownst that there was something cooking and something brewing, they just innocently without prior knowledge of the lawsuit bought these shares and within three weeks you're nominating them as plaintiff?  That's what you're telling me.

MR. HOOKER:  Yeah.  So the outside investment manager may have had any number of reasons to purchase the shares. They might have thought that there was value in the shares.

But for whatever reason, defendant's argument would require us to believe that Oklahoma's outside investment manager decided to buy shares in March in order to deliberately lose money for its client on those purchases because, according to defendants, they made purchases to extend the class date to April.  So they also had to anticipate that there was an impending stock price decline.  And they did all that before even knowing that Oklahoma would even be selected as the lead plaintiff because any number of other institutions could have moved for lead plaintiff.  And the fact that they purchased shares after a partial disclosure of this fraud, which is what we are dealing with here, it lacks legal merit.

There's a number of cases that say if a plaintiff, if a proposed class representative purchases shares after a partial disclosure of the fraud, there's no concerns regarding the class certification process.  Typically it comes up in the context of a defendant's argument that the class representative is atypical because of those purchases, but again defendants aren't arguing that here.  Their argument is even further removed.  They say the entire class period should be shortened because of these purchases, but the factual record really couldn't be clearer.  Oklahoma made 20 previous purchases of HIIQ stock throughout the class period.  It suffered damages as a result of all of those transactions.  Its CEO testified at her deposition that the March 2019

purchases were made before knowing what the appropriate class period would be in the consolidated complaint. And again, those purchases were made by an outside investment manager who had, you know, no knowledge at that point that Oklahoma would even be moving for lead plaintiff. So there really is nothing extraordinary about the purchases. We see this type of trading a lot especially with institutional investors who, again we pointed out in the briefing, that courts and Congress prefer institutional investors to serve as class representative.

THE COURT: Why do we need Oklahoma? I know there hasn't been a specific objection to it, but we have Birmingham. It just looks better and it's more, whatever the word is, makes the arrangements easier to have two institutional plaintiffs?

MR. HOOKER: It's always good to have the two lead plaintiffs. They have been appointed as lead plaintiffs by Your Honor. They vigorously prosecuted the class's interest throughout the litigation. Oklahoma has complied with all the discovery obligations. Its CEO testified at a deposition. Both of the lead plaintiffs have a track record of successfully prosecuting these types of litigations on behalf of there constituents in the class. So there's really nothing disqualifying about the purchases. It happens all the time. There's no -- again, the factual record really couldn't be

clearer.  And it would be chronologically and just factually illogical for the investment manager to make four purchases in March of 2019 at the time when the defendants are trying to distance themselves from the Simple Health allegations and they've issued materially false and misleading statements that Your Honor has already held were actionable downplaying the allegations that were out about the Simple Health scheme.  So there's nothing disqualifying about those purchases.  The cases are clear.  It doesn't affect typicality.  It doesn't affect reliance.  And that's not what the defendants are arguing here, but it sure doesn't support shortening the class period on that basis either.

So, you know, we pointed out in the briefing and I think as I just mentioned, those purchases, they weren't made -- you know, even if they hadn't made those four purchases, they would still be a perfectly fine class representative is the ultimate point.  Making purchases after a partial disclosure of the fraud is not disqualifying in any way.  It's certainly no basis to shorten the class period.

THE COURT:  All right.

MR. HOOKER:  If you would like, Your Honor, I can address the overall argument that the class period should be shortened either to November --

THE COURT:  Yes.  Let's focus on that.  Let me just share with you my thoughts.  I always hated when I argued in

front of judges and you had no idea what they were thinking. You were, like, what is in that man's mind?  And usually, I hate to say this, but occasionally it is because the judge hasn't read everything.

So here's my thoughts.  We are going to -- Mr. Hooker, I will give you a chance to address the Affiliated Ute piece, that there shouldn't be a construed reliance, but only after I talk to Mr. Matthews about it because I don't see how that theory survives Basic and then the Eleventh Circuit 2016 case Regions.

So if you would, what would be helpful to me is cover the ending date issue.  And then also their third point, which is mildly concerning, is that the class should only cover purchasers.  Now, here is why it mildly -- I assume, I think you said, well, if they receive shares by barter or maybe by bequest or by gift.  My only concern about that is damages.  I mean, in those cases where someone got some by damages -- I'm sorry -- by bequest, for example, where is the basis?  Is it the grantor's basis or do we get a step up in basis?  Do we just go by the date?  When those shares hit your hands, that's the basis?  It seems to challenge typicality or challenge, you know, the -- it seems to be an individualized inquiry that's contrary to class action, whatever you want to call it, thought.

So anyway, if you will address that ending date

subject and then that "otherwise acquired" rather than purchaser subject, that would help me.

Thank you.

MR. HOOKER:  Sure, Your Honor.  Thank you for the guidance and thank you for reading the materials.  As you mentioned, it does give a framework from which we can adequately address your questions or concerns.

So on the first point, the ending date, as Your Honor notes, the defendants argued that the end date of the class should be shortened by several months, one or two, and it would be either the November 27, 2018, date when the research firm Aurelius Value issued a report that partially revealed the alleged fraud, and then their second alternative is the February 18, 2019, date when Mr. Keippel filed his complaint. And there actually is no alleged disclosure whatsoever on that day.  It's just the filing of Mr. Keippel's complaint.

As I have explained in our reply, both of those alternative class periods are deficient both on a legal and factual basis.  First, the notion of shortening their class period under these circumstances where defendants don't challenge any aspect of Rule 23(a) or (b)(3) and they don't have any expert report or event study, they don't challenge market efficiency.  It's inappropriate because in order to shorten the class period, the Court would have to wade into areas that the Supreme Court has expressly held it's

inappropriate to do so at this stage.  And that's namely loss causation and materiality.

As Your Honor is aware, the complaint specifically alleges corrective disclosures in March and April of 2019. Those corrective disclosures revealed new information concerning defendant's misconduct.  And shortening the class period to exclude those corrective disclosures necessarily requires the Court to resolve this disputed issue of whether or not the disclosures are in fact corrective in nature, whether they revealed the information, whether they were material --

THE COURT:  And here's the question, Mr. Hooker.  You are an expert on this.  I'm not.  But here's my question. When we are talking about this date, we are talking about a cutoff date for acquirers, whatever the word is, people coming into the stock, right?  We're not talking about a cutoff date for when they had to have sold.  Is that not correct?

MR. HOOKER:  Yes, that's correct.

THE COURT:  Okay.

MR. HOOKER:  It does affect the calculation and it affects -- you know, in the instance we have here where defendants are making actionable material misstatements during this time period, the stock would remain in place.  And that inflates at least until April of 2019, yes, Your Honor.

THE COURT:  And your position would be that

because -- pardon my French -- because they are lying through April, a purchaser let's say who bought April 1 ought to be able to rely on the market which still had the poised puff statements in it?

MR. HOOKER:  That's correct, Your Honor.

And as I was mentioning, the Supreme Court is clear on this issue.  In Halliburton I, the Supreme Court specifically rejected the notion that plaintiffs had to prove loss causation for class certification.  And a couple years in the Amgen case, the Supreme Court relatedly said that not only do plaintiffs not need to prove loss causation of class certification, they also don't need to prove materiality, which is one of the things the defendants argued here, that later disclosures and later misstatements were not material.

And the reason the Supreme Court held that way and other courts around the country have followed suit is because the issues are premature at this stage at class certification. There's no full evidentiary record.  There's no expert testimony.  It's even more so here.  Defendants haven't proffered any evidence to support their argument.  There is no expert report or competing event study.  So there's simply no grounds to exclude the later disclosures.  And that's true whether we're talking loss causation or materiality.

Defendants, I think, implicitly recognized that when they reserve their right to argue at summary judgment and

trial that loss causation can't be established here.  And that's actually consistent with the Supreme Court's precedent and the precedent around the country.  These arguments should be reserved for later stages of the litigation, summary judgment, when we have expert reports and the full evidentiary record.  So right out of the gate the argument is legally deficient because it runs counter to the Supreme Court precedent.

So my second point on it is that it also ignores the plain allegations of the complaint and what Your Honor held at the motion to dismiss stage.

THE COURT:  Let me interrupt you for a second.

MR. HOOKER:  Sure.

THE COURT:  And I appreciate that, but the motion to dismiss, you know, quite frankly, that is sort of neither here nor there because of the way we have to presume every fact as accurate.

Well, I dropped my train of thought.  So go ahead. It will come back to me.

MR. HOOKER:  Okay.  So here the overriding point is that the complaint clearly alleges that defendants themselves continue to mislead the market after the earliest value report and even after Mr. Keippel's complaint was filed.  We highlighted in our reply brief that defendants specifically, explicitly, they repeatedly denied that research firm's

report's accuracy. They downplayed any connections they had to Simple Health or Mr. Dorfman's company. They continued to mislead investors about HIIQ's complaint and the compliance practices. And they made these misrepresentations again in December of 2018, January of 2019, March 2019.

One thing that we noted in our reply brief is the market credited these assurances. HIIQ's share price rose over $13 per share after the November disclosures to reach $40 by early February of 2019. And relatedly, the reason for defendant's reassurances, the individual defendants here engaged in significant and suspiciously timed insider selling in early February of 2019, and that was just weeks after their false denials caused the stock price to increase.

So, you know, defendants argue that the full truth regarding their fraud is revealed with that report, but that argument ignores that they themselves continued to make those false statements after that date. And a truth-on-the-market defense, which is basically what that amounts to, it fails at class certification because the trier of fact is the one that needs to determine whether such a defense would be applicable. And that's even more true here when defendants continued to engage in the misconduct. It's not a situation where there's no dispute over whether or not the full truth of the fraud was revealed on a certain date.

And the second point is the beyond making additional

false and misleading statements, there's also those corrective disclosures that are mentioned.  You know, these -- the information that was released on those dates was significant.  And one thing that remains unexplained by defendants' argument is the significant decline in HIIQ's stock price that defendants can't explain or demonstrate were caused by other factors, other factors other than the alleged fraud here.  And they are significant.

So we have the March 13, 2019, disclosure when the House Committee on Energy and Commerce revealed its investigation, you know, "junk health insurance" and they mention that consumers were being misled and the conduct was disturbing and concerning.  The stock price reaction to this disclosure reinforces the significance of the information.  The share price fell by over 17 percent.  And, you know, the cases are clear there's a strong indication that the information revealed on that date was new and the market reacted to it.

We point out in the complaint that analysts specifically tied that stock drop to the information released in connection with the investigation announcement.  And the March 25th disclosure when Mr. Dorfman made his voluminous filing in the FTC action, again, you know, this was substantial information that was released.  It was sales scripts, verification processes, and calls that were stored on

HIIQ servers. The filing even included examples of HIIQ audits. So the information was much more detailed and specifically tied HIIQ as being the one pulling the strings behind the scenes beyond what was previously released. And again, the stock price reaction confirmed it. The stock price fell again by 7.4 percent. It makes no sense for the stock price to crater by that much if, as defendants suggests, the market was fully aware of these details.

THE COURT: Why don't we pick April 11 as the ending date?

MR. HOOKER: Well, that's a day later the receiver over Simple Health issued a 229-page report in the FTC act. And that was really kind of, okay, you know, all the cards are on the table at this point. It detailed Simple Health as what they called the classic bait and switch scam. It concluded that Simple Health had no legitimate business at all and couldn't be operated legally. And this is important, something that we highlight in the reply brief. The receiver report disclosed that after the temporary restraining order was entered in 2018, HIIQ was still collecting from Simple Health victims on 59,000 policies sold by Simple Health.

THE COURT: Yeah, and I read that report, but they were remitting to the receiver. I mean, is that a fraud that the people send the money in and they kicked it over to the receiver?

MR. HOOKER:  Well, it's not necessarily that that's part of the fraud, but it's more confirmation at this point, the conclusive confirmation by the receiver over Simple Health that HIIQ could no longer claim that Dorfman was the problem. It was now clear that HIIQ was either in on the fraud, enabled it, facilitated it, or was in on it, and this is even a stretch, that they were reckless in doing it.  They were involved.  And the share price reaction, again a 7.6 percent drop.  Again it reflects that the market was directly reacting to this new information.

So even at minimum, there's a dispute between defendants and plaintiffs over the significance of this information.  If there is such a dispute, we need to move past the class certification stage to resolve it.  It has to be done on a full evidentiary record either at summary judgment or trial.

You know, the arc of this argument is the defendants is saying, well, truth was known by the market in November, but the fact of the matter is they denied the accuracy of that report.  They downplayed it, continued to make false statements.  The market credited those statements.  HIIQ share price increased.  The individual defendants engaged in insider selling.  And then new information, what we would respectfully suggest is damning information, information that was not previously known by the market was released.  And there was a

significant stock price decline that defendants don't explain or cannot explain, and it really would be improper for them to be (someone joined call causing audio interruption) at this point. And all of that is in our view compelling evidence that new material information was released to the market on this day. And again, defendants don't provide any explanation. So, you know, that's with respect to the November alternative class period that defendants suggest.

I can briefly touch on the other fallback argument that class cert should end when Mr. Keippel filed his complaint.

THE COURT: And here is this point on that, or at least what I gleaned. I mean, there are a couple cases that say, you know, maybe it's just ipse dixit by the judge, hey, we're going to stop this on the day the complaint was filed. But to some extent your very able presentation in the first part of your motion explaining how this is a highly efficient market cuts against the argument that, well, gee, even though it's a highly efficient argument and there were 21 market makers and 171 reports, even the lawsuit that was filed, you know, in federal court -- and I'm sure it hit Law360 or whatever -- still didn't alert the sufficient market. You know, there's an element of that, that, well, I thought it was efficient. Well, apparently it's not that efficient. So that's their two arguments, I think, that there's a couple

cases.  You know, it's a nice little dividing line.  It avoids the head scratcher on why Oklahoma is buying shares three weeks before Saxena White nominates them as a plaintiff.  And it also follows and is congruent and consistent with the efficient market argument that you made in the first part of your motion.

So, yes, go ahead.  Talk about -- I realize there's no market event on that date other than the filing.  So let me hear what you have to say on that.

MR. HOOKER:  Yeah.  That's correct, Your Honor. There really -- you know, there's no corrective disclosure on that date.  Defendants don't point to one.  So ending a class period on a date where there's no corrective disclosure simply doesn't make sense.  And I take your concerns about the efficient market and the filing of a lawsuit, but again it's entirely consistent with the efficient market when you have the defendants downplaying the allegation, saying there's no truth to it.

Lawsuits get filed all the time, and particularly here where the initial complaint was fairly bare boned, it was filed by an individual investor, Mr. Keippel.  A different law firm filed it.  So, you know, it certainly wasn't as detailed, and the events hadn't happened in March and April that confirmed the fraud.

You know, we pointed out in the briefing that courts

routinely certify class periods that extend beyond the filing of an original complaint.  And that's particularly true here in situations like this where, again, defendants continued to engage in actionable misconduct after the filing of the initial complaint and where we have significant additional information concerning that misconduct that's revealed to the market after or post filing.

You know, even one of defendant's own authorities, the Fannie Mae case, actually supports us on that point as the Court certified a class that extended beyond the filing of the original complaint there by several months.  It's a very common occurrence where you have an ongoing fraud here.  It's not a situation like in some of defendants' authorities where you have the company coming out and saying, yes, our past financial statements were wrong, we are going to have to do a restatement of public investors, be aware, you know, please don't rely on these past restatements.  That is not a situation we have here.  We have actually the opposite.  They continued to downplay and deny it.

THE COURT:  I don't remember.  I'm not sure I read it.  What did the 8-K that came out in January say that was false?

MR. HOOKER:  Let me see the date of that.  Yeah.  So it was January 7, 2019, there was an investor presentation there.  It talked about complaints being down.  The Department

of Insurance complaints were reduced.  Only four were upheld in 2017.  Only three were upheld in 2017.  So they continued to downplay the prevalence of the compliance failures and the nature of the complaint.

Same thing in the March 6 conference call.  They reiterated that there were advancements in compliance under Defendant Southwell's guidance.  You know, it highlighted that that was particularly still in the compliance division.  There was a prioritization kind of foundation of compliance when, you know, we learned just a month later that that wasn't the case at all during this tenure.  So, you know, they continued to do that even.

Back after the press -- or the research firm report was issued in November, they downplayed it.  So, you know, ending the class period on Mr. Keippel's complaint really doesn't make sense here given the nature of the misconduct that was continuing to be perpetrated during this time. Defendants make this passing argument about investors having inquiry notice.  You know, I'm just not sure how investors are supposedly on inquiry notice of the fraud when defendants continued to make the same misstatements they were making before and downplaying the allegations that were raised in November.  Usually inquiry notice is a concept in these cases made in connection with a statute of limitation argument, but there is no statute of limitation concerns at issue here.  So

it simply doesn't fit the facts of the case.

You know, the operative complaint is our complaint. The lead plaintiff's complaint is the only complaint that the lead plaintiffs have filed. And, you know, the cases are pretty clear it supersedes the previous complaints. This isn't a situation where, again, it's not like a restatement where it was obvious to the market and defendants actually admit that the misstatements shouldn't be relied upon by the public. Exactly the opposite.

So, you know, overall in terms of shortening the class period to either of these two dates, Your Honor, given the nature of the misconduct here, the significance of what came out in 2019 and the fact that defendants continued to downplay and mislead the market, it really isn't appropriate to shorten the class periods here.

If defendants want to do that, want to summary judgment, they have experts to show that the information that was released after November of 2018 was not material in some way or was not -- didn't cause investor losses, that's the appropriate time to consider these types of arguments. The cases that have shortened class periods generally have done so either, as I mentioned, the clear-cut restatement issue, accounting violation, don't rely on these misstatements, or they predate the Supreme Court cases that have spoken about these issue, or they fall under again the later Supreme Court

case Halliburton II that gives defendants an opportunity to rebut the presumption of reliance if they introduce evidence severing the link.  But that's not at play here.  Defendants haven't tried do that here.

They are simply saying we think that everybody knew about the fraud in November.  It should end that date.  I'm just simply saying it isn't enough at this point.  We have our expert report.  We have our allegations that completely are still in play here.  And the nature of those allegations, the nature of the misconduct, the false and misleading statements and the corrective disclosures, you know, really significant issues that had significant stock price declines immediately thereafter, they remain unexplained by defendants, we respectfully submit, Your Honor, that now is not the time to shorten the class period under those circumstances and the class period should end on April 11, 2019.

THE COURT:  All right.  Here's a question.  Have you seen -- I will ask Mr. Matthews too.  Let's say those insider sales are kosher, they're not illegal, they are appropriate. And that's, I guess, an argument you wouldn't agree with.  I guess in theory -- you know, I get Barron's magazine.  Of course I never made any money buying or selling stock, but it comes because my kid is a finance major.  And of course they have every week -- I don't know what the name of the form is, but they have a list of all the insider sales and purchases in

Barron's.  I would think that there's an argument that could be made -- you know, I guess Mr. Matthews will have to figure this out later -- that some of that reduction, you are telling me the sales were significant, was caused, or an argument could be made some of that -- I'm just observing.  This is probably apropos of nothing, just a random thought -- caused by people perceiving maybe a combination of what may be legal insider sales and all the other stuff like the House of Representatives or whoever the congressional entity was that was putting -- I'm just -- here is another thought.  Tell me whether I'm wrong here.  No matter where the cutoff is, that's the cutoff for purchases.  So would you not be able to introduce those sales because the damages, you know, depends when the person sold.  And if you were in front of a jury and they sold the day after those insider sales hit the public pipeline, wouldn't that be relevant even if one of the dates that the defendants wanted I accepted?  In other words, I'm not sure the later date that you want is required to introduce on cross-examination or otherwise those insider sales.  Does that make any sense at all?

MR. HOOKER:  I think, though, Your Honor, in terms of the damages, which obviously is the issue for later on in the litigation, but there's a 90-day cap on determining damages. Obviously damages can be calculated when a specific investor sells the share.  If the investor held through the end of the

class period, you know, there will be a calculation.  And if there is a recovery in the case, there will be a plan of allocation determining what the end date and the end price would be for the individual shares.

Here you are right.  I would contend that under these circumstances where Defendant Southwell -- I mean, what courts generally look at in determining whether insider sales are suspicious is, you know, is it out of line with prior sales? Does it come at a time when they are in possession of information that wasn't publicly known that is suggestive of fraud or in line with what the allegations are that the individual knew.

Here they were sales coming on the heels of very vociferous denials of the allegations.  Those denials had pushed the price of HIIQ stock up to the year term high.  And the sales were completely out of line with prior trading because we had never sold any shares of HIIQ stock.  You know, in some cases the defendants argue that, you know, they didn't know anything was wrong.  They had put this in place before, but nevertheless we still see instances where they delay the release of that information until after the sales were completed.

But here it certainly was at a time when it's highly suspicious.  It's highly relevant to our claim.  Both of these sales were suspicious under the factors that courts consider.

And again, the end date of the class period when you have just a few weeks after these sales are made, you know, a congressional investigation into the HIIQ entity itself as opposed to allegations against Simple Health and then you have the receiver report and all of the filings by Mr. Dorfman that specifically tie HIIQ to the fraud, as opposed to a research firm's report, those are all significant events. And the stock price declines are -- they reinforce it. There's no reason for the stock prices to decline that much if the market already knew that this fraud existed.

So regarding those sales and regarding the timeline, the chronology of it, the April 11 date before the end of the class period, before the receiver report comes out really is the appropriate date to end the class period.

THE COURT: Okay. And then let me direct you to the third point that the defendants make. And that would be that it should be only purchasers and not purchases or those who otherwise acquired. Two questions: Is that really an issue? Do we really think there's going to be a bunch of people that were gifted this or got a bonus or bequeathed these shares?

Secondly, wouldn't that impair typicality? I mean, somebody got the shares for, you know, singing at a wedding reception. How are we going to value that? So that was just a thought, my two thoughts. Maybe this is much ado about nothing. And then, well, it's certainly easier if they bought

it because we have a date and a closing price.

MR. HOOKER:  Yeah, Your Honor, you know, it's really something that is pretty common in terms of the definition of the class to include the language "otherwise acquired."  The really important language is "who were damaged thereby."  And that's what we pointed out in our reply brief is the case law is pretty much concentrated on that.  The instance where "otherwise acquired" was stricken, they didn't have the limitation of "damaged thereby."  I mean, it's pretty consistent.

You know, ultimately everything is tied to the market price.  In an efficient market, you know, the reliance issue isn't that way in the class action because of the Basic presumption of reliance.  So long as the market is efficient, investors are entitled to rely on the market price as reflecting all available information.  And that's true whether you purchase it or otherwise acquire it.

The main thing that would implicate really the ability to recover is that you were damaged by those shares. And acquired or damaged by their acquisition of the stocks are routinely included in class definitions.

I mean, ultimately your pragmatic question I think is correct.  The vast majority of the class is going to be comprised of purchasers.  Frankly, I don't know -- I don't recall the last case that I've had that that even was an

issue.  The "otherwise acquired" language is pretty standard in these cases.  So I think your instinct is correct on that.

THE COURT:  All right.  Well, let me -- and I appreciate your comments.  I jumped around, and I appreciate you indulging me.

Let's get over to Mr. Matthews and ask him on these three points, and then I will come back to you as the movant, Mr. Hooker.

Mr. Matthews, let's talk first about -- and I didn't ask Mr. Hooker about this -- the Affiliated Ute issue.  It seemed to me that sort of Affiliated Ute is sort of yesterday's news.  And we go to Basic, and then we go from Basic to like Regions which, you know, said it can be, in so many words, the way I read Regions -- of course, those people grade my papers so I care a lot about what they say.  You know, they basically said in Regions that the fraud on the market here is more than pure nondisclosure.  It can also be -- you know, some of the Affiliated Ute cases were in stocks that was not really a very broad, efficient market. Regions seems to say that the fraud on the market can be more than pure nondisclosure.  It can be statements also.  And then if we don't do a fraud-on-the-market theory under Affiliated Ute, aren't you basically saying this can't be a class action? So let me ask you on that point what's your take on that? What would you want me to do or think about on that point?

MR. MATTHEWS: Sure, Your Honor. And if I could just step back just for one moment before I get to that. I'm normally a man of few words, but every one of lead plaintiff's arguments on all of the issues we are talking about are in the reply brief. And we didn't get a surreply. So I have a lot to say on different issues, but I will address your question first.

So Affiliate Ute. So first of all, I want to point out as set forth in the Medtronic case, the *West Virginia v. Medtronic* case, whether we use Affiliated Ute here or we use Basic, those are the two avenues, has no bearing on the analysis of the end date. The Medtronic court said the end date analysis is the same. So I'll turn to the end date analysis in a moment.

In terms of which presumption do you use, in Regions only confirmatory statements were alleged, no affirmative misstatements. And the same footnote that's pointed to in Regions says that confirmatory statements are the same as omissions essentially. They result in price stability. But in this case, plaintiffs are asserting the stock price went all over the case based on different statements.

What plaintiffs are ignoring in their reply on this Affiliated Ute issue is the Kirkpatrick case from the Eleventh Circuit which directly addresses complaints just like this complaint which are mixed claims of misrepresentations and

omissions. And it says, "Affiliated Ute's presumption of reliance does not apply," when you have those mixed claims. So I think that takes care of Affiliate Ute.

If Your Honor wouldn't mind, I'd like to turn to the end date analysis.

THE COURT: Yeah. Well, hold on just a second. And I don't fault them for, you know, having the reply brief because they did not anticipate that you all would narrow these issues so professionally in your response. You know, they had a full bore, you know, typicality, numerosity, you know, the whole bit, which of course they were supposed to do.

Okay. So, I mean, this is a -- notwithstanding Mr. Hooker's contention that the market didn't know the true story until April, this is basically -- I'm still back on the Basic thing. This is an efficient market with a big float, you know, millions of shares traded, publicly reported. So why do I even go there or consider Basic? I mean, isn't this going to be a fraud-on-the-market case, and is there anything at this point I need to worry about on that topic before we get to the end date?

MR. MATTHEWS: Well, it's the same topic, Your Honor. We have gone about a thousand miles away from what we are actually arguing here. So I need to reset.

THE COURT: All right. I'm all ears.

MR. MATTHEWS: Thank you, Your Honor. And I didn't

mean to cast any aspersions about the reply brief.  I'm just pointing out why I have a lot to say.

THE COURT:  Okay.  Let's hear it.

MR. MATTHEWS:  So first, at this stage defendants are not arguing loss causation.  We are not arguing materiality. We are not arguing typicality.  We are only arguing one thing on the end date and that is the timing element of the Basic fraud-on-the-market presumption of reliance.  That is a separate element from efficient market.  And without the timing element, the lead plaintiffs cannot establish the predominance requirement under Rule 23(b)(3) as to stock purchases after November 27, 2018, or at least after this case was filed on February 18, 2019.

Second, there is no substantial doubt and there's no issue of fact here or any dispute of fact at all about the timing element of the Basic presumption.  It's simply when did the corrective information become public.  On that element, you don't need any experts.  You don't need witness testimony. You don't need additional discovery.  You don't need analysis or discussion of what caused plaintiff's alleged losses or why the stock price went up and down.

The only thing you need to do, Your Honor, is read the text of the alleged corrective disclosures attached as exhibits to our response and then read the text of the alleged misstatements and determine the date on which allegedly

corrective information became public.

Third, the end date for the class period must be decided now under Rule 23(c)(1)(B) and Supreme Court precedent.  And lead plaintiffs bear the burden of proof of establishing the timing element of the Basic fraud-on-the-market presumption.  And they have to do it now at the class cert stage.  They have to actually produce evidentiary proof.  So when Mr. Hooker says simply saying it isn't enough, well, that counts against the lead plaintiffs because they have to establish that element.

THE COURT:  And what is that case --

MR. MATTHEWS:  So --

THE COURT:  -- that says that?

MR. MATTHEWS:  So let me go through that.  So I will -- so it is Halliburton II.  So the lead plaintiffs cite Halliburton I in their reply, but they don't cite Halliburton II, a 2014 case.  And I'm going to quote from that case which is going to answer your question.  So this is 573 U.S. 258, page 276.

THE COURT:  Go ahead.

MR. MATTHEWS:  "In securities class action cases, the crucial requirement for class certification will usually be the predominance requirement of Rule 23(b)(3).  The Basic presumption does not relieve plaintiffs of the burden of proving before class certification that this requirement is

met.  Basic instead establishes that a plaintiff satisfies that burden by proving the prerequisites for invoking the presumption, namely publicity, materiality, market efficiency, and market timing.  The burden of proving those prerequisites still rests with plaintiff and, with the exception of materiality, must be satisfied before a class certification."  And it's that market timing element that lead plaintiffs bear the burden on.

And even in their reply, lead plaintiffs don't submit any evidence and they don't point to anything that may come out in discovery or trial or any contested issue of fact.  Instead, they point to the very same things that we point to on this issue of when the corrective disclosure came out.  Now, we have a lot of disagreements about what these things say.

So, for example, the plaintiffs characterized the March 13 congressional announcement as, "Congress's conclusion after an investigation."  That, "HII's practices were disturbing and concerning."  We would point out the announcement is entitled, "Congress launches investigation."  And it merely lists HII as one of the 14 companies receiving letters from Congress.  None of that is corrective of any of the alleged misstatements in that case -- in this case.  So there aren't any fact disputes.  There's no need for experts.  None of the cases we cited have expert analysis.  The Court

doesn't need to look to the cause of stock price declines or any of that.  Just look at the exhibits that are added, that they are attached to our response.

THE COURT:  Well, are they wrong when they say that in connection with the 8-K and I think then earlier in March that your principals sort of gilded the lily and said, hey, we're not only doing good, we're doing better and made statements into the market that they say were false and that lulled people?  Have they proven that or have they just alleged that?

MR. MATTHEWS:  Well, first of all, they've only alleged things.  They cited in their complaint over and over.  That all has to be ignored at this stage.  They need actual proof on all of these elements.

THE COURT:  What case is that?  Halliburton II?  That's your best case?  In the an Allah summary judgment, they need to set that forth now.

MR. MATTHEWS:  Actually it's Halliburton II, but it's also your own case, Your Honor.  *Wilson v. Badcock Home Furniture*, 329 F.R.D. 454 you say, "The parties seeking certification must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)."  And Your Honor cites Comcast.  And Comcast is in the line of cases that started with *Wal-Mart v. Dukes*, then Comcast, then Halliburton II, all of which puts the burden of proof on

plaintiffs.  That's a sea change in class action law.

So when the plaintiffs are citing cases from before that time saying, well, if there's any question, just give us the class period we want, that's not the law anymore.  The law is that they've got to have the burden of proof.  And under Halliburton II, they have to have it on this market timing requirement.

So if I could address your question about the post complaint -- or the post corrective disclosure statements.  So the Alaska case directly addresses that question.  So in the Alaska case, that's *Alaska v. Pharmacia*.  And I apologize.  I think it may have been omitted from our table of cases but it's all through our response brief, which is the Court said, "Corrective information puts the investor on inquiry notice of the alleged fraud, making further reliance on the original statements by investors unreasonable."

So in the Alaska case, the Court went with the shorter class period.  They rejected the argument that the class period should be extended to the alleged misstatements after the case was filed allegedly made to perpetuate defendants' fraud because the prior disclosure had already previously put the investor on inquiry notice of the alleged fraud.  And the Court held that the defendants' post complaint statements that were defensive statements of their prior statements did not outweigh the significance and the effect of

the original corrective disclosures.

And the Alaska court relied on an earlier decision going the same way, the Lerch case. And the Alaska court also distinguished the one case cited by lead plaintiffs that goes the other way on this issue, In Re: Resource America, which is distinguishable for a couple of reasons. So first of all, in Resource America the defendants were making a typicality challenge to the lead plaintiff, not a market timing argument under Basic as we are doing here.

Second, Resource America is a 2001 case. So as I discussed, the idea that that should be resolved in favor of extending the class period is not the case anymore under Halliburton II and Comcast and Wal-Mart.

Third, the post complaint statements in Resource America not only were new misstatements but they caused new series to be added to the case and even a new defendant to be added to the case. So one of the post complaint alleged misstatements there was new statements by the company's auditor that were alleged to be false, after which the auditor was added as a new defendant and new claims were added.

So here in this case the alleged post complaint misstatements are nothing but repetitive of the earlier statements. They add nothing to the equation. And in particular what I think is the weakest argument that lead plaintiffs have here is there's only one statement that is

after the filing of the complaint here, the March 6 statement. And that statement is simply general statements about advancements and compliance and we're prioritized compliance to try to get to a best-in-class compliance. There's nothing new in that March 6 statement that would cause a reasonable investor to say, okay, now I can ignore the FTC shutdown of Simple Health. I can ignore the disclosure in the FTC filings saying that there were thousands and thousands of customer complaints about HII. And I can ignore the Aurelius report that half of HII's revenue came from Simple Health. We dispute all of that, of course, but that's not at issue today.

So that March 6 statement is a very thin read on which to extend the class period beyond February 18, 2019, to take advantage of three more post complaint alleged corrective disclosures none of which are both new and corrective. They have to be both. It's not just new information. It has to be corrective of one of the alleged misstatements in the case. And here there are three all of which were corrected in November, if they were ever corrected at all. First is the positive statements about compliance. Second is the number of customer complaints allegedly was misleading because other categories of complaints should have been added. And there were more than the small number reported to investors. And third is the 10 percent statement, which is Simple Health was less than 10 percent of our policies in 2018. All three of

those, if they are ever corrected, are corrected in November of 2018.  They are all taken on directly by the Aurelius report.  In fact, all of them are in the November 2nd FTC filing.

And Your Honor mentioned what you thought maybe was ipse dixit of the judges in CMS and Novatel, but it's not ipse dixit.  The basis for cutting off the class period at the filing of the complaint is that that is when the alleged securities violations become known under an efficient market. Your Honor is completely correct on that.  We all agree there is an efficient market here, but you've got to live with both sides of that sword.  So if you want to claim efficient market, then all of that knowledge is going to be imputed to every single investor.  But we don't even have to really worry about that because February 2019 was when Saxena White sent its confidential memo assessing claims in this case to both Oklahoma and to Birmingham.

The point that we are making about Birmingham is -- or about Oklahoma is not that we should litigate today and decide why in particular Oklahoma bought or how much it bought or all of that.  Mr. Hooker said those purchases may have had any number of reasons behind them.  Maybe they saw value. Well, the point is those are individualized issues.  Not just for Oklahoma, for every purchaser after the complaint was filed and we argue after November 27, and that's why the

predominance requirement is not met.  You don't get the presumption of reliance under Basic after the corrective disclosures are put out there.

Your Honor, there's a couple of other points that I would like to cover, but I will pause there if you have questions.

THE COURT:  No.  I'm taking notes here.  I'm listening.  Thank you.

MR. MATTHEWS:  Your Honor, I wanted to address why this is not a loss causation argument that we're making at this point.  The only time we even mentioned loss causation, as Mr. Hooker correctly points out, is in the footnote saying we are reserving that for a future stage.

And the Medtronic court explains very well on page 292 of that decision why this is not a loss causation issue.  It's a reliance issue.  We are arguing reliance here. So I'll quote from that.  "Plaintiffs claim that consideration of the date of corrective disclosure would amount to consideration of loss causation in contravention of Halliburton I.  Not so.  Loss causation requires plaintiffs to show that defendants' misrepresentation or omission caused the plaintiffs' subsequent loss.  In contrast, the date of corrective disclosure concerns when this misrepresentation or omission was publicly revealed.  It does not concern actual causation."

In that same section, the Medtronic court explains why this market timing element is also distinct from materiality, which was again not something we're arguing. And I'll quote from Medtronic, same page. "In Amgen, the Supreme Court focused on the fact that the elements of materiality was more relevant to the merits than class certification and that a failure to satisfy the elements of materiality would end the case for all class members. Unlike the issue of materiality, the corrective disclosure issue in this case would not be dispositive for the claim for all proposed class members."

So arguments like materiality and loss causation, those are merits arguments because they could wipe out the whole class. We are not arguing to wipe out the whole class at this stage of the case, only what the class definition should be, which the Court is required to decide under Rule 23 at this stage just as the Medtronic court explained.

Now, the plaintiffs only address reliance in one footnote, Footnote 3, page 3 of their reply. They say, "Defendants' cases are no longer good laws that created Halliburton I." That's not correct for the reasons explained in Medtronic. We're also not arguing typicality. So the typicality cases like City of Sunrise that plaintiffs cite are inapposite here.

And what plaintiffs are doing in that Footnote 3 is they are selectively quoting Medtronic as holding that

purchasers there were without the presumption of reliance. And lead plaintiffs seem to suggest that it was for lack of an efficient market, but the full quote demonstrates it had nothing to do with efficient market which is a separate element.  Medtronic trades on the New York Stock Exchange. There's no efficient market issue there.

The full quote makes the same point that defendants are making here as to the subgroup of purchasers after November 27 or certainly after the complaint was filed.  And I'll quote from 325 F.R.D. at 293.  "If the corrective disclosure occurred on" --

THE COURT:  Hold on.  Where are you quoting from?

MR. MATTHEWS:  Page 293 of the Medtronic case, 325 F.R.D.

THE COURT:  Got it.

MR. MATTHEWS:  "If the corrective disclosure occurred on June 28, 2011, then Medtronic's alleged omission could not have been reflective of the market price at the time of the subgroup's transactions, and therefore members of that subgroup cannot benefit from the presumption of reliance."

And lead plaintiffs also say that the court in Medtronic shortened the class period because it found that there was an issue of reliance that would arise with respect to those who purchased between two corrective disclosures. That's not a correct cite either because the Medtronic court

found the second disclosure was not a corrective disclosure at all.  It cut off the class period before that.

The lead plaintiff also suggests that the later alleged corrective disclosures have to be included because the stock price dropped after those.  But Medtronic debunks that as well.  States at page 295, "The Court need not consider whether there was a decrease in stock price."

Likewise, the Court in the American Italian Pasta case that we cited said that later stock price drops after disclosures that nearly reiterate and reinforce earlier corrective disclosures do not extend the class period.  And that makes sense because stock prices go up and down all the time for all kinds of reasons, often on a daily basis.  You don't get to keep extending class periods just because the stock price drops.  The cause of stock price movements is something to hash out at a later stage of the case when we do litigate loss causation, but we're not doing that now.  We are not litigating price impact either.  We're only litigating the issue of when the corrective information became public so that we can set the end date.

And plaintiffs cite to two cases for the stock drop point, the KBC case and the Petrie case, but neither of those support that you can extend the class period because there's a later stock price.

In KBC, the Court noted that there was a price drop

when it rejected defendant's argument that there was no price impact, which is not what we're arguing. KBC is also distinguishable because the first corrective disclosure said we don't expect growth this quarter but we haven't given up on growth for the year. And the later corrective disclosure reveals a growth declined by 7 percent, and the company withdrew all of its guidance for year. That's new and corrective information unlike the 2019 disclosures in our case. Nothing new, nothing corrective.

The Petrie case that is cited by lead plaintiffs, the defendants there were arguing not an efficient market under the Cammer factors. That's when the Court noted the stock price drop to show that some of the Cammer factors for an efficient market were met. We're not arguing efficient market. None of the cases we cited required or relied on any expert opinion. And if expert opinion had been required to determine this element, well, then lead plaintiffs are sunk because they bear the burden of proof on this element of Basic. And they haven't submitted any expert opinion about the class period end date or about when the corrective information became available. Their expert only opined on efficient market and whether it would be possible to calculate class-wide damages. He admitted he didn't do any analysis to determine the class period end date. It was just an assumption given to him by lead plaintiffs' counsel, or in

Mr. Hooker's words, just their say so.  And there's no duty on behalf of the defendants or on behalf of the Court to explain the stock price declines or even to address them.

And the same is true of the stock sales.  Your Honor and I, I think, know all too well of the many ways that evidence of stock sales has a way of getting into evidence at trial.  But that's an irrelevant question to today's analysis.  Your Honor is right that the issue of when class members purchased stock doesn't really have anything to do with alleged "I enter" of defendants.

And by the way, those stock sales were pursuant to 10b5-1 trading plans.  We contend that they are completely kosher, but that's off point from what we're discussing today.  The Court need not address anything about stock sales or any of that.

Your Honor, there's a couple of other things that I'd like to cover here.

THE COURT:  All right.  I want everybody to have their say.

Let me ask you, not to go back and be a simpleton.  So it's your position that as a matter of evidence, as a matter of evidence they're required to make that showing.  And that's under Medtronic?  Where do I get that rule from?  Medtronic and Halliburton II?

MR. MATTHEWS:  Right.  It comes from the quote that I

stated from Halliburton II, but it also traces its way back to Comcast and Wal-Mart. And that's -- the cites for Haliburton is -- well, I'll move on from that, but Your Honor is correct. In Medtronic, the Court explains exactly why there's the burden of proof. But again, it's your own decision in Badcock Home Furniture. Your Honor also stated the plaintiffs bear the burden of evidentiary proof.

Halliburton II goes even further. It says they bear the burden of proof now at the class cert stage of supporting specifically this market timing element that we're talking about. And they don't submit any proof. What they do instead is they argue with us about what the exhibits that are attached to our response say. But this Court can simply read those exhibits, match them up to the alleged misstatements and try and figure out when was an investor on inquiry notice. No one disputes what those documents say.

If you look at all of the cases we are citing here, none of them are citing experts. None of them are citing witness testimony about what different people thought, the corrective disclosures said or didn't say. The Court just needs to read those and make the decision on those. And it has to do that under Halliburton II, and it has to do that now under Rule 23(c)(1)(B).

THE COURT: So if I read those and I determine that your principals were playing a little bit of slide of hand or

gild the lily, then the market notification continues beyond that date; is that correct?

MR. MATTHEWS:  Well, no.

THE COURT:  You're saying I won't determine that, but if I do say he speaks with forked tongue, then the period continues, doesn't it?

MR. MATTHEWS:  Respectfully, Your Honor, no, that is not the issue at all.  So the issue is you will read the alleged corrective disclosures.  That is the FTC filings, the Aurelius report, and you won't make a determination about whether you think defendants are speaking with forked tongue or not.

THE COURT:  They are saying that later you all -- you all lulled the market.  Now, is that in the record, whatever those statements were?  Some presentation when 8-K came out in January and at least one other one, right?

MR. MATTHEWS:  Well, for that half of the equation.  So for the corrective disclosures, they have to point to the evidence of what the corrective disclosure is.  We have attached them to the response.  You look at those.

For the other half of the equation, the alleged misrepresentations, then you do look at the complaint and you compare and you say, okay, there are three categories of misstatements.  Here is the 10 percent statement, the statement that we have good compliance, and the number of

customer complaints, when did those three things come out. And if you read the corrective disclosures to look for when, if at any time they came out, which is a separate question that we are reserving for loss causation at some later stage -- has nothing to do with what we're arguing today -- when, if at all in any of those corrective disclosures did the information come out that would cause an investor to be on inquiry notice, which is there's something that I am doubting now.  So if it came out at any time, it certainly came out in November 2018.  All three of those alleged misstatements are directly taken on by the Aurelius report.

THE COURT:  I understand that.  See, the problem is they are going to say, and I'm going to let Mr. Hooker say it if he cares to, that your clients poo-pooed that and made statements poo-pooing that into the market.  But it's sort of like being pregnant.  We got pregnant at the Aurelius report. And whatever your client said, if there is some evidence they were poo-pooing that, or whatever the right word is, lulling, we were already on notice, we were already pregnant.  So whatever, you know, the individual defendants might have said doesn't change that.  That's what he's going to say, right?

MR. MATTHEWS:  Yes.  And that's exactly correct.  So the Alaska court case makes the pregnant point that you're making.  Once it's out there, it's out there.  And these later statements are just more of the same.  Everybody makes

defensive statements.  That doesn't alone extend --

THE COURT:  So if Southwell made materially misleading statements in 2019, that doesn't -- that doesn't change the fact that when Aurelius came out, boom, the market knew and that's the end of it?

MR. MATTHEWS:  That's right because they're the same statements that were made before.  He did not make any new statements of any kind.  It's the same three.  It's the less than 10 percent, the number of complaints, and we have good compliance.  Simply reiterating the same thing before the Alaska case says is not sufficient to let you extend the class period.

There's only one case going the other way.  It's In Re:  Resource America.  And I think the Court just needs to read those two cases, Alaska and In Re:  Resource America and decide which ones to follow, but I think I've gone through why Resource America is far off point from what we're talking about.  We are talking about new defendants being added to the case.  And here, particularly after February 2019 where not only is the case filed but Saxena White is already talking to Oklahoma and Birmingham about the claims in February of 2019.  The only statement that comes after that is March 6, 2019, which is again saying we've made advancements in our compliance.  That's a very thin read to try and pile three more alleged corrective disclosures on top of.

THE COURT:  Okay.  I got that.

MR. MATTHEWS:  And I could also address the otherwise -- the last point if you'd like, Your Honor.

THE COURT:  Yeah.  Two questions on that.  I mean, is it really -- is it much ado about nothing?  Are we really going to have a bunch of people that got this stock in their bonus plan or from grandma when she passed?

And secondly, how do you value that, or do we need to worry about it?  It sounds like I don't know what the basis would be on a bequeathed stock.  Is it a step up in basis?  Is it the market price the day the guy got it?  What if it's in a trust?  So that's the two points.  Is it much ado about nothing?

MR. MATTHEWS:  Right.  Well, it's not one of our main arguments.  End date is obviously our main argument here.  But it is something the Court should address when it is framing the class here.  And the Aranaz court says in Footnote 2 in that decision this is not a damages issue at this point.  It's a reliance issue.  Because again, reliance is the element that has to be decided at the class cert stage.  Is there a Basic presumption?  What is reliance?  So I wouldn't worry about damages.

And I also think that the phrase the lead plaintiffs added "and too were damaged thereby" doesn't fix the issue because again it's addressing damages, not reliance.  So in

Footnote 2 of Aranaz it says, "Even assuming arguendo that certain putative class members who acquired Catalyst securities by means other than purchase could nonetheless prove reliance, a class consisting of all who acquired Catalyst stock by any means, including gifts or bequest, would be overbroad."

So the Aranaz court says that it doesn't -- it doesn't fix the problem that we have here and "otherwise acquired" shouldn't be in there.  And, yes, it does appear in other cases, but those are all cases where the defendants didn't raise the issue for whatever reason.  So we would contend that the class should not have that phrase "or otherwise acquired" in it.  It should be purchasers under the Aranaz case.

THE COURT:  Okay.  And I guess if the people got their -- and I think, you know, what comes to my mind is George Bush, Daddy Bush gave a speech and got $200,000 worth of, I recall, Global Crossing stock which of course, you know, ended up cratering.  And I think it was worth 400 grand and then it was worth zero.  So I just don't know whether this is such an unusual subject matter that it really doesn't make any difference, but it's been asserted so I need to rule on it.

What else do you have, Mr. Matthews?

MR. MATTHEWS:  I would just conclude, Your Honor, by saying that we think you are correct that there's a nice

dividing line here when the case is filed.  It avoids all the issues with all the Oklahoma purchases.

And by the way, they purchased twice as much stock after the case was filed than they bought before it. Mr. Hooker focused on the number of transactions, but they had 20 very tiny transactions and the four giant transactions, but it solves that issue.

And also it solves the issue of both of the lead plaintiffs not only knowing of this case but actively working on with Saxena in February.  And it also avoids just the smell of a lead plaintiff that for whatever reason, and it may be because they saw a value or what have you, is already actively working on litigation but then buys a bunch more stock and tries to get damages for it.  That's just not right, not the way it should be.  So we agree with Your Honor drawing the dividing line at the filing of the case.  And there is case law support for it.

And by the way, lead plaintiffs didn't address that at all in their briefs.  They didn't say anything about the CMS court holding that it could be disguised purchase of a lawsuit which is the type of individualized issue that craters reliance and craters the Basic presumption at that point.

THE COURT:  All right.  Thank you, Mr. Matthews.

Okay.  Mr. Hooker, why don't you finish up for us. What do you have in rebuttal?

MR. HOOKER:  Thank you.  Thank you, Your Honor.

And I'll be brief.  Really there are just a couple quick points.  And again the presentation by Mr. Matthews on Halliburton II really just confuses primarily the burden and the issues that we are talking about here.

Under the Basic presumption, plaintiffs have to establish that the market for HIIQ's stock is efficient in order to invoke the presumption of reliance under Basic.  We did that in our opening motion.  We set forth Mr. Coffman's expert report setting forth the bases for that, and critically defendants did not challenge that.  They did not challenge that the market is not efficient.

THE COURT:  It is plainly efficient.

MR. HOOKER:  Yes.  So because plaintiffs established that, they successfully invoked the Basic presumption of reliance.

And Halliburton II, what that did was that it dictates that the burden is now on defendants to demonstrate that -- and the quote is the asserted misrepresentation for its correction did not affect the market price of the defendants' stock.  And that's at 573 U.S. at 28.

So the burden is now on defendants to -- and that's price impact.  Now, defendants didn't try to do that here.  There's no -- there's no attempt to sever the corrective disclosure.  Sometimes that's done by proving what's called

back-end price, lack of back-end price impact or lack of front-end price impact.  They didn't try either, and Mr. Matthews acknowledged that in his presentation.

So defendants can't meet their burden without referring to my initial presentation with just a say so.  They can't meet their burden by just saying the disclosure in November totally revealed their fraud.  That's plainly insufficient, and Halliburton II says that.

And it's even more so here given that defendants downplay that very revelation.  How could you say that the market knew that this was fraud when you continue thereafter to say that's not true, that what was released in the Aurelius Value report was not accurate.  You downplay it, and you continue to try to separate yourself from Simple Health and Mr. Dorfman, and later information is revealed, significant information is revealed that actually proved that those statements were false.

THE COURT:  Those statements where they lulled, you say in 2019 they gilded the lily, where are those in this record?

MR. HOOKER:  The statements were in December of 2018, January of 2019, the March 2019.  They're in the complaint.

THE COURT:  Hold on.  Are they anywhere else other than in the complaint?

MR. HOOKER:  Yeah.  In the complaint and in Your

Honor's motion to dismiss order.  They are also there.

THE COURT:  But physically, you know, your worthy opponent Mr. Matthews is saying that you need to basically physically file the Edgar transcript or whatever it's called in this record.  You have alleged that these are lulling statements.  Now, my order is just accepting everything as true on a motion to dismiss.  So he's basically saying you have a duty to evidentiarily, whatever that word is, prove the issue, prove the notice to the market.  And what you are telling me is you have alleged it in the complaint and that's where we will find it.

MR. HOOKER:  Well, actually what Mr. Matthews is saying isn't accurate.  We don't have to prove at this point that there was a corrective disclosure.  What we have to prove to get class certification for the entire class period is that the market was sufficient and that we meet all of Rule 23(a) and 23(b)(3)'s requirements.  And what I'm saying is given the Supreme Court precedent, we've done that.

One of the things that Mr. Matthews said was that there's no loss causation arguments in his opposition.  But what the Court's are clear is that a lot of times these arguments are repackaged as something else, when once you peer under the hood they are actually loss causation or materiality arguments.  That's why those two Supreme Court opinions in Halliburton I and Amgen are important, because both of those

say that materiality and loss causation are inappropriate to resolve at the class certification stage.

THE COURT:  He is saying that we ticked the market. We range -- we didn't but the other people did.  The market bell -- the fire bell was rung with this Valerian report, whatever, the receiver's report.  And that if you want to prove otherwise that the market timing happened later, the market timing of the corrective disclosure, you have to put evidence in the record.  And you're saying that you don't. You can just allege it in your complaint.

MR. HOOKER:  The evidence that is required at class certification is that the market is efficient and that the Rule 23(a) and (b)(3) is requirements are met.  And we have done that.

What Mr. Matthews says in response, and I think you said that the corrective disclosures in 2019 can't be linked to misstatements, but that's exactly what the *Thorpe v. Walter Investment Management* court case that we cited in our brief says is it's insufficient to defeat the class certification at this point.  And the quote that we cite is the argument that the corrective disclosures cannot be linked to the alleged misstatements are simply repackaged assertions that the corrective disclosure was in fact not corrective.  Thus, the Court is unable to decouple defendants' arguments from a materiality inquiry, which would impermissibly require the

Court to scrutinize the underlying merits.  And the reason that the Thorpe court case said that --

THE COURT:  You garbled on me there.  Give me that case again, the cite.

MR. HOOKER:  Oh, the cite is 2016 Westlaw 4006661. And that's a 2016 case from the Southern District of Florida.

The KBC case that Mr. Matthews poo-pooed again says the same thing.  This is a 2017 case.  Whether the stock price declined was caused by alleged misrepresentations or some other factor is for now an open question.  And again, this all goes back to the Supreme Court edicts that basically say arguments that touch upon or that are really repackaged of loss causation or materiality are inappropriate at this stage. And we see that here in the cases that Mr. Matthews relies upon.

You know, they either predate the Supreme Court authority or they involve those unique situations that I mentioned where there was a restatement of financial results or other admissions by companies informing investors not to rely on their prior misstatements, like the Data Access case, the American Italian Pasta case, and Rybozyme case and others. The companies themselves admitted that there were accounting problems or restated their financial statements.  And for that reason, the Court said, well, we have got to end the class period earlier because the defendants said, look, doesn't rely

on this anymore.  That's not what we have here.

What we have here is the defendants -- actually the information that was released is gone.

THE COURT:  I know, but Matthew's point is you haven't proved that.  And you are saying I don't have to prove it; I just have to allege it at this point.

MR. HOOKER:  Yes.  If you look at the Thorpe case, the KBC case, these are more than allegations.  The corrective -- there's stock price declines afterwards.  And we did cite several cases that say at this stage a 2015 case, the Petrie case, stock price drops at this stage are indicative of a corrective disclosure.

You know, Mr. Matthews talked a lot about Medtronic, the District of Minnesota case.  And that case is really distinguishable on a number of fronts.  There were three corrective disclosures, but the first was a medical journal article that revealed financial ties to doctors, which is what the case was about.  The other two were just a Wells Fargo report that showed the financial effects of the article, and then an announcement that the drug manufacturer hired Yale to oversee a study.

And, you know, critically the Medtronic case in a footnote, the cite is 325 F.R.D. 294 at Note 6, "If a material dispute of fact exists regarding the date of the corrective disclosure, then it is necessary to certify the longer class

period while knowledge that the class period may be limited upon further evidence."  And really the evidence that's being talked about there is later on in the litigation you will have competing expert reports on this issue.  At this point, the only expert report that we have on the record is ours demonstrating the efficient market.  And then the burden shifts to defendants' proof to rebut that presumption.

THE COURT:  Well, they want an efficient market. They are embracing that because only with an efficient market does that Valerian, or whatever his name is, that report becomes a writ upon the world that they want it to be. They're in favor of an efficient market.

MR. HOOKER:  But again, the efficient market also takes into account their denial of that report.

THE COURT:  Right.  Right.  Which he says that may be but you haven't proved that.

MR. HOOKER:  Well, they haven't proved that the Aurelius Value report actually corrected the fraud either.

THE COURT:  Yeah, I know.

MR. HOOKER:  What we have said is that it was a partial disclosure of the fraud.  That's actually backed up by what happened with the stock price later on.

THE COURT:  His response to that is, well, at least it's in the record.  And his second response was I may not have proved it, but it's not my burden.  It's plaintiffs'

burden at this stage.

MR. HOOKER:  And that's incorrect.  It's not our burden to prove that the fraud was the sole cause of the later stock price decline.

THE COURT:  No, no.  He's saying it's your burden to prove market timing.  When the clarification hit the market and was infused to the market, he says you have to prove that.  Not for certification but for the date.  For the date, you have to prove it.

MR. HOOKER:  For the end date of the class period what we have to show is that the market was efficient throughout.  And we have to allege that there was corrective disclosures on those dates.

THE COURT:  Hold on.  You have to allege or you have to prove?

MR. HOOKER:  We don't have to -- well, it's undisputed in the record that these disclosures took place.  Mr. Matthews isn't saying that these disclosures in March and April did not take place.  What he is saying is they weren't corrective in nature.

THE COURT:  Well, I think what I heard he was saying is that, whatever you want to call it, the bell had already been rung by the previous items and these just sort of didn't count.  They weren't -- you know, the market had been alerted by the report and by the document coming out of South Florida.

I don't mean to argue with you.  Go ahead.

MR. HOOKER:  Yeah, and again, that's where there is a material dispute here.  What is corrective, what is not.  And that's why I discussed the Thorpe case, because there the Southern District of Florida plainly said that that's a materiality inquiry.  That's not appropriate for this stage.  And he has no rebuttal for the stock price declines themselves, which we noted in the briefings plenty of courts say that that's sufficient at class certification stage.  Why would the stock price decline by 17 percent and by 7 percent on these dates if the market already knew?  It's just not -- it's implausible.

And this other notion about Mr. Keippel's filing of the complaint, again the PSLRA sets forth a very strict timeline by which the cases proceed at the beginning of these actions.  We have 60 days after the initial complaint is filed to move for lead plaintiff.  And given that both courts and Congress prefer an institution to serve in that capacity notifying Oklahoma and Birmingham that a case had been filed and that they think should consider moving for lead plaintiff given their loss and their position and their track record, that really has no bearing on when the track period should end.  Especially, again, I keep beating the drum about it, but this isn't a situation like some of these other cases where the defendant said, yeah, we did it and there is something

wrong, don't allow it, they continued to mislead the market, and the truth wasn't revealed until the end.  The defendants haven't rebutted that.

It really is, according to Halliburton II, and I encourage Your Honor to take a look at that, it's defendants' burden to rebut that presumption.  And they haven't done it here.

THE COURT:  Well, I think Halliburton II says the defendant has the right to rebut the loss causation.  Halliburton I says the plaintiff is not required to establish loss causation.  I mean, that's the big 30,000-foot reading of those two cases.  They are a little bit -- of course, John Roberts wrote both of them.  They are a little bit in conflict when you think about it.  But Roberts is kind of writing securities law for the country.

What else, Mr. Hooker?

MR. HOOKER:  You know, I think we have touched upon -- I'm just checking my notes, Your Honor.  I'm sorry.

THE COURT:  I guess I will just not spend much time thinking about this other point, which is are we aware -- I don't think Mr. Matthews was aware.  We are not aware of any large body of plaintiffs out there that received these shares other than by a purchase?  Is there something I'm missing?  I don't want you to go outside the record, but is there some big fiduciary retirement fund that's received these shares?  This

is on the minor third point.  That's just kind of standard language.  We are not aware of any big group of plaintiffs, are we?

MR. HOOKER:  I'm not, Your Honor.  But again, I think we would stand on what we indicated in our reply brief.  Given that we cited other cases, the Monroe case, the Regions case where this language was held appropriate.  You know, the qualifier "damage thereby" I think is fine.  On the Affiliated Ute issue, I think the Regions case was right on point, but the overriding issue on Affiliated Ute, as we mentioned in our brief, that the Basic fraud-on-the-market presumption, that's the Basic presumption, that applies to this case.  Defendants did not challenge that.

THE COURT:  It's sufficient and Basic applies.  I agree with you completely on that.  I don't think the defendants disagree with that.

MR. HOOKER:  Yeah.  It's kind of ancillary whether Affiliated Ute applies.  We would respectfully submit that it does as well and that the case law is clear that you can have both apply.  But ultimately given that Basic does apply, that's not challenged, it's really academic at that point.

I think I've hit everything that I wanted to discuss on rebuttal.  I think the record is pretty clear.  The class period definitely shouldn't end in November of 2018 when you have continued misrepresentations after that.  And ending it

on Mr. Keippel's complaint date really doesn't make sense at all.  There is no corrective disclosure.

So what defendants want to do there is they really want to gummy the work with investors being able to calculate their damages because there is nothing to point to on that date as a disclosure.  There just isn't.  So it is a little bit irrespectively self-serving on their part.  But given the fact that there's plenty of cases, including the Fannie Mae case, which is their own case that certified classes extending beyond the initial complaint filings and the circumstances here, we think at this stage the appropriate date is the April 11 date.

THE COURT:  All right.  Thank you.  I appreciate so much this quality of lawyering.  I can't tell you how helpful it is.  Sometimes you get various cases and the lawyers are just like you're not helping me at all.  But I'm so grateful.  I'm so grateful, in fact, that no good turn goes unpunished on your collective behalf.

So here's what I want you to do.  I'm going to read some more of these cases.  I want you, each of you -- this is because you are so good.  Sorry.  If you were mediocre lawyers I wouldn't care.  I want each of you to write the order you want me to sign.  Okay?  You don't have to show it to each other.  And I'm going to spend Friday afternoon on this case. Can you get that to me on an email, say by 1:00 p.m. on

Friday?

Mr. Hooker, can you do that?

MR. HOOKER:  Yes, Your Honor, we can.

THE COURT:  Mr. Matthews, can you all do that?

MR. MATTHEWS:  Yes, Your Honor.

THE COURT:  And all I can tell you is I may not get it right, but it won't be for my lack of trying.  So let's do that.  And I'm going to come back from lunch.  I usually eat at my desk anyway, but Friday I'm going to turn and say where are those orders?  We are going to try to get something out for y'all on Friday before departing.  And therefore for better or worse, you will have something to take to mediation and wave around or shred or whatever you want to do with it.

Anything else, movant?  Mr. Hooker, anything else?

MR. HOOKER:  Nothing else from plaintiffs, Your Honor.  Thank you.

THE COURT:  Okay.  Do me a favor.  There's a chambers email.  You can use that.  But also because some of the staff is out because of COVID, they're not sick but they're remoting, send it to me directly William_Jung@flmd.uscourts.com.  And then I will get it directly.

Mr. Matthews, anything from your side?

MR. MATTHEWS:  I would like to say no, Your Honor.  I want to clarify one thing though.  It sounded like Mr. Hooker

and you were saying that defendants agree that they get the Basic presumption.  We only agree to that before November 27, 2018, or February 18 of 2019.  The elements are set forth on page 15 of their brief.  Efficient market is only one of four elements.

THE COURT:  That's understood.  And I appreciate you clarifying that.

Okay.  So if you guys can get that to me after you lunch on Friday.  And you have my admiration and my gratitude. Thank you for this fabulous presentation.

All right.  We're over and out now.  Thank you.

(Proceedings concluded at 11:31 a.m.)

UNITED STATES DISTRICT COURT      )
                                  )
MIDDLE DISTRICT OF FLORIDA        )


### REPORTER TRANSCRIPT CERTIFICATE

    I, Tracey Aurelio, Official Court Reporter for the United States District Court, Middle District of Florida, certify, pursuant to *Section 753, Title 28, United States Code*, that the foregoing is a true and correct transcription of the stenographic notes taken by the undersigned in the above-entitled matter (Pages 1 through 69 inclusive) and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States of America.


                                  /s    *Tracey Aurelio*
                                  _____
                                  Tracey Aurelio, RMR, RDR, CRR
                                  Official Court Reporter
                                  United States District Court
                                  Middle District of Florida
                                  Tampa Division
                                  Date:  August 26, 2020