**FOLEY**

**FOLEY & LARDNER LLP**

ATTORNEYS AT LAW

111 NORTH ORANGE AVENUE, SUITE 1800
ORLANDO, FL  32801-2386
407.423.7656 TEL
407.648.1743 FAX
WWW.FOLEY.COM

WRITER'S DIRECT LINE
407.244.7137
ckennedy@foley.com

CLIENT/MATTER NUMBER
106551-0117

December 11, 2020

***Via USPS certified mail, return receipt requested***

William Barr
Attorney General
United States
950 Pennsylvania Avenue, NW
Washington, DC 20530

Re:   **Notice Pursuant to 28 U.S.C. § 1715**:  Notice of Proposed
Class Action Settlement in *Keippel v. Health Insurance*
*Innovations, Inc. n/k/a Benefytt Technologies, Inc., et al.*, No.
8:19-cv-00421-WFJ-CPT
(M.D. Fla.)

Dear Sir or Madam:

The defendants in the above captioned action, Health Insurance Innovations, Inc. (now known as Benefytt Technologies, Inc.) (hereinafter "HIIQ" or the "Company"), Michael D. Hershberger, and Gavin Southwell (together with HIIQ, the "Defendants"), hereby provide this Notice of a Proposed Class Action Settlement ("Notice") in the above-referenced action pursuant to the Class Action Fairness Act of 2005 ("CAFA").

In accordance with their obligations under CAFA, the Defendants provide notice consisting of the following:

- **28 U.S.C. § 1715(b)(1): A copy of the Complaint, any materials filed with the Complaint, and any Amended Complaints:**

Enclosed with this Notice are copies of (i) the original Complaint filed February 18, 2018 (marked Exhibit 1); and (ii) the Consolidated Class Action Complaint filed July 19, 2019 (marked as Exhibit 2), along with materials filed with the complaints. Copies of the complaints and materials filed with the complaints can also be found online as follows: (1) enter PACER through https://ecf.flmd.uscourts.gov/cgi-bin/login.pl (2) click on "Query," (3) enter the civil case number 8:19-cv-00421, (4) click on the link "Run Query," and (5) then click on the link "Docket Report" or "History/Documents." The complaints are on the docket entry sheet. (Dkts. 1 & 30).

| | | | | |
|---|---|---|---|---|
| AUSTIN | DETROIT | MEXICO CITY | SACRAMENTO | TAMPA |
| BOSTON | HOUSTON | MIAMI | SAN DIEGO | WASHINGTON, D.C. |
| CHICAGO | JACKSONVILLE | MILWAUKEE | SAN FRANCISCO | BRUSSELS |
| DALLAS | LOS ANGELES | NEW YORK | SILICON VALLEY | TOKYO |
| DENVER | MADISON | ORLANDO | TALLAHASSEE | |

4848-3499-8995.1

EXHIBIT 2



**FOLEY & LARDNER LLP**

December 11, 2020
Page 2

- **28 U.S.C. § 1715(b)(2):  Notice of any scheduled judicial hearing in the class action:**

    A hearing on the Approval of the Final Settlement of the Class Action is scheduled for **March 23, 2021 at 9:30 a.m**. before the Honorable U.S. District Judge William F. Jung, for the United States District Court for the Middle District of Florida, Tampa Division, located at the Sam M. Gibbons U.S. Courthouse, 801 North Florida Avenue, Tampa, FL, 33602. The hearing will take place by telephonic means by calling the reserved conference toll-free number at 1-888-557-8511, then entering the access code 4744914 followed by the # (pound) key, and then entering the security code 0421 followed by the # (pound) key. As set forth in the Court's Order Preliminarily Approving Settlement and Providing Notice (enclosed and marked as Exhibit 3) and the Notice of (I) Pendency of Class Action and Proposed Settlement of Class Action; (II) Settlement Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Class Notice"), anyone wishing to be heard orally at the March 23, 2021 hearing must file with the Court and serve on counsel for all parties a notice of appearance no later than Tuesday, March 2, 2021. These procedures are located in the Class Notice at paragraphs 66-70, and in the Order Preliminarily Approving Settlement and Providing for Notice at paragraphs 13 and 14. The Class Notice is enclosed and can be found at Exhibit 3, at Exhibit A-1.

- **28 U.S.C. § 1715(b)(3): Any proposed or final notification to Class Members:**

    The Class Notice informs members of the Class[1] and Settlement Class that they have the right to exclude themselves from the settlement, and provides information about the terms of settlement. Specifically as to the right to request exclusion, the Class Notice states, in part:

    > Each Class Member or Settlement Class Member will be bound by all determinations and judgments in this lawsuit, whether favorable or unfavorable, unless such person or entity mails or delivers a written request for exclusion, addressed to Health Insurance Innovations Securities Settlement, Exclusions c/o Epiq, P.O. Box 5657, Portland, OR 97228-5657. The exclusion request must be received no later than **Tuesday, March 2, 2021**. You will not be able to exclude yourself after that date. Each request for exclusion must (a) state the name, address and telephone number of the person or entity requesting exclusion, and in the case of entities the name and telephone number of the appropriate contact person; (b) state that such person or entity "requests exclusion from the Class or Settlement Class in *Julian Keippel v. Health Insurance Innovations, Inc., et al.*, No. 8:19-cv-00421"; (c) state the number of HIIQ shares that the person or entity requesting exclusion purchased/acquired

---

[1] All capitalized defined terms used herein have the same meanings ascribed in the Court's Order Preliminary Approving Settlement and Providing for Notice, dated December 3, 2020. (Dkt. 101.)



**FOLEY & LARDNER LLP**

December 11, 2020
Page 3

and/or sold during the Class Period or Settlement Class Period, as well as the dates and prices of each such purchase/acquisition and sale, and the number of HIIQ shares held at the beginning of the Class Period (and Settlement Class Period); and (d) be signed by the person or entity requesting exclusion or an authorized representative. A request for exclusion shall not be effective unless it provides all the information called for in this paragraph and is received within the time stated above, or is otherwise accepted by the Court.

- **28 U.S.C. § 1715(b)(4): Any proposed or final class action settlement:**

The Stipulation and Agreement of Settlement filed with the Court on December 3, 2020, is enclosed as Exhibit 4.

- **28 U.S.C. § 1715(b)(5): Any settlement or other agreement contemporaneously made between class counsel and counsel for the defendants:**

In addition to the Stipulation and Agreement of Settlement, Lead Plaintiffs and Defendants have entered into a separate, confidential Supplemental Agreement that permits the Defendants to terminate the proposed settlement if potential Class Members or Settlement Class Members who meet certain criteria exclude themselves from settlement. Because of the Supplemental Agreement's confidentiality provisions, it is not included in the enclosed documents. Should you require additional information about the Supplemental Agreement, Defendants will coordinate with counsel for Lead Plaintiffs to make all reasonable efforts to address questions, subject to the confidentiality provisions.

- **28 U.S.C. § 1715(b)(6): Any final judgment or notice of dismissal:**

No judgment has been entered and no dismissal filed. Upon entry, a copy of the anticipated Final Judgment will be available online as follows: (1) enter PACER through https://ecf.flmd.uscourts.gov/cgi-bin/login.pl, (2) click on "Query," (3) enter the civil case number 8:19-cv-00421, (4) click on the link "Run Query," and (5) then click on the link "Docket Report" or "History/Documents." The Final Judgment will be found on the docket entry sheet.

- **28 U.S.C. § 1715(b)(7)(B): Estimate of Class Member Shares in Settlement:**

It is not feasible at this time to provide the names of Class Members and/or Settlement Class Members who reside in each state or the estimated proportionate share of the claims of such members to the entire settlement. The names and residences of all the Class Members and/or Settlement Class Members will not be known until after notice of the proposed settlement is disseminated and potential class members submit claim forms.



FOLEY & LARDNER LLP

December 11, 2020
Page 4

- **28 U.S.C. § 1715(b)(8): Any written judicial opinion relating to the materials described in 28 U.S.C. §§ 1715(b)(3)-(6), above:**

On December 3, 2020, the Court issued its Order Preliminarily Approving Settlement and Providing Notice. A copy of the Preliminary Approval Order is enclosed as Exhibit 3.

**Conclusion:**

Please acknowledge receipt of this Notice by date-stamping the additional copy of this Notice provided for that purpose and returning it in the self-addressed, postage-prepaid envelope also enclosed. If you have any questions about this Notice, the lawsuit, or the enclosed materials, please contact me.

Respectfully,

Christina M. Kennedy, Esq.
FL Bar No. 58242
ckenndy@foley.com
Foley & Lardner LLP
111 North Orange Ave., Suite 1800
Orlando, FL 32801
Telephone: (407) 423.7656
Facsimile: (407) 648.1743

Enclosures:
Exhibit 1: Complaint
Exhibit 2: Consolidated Complaint
Exhibit 3: Order Preliminarily Approving Settlement and Providing for Notice
Exhibit 4: Stipulation and Agreement for Settlement

4848-3499-8995.1

# Exhibit 1: Complaint

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| JULIAN KEIPPEL, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>HEALTH INSURANCE INNOVATIONS, INC., GAVIN SOUTHWELL, and MICHAEL D. HERSHBERGER,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Julian Keippel ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Health Insurance Innovations, Inc. ("HIIQ" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by HIIQ; and (c) review of other publicly available information concerning HIIQ.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired HIIQ securities between February 28, 2018 and November 27, 2018, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. HIIQ purports to distribute individual and family health insurance plans, including short-term medical insurance plans, and guaranteed-issue and underwritten health benefit insurance plans. Health Plan Intermediaries Holdings, LLC ("HPIH") is one of the Company's subsidiaries.

3. On November 2, 2018, the Company announced that it had immediately suspended its relationship with Health Benefits One LLC ("HBO"), an entity which the Federal Trade Commission ("FTC") alleged had misleadingly sold HIIQ policies, among others, as "comprehensive health insurance." Moreover, the Company stated that, for the 2018 fiscal year to date, HBO "was the agency of record for less than 10% of HIIQ's submitted policies."

4. On this news, the Company's share price fell $4.47 per share, more than 8%, to close at $46.27 per share on November 2, 2018, on unusually heavy trading volume. The stock price continued to decline over the next trading session to close at 39.62 per share on November 5, 2018.

5. On November 27, 2018, Aurelius Value published a report titled "HIIQ: Boiler

Rooms, 'Worthless' Policies, and Defrauded Families," which alleged, among other things, that more than half of the Company's revenues were derived from boiler room operations that had recently been shut down by the FTC and that a "material portion" of the Company's policies were likely "contaminated by insurance fraud."

6. On this news, the Company's share price fell $1.93, or nearly 6%, to close at $31.20 per share on November 27, 2018, on unusually heavy trading volume.

7. Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that a substantial portion of the Company's revenues were derived from third parties; (2) that these third parties used deceptive tactics to sell the Company's policies, including overstating the policy's coverage and/or selling under the licenses of employees who had no involvement in the underlying sales; (3) that regulatory scrutiny of these third parties would materially impact the Company's operations; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

8. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts

charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this district.

12. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## **PARTIES**

13. Plaintiff Julian Keippel, as set forth in the accompanying certification, incorporated by reference herein, purchased HIIQ securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14. Defendant HIIQ is incorporated under the laws of Delaware with its principal executive offices located in Tampa, Florida. HIIQ's common stock trades on the NASDAQ exchange under the symbol "HIIQ."

15. Defendant Gavin Southwell ("Southwell") was the President, Chief Executive Officer, and Chairman of the Board of Directors of the Company at all relevant times.

16. Defendant Michael D. Hershberger ("Hershberger") was the Chief Financial Officer of the Company at all relevant times.

17. Defendants Southwell and Hershberger, (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were

being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

18.     HIIQ purports to distribute individual and family health insurance plans, including short-term medical insurance plans, and guaranteed-issue and underwritten health benefit insurance plans. Health Plan Intermediaries Holdings, LLC ("HPIH") is one of the Company's subsidiaries.

### Materially False and Misleading
### Statements Issued During the Class Period

19.     The Class Period begins on February 28, 2018. On that day, the Company announced financial results for fourth quarter and full year 2017 and reported revenue for the year of $250.5 million and net income of $26.5 million.

20.      On March 1, 2018, the Company filed its annual report on Form 10-K for the year ended December 31, 2017 (the "2017 10-K"). Regarding advance commission arrangements, the 2017 10-K stated, in relevant part:

> ***Advance commission arrangements between us and some of our third-party distributors expose us to the credit risks of such distributors, which could in turn have an adverse effect on our business, financial condition, and results of operations.***
>
> We make advance commission payments to many of our independent distributors in order to assist them with the cost of lead acquisition and provide working capital. As of December 31, 2017, we had a balance outstanding for advanced commissions of approximately $39.5 million under such arrangements of which approximately $26.8 million is with three distributors. ***Of the three, one distributor accounts for approximately $14.2 million or 35.8% of the total outstanding balance.*** . . .

(Emphasis added.)

21.     The 2017 10-K also stated that premium equivalents, one of the Company's key business metrics, is defined as "total collections, including the combination of premiums, fees for

discount benefit plans, enrollment fees, and third-party commissions and referral fees." For the fiscal year, the Company reported $396.6 million in premium equivalents.

22.     On May 3, 2018, the Company filed its quarterly report on Form 10-Q for the period ended March 31, 2018. Therein, the Company reported revenue of $67.8 million, net income of $6.0 million, balance outstanding for advanced commissions of $37.1 million, and premium equivalents of $104.9 million.

23.     On August 2, 2018, the Company filed its quarterly report on Form 10-Q for the period ended June 30, 2018. Therein, the Company reported revenue of $71.7 million, net income of $4.0 million, balance outstanding for advanced commissions of $34.8 million, and premium equivalents of $111.15 million.

24.     On October 30, 2018, the Company filed its quarterly report on Form 10-Q for the period ended September 30, 2018. Therein, the Company reported revenue of $74.0 million, net income of $4.0 million, balance outstanding for advanced commissions of $38.3 million, and premium equivalents of $114.5 million.

25.     The truth began to emerge on November 2, 2018 when an FTC complaint against Steven J. Dorfman and five affiliated entities alleged that the defendants had misleadingly sold HIIQ policies, among others, as "comprehensive health insurance." Documents supporting the FTC's request for a temporary restraining order showed that HPIH paid the majority of the funds received by Health Benefits One LLC ("HBO"), one of the defendants in the FTC's complaint, and revealed the allegedly deceptive communications that formed the basis of the FTC's allegations.

26.     In response, the Company announced the same day that it had immediately suspended its relationship with HBO and stated that, for the 2018 fiscal year to date, HBO "was the agency of record for less than 10% of HIIQ's submitted policies."

27.     On this news, the Company's share price fell $4.47 per share, more than 8%, to close at $46.27 per share on November 2, 2018, on unusually heavy trading volume. The stock price continued to decline over the next trading session to close at 39.62 per share on November 5, 2018.

28.     The above statements identified in ¶¶19-26 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that a substantial portion of the Company's revenues were derived from third parties; (2) that these third parties used deceptive tactics to sell the Company's policies, including overstating the policy's coverage and/or selling under the licenses of employees who had no involvement in the underlying sales; (3) that regulatory scrutiny of these third parties would materially impact the Company's operations; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

### Disclosures at the End of the Class Period

29.     On November 27, 2018, Aurelius Value published a report titled "HIIQ: Boiler Rooms, 'Worthless' Policies, and Defrauded Families," which alleged, among other things, that more than half of the Company's revenues were derived from Simple Health and its affiliates and that a "material portion" of the Company's policies were likely "contaminated by insurance fraud." The report stated, in relevant part:

> FTC Documents reveal that HIIQ's subsidiary, Health Plan Intermediaries Holding ("HPIH"), paid the Dorfman Group *$145 million* in cash from January 2016 to April 2018. This amounts to **49%** of the $294.2 million in third-party commissions that HIIQ's SEC filings state it paid out during this approximate timeframe. **We therefore believe that Dorfman's alleged fraud was responsible for *as much as half* of HIIQ's total revenues.**

> \* \* \*

> Documents compiled by the FTC indicate that HIIQ policies sold by Simple Health may also be contaminated by insurance fraud. A former Simple Health employee told the FTC that "*hundreds, if not thousands*" of policies in HIIQ's system [captioned below] fraudulently identify her as the agent of record even though she had no interaction with the customers. This confirmed rumors she heard that Simple Health "*sold policies under the licenses of employees who had no involvement in the underlying sales*", presumably enabling unlicensed boiler room operators to sell policies.

> \* \* \*

HIIQ also makes loans to its distributors to help them build out boiler rooms and hire marketers in the form of advanced commissions, which totaled approximately $40 million as of September 2018. A 2015 disclosure states that Health Benefits One, a company owned by Dorfman named in the FTC's complaint, represented 63% of this balance. HIIQ's 10-K states that the company's loans are concentrated amongst three distributors, with the largest single outstanding loan having a balance $14.2 million as of December 2017. Considering that the FTC stated that Dorfman personally absconded with millions in cash proceeds to spend on luxuries and that the assets of his companies have been frozen and placed in receivership, **HIIQ's loan to Dorfman likely is now impaired**.

\* \* \*

Dorfman established a large "downline" of sub-brokers that sold HIIQ policies under his organizational umbrella and lead generation network. We obtained contracts between HIIQ and the Dorfman Group that reveal an undisclosed arrangement whereby HIIQ entered into an "Independent Broker's Contract" with Dorfman's various sub-brokers individually. HIIQ paid commissions earned by sub-brokers to the Dorfman Group directly, with those profits then presumably being split between Dorfman and the sub-brokers. Importantly, A UCC filing shows that the sub-brokers themselves (and not the Dorfman Group) are the "Broker of Record" for the HIIQ policies they originate. **HIIQ's press release appears highly misleading—of course Simple Health is not the agent of record** *because its sub-brokers are.*

\* \* \*

The FTC states that Dorfman's fraud "*has left tens of thousands of consumers who thought they had purchased comprehensive health insurance without such coverage*". For example, the FTC evidence includes a declaration from a consumer who was told by Simple Health that the HIIQ policy would provide extensive medical coverage. But after her husband was hospitalized, she "*learned that my policy does not require HII [Health Insurance Innovations] to pay medical expenses on my behalf*", leaving her and her husband stuck with tens of thousands in medical bills.

30.     On this news, the Company's share price fell $1.93, or nearly 6%, to close at $31.20 per share on November 27, 2018, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

31.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired HIIQ securities between February 28, 2018 and November 27, 2018, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their

immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

32. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, HIIQ's common shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of HIIQ common stock were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by HIIQ or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

33. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

34. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

35. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of HIIQ; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

36. A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

37. The market for HIIQ's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, HIIQ's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired HIIQ's securities relying upon the integrity of the market price of the Company's securities and market information relating to HIIQ, and have been damaged thereby.

38. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of HIIQ's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about HIIQ's business, operations, and prospects as alleged herein.

39. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about HIIQ's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at

artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

40.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

41.     During the Class Period, Plaintiff and the Class purchased HIIQ's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

42.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding HIIQ, their control over, and/or receipt and/or modification of HIIQ's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning HIIQ, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

43.     The market for HIIQ's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, HIIQ's securities traded at artificially inflated prices during the Class Period. On September 28, 2018, the Company's share price closed at a Class Period high of $61.65 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's

securities relying upon the integrity of the market price of HIIQ's securities and market information relating to HIIQ, and have been damaged thereby.

44. During the Class Period, the artificial inflation of HIIQ's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about HIIQ's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of HIIQ and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

45. At all relevant times, the market for HIIQ's securities was an efficient market for the following reasons, among others:

(a) HIIQ shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, HIIQ filed periodic public reports with the SEC and/or the NASDAQ;

(c) HIIQ regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) HIIQ was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

46. As a result of the foregoing, the market for HIIQ's securities promptly digested

current information regarding HIIQ from all publicly available sources and reflected such information in HIIQ's share price. Under these circumstances, all purchasers of HIIQ's securities during the Class Period suffered similar injury through their purchase of HIIQ's securities at artificially inflated prices and a presumption of reliance applies.

47.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

48.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of HIIQ who knew that the statement was false when made.

## FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

49.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

50.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase HIIQ's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

51.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for HIIQ's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

52.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about HIIQ's financial well-being and prospects, as specified herein.

53.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of HIIQ's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about HIIQ and its business

operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

54. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

55. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing HIIQ's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

56. As a result of the dissemination of the materially false and/or misleading

information and/or failure to disclose material facts, as set forth above, the market price of HIIQ's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired HIIQ's securities during the Class Period at artificially high prices and were damaged thereby.

57. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that HIIQ was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their HIIQ securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

58. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

59. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

60. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

61. Individual Defendants acted as controlling persons of HIIQ within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's

operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

62.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

63.    As set forth above, HIIQ and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)      Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.


Dated: February 18, 2019                    */s/ Leo W. Desmond*
                                            Leo W. Desmond
                                            Florida Bar Number 0041920
                                            **DESMOND LAW FIRM, P.C.**
                                            5070 Highway A1A, Suite D
                                            Vero Beach, Florida 32963
                                            Telephone:  (772) 231–9600
                                            Facsimile:   (772) 231–0300
                                            lwd@desmondlawfirm.com

                                            **GLANCY PRONGAY & MURRAY LLP**
                                            Lionel Z. Glancy
                                            Robert V. Prongay
                                            Lesley F. Portnoy
                                            Charles H. Linehan
                                            1925 Century Park East, Suite 2100
                                            Los Angeles, CA 90067
                                            Telephone:  (310) 201-9150
                                            Facsimile:   (310) 201-9160

                                            *Attorneys for Plaintiff Julian Keippel*

**SWORN CERTIFICATION OF PLAINTIFF**

**HEALTH INSURANCE INNOVATIONS, INC. SECURITIES LITIGATION**

I, Julian Keippel individually, and/or in my capacity as trustee and/or principal for accounts listed on Schedule A, certify that:

1. I have reviewed the Complaint and authorize its filing and/or the filing of a Lead Plaintiff motion on my behalf.

2. I did not purchase the Health Insurance Innovations, Inc. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in Health Insurance Innovations, Inc. securities during the Class Period set forth in the Complaint are as follows:

   (See attached transactions)

5. I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years, except for the following:

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

2/13/2019

_____
Date

DocuSigned by:

*Julian Keippel*

FC4C2DB5F675447

_____
Julian Keippel

**Julian Keippel's Transactions in**
**Health Insurance Innovations, Inc. (HIIQ)**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 08/16/2018 | Bought | 39 | $51.4000 |
| 08/20/2018 | Bought | 10 | $50.8450 |
| 08/20/2018 | Bought | 20 | $51.0000 |
| 08/20/2018 | Bought | 100 | $51.0000 |
| 08/23/2018 | Sold | -169 | $53.9050 |
| 09/06/2018 | Bought | 18 | $52.4950 |
| 09/11/2018 | Bought | 5 | $55.9450 |
| 09/12/2018 | Bought | 8 | $54.4940 |
| 09/14/2018 | Sold | -31 | $53.2550 |
| 09/24/2018 | Bought | 35 | $52.8500 |
| 09/26/2018 | Bought | 16 | $58.3500 |
| 09/28/2018 | Bought | 2 | $55.5000 |
| 09/28/2018 | Bought | 16 | $56.1500 |
| 09/28/2018 | Bought | 50 | $57.8500 |
| 10/02/2018 | Bought | 13 | $61.4500 |
| 10/03/2018 | Bought | 1 | $59.9700 |
| 10/03/2018 | Bought | 1 | $61.3299 |
| 10/03/2018 | Bought | 11 | $59.2575 |
| 10/03/2018 | Bought | 25 | $59.1299 |
| 10/03/2018 | Bought | 61 | $60.7199 |
| 10/05/2018 | Bought | 21 | $54.0399 |
| 10/10/2018 | Bought | 1 | $56.3300 |
| 11/02/2018 | Bought | 1 | $46.0700 |

# Exhibit 2: Consolidated Complaint

Case 8:19-cv-00421-WFJ-CPT Document 104 Filed 12/23/21 Page 27 of 306 PageID 2190

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| JULIAN KEIPPEL, Individually and On Behalf of All Others Similarly Situated, | CASE NO. 8:19-CV-00421-WFJ-CPT |
| Plaintiff, | CLASS ACTION |
| vs. | |
| HEALTH INSURANCE INNOVATIONS, INC., GAVIN SOUTHWELL, and MICHAEL D. HERSHBERGER, | JURY TRIAL DEMANDED |
| Defendants. | |

**CONSOLIDATED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................................... 2

II. PARTIES .......................................................................................................... 6

    A.    Plaintiffs...................................................................................................6

    B.    Defendants ...............................................................................................7

    C.    Relevant Nonparties...............................................................................8

III. JURISDICTION AND VENUE ....................................................................... 10

IV. SUMMARY OF THE ACTION....................................................................... 11

    A.    HIIQ Sells Its "Health Insurance Products" In A Highly
        Regulated Market...................................................................................11

    B.    Unknown To Investors, HIIQ's Business Was Built On
        Consumer Fraud....................................................................................13

        1.    Simple Health Was Critical To HIIQ's Financial
            Success..................................................................................... 15

        2.    HIIQ And Simple Health Teamed Up To Deceive
            Consumers................................................................................ 18

        3.    Former Employees And HIIQ's Own Internal
            Documents Establish That HIIQ Received Thousands
            Of Complaints Each Year About Simple Health ................................. 27

        4.    HIIQ Closely Monitored And Documented The
            Intentional Deception Of Customers ....................................... 38

        5.    HIIQ's Senior-Most Executives Internally
            Acknowledged Being "Bombarded" With Customer
            Complaints Due To Simple Health's "Widespread" and
            "Out of Control" Deception ...................................................... 42

        6.    The Deceptive Sale Of HIIQ's Products Caused
            Enormous Harm To Consumers................................................ 46

    C.    The FTC Revealed That Simple Health Was A "Sham" But
        Defendants Continued To Mislead Investors While Reaping
        Millions of Dollars From Insider Stock Sales..................................49

1.  The FTC Announced Its Extraordinary Enforcement
    Action And Shuttering Of Simple Health ........................................ 49

2.  Securities Analysts Issued A Scathing Research Report
    On HIIQ ........................................................................................... 53

3.  Defendants' Misrepresentations Continued As They
    Reaped Millions Through Insider Stock Sales .................................. 55

4.  Congress Launched An Investigation Of HIIQ's "Junk
    Plans" .............................................................................................. 56

5.  Court Filings In The FTC Action Revealed HIIQ's
    Intimate Knowledge Of The Deceptive Sales Practices .................... 58

6.  A Court-Appointed Receiver Concluded That Simple
    Health's Business Was "A Classic Bait-And-Switch
    Scam" And "Never Legally Viable" .................................................. 60

D.  Post-Class Period Events ....................................................................... 62

V.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS ............................. 64

A.  September 2017 Investor Presentation And Press Release ....................... 66

B.  November 2017 Press Release, Conference Call, And Investor
    Presentation .......................................................................................... 68

C.  December 2017 Press Release ................................................................. 73

D.  March 2018 Investor Conference Call And Presentation ......................... 74

E.  May 2018 Investor Conference Call And Presentation ............................ 75

F.  August 2018 Investor Conference Call And Presentation ........................ 77

G.  October 2018 Investor Conference Call .................................................. 79

H.  November 2018 And December 2018 Press Releases ............................... 80

I.  December 2018 Investor Presentation ..................................................... 81

J.  January 2019 Investor Presentation ........................................................ 82

K.  March 2019 Investor Conference Call ..................................................... 82

VI.  ADDITIONAL SCIENTER ALLEGATIONS ................................................... 83

VII.  LOSS CAUSATION ................................................................................... 88

iii

VIII.   CLASS ACTION ALLEGATIONS ............................................................................ 91

IX.   UNDISCLOSED ADVERSE FACTS ....................................................................... 93

X.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE .......................................................... 94

XI.   NO SAFE HARBOR ................................................................................................ 96

XII.   COUNTS .................................................................................................................. 96

XIII.   PRAYER FOR RELIEF ......................................................................................... 100

XIV.   JURY DEMAND .................................................................................................... 101

Lead Plaintiffs Oklahoma Municipal Retirement Fund and City of Birmingham Retirement and Relief System (collectively, "Lead Plaintiffs") bring this action under the federal securities laws, individually, and on behalf of all persons or entities that purchased or otherwise acquired Health Insurance Innovations, Inc. ("HIIQ" or the "Company") common stock during the period September 25, 2017 through April 11, 2019, inclusive (the "Class Period"), and who were damaged thereby (the "Class") seeking to pursue remedies under the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, *et seq.* (the "Exchange Act").

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based on the independent investigation of their undersigned counsel. This investigation includes review and analysis of (i) HIIQ's public filings with the Securities and Exchange Commission (the "SEC"); (ii) research reports by securities analysts; (iii) transcripts of HIIQ's conference calls with analysts and investors; (iv) presentations, press releases, and reports; (v) news and media reports concerning the Company and other facts related to this action; (vi) data reflecting the pricing of HIIQ common stock; (vii) interviews with former HIIQ employees; (viii) consultation with an insurance industry expert; (ix) materials and court rulings filed in the action *Federal Trade Commission vs. Simple Health Plans LLC, et al.*, Case No. 18-62593-DPG (S.D. Fla.) and other legal and regulatory proceedings; and (x) other material and data concerning the Company, as identified herein. Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by the Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## I.    INTRODUCTION

1.      HIIQ develops, distributes, and sells short-term "medical discount plans," "limited benefit indemnity plans," and other "health insurance products." The products that HIIQ distributes are not comprehensive health insurance and do not comply with the Affordable Care Act ("ACA"). Instead, they are supplemental products that, at best, merely defray a fraction of a consumer's out-of-pocket medical costs. These products represent less than 1% of the health insurance marketplace and their sale and administration are subject to strict regulation by state and federal authorities. As HIIQ acknowledged in its public filings with the SEC, the Company's business practices and those of its licensed third-party call centers were "heavily regulated by each state in the United States and various federal agencies." As a result, it was critical for the Company and its network of call centers to adhere to responsible sales practices and follow strict standards of compliance.

2.      Throughout the Class Period, Defendants falsely assured investors that HIIQ and its call centers adhered to purportedly exceptional compliance standards and experienced "*incredibly low*" rates of consumer complaints—"*an absolutely tiny, tiny number*." Indeed, Defendants claimed a complaint rate of "*0.00%*" on HIIQ policies and specifically attributed this exceptional performance to their "laser focus" on customer service and compliance.

3.      Moreover, at every opportunity, Defendants highlighted their purportedly extensive compliance controls and "outstanding compliance performance," and emphasized that such "outstanding compliance" extended to their external call centers, which they repeatedly represented were "highly compliant" with HIIQ's own procedures. HIIQ, which was purportedly "upholding the highest standards" in compliance, published multiple investor presentations asserting that the Company's "Best-in-Class Compliance" was so strong that it

2

was a "significant barrier to entry" to current and potential competitors. The Company's executives underscored that their insurance products were built on "objective and measurable" data, and assured investors that "every data point indicates that our customer satisfaction is market-leading." Defendants further assured investors that HIIQ maintained strict control over its external call centers' compliance performance, claiming that these call centers underwent a comprehensive "process of training, of meeting and constantly hitting our compliance matrix, our market leading compliance."

4. All of these statements, and many more detailed below, were false and misleading. Unbeknownst to investors at the time, a significant portion of HIIQ's business depended on—and stemmed from—a complete and utter fraud. An extraordinary enforcement action by the FTC and related federal court receivership proceedings have recently revealed that HIIQ's most lucrative call center, called "Simple Health"—which was responsible for as much as 50% of the Company's revenue—was "a *classic bait-and-switch scam* whereby unwitting consumers are falsely led to believe that they are purchasing a Preferred Provider Organization medical insurance policy ('PPO') that is compliant with the Affordable Care Act ('ACA'), but in reality are sold limited benefit indemnity plans that are not compliant with the ACA." Indeed, as the FTC action revealed, Simple Health "*was never legally viable and cannot be viable in the future*" because "*deception permeated the … entire business relationship with the[] customers*." Simple Health's multitude of fraudulent sales practices preyed on unsuspecting consumers in search of comprehensive health insurance through deceptive advertising, boiler room sales tactics, and outright lies.

5. The truth began to emerge on November 2, 2018, when the FTC announced its enforcement action aimed at completely shuttering Simple Health's operations. The FTC

3

found that Simple Health, through its sales of HIIQ products, had perpetrated a "deceptive scheme" by "preying on Americans in search of health insurance, selling these consumers worthless plans that left tens of thousands of people uninsured" and "st[icking consumers] with thousands of dollars in unpaid medical bills." As was ultimately revealed, for years, thousands upon thousands of consumers had complained to HIIQ regarding its call centers' deceptive sales practices. The FTC promptly obtained a court order shutting down Simple Health's operations and freezing its assets, shocking HIIQ's investors and sending HIIQ's stock price to a more than 20% free fall.

6.      FTC disclosures, Lead Plaintiffs' investigation, and additional sources have revealed an extensive record establishing that HIIQ was at all times fully aware of Simple Health's fraudulent business operations. Indeed, HIIQ coordinated with Simple Health at virtually every step of the sales process and continuously monitored the endemic sales deception. The companies were so closely intertwined that while the consumer fraud was ongoing, HIIQ designated Simple Health a "*related party*" in its SEC filings. The companies joined forces to create misleading "lead generation" websites; HIIQ loaned Simple Health millions of dollars to fund its operations; and HIIQ recruited and trained Simple Health's sales agents. In addition, HIIQ continuously monitored Simple Health's compliance failures by listening to calls of Simple Health's agents preying on consumers; reviewing, editing and approving fraudulent sales scripts; and fielding the seemingly endless flood of customer complaints. Moreover, as Simple Health's now-disgraced owner, Steven Dorfman, averred to a federal district judge in the Southern District of Florida, HIIQ "*regularly audited* [Simple Health]'s employee training and sales and verification processes" and even "*verified that [Simple Health] trains its employees using materials provided by HII*." The companies were

4

so close that HIIQ executives even attended Dorfman's wedding.

7.    HIIQ's own internal emails further show that Defendants were fully aware of the consumer fraud underpinning the Company's business and, by the start of the Class Period, had already compiled a massive record of Simple Health's customer complaints. For example, only one month into the start of the Class Period, senior HIIQ executives—including the Company's Vice President of Operations (the third most senior executive and a member of the Company's senior management team) and HIIQ's Customer Service Supervisor—internally acknowledged that "*the incorrect information being given by Simple Health to members is getting out of control*," and that HIIQ's customer service representatives were "*getting bombarded with calls*" from consumers complaining that Simple Health misrepresented HIIQ's policies as comprehensive health insurance.

8.    Many of HIIQ's former employees, interviewed as part of Lead Plaintiffs' investigation, have confirmed that the Company's Customer Service department fielded a daily barrage of consumer complaints. Consumers complained in droves to HIIQ that telemarketers in Simple Health's licensed call centers had sold them limited medical discount plans and ancillary products by falsely representing that they were purchasing comprehensive health insurance. As the former employees attest, such customer complaints were "endemic" at HIIQ during the Class Period, with thousands upon thousands of customers demanding refunds once they learned the truth about HIIQ's virtually worthless products. The complaints were compiled for HIIQ's executives in daily and weekly reports and comprehensive databases that documented in meticulous detail widespread compliance failures. Given the undisclosed truth about the "rampant" customer complaints inside HIIQ, these former employees characterized Defendants' Class Period statements to investors asserting "best-in-class compliance" and

5

"0.00%" complaint rates as *absurd*," *completely asinine*," and a *bold-faced lie*."

9. After the FTC shuttered Simple Health in November 2018, a series of subsequent disclosures through April 12, 2019 further detailed HIIQ's and Simple Health's deceptive scheme and the falsity of Defendants' prior assurances to investors. In total, these disclosures wiped out nearly $550 million in shareholder value, as HIIQ's stock price plummeted from its Class Period high of $63.13 per share, to a low of $23.85 per share—a decline of more than 60%. HIIQ's stock price has not recovered since, and currently hovers around $22. The fallout from the fraud continues to this day, as a Congressional investigation into Defendants' fraudulent conduct is currently pending.

10. As a result of Defendants' violations of the federal securities laws, investors who purchased HIIQ common stock at artificially inflated prices during the Class Period have suffered substantial losses. This action seeks redress on behalf of such aggrieved shareholders.

## II. PARTIES

### A. Plaintiffs

11. Lead Plaintiff Oklahoma Municipal Retirement Fund ("Oklahoma Municipal") is a public pension fund that manages retirement funds of current and retired employees in the State of Oklahoma. As of the start of the second quarter of 2019, Oklahoma Municipal oversaw more than $800 million in assets for more than 12,200 members. As set forth in the attached certification, Oklahoma Municipal bought HIIQ common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

12. Lead Plaintiff City of Birmingham Retirement and Relief System ("City of Birmingham") is a public pension fund that manages retirement funds of current and retired civil service employees, elected officials, and appointed employees in the City of Birmingham,

6

Alabama. As of the start of the second quarter of 2019, City of Birmingham oversaw approximately $1 billion in assets for more than 7,300 members. As set forth in the attached certification, City of Birmingham bought HIIQ common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

**B. Defendants**

13. Defendant Health Insurance Innovations, Inc. sells and distributes health and life insurance products. HIIQ is incorporated in Delaware and maintains its headquarters in Tampa, Florida. HIIQ's common stock is traded on the NASDAQ under the ticker symbol "HIIQ." As stated in HIIQ's public securities filings, HIIQ is a holding company whose only material asset is ownership of a 100% economic interest in Health Plan Intermediaries Holdings, LLC ("HPIH"), in which HIIQ is the sole managing member, and HIIQ has "100% of the voting rights and control" over HPIH. HIIQ's consolidated, wholly-owned subsidiaries also include HealthPocket, Inc., d/b/a AgileHealthInsurance ("HealthPocket" or "Agile Health Insurance"). References to "HIIQ" herein include HIIQ's subsidiaries, including those referenced herein.

14. Defendant Gavin Southwell has served as HIIQ's Chief Executive Officer ("CEO") since November 2016 and has served as its President since July 2016. During the Class Period, Defendant Southwell certified the Company's periodic financial reports on Forms 10-Q and 10-K, and regularly spoke with investors and securities analysts about the Company during investor conference calls and presentations to investors.

15. Defendant Michael D. Hershberger has served as HIIQ's Chief Financial Officer ("CFO") since September 2015. Previously he served as CFO from October 2011 to November 2013, Senior Vice President of Finance from November 2013 to July 2014, Interim

7

CFO from July 31, 2014 to September 2, 2014 and from March 30, 2015 to September 16, 2015. During the Class Period, Defendant Hershberger certified the Company's periodic financial reports on Forms 10-Q and 10-K, and regularly spoke with investors and securities analysts about the Company during investor conference calls and presentations to investors.

16. Defendants Southwell and Hershberger are collectively referred to herein as the "Individual Defendants." Throughout the Class Period, the Individual Defendants possessed the power and authority to control the contents of HIIQ's reports to the SEC, as well as its press releases and presentations to investors and securities analysts, money and portfolio managers and institutional investors, including those found on HIIQ's website, www.hiiq.com. Each Individual Defendant, while serving as a senior executive of HIIQ, was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information and were the result of the collective actions of the Individual Defendants.

## C. Relevant Nonparties

17. Steven J. Dorfman ("Dorfman") was an owner, officer, member or manager of Simple Health Plans, HBO, HCM, ICC, SIL and SBO (as defined below). These entities—which were responsible for roughly half of HIIQ's sales during much of the Class Period—

8

conducted business from the State of Florida through interrelated companies with common ownership, officers, managers and business functions. According to the FTC, Dorfman absconded with millions of dollars in cash from Simple Health to spend on luxuries. In addition, Dorfman has personally been linked to a violent gang of criminals that he allegedly used to intimidate Simple Health's employees.

18. Simple Health Plans LLC ("Simple Health Plans") is a Florida limited liability company with its principal place of business in Hollywood, Florida.

19. Health Benefits One LLC ("HBO") is a Florida limited liability company with its principal place of business in Hollywood, Florida. HBO also did business as Health Benefits Center, Simple Health, Simple Health Plans, Simple Insurance, Simple Insurance Plans, Simple Auto, Simple Home, Simple Home Plans, Simple Care, Simple Life and National Dental Savings.

20. Health Center Management LLC ("HCM") is a Florida limited liability company with its principal place of business in Hollywood, Florida.

21. Innovative Customer Care LLC ("ICC") is a Florida limited liability company with its principal place of business in Hollywood, Florida.

22. Simple Insurance Leads LLC ("SIL") is a Florida limited liability company with its principal place of business in Hollywood, Florida. As HIIQ reported in its SEC filings, SIL was formed by HIIQ and its "third-party joint venture partner [Simple Health] in June 2013." HIIQ sold its interest in SIL to Simple Health in 2015.

23. Senior Benefits One LLC ("SBO") is a Florida limited liability company with its principal place of business in Hollywood, Florida.

24. Simple Health Plans, HBO, HCM, ICC, SIL and SBO are referred to herein as

9

"Simple Health" or the "Dorfman Entities." At all times relevant to the claims asserted herein, the Simple Health entities advertised, marketed, distributed and/or sold HIIQ's limited benefit plans and medical discount plans to consumers throughout the United States. Judge Darrin P. Gayles of the United States District Court for the Southern District of Florida has shut down, and frozen the assets of, all of the Simple Health entities, as described further below.

## III. JURISDICTION AND VENUE

25. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

26. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

27. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District. Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Additionally, the principal executive offices of HIIQ are located within this District at 15438 N. Florida Avenue, Suite 201, Tampa, FL 33613.

28. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone calls, and the facilities of a national securities exchange.

Case 1:19-cv-00412-WFJ-CPT Document 104-2 Filed 07/09/21 Page 41 of 306 PageID 2204

## IV.  SUMMARY OF THE ACTION

### A.  HIIQ Sells Its "Health Insurance Products" In A Highly Regulated Market

29.  Defendant HIIQ is a developer, distributor, and administrator of web-based individual "health insurance products," including limited medical indemnity plans and medical discount plans.  These limited medical indemnity plans and medical discount plans make up the lion's share of the Company's revenues.  In addition, HIIQ offers "supplemental products" which, according to the Company's SEC filings, "include a variety of additional insurance and non-insurance products that are frequently purchased as supplements" to the limited medical indemnity plans and medical discount plans.

30.  HIIQ is not an insurer and does not process or pay claims.  Instead, the Company works with third-party insurance companies to develop products for HIIQ's target market.  These products are underwritten by the insurance carriers, and the Company assumes no underwriting, insurance, or reimbursement risk.

31.  HIIQ principally derives its revenues by marketing and selling its products through external distributors, also known as "call centers," "brokers" or sales "agents."  HIIQ also earns revenues by selling products through its internal distribution channel consisting of HIIQ-owned websites and subsidiaries.  Customers pay HIIQ premiums and an enrollment fee, and HIIQ pays its brokers substantial commissions for selling HIIQ products.

32.  Both before and during the Class Period, HIIQ experienced rapid revenue and profit growth because its external sales agents sold increasing numbers of the Company's products.  HIIQ's external sales agents were responsible for far more Company revenues and profits than HIIQ's internal distribution channel.

33.  HIIQ operates in highly regulated insurance markets across the country.  As

HIIQ stated in its Forms 10-K filed with the SEC, HIIQ's "business practices and the business practices of [its] third-party licensed distributors and carriers are heavily regulated by each state in the United States and various federal agencies." As such, it was critical for HIIQ and its distributors to adhere strictly to applicable insurance laws and regulations.

34. Leading up and during the Class Period, HIIQ assured investors that it was "focus[ed] on compliance" and that while the Company had previously "received complaints that the information [HIIQ] provided" in selling its products was "not accurate or was misleading," HIIQ had "resolved these complaints without significant financial cost" and the "consumer experience" was a "compliance area" in which HIIQ had "invested significant resources." Indeed, the Company repeatedly touted its "outstanding" and "market-leading" compliance, and claimed that its compliance efforts afforded it a competitive advantage in the industry. HIIQ also made clear that such purported "outstanding compliance controls" extended to the Company's external call centers such as Simple Health, stating that the Company was "laser-focused on" and "facilitated our third-party distributors' compliance." Moreover, Defendants repeatedly assured investors that HIIQ had "leading compliance" due to consumer complaints of "less than 0.01%" of policies in force.

35. Throughout the Class Period, Defendants repeatedly touted HIIQ's "record" financial results due to third-party call center sales and continued to assure investors that HIIQ was "laser focused" on customer satisfaction and compliance, both internally and with respect to its network of call centers, including Simple Health. In nearly twenty investor presentations, analyst conference calls, press releases, and securities filings during the Class Period, Defendants touted HIIQ's "best-in-class" and "market leading" compliance and customer service, as well as its "highly compliant" licensed agent call centers. Defendants told investors

12

that HIIQ was "upholding the highest standards" in compliance and customer service, which was purportedly so strong that it was a "significant barrier to entry" to current and potential competitors. Defendants highlighted the Company's purportedly "incredibly strong" and "market-leading" "control environment."

36. Defendants underscored to investors that "insurance is built on data" that is "objective and measurable," and "every data point indicates that our customer satisfaction is market-leading." In particular, Defendants pointed to HIIQ's "incredibly low number of customer complaints," which was purportedly so low that it was "nearly impossible to improve" upon. Defendants quantified the percentage of "HIIQ-specific" complaints that were "upheld" by the DOI as a percentage of policies in force in a given quarter—which, Defendants repeatedly stated, was "less than 0.01%" or "0.00%."

**B.      Unknown To Investors, HIIQ's Business Was Built On Consumer Fraud**

37. Defendants' Class Period representations obscured a shocking truth inside HIIQ: Since at least 2013, HIIQ's most lucrative and important distributor, Simple Health, coordinated with HIIQ to boost HIIQ's financial performance through rampant consumer fraud. Significantly, Defendants' fraudulent practices have been substantiated by various legal proceedings and regulatory investigations, including the FTC's civil enforcement, as well as in-depth third-party research reports and Lead Plaintiffs' independent investigation.

38. Using classic boiler room tactics of fear, intimidation, misdirection, and outright lies, Simple Health deceptively sold HIIQ's short-term products and discount programs to consumers while falsely telling them that they were buying comprehensive health insurance offered by major national insurance carriers. As the court-appointed Receiver for now-shuttered Simple Health summarized in April 2019, Simple Health was "***largely a classic***

*bait-and-switch scam whereby unwitting consumers are falsely led to believe that they are purchasing a Preferred Provider Organization medical insurance policy ('PPO') that is compliant with the Affordable Care Act ('ACA'), but in reality are sold limited benefit indemnity plans that are not compliant with the ACA.*"[1] As the Receiver succinctly stated, Simple Health's *"business was never legally viable and cannot be viable in the future,"* as *"deception permeated the … entire business relationship with their customers."*

39.     Simple Health's basic fraud was to prey upon unsuspecting customers by convincing them HIIQ's products provided comprehensive health insurance that would cover preexisting medical conditions, prescription drug medications, primary and specialty care treatment, inpatient and emergency hospital care, surgical procedures, and medical and laboratory testing.  In reality, HIIQ's self-described "health insurance products" were far from comprehensive health insurance and did not provide consumers with the promised benefits.

40.     The fraud left HIIQ's and Simple Health's customers unknowingly bearing virtually all healthcare-related costs, including catastrophic medical bills.  Customers were shocked when, after accessing medical services based on the representations of HIIQ's and its call centers' sales agents that they had bought comprehensive health insurance, they were instead stuck with devastating medical bills that HIIQ's products did not cover.  Even customers who did not access major medical services faced serious consequences from the sales deception.  Customers bought HIIQ products in part because Simple Health told customers that by doing so they would avoid government penalties for not having ACA-compliant policies.  But because HIIQ products were not ACA-compliant, customers who bought the Company's policies were still penalized.

---

[1] Unless otherwise noted, all emphasis herein is added.

14

41.     A wealth of evidence, including internal HIIQ documents exposed in the ongoing FTC enforcement action and cross-corroborating statements by HIIQ's former employees, amply demonstrates that Defendants were at all times fully aware of Simple Health's deceptive practices.   Simply put, HIIQ knew of, enabled, financed, and directly participated in Simple Health's undisclosed and deceptive sales practices.

### 1.     Simple Health Was Critical To HIIQ's Financial Success

42.     During the Class Period, Simple Health was HIIQ's largest call center, with securities analysts calculating that Simple Health alone accounted for up to half of HIIQ's revenues.  The companies were extremely close.  Indeed, HIIQ developed the Simple Health distribution channel through which tens of thousands of consumers were defrauded.  As discussed below, HIIQ loaned Simple Health millions of dollars to fund its operations; trained Simple Health's sales agents; monitored Simple Health's sales calls; reviewed and edited the fraudulent scripts that Simple Health's telemarketers used to sell HIIQ's products; provided customer service to customers following those sales (including fielding tens of thousands of customer complaints); collected monthly premiums from those customers; administered and distributed the commissions and other proceeds of those sales; and directed Simple Health to use Defendants' online platform to quote and sell HIIQ products.

43.     The relationship between HIIQ and Simple Health was so close that HIIQ reported Simple Health as a related party in its SEC filings.  Under SEC regulations and Generally Accepted Accounting Principles ("GAAP"), and specifically FASB Accounting Standards Codification 850-10-20 ("ASC 850"), companies are required to disclose in their financial statements "related party transactions," including the nature of the relationship involved.  Under GAAP, designated something as a related party means that the reporting

15

entity "controls or can significantly influence the management or operating policies of the other to the extent that [it] might be prevented from fully pursuing its own interest." ASC 850.

44. HIIQ's strategic partnership with Simple Health was formed in March 2013, when the companies entered into a Management General Agent Agreement ("MGAA") and a Master Commission Advance Agreement ("MCAA"). These agreements, which were put in place only one month after HIIQ went public, financed Simple Health's business and authorized Simple Health to promote and sell various HIIQ-developed products.

45. Pursuant to the MGAA, Simple Health agreed to exclusively sell HIIQ products. HIIQ, in turn, directed and performed a variety of services for Simple Health. HIIQ processed customer enrollment forms, collected millions of dollars in monthly payments from Simple Health customers, provided fulfilment documents to customers, and fielded customer service calls. Under the MCAA, HIIQ also financed Simple Health's business by advancing commissions prior to Simple Health earning them. In essence, the MCAA served as a revolving credit facility from HIIQ to Simple Health whereby HIIQ repaid itself by withholding payments on future Simple Health commissions. As collateral, Simple Health granted HIIQ a security interest in Simple Health's assets, including future commissions and accounts receivable. Simple Health's principals, including Dorfman, also provided HIIQ with personal guarantees. HIIQ exercised a high amount of control over Simple Health pursuant to the MCAA. For example, if in any given month Simple Health did not generate enough revenue in order to offset the advanced commissions from HIIQ, HIIQ had unilateral power to suspend all commission advances unless Simple Health paid the full amount within five days of HIIQ's demand.

46. Simple Health, fueled by its financing arrangement and close coordination of

operations with HIIQ, rapidly grew from a small call center a few hours away from HIIQ's headquarters in Tampa, Florida, to a large operator of call centers across the State of Florida. By 2015, Simple Health was responsible for almost all of HIIQ's limited benefit indemnity policy sales. And without HIIQ's support, Simple Health would not have been able to operate.

47. By the start of the Class Period, HIIQ's profits from Simple Health's sales (and thus HIIQ's payments of commissions to Simple Health) were rising rapidly. For example, HIIQ's wholly-owned subsidiary, HPIH, paid Simple Health *$145 million* in cash commissions from January 2016 to April 2018, as revealed in court filings in the FTC enforcement action. This *$145 million* represented a staggering *49%* of the $294.2 million in total third-party commissions that HIIQ's SEC filings state the Company paid out during this approximate timeframe. Thus, as securities analysts at Aurelius Value later determined, Simple Health's sale of HIIQ products "was responsible for *roughly half* of HIIQ's sales." *See* ¶130, *infra*.



**Source: Declaration of Emil George, FTC Forensic Accountant**

48. HIIQ's executives also had close personal relationships with Dorfman. For example, according to Simple Health co-founder Matthew Spiewak ("Spiewak"), both Amy Brady, HIIQ's Vice President of Sales, and Gary Raeckers, HIIQ's Chief Operations Officer, attended Dorfman's wedding in March 2018. Given their personal relationships with Dorfman and the importance of Simple Health's business to HIIQ, the Company's executives refused to cut ties with Dorfman even though Dorfman had violent tendencies and affiliations with gang members. According to Spiewak, Dorfman "associated with known violent gang members and provided them cash when they needed it." Dorfman "used his affiliation with those gang members to threaten [Spiewak] and other [Simple Health] employees." Spiewak asserts that Dorfman "had an extreme temper and entered into violent fits of rage, especially when he could not have his way with the business or business operations." Dorfman additionally used threats of physical violence against Spiewak and his father (who co-founded Simple Health with Spiewak) to "have his way with corporate assets and control." Spiewak has accused Dorfman of "text[ing] threats of physical violence" to Spiewak, "either directly or by gang members," and that Dorfman's threats caused Spiewak to become "fearful for his own life."

### 2. HIIQ And Simple Health Teamed Up To Deceive Consumers

49. Both before and during the Class Period, HIIQ and Simple Health worked together to lure vulnerable consumers in search of comprehensive health insurance into purchasing HIIQ's limited medical benefit and discount plans. These deliberate and coordinated deceptive sales practices, through which HIIQ and Simple Health each reaped millions of dollars, included creating and financing misleading "lead generation" websites, recruiting and training Simple Health's salespeople to sell HIIQ's "health insurance products,"

18

and implementing the fraudulent sales practices through misleading sales scripts and classic telemarketing scams.

50. Simple Health's deceptive sales process began with a series of misleading "lead generation" websites. Some of these websites were owned, in whole or in part, by HIIQ or its authorized sales agents. In other instances, HIIQ or its authorized sales agents paid lead generators for leads generated through third-party sites. The websites used various deceptive methods to lure to HIIQ's products customers who were searching for comprehensive health insurance plans, including government-sponsored policies like those offered under the ACA. For example, Simple Health paid search engines to direct consumers searching for ACA-compliant plans—using terms associated with the ACA, such as "Obamacare," "Obama Health Care," "Obama Insurance," "Obama Care Insurance," and "Obamacare Marketplace"—toward one or more of Simple Health's approximately 130 lead generation websites. The names of the lead generation websites—such as "www.myobamacareapplication.com," "www.Obamacare-plans.com," "www.Obamacare-healthquotes.com," "www.official-plans.com"—were also designed to mislead consumers into believing they were shopping for ACA-compliant policies.

51. Beyond their web addresses and names, the lead generation websites themselves misled investors in a variety of additional ways. For example, Simple Health's main website falsely claimed that its "one objective" was to "help consumers through the complexities of the Affordable Care Act." Simple Health's lead generation websites also featured logos of large, well-known insurance carriers like Blue Cross, Anthem Blue, Blue Shield, Aetna and Cigna, which further implied the sale of reliable and comprehensive health insurance. However, Simple Health's HIIQ products were not ACA-compliant and had no

affiliation with Blue Cross, Blue Shield, and many other of these large insurance carriers.

52.     Simple Health also used the ACA as an employee recruitment tool, shamelessly promising in cartoonish help-wanted ads that prospective salespeople "WILL HAVE MONEY THROWN AT YOU" during "open enrollment."  As set forth below, Simple Health's job posting for sales agents stated, beneath an image of a cigar-smoking man in a top hat tossing a wad of cash into the air, "[i]f you are not making money hand over first [sic] this open enrollment you are not making the most of your time left on this earth.  Well guess what … here is your golden opportunity to MAKE THAT MONEY!"



53.     HIIQ worked directly with Simple Health to create misleading and deceptive

20

lead generation websites. For example, in October 2013, HIIQ and Simple Health formed a company known as "SIL" to generate "sales leads" for customers to buy HIIQ products. The operating agreement for SIL listed Defendant Hershberger as HIIQ's contact person. HIIQ and Simple Health each owned 50% of SIL until 2015, when HIIQ sold its interest to Simple Health. HIIQ made multiple capital contributions to SIL. As with other Simple Health lead generation websites described above, SIL targeted consumers to prey upon by paying millions of dollars to internet search engines, including Google, to direct users to SIL's lead generation websites or display Simple Health advertisements when users searched for keywords (or "AdWords") associated with traditional health insurance or the ACA, such as "Obama Care," "Obamacare Texas," "Obama Health Care," "Obama Insurance," "Obama Care Insurance," "individual health insurance plan," and "Blue Cross Blue Shield." SIL paid millions of dollars for these advertisements even though HIIQ did not distribute products that were compliant with the ACA. These efforts to deceive consumers paid off, as SIL's deceptive advertisements led to nearly 850,000 clicks and 230,000 inbound telephone calls.

54. Significantly, HIIQ was not only involved in creating the lead generation websites that funneled potential customers to Simple Health, but was also involved in finding the salespeople to staff Simple Health's boiler rooms. As explained by Confidential Witness 1 ("CW 1"),[2] Gerod Vernon, Amy Brady, and Casey, who were all employees of HIIQ, recruited

---

[2] Former HIIQ employees are referred to herein as Confidential Witness "CW __" and are referenced in the feminine form to protect their confidentiality.

21

agents for the call centers who sold HIIQ products nationwide.[3]  CW 2[4] similarly stated that the sales managers "Amy [Brady,] Jared [sic] Vernon and Casey" were responsible for identifying the third-party call centers.  CW 1 stated that HIIQ's representatives, including Vernon and Casey, were traveling "all the time" to train call centers' salespeople.

55.    CW 3[5] described how Simple Health would sell HIIQ products, yet in so doing list HIIQ as the call center of record.  She stated that "it was explained to us … that HII[Q] had many DBAs and others working for them."  When a customer called regarding such a policy—which, she said, occurred about three or four times per day—CW 3 could see on the system that the policy had been sold by Simple Health yet listed HIIQ as the call center of record.

56.    Next, using contact information provided through the lead generation sites, HIIQ's authorized sales agents at Simple Health engaged in both outbound and inbound telemarketing with consumers.  The scale of the call centers' operations was enormous.  According to the FTC, Simple Health's "boiler rooms" alone "handled over 62 million calls with consumers."

57.    HIIQ's sales agents at Simple Health provided their telemarketers with

---

[3] CW 1 was HIIQ's full-time licensing specialist from October 2017 until March 2018.  She reported to Wilma Orozco, who reported to Dan Garavuso, HIIQ's Vice President of Compliance.  Her responsibilities included reviewing sales agent contracts and licenses.

[4] CW 2 was employed at HIIQ on two separate occasions.  From 2015 through the end of 2016, she worked in HIIQ's Customer Service department.  From 2017 until March 2019, she worked first as a customer service representative, responding to emails from customers requesting changes or refunds, and then as an Administrative Assistant to Susan Adcock, HIIQ's Customer Service Supervisor.  CW 2 worked full-time out of HIIQ's North Florida Avenue office.  In her customer service roles, she worked mostly on escalation issues.

[5] CW 3 was a Customer Service representative at HIIQ's Tampa, Florida office from October 2015 to April 2016.  In that role, she directly fielded customer complaints, and worked alongside 30-40 other people in the Customer Service department.  She reported to HIIQ's Call Center Director, Heidi Hanstein.

carefully crafted scripts that were reviewed and edited by HIIQ and designed to mislead consumers into believing they were being offered ACA-compliant insurance. Telemarketers were directed to follow the misleading sales scripts exactly. Simple Health's policies provided that any deviation from the scripts could be grounds for termination.

58. In calls with consumers, Simple Health's sales representatives stated that for a modest one-time enrollment fee ranging from approximately $60 to $175 and a monthly payment ranging from approximately $40 to $700, the consumer could receive a "PPO" health insurance plan. Telemarketers would tell consumers that, like comprehensive health insurance, HIIQ's plans would cover preexisting medical conditions, prescription medications, hospitalization, lab work and access to primary care physicians, specialists, and other healthcare providers for a nominal copayment. HIIQ's authorized telemarketers often referred to the consumer's monthly payments as "premiums" and misleadingly used other established insurance terms in their sales pitches, such as "copay," "deductible," "preexisting condition," and "coverage"—even though such terms had no relevance whatsoever to HIIQ's limited benefit plans and discount medical plans.

59. HIIQ's authorized sales agents employed a variety of other deceptive sales practices in calls with potential consumers. For example, their telemarketers falsely represented to consumers that HIIQ's purported "PPO" health insurance plan was widely accepted by physicians in the consumers' geographic area, and the vast majority of doctors nationwide. The telemarketers also would falsely state that HIIQ's purported "PPO" health insurance plan was a qualified health plan under the ACA. If consumers asked for written information about HIIQ's plan before agreeing to buy it, the telemarketers would often refuse, claiming that they were either incapable or prohibited from doing so. Additionally, the

23

telemarketers often falsely claimed to consumers that a given HIIQ "PPO" health insurance plan was at least as good as comprehensive health insurance because it offered comparable coverage at a lower price, and with no deductibles.

60. Contrary to the false and misleading telemarketer scripts, HIIQ's plans were not PPOs. The plans had no "preferred" network of providers with favorable co-insurance or copays that apply toward a deductible. HIIQ, Simple Health, and additional authorized sales agents were selling limited benefit indemnity plans and discount medical plans that, unlike PPOs, provided for certain preset discounts only. The networks of health care providers that had signed up to participate in HIIQ's limited benefit indemnity plans and discount plans did not agree to provide plan "members" with insurance, did not administer the plans, and did not pay claims to doctors or providers within the network. The plans merely provided a discount, the level of which was not even known to the consumer prior to receiving care, which made it impossible for the consumer to make informed choices about her or his medical care.

61. Continuing to follow the carefully crafted sales scripts, the telemarketers collected personal information from potential customers and pretended that they were searching for health plans that were custom suited to the consumers. For example, the sales scripts instructed agents to say "Ok, I know exactly what you're looking for," and "I am going to submit your application" and "search" for the best plan.

62. Agents were told to falsely caution customers that they might not be approved for the recommended plan even though they were certain to be "approved" for the HIIQ plans. Pursuant to a paragraph in a sales script entitled "*Fear of God*," agents were instructed to warn consumers that "most insurance companies are VERY DISCRIMINATORY against pre-existing health conditions" and "I may not be able to get you approved for anything right now."

24

The script concealed that, no matter what their circumstances, consumers would be offered a limited benefit indemnity plan from HIIQ that would all but certainly be approved, and that for the first 12 months of the policy, preexisting conditions were not covered.

63. The sales scripts then instructed agents to place the consumer on a brief hold, in order to pretend that the agents were searching for different options. The scripts told agents to tell consumers that after the hold "we'll go over all of your options, if there are any, and make sure we find you the best plan for the best price." But the agents were not searching for different insurance options. Instead, the agent was simply stalling to give the appearance that she or he was deliberating between various plans. Notably, the FTC, in its investigation of Simple Health, recorded sales agents chatting with one another socially while the customer was on hold.

64. Once the artificial hold was lifted, Simple Health's scripts instructed agents to congratulate customers on their approval. Agents told customers that "I have some great news for you! Based upon your application, I was able to get you approved ...." After giving congratulations, agents were told to represent to customers that the approval was by an "'A Rated' carrier and a PPO," ensuring that "you can choose your own doctors and hospitals, and you don't need a referral to see a specialist." The script continued, "[n]ow, you can go to any doctor in the country" and "your insurance can be used at virtually ANY inpatient, or outpatient facility in the NATION." These statements were false. As discussed above, HIIQ's limited benefit indemnity plans and discount medical plans were not accepted by virtually every doctor in the country, nor were they accepted in most facilities. Nor were they comprehensive medical insurance or a "PPO" from an "A Rated carrier."

65. Simple Health's script also packaged dental and vision coverage in the

25

consumer's plan, seemingly without any additional charge. The script also went on to include "additional insurance benefits" in the consumer's package, such as accidental death and dismemberment ("AD&D") and accidental medical expense ("AME") plans, again, purportedly without any additional cost. In truth, consumers were charged significant fees and premiums for this "included" coverage.

66. Once consumers were "approved" for HIIQ's purported "PPO" health insurance plan, HIIQ's authorized sales agents arranged for payment by credit card or debit card, including via HIIQ's web-based payment platform. According to HIIQ's 2018 Annual Report on Form 10-K, the Company's sales agents, including Simple Health, used HIIQ's web-based platform to make payment and complete the enrollment process, taking "credit card and Automated Clearing House ('ACH') payments directly from members at the time of sale."

67. After taking consumers' payment information via HIIQ's web-based platform, telemarketers transferred consumers to a different employee to guide consumers through the "post close" portion of the script. The post-close script was designed to dull the customer to the ensuing "verification" process. The "verification" process contained some truthful statements about the HIIQ products that consumers were purchasing, but, before transferring consumers to "verification," the telemarketers often instructed them to disregard any statements in the "verification" process that indicated that comprehensive health insurance would not be provided.

68. The post-close script also instructed telemarketers to mislead customers into believing that there were no limitations on coverage for preexisting conditions and pressured customers into accepting the verification or being forced to start the process anew. During verification, consumers were asked to confirm a series of complex, lengthy statements that

26

were either read by the verification employee or transmitted directly to the consumer by email or text message. Immediately before telemarketers transferred consumers from the post-close phase to verification, they stressed to consumers that they should remain silent and withhold any questions until after the verification process was complete. As a result, consumers would feel pressure to agree with all of the verification statements, even if they conflicted with representations made by the sales representative or if the consumers do not understand or actually agree with them.

69. If a question was asked, the verification agent would simply turn off the recording before responding. Here, yet another layer of deception was baked into the misleading sales scripts. Agents used "verification rebuttal" scripts to provide different and conflicting responses to customers' questions depending on whether the verification was on the record, or off the record. For example, Simple Health maintained an "on recording" rebuttal script describing HIIQ's limited benefit indemnity plan as "not health insurance," and a corresponding "off recording" rebuttal script that stated precisely the opposite, *i.e.*, "this is health insurance." By proceeding in this fashion, the sales agents could obtain "clean" recordings of a verification script (*i.e.*, that were inconsistent with what the customer had just been read in the sales script and post-close script) even though, off the record, the sales agents were blatantly lying to the customers about the products they were selling.

### 3. Former Employees And HIIQ's Own Internal Documents Establish That HIIQ Received Thousands Of Complaints Each Year About Simple Health

70. Both before and during the Class Period, HIIQ regularly received thousands upon thousands of customer complaints that HIIQ's licensed call centers, including Simple Health, were misrepresenting the nature and material terms of HIIQ's products. HIIQ

27

developed an elaborate scheme to prevent customers from complaining, but, faced with the torrent of complaints, was ultimately forced to refund thousands of customers' payments due to sales agent misrepresentations.

71.     HIIQ engaged in deceptive practices to artificially suppress customer complaints.  As CW 4[6] explained, HIIQ instructed Customer Service personnel not to email customers their policy terms when the customers asked for them to be emailed.  "They only sent it via mail or fax," CW 4 stated.  She confirmed that she thought HIIQ was using mail to avoid an email trail, and stated that "[e]verything else besides the policies, they would email to the members."

72.     If customers did succeed in ultimately learning the true terms of their policies—whether by discovering that they were stuck with massive medical bills, or by reviewing the policy terms—HIIQ attempted to rebuff customers by denying their requests for refunds as a matter of Company policy.  As CW 5[7] stated, many HIIQ customers would first complain about broker misrepresentations to the HIIQ broker that sold them the policies.  However, according to CW 5, "[n]ine times out of ten [the customer] would get the runaround" from the broker and "[t]he broker wouldn't refund money to the members they had deceived."  "The members would call the agents and the agents wouldn't return their calls or they would tell them 'Sorry, you signed it, you can't get your money back.'"  CW 5 clarified that one time out of ten the broker would say they would cancel the policy, but they would not.

---

[6] CW 4 was an Insurance Support Specialist at HIIQ from February 2017 through June 2017. In that role, she directly received email complaints from customers who sought to cancel their HIIQ policies.  She reported to Call Center Director Heidi Hanstein.

[7] CW 5 worked in HIIQ's Escalations department from March 2018 until March 2019.  She was directly responsible for fielding customer complaints.  She reported to Theresa Mills Snyder, who reported to Brian Gamlen.

28

73.     As CW 5 explained, a certain percentage of the still dissatisfied customers would then complain to HIIQ by calling the Company's Customer Service telephone number. Inbound customer complaints to HIIQ were first routed to the Company's Customer Service call center in the Philippines.[8]  CW 3 explained that the HIIQ representatives in the Philippines were not licensed, so for any customer who wanted to make changes to their policy or cancel their policy, they had to then be transferred to the representatives in HIIQ's offices in Florida. CW 5 confirmed representatives in the Philippines could not make certain changes to customer policies and explained that transferred customers first went to HIIQ's Retention department, and Escalations saw only a percentage of the complaints.

74.     The number of people who nonetheless succeeded in reaching HIIQ's headquarters and lodging complaints with the Customer Service or Escalations was still extraordinarily high.  The complaints about call center misrepresentations were pervasive and widely known inside HIIQ.  For example, CW 3 stated that she learned early on while working at HIIQ that "[p]eople were being misled.  I realized that the brokers and sales representatives would lie."  She specified that 60% of the calls she received each day regarded "***gross misrepresentation or cancellation calls***" due to customers not understanding the policies, and the other representatives had the same volume of such calls.  As she stated, "[t]hese policies don't cover pretty much anything.  You go to the ER, you pay thousands.  These people were paying hundreds a month for insurance and then only getting $750 covered [of the ER visit]. ***It was very obvious that the brokers and sales representatives were not being forthcoming***"

---

[8] CW 3 noted that HIIQ opened its customer service call center in the Philippines at the end of 2015 because there was an increase in complaints, as "a lot of th[e policies] were sold under the guise that they were ACA-compliant, when they're not."  She noted that the "call volume was so huge—up to 90-minute waits."

so that "[m]ore often than not, people were not aware what they were purchasing." She added, "*[p]retty much anytime someone complained about a policy—90% of the time—it was a misrepresentation*." CW 3 stated that "it kind of wears on… your conscience when the company you work for and its partners are *trying to do everything in their power to destroy the customers* you are trying to support."

75.     CW 4 agreed that customer complaints about misrepresentations by brokers were "*endemic*" and "*rampant*" at HIIQ. CW 5 stated that such complaints were "absolutely" "endemic" and "rampant" at HIIQ, and pointed to weekly reports that HIIQ management received compiling the extensive complaints (*see* ¶99, *infra*). CW 5 stated that the customer complaints about misrepresentations by brokers were still endemic after Simple Health was shut down in 2018 because "*other agents … were doing the same thing*."

76.     CW 6[9] similarly stated that it was "early on" during her employment at HIIQ— in approximately the first month—that she realized there was a problem with policies being sold by Simple Health. "A lot of the time [customers] were being told they were major medical policies when they were not. A lot of them would call and express their feeling that they had been misled," she added. CW 6 added that "I wasn't happy having to deal with these customers who were pretty much *being taken advantage of a lot of the time and with Simple Health all of the time*."

77.     CW 3 explained that most calls she received from customers were about misrepresentations, and that "not only were [customers] being told they had major medical, the [HIIQ policies] were also not ACA-compliant, so [customers were] hit with a penalty." She

---

[9] CW 6 worked as a Customer Service Specialist in HIIQ's Customer Service department from February 2015 until March 2018. In that role, she handled customers' issues directly by phone as well as through email correspondence.

specified that "a lot of the [customer complaint] calls came in during tax time when [customers] were waiting for their [tax form related to insurance coverage]." The call centers lied by promising customers they would not be penalized by the government, and "were especially predatory on people that never had to buy insurance, or on people with families." CW 2 similarly stated that HIIQ customers told her that sales agents had lied to them, telling them that "they were associated with Blue Cross Blue Shield or Aetna, when they weren't."

78. HIIQ consistently received the same complaints over and over again from customers about HIIQ's brokers misrepresenting HIIQ's products. As CW 5 stated, customers would say "[t]hey told me it was full medical, or they told me I could cancel in thirty days," when in fact customers only had ten days to cancel the HIIQ policies. Customers complained that brokers told them "[i]t's a full-coverage policy; ignore the disclaimers," and that they were getting the same coverage they would get under the ACA. CW 5 explained that this conduct occurred throughout her employment with HIIQ. CW 5 believed that sales agents could be characterized as "abusive." CW 4 similarly explained that she received numerous complaints from customers who believed they were getting a major PPO plan due to broker misrepresentations, with "the majority" of customers dissatisfied. As CW 4 explained, customers would call for refunds when they "would find out that it was absolute crap; it wasn't actually covering anything." CW 4 added, "I would never buy [HIIQ's] policies—*they were useless. It seemed like people were paying for nothing*." CW 4 agreed that the Company was a "*scam*" and that it was important for the public to learn the truth about how HIIQ treated customers: "It means a lot to me [to reveal the truth about HIIQ]. I don't want them to be treating other people poorly." Asked if she would buy any of the health insurance products that HIIQ sold, CW 3 similarly replied, "*God no*." CW 1 confirmed that she, too, would not

buy health insurance from HIIQ.

79. Most of the complaints about HIIQ and its brokers misrepresenting what they were selling were complaints about Simple Health. CW 5 stated that "80-90%" of the complaints she handled consistently concerned "the same agents," *i.e.*, the same brokers, and noted that Simple Health and Assurance IQ, Inc. ("Assurance IQ") were a particularly bountiful source of complaints. CW 5 recounted how "[y]ou get to the point where you get so many calls everyday. They're the same agencies over and over again." CW 2 noted that the majority of the complaints were about Simple Health, and CW 6 estimated that Simple Health was responsible for 80-85% of all the complaints that HIIQ received. CW 4 stated that while the customer complaints about not receiving what they thought they had bought "was a widespread problem," the "main one [she] dealt with was Simple Health." CW 7[10] singled out HBO and Simple Health as the two brokerages she was especially concerned about.

80. The rampant misrepresentations by Simple Health agents were so well known at HIIQ that, according to CW 1, HIIQ had a special policy of secondary screening of former

---

[10] CW 7 joined HIIQ in 2013 and worked as a Chargeback Specialist until February 2017. In that role, CW 7 was tasked with preventing dissatisfied customers from clawing back money that they had already paid to HIIQ through their banks or credit cards. In February 2017, CW 7 became a Compliance Escalations Specialist. In that role, she spoke directly with customers who were unhappy with the HIIQ products that they had purchased. It was in this role when CW 7's "knowledge broadened" regarding why she had fielded so many chargeback requests as a Chargeback Specialist, because customers discovered that the policies they thought they had bought had very little to do with the policies they had actually bought. CW 7 resigned from HIIQ because of what she perceived as greed and wrongdoing by HIIQ and Simple Health. "The policies that were being sold to them [the customers] were garbage -- literally garbage. That is why I resigned. I could not take it anymore," she said. CW 7 stated that in her exit interview, she told HIIQ's Head of Human Resources that the Company would be destroyed if it did not stop working with Simple Health and its record of pushing customers to buy policies that did not cover what the customers believed they covered. "In the exit interview, I told [HIIQ's Head of Human Resources] that they needed to get rid of those companies in particular, because it was not going to end well for [HIIQ] otherwise."

32

Simple Health sales agents who wished to sell HIIQ policies for a different broker. CW 5 explained that when Simple Health became the subject of scrutiny, **HIIQ management "told us, 'we're going to have to pay a lot of money. Just keep your mouth shut. Say you didn't know anything about Simple Health**.'"

81. The misrepresentations by HIIQ's brokers were not limited to Simple Health. CW 3 confirmed that misrepresentations were a problem with all of HIIQ's brokers, and she could not recall any good brokers. CW 5 stated that there were other HIIQ agents besides Simple Health that were problematic, including Assurance IQ and Health Benefits Group, and that when she started at HIIQ in March 2018, she was told that the majority of the calls she would be dealing with were going to be for Simple Health, Assurance IQ, "and brokers like that." She estimated that about 80% of the calls she received in Escalations concerned between three to five of the agencies HIIQ used.[11]

82. HIIQ representatives were trained to rebuff customer requests for cancellation as a matter of company policy. For instance, CW 2 stated that she was instructed that she should not agree with customers when they made complaints over the phone. CW 5 stated that, the entire time she worked at HIIQ, when disgruntled customers would call HIIQ, "our job would be to try to **not give them their money back**." CW 7 stated that HIIQ's approach was to "**blam[e] the customers who are being taken advantage of**" and "not do[] anything about it because [HIIQ] care[d] more about the money than … about people's lives." CW 7

---

[11] CW 3 noted that she received complaints about Agile Health's representatives making misrepresentations about the policies, and that she was directed to pass those calls directly to Agile Health for them to handle. CW 3 added that Agile Health employees were in the back corner of the Customer Service office when she started working at HIIQ, and "we were told to just leave them alone." CW 3 noted that sales agents working directly for HIIQ were also seated near her.

said that the motive behind such behavior was "greed." CW 3 similarly stated that the "*blame was always placed on the customers for not understanding*" even though the agents "scare[d] people using the law dealing with tax obligations" and were "*very predatory*." As CW 6 put it, "[w]hen there is a lot of money to be made a lot of people change their belief system."

83. Given the high volume of requests for refunds, HIIQ was forced to issue refunds to many customers who had learned the truth about the policies. As CW 4 explained, "[i]t got to the point where they had a lot of refunds all the time" and "there were a lot of refunds going out." "Charge backs" were a problem, she stated. "People bought the insurance, then realized it was bullshit, so they went to their bank and said 'don't pay them.'" HIIQ tried to avoid chargebacks. CW 7, who began her employment at HIIQ handling chargeback requests, estimated that in her first year alone she saved HIIQ $730,000 by disputing chargebacks on HIIQ's behalf. HIIQ managed to send its stock price so high, CW 7 stated, "because they treated their employees like crap and they treated their members [*i.e.*, customers] like crap." CW 3 similarly stated that HIIQ "*prioritized profits over compliance*."

84. Significantly, HIIQ's internal documentation, Simple Health's internal data, and the statements of HIIQ's former employees all cross-corroborate the fact that HIIQ experienced a very high volume of customer complaints about HIIQ's brokers misrepresenting HIIQ products during the Class Period.

85. For example, CW 4 explained that she received approximately 30 email complaints per day in which customers complained that the policies were not what they thought they had bought. CW 4 stated that seven additional representatives worked alongside her in "Customer Service," and it was her understanding that they each received the same quantity of such complaints on a daily basis.

34

86.     CW 5, who worked in Escalations, noted that the complaints handled by Escalations were just a fraction of the customer complaints made in a given day to HIIQ, as customer complaints also went to the separate areas of "Retention," "Claims," and "Customer Service."  CW 5 stated that there were, depending on the day, three to four people on her Escalations team who each handled on "average ten to twenty tickets apiece per rep per day" dealing with agents misrepresenting HIIQ's policies when selling them.

87.     Based on CW 4's statement that eight people in Customer Service each received about 30 such complaints per day, and based on CW 5's statement that there were three to four Escalations representatives fielding on average 10-20 customer complaints per day regarding agent misrepresentation, HIIQ's Customer Service department received approximately 1,200 complaints per week regarding agent misrepresentations, or 60,000 per year (assuming a 50-week work year), and HIIQ's Escalations department received approximately 30-80 such complaints per week regarding agent misrepresentations, or 1,500-4,000 per year (assuming a 50-week work year).

88.     HIIQ's internal data, which it provided to the FTC as part of the FTC's enforcement action, corroborates these accounts and shows that HIIQ received thousands of complaints specifically about Simple Health agent misrepresentations during the Class Period. HIIQ stated that in 2017, for example, customer complaints concerning Simple Health resulted in approximately 2,335 "escalations" at HIIQ.  Of these, 1,880, or more than 80%, regarded misrepresentations by Simple Health's sales agents.  HIIQ's pre-Class Period data also showed similarly high numbers of customer complaints about Simple Health misrepresenting HIIQ's products.  Between 2014 and 2016, customer complaints about Simple Health resulted in approximately 2,250 "escalations" at HIIQ.  As with the complaints to HIIQ about Simple

Health in 2017 and 2018, the vast majority of complaints between 2014 and 2016 concerned misrepresentations by Simple Health's sales agents.

89.     The overwhelming complaints about Simple Health's deceptive sales practices continued in 2018. According to an internal Simple Health presentation, *HIIQ flagged over 2,000 escalations from customers concerning Simple Health in the six-month period between January 1, 2018 and June 27, 2018*. Most of these escalations were "labeled as [a]gent [m]isrep." In addition to complaints forwarded by HIIQ, Simple Health received 2,000 to 3,000 Customer Service calls a day, virtually all of which were complaints from consumers that they were misled about the benefits they would receive from the HIIQ products.

90.     Given the rampant complaints about sales misrepresentations at HIIQ, CW 5 exclaimed regarding HIIQ's statements during the Class Period that it had a 0.01% rate of complaints being "upheld" by the Department of Insurance: "*Oh my God, that's a bold-faced lie*." CW 3 stated that HIIQ's citation of the "0.01%" rate was "*[c]ompletely asinine. They were obviously not in compliance* …." CW 3 added that HIIQ's claim that it had "best-in-class compliance" was "*[v]ery wrong*" and CW 5 agreed that it was "*absurd*."

91.     Moreover, as explained by Robert M. Willis, a former Commissioner of the Department of Insurance, Securities and Banking (DISB) for the District of Columbia with over forty years of experience in the insurance industry, HIIQ's representations regarding the purported rate of customer complaints "upheld" by the DOIs is false on its face and highly misleading for two additional reasons.

92.     First, the former Insurance Commissioner explained that "*DOIs do not 'uphold' consumer complaints*." Instead, the DOIs review consumer complaints with two goals in mind: (1) to determine whether an insurer has violated any contractual rights of the

36

consumer; and (2) to determine if the complaint is related to a pattern or practice of complaints filed against the same company in other states. In each of these regulatory practices, the former Insurance Commissioner emphasized, *"the DOI does not administratively uphold a complaint for the consumer, or for or against a company. In cases where a consumer complaint is found to be unsubstantiated or baseless, the DOI does not make a formal administrative decision."*

93. Moreover, as a former Insurance Commissioner who supervised staff responsible for resolving consumer complaints, Mr. Willis described multiple instances where staff recommended corrective actions to address a consumer complaint, and, in the majority of cases, "the company complied with the proposed corrective action to avoid a formal administrative action that could result in suspension or revocation of its license."

94. Second, Mr. Willis explained that based on his forty years of experience in the field, including as a former Insurance Commissioner, senior manager with a major national insurer, member of the board of directors of both a life insurer and a health insurer, insurance consultant and lobbyist, and insurance law practitioner, the vast majority of consumers do not even know that they can file a complaint with DOIs. "In most instances," Mr. Willis stated, "if consumers have a complaint about an insurance product, they simply register their concerns with the agent who sold them the product." A consumer complaint to the agent could result in a policy being cancelled without filing a complaint at a higher level, such as with the insurance carrier or regulatory authority. "Moreover, due to the relatively small premium associated with limited benefit products," Mr. Willis added, "many consumers just suffer their loss and do not file a complaint with an insurer or DOI." "In fact," Mr. Willis emphasized, *"most consumers are unaware they have the right to file a complaint with DOI."*

### 4. HIIQ Closely Monitored And Documented The Intentional Deception Of Customers

95. HIIQ kept extensive and comprehensive records of the complaints it received regarding broker misrepresentations, including by Simple Health.

96. First, the Company maintained a proprietary product, distribution, and customer management platform known as Automated Real-Time Integrated E System or "A.R.I.E.S." CW 8,[12] who built HIIQ's A.R.I.E.S. database, stated that everything was logged into A.R.I.E.S., including compliance information and all information available on customer retention and customer complaints. CW 2 stated that while she worked in HIIQ Escalations, she would receive emails from members complaining about their policy, identify the sales agent involved, and then retrieve the relevant phone call, if it was available. CW 2 said that she would enter relevant information into A.R.I.E.S. "Everything went into A.R.I.E.S.," including personal customer information and notes from previous representatives that the customer might have spoken with. CW 2 stated that when she got complaints about sales agents, she would enter that information into A.R.I.E.S. CW 6 similarly confirmed that A.R.I.E.S. was HIIQ's main platform for processing all data, stating that "[w]hen a customer would call in we would call up all their information from that system." CW 6 stated that all cancellation and refund requests would be processed using information from A.R.I.E.S.

97. As CW 8 stated, "every phone call that comes in is recorded in A.R.I.E.S." CW 1 similarly confirmed that HIIQ recorded all of its calls, and CW 5 also confirmed that all

---

[12] CW 8 was HIIQ's Senior Vice President of Quality Assurance from January 2009 until her retirement in July 2018. She was, and worked directly with, HIIQ's senior management, including HIIQ founder Mike Kosloske and Defendant Southwell. She stated that she helped form Agile Health at its inception and "built" HIIQ's A.R.I.E.S. system along with "the programmers" over a period of years.

of HIIQ's escalation calls were recorded. CW 8 stated that HIIQ required its own sales personnel to record every customer call and upload every conversation to HIIQ servers on a daily basis. A.R.I.E.S.' detailed data included a system of 30 different codes, each of which is assigned to each call to describe the reason for the call. Management "can look at the actual numbers," she stated. CW 5 pointed out that HIIQ kept its recorded calls "for several years on several different systems."

98. CW 8 stated that A.R.I.E.S. enabled HIIQ to pull data that was then passed on to top management every single week. "*Management got a report every week*," she said. The Compliance department received its own report every week and then "*Compliance had to report every single week to top management*." CW 8 stated that Southwell received this report and, indeed, the weekly reporting discipline was initiated by Southwell. "Gavin started all of that" and "knows everything." She explained that if one particular call center is generating an unusual number of complaints, HIIQ management will quickly see it, and that there are "averages" for the occurrence of different kinds of complaints, each with their own code, and HIIQ keeps an eye on the averages.

99. CW 5 similarly explained that senior management reviewed compliance data through weekly reports from the Escalations department. The reports told HIIQ's senior management "which agency we got the most complaints about, which ones we had to issue the most refunds." CW 5 stated that Theresa Mills Snyder, who created the weekly reports, "absolutely" knew that brokers were deceiving HIIQ's members, and complained to CW 5 that Defendant Southwell and Brian Gamlen "know and they're not doing anything" about the reports. Senior management "chose to ignore it—those complaints went nowhere." CW 5 added that senior management knew about the problems with Simple Health because "they got

the reports every week." CW 2 also personally informed Customer Service Supervisor Susan Adcock of customer complaints.

100. CW 4 explained that there were also daily reports. Every day she and her colleagues documented in a spreadsheet all of the customer complaints and sent it to their supervisor. CW 6 similarly stated that she logged in an Excel spreadsheet every time that she made a customer refund, and the Excel spreadsheet was generated daily. CW 4 noted that everything she did was documented in A.R.I.E.S. and in email.

101. HIIQ was also aware of deceitful sales tactics by its brokers, including Simple Health, due to additional various monitoring mechanisms. For example, CW 5 stated that, working in HIIQ's Escalations department, she was in contact with Simple Health's representatives and could ask for Simple Health's agents' sales call notes.

102. CW 8 explained that Defendant Southwell was aware of the complaints against Simple Health, and that in early 2017, Southwell hired people to "pose[] as customers" and call the third-party agents to witness the agents' sales practices first-hand. Dorfman was of special concern to HIIQ and HIIQ was "watching him very closely" because "he was very important" due to his "volume and value." CW 6 similarly stated that in Spring 2017, HIIQ began grading Simple Health agents on their communications with customers. As part of the grading, she and other HIIQ employees listened to recordings of numerous calls that Simple Health representatives had with Simple Health customers. She explained that the calls were graded first based on whether the customer was "saved" or persuaded not to cancel HIIQ products. But then they were graded additionally on whether the agent had been honest or dishonest in keeping the client on the books.

103. CW 6 listened to and graded about ten or twelve of these calls every day. Very

40

often, CW 6 said, the Simple Health agents were entirely dishonest. Most commonly, she said, they would falsely state that 70% or 80% of treatment and hospital visits would be covered by the insurance company. They would "let the customer believe that it was major medical" when it was not. "They kept reiterating the 80/20 split. That was dishonest. They were not 80/20 or 70/30 policies whatsoever." CW 6 added that the Simple Health agents were "very creative" in making it seem like the policies equated to just a 30 percent cost to the customer when that was "nowhere near the truth." Often, therefore, customers were "saved but with lies." CW 6 pointed out that after listening to such conversations, HIIQ employees including CW 6 would write up their reports on the calls and enter them in an Excel spreadsheet that was put on a hard drive for more senior HIIQ employees to review. Such reports included the false statements made by Simple Health, pinpointing at what time in the recording the statements were made.

104. CW 8 explained that by mid-2017, worries about Dorfman had set in at HIIQ. The Company did not cut ties with Dorfman, CW 8 stated, "because of all the business we had on the books, that we had done with him already," and "he also owed [HIIQ] money." CW 9[13] similarly stated HIIQ chose not to cut ties with Simple Health because the Company knew that losing the Dorfman Entities would be a "significant financial hit" for HIIQ. CW 9 pointed out that she heard at least one year before the FTC shut down Simple Health that the Dorfman Entities were engaged in non-compliant activity, and "*we knew what they were doing marketing-wise [at Simple Health] was extremely illegal*."

---

[13] CW 9 was a Director of Senior Marketing at American Service Insurance Agency, an HIIQ broker and a subsidiary of HIIQ, from 2014 until early 2018. In early 2018, she transitioned to the position of sales agent at the same company, where she remained until August 2018 when she left the company.

41

**5.  HIIQ's Senior-Most Executives Internally Acknowledged Being "Bombarded" With Customer Complaints Due To Simple Health's "Widespread" and "Out of Control" Deception**

105.  Recent revelations in the FTC's enforcement action have filled the public domain with an extensive record, which shows that HIIQ executives were fully aware of the deceptive sales practices and compliance failures at Simple Health.

106.  Filings in the FTC action show that HIIQ conducted frequent "site visits" at Simple Health, where HIIQ was given access to Simple Health's files and able to personally inspect Simple Health's deceptive sales practices. *See* ¶¶140-44, *infra*. For example, and as the FTC explained, at Simple Health "written evaluations regularly documented examples of telemarketers deceptively assuring consumers that they would only pay relatively low fixed amounts (often falsely described as 'copays') for doctor visits, prescription medications, hospitalization, or other medical care, similar to a traditional comprehensive health insurance policy." Although Simple Health "regularly documented these transgressions, [Simple Health] typically allowed problem telemarketers to continue selling." By contrast, telemarketers who told the truth were fired for making statements such as "we're lying to people around here."

107.  Extensive documentation filed by the FTC in its enforcement action details the sales scripts used by Simple Health—which, as explained above, Simple Health had drafted in concert with HIIQ. The FTC has noted that the scripts "*are replete with deceptive statements and high-pressure sales tactics*." These tactics included: "1) pretending that Defendants can provide the highest quality comprehensive health insurance plans and then scaring consumers into thinking they may not qualify for these plans; 2) 'legitimizing' Defendants' products by grossly misstating their benefits and coverage; and 3) 'omitting critical information about the products.'" The FTC additionally stated that "the intent of the scripts is unmistakable—to

42

leave consumers with the impression that they were purchasing comprehensive health insurance or its equivalent." And as the FTC has explained, "[s]cores of documents— including 'quality assurance' reports, Defendants' customer database, sales recordings, and internal communications" showed how, in addition to using misleading scripts, Simple Health's agents regularly used *"unsanctioned, outright falsehoods"* in selling HIIQ products to customers.

108. As the FTC explained, Simple Health maintained extensive documentation of its misconduct, as it "maintained dozens of servers containing hundreds of thousands, possibly millions, of [its] recorded sales calls." Moreover, the FTC has filed publicly internal HIIQ emails showing that HIIQ executives were clearly well-aware of the "widespread" and "out of control" deceptive practices that they orchestrated.

109. For example, on October 5, 2017, just ten days after the start of the Class Period, Christine Gillis ("Gillis"), Agency Compliance Manager at HIIQ, emailed Amy Brady and Dan Garavuso, HIIQ's Vice President of Compliance, detailing *"widespread"* misrepresentations by Simple Health. Specifically, the email stated: *"We still have inaccurate information being presented along with agents speaking to subjects they have no visibility on, namely claims processing procedure and status."* The email additionally documented how HIIQ knew that Simple Health sales agents were grossly distorting how much purported coverage the "insurance" they were selling provided. Alluding to Simple Health's practice of falsely telling customers that the "insurance" would cover 70% of claimed expenses, Gillis wrote that "[t]he communication of 70% has been a consistent challenge for Simple and, we know from experience, *these communications result in escalations and complaints*." The Simple Health/HIIQ script dissuaded customers from calling the carrier and included the false

and misleading pitch of 70% coverage, stating "the PPO network will take your entire hospital bill, and re-price the bill up to the FIRST 70% off.… The whole idea of this plan is to make your out of pocket expenses as low as possible, without you EVER having to meet a deductible first."

110. Another email dated October 5, 2017, from HIIQ Customer Service Supervisor Susan Adcock to Gillis and HIIQ's Vice President of Operations, Brian Gamlen—who was the third most senior employee and a member of HIIQ's senior management team along with Defendants Southwell and Hirschberger—described "*out of control*" deceptive practices at Simple Health, where sales agents were falsely representing which company they were working for ("telling [customers] they are ACI when giving benefit information") and Customer Service agents were "*getting bombarded with calls from members advising they are being told the benefits pay 70/30*." As the October 5, 2017 email summarized, "*the incorrect information being given by Simple Health to members is getting out of control.…*" Another email, dated March 11, 2016, showed that HIIQ's executives were aware of "misleading" statements by Simple Health and showed that the Simple Health customer calls were assembled in HIIQ's own digital files.

111. Recently revealed emails further show that, in the face of customer complaints, Simple Health falsified public reviews of itself. A September 18, 2017 email chain showed Steven Dorfman asking "who is working" on the fact that Simple Health was "still sitting with a D rating" with the Better Business Bureau ("BBB"). Shawn Gibson, Simple Health's Chief Operations Officer, responded that several employees and a "new reputation management company" were all working on "undo[ing] the D rating." Dorfman then responded by urging them to "*create[e] fake positive reviews*" to "help with the ratio" of positive reviews to

44

negative reviews. Another email chain, dated May 8, 2018, confirms that Simple Health was "submitting 2 positive reviews each week." According to Simple Health, there were "*countless complaints*."

112. In addition to "creating fake positive reviews" to deceive the BBB, Simple Health also lied to the DOI to cover up its misconduct. An April 19, 2016 email string revealed in the FTC's filing shows that Simple Health "change[d] the answer" it gave to the DOI regarding a complaint inquiry to obscure a "bad question and answer" given to a customer, in which Simple Health had told the customer that the product it was selling was "ObamaCare." A September 6, 2018 email revealed that Simple Health used a string of false and misleading representations to lie to potential customers about the products they were purchasing, complete with side-by-side comparisons of what the agents would say while the calls were being recorded, and then the misrepresentations they would make "off recording." A script emailed on July 26, 2018 showed that Simple Health's sales tactics included trying to put the "*Fear of God*" in consumers.

113. Now-public emails indicate that HIIQ had a role in Simple Health's intentional deception of the Better Business Bureau and government regulators. An email dated August 9, 2017, from HIIQ's Chief Risk Officer, Nick Marley ("Marley"), to Simple Health's Chief Compliance Officer, Candida Girouard ("Girouard"), discussed Simple Health's lead generation website Trumpcarequotes.com, which Marley found "*misleading*." Marley reminded Girouard that HIIQ was still helping Simple Health with the costs of government investigations, stating "*we're still covering the MT investigation costs for you (and others)*. We'll keep doing this (although will keep it under review) but at some point I'll give you an idea of the run rates so you can see why I'm keen to avoid new issues where ever possible."

114. Now-public internal HIIQ emails also reveal that HIIQ was not only aware of Simple Health's rampant misconduct during the Class Period, but had been for years beforehand. A March 12, 2016 email from Girouard to Dorfman stated that HIIQ's Compliance department was "secret shopping" Simple Health multiple times per day and Girouard "got [her] ass chewed for 4 hours by [HIIQ Compliance Manager Amy Brady] yesterday," whom Girouard had "never heard … curse so much." Girouard stated, however, that despite HIIQ knowing of Simple Health's compliance failures at the time, HIIQ nonetheless authorized Simple Health to "post close however we want" with customers. Similarly, recently revealed documents show that as of March 2016, HIIQ was receiving Simple Health "escalated complaint" summaries. In April 2016, Defendant Hershberger received an email stating that another troubled HIIQ broker, National Brokers of America, Inc. ("NBOA"), was found to be "misrepresenting plan benefits and more."

**6. The Deceptive Sale Of HIIQ's Products Caused Enormous Harm To Consumers**

115. The deceptive business practices designed and deployed by HIIQ and its network of authorized sales agents harmed tens of thousands of people throughout the United States. These consumers paid significant enrollment fees and hefty monthly payments for what had been marketed as comprehensive health insurance. In reality, consumers received relatively worthless limited benefit indemnity plans and discount plans that do not provide the insurance they were promised, and often cannot be used at all for healthcare services typically covered by health insurance. Consumers frequently did not realize they were uninsured until after incurring substantial medical expenses which, contrary to the representations made by HIIQ and its authorized sales agents, were not covered by HIIQ's products.

116. The FTC has recently revealed ample evidence of the great number of deceived

46

consumers, and several victims of Defendants' deceptive business practices have filed lawsuits against HIIQ.  As of the filing of this Complaint, no less than a half dozen consumer class action lawsuits have been filed against HIIQ and related parties asserting claims for damages as a result of the Company's deceptive business practices.  These complaints assert claims for, *inter alia*, violations of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), Florida's RICO Act, fraud, aiding and abetting fraud, conspiracy to commit fraud, aiding and abetting breaches of fiduciary duty, unjust enrichment, and violations of the Telephone Consumer Protection Act.

117.    For example, Elizabeth Belin is a named plaintiff in a consumer class action pending in the Southern District of Florida.  As detailed in the *Belin* complaint, Ms. Belin had been recently divorced, without insurance, and suffering from a preexisting knee injury in early 2016 when she began looking for ACA-compliant healthcare.  Ms. Belin found one of Simple Health's dozens of websites, which, as described in ¶¶50-51 above, had highly misleading names.  Simple Health's sales agent told Ms. Belin that he was shopping among numerous PPOs of "A-rated carriers," and would find the best one for Ms. Belin at the best price.  Reading from a script, the sales agent's misrepresentations and omissions led Ms. Belin to believe she was buying comprehensive medical insurance.  Instead, and unbeknownst to her at the time, she was charged for a limited benefit indemnity plan and medical discount plan, as well as AD&D insurance that she never requested.  She paid an enrollment fee of $150 and a monthly premium of $238.77.  Ms. Belin later had knee replacement surgery, only to learn that the surgery was not covered.  Ms. Belin was shocked to receive bills in excess of $48,000, which was more than her annual salary.

118.    Chris Mitchell is also a named plaintiff in the *Belin* class action.  An advocate

for the homeless, Mr. Mitchell's employer did not offer health insurance benefits. Mr. Mitchell purchased a limited indemnity plan and medical discount plan from Simple Health in early 2016 after listening to a sales agent read from the sales script that Simple Health read to Belin and other class members. Mitchell paid a $155 enrollment fee and a $206.90 monthly premium. In early 2018, Mr. Mitchell was diagnosed with an aggressive form of cancer and was immediately scheduled for surgery. Just days before that surgery, Mr. Mitchell's hospital told him that he had no insurance coverage. Mr. Mitchell was surprised, and scrambled to come up with a down payment for the surgery, but ultimately received bills exceeding $40,000. He described the difficulties caused by Simple Health and HIIQ as oftentimes more difficult than fighting cancer.

119. Lead Plaintiffs' investigation has confirmed countless other instances of Americans being badly harmed by HIIQ and its call centers' deceptive practices. For example, CW 6 recalled a particularly egregious case in which a mother had to pay for her 17-year-old son's brain surgery, then found out that the surgery was not at all covered by the HIIQ product she bought through Simple Health. CW 6 was disgusted by the event, and still remembers the boy's name. She added, "I am sure [the mother] had made [Simple Health] aware why she was buying the insurance and they sold it to her anyway," even though it did not cover surgeries of any kind. "Simple Health had no business selling that policy to her…. It was useless…. I wasn't happy having to deal with these customers who were pretty much being taken advantage of a lot of the time and with Simple Health all of the time."

120. "It was story after story," CW 7 similarly explained. HIIQ customers "went to the hospital or they went to the ER" and discovered that the policies they thought they had bought had very little to do with the policies they had actually bought. CW 7 recalled speaking

48

to grandmothers crying on the phone with her because they had taken their grandchildren to the doctor or to the ER, some with life-threatening conditions, only to discover that none of what they thought they had purchased in health coverage actually existed. She would hear people "cry and cry," she said. "It was horrible, it was horrible."

### C.   The FTC Revealed That Simple Health Was A "Sham" But Defendants Continued To Mislead Investors While Reaping Millions of Dollars From Insider Stock Sales

121.   Beginning in November 2018, the truth began to emerge through a series of partial disclosures. As the partial disclosures progressed, Defendants continued to make false and misleading statements concerning HIIQ's compliance, customer complaints, and the impact of revelations regarding Simple Health's deceptive sales practices on HIIQ's business.

### 1.   The FTC Announced Its Extraordinary Enforcement Action And Shuttering Of Simple Health

122.   On November 2, 2018, the FTC issued a press release announcing its enforcement action against Dorfman and Simple Health. The press release, entitled "***FTC Halts Purveyors of Sham Health Insurance Plans***," revealed that Simple Health, through its sales of HIIQ products, had "collected more than $100 million by preying on Americans in search of health insurance, selling these consumers worthless plans that left tens of thousands of people uninsured" and "st[icking consumers] with thousands of dollars in unpaid medical bills." The FTC explained that "consumers were misled into thinking they had purchased comprehensive health insurance, but when they needed to rely on that insurance, they learned they had none of the promised benefits."

123.   The FTC's press release detailed Simple Health's "deceptive scheme." The FTC stated that Simple Health and the other Dorfman Entities had "falsely held themselves out as experts on and providers of government-sponsored health insurance policies." For

49

example, the FTC revealed how the Dorfman Entities used deceptive websites, such as those developed with HIIQ, to "lure" customers by "misleadingly featur[ing] the logos of the AARP or well-known insurance carriers, such as Blue Cross Blue Shield plans, when in fact the defendants were not affiliated with such entities." Next, customers were led to believe they purchased a PPO insurance plan that "was widely accepted by doctors in the consumers' geographical areas," while in reality the plan left them essentially "uninsured." The FTC further stated that "[o]n top of that, because the defendants' limited benefit plans and discount memberships do not qualify as health insurance under the Affordable Care Act, some people who enrolled were subject to a fee imposed on those who can afford health insurance, but choose not to buy it." The FTC asserted that these practices impacted "tens of thousands of consumers," and "[i]n the past three years alone, Defendants' scheme has generated over $100 million in revenue."

124. The FTC's press release further revealed that the agency had obtained a temporary restraining order ("TRO") freezing the Dorfman Entities' assets, appointing a Receiver to manage the seized assets, and halting any further selling of HIIQ products by the Dorfman Entities. The press release contained a weblink to the previously sealed TRO, signed by United States District Judge Darrin P. Gayles. In granting the TRO, Judge Gayles reviewed extensive evidence submitted by the FTC after a lengthy investigation and concluded that, "[a]s demonstrated by the consumer complaints and declarations, expert witness testimony, records of undercover purchases, corporate banking and payment processing records, as well as testimony from former employees, *the FTC has established a likelihood of success in showing that Defendants have made false and misleading statements in connection with the advertising, marketing, promoting, offering for sale, or sale of their limited benefit plans*

50

*and medical discount memberships*." The court held that there was good cause to believe that restraining and enjoining Simple Health was necessary to prevent "immediate and irreparable harm" to consumers:

> "There is good cause to believe that, in numerous instances, Defendants have sold limited benefit plans and medical discount memberships to consumers by **misrepresenting that such products are comprehensive health insurance**, or the equivalent of such insurance, or are qualified health insurance plans under the Patient Protection and Affordable Care Act ('ACA' or 'Affordable Care Act'), 42 U.S.C. § 18001, et seq. . . . **Defendants have, in numerous instances, falsely represented** that they are experts on, or providers of, government-sponsored health insurance policies, such as those offered pursuant to the ACA, and are affiliated with the Blue Cross Blue Shield Association or AARP."

125.    Newspapers and other publications immediately reported the news of the FTC's enforcement action. On November 2, 2018, the *South Florida Sun Sentinel* published an article entitled, "***Feds shut down Hollywood-based 'sham' health insurance marketer***." The article revealed prior allegations of the same misconduct by Simple Health, including "numerous complaints" made directly to Florida's Attorney General's Office that Simple Health misrepresented the coverage it was selling, and then "wouldn't mail policy information after withdrawing customers' money." The article also detailed several emails from customers defrauded by Simple Health. As one customer stated, "[t]he phone sales agents are very misleading. Several company names were given during our discussion. I really could not define what company I was dealing with." As another defrauded customer cogently stated, "[t]his outfit pretends to sell health insurance, but it's all a con." The customer implored the FTC to "prosecute this scam operation with all due speed." The article pointed out that all of the Dorfman Entities sued by the FTC were personally owned by Dorfman, and that the TRO had authorized the seizure of "more than $1 million from bank accounts controlled by the defendants, about $100,000 in jewelry, and three luxury cars including a Lamborghini, Range

Rover, and Rolls-Royce."

126. Similarly, on Monday, November 5, 2018, *The New York Times* published an article entitled "***Federal Officials Shut Down Sales of 'Ruinous' Health Insurance Plans***." The article cited Judge Gayles's TRO and reported that "federal authorities have shut down a network of Florida companies that they say used aggressive, deceptive tactics to sell skimpy health insurance products that skirt requirements of the [ACA] and left tens of thousands of people around the country with unpaid medical bills." The article further reported that the FTC's decision to take action against Simple Health was unanimous amongst the three Republicans and two Democrats on the trade commission. The article noted that the FTC had learned about the unlawful "boiler room" sales practices from consumer complaints and undercover telephone calls made by FTC investigators, among other evidence.

127. HIIQ's share price plunged in response to these revelations. After closing at $50.74 on November 1, 2018, HIIQ's share price fell by 21.9% over the next two trading days, falling to $39.62 on November 5, 2018, wiping out over $160 million in market capitalization. On November 5, *Investor's Business Daily* published an article noting that HIIQ was the day's "biggest loser" on large-volume trading.

128. In the wake of these revelations, HIIQ attempted to comfort investors by purporting to distance the Company from Simple Health and minimizing the importance of their relationship. HIIQ immediately issued a press release on November 2, 2018, responding to the news of the FTC's enforcement action, which assured investors that "HIIQ maintains an active internal compliance team," "HIIQ closely monitors all sales of HIIQ products by each agency" selling its products, and,"[f]or 2018 to date, Simple Health was the agency of record for less than 10% of HIIQ's submitted policies."

52

129. Securities analysts credited HIIQ's continued misrepresentations. For example, Cantor Fitzgerald issued a November 4, 2018 report stating that while "[w]e assume the FTC announcement probably was the reason for the share weakness on Friday," HIIQ "[m]anagement has consistently spoken about how it has improved its broker distribution channel to higher-quality entities." The same day, securities analysts at Canaccord Genuity issued a report accepting HIIQ's assertion that "Simple Health accounted for less than 10% of HIIQ's submitted policies," which noted that the analysts had spoken with management following the FTC's November 2 disclosure and that HIIQ "stands by its compliance processes" and "did not notice any irregularities" with Simple Health.

**2. Securities Analysts Issued A Scathing Research Report On HIIQ**

130. On November 27, 2018, Aurelius Value, a securities research firm, published a scathing report on HIIQ titled, "***HIIQ: Boiler Rooms, 'Worthless' Policies, and Defrauded Families***." The Aurelius Value research report further revealed to the market the deep ties between HIIQ and Simple Health, and sharply criticized HIIQ's November 2, 2018 press release as "misleading … [for] suggesting that Dorfman was responsible for less than 10% of HIIQ's business." The Aurelius Value report warned that "***many HIIQ investors have not yet recognized the significance of the FTC's action because HIIQ issued [its] highly misleading press release … that attempted to downplay HIIQ's relationship with Dorfman***" and Defendants' press release "leads investors to believe that the Dorfman Group is immaterial to HIIQ's business." But, as Aurelius Value reported, "[p]reviously sealed documents gathered by the FTC ***directly undermine management's claims*** and prove that a large boiler room operation recently shuttered by the government for a massive alleged fraud was responsible for ***roughly half*** of HIIQ's sales." The report cited "previously unpublished bank records

reveal[ing] that HIIQ has paid at least *$145 million in cash* to Dorfman's companies, representing about *half of the third-party commissions paid out by HIIQ* over this approximate period."[14]

131. Relying on such newly disclosed facts and an extensive documentary record, the Aurelius Value report concluded that *"the deceptive sales tactics described by the FTC appear endemic across HIIQ's broker network"* and *"[a] material portion of HIIQ's 377,000 policies in force may … be contaminated by insurance fraud."* The report summarized that HIIQ's *"business model relies on a classic boiler room scam"* in which "more than 60% of the money paid by consumers goes to HIIQ's brokers." The report cited testimony to the FTC by a Simple Health manager that "approximately 95% of the *two to three thousand customer service calls received by [Simple Health] each day* consisted of complaints from consumers who had been misled about the benefits they would receive."

132. Following the publication of the November 27, 2018 Aurelius Value research report, HIIQ's stock price declined swiftly. On November 27, 2018, the Company's share price fell 5.8% from its November 26, 2018 closing price, on unusually high trading volume of over 4.2 million shares—nearly 10 times the stock's average trading volume over the prior year, and the highest traded volume for HIIQ shares in over a year. *SeekingAlpha* noted that the Company's stock was "down 6%" in reaction to the Aurelius Report, which connected "fraudster Steve Dorfman" to "half of [HIIQ's] revenues."

---

[14] Aurelius Value's report was based on its thorough investigation and detailed analysis of numerous relevant documents, including Florida UCC filings, the California Insurance License Database, and previously sealed documents related to the FTC enforcement action. As for the documents related to the FTC enforcement action, Aurelius Value stated that some of the documents underlying its November 27, 2018 report were "apparently … too voluminous to have uploaded to PACER" in that action.

### 3. Defendants' Misrepresentations Continued As They Reaped Millions Through Insider Stock Sales

133. By late December 2018, as a direct result of the revelations about Simple Health and Dorfman, HIIQ stock was trading at roughly $26.50 per share, approximately half the price it was trading at on November 1, 2018, the day before the announcement of the FTC enforcement action. As a result, Defendants embarked on another scheme—one designed to artificially inflate the stock price, and allow them to sell millions of dollars of their personal holdings of HIIQ stock. Beginning in late December and continuing in January, Defendants issued a series of statements that falsely attempted to minimize the impact of Simple Health on HIIQ's business, as well as HIIQ's extensive knowledge and involvement in Simple Health's operations. In particular, Defendants claimed that Simple Health accounted for "only" 8.2% of submitted policies through October 2018, when Defendants knew that Simple Health accounted for a substantially larger portion of HIIQ's revenue and profits. In addition, Defendants repeatedly defended the Company's compliance efforts.

134. As a result, HIIQ's stock increased to $40 per share by early February and Defendants took full advantage. Between February 1 and February 13, 2019, Defendant Southwell sold $3.22 million worth of HIIQ common stock. These sales were strategically timed to maximize Southwell's profits, as they were made at prices of up to $40.31 per share, at near-term highs for HIIQ's stock price in mid- and late-February, and before several corrective disclosures sank HIIQ's stock price as low as $23.85 at the end of the Class Period. Southwell's stock sales were also far out of line with his prior trading. Previously, Southwell had never sold *any* shares of HIIQ stock.[15]

---

[15] Based on SEC filings, Southwell's February 2019 sales appear to have represented 13% of his non-derivative HIIQ stock holdings at the time.

135.    Defendant Hershberger also made suspiciously timed HIIQ stock sales that were far out of line with his prior sales.  Between February 1 and February 13, 2019, Hershberger sold over $2 million worth of stock, reducing his holdings of non-derivative HIIQ securities by 56%.  As with Southwell's February 2019 sales of HIIQ stock, Hershberger's large insider sales were made close to a near-term high for HIIQ's stock price.  These trades were also far out of line with Hershberger's prior trading history.  In the 10 months prior to the Class Period, Hershberger had a pattern of selling relatively consistent amounts of HIIQ stock nearly every month (for instance, Hershberger sold stock each month between February 2017 and September 2017).  However, during the Class Period, Hershberger sold HIIQ stock *only* in February 2019, near the near-term peak in HIIQ's artificially inflated stock price.

### 4.    Congress Launched An Investigation Of HIIQ's "Junk Plans"

136.    On March 13, 2019, the U.S. House of Representatives Committee on Energy & Commerce ("House E&C Committee") issued a press release entitled "***E&C Launches Investigation Into Companies That Sell Or Broker Junk Health Insurance Plans***."  The House E&C Committee announced that it was investigating HIIQ and Agile Health Insurance as part of "an investigation into the concerning practices of Short-Term, Limited Duration Insurance (STLDI) health care plans and insurance brokers," *i.e.*, those "that either sell or assist consumers in signing up for these ***junk plans***."  The press release stated that the "Committee's initial examination of these plans has yielded disturbing information" and "we are troubled that consumers who sign up for these plans are being misled about the nature of the coverage they are purchasing."[16]

---

[16] According to HIIQ's 2018 Form 10-K, AgileHealthInsurance.com is HIIQ's "direct-to-consumer insurance website," that "allows consumers to … purchase [individual and family health insurance plans]."

137. A March 13, 2019 press release issued by Congresswoman Dianna DeGette described the insurance policies at issue, stating: "They're called 'junk' health care plans because they don't comply with the [ACA]. They don't provide coverage for prescription drugs or maternity care or people with pre-existing conditions. And while they may be cheaper than more traditional health insurance plans, the coverage they actually provide to consumers is little to none - hence them being called 'junk.'" A March 13, 2019 article by *Healthcare Dive* noted that Simple Health "exemplif[ied]" Congressional concerns "after selling what the Federal Trade Commission deemed 'worthless' plans to thousands of patients, leaving them saddled with major medical expenses." *Healthcare Dive* additionally stated that Congress was looking into, among other things, "what percentage of applicants are denied coverage and why, how the plans are marketed, [and] how much commission agencies and brokers are paid."

138. As a result of the news regarding the House E&C Committee's investigation, HIIQ's stock price declined by $6.62, or 17.2%, to close at $31.77 on March 13, 2019, on unusually high trading volume of nearly 5 million shares—approximately eight times the average trading volume over the prior year. The decline eliminated over $82 million in shareholder value.

139. Analyst and media reports easily connected HIIQ's stock price decline to the news of the Congressional investigation. For example, CNBC stated that "[s]hares of … Health Insurance Innovations—dropped sharply after the news" of the investigation. A report issued by securities analysts at Canaccord Genuity stated: "Shares of HIIQ are trading off ~20% on a tweet… reporting that the U.S. House of Representatives is expected to open an investigation into short-term medical (STM) insurance. The tweet further stated that companies are misleading consumers and insinuated that they are siphoning consumers away

57

from the more comprehensive but more expensive ACA market."

### 5. Court Filings In The FTC Action Revealed HIIQ's Intimate Knowledge Of The Deceptive Sales Practices

140. On March 25, 2019, a voluminous filing by Steven Dorfman in the FTC action revealed substantial evidence of HIIQ's extensive involvement in Simple Health's business and Defendants' awareness of Simple Health's fraudulent activities. Dorfman stated that HIIQ *"regularly audited [Simple Health]'s employee training and sales and verification processes"* and that HIIQ *"verified that [Simple Health] trains its employees using materials provided by HII and insurers."*

141. The filing included copies of multiple reports documenting HIIQ *"site visits"* at Simple Health from 2015 through August 31, 2018. The "site visit" documents showed that HIIQ *"examin[ed] … [Simple Health's] sales verifications, sales productions, consumer complaints and consumer escalations,* for the period January 1, 2017 to May 31, 2018," among others. The documents detailed how, as part of the site visits, HIIQ reviewed "complaints and escalations data," "BBB Consumer complaints," and "DOI inquiries," and obtained a thorough "understanding of the organization['s] current sales practices and … how compliance responsibilities are carried out." The audit documents showed that HIIQ was closely monitoring "the various ways that complaints come into HII," including "DOI, BBB and Non-Regulatory Complaints."

142. The Company documents also showed that HIIQ had additional reporting methods and systems available to remain constantly vigilant over Simple Health's deceptive sales practices. As the "site visits" stated, customer sales call "[v]erifications are saved and stored to [HIIQ's] server, [t]hen, uploaded to HII's FTP site"; Simple Health's customer "[c]alls are reviewed daily by [HIIQ's] quality assurance department"; "[o]nce a call is

received, the customer service representative addresses any questions or concerns" and "notates[,] if applicable, in HII's Retention Queue"; and Simple Health "conduct[ed] secret shopping of [its] own agents and ke[pt] a log." The reports underscored that Simple Health's compliance department *is always in constant contact with HII[Q]'s compliance department.*"

143. Next, the reports revealed Simple Health's policy of boosting sales and preventing cancellations by making it difficult for customers to learn the terms of the insurance policies they had purchased, stating that Simple Health "does not provide members with any product information by means of email or text." One HIIQ audit specifically noted Simple Health's pitch of "a PPO group plan" as "misleading." As Dorfman's filings underscored, HIIQ was well-aware of Simple Health's conduct and policies in sales calls, as Simple Health's script "was periodically reviewed by HII" and "[e]ach [Simple Health] representative takes on a daily basis an average of approximately 40-60 calls per day and all calls are logged in their CRM system as well as HII's Back Office (A.R.I.E.S.)."

144. Critically, the site visits were designed "to monitor agent performance and *protect business.*" As the March 25, 2019 filing shows, rather than reflecting any critical review of Simple Health's (mis)conduct, the *pro forma* reports did little more than parrot and outright copy the representations that Simple Health made to HIIQ about its own practices, with little if any independent analysis by HIIQ.

145. Following the revelations of HIIQ's years-long involvement in Simple Health's business practices via "site visits," HIIQ's stock price fell 7.4% on March 26, 2019, on elevated trading volume, wiping out over $32 million in shareholder value.

59

### 6.  A Court-Appointed Receiver Concluded That Simple Health's Business Was "A Classic Bait-And-Switch Scam" And "Never Legally Viable"

146.    On April 12, 2019, Michael I. Goldberg (the "Receiver"), the court-appointed Receiver over Simple Health, filed the "Receiver's First Interim Report" ("Receiver's Report") in the FTC enforcement action—the result of over five months of investigation.  The Receiver's Report stated that the "Receiver and his professionals have spent a great deal of time analyzing [Simple Health]'s business practices in an effort to determine if the allegations made by the FTC are accurate.  ***In short, the FTC is correct.  [Simple Health's] business model is largely a classic bait-and-switch scam*** whereby unwitting consumers are falsely led to believe that they are purchasing a Preferred Provider Organization medical insurance policy ('PPO') that is compliant with the Affordable Care Act ('ACA'), but in reality are sold limited benefit indemnity plans that are not compliant with the ACA."

147.    Over the course of the 229-page Receiver's Report (including exhibits), the Receiver chronicled the various tools of deception that Simple Health systematically utilized to "scam" people looking to buy legitimate comprehensive health insurance, including deceptive sales scripts, "deceptive search words direct[ing] customers" to Simple Health, and websites that "build on the fraud."

148.    The Receiver's Report first found that the sales script used by Simple Health was "designed to lead the customer into believing they are buying traditional major medical insurance coverage as opposed to a limited benefit plan."  The report stated that the "script is also deceptive because it is designed to lead the customer into believing that the company is actually shopping for the most suitable insurance plan to meet the customer's specific needs," adding that "[i]n reality… the sales person already knows what plan he or she is attempting to

sell the customer from the beginning of the call regardless of the customer's best interest." The Receiver noted that the "script also contains **outright lies** about the type of benefits the customer will get if he or she purchases the plan." For example, the script states "we want to find you a PPO, that way you can keep your own doctors and hospitals. I want to get you prescription coverage and lab coverage for your preventative care and maintenance…" The Receiver's Report added that "[i]n reality, the plans sold are not traditional medical insurance at all and offer very few of the benefits of traditional comprehensive health insurance that the customer is led to believe they are purchasing."

149. The Receiver's Report similarly found that Simple Health's verification process and use of a "Post Close" sales script were deceptive. The Receiver stated that the "**verification process is also designed to defraud the customer by attempting to disclaim everything the customer was just led to believe in making their decision to purchase**." The Receiver noted that the "Post Close script is designed, in part, to desensitize the customer to the upcoming verification process, which process is purposely designed to attempt to 'walk back' and negate many of the representations just made to the customer pursuant to the sales script." The Receiver further noted that the sales agents at Simple Health told customers to hold their questions until after the verification process, citing limited "minutes of tape time." The Receiver stated "[s]imply put, this statement is solely designed to attempt to **prevent the customer from asking questions so that a 'clean' recorded verification can be obtained**— even though many statements in the verification script are inconsistent with what the sales person has told the customer in obtaining the sale."

150. The Receiver concluded that Simple Health's "**business cannot be operated legally and/or profitably**" and that the "**business was never legally viable and cannot be viable**

*in the future*." The "business model was largely based on deceiving consumers," which "deception *permeated [Simple Health's] entire business relationship with their customers* from the moment customers conducted Google searches all the way to post-sale customer relations."

151. Significantly, the Receiver noted that after the TRO had been entered in 2018, HIIQ arguably violated it by continuing to collect money from Simple Health's victims. HIIQ then "claimed that it was owed" more than $2.6 million and proceeded to "unilaterally offset this sum from the payments [HIIQ] collected from [Simple Health's] customers subsequent to the receivership." The Receiver added that Simple Health's "relationship with HII was certainly complex" and that HIIQ had paid Simple Health approximately *$180 million* in commissions in *fewer than five years.*

152. Finally, the Receiver's Report noted that because many of HIIQ's/Simple Health's customers "are not yet aware that they have been deceived," it had been suggested to HIIQ that it should "provide notice to customers of this potential issue with their insurance." As the Receiver noted, however, "HII has not yet done so."

153. In response to the revelations in the Receiver's Report, HIIQ's stock price declined by 7.6% on April 12, 2019, on unusually high trading volume.

**D.      Post-Class Period Events**

154. On May 14, 2019, the court overseeing the FTC's enforcement action against Simple Health issued an order granting the FTC's preliminary injunction shutting down Simple Health's operations. The court stated that "[t]hrough its evidence, the FTC gives a well-documented account of a classic bait and switch scheme," noting that the FTC established its case through, "approximately 43 exhibits—encompassing over 1000 pages of documents" and

62

live testimony of former Simple Health customers. The court found that "a preliminary injunction is necessary to protect consumers, prevent future violations of the law, protect assets, and to preserve the status quo." The order also permanently appointed Goldberg as the Receiver, granting him "full powers of an equity receiver."

155. On June 13, 2019, the court overseeing the FTC's action against Simple Health issued an order instructing HIIQ to notify Simple Health victims that they were deceptively sold a limited indemnity plan and that they did not have comprehensive health insurance. The court stated that there was "good cause" to believe that due to Simple Health's "deceptive sales practices," many customers that purchased an HIIQ policy "still believe that they purchased comprehensive health insurance or its equivalent." The court also ordered that HIIQ put into escrow all payments made by existing Simple Health customers received by HIIQ after entry of the June 13 order.

156. On June 26, 2019, Massachusetts Superior Court Justice Debra A. Squires-Lee penalized HIIQ's wholly-owned subsidiary, HPIH, for multiple instances of discovery misconduct aimed at avoiding exposure of its fraudulent business practices. Starting in 2016, the Massachusetts Attorney General began investigating HIIQ regarding "the unlawful marketing and sale in Massachusetts of health insurance and discount health plans by HPIH, including, but not limited to, through its agents, NBOA and Health Benefits One, LLC." On March 28, 2019, the Massachusetts Attorney General filed a petition to assess civil penalties against HPIH for its misconduct in attempting to avoid discovery of HPIH's illicit practices, including by "withholding (or destroying) responsive documents," "failing to give adequate testimony under oath," and "failing entirely to appear to give testimony under oath." The June 26, 2019 Order granted the petition based on "egregious" discovery avoidance.

63

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS

157. Defendants made materially false and misleading statements and omitted material facts when speaking to investors during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Among other things:

    i. Defendants represented to investors that HIIQ was "upholding the highest standards" in compliance and had "best-in-class compliance" and "market leading" compliance when, in reality, HIIQ's compliance standards and practices were highly deficient. As numerous former HIIQ employees have confirmed, HIIQ suffered from systemic compliance failures and "endemic" misrepresentations to consumers. Indeed, as the Receiver found, HIIQ's most significant distributor, Simple Health, was a "classic bait and switch scam" where business was "never legally viable" and where "deception permeated the … entire business relationship with the[] customers";

    ii. Defendants represented to investors that HIIQ was "upholding the highest standards" in customer service and had "best-in-class" and "market-leading" customer service when, in reality, the sale of HIIQ's health insurance products was predicated upon deceiving the consumer from the beginning to the end of the sales process, which resulted in thousands upon thousands of undisclosed customer complaints. Moreover, Defendants worked hand-in-hand with HIIQ's distributors to develop and approve misleading "lead generation" websites and sales scripts, and conducted "site visits" which provided Defendants first-hand proof of the fraudulent sales practices, resulting in site visit reports. Defendants received regular reporting of an overwhelming flood of customer complaints

and possessed still further detailed data points, including a "distributor performance scorecard" and a proprietary data management platform known as "A.R.I.E.S.," each of which meticulously documented consumer complaints and indicated that customer satisfaction was exceptionally poor;

iii. Defendants represented to investors that the ratio of HIIQ customer complaints "upheld" by the DOI in a given time period was "0.00%" or "less than 0.01%" of policies in force, when, in reality, (i) Defendants concealed thousands upon thousands of rampant customer complaints that perpetually inundated the Company; (ii) DOIs do not administratively "uphold" complaints for or against a consumer, or for or against a company; (iii) Defendants ignored complaints to the DOI that HIIQ agreed to voluntarily resolve in customers' favor in order to avoid a formal administrative action that could result in suspension or revocation of HIIQ's license; and (iv) Defendants' statements rested on the false premise that most aggrieved consumers know that they can file a complaint with the DOI when in fact the opposite is true;

iv. Defendants represented to investors that HIIQ was "laser focused" on the compliance of its third-party call centers and "continued to facilitate" call center compliance, when, in reality, HIIQ's most significant call center, Simple Health, was a "classic bait and switch scam" and HIIQ's own senior executives internally acknowledged in emails that HIIQ was being "bombarded" with an "out of control" number of complaints about Simple Health. As HIIQ's own documents reveal, HIIQ received thousands and thousands of complaints about Simple Health every year from 2014 through 2018; and

65

v.      Defendants represented to investors that HIIQ's sales were not concentrated in any external call center, including any call center that made up more than 10% of sales in a given period when, in reality, the Company's largest external call center, Simple Health, was responsible for as much as half of the Company's revenues during the Class Period, as determined by securities analysts based on information uncovered in the FTC's enforcement action against Simple Health.

A.      **September 2017 Investor Presentation And Press Release**

158.    The Class Period begins on September 25, 2017, when HIIQ filed an investor presentation with the SEC on Form 8-K. The presentation stated that HIIQ had "Best-in-Class Compliance," which was so strong that it was a "significant barrier to entry" positively distinguishing HIIQ from its current and potential competitors. The presentation asserted that customer complaints to the DOI were "less than 0.01% of [policies in force]" as of June 30, 2017.

159.    The statements identified above in ¶158 were materially false and misleading, and omitted material facts when made. Contrary to Defendants' representations regarding the Company's "Best-in-Class" compliance, HIIQ's compliance standards and practices were weak, deficient, and did not present a barrier to entry to current and potential competitors. As the Receiver found, HIIQ's most significant distributor, Simple Health, was a "classic bait and switch scam" where business was "never legally viable" and where "deception permeated the … entire business relationship with the[] customers." The sale of HIIQ's health insurance products was predicated upon deceiving the consumer from the beginning to the end of the sales process, which resulted in a flood of undisclosed customer complaints. Rather than attempting to resolve legitimate customer complaints, the Company's policy and practice was

66

to rebuff complaints from the moment they were received and, even if escalated, avoid cancelling policies, extending coverage, or otherwise resolving complaints in favor of the consumer. As numerous former HIIQ employees have confirmed, HIIQ suffered from systemic compliance failures and "endemic" misrepresentations to consumers.

160. Defendants' statements regarding the number of consumer complaints to the DOI were highly misleading because the statements (i) concealed the thousands upon thousands of customer complaints that inundated the Company on an annual basis; (ii) created the false impression that virtually 100% of customer complaints were denied by the DOI within the given time period, when the DOI in fact did not make such denials; (iii) ignored complaints that HIIQ agreed to voluntarily resolve in the customer's favor in order to avoid a formal administrative action that could result in suspension or revocation of HIIQ's license; and (iv) rested on the false premise that most aggrieved consumers know that they can file a complaint with the DOI when, in reality, most consumers are unaware they have the right to file a complaint with the DOI.

161. Indeed, at the exact same time HIIQ was telling investors that the Company essentially had no complaints, its own senior officers—including the VP of Operations—were internally acknowledging in emails that HIIQ was being "bombarded" with complaints about Simple Health, and that customer complaints were "out of control." As HIIQ's own documents reveal, HIIQ received thousands and thousands of complaints about Simple Health every year from 2014 through 2018. Moreover, Defendants worked hand-in-hand with HIIQ's distributors to develop and approve misleading sales tactics, and conducted "site visits" which provided Defendants first-hand proof of the fraudulent sales practices, resulting in site visit reports. Defendants possessed still further detailed data points, including a "distributor

scorecard" or "distributor performance scorecard" and a proprietary data management platform known as "A.R.I.E.S.," each of which meticulously documented consumer complaints and indicated that customer satisfaction was exceptionally poor. The reference to "policies in force" is also misleading because it does not account for complaints about policies that were cancelled prior to the end of the referenced business cycle, including policies that were cancelled because customers complained they had been misled into purchasing them.

162. On September 27, 2017, HIIQ published a press release entitled "Health Insurance Innovations, Inc. Highlights Strength of Business." Purporting to provide an update regarding regulatory matters, Defendant Southwell represented in the press release that HIIQ had "unparalleled customer service."

163. The statement identified above in ¶162 was materially false and misleading, and omitted material facts when made for the reasons set forth above in ¶¶159-61. In addition, in contrast to Defendant Southwell's statement that HIIQ had "unparalleled customer service," HIIQ's customer service profile was poor and characterized by inherently deceptive sales practices, and thousands of customer complaints that HIIQ and its agents intentionally deceived HIIQ's customers. Defendants also had extensive documentation disproving Southwell's claim of "unparalleled customer service."

**B.      November 2017 Press Release, Conference Call, And Investor Presentation**

164. On November 1, 2017, Defendants published a press release, which was also filed with the SEC on a Form 8-K signed by Defendant Hershberger. The press release promoted HIIQ's purported "compliance metrics and benchmarks," highlighting HIIQ's "secret shopping" of its external call centers, which Defendants stated "ensure[d] adherence to HIIQ's best-in-class process and procedures." Defendants assured investors that HIIQ

"measures key metrics such as member complaints, escalations and chargebacks monthly," "[i]n 2016, the Company terminated two distributors for not meeting compliance metrics and benchmarks," and "HIIQ … continues to enforce the Company's policies and procedures with third-party distributors."

165. The November 1, 2017 press release further asserted that the Company's "investment in compliance has generated a measuredly stronger customer experience," and that "[c]omplaints, specific to HIIQ, upheld by the Department of Insurance as a percentage of policies in force [were] 0.00% in Q3 2017, down from 0.01% in Q3 2016. Additionally, HIIQ-specific Better Business Bureau complaints have reduced by 90% since Q1 2016. In Q3 2017, HIIQ-specific complaints were effectively 0.00% of policies in force."

166. On November 2, 2017, HIIQ held an investor conference call, in which Defendants Southwell and Hershberger participated. During the call, Southwell attributed the Company's "record performance" to HIIQ's "proven strategy" of "focus[ing] on efficiently providing … consumers … insurance that meets their needs" through the "compliance of [its] third-party licensed agent call centers" and "laser focus[] on [its] best-in-class customer service." Southwell represented that HIIQ "continued to facilitate our third-party distributors' compliance and improved our customer service, all while setting records for meeting our customers' needs for exceptional value health insurance," and noted that "[t]hird-party licensed agent call centers continued to be the growth leader this quarter." Defendant Southwell stated that the Company's "technology holds [HIIQ's] distributors to our compliance standards throughout the process, and as part of the sales process, the consumer goes through a third-party verification process, either digitally or a recorded, affirmative call, confirming the insurance product is what the consumer expected." Southwell underscored that HIIQ was

69

"upholding the highest standards in customer service and compliance."

167. During the November 2, 2017 investor conference call, Defendant Southwell represented that the Company's "investment in compliance has generated a measurably stronger customer experience," noting that "Department of Insurance upheld complaints as a percentage of policies [were] 0.00% in the third quarter of 2017, down from 0.01% in the third quarter of 2016. Additionally, HIIQ-specific Better Business Bureau complaints have reduced by 90% since the first quarter of 2016. In Q3 2017, HIIQ-specific complaints were effectively 0.00% of policies in force."

168. During the call, a securities analyst at Lake Street Capital Markets asked whether HIIQ had any concentration issues, such as any distributors that are more than 10% of sales. Defendant Southwell responded that "in 2016, we terminated two large distributors, which was about 16% of sales. And what I can confirm is that we don't have any third-party distribution as large as the guys we … terminated back in 2016."

169. The statements identified above in ¶¶164-67 regarding the Company's compliance and customer service were materially false and misleading, and omitted material facts when made for the reasons set forth above in ¶¶159-61. Defendants' statements on November 1 and 2, 2017, regarding the number of consumer complaints that were upheld by the DOI were false and misleading and omitted material facts when made for the reasons set forth in above in ¶¶160-61. Indeed, in reality, such complaints were "*out of control*" as the Company was being "*bombarded*" with complaints from defrauded customers. In addition, DOIs do not administratively "uphold" complaints for or against a consumer, or for or against a company. In cases where a consumer complaint is found to be substantiated, DOI staff ordinarily recommends corrective actions to address each consumer complaint, which are

70

accepted by the company voluntarily in the vast majority of cases to avoid a formal administrative action that could result in suspension or revocation of its license. In cases where a consumer complaint is found to be unsubstantiated or baseless, the DOI does not recommend corrective action or make any formal administrative decision. Furthermore, most consumers are unaware they have the right to file a complaint with the DOI. Defendants' reference to "HIIQ-specific complaints" is similarly misleading because it implies that consumer complaints about HIIQ's products were made only to HIIQ or explicitly referenced HIIQ, when, in reality, complaints were often made to or regarding the HIIQ brokers that deceptively sold HIIQ's products.

170. Defendants' statements on November 1 and 2, 2017, regarding the compliance of the Company's third-party distributors were false and misleading and omitted material facts when made for the same reasons set forth above concerning HIIQ's statements about its own compliance and customer service. In reality, HIIQ's most significant distributor, Simple Health, was a "classic bait and switch scam" where business was "never legally viable" and where "deception permeated the … entire business relationship with the[] customers." In addition, rather than being "laser focused" on the "compliance of our third-party licensed agent call centers," HIIQ knew of, supported, and participated in distributors' undisclosed and deceptive sales practices. Defendant Southwell's statements that HIIQ "continued to facilitate our third-party distributors' compliance" and that the Company's "technology holds [HIIQ's] distributors to our compliance standards throughout the process" were false and highly misleading because the Company did not, in fact, enforce critical compliance policies and procedures with respect to certain large third-party brokers, such as Simple Health. Defendants' statements assuring investors that HIIQ's sales were not concentrated in any

71

external broker were also false and misleading. Contrary to Southwell's assertion that the Company did not have "any third-party distribution as large as the guys we… terminated back in 2016" (*see* ¶168) the Company's largest external broker, Simple Health, was responsible for as much as half of the Company's revenues, as determined by securities analysts based on information uncovered in the FTC's enforcement action. Defendants' statements purporting to use BBB data as a comparable measure of insurer complaint activity were false and misleading because (i) the BBB does not have the insurance expertise to assess the basis of insurance complaints; and (ii) Simple Health attempted to manipulate the BBB rating system, including by submitting false reviews.

171. Defendants' statements on November 1 and 2, 2017 that the Company's "record performance" was due to HIIQ's "proven strategy" of "focus[ing] on efficiently providing … consumers … insurance that meets their needs" through the "compliance of [its] third-party licensed agent call centers" and that Defendants had a "laser focus[] on [HIIQ's] best-in-class customer service" while HIIQ "continued to facilitate our third-party distributors' compliance and improved our customer service, all while setting records for meeting our customers' needs for exceptional value health insurance," were false and misleading and omitted material information when made for the reasons set forth in ¶¶159-61 above. In addition, Defendants concealed the fact that the Company's financial performance largely depended on Simple Health, whose business according to the court-appointed Receiver in the FTC action was "never legally viable and cannot be viable in the future," as "deception permeated the … entire business relationship with … customers."

172. On November 8, 2017, HIIQ published an investor presentation on the Company's website. The presentation stated that HIIQ had "Best-in-Class

72

Compliance," which was so strong that it was a "significant barrier to entry" positively distinguishing HIIQ from its current and potential competitors. The presentation asserted that customer complaints "upheld" by the DOI were "0.00% of [policies in force]," as of September 30, 2017.

173. The statements identified above in ¶172 were materially false and misleading, and omitted material facts when made for the reasons set forth in ¶¶159-61, 169.

**C. December 2017 Press Release**

174. On December 15, 2017, HIIQ filed a current report with the SEC on Form 8-K, which was signed by Defendant Hershberger. The Form 8-K included a press release, also issued on December 15, 2017, announcing the Board's formation of a new Risk and Compliance Committee. HIIQ asserted that the Risk and Compliance Committee "will further strengthen" the Company's "market-leading compliance and customer service." Paul G. Gabos, Chairman of HIIQ's Board of Directors, is quoted in the press release as stating that HIIQ "uphold[s] the highest standards in customer service and compliance."

175. The statements identified above in ¶174 were materially false and misleading, and omitted material facts when made for the reasons set forth above in ¶¶159-61. In addition, the Company's formation of a new Risk and Compliance Committee at the board level was insufficient to address HIIQ's undisclosed compliance problems, which were systemic and pervasive within the Company and across its call centers. The statements that the creation of this committee "will further strengthen" the Company's "market-leading compliance and customer service" and that HIIQ "uphold[s] the highest standards in customer service and compliance" were false and misleading because HIIQ's compliance and customer service were neither "market-leading" nor subject to the "highest standards." To the contrary, a substantial

portion of the Company's revenues were the direct product of fraud.

**D.      March 2018 Investor Conference Call And Presentation**

176.     On March 1, 2018, HIIQ held an investor conference call, in which Defendants Southwell and Hershberger participated.  During the call, Southwell stated that HIIQ's "third-party licensed agent call centers drove the year-over-year increases" in HIIQ's business, and that HIIQ had "improv[ed] compliance" and "improved all aspects of customer service, with less than 0.01% DOI complaint ratio."  Southwell underscored that "we are laser focused on our best-in-class customer service," adding that HIIQ was even a "a consumer advocate." Southwell stated: "Insurance is built on data.  Data is objective and measurable.  And every data point indicates that our customer satisfaction is market-leading."  In response to a question from a securities analyst at Canaccord Genuity regarding compliance, Southwell acknowledged that "people are interested in what we're doing around our compliance areas," and assured investors that HIIQ had an "incredibly strong" and "market-leading" "control environment," and "high levels of consumer satisfaction."

177.     In response to a question from a securities analyst at Northland Capital Markets, Southwell represented that, if there are "too many calls to customer service, not even cancellations," due to a call center's conduct, HIIQ would "turn off the links" to HIIQ's products "in order to be able to maintain such a high level of customer satisfaction." Defendant Hershberger referenced HIIQ's "best-in-class customer service and scalability, driven by our technology platform."

178.     The statements identified above in ¶¶176-77 were materially false and misleading, and omitted material facts when made for the reasons set forth above in ¶¶159-61, 171.  Southwell's statement that HIIQ would "turn off the links" if there were "too many calls

74

to customer service, not even cancellations" regarding new distributors was also false and misleading and omitted material facts because the Company did not, in fact, enforce critical compliance policies and procedures with respect to certain large third-party brokers, such as Simple Health.

179.     On March 13, 2018, HIIQ published an investor presentation on the Company's website.  The presentation stated that HIIQ had "Best-in-Class Compliance," which was so strong that it was a "significant barrier to entry" positively distinguishing HIIQ from its current and potential competitors.  The presentation asserted that customer complaints "upheld" by the DOI were "0.00% of [policies in force]," as of December 31, 2017.

180.     The statements identified above in ¶179 were materially false and misleading, and omitted material facts when made for the reasons set forth above in ¶¶159-61, 169.

**E.     May 2018 Investor Conference Call And Presentation**

181.     On May 3, 2018, HIIQ held an investor conference call to discuss recent Company performance, in which Defendants Southwell and Hershberger participated.  During the call, Southwell stated that HIIQ had "outstanding compliance performance" and "highly compliant third-party call center[s]."  Defendant Southwell stated that in a comparison between HIIQ and three of the largest ACA carriers, "complaints are significantly higher at the ACA carriers than here at HIIQ."  Southwell underscored that "[c]omparing the number of complaints versus the number of policies, the ACA carriers have 14x higher, 22x higher and 37x higher.  Or to put it another way, their complaints are 1,400%, 2,200% and 3,700% higher than here at HIIQ.  This theme is not just for larger carriers, there are many, many examples."

182.     During the May 3, 2018 investor conference, Defendant Southwell emphasized that the comparison between HIIQ and large ACA carriers was "clearly, and beyond any doubt,

75

measurable evidence of our outstanding compliance controls," stating:

> We have also identified that some ACA carriers have seen a large increase in complaints from 2016 to 2017. Whilst here at HIIQ, we have seen our complaints plummet 56% over the same period, as a direct result of continued investment in resource and technology. This outstanding compliance performance at HIIQ continues in 2018 with only 6 Department of Insurance complaints in the entire first quarter of 2018, including 0 complaints across all of the U.S. in February 2018, and out of a grand total of 6, there was a total of 1, DUI complaint upheld against the company, and this was relating to a refund that wasn't processed correctly.
>
> ….
>
> We continue to add resource to the compliance team and enhance our controls with the development and implementation of a new verification system to ensure 100% recording compliance and increased third-party site visits, secret shopping and product training webinars. And this has resulted in a level of compliance, which we believe leads our market. We feel this independent third-party data from the Department of Insurance and NAIC or National Association of Insurance Commissioners shows clearly, and beyond any doubt, measurable evidence of our outstanding compliance controls.

183. In response to a securities analyst's question regarding HIIQ's performance compared to ACA carriers and where investors can find the data previously cited by HIIQ, Defendant Southwell stated:

> So the National Association of Insurance Commissioners has a section, where they kind of aggregate together all of the Department of Insurance complaints. So there is publicly available information. People can go on and find this. And yes, I think it's really just a fantastic illustration. We are not going to -- we don't need to kind of defend this business anymore around sort of regulatory compliance. We have proven beyond any reasonable doubt according to independent third-party data that we are outstanding at compliance because we have invested in it in terms of resource, controls and look at the comparisons. I mean, we're not just 10% or 20%. We are 3,700% better than some of larger ACA carriers.

184. The statements identified above in ¶¶181-83 were materially false and misleading, and omitted material facts when made for the reasons set forth in ¶¶159-61, 169. In addition, Defendants' statements regarding HIIQ's "highly compliant third-party call center[s]" were false and misleading for the same reasons set forth above concerning HIIQ's statements about its own compliance and customer service.

76

185.    On May 8, 2018, HIIQ published an investor presentation on the Company's website.  The presentation stated that HIIQ had "Best-in-Class Compliance," which was so strong that it was a "significant barrier to entry" positively distinguishing HIIQ from its current and potential competitors.  The presentation asserted that customer complaints "upheld" by the DOI were "0.01% of [policies in force]," as of March 31, 2018.

186.    The statements identified above in ¶185 were materially false and misleading, and omitted material facts when made for the reasons set forth in ¶¶159-61, 169.

**F.    August 2018 Investor Conference Call And Presentation**

187.    On August 2, 2018, HIIQ held an investor conference call to discuss recent Company performance.  During the call, Defendant Southwell touted HIIQ's "record" revenue and earnings in the second quarter, as well as its "outstanding" compliance and "incredibly low" number of customer complaints, stating:

> We are committed to the highest standards in compliance and customer service, and maintaining a high level of consumer satisfaction.  We have previously released data to showcase our outstanding compliance performance, and I would like to provide a further update to reinforce our position as the market leader for consumer satisfaction and best practice compliance.  Previously, we talked about how, from 2016 to 2017, our Department of Insurance complaints plummeted 56% year-over-year, whilst ACA carriers often saw large increases in complaints over the same period.  We also explained how our Department of Insurance complaints versus a number of policies were dramatically lower than the main ACA carriers; in some cases 14x, 22x, or even 37x lower than an ACA carrier.
>
> I am pleased to update that in 2018, we continue to improve even further still, with a comparison of the first half of 2018 versus the first half of 2017 seeing a drop of another 45%, which is from 22 complaints to only 12.  Importantly, out of those 12 complaints, only 3 were upheld, a fantastic achievement for a business with a record 390,000 policies in force and over a million people covered.
>
> Although it is nearly impossible to improve on these statistics, as the numbers are so incredibly low, we continually are looking for ways to keep enhancing our control environment. And in the second quarter, we invested in a new software to enhance our call screening capabilities, further evidence of our continued investment in ensuring the consumer is always treated fairly and we are meeting their demands and needs.

77

188. In response to a question from a securities analyst from Canaccord Genuity regarding negative sentiment in the media regarding the quality of short-term health insurance and the "true story" about whether HIIQ's products were "decent products" and not "skimpy insurance," Defendant Southwell dispelled any notion that HIIQ's products were not of high quality and that its consumers were not highly satisfied. Specifically, Southwell stated that "people who are attacking this, they're not attacking it based on any data or any facts" and that "for us, educating the consumer is important… If we have an absolutely tiny, tiny number of complaints and we have high consumer satisfaction, it means we have distribut[ors] who are very good at explaining these products."

189. The statements identified above in ¶¶187-88 regarding the Company's compliance and customer service were materially false and misleading, and omitted material facts when made for the reasons set forth in ¶¶159-61. Defendants' statements regarding the compliance of the Company's third-party distributors were false and misleading for the same reasons set forth above concerning HIIQ's statements about its own compliance and customer service. Contrary to Southwell's assertions that the Company had "distribution who are very good at explaining these products," and that distributors were "historically" not built into guidance until they pass "our compliance metrics," many of HIIQ's distributors engaged in a host of undisclosed and deceptive sales practices, such as misrepresenting the nature, terms, and coverage of HIIQ products. This included Simple Health, the Company's largest distributor for much of the Class Period, which was a "classic bait and switch scam" where business was "never legally viable" and where "deception permeated the … entire business relationship with the[] customers."

190. On August 31, 2018, HIIQ published an investor presentation on the

78

Company's website. The presentation stated that HIIQ had "Best-in-Class Compliance," which was so strong that it was a "significant barrier to entry" positively distinguishing HIIQ from its current and potential competitors. The presentation asserted that customer complaints "upheld" by the DOI were "0.01% of [policies in force]," as of June 30, 2018.

191. The statements identified above in ¶190 were materially false and misleading, and omitted material facts when made for the reasons set forth in ¶¶159-61, 169.

G. October 2018 Investor Conference Call

192. On October 30, 2018, HIIQ held an investor conference call to discuss recent Company performance. During the investor call, Defendant Southwell touted HIIQ's "record revenue," and stated that HIIQ's "offering is built around our ability to be laser focused on the consumer and that is built on the vast amount of data we have access to, our technology, our customer experience and … compliance." Southwell stated that the "strength of this business is the data we have access to, our technology, our customer experience, and our compliance," and that "[w]e work with leading third-party distributors to ensure that the consumers are offered a product which is right for them and meet their demands and needs. And this is evident clearly by the fact our products are lasting longer and our customer satisfaction is market leading… I want investors to have all the facts." Defendant Hershberger promoted HIIQ's purportedly "rigorous compliance standards." Defendant Southwell stated HIIQ had a "very happy consumer base," "very low number of complaints," and "very high number customer satisfaction." Hershberger assured investors that the Company was "laser focused" on "training and compliance especially."

193. The statements identified above in ¶192 were materially false and misleading, and omitted material facts when made for the reasons set forth in ¶¶159-61, 171.

79

**H.      November 2018 And December 2018 Press Releases**

194.    On November 2, 2018, the FTC published a press release announcing the commencement of an enforcement action against Simple Health and Dorfman. That same day, HIIQ published its own press release attempting to minimize the Company's relationship with Simple Health and Dorfman. The press release reassured investors that:

> HIIQ maintains an active internal compliance team and works closely with state insurance agencies. The company has relationships with over 100 independent insurance sales agencies, many of whom sell products for many different carriers, and HIIQ closely monitors all sales of HIIQ products by each agency. For 2018 to date, Simple Health was the agency of record for less than 10% of HIIQ's submitted policies.

195.    On December 20, 2018, HIIQ issued another press release attempting to downplay the Company's relationship with Simple Health and Dorfman. The December 20, 2018 press release stated that Simple Health and "all downlines and affiliates … represented only 8% of submitted policies year to-date through the date of their termination."

196.    The statements identified above in ¶¶194-95 were materially misleading and omitted material facts when made. Contrary to Defendants' attempt to minimize the significance of the Company's relationship to Simple Health and Dorfman, Simple Health and the other Dorfman Entities were responsible for as much as half of HIIQ's revenues, as determined by securities analysts based on information uncovered in the FTC's enforcement action. Even after the FTC shut down the Dorfman Entities, they continued to comprise a larger percentage of HIIQ's business than HIIQ represented, namely, over 20% of HIIQ's revenues for 2018. Defendants' statements attempting to minimize the significance of the Company's relationship to Simple Health and Dorfman further misled investors because Defendants omitted to mention the close ties and significant history between the parties, including working together to develop, finance, and implement the deceptive sales practices.

## I.   December 2018 Investor Presentation

197.   On December 20, 2018, HIIQ published a presentation on the Company's website in connection with HIIQ's Analyst and Investor Day.   In a section entitled "Compliance & Customer Experience: A Long-Term Focus," the presentation highlighted a purported "HIIQ Regulatory Complaint Reduction" and provided statistics regarding the number of complaints to the DOI and BBB.   Specifically, the presentation stated "DOI's Reduced 46% 2017 to 2018," and "BBB's Reduced 39% 2017 to 2018."   Additionally, the presentation stated that the Company had "0 Total HIIQ DOI (0.000%)" and "0 Upheld HIIQ DOI (0.000%)" complaints in November 2018.   The presentation also stated that total DOI complaints fell from 28 complaints against HIIQ in 2017 to 15 complaints in 2018, and total upheld DOI complaints fell from 4 in 2017 to 3 in 2018.

198.   The presentation attempted to minimize the importance of Simple Health and Dorfman's business to HIIQ, stating that "Health Benefit One (Simple / Dorfman) was 8.2% of submitted [policies] YTD through October" and had "[n]o material impact in Q4."

199.   The statements identified above in ¶¶197-98 were materially misleading and omitted material facts when made.   Defendants' statements regarding the Company's compliance and customer service were false and misleading for the reasons set forth in ¶¶159-61, 169.   Defendants' statements purporting to use BBB data as a comparable measure of insurer complaint activity were false and misleading for the reasons set forth in ¶170. Defendants' statements attempting to minimize the significance of the Company's relationship to Simple Health and Dorfman were false and misleading for the reasons set forth in ¶196.

81

**J.      January 2019 Investor Presentation**

200.    On January 7, 2019, HIIQ filed a current report with the SEC on Form 8-K, which was signed by Defendant Hershberger.  The Form 8-K included an HIIQ "Investor Presentation."   The investor presentation stated that "Health Benefit One was 8.2% of submitted apps through October 2018" and purported to describe "Compliance & Customer Experience By The Numbers," by stating that "[c]omplaints are down."  The presentation stated that "Upheld Department of Insurance (DOI) Complaints Reduced YOY," noting that there were 4 "Upheld" DOI complaints in 2017 and 3 "Upheld" DOI complaints in 2018.

201.    The statements identified above in ¶200 regarding the Company's compliance and customer service were materially false and misleading and omitted material facts when made for the reasons set forth in ¶¶159-61, 169.  Defendants' statements attempting to minimize the significance of the Company's relationship to Simple Health and Dorfman were materially false and misleading and omitted material facts when made for the reasons set forth in ¶196.

**K.      March 2019 Investor Conference Call**

202.    On March 6, 2019, HIIQ held an investor conference call to discuss recent Company performance, in which Defendants Southwell and Hershberger participated.  During the call, Southwell stated that the Company had made "advancements … under [his] guidance … particularly in the compliance division," emphasizing that the Company had purportedly "prioritized" HIIQ's "foundation of compliance … since I became its President and CEO" and "in the last few years, we spent a tremendous amount of time, energy and investments to create best-in-class compliance, customer care, distribution and human capital."  Southwell added that "[t]he strength of this business is the data we have access to, our technology, our customer

82

experience and our compliance."

203. The statements identified above ¶202 were materially misleading and omitted material facts when made for the reasons set forth in ¶¶159-61.

## VI. ADDITIONAL SCIENTER ALLEGATIONS

204. Numerous facts raise a strong inference that Defendants knew or were severely reckless in disregarding the true facts concerning HIIQ's materially false and misleading statements listed above. These facts include, in addition to the allegations set forth above, the following significant facts that were well-known to Defendants throughout the Class Period.

205. HIIQ was intimately involved in every significant aspect of Simple Health's operations. Since 2013 and throughout the Class Period, HIIQ was deeply involved in Simple Health's operations. HIIQ loaned Simple Health tens of millions of dollars in working capital that allowed Simple Health to grow and carry out its fraudulent scheme. HIIQ also co-founded with Simple Health, and provided funding to, SIL, the entity responsible for Simple Health's misleading "lead generation" websites used to lure customers looking for ACA compliant plans into purchasing non-ACA compliant HIIQ products. HIIQ then recruited and trained Simple Health's sales agents.

206. As Simple Health's CEO confirmed, HIIIQ also maintained continuous oversight of Simple Health through regular audits of Simple Health's business before and during the Class Period. These audits included "site visits" and a review of "complaints and escalations data," "BBB Consumer complaints," and "DOI inquiries." The audits stated that Simple Health's customer "[c]alls are reviewed daily by [HIIQ's] quality assurance department" and that Simple Health's compliance department "is always in constant contact with HII's compliance department." The relationship between HIIQ and Simple Health was

83

so close that until March 2015, HIIQ reported Simple Health as a related party in its SEC filings.

207.    Specific internal HIIQ documents reveal that HIIQ's executives were aware of "widespread" and "out of control" customer deception at HIIQ distributors.    Internal emails among and between HIIQ executives summarized HIIQ's knowledge of the rampant misconduct at HIIQ's sales brokers, including Simple Health. *See* ¶¶109-10, 114.  Indeed, just one month into the Class Period, in October 2017, HIIQ executives discussed "*widespread*" and "*out of control*" misrepresentations by Simple Health causing customer service agents to be "*bombarded*" with customer complaints.

208.    Now-public internal HIIQ emails reveal that HIIQ was not only aware of Simple Health's rampant sales misconduct during the Class Period, but had been for years.  A March 12, 2016 email from Girouard to Dorfman stated that HIIQ's Compliance department was "secret shopping" Simple Health multiple times per day and Girouard "got [her] ass chewed for 4 hours by [HIIQ Compliance Manager Amy Brady] yesterday," whom Girouard had "never heard … curse so much."  Girouard stated, however, that despite HIIQ knowing of Simple Health's compliance failures at the time, HIIQ nonetheless authorized Simple Health to "post close however we want" with customers.

209.    HIIQ's internal reporting mechanisms provided executives with frequent and up-to-date reports documenting that HIIQ was receiving an overwhelming number of customer complaints.    As described above, HIIQ systematically documented all relevant customer complaints regarding broker deception, including in the Company's proprietary A.R.I.E.S. software platform, and Defendants received regular daily and weekly reports detailing the customer complaints.  ¶¶96-100.  In addition, HIIQ's own internal documentation, which it

provided to the FTC, shows that Defendants were well aware of the **thousands** of complaint escalations that HIIQ received regarding Simple Health for each year between 2014 to 2018, with most customers complaining that sales agents misrepresented HIIQ's products. HIIQ's data showed that the number of escalations HIIQ processed regarding Simple Health rose sharply in 2016 and 2017. HIIQ categorized these escalations based on their nature and the vast majority of escalations concerned misrepresentations by brokers.

210. The sheer duration of Simple Health's fraudulent scheme makes it inconceivable that Defendants were not aware of the deceptive practices. According to the FTC, Simple Health has been using deceptive sales practices since "at least October 2013," the same month that HIIQ and Simple Health formed SIL. Given HIIQ's intimate relationship with Simple Health and the fact that Simple Health's fraudulent conduct went on for over five years, it is inconceivable that Defendants were unaware of the fraud.

211. Securities analysts recognized that Defendants' misrepresentations were knowingly made. As securities analysts and the media have noted, the extensive public record shows that HIIQ was well aware of Simple Health's misconduct for years. On April 9, 2019, securities research firm The Capitol Forum published a report entitled "Health Insurance Innovations: Evidence Submitted in Support of Preliminary Injunction Suggests that the Company Knew of Problematic Sales Practices by Dorfman Entities as Early as 2014." The report noted that the "evidence submitted [by the FTC] indicates that Health Insurance Innovations (HIIQ) was aware of problematic sales practices by the Dorfman entities since at least 2014. Despite this knowledge, Heath Insurance Innovations continued to allow the Dorfman entities to sell policies for the benefit of Health Insurance Innovations." The report also noted that the FTC's filing included HIIQ's data showing that HIIQ received "over 5,000

85

complaints about [Simple Health] between 2014 and 2018," with the "most common complaint" being "agent misrepresentation."

212.    In addition to discussing evidence showing that HIIQ was aware of Dorfman's deceptive practices, the report stated that HIIQ misled investors regarding the Company's legal compliance and customer satisfaction.  Specifically, the report pointed to statements by Defendant Southwell discussing "the investment in compliance and reduction in complaints against the company" and asserting that HIIQ had "0.01%" and "0.00%" complaint rates with the DOI, and "reduced" complaints with the Better Business Bureau.  The report concluded that "it is not clear how these statements reconcile" with reality.

213.    On April 10, 2019, securities analysts at Aurelius Value issued a report entitled "HIIQ: The Big Deception."  After reviewing revelations by the FTC, the report concluded that "[w]e believe HIIQ management has made a series of misleading statements that conceal thousands of customer complaints that have not been disclosed to investors," and that "HIIQ management is misleading investors about the true nature of its business."

214.    The report highlighted that, contrary to the "thousands of customer complaints" HIIQ received, HIIQ management nonetheless "has consistently made statements to investors suggesting that HIIQ has received virtually no customer complaints and has 'market leading customer satisfaction.'"  The report specifically highlighted the following statements as particularly misleading: (1) in November 2017, Defendant Southwell stated that "HIIQ-specific complaints were effectively 0.00% of policies in force" during the quarter; (2) in August 2018, "Southwell again referenced 'an absolutely tiny, tiny number of complaints' and stated that 'people who are attacking this, they're not attacking it based on any data or facts'"; (3) in October 2018, "Southwell again touted that 'we can show them [regulators] a very happy

86

customer base, we can show them a very low number of complaints.'" As Aurelius Value pointed out, "[b]y adding qualifiers when referring to complaint data such as 'HIIQ-specific' or 'Department of Insurance,' management may claim that its statements are technically true. But we find them highly misleading because they have failed to mention the thousands of complaints which have indisputably poured in from customers who say agents lied to them."

215. The Aurelius Report also pointed out how "[i]nvestors and Sell Side analysts have relied on management's representations to promote the (fictitious) narrative that virtually no HIIQ customers complain," citing in particular analysts' positive responses to Defendants' misrepresentations at "the closed-door December 2018 analyst day" regarding HIIQ's purported "stunningly limited number of complaints."

216. Simple Health was critical to the success of HIIQ's business, accounting for a substantial portion of the Company's revenues during the Class Period. Forensic analysis submitted by the FTC in its enforcement action shows that HIIQ paid Simple Health $145 million in cash from January 2016 to April 2018. Securities analysts have pointed out that this amount represented a staggering 49% of the $294.2 million in third-party commissions that HIIQ's SEC filings state the Company paid out during this approximate timeframe, and that Simple Health's sales of HIIQ products were responsible for as much as half of HIIQ's total revenues. The amount that HIIQ paid in commissions to Simple Health dwarfed HIIQ's net income during the same time frame. HIIQ reported just $13.1 million, $26.5 million, and $18.9 million in net income in 2016, 2017, and 2018, respectively.

217. Simple Health's significant value to HIIQ is corroborated by HIIQ's own SEC filings. In its 2015 annual report, HIIQ represented that Simple Health comprised 62.8% of the Company's total advanced commission balance. In subsequent SEC filings, HIIQ was less

87

transparent about what percentage of its business Simple Health represented. However, in its 2016 annual report, HIIQ represented that "one distributor" (*i.e.*, Simple Health) comprised 65% of the Company's advanced commission balance and in its 2017 annual report, HIIQ stated that "one distributor" (*i.e.*, Simple Health) represented 35.8% of the Company's total advanced commission balance.

218.    The critical importance of this large revenue stream for HIIQ further raises the inference that Defendants were well aware of Simple Health's fraudulent and deceptive sales practices, and the attendant rampant complaints and compliance failures.

219.    <u>The Individual Defendants' Insider Trading Further Demonstrates Their Scienter.</u> Defendants Southwell and Hershberger each sold unusually large amounts of their HIIQ stock during the Class Period, precisely at a time when they could maximize their insider profits before further partial disclosures regarding the fraud. Between February 1 and February 13, 2019, Defendant Southwell sold $3.22 million, and Defendant Hershberger sold $2.01 million, of HIIQ common stock. These sales were strategically timed to maximize the Individual Defendants' insider profits, as they were made at prices of up to $40.31 per share, at near-term highs for HIIQ's stock price, and before several disastrous corrective disclosures that sank HIIQ's stock price as low as $23.85 at the end of the Class Period. In addition to being strategically timed to maximize profit, the stock sales were also far out of line with Defendants' prior trading, as explained further above. *See* ¶¶134-35. Indeed, prior to these stock sales, Southwell had never sold *any* shares of HIIQ stock. Similarly, Hershberger did not sell *any* stock during the Class Period before the February 2019 sales.

## VII.    <u>LOSS CAUSATION</u>

220.    During the Class Period, Defendants' materially false and misleading

88

statements and omissions artificially inflated the price of HIIQ common stock and maintained inflation in the stock price. A series of partial disclosures revealed the relevant truth and removed the artificial inflation from the stock price. As a result of their purchases of HIIQ stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss.

221. HIIQ's common stock reached a Class Period peak price of $63.13 on October 1, 2018, then lost approximately 62% of its value to close at $23.85 per share at the end of the Class Period.

222. On November 2, 2018, the FTC published a press release announcing its extraordinary enforcement action against Simple Health, Dorfman, and five additional entities connected to Dorfman, accusing the brokers of misleadingly selling HIIQ policies to consumers that believed they were purchasing comprehensive health insurance. The partial disclosures (*see* ¶¶122-26) caused HIIQ's stock price to decline. On November 2, 2018, the stock price declined by $4.47 per share, or 8.81%, erasing over $64 million in market value on unusually high trading volume of over 1.2 million shares. Investors continued to react to the news on the next trading day, November 5, 2018, and the stock price fell another $6.65, or 14.37%, per share, erasing an additional $95.8 million in market capitalization on unusually high trading volume of over 2.7 million shares, for a total decline of nearly 22% during the two trading days.

223. On November 27, 2018, research firm Aurelius Value published a report titled "HIIQ: Boiler Rooms, 'Worthless' Policies, and Defrauded Families." The partial disclosures (*see* ¶¶130-31) caused HIIQ's stock price to decline. On November 27, 2018, the share price fell $1.93, or 5.8%, erasing $27.8 million in market capitalization on unusually high trading

volume of over 4.2 million shares—nearly 10 times the stock's average trading volume over the prior year, and the highest traded volume for HIIQ shares in over a year.

224. On March 13, 2019, the U.S. House of Representatives Committee on Energy & Commerce issued a press release entitled "E&C Launches Investigation Into Companies That Sell Or Broker Junk Health Insurance Plans." The partial disclosures (*see* ¶¶136-37) caused HIIQ's stock price to decline. On March 13, 2019, the share price fell $6.62, or 17.2%, erasing over $82 million in market capitalization on unusually high trading volume of nearly 5 million shares.

225. On March 25, 2019, a filing by Steven Dorfman in the FTC enforcement action revealed extensive evidence of HIIQ's involvement in Simple Health's business as well as Defendants' awareness of Simple Health's fraudulent activities. The partial disclosures (*see* ¶¶140-44) caused HIIQ's stock price to decline. On March 26, 2019, the share price fell $2.20, or 7.4%, erasing over $32 million in market capitalization.

226. On April 12, 2019, the court-appointed Receiver over Simple Health filed the Receiver's Report in the FTC enforcement action. The partial disclosures (*see* ¶¶146-52) caused HIIQ's stock price to decline. On April 12, 2019, the share price fell $1.97, or 7.6%, to close at $23.85 per share, erasing over $28 million in market capitalization.

227. The drastic and repeated declines in HIIQ's stock price were a direct result of the nature and extent of Defendants' misrepresentations finally being revealed to investors and the market. The timing and magnitude of the declines in the Company's share price negate any inference that the losses suffered by Lead Plaintiffs and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' violations of the federal securities laws. The following

90

graphic shows the performance of a $100 investment in HIIQ's stock price prior to the corrective disclosure period as compared to two market indexes:



### VIII. CLASS ACTION ALLEGATIONS

228. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired HIIQ common stock between September 25, 2017 and April 11, 2019, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of HIIQ, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

229. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, HIIQ shares were actively traded on the

91

NASDAQ. As of April 11, 2019, there were over 14.6 million shares of HIIQ common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Throughout the Class Period, HIIQ common stock was actively traded on the NASDAQ, an open and efficient market, under the symbol "HIIQ." Millions of HIIQ shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by HIIQ and/or its transfer agents and may be notified of the pendency of this action by mail, using a form notice similar to that customarily used in securities class actions.

230. Lead Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

231. Lead Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

    (a)    Whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

    (b)    Whether Defendants participated in and pursued the common course of conduct complained of herein;

    (c)    Whether documents, press releases, and other statements disseminated to the investing public and the Company's stockholders during the Class Period misrepresented material facts about the business, finances, and prospects of HIIQ;

(d)     Whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose facts about the business, finance, value, and performance of HIIQ;

(e)     Whether the market price of HIIQ common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

(f)     The extent to which the members of the Class have been damaged and the proper measure of damages.

232.    A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Furthermore, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

## IX.    <u>UNDISCLOSED ADVERSE FACTS</u>

233.    The market for HIIQ common stock was an open, well-developed and efficient market at all relevant times. As a result of these materially false and misleading statements and omissions described herein, HIIQ common stock traded at artificially inflated prices during the Class Period. Lead Plaintiffs and the other members of the Class purchased or otherwise acquired HIIQ shares relying upon the integrity of the market price of the Company's stock and market information relating to HIIQ, and have been damaged thereby.

234.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of HIIQ common stock and maintaining inflation in the stock price, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose

material adverse non-public information and misrepresented the truth about the Company, as well as its business and operations, as alleged herein.

235. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiffs and the other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about HIIQ's legal and regulatory compliance, financial well-being and prospects.

236. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's stock price to be overvalued and artificially inflated and/or maintained at artificially inflated levels at all relevant times. Defendants' materially false and misleading statements made during the Class Period resulted in Lead Plaintiffs and the other members of the Class purchasing the Company's stock at artificially inflated prices, thus causing the damages complained of herein.

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

237. At all relevant times, the market for HIIQ's common stock was efficient for the following reasons, among others:

(a) HIIQ's stock met the requirements for listing, and was listed and actively traded, on the NASDAQ, a highly efficient and automated market;

(b) As a public company, HIIQ filed periodic reports with the SEC and the NASDAQ;

(c) HIIQ was followed by numerous securities analysts employed by major firms who wrote reports which were distributed to the sales force and certain customers of

94

their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

(d) HIIQ regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

238.    As a result of the foregoing, the market for HIIQ's common stock reasonably promptly digested current information regarding HIIQ from all publicly available sources and reflected such information in the price of HIIQ's common stock.  All purchasers of HIIQ common stock during the Class Period suffered similar injury through their purchases of HIIQ common stock at artificially inflated prices, and a presumption of reliance applies.

239.    A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose. As this action involves Defendants' failure to disclose material adverse information regarding HIIQ's business practices, operations and financial performance, legal compliance, and customer satisfaction — information that Defendants were obligated to disclose during the Class Period but did not — positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered such information important in the making of investment decisions.

95

## XI.  NO SAFE HARBOR

240.  The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

241.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of HIIQ who knew that the statement was false when made.

## XII.  COUNTS

### COUNT I
### For Violations Of Section 10(b) Of The Exchange Act
### And SEC Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

242.  Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

243.  This Count is asserted on behalf of all members of the Class against Defendants HIIQ, Southwell, and Hershberger for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

96

244. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

245. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of HIIQ common stock during the Class Period.

246. Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of HIIQ common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and the other members of the Class, regarding, among other things, HIIQ's business and operations; (b) artificially inflate and maintain the market price of HIIQ common stock;

and (c) cause Lead Plaintiffs and the other members of the Class to purchase the Company's common stock at artificially inflated prices, and to suffer losses when the true facts became known.

247.    Defendants HIIQ, Southwell, and Hershberger are liable for all materially false and misleading statements made during the Class Period, as alleged above.

248.    As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with the intent to deceive, manipulate, or defraud, or with severe recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers of HIIQ stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

249.    Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for HIIQ common stock, which inflation was removed from its price when the true facts became known. Lead Plaintiffs and the Class would not have purchased HIIQ common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

250.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of HIIQ common stock during the Class Period.

## COUNT II
### For Violations Of Section 20(a) Of The Exchange Act
### (Against the Individual Defendants)

251.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above as

98

if fully set forth herein.

252.     This Count is asserted on behalf of all members of the Class against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

253.     During their tenures as officers of HIIQ, each of these Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers of HIIQ, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of the public statements made by HIIQ during the Class Period, including its materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

254.     In their capacities as senior corporate officers of the Company, and as more fully described above, the Individual Defendants had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions.  The Individual Defendants signed the Company's SEC filings during the Class Period, and were directly involved in providing false information and certifying and approving the false statements disseminated by HIIQ during the Class Period.  As a result of the foregoing, Defendants Southwell and Hershberger as a group, and individually, were controlling persons of HIIQ within the meaning of Section 20(a) of the Exchange Act.

255.     As set forth above, HIIQ violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Amended Complaint.

256. By virtue of their positions as controlling persons of HIIQ and as a result of their own aforementioned conduct, Defendants Southwell and Hershberger are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired HIIQ securities. Moreover, as detailed above, during the respective times these Defendants served as officers of HIIQ, each of these Defendants culpably participated in the material misstatements and omissions made by HIIQ.

257. As a direct and proximate result of these Defendants' conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of HIIQ common stock.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

(a) Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b) Awarding all damages and other remedies available under the Exchange Act in favor of Lead Plaintiffs and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' and experts' witness fees and other costs; and

(d) Awarding such other relief as this Court deems appropriate.

## XIV.  JURY DEMAND

Lead Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  July 19, 2019

Respectfully Submitted,

**SAXENA WHITE P.A.**

*/s/ Maya Saxena*

Maya Saxena (FL Bar No. 0095494)
Joseph E. White, III (FL Bar No. 621064)
Lester R. Hooker (FL Bar No. 32242)
150 East Palmetto Park Road, Suite 600
Boca Raton, FL 33432
Tel: (561) 394-3399
Fax: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com

Steven B. Singer (*pro hac vice* forthcoming)
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com

David R. Kaplan (admitted *pro hac vice*)
Brandon Marsh (*pro hac vice* forthcoming)
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Tel: (858) 997-0860
Fax: (858) 369-0096
dkaplan@saxenawhite.com
bmarsh@saxenawhite.com

*Lead Counsel for the Class*

**ABRAHAM, FRUCHTER AND TWERSKY, LLP**
Mitchell M.Z. Twersky (admitted *pro hac vice*)
One Penn Plaza, Suite 2805
New York, NY 10119
Tel: (212) 279-5050
Fax: (212) 279-3655
MTwersky@aftlaw.com

*Additional Counsel*

101

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 19, 2019, I presented the foregoing to the Clerk of

the Court for filing and uploading to the CM/ECF system.  This system will send electronic

notice of filing to all counsel of record by operation of the Court's electronic filing system.


/s/ *Maya Saxena*
Maya Saxena

## CERTIFICATION AND AUTHORIZATION

I, Jodi S. Cox, on behalf of the Oklahoma Municipal Retirement Fund ("Oklahoma Municipal"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I have reviewed the consolidated class action complaint in this matter and I am authorized in my capacity as Executive Director & CEO of the Board of Trustees of Oklahoma Municipal to initiate litigation and to execute this Certification on behalf of Oklahoma Municipal. I have authorized Saxena White P.A. to file the complaint on Oklahoma Municipal's behalf.

2. Oklahoma Municipal did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3. Oklahoma Municipal is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Oklahoma Municipal's transactions in Health Insurance Innovations, Inc.'s securities are set forth in the attached "Schedule A."

5. Oklahoma Municipal has sought to serve and was appointed as lead plaintiff and/or representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification: *None*

6. Oklahoma Municipal has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff, was not appointed lead plaintiff or the lead plaintiff decision is still pending:

   *In re WageWorks, Inc. Securities Litigation*, Case No. 4:18-cv-01523 (N.D. Cal.)

7. Oklahoma Municipal will not accept any payment for serving as a representative party on behalf of the Class beyond Oklahoma Municipal's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of July, 2019.

Oklahoma Municipal Retirement Fund

_____
Jodi S. Cox, Executive Director & CEO

| SCHEDULE A |
|---|
| Oklahoma Municipal Retirement Fund |
| Transactions in Health Insurance Innovations, Inc. |
| Period: September 25, 2017 through April 11, 2019 |

| Common Stock Purchases | | | | Common Stock Sales | | |
|---|---|---|---|---|---|---|
| **Date** | **Shares** | **Price** | | **Date** | **Shares** | **Price** |
| 09/12/18 | 400 | $51.22 | | 03/08/19 | 200 | $37.94 |
| 09/12/18 | 100 | $51.53 | | | | |
| 09/14/18 | 200 | $52.15 | | | | |
| 09/17/18 | 100 | $52.75 | | | | |
| 09/17/18 | 100 | $52.68 | | | | |
| 09/18/18 | 200 | $52.03 | | | | |
| 09/19/18 | 100 | $51.96 | | | | |
| 09/21/18 | 100 | $58.08 | | | | |
| 09/21/18 | 100 | $58.68 | | | | |
| 09/21/18 | 100 | $57.84 | | | | |
| 09/21/18 | 100 | $58.08 | | | | |
| 09/21/18 | 500 | $57.14 | | | | |
| 09/26/18 | 100 | $54.68 | | | | |
| 09/26/18 | 900 | $55.32 | | | | |
| 10/05/18 | 200 | $55.23 | | | | |
| 10/09/18 | 100 | $54.99 | | | | |
| 10/10/18 | 1,000 | $50.20 | | | | |
| 10/10/18 | 200 | $50.59 | | | | |
| 10/11/18 | 100 | $49.83 | | | | |
| 10/18/18 | 200 | $48.62 | | | | |
| 03/25/19 | 3,317 | $29.54 | | | | |
| 03/26/19 | 1,521 | $29.82 | | | | |
| 03/28/19 | 867 | $27.14 | | | | |
| 03/29/19 | 2,228 | $27.14 | | | | |

## CERTIFICATION AND AUTHORIZATION

I, James D. Love, on behalf of the City of Birmingham Retirement and Relief System ("Birmingham"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.  I have reviewed the consolidated class action complaint in this matter and I am authorized in my capacity as Assistant City Attorney of Birmingham to initiate litigation and to execute this Certification on behalf of Birmingham. I have authorized Saxena White P.A. to file the complaint on Birmingham's behalf.

2.  Birmingham did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3.  Birmingham is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.  Birmingham's transactions in Health Insurance Innovations, Inc.'s securities during the class period as specified in the complaint are set forth in the attached "Schedule A."

5.  Birmingham has sought to serve and was appointed as lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

    *Westchester Putnam Counties v. Brixmor Prop. Group Inc.*, No. 1:16-cv-2400 (S.D.N.Y.)

    *Boynton Beach Firefighters' Pension Fund v. HCP, Inc.*, No. 3:16-cv-1106 (N.D. Ohio)

    *City of Birmingham Ret. and Relief Sys. v. Credit Suisse Group AG*, No. 1:17-cv-10014 (S.D.N.Y.)

    *In re BRF S.A. Sec. Litig.*, No. 1:18-cv-02213 (S.D.N.Y.)

    *City of Birmingham Firemen's and Policemen's Supplemental Pension Sys. v. Ryanair Holdings plc*, No. 1:18-cv-10330 (S.D.N.Y.)

6.  Birmingham has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff, was not appointed lead plaintiff or the lead plaintiff decision is still pending:

    *Ollila v. Babcock & Wilcox Enterprises, Inc.*, No, 3:17-cv-00109 (W.D.N.C.)

*Grodko v. Teva Pharmaceutical Indus. Ltd.*, No. 2:17-cv-03743 (E.D. Pa.)

*In re Nutanix, Inc. Securities Litigation*, No. 3:19-cv-01651 (N.D. Cal.)

*Koch v. Healthcare Services Group, Inc.*, No. 2:19-cv-1227 (E.D. Pa.)

7. Birmingham will not accept any payment for serving as a representative party on behalf of the Class beyond Birmingham's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17ᵗʰ day of July, 2019.

City of Birmingham Retirement
and Relief System

James D. Love, Assistant City Attorney

## SCHEDULE A
### City of Birmingham Retirement and Relief System
### Transactions in Health Insurance Innovations, Inc.
### Period: September 25, 2017 through April 11, 2019

| Common Stock Purchases | | | | Common Stock Sales | | |
|---|---|---|---|---|---|---|
| Date | Shares | Price | | Date | Shares | Price |
| 08/21/18 | 11,751 | $54.65 | | 11/13/18 | 11,751 | $41.61 |

# Exhibit 3: Order Preliminarily Approving Settlement and Providing for Notice

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| JULIAN KEIPPEL, Individually and On Behalf of All Others Similarly Situated, | CASE NO. 8:19-cv-421-T-02CPT |
| Plaintiff, | <u>CLASS ACTION</u> |
| v. | |
| HEALTH INSURANCE INNOVATIONS, INC. n/k/a BENEFYTT TECHNOLOGIES, INC., GAVIN SOUTHWELL, and MICHAEL D. HERSHBERGER, | |
| Defendants. | |

**ORDER PRELIMINARILY APPROVING**
<u>**SETTLEMENT AND PROVIDING FOR NOTICE**</u>

WHEREAS, a putative class action is pending in this Court entitled *Julian Keippel v. Health Insurance Innovations, Inc., et al.*, Case No. 8:19-cv-421-T-02CPT (the "Action");

WHEREAS, (a) Oklahoma Municipal Retirement Fund and City of Birmingham Retirement and Relief System (collectively, "Lead Plaintiffs"), and (b) defendants Health Insurance Innovations, Inc., n/k/a Benefytt Technologies, Inc. ("HIIQ" or the "Company"), Gavin Southwell, and Michael Hershberger (together with HIIQ, "Defendants"), have entered into a Stipulation and Agreement of Settlement dated December 2, 2020 (the "Stipulation"), subject to approval of this Court (the "Settlement");

WHEREAS, Lead Plaintiffs have made an application, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for an order preliminarily approving the Settlement in accordance with the Stipulation and allowing notice to Class Members and Settlement Class Members, as more

fully described herein;

WHEREAS, on August 28, 2020, the Court granted class certification of the following class with the following Class Period: "All persons or entities that purchased or otherwise acquired HIIQ common stock between September 25, 2017 through February 18, 2019, inclusive, and who were damaged thereby";

WHEREAS, the Class Period certified by the Court shortened the class period proposed in the Complaint by moving the ending date from April 11, 2019 to February 18, 2019; and, pending before the Court is Lead Plaintiffs' motion for reconsideration asking the Court to move the class period end date to April 11, 2019, which motion has not been ruled on by the Court, will not be decided on its merits given the Settlement, and is denied as moot, without prejudice pending the Judgment;

WHEREAS, the Court has read and considered: (a) Lead Plaintiffs' motion for preliminary approval of the Settlement, and the papers filed and arguments made in connection therewith; and (b) the Stipulation and the exhibits attached thereto; and

WHEREAS, unless otherwise defined herein, all capitalized words contained herein shall have the same meanings as they have in the Stipulation;

NOW THEREFORE, IT IS HEREBY ORDERED:

1. **<u>Certification of Settlement Class</u>** – The Court preliminarily certifies, solely for purposes of effectuating the Settlement and for no other purpose, pursuant to Rule 23(a) and (b)(3), a Settlement Class consisting of "all persons or entities that purchased or otherwise acquired HIIQ common stock between September 25, 2017 through April 11, 2019, inclusive, and who were allegedly damaged thereby" (the "Settlement Class"). Excluded from the Settlement Class are Defendants, the officers and directors of HIIQ, members of their

2

immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest. Also excluded from the Settlement Class and the Class are those Potential Members who timely and validly request exclusion from the Settlement Class or the Class pursuant to the requirements set forth in the Notice to the Claims Administrator by the Opt-out Deadline (as defined in the Notice).

a. Pursuant to Rule 23 and for purposes of effectuating the Settlement and for no other purpose, the Court preliminarily certifies Lead Plaintiffs Oklahoma Municipal Retirement Fund and City of Birmingham Retirement and Relief System as Settlement Class Representatives for the Settlement Class, and preliminarily appoints Saxena White P.A. as Lead Counsel for the Settlement Class. Lead Counsel is authorized to act on behalf of the Settlement Class with respect to all acts required by, or which may be undertaken pursuant to, the Stipulation or such other acts that are reasonably necessary to consummate the proposed Settlement set forth in the Stipulation.

b. With respect to the Settlement Class, the Court preliminarily finds, solely for purposes of effectuating the Settlement and no other purpose, that the prerequisites for a class action under Rules 23(a) and (b)(3) have been satisfied. The members of the Settlement Class are so numerous that joinder of all Settlement Class Members in the class action is impracticable and there are questions of law and fact common to the Settlement Class. The claims of Lead Plaintiffs are typical of the claims of the Settlement Class, and Lead Plaintiffs and their counsel have fairly and adequately represented and protected the interests of all of the Settlement Class Members. There are questions of law

3

and fact common to the Settlement Class Members that predominate over any questions affecting only individual members. A class action is also superior to other available methods for the fair and efficient adjudication of the controversy, considering: (a) the interests of the members of the Settlement Class in individually controlling the prosecution of the separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by members of the Settlement Class; (c) the desirability or undesirability of continuing the litigation of these claims in this particular forum; and (d) the difficulties likely to be encountered in the management of the class action.

2. **Preliminary Approval of the Settlement** – The Court hereby preliminarily approves the Settlement, as embodied in the Stipulation, as being fair, reasonable, and adequate, and preliminarily approves the proposed Plan of Allocation described in the Notice, subject to the right of any Class Member or Settlement Class Member to challenge the fairness, reasonableness, and adequacy of the Settlement, the Stipulation, or the proposed Plan of Allocation, and subject to further consideration at the Settlement Hearing to be conducted as described below.

3. **Settlement Hearing** – The Court will hold a settlement hearing (the "Settlement Hearing") on Tuesday, March 23, 2021 at 9:30 a.m. before the undersigned by telephonic means by calling the reserved conference toll-free number at 1-888-557-8511, then entering the access code: 4744914 followed by the # (pound) key, and then entering the security code: 0421 followed by the # (pound) key, as posted on the website of the Claims Administrator, for the following purposes: (a) to determine whether the proposed Settlement on the terms and conditions provided for in the Stipulation is fair, reasonable and adequate, and should be

4

approved by the Court; (b) to determine whether a Judgment substantially in the form attached as Exhibit B to the Stipulation should be entered dismissing the Action with prejudice against Defendants; (c) to determine whether the proposed Plan of Allocation for the proceeds of the Settlement is fair and reasonable and should be approved; (d) to determine whether the motion by Lead Counsel for an award of attorneys' fees and reimbursement of Litigation Expenses should be approved; and (e) to consider any other matters that may be properly brought before the Court in connection with the Settlement. Notice of the Settlement and the Settlement Hearing shall be given as set forth in paragraph 5 of this Order.

4. The Court may adjourn the Settlement Hearing without further notice and may approve the proposed Settlement with such modifications as the Parties may agree to, if appropriate, without further notice.

5. **Retention of Claims Administrator and Manner of Giving Notice** – Lead Counsel are hereby authorized to retain Epiq Class Action & Claims Solutions, Inc. ("Epiq" or the "Claims Administrator") to supervise and administer the notice procedure in connection with the proposed Settlement as well as the processing of Claims as more fully set forth below. Notice of the Settlement and the Settlement Hearing shall be given by Lead Counsel as follows:

(a) within seven (7) days of the date of entry of this Order, HIIQ shall provide or cause to be provided to the Claims Administrator (at no cost to the Settlement Fund, Lead Counsel, the Claims Administrator, the Class, or the Settlement Class) records reasonably available to HIIQ or its transfer agent concerning the identity and last known address of Class Members and Settlement Class Members, in electronic form or other form as is reasonably available to HIIQ or its transfer agent, which information the

5

Claims Administrator shall treat and maintain as confidential;

      (b)    not later than twenty-five (25) business days after the date of entry of this Order (the "Notice Date"), the Claims Administrator shall cause a copy of the Notice and the Claim Form, substantially in the forms attached hereto as Exhibits A-1 and A-2, respectively (the "Notice Packet"), to be mailed by first-class mail to potential Class Members and Settlement Class Members at the addresses set forth in the records which HIIQ caused to be provided, or who otherwise may be identified through further reasonable effort;

      (c)    contemporaneously with the mailing of the Notice Packet, the Claims Administrator shall cause copies of the Notice and the Claim Form to be posted on a website to be developed for the Settlement, from which copies of the Notice and Claim Form can be downloaded;

      (d)    not later than ten (10) days after the Notice Date, the Claims Administrator shall cause the Summary Notice, substantially in the form attached hereto as Exhibit A-3, to be published once in *Investor's Business Daily* and to be transmitted once over the *PR Newswire*; and

      (e)    not later than seven (7) days prior to the Settlement Hearing, Lead Counsel shall file with the Court proof, by affidavit or declaration, of such mailing and publication.

6.   **<u>Approval of Form and Content of Notice</u>** – The Court (a) approves, as to form and content, the Notice, the Claim Form, and the Summary Notice, attached hereto as Exhibits A-1, A-2, and A-3, respectively, and (b) finds that the mailing and distribution of the Notice and Claim Form and the publication of the Summary Notice in the manner and form set forth

in paragraph 5 of this Order (i) is the best notice practicable under the circumstances; (ii) constitutes notice that is reasonably calculated, under the circumstances, to apprise Class Members and Settlement Class Members of the pendency of the Action, of the effect of the proposed Settlement (including the Releases to be provided thereunder), of Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses, of the Class Members' and Settlement Class Members' right to object to the Settlement, the Plan of Allocation or Lead Counsel's motion for attorneys' fees and reimbursement of Litigation Expenses, of their right to exclude themselves from the Class or Settlement Class, and of their right to appear at the Settlement Hearing; (iii) constitutes due, adequate and sufficient notice to all persons and entities entitled to receive notice of the proposed Settlement; and (iv) satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause), the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4, as amended, and all other applicable law and rules.  The date and time of the Settlement Hearing shall be included in the Notice and Summary Notice before they are mailed and published, respectively.

7.    **<u>Nominee Procedures</u>** – Brokers and other nominees who purchased or otherwise acquired HIIQ common stock during the Class Period or Settlement Class Period for the benefit of another person or entity shall (a) within seven (7) calendar days of receipt of the Notice request from the Claims Administrator sufficient copies of the Notice Packet to forward to all such beneficial owners and within seven (7) calendar days of receipt of those Notice Packets forward them to all such beneficial owners; or (b) within seven (7) calendar days of receipt of the Notice, send a list of the names and addresses of all such beneficial owners to the Claims Administrator in which event the Claims Administrator shall promptly mail the Notice

7

Packet to such beneficial owners. Upon full compliance with this Order, such nominees may seek reimbursement of their reasonable expenses actually incurred in complying with this Order by providing the Claims Administrator with proper documentation supporting the expenses for which reimbursement is sought. Such properly documented expenses incurred by nominees in compliance with the terms of this Order shall be paid from the Settlement Fund, with any disputes as to the reasonableness or documentation of expenses incurred subject to review by the Court.

8. **<u>Participation in the Settlement</u>** – Class Members and Settlement Class Members who wish to participate in the Settlement and to be potentially eligible to receive a distribution from the Net Settlement Fund must complete and submit a Claim Form in accordance with the instructions contained therein. Unless the Court orders otherwise, all Claim Forms must be postmarked no later than one hundred twenty (120) days after the Notice Date. Notwithstanding the foregoing, Lead Counsel may, at their discretion, accept for processing late Claims provided such acceptance does not delay the distribution of the Net Settlement Fund. By submitting a Claim, a person or entity shall be deemed to have submitted to the jurisdiction of the Court with respect to his, her, or its Claim and the subject matter of the Settlement.

9. Each Claim Form submitted must satisfy the following conditions: (a) it must be properly completed, signed, and submitted in a timely manner in accordance with the provisions of the preceding paragraph; (b) it must be accompanied by adequate supporting documentation for the transactions and holdings reported therein, in the form of broker confirmation slips, broker account statements, an authorized statement from the broker containing the transactional and holding information found in a broker confirmation slip or

account statement, or such other documentation as is deemed adequate by Lead Counsel or the Claims Administrator; (c) if the person executing the Claim Form is acting in a representative capacity, a certification of his, her, or its current authority to act on behalf of the Class Member or Settlement Class Member must be included in the Claim Form to the satisfaction of Lead Counsel or the Claims Administrator; and (d) the Claim Form must be complete, must contain no material deletions or modifications of any of the printed matter contained therein, and must be signed under penalty of perjury.

10. Any Class Member or Settlement Class Member who or which does not timely and validly submit a Claim Form or whose Claim is not otherwise approved by the Court: (a) shall be deemed to have waived his, her, or its right to share in the Net Settlement Fund; (b) shall be forever barred from participating in any distributions therefrom; (c) shall be bound by the provisions of the Stipulation and the Settlement and all proceedings, determinations, orders and judgments in the Action relating thereto, including, without limitation, the Judgment and the Releases provided for therein, whether favorable or unfavorable; and (d) will be barred from commencing, maintaining, or prosecuting any of the Released Plaintiffs' Claims against each and all of the Defendants' Releasees, as more fully described in the Stipulation and Notice. Notwithstanding the foregoing, late Claim Forms may be accepted for processing as set forth in paragraph 8 above.

a. **Exclusion** – Any member of the Class or Settlement Class who wishes to exclude himself, herself, or itself from the Class or Settlement Class must request exclusion in writing within the time and in the manner set forth in the Notice, which shall provide that: (a) any such request for exclusion from the Class or Settlement Class must be mailed or delivered such that it is received no later than twenty-one (21) days prior to

9

the Settlement Hearing, to: Health Insurance Innovations Securities Settlement, Exclusions, P.O. Box 5657, Portland, Oregon, 97228-5657, and (b) each request for exclusion must (i) state the name, address, and telephone number of the person or entity requesting exclusion, and in the case of entities, the name and telephone number of the appropriate contact person; (ii) state that such person or entity "requests exclusion from the Class in *Julian Keippel v. Health Insurance Innovations, Inc., et al.*, No. 8:19-cv-00421"; (iii) state the number of shares of HIIQ common stock that the person or entity requesting exclusion purchased/acquired and sold during the Class Period or Settlement Class Period, as well as the dates and prices of each such purchase/acquisition and sale, and the number of shares held at the beginning of the Class Period or Settlement Class Period; and (iv) be signed by the person or entity requesting exclusion or an authorized representative. A request for exclusion shall not be effective unless it provides all the required information and is received within the time stated above, or is otherwise accepted by the Court.

11. Any person or entity who or which timely and validly requests exclusion in compliance with the terms stated in this Order and is excluded from the Class or Settlement Class shall not be a Class Member or Settlement Class Member, shall not be bound by the terms of the Settlement or any orders or judgments in the Action, and shall not receive any payment out of the Net Settlement Fund.

12. Any Class Member or Settlement Class Member who does not timely and validly request exclusion from the Class or Settlement Class in the manner stated in this Order: (a) shall be deemed to have waived his, her, or its right to be excluded from the Class or Settlement Class; (b) shall be forever barred from requesting exclusion from the Class or

10

Settlement Class in this or any other proceeding; (c) shall be bound by the provisions of the Stipulation and Settlement and all proceedings, determinations, orders and judgments in the Action, including, but not limited to, the Judgment and the Releases provided for therein, whether favorable or unfavorable; and (d) will be barred from commencing, maintaining, or prosecuting any of the Released Plaintiffs' Claims against any of the Defendants' Releasees, as more fully described in the Stipulation and Notice.

13. **<u>Appearance and Objections at Settlement Hearing</u>** – Any Class Member or Settlement Class Member who does not request exclusion may enter an appearance in the Action, at his, her, or its own expense, individually or through counsel of his, her, or its own choice, by filing with the Clerk of Court and delivering a notice of appearance to representatives of both Lead Counsel and Defendants' Counsel, at the addresses set forth in paragraph 14 below, such that it is received no later than twenty-one (21) days prior to the Settlement Hearing, or as the Court may otherwise direct. Any Class Member or Settlement Class Member who does not enter an appearance will be represented by Lead Counsel.

14. Any Class Member or Settlement Class Member who does not request exclusion may file a written objection to the proposed Settlement, the proposed Plan of Allocation, or Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses and appear and show cause, if he, she, or it has any cause, why the proposed Settlement, the proposed Plan of Allocation or Lead Counsel's motion for attorneys' fees and reimbursement of Litigation Expenses should not be approved; *provided, however*, that no Class Member or Settlement Class Member shall be heard or entitled to contest the approval of the terms and conditions of the proposed Settlement, the proposed Plan of Allocation, or the motion for attorneys' fees and reimbursement of Litigation Expenses unless that person or

11

entity has filed a written objection with the Court and served copies of such objection on Lead Counsel and Defendants' Counsel at the addresses set forth below such that they are received no later than twenty-one (21) days prior to the Settlement Hearing.

| **Lead Counsel** | **Defendants' Counsel** |
|---|---|
| Saxena White P.A. | Foley & Lardner LLP |
| Brandon T. Grzandziel | Michael Matthews |
| 7777 Glades Road, Suite 300 | 100 North Tampa Street, Suite 2700 |
| Boca Raton, FL 33434 | Tampa, FL 33602-5810 |

15. Any objections, filings and other submissions by the objecting Class Member or Settlement Class Member: (a) must state the name, address, and telephone number of the person or entity objecting and must be signed by the objector; (b) must contain a statement of the objection or objections, and the specific reasons for each objection, including any legal and evidentiary support; and (c) must include documents sufficient to prove membership in the Class or Settlement Class including the number of shares of HIIQ common stock that the objecting Class Member or Settlement Class Member purchased/acquired and sold during the Class Period or Settlement Class Period, as well as the dates and prices of each such purchase/acquisition and sale, and the number of shares held at the beginning of the Class Period or Settlement Class Period. Objectors who enter an appearance and desire to present evidence at the Settlement Hearing in support of their objection must include in their written objection or notice of appearance the identity of any witnesses they may call to testify and any exhibits they intend to introduce into evidence at the hearing.

16. Any Class Member or Settlement Class Member who or which does not make his, her, or its objection in the manner provided herein shall be deemed to have waived his, her, or its right to object to any aspect of the proposed Settlement, the proposed Plan of Allocation,

and Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses and shall be forever barred and foreclosed from objecting to the fairness, reasonableness, or adequacy of the Settlement, the Plan of Allocation, or the requested attorneys' fees and Litigation Expenses, or from otherwise being heard concerning the Settlement, the Plan of Allocation, or the requested attorneys' fees and Litigation Expenses in this or any other proceeding.

17. **Stay** – Until otherwise ordered by the Court, the Court stays all proceedings in the Action other than proceedings necessary to carry out or enforce the terms and conditions of the Stipulation. Pending final determination whether the Settlement should be approved, Defendants Lead Plaintiff, Lead Counsel, and all members of the Class and Settlement Class are barred and enjoined from commencing, instituting, intervening in or participating in, prosecuting or continuing to prosecute any action or other proceeding in any court of law or equity, arbitration tribunal, or administrative forum, or other forum of any kind or character (whether brought directly, in a representative capacity, derivatively, or in any other capacity), that asserts any of the Released Claims against any of the Releasees, as defined in the Stipulation.

18. **Settlement Administration Fees and Expenses** – All reasonable costs incurred in identifying Class Members and Settlement Class Members, and notifying them of the Settlement as well as in administering the Settlement shall be paid as set forth in the Stipulation without further order of the Court. Notwithstanding the foregoing, prior to the Effective Date, such Notice and Administration Costs paid shall not exceed $200,000 without further approval of the Court.

13

19.  **Settlement Fund** – The contents of the Settlement Fund held by Western Alliance Bank, for which Western Alliance Bank will serve as the Escrow Agent, shall be deemed and considered to be *in custodia legis* of the Court, and shall remain subject to the jurisdiction of the Court, until such time as they shall be distributed pursuant to the Stipulation or further order(s) of the Court.

20.  **Taxes** – Lead Counsel are authorized and directed to prepare any tax returns and any other tax reporting form for or in respect to the Settlement Fund, to pay from the Settlement Fund any Taxes owed with respect to the Settlement Fund, to apply for any tax refund owed to the Settlement Fund, and to otherwise perform all obligations with respect to Taxes and any reporting or filings in respect thereof without further order of the Court in a manner consistent with the provisions of the Stipulation.

21.  **Termination of Settlement** – If the Settlement is terminated as provided in the Stipulation, the Settlement is not approved, or the Effective Date of the Settlement otherwise fails to occur, this Order shall be vacated, rendered null and void, and be of no further force and effect, except as otherwise provided by the Stipulation, and this Order shall be without prejudice to the rights of Lead Plaintiffs, the other Class Members, Settlement Class Members, and Defendants, and the Parties shall revert to their respective positions in the Action as of December 1, 2020 as provided in the Stipulation.

22.  **Use of this Order** – Neither this Order nor the Stipulation (whether or not consummated), including the exhibits thereto and the Plan of Allocation contained therein (or any other plan of allocation that may be approved by the Court), the Supplemental Agreement, and the documents prepared to effectuate this Settlement, the negotiations leading to the

14

execution of the Stipulation, nor any proceedings taken pursuant to or in connection with the Stipulation or the Settlement (including any arguments proffered in connection therewith):

(a) shall (i) be offered or received against any of the Defendants' Releasees as evidence of, or construed as, or deemed to be evidence of any presumption, concession, or admission by any of the Defendants' Releasees with respect to, (aa) the truth of any fact alleged by Lead Plaintiffs; (bb) the validity of any claim or alleged damages that were or could have been asserted in the Action or in any other litigation; (cc) the deficiency of any defense that has been or could have been asserted in this Action or in any other litigation; or (dd) any liability, negligence, fault, or other wrongdoing of any kind of any of the Defendants' Releasees; or (ii) in any way used or referred to for any other reason as against any of the Defendants' Releasees, in any civil, criminal, or administrative action or proceeding (including any arbitration), other than such proceedings as may be necessary to effectuate the provisions of the Stipulation;

(b) shall be (i) offered against any of the Plaintiffs' Releasees, as evidence of, or construed as, or deemed to be evidence of any presumption, concession, or admission by any of the Plaintiffs' Releasees (aa) that any of their claims are without merit, that any of the Defendants' Releasees had meritorious defenses, or that damages recoverable under the Complaint would not have exceeded the Settlement Amount; or (bb) with respect to any liability, negligence, fault, or wrongdoing of any kind; or (ii) in any way referred to for any other reason as against any of the Plaintiffs' Releasees, in any civil, criminal, or administrative action or proceeding (including any arbitration), other than such proceedings as may be necessary to effectuate the provisions of the Stipulation; or

15

(c) shall be construed against any of the Releasees as an admission, concession, or presumption that the consideration to be given under the Settlement represents the amount which could be or would have been recovered after trial; *provided, however*, that if the Stipulation is approved by the Court, the Parties and the Releasees and their respective counsel may refer to it to effectuate the protections from liability granted thereunder or otherwise to enforce the terms of the Settlement, and Defendants and/or the Defendants' Releasees may file the Stipulation, this Order, and/or the Judgment in any action that might be brought against them to support a defense, claim, or counterclaim based on principles of res judicata, collateral estoppel, release and discharge, good faith settlement, judgment bar or other bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense, claim, argument, or counterclaim.

23. **Supporting Papers** – Lead Counsel shall file the opening papers in support of the proposed Settlement, the Plan of Allocation, and Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses no later than thirty-five (35) days prior to the Settlement Hearing; and Lead Plaintiffs and Lead Counsel are authorized to file reply papers, which shall be filed no later than seven (7) days prior to the Settlement Hearing.

24. **CAFA Notice** – Defendants shall, no later than ten (10) days following the filing of the Stipulation with the Court, serve notice of the proposed Settlement upon those who are entitled to such notice pursuant to and in compliance with the requirements of the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1715. HIIQ shall be responsible only for the costs of service of the CAFA notice. At least fourteen (14) days before the Settlement Hearing,

16

Defendants shall cause to be served on Lead Counsel and filed with the Court proof, by affidavit or declaration, regarding compliance with CAFA § 1715(b).

25. The Court retains jurisdiction to consider all further applications arising out of or connected with the proposed Settlement.

SO ORDERED this 3rd day of December, 2020.

_____
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

17

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

|  |  |
|---|---|
| JULIAN KEIPPEL, Individually and On Behalf of All Others Similarly Situated, | CASE NO. 8:19-CV-00421-WFJ-CPT |
| Plaintiff, | CLASS ACTION |
| v. | |
| HEALTH INSURANCE INNOVATIONS, INC. n/k/a BENEFYTT TECHNOLOGIES, INC., GAVIN SOUTHWELL, and MICHAEL D. HERSHBERGER, | EXHIBIT A-1 |
| Defendants. | |

**NOTICE OF (I) PENDENCY OF CLASS ACTION AND PROPOSED SETTLEMENT OF CLASS ACTION; (II) SETTLEMENT HEARING; AND (III) MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

*A Federal Court authorized this Notice.  This is not a solicitation from a lawyer.*

**NOTICE OF PENDENCY OF CLASS ACTION:**  You are hereby notified, pursuant to Rule 23 of the Federal Rules of Civil Procedure and an Order of the United States District Court for the Middle District of Florida, that the lawsuit *Keippel v. Health Insurance Innovations, Inc. n/k/a Benefytt Technologies, Inc., et al.*, No. 8:19-cv-00421-WFJ-CPT (M.D. Fla.) (the "Action") has been certified as a class action on behalf of a Class and Settlement Class, except for certain persons and entities that are excluded from the Class by definition as set forth below.

**NOTICE OF SETTLEMENT:**  Please also be advised that the Court-appointed Lead Plaintiffs, Oklahoma Municipal Retirement Fund ("Oklahoma") and City of Birmingham Retirement and Relief System ("Birmingham" and, together with Oklahoma, "Lead Plaintiffs"), on behalf of themselves and the Class and Settlement Class (as defined in paragraph 18 below), have reached a proposed settlement of the Action for $11,000,000.00 in cash that, if approved, will resolve all claims in the Action (the "Settlement"). Your rights may be affected if, during the period from September 25, 2017, through April 11, 2019, inclusive, you purchased or otherwise acquired

1

common stock issued by Health Insurance Innovations, Inc. ("HIIQ" or the "Company"), and were allegedly damaged thereby.[1]

**PLEASE READ THIS NOTICE CAREFULLY.  This Notice explains important rights you may have, including the possible receipt of cash from the Settlement.  If you are a member of the Class or Settlement Class, your legal rights will be affected whether or not you act.**

**If you have any questions about this Notice, the proposed Settlement, or your eligibility to participate in the Settlement, please DO NOT contact HIIQ, any other Defendants in the Action, their counsel, or the Court.  All questions should be directed to Lead Counsel or the Claims Administrator (see paragraph 74 below).**

1.      **Description of the Action:**  This Notice relates to a proposed Settlement of claims in a pending securities class action brought by investors alleging, among other things, that defendants HIIQ, Gavin Southwell ("Southwell") and Michael Hershberger ("Hershberger and, together with Southwell, the "Individual Defendants," and together with HIIQ, "Defendants") violated the federal securities laws by making alleged misrepresentations or omissions, which Defendants deny. A more detailed description of the Action is set forth in paragraphs 4-12 below.  The proposed Settlement, if approved by the Court, will settle claims of the Class and Settlement Class, as defined in paragraph 21 below.

2.     **Statement of Recovery:**  Subject to Court approval, Lead Plaintiffs have agreed to settle the Action in exchange for a settlement payment of $11,000,000.00 in cash (the "Settlement Amount") to be deposited into an escrow account.  The Net Settlement Fund (i.e., the Settlement Amount plus any and all interest earned thereon (the "Settlement Fund") less (a) any Taxes, (b) any Notice and Administration Costs, (c) any Litigation Expenses awarded by the Court, and (d) any attorneys' fees awarded by the Court) will be distributed in accordance with a plan of allocation that is approved by the Court, which will determine how the Net Settlement Fund shall be allocated among members of the Class and Settlement Class.  The proposed plan of allocation (the "Plan of Allocation") is set forth in paragraphs 41-58 below.

3.     **Estimate of Average Amount of Recovery Per Security:**  Based on Lead Plaintiffs' damages expert's estimates of the number of shares of HIIQ common stock purchased during the Class Period and Settlement Class Period that may have been affected by the alleged conduct at issue in the Action, and assuming that all Class Members and Settlement Class Members elect to participate in the Settlement, the estimated average recovery (before the deduction of any Court-approved fees, expenses and costs as described herein) per allegedly damaged share is $0.52. Class Members and Settlement Class Members should note, however, that the foregoing average recovery per share is only an estimate.  Some Class Members and Settlement Class Members may recover more or less than this estimated amount depending on, among other factors, when and at what prices they purchased/acquired or sold their HIIQ common stock, and the total number and recognized loss amount of valid Claim Forms submitted.  Distributions to Class Members and

---

[1]  All capitalized terms used in this Notice that are not otherwise defined herein shall have the meanings ascribed to them in the Stipulation and Agreement of Settlement (the "Stipulation"), which is available at www.HealthInsuranceInnovationsSecuritiesSettlement.com.

Settlement Class Members will be made based on the Plan of Allocation set forth herein (see paragraphs 41-58 below) or such other plan of allocation as may be ordered by the Court.

4. **Average Amount of Alleged Damages Per Security:** The Parties do not agree on the average amount of alleged damages per share that would be recoverable if Lead Plaintiffs were to prevail in the Action. Among other things, Defendants deny the assertion that they violated the federal securities laws or that any damages were suffered by any members of the Class or Settlement Class as a result of their conduct. The range of the potential recovery is discussed in greater detail in paragraph 5 below.

5. **Attorneys' Fees and Expenses Sought:** Plaintiffs' Counsel, which have been prosecuting the Action on a wholly contingent basis since its inception, have not received any payment of attorneys' fees for their representation of the Class or Settlement Class and have advanced the funds to pay expenses necessarily incurred to prosecute this Action. Court-appointed Lead Counsel Saxena White P.A. will apply to the Court for an award of attorneys' fees in an amount not to exceed one-third (33-1/3%) of the Settlement Fund. In addition, Lead Counsel will apply for reimbursement of Litigation Expenses paid or incurred in connection with the institution, prosecution and resolution of the claims against the Defendants, in an amount not to exceed $450,000, which may include an application for reimbursement of the reasonable costs and expenses incurred by Lead Plaintiffs directly related to their representation of the Class and Settlement Class. Any fees and expenses awarded by the Court will be paid from the Settlement Fund. Class Members and Settlement Class Members are not personally liable for any such fees or expenses. Estimates of the average recovery per allegedly damaged HIIQ share, if the Court approves Lead Counsel's fee and expense application, is $0.32 per allegedly damaged share.

6. **Identification of Attorneys' Representatives:** Lead Plaintiffs, the Class, and Settlement Class are represented by Joseph E. White, III, Brandon Grzandziel, and Adam D. Warden of Saxena White P.A., 7777 Glades Road, Suite 300, Boca Raton, FL 33434, (561) 394-3399, jwhite@saxenawhite.com, bgrzandziel@saxenawhite.com, and awarden@saxenawhite.com; and Steven B. Singer of Saxena White P.A., 10 Bank Street, 8th Floor, White Plains NY, 10606, ssinger@saxenawhite.com.

7. **Reasons for the Settlement:** Lead Plaintiffs' principal reason for entering into the Settlement is the substantial immediate cash benefit for Class Members and Settlement Class Members without the risk or the delays inherent in further litigation. Moreover, the substantial cash benefit provided under the Settlement must be considered against the significant risk that a smaller recovery – or indeed no recovery at all – might be achieved after further contested motions, a trial of the Action and the likely appeals that would follow a trial. This process could be expected to last several years. Defendants, who deny all allegations of wrongdoing or liability whatsoever, are entering into the Settlement solely to eliminate the uncertainty, burden and expense of further protracted litigation.

Before agreeing to the Settlement, Lead Counsel conducted extensive investigation and research into the merits of the Action. This investigation included consultation with experts concerning the amount of damages allegedly suffered by the Class and Settlement Class; detailed review of HIIQ's public filings, including SEC filings, press releases, and other public statements; locating and interviewing fact witnesses; collecting and reviewing more than 1.9 million pages of

documents; taking oral discovery, and researching the applicable law with respect to the claims asserted in the complaint filed in this Action and the potential defenses thereto.

| YOUR LEGAL RIGHTS AND OPTIONS IN THE SETTLEMENT: | |
|---|---|
| **SUBMIT A CLAIM FORM BY MAIL OR ONLINE AT THE SETTLEMENT WEBSITE POSTMARKED OR SUBMITTED NO LATER THAN _____, 2021.** | This is the only way to be potentially eligible to receive a payment from the Settlement Fund. If you are a Class Member or Settlement Class Member and you submit a claim form, you will be bound by the Settlement as approved by the Court and you will give up any Released Plaintiffs' Claims (defined in paragraph 22 below) that you have against Defendants and the other Defendants' Releasees (defined in paragraph 23 below), so it is in your interest to submit a Claim Form. |
| **EXCLUDE YOURSELF BY SUBMITTING A WRITTEN REQUEST FOR EXCLUSION SO THAT IT IS *RECEIVED* NO LATER THAN _____, 2021.** | If you exclude yourself, you will not be eligible to receive any payment from the Settlement Fund. This is the only option that allows you to be part of any other lawsuit against any of the Defendants or the other Defendants' Releasees concerning the Released Plaintiffs' Claims. |
| **OBJECT TO THE SETTLEMENT BY SUBMITTING A WRITTEN OBJECTION SO THAT IT IS *RECEIVED* NO LATER THAN _____, 2021.** | If you do not like the proposed Settlement, the proposed Plan of Allocation, or the request for attorneys' fees and reimbursement of Litigation Expenses, you may write to the Court and explain why you do not like them. You cannot object to the Settlement, the Plan of Allocation or the fee and expense request unless you are a Class Member or Settlement Class Members, and do not exclude yourself. |
| **ATTEND A HEARING ON _____, 2021 AT __:__ __.M., AND FILE A NOTICE OF INTENTION TO APPEAR SO THAT IT IS *RECEIVED* NO LATER THAN _____, 2021.** | Filing a written objection and notice of intention to appear by _____, 2021, allows you to speak in Court, at the discretion of the Court, about the fairness of the proposed Settlement, the Plan of Allocation, and/or the request for attorneys' fees and reimbursement of Litigation Expenses. If you submit a written objection, you may (but you do not have to) attend the hearing and, at the discretion of the Court, speak to the Court about your objection. |
| **DO NOTHING.** | If you are a member of the Class or Settlement Class and you do not submit a valid Claim Form, you will not be eligible to receive any payment from the Settlement Fund. You will, however, remain a member of the Class or Settlement Class, which means that you give up your right to sue about the claims that are resolved by the Settlement and you will be bound by any judgments or orders entered by the Court in the Action. |

| WHAT THIS NOTICE CONTAINS |
|---|

4

Why Did I Get This Notice?   Page __
What Is This Case About?   Page __
How Do I Know If I Am Affected By The Settlement?
Who Is Included In The Class and Settlement Class?   Page __
What Are Lead Plaintiffs' Reasons For The Settlement?   Page __
What Might Happen If There Were No Settlement?   Page __
How Are Class Members and Settlement Class Members Affected By The Action
   And The Settlement?   Page __
How Do I Participate In The Settlement?  What Do I Need To Do?   Page __
How Much Will My Payment Be?   Page __
What Payment Are The Attorneys For The Class and Settlement Class Seeking?
  How Will The Lawyers Be Paid?   Page __
What If I Do Not Want To Be A Member Of The Class or Settlement Class?
   How Do I Exclude Myself?   Page __
When And Where Will The Court Decide Whether To Approve The Settlement?
   Do I Have To Come To The Hearing?  May I Speak At The Hearing If I
   Don't Like The Settlement?   Page __
What If I Bought HIIQ Common Stock On Someone Else's Behalf?   Page __
Can I See The Court File?  Whom Should I Contact If I Have Questions?   Page __

## WHY DID I GET THIS NOTICE?

1. The Court directed that this Notice be mailed to you because you or someone in your family or an investment account for which you serve as a custodian may have purchased or otherwise acquired HIIQ common stock during the period from September 25, 2017 through April 11, 2019, inclusive. The Court has directed us to send you this Notice because, as a potential Class Member or Settlement Class Member, you have a right to know about your options before the Court rules on the proposed Settlement. Additionally, you have the right to understand how this class action lawsuit may generally affect your legal rights. If the Court approves the Settlement, and the Plan of Allocation (or some other plan of allocation), the Claims Administrator selected by Lead Plaintiffs and approved by the Court will make payments pursuant to the Settlement after any objections and appeals are resolved.

2. The purpose of this Notice is to inform you of the existence of this case, that it is a class action, how you might be affected, and how to exclude yourself if you wish to do so. It is also being sent to inform you of the terms of the proposed Settlement, and of a hearing to be held by the Court to consider the fairness, reasonableness, and adequacy of the Settlement, the proposed Plan of Allocation and the motion by Lead Counsel for an award of attorneys' fees and reimbursement of Litigation Expenses (the "Settlement Hearing"). See paragraph 65 below for details about the Settlement Hearing, including the date and location of the hearing.

3. The issuance of this Notice is not an expression of any opinion by the Court concerning the merits of any claim in the Action, and the Court still has to decide whether to approve the Settlement. If the Court approves the Settlement and a plan of allocation, then payments to Authorized Claimants will be made after any appeals are resolved and after the completion of all claims processing. Please be patient, as this process can take some time to complete.

| WHAT IS THIS CASE ABOUT? |
| :---: |

4.  On February 18, 2019, this Action was commenced in the United States District Court for the Middle District of Florida, styled *Julian Keippel v. Health Insurance Innovations, Inc., et al.*, Case No. 8:19-cv-00421-WFJ-CPT.

5.  By Order dated May 13, 2019, the Court appointed Oklahoma Municipal Retirement Fund and City of Birmingham Retirement and Relief System as Lead Plaintiffs and approved Lead Plaintiffs' selection of Saxena White P.A. ("Saxena White") as Lead Counsel.

6.  On July 19, 2019, Lead Plaintiffs filed their Consolidated Class Action Complaint (the "Complaint"), on behalf of the Class, asserting claims against Defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and against the Individual Defendants under Section 20(a) of the Exchange Act. The Complaint alleges, among other things, that Defendants: (1) made allegedly false and misleading statements or omissions claiming HIIQ had "best-in-class" and "market leading" compliance; and (2) made allegedly false and misleading statements or omissions about the purportedly "incredibly low" number of customer complaints upheld by state departments of insurance. The Complaint further alleges that HIIQ's stock price was artificially inflated as a result of Defendants' alleged false and misleading statements, and that HIIQ's stock price declined when the truth regarding Defendants' alleged misrepresentations was revealed. By Order dated November 4, 2019, the Court denied in full Defendants' motion to dismiss for failure to state a claim.

7.  From December 2019 through September 2020, counsel for Lead Plaintiffs and Defendants engaged in extensive fact discovery. Among other things, in response to document requests and subpoenas for the production of documents served by Lead Plaintiffs, Lead Plaintiffs reviewed and analyzed more than 1.9 million pages of documents. In response to discovery requests served on Lead Plaintiffs, Lead Plaintiffs produced over 3,800 pages of documents to Defendants. In addition, Lead Plaintiffs deposed HIIQ's former head of broker compliance, and Defendants deposed Lead Plaintiffs' representatives.

8.  On May 21, 2020, Lead Plaintiffs filed their motion for class certification, which was fully briefed on August 13, 2020. In their motion Lead Plaintiffs sought to certify a class period ranging from September 25, 2017 through April 11, 2019, inclusive (the "Settlement Class Period"). By Order dated August 28, 2020, the Court granted class certification and certified a class period ranging from September 25, 2017 through February 18, 2019, inclusive (the "Class Period"). The Court defined the class as: "All persons or entities that purchased or otherwise acquired HIIQ common stock between September 25, 2017 and February 18, 2019, inclusive, and who were damaged thereby. Excluded from the class are Defendants, the officers and directors of HIIQ, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest." At the time that the Settlement was reached, Lead Plaintiffs had filed and were briefing a motion for reconsideration arguing that the Class Period as certified was incorrectly shortened and should properly be extended to end on April 11, 2019 (which motion has not been decided and will not be decided on its merits given the Settlement).

9. Lead Plaintiffs and Defendants participated in a full-day mediation session on September 3, 2020 with Jed D. Melnick, Esq. of JAMS, conducted remotely via videoconference. The session ended without an agreement to settle. Following the mediation, counsel continued to engage in extensive arm's-length discussions and negotiations concerning a possible settlement of the Action, with the aid of a mediator. On October 21, 2020, the Parties reached an agreement in principle to settle and release all claims asserted against the Defendants in the Action in return for a cash payment of $11,000,000.00 for the benefit of Class Members and Settlement Class Members, subject to certain terms and conditions, including the execution of a customary stipulation and Court approval. The parties promptly informed the Court of the agreement to settle.

10. Based on their investigation, discovery, prosecution and mediation of the case, Lead Plaintiffs and Lead Counsel have concluded that the terms and conditions of the Stipulation are fair, reasonable and adequate to Lead Plaintiffs and the other members of the Class and Settlement Class, and in their best interests. Based on Lead Plaintiffs' oversight of the prosecution of this matter and with the advice of their counsel, each of the Lead Plaintiffs has agreed to settle and release the claims raised in the Action pursuant to the terms and provisions of the Stipulation, after considering: (a) the substantial financial benefit that members of the Class and Settlement Class will receive under the proposed Settlement; (b) the significant risks and costs of continued litigation and trial against Defendants; and (c) the desirability of permitting the proposed Settlement to be consummated as provided by the terms of the Stipulation.

11. The Stipulation and the Settlement constitute a compromise of matters that are in dispute among the Parties. Defendants have entered into the Stipulation solely to eliminate the uncertainty, burden and expense of further protracted litigation. Each of the Defendants denies any wrongdoing, and the Settlement and Stipulation shall in no event be construed or deemed to be evidence of or an admission or concession on the part of any of the Defendants with respect to any claim or allegation of any fault, liability, wrongdoing, or damage whatsoever, or any infirmity in the defenses that the Defendants have, or could have, asserted. Defendants expressly deny that Lead Plaintiffs have asserted any valid claims as to any of them, and expressly deny any and all allegations of fault, liability, wrongdoing, or damages whatsoever. The Stipulation and the Settlement also shall in no event be construed or deemed to be evidence of or an admission or concession on the part of any Lead Plaintiff of an infirmity in any of the claims asserted in the Action, or an admission or concession that any of the Defendants' defenses to liability had any merit.

12. On _____, 2020, the Court preliminarily approved the Settlement, authorized this Notice to be disseminated to potential Class Members and Settlement Class Members, and scheduled the Settlement Hearing to consider, among other things, whether to grant final approval to the Settlement.

> **HOW DO I KNOW IF I AM AFFECTED BY THE SETTLEMENT?**
> **WHO IS INCLUDED IN THE CLASS?**

13. If you are a member of the Class or Settlement Class, you are subject to the Settlement, unless you timely request to be excluded. As set forth in ¶ 8 above, the Class consists of:

All persons or entities that purchased or otherwise acquired HIIQ common stock between September 25, 2017 and February 18, 2019, inclusive, and who were damaged thereby.

As set forth in ¶ 8 above, the Settlement Class consists of:

All persons or entities that purchased or otherwise acquired HIIQ common stock between September 25, 2017 and April 11, 2019, inclusive, and who were damaged thereby.

Excluded from both the Class and Settlement Class are Defendants, the officers and directors of HIIQ, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest. Also excluded are any persons and entities who or which exclude themselves by submitting a timely and valid request for exclusion that is accepted by the Court. See "What If I Do Not Want To Be A Member Of The Class? How Do I Exclude Myself?" on page __ below.

Both Class Members and Settlement Class Members will be potentially eligible to receive a payment from the Settlement Fund in accordance with the Plan of Allocation (set forth at ¶¶ 41-58 below) in exchange for giving up any Released Plaintiffs' Claims (defined in ¶ 22 below) against Defendants and Defendants' Releasees.

**PLEASE NOTE: RECEIPT OF THIS NOTICE DOES NOT MEAN THAT YOU ARE A CLASS MEMBER OR SETTLEMENT CLASS MEMBER, OR THAT YOU WILL BE ENTITLED TO RECEIVE PROCEEDS FROM THE SETTLEMENT. IF YOU ARE A CLASS MEMBER OR SETTLEMENT CLASS MEMBER AND YOU WISH TO BE POTENTIALLY ELIGIBLE TO PARTICIPATE IN THE DISTRIBUTION OF PROCEEDS FROM THE SETTLEMENT, YOU ARE REQUIRED TO SUBMIT THE CLAIM FORM THAT IS BEING DISTRIBUTED WITH THIS NOTICE AND THE REQUIRED SUPPORTING DOCUMENTATION AS SET FORTH THEREIN POSTMARKED OR SUBMITTED ONLINE NO LATER THAN _____, 2021.**

| WHAT ARE LEAD PLAINTIFFS' REASONS FOR THE SETTLEMENT? |
|---|

14. Lead Plaintiffs and Lead Counsel believe that the claims asserted against Defendants have merit. They recognize, however, the expense and length of continued proceedings necessary to pursue their claims against Defendants through further motion practice, trial and appeals, as well as the very substantial risks they would face in establishing liability and damages. Lead Plaintiffs and Lead Counsel recognized that Defendants had numerous avenues of attack that could preclude a recovery. For example, Defendants would assert that their statements were not materially false and misleading, and that even if they were, they did not cause any damage to the Class. Even if the hurdles to establishing liability were overcome, the amount of damages that could be attributed to the allegedly false statements would be hotly contested. Lead Plaintiffs would have to prevail at several stages – reconsideration of the class certification order, motions for summary judgment, trial, and if they prevailed on those, on the appeals that were likely to follow. Thus, there were very significant risks attendant to the continued prosecution of the Action.

15. In light of these risks, the amount of the Settlement and the immediacy of recovery to the Class and Settlement Class, Lead Plaintiffs and Lead Counsel believe that the proposed Settlement

8

is fair, reasonable and adequate, and in the best interests of the Class and Settlement Class. Lead Plaintiffs and Lead Counsel believe that the Settlement provides a substantial benefit to the Class and Settlement Class, namely $11,000,000 in cash (less the various deductions described in this Notice), as compared to the risk that the claims in the Action would produce a smaller or no recovery after summary judgment, trial and appeals, possibly years in the future.

16. Defendants have denied the claims asserted against them in the Action and deny having engaged in any wrongdoing or violation of law of any kind whatsoever. Defendants have agreed to the Settlement solely to eliminate the burden and expense of continued litigation. Accordingly, as noted above, the Settlement may not be construed as an admission of any wrongdoing by Defendants.

## WHAT MIGHT HAPPEN IF THERE WERE NO SETTLEMENT?

17. If there were no Settlement and Lead Plaintiffs failed to establish any essential legal or factual element of their claims against Defendants, neither Lead Plaintiffs nor the other members of the Class or Settlement Class would recover anything from Defendants. Also, if Defendants were successful in proving any of their defenses, either at summary judgment, at trial or on appeal, the Class and/or the Settlement Class could recover substantially less than the amount provided in the Settlement, or nothing at all.

## HOW ARE CLASS MEMBERS AFFECTED
## BY THE ACTION AND THE SETTLEMENT?

18. As a Class Member or Settlement Class Member, you are represented by Lead Plaintiffs and Lead Counsel, unless you enter an appearance through counsel of your own choice at your own expense. You are not required to retain your own counsel, but if you choose to do so, such counsel must file a notice of appearance on your behalf and must serve copies of his or her appearance on the attorneys listed in the section entitled, "When And Where Will The Court Decide Whether To Approve The Settlement?" below.

19. If you are a Class Member or Settlement Class Member and do not wish to remain a Class Member or Settlement Class Member, you may exclude yourself from the Class or Settlement Class by following the instructions in the section entitled, "What If I Do Not Want To Be A Member Of The Class or Settlement Class? How Do I Exclude Myself?" below.

20. If you are a Class Member or Settlement Class Member and you wish to object to the Settlement, the Plan of Allocation, or Lead Counsel's application for attorneys' fees and reimbursement of Litigation Expenses, and if you do not exclude yourself from the Class or Settlement Class, you may present your objections by following the instructions in the section entitled, "When And Where Will The Court Decide Whether To Approve The Settlement?" below.

21. If you are a Class Member or Settlement Class Member and you do not exclude yourself from the Class or Settlement Class, you will be bound by any orders issued by the Court. If the Settlement is approved, the Court will enter a judgment (the "Judgment"). The Judgment will dismiss with prejudice the claims against Defendants and will provide that, upon the Effective Date of the Settlement, Lead Plaintiffs and each of the other Class Members and Settlement Class Members, on behalf of themselves, and their respective heirs, executors, administrators,

predecessors, successors, assigns, assignees, employees, associates, insurers, co-insurers, reinsurers, spouses, trustees, general or limited partners or partnerships, limited liability companies, members, stockholders, underwriters, personal or legal advisors or representatives, estates, or other individuals or entities in which they have a controlling interest or which is related to or affiliated with them, any members of their immediate families, or any trusts for which any of them are trustees, settlors, or beneficiaries, and the predecessors, successors, administrators and assigns of each of the foregoing, in their capacities as such, and anyone claiming through or on behalf of any of them, regardless of whether they execute and deliver a Proof of Claim and Release and regardless of whether they share in the Settlement Fund, shall be deemed to have, and by operation of the Stipulation, of law, and of the Judgment shall have, fully, finally and forever compromised, settled, released, resolved, relinquished, waived, dismissed, covenanted not to commence, institute, intervene in, participate in, or prosecute, and discharged each and every Released Plaintiffs' Claim (as defined in paragraph 22 below) against the Defendants and the other Defendants' Releasees (as defined in paragraph 23 below), and shall forever be barred and enjoined from commencing, instituting, intervening in or participating in, or prosecuting any or all of the Released Plaintiffs' Claims against any of the Defendants' Releasees in any court of law or equity, arbitration tribunal, administrative forum, or other forum of any kind or character, whether brought directly, in a representative capacity, derivatively, or in any other capacity.

22. "Released Plaintiffs' Claims" means all claims, demands, losses, rights, obligations, damages, liabilities, actions, suits, matters, issues, and causes of action of any nature whatsoever, whether known or Unknown Claims, in law or in equity, accrued or unaccrued, fixed or contingent, direct, individual or representative, of every nature and description, that have been or could have been asserted in this Action or could in the future be asserted in any forum, whether foreign or domestic, whether arising under federal, state, local, common, or foreign law or any other law, rule, or regulation, by Lead Plaintiffs, any member of the Class or Settlement Class, or their successors, assigns, executors, administrators, representatives, attorneys, and agents, in their capacities as such, whether brought directly or indirectly against any of the Defendants, which (a) arise out of, are based upon, or relate to in any way, in whole or in part, any of the allegations, acts, transactions, facts, events, matters, occurrences, statements, disclosures, publications, disseminations, presentations, press releases, representations or omissions or failures to act involved, set forth, alleged or referred to, in this Action, or which could have been alleged in this Action, or which could be asserted in the future, in the Action or in any other action in any court or forum, and (b) arise out of, are based upon, or relate to in any way the purchase, acquisition, holding, sale, or disposition of any HIIQ common stock during the Class Period or Settlement Class Period. Released Plaintiffs' Claims do not include: (i) any claims relating to the enforcement of the Settlement; and (ii) any claims of any person or entity who or which submits a request for exclusion from the Class or Settlement Class that is accepted by the Court.

23. "Defendants' Releasees" means Defendants and their respective current and former officers, directors, insurers, principals, agents, parents, affiliates, subsidiaries, divisions, departments, joint ventures, successors, predecessors, assigns, assignees, employees, associates, co-insurers, reinsurers, accountants, and attorneys spouses, heirs, executors, trustees, general or limited partners or partnerships, limited liability companies, members, stockholders, underwriters, personal or legal advisors or representatives, estates, administrators, or other individuals or entities in which Defendants have a controlling interest or which is related to or affiliated with the respective Defendants, any members of their immediate families, or any trusts for which any of them are trustees,

settlors, or beneficiaries, and the predecessors, successors, administrators and assigns of each of the foregoing.

24. "Unknown Claims" means any Released Plaintiffs' Claims that any Lead Plaintiff or any other Class Member or Settlement Class Member does not know or suspect to exist in his, her or its favor at the time of the release of such claims, and any Released Defendants' Claims (as defined in Paragraph 31 below) that any Defendant or any other Defendants' Releasee does not know or suspect to exist in his, her, or its favor at the time of the release of such claims, which, if known by him, her or it, might have affected his, her or its decision(s) with respect to this Settlement, including but not limited to whether to object to the Settlement or seek exclusion from the Class or Settlement Class. With respect to any and all Released Claims, the Parties stipulate and agree that, upon the Effective Date of the Settlement, Lead Plaintiffs and Defendants shall expressly waive, and each of the other Class Members and Settlement Class Members and each of the other Plaintiffs' Releasees and Defendants' Releasees shall be deemed to have waived, and by operation of the Judgment, shall have expressly waived, any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law or foreign law, which is similar, comparable, or equivalent to California Civil Code §1542, which provides:

> A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

Lead Plaintiffs and the Class Members and Settlement Class Members may hereafter discover facts in addition to or different from those which he, she, or it now knows or believes to be true with respect to the subject matter of the Released Claims, but Lead Plaintiffs shall expressly, fully, finally, and forever settle and release, and each Class Member and Settlement Class Member shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever settled and released, any and all Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct which is negligent, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such additional or different facts. Lead Plaintiffs and Defendants acknowledge, and each of the other Class Members and Settlement Class Members, and each of the other Plaintiffs' Releasees and Defendants' Releasees shall be deemed by operation of law to have acknowledged, that the foregoing waiver was separately bargained for and a key element of the Settlement.

25. The Judgment will also provide that, upon the Effective Date of the Settlement, Defendants, on behalf of themselves, and their respective heirs, executors, administrators, predecessors, successors, and assigns, in their capacities as such, shall be deemed to have, and by operation of the Stipulation, of law, and of the Judgment shall have, fully, finally, and forever compromised, settled, released, resolved, relinquished, waived, and discharged each and every Released Defendants' Claim (as defined in paragraph 26 below) against any of the Plaintiffs' Releasees (as defined in paragraph 27 below), and shall forever be barred and enjoined from prosecuting any or all of the Released Defendants' Claims against any of the Plaintiffs' Releasees.

11

26.   "Released Defendants' Claims" means all claims and causes of action of every nature and description, whether known claims or Unknown Claims, whether arising under federal, state, common, or foreign law, that arise out of or relate in any way to the institution, prosecution, or settlement of the claims asserted in the Action against the Defendants.  Released Defendants' Claims do not include any claims relating to the enforcement of the Settlement and any claims against any person or entity who or which submits a request for exclusion from the Class or Settlement Class that is accepted by the Court.

27.   "Plaintiffs' Releasees" means Lead Plaintiffs, all other plaintiffs in the Action, their respective attorneys, and all other Class Members and Settlement Class Members.

28.   The Judgment will also provide that, upon the Effective Date, the Stipulation shall operate conclusively as an estoppel, res judicata, bar, full defense, and any other theory of claim preclusion or issue preclusion or similar defense, argument, or counterclaim in the event, and to the extent, of any claim, demand, action, or proceeding brought by a Lead Plaintiff, Class Member, or Settlement Class Member against any of the Defendants' Releasees with respect to any Released Plaintiffs' Claim, or brought by a Defendant against any of the Plaintiffs' Releasees with respect to any Released Defendants' Claim.

29.   The Judgment shall, among other things, provide for the dismissal with prejudice of the Action against the Defendants, without costs to any Party, except for the payments expressly provided for in the Stipulation.

| HOW DO I PARTICIPATE IN THE SETTLEMENT?  WHAT DO I NEED TO DO? |
| --- |

30.   To be potentially eligible for a payment from the proceeds of the Settlement, you must be a member of the Class or Settlement Class and you must timely complete and return the Claim Form with adequate supporting documentation. The Claim Form and documentation can be submitted by mail or online at the Settlement website, www.HealthInsuranceInnovationsSecuritiesSettlement.com. The Claim Form must be postmarked or submitted online no later than _____, 2021.  A Claim Form is included with this Notice, or you may obtain one from the website maintained by the Claims Administrator for the Settlement, www.HealthInsuranceInnovationsSecuritiesSettlement.com, or you may request that a Claim Form be mailed to you by calling the Claims Administrator toll free at 1-855-914-4697. Please retain all records of your ownership of and transactions in HIIQ common stock, as they may be needed to document your Claim.  If you request exclusion from the Class or Settlement Class or do not submit a timely and valid Claim Form, you will not be eligible to share in the Net Settlement Fund.

| HOW MUCH WILL MY PAYMENT BE? |
| --- |

31.   At this time, it is not possible to make any determination as to how much any individual Class Member or Settlement Class Member may receive from the Settlement.

32.   Pursuant to the Settlement, Defendants have agreed pay eleven million dollars ($11,000,000.00) in cash.  The Settlement Amount will be deposited into an escrow account.  The Settlement Amount plus any interest earned thereon is referred to as the "Settlement Fund."  If the Settlement is approved by the Court and the Effective Date occurs, the "Net Settlement Fund" (that

12

is, the Settlement Fund less (a) all federal, state and/or local taxes (including any interest or penalties thereon) on any income earned by the Settlement Fund, the reasonable costs incurred in connection with determining the amount of and paying taxes owed by the Settlement Fund (including reasonable expenses of tax attorneys and accountants), and all taxes imposed on payments by the Settlement Fund, including withholding taxes; (b) the costs and expenses incurred in connection with providing notice of the Settlement and administering the Settlement; and (c) any attorneys' fees and Litigation Expenses awarded by the Court) will be distributed to Class Members and Settlement Class Members who submit valid Claim Forms, in accordance with the proposed Plan of Allocation or such other plan of allocation as the Court may approve.

33. The Net Settlement Fund will not be distributed unless and until the Court has approved the Settlement and a plan of allocation, and the time for any petition for rehearing, appeal or review, whether by certiorari or otherwise, has expired.

34. Neither Defendants nor any other person or entity that paid any portion of the Settlement Amount on their behalf are entitled to get back any portion of the Settlement Fund once the Court's order or judgment approving the Settlement becomes final. Defendants shall not have any liability, obligation or responsibility for the administration of the Settlement, the disbursement of the Net Settlement Fund or the plan of allocation.

35. Approval of the Settlement is independent from approval of a plan of allocation. Any determination with respect to a plan of allocation will not affect the Settlement, if approved.

36. Unless the Court otherwise orders, any Class Member or Settlement Class Member who fails to submit a Claim Form postmarked or submitted online on or before _____, 2021, shall be fully and forever barred from receiving payments pursuant to the Settlement but will in all other respects remain a Class Member or Settlement Class Member and be subject to the provisions of the Stipulation, including the terms of any Judgment entered and the releases given. This means that each Class Member or Settlement Class Member releases the Released Plaintiffs' Claims (as defined in paragraph 22 above) against the Defendants' Releasees (as defined in paragraph 23 above) and will be permanently barred, enjoined and prohibited from filing, prosecuting, or pursuing any of the Released Plaintiffs' Claims against any of the Defendants' Releasees whether or not such Class Member or Settlement Class Member submits a Claim Form.

37. Participants in and beneficiaries of a plan covered by ERISA ("ERISA Plan") should NOT include any information relating to their transactions in HIIQ common stock held through the ERISA Plan in any Claim Form that they may submit in this Action. They should include ONLY the HIIQ common stock that they purchased, acquired, or sold outside of the ERISA Plan.

38. The Court has reserved jurisdiction to allow, disallow, or adjust on equitable grounds the Claim of any Class Member or Settlement Class Member.

39. Each Claimant shall be deemed to have submitted to the jurisdiction of the Court with respect to his, her or its Claim Form.

40. Only Class Members or Settlement Class Members will be potentially eligible to share in the distribution of the Net Settlement Fund. Persons and entities that are excluded from the Class and/or Settlement Class by definition or that exclude themselves from the Class and/or Settlement

Class pursuant to request will not be eligible to receive a distribution from the Net Settlement Fund and should not submit Claim Forms.

## PROPOSED PLAN OF ALLOCATION

41.    The objective of the Plan of Allocation is to equitably distribute the Net Settlement Fund among Authorized Claimants who suffered economic losses as a proximate result of the alleged wrongdoing.  The calculations made pursuant to the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Class Members or Settlement Class Members might have been able to recover after a trial.  Nor are the calculations pursuant to the Plan of Allocation intended to be estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement.  The computations under the Plan of Allocation are only a method to weigh the claims of Authorized Claimants against one another for the purposes of making pro rata allocations of the Net Settlement Fund.

42.    The Plan of Allocation was created with the assistance of a consulting damages expert and reflects the assumption that Defendants' alleged materially false and misleading statements and material omissions proximately caused the price of HIIQ common stock to be artificially inflated throughout the Class Period and Settlement Class Period.  In calculating the estimated artificial inflation allegedly caused by Defendants' alleged misrepresentations and omissions, Lead Plaintiffs' damages expert considered price changes in HIIQ common stock in reaction to certain public announcements allegedly revealing the truth concerning Defendants' alleged misrepresentations and material omissions, adjusting for price changes that were attributable to market or industry forces.

43.    In order to have recoverable damages, the disclosure of the allegedly misrepresented information must be the cause of the decline in the price of HIIQ common stock.  In this case, Lead Plaintiffs allege that Defendants made false statements and omitted material facts during the period between September 25, 2017 and April 11, 2019, inclusive, which had the effect of artificially inflating the price of HIIQ common stock.[2]  Lead Plaintiffs further allege that corrective information was released to the market on: November 2, 2018, November 27, 2018, March 13, 2019, March 25, 2019, and April 12, 2019, which partially removed the artificial inflation from the price of HIIQ common stock on November 2, 2018, November 5, 2018, November 27, 2018, March 13, 2019, March 26, 2019, and April 12, 2019.

44.    Recognized Loss Amounts are based primarily on the difference in the amount of alleged artificial inflation in the prices of HIIQ common stock at the time of purchase or acquisition and at the time of sale, or the difference between the actual purchase price and sale price.  Accordingly, in order to have a Recognized Loss under the Plan of Allocation, a Class Member or Settlement Class Member who or which purchased or otherwise acquired HIIQ common stock during the period from September 25, 2017 through and including April 11, 2019 must have held those shares

---

[2] Because the Class Period certified by the Court ends on February 18, 2019, claims relating to the alleged corrective disclosures on March 13, 2019, March 25, 2019, and April 12, 2019 were not included in the Class Period. At the time that the Settlement was reached, Lead Plaintiffs had filed and were briefing a motion for reconsideration arguing that the Class Period as certified was incorrectly shortened and should properly be extended to end on April 11, 2019. Due to the substantial litigation risk these claims faced, the artificial inflation amounts on those corrective disclosures have been discounted by 95% (multiplied by 5%).

through at least one of the dates where new corrective information was released to the market and partially removed the artificial inflation from the price of HIIQ common stock.

### Calculation of Recognized Loss Amounts

45. Based on the formula stated below, a Recognized Loss Amount will be calculated for each purchase or acquisition of HIIQ common stock that is listed on the Claim Form and for which adequate documentation is provided. If a Recognized Loss Amount calculates to a negative number or zero under the formula below, that number will be zero.

46. For each share of HIIQ common stock purchased or otherwise acquired during the period from September 25, 2017 through and including April 11, 2019, and:

    i.    sold before November 2, 2018, 12:09 p.m. ET, the Recognized Loss Amount will be $0.00.

    ii.    sold from November 2, 2018 at or after 12:09 p.m. ET through and including April 11, 2019, the Recognized Loss Amount will be *the lesser of:* (i) the amount of artificial inflation per share on the date of purchase/acquisition as stated in Table A below minus the amount of artificial inflation per share on the date of sale as stated in Table A below; (ii) the purchase/acquisition price minus the sale price.

    iii.    sold from April 12, 2019 through and including the close of trading on July 10, 2019, the Recognized Loss Amount will be *the least of:* (i) the amount of artificial inflation per share on the date of purchase/acquisition as stated in Table A below; (ii) the purchase/acquisition price minus the average closing price between April 12, 2019 and the date of sale as stated in Table B below; or (iii) the purchase/acquisition price minus the sale price.

    iv.    held as of the close of trading on July 10, 2019, the Recognized Loss Amount will be *the lesser of:* (i) the amount of artificial inflation per share on the date of purchase/acquisition as stated in Table A below; or (ii) the purchase/acquisition price minus $24.96.[3]

### Additional Provisions

---

[3] Pursuant to Section 21D(e)(1) of the Exchange Act, "in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." Consistent with the requirements of the Exchange Act, Recognized Loss Amounts are reduced to an appropriate extent by taking into account the closing prices of HIIQ common stock during the "90-day look-back period," April 12, 2019 through and including July 10, 2019. The mean (average) closing price for HIIQ common stock during this 90-day look-back period was $24.96.

47.  **Calculation of Claimant's "Recognized Claim":**  A Claimant's "Recognized Claim" will be the sum of his, her, or its Recognized Loss Amounts as calculated above with respect to HIIQ common stock.

48.  **FIFO Matching:** If more than one purchase/acquisition or sale of HIIQ common stock was made during the period from September 25, 2017 through and including April 11, 2019, all purchases/acquisitions and sales will be matched on a First In, First Out ("FIFO") basis.  Sales in the Class Period or Settlement Class Period will be matched first against any holdings at the beginning of the Class Period or Settlement Class Period, and then against purchases/acquisitions in chronological order, beginning with the earliest purchase/acquisition made.

49.  **"Purchase/Sale" Dates:**  Purchases or acquisitions and sales of HIIQ common stock will be deemed to have occurred on the "contract" or "trade" date as opposed to the "settlement" or "payment" date.  The receipt or grant by gift, inheritance, or operation of law of HIIQ common stock during the period from September 25, 2017 through and including April 11, 2019 shall not be deemed a purchase, acquisition or sale of HIIQ common stock for the calculation of a Claimant's Recognized Loss Amount, nor shall the receipt or grant be deemed an assignment of any claim relating to the purchase/acquisition/sale of HIIQ common stock unless (i) the donor or decedent purchased or otherwise acquired or sold HIIQ common stock during the period from September 25, 2017 through and including April 11, 2019; (ii) the instrument of gift or assignment specifically provides that it is intended to transfer such rights; and (iii) no Claim was submitted by or on behalf of the donor, on behalf of the decedent, or by anyone else with respect to such shares of HIIQ common stock.

50.  **Short Sales:**  The date of covering a "short sale" is deemed to be the date of purchase or acquisition of the HIIQ common stock.  The date of a "short sale" is deemed to be the date of sale of the HIIQ common stock.  In accordance with the Plan of Allocation, however, the Recognized Loss Amount on "short sales" and the purchases covering "short sales" is zero.

51.  In the event that a Claimant has an opening short position in HIIQ common stock, the earliest purchases or acquisitions of HIIQ common stock during the period from September 25, 2017 through and including April 11, 2019 will be matched against such opening short position and not be entitled to a recovery until that short position is fully covered.

52.  **Common Stock Purchased/Sold Through the Exercise of Options**:  With respect to HIIQ common stock purchased or sold through the exercise of an option, the purchase/sale date of the common stock is the exercise date of the option and the purchase/sale price is the exercise price of the option.

53.  **Determination of Distribution Amount:**  If the sum total of Recognized Claims of all Authorized Claimants who are entitled to receive payment out of the Net Settlement Fund is greater than the Net Settlement Fund, each Authorized Claimant shall receive his, her, or its pro rata share of the Net Settlement Fund.  The pro rata share will be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund.

54.  If the Net Settlement Fund exceeds the sum total amount of the Recognized Claims of all Authorized Claimants entitled to receive payment out of the Net Settlement Fund, the excess

16

amount in the Net Settlement Fund will be distributed pro rata to all Authorized Claimants entitled to receive payment.

55. If an Authorized Claimant's Distribution Amount calculates to less than $10.00, no distribution will be made to that Authorized Claimant.

56. After the initial distribution of the Net Settlement Fund, the Claims Administrator will make reasonable and diligent efforts to have Authorized Claimants cash their distribution checks. To the extent any monies remain in the Net Settlement Fund six (6) months after the initial distribution, if Lead Counsel, in consultation with the Claims Administrator, determine that it is cost-effective to do so, the Claims Administrator will conduct a re-distribution of the funds remaining after payment of any unpaid fees and expenses incurred in administering the Settlement, including for such re-distribution, to Authorized Claimants who have cashed their initial distributions and who would receive at least $10.00 from such re-distribution. Additional re-distributions to Authorized Claimants who have cashed their prior checks and who would receive at least $10.00 on such additional re-distributions may occur thereafter if Lead Counsel, in consultation with the Claims Administrator, determine that additional re-distributions, after the deduction of any additional fees and expenses incurred in administering the Settlement, including for such re-distributions, would be cost-effective. At such time as it is determined that the re-distribution of funds remaining in the Net Settlement Fund is not cost-effective, the remaining balance will be contributed to non-sectarian, not-for-profit, 501(c)(3) organization(s), to be recommended by Lead Counsel and approved by the Court.

57. Payment pursuant to the Plan of Allocation, or such other plan of allocation as may be approved by the Court, will be conclusive against all Authorized Claimants. No person shall have any claim against Lead Plaintiffs, Plaintiffs' Counsel, Lead Plaintiffs' damages expert, Lead Plaintiffs' consulting experts, Defendants, Defendants' Counsel, or any of the other Plaintiffs' Releasees or Defendants' Releasees, or the Claims Administrator or other agent designated by Lead Counsel arising from distributions made substantially in accordance with the Stipulation, the plan of allocation approved by the Court, or further Orders of the Court. Lead Plaintiffs, the Defendants, and their respective counsel, and all other Defendants' Released Parties, shall have no responsibility or liability whatsoever for the investment or distribution of the Settlement Fund or the Net Settlement Fund; the plan of allocation; the determination, administration, calculation, or payment of any Claim or nonperformance of the Claims Administrator; the payment or withholding of Taxes; or any losses incurred in connection therewith.

58. The Plan of Allocation stated herein is the plan that is being proposed to the Court for its approval by Lead Plaintiffs after consultation with their damages expert. The Court may approve this plan as proposed or it may modify the Plan of Allocation without further notice to the Class. Any Orders regarding any modification of the Plan of Allocation will be posted on the case website.

**Table A**

**Estimated Artificial Inflation with Respect to Transactions in HIIQ Common Stock
September 25, 2017 through April 11, 2019**

| Date Range | Artificial Inflation Per Share |
|---|---|
| September 25, 2017 – November 2, 2018 (prior to 12:09 p.m. ET)[4] | $13.89 |
| November 2, 2018 (at or after 12:09 p.m. ET) – November 4, 2018 | $9.79 |
| November 5, 2018 – November 27, 2018 (prior to 10:37 a.m. ET)[5] | $2.65 |
| November 27, 2018 (at or after 10:37 a.m. ET) – March 13, 2019 (prior to 1:43 p.m. ET)[6] | $0.58 |
| March 13, 2019 (at or after 1:43 p.m. ET) – March 25, 2019 | $0.23 |
| March 26, 2019 – April 11, 2019 | $0.11 |

---

[4] For purposes of this Plan of Allocation, the Claims Administrator will assume that any HIIQ common stock transactions on November 2, 2018 at any price equal to or less than $48.63 per share occurred after the corrective information was released to the market at 12:09 p.m. ET on that day, and any HIIQ common stock transactions at any price greater than $48.63 per share occurred prior to the release of the corrective information at 12:09 p.m. ET on November 2, 2018.

[5] For purposes of this Plan of Allocation, the Claims Administrator will assume that any HIIQ common stock transactions on November 27, 2018 at any price equal to or less than $32.20 per share occurred after the corrective information was released to the market at 10:37 a.m. ET on that day, and any HIIQ common stock transactions at any price greater than $32.20 per share occurred prior to the release of the corrective information at 10:37 a.m. ET on November 27, 2018.

[6] For purposes of this Plan of Allocation, the Claims Administrator will assume that any HIIQ common stock transactions on March 13, 2019 at any price equal to or less than $38.20 per share occurred after the corrective information was released to the market at 1:43 p.m. ET on that day, and any HIIQ common stock transactions at any price greater than $38.20 per share occurred prior to the release of the corrective information at 1:43 p.m. ET on March 13, 2019.

Table B

| | | 90-Day Look-back Table for HIIQ Common Stock Closing Price and Average Closing Price April 12, 2019 through July 10, 2019 | | | |
|---|---|---|---|---|---|
| Date | Closing Price | Average Closing Price between April 12, 2019 and Date Shown | Date | Closing Price | Average Closing Price between April 12, 2019 and Date Shown |
| 4/12/2019 | $23.85 | $23.85 | 5/29/2019 | $23.31 | $23.60 |
| 4/15/2019 | $23.43 | $23.64 | 5/30/2019 | $23.47 | $23.60 |
| 4/16/2019 | $24.20 | $23.83 | 5/31/2019 | $25.79 | $23.66 |
| 4/17/2019 | $23.95 | $23.86 | 6/3/2019 | $26.62 | $23.74 |
| 4/18/2019 | $23.85 | $23.86 | 6/4/2019 | $28.74 | $23.88 |
| 4/22/2019 | $24.85 | $24.02 | 6/5/2019 | $28.72 | $24.01 |
| 4/23/2019 | $26.12 | $24.32 | 6/6/2019 | $28.75 | $24.14 |
| 4/24/2019 | $24.75 | $24.38 | 6/7/2019 | $29.70 | $24.28 |
| 4/25/2019 | $24.55 | $24.39 | 6/10/2019 | $30.50 | $24.44 |
| 4/26/2019 | $25.12 | $24.47 | 6/11/2019 | $28.92 | $24.55 |
| 4/29/2019 | $25.43 | $24.55 | 6/12/2019 | $28.38 | $24.64 |
| 4/30/2019 | $23.32 | $24.45 | 6/13/2019 | $27.78 | $24.71 |
| 5/1/2019 | $21.88 | $24.25 | 6/14/2019 | $27.87 | $24.78 |
| 5/2/2019 | $21.56 | $24.06 | 6/17/2019 | $26.36 | $24.82 |
| 5/3/2019 | $23.76 | $24.04 | 6/18/2019 | $25.67 | $24.84 |
| 5/6/2019 | $25.85 | $24.15 | 6/19/2019 | $25.67 | $24.85 |
| 5/7/2019 | $21.94 | $24.02 | 6/20/2019 | $26.58 | $24.89 |
| 5/8/2019 | $21.72 | $23.90 | 6/21/2019 | $26.09 | $24.91 |
| 5/9/2019 | $21.15 | $23.75 | 6/24/2019 | $26.13 | $24.94 |
| 5/10/2019 | $20.32 | $23.58 | 6/25/2019 | $24.43 | $24.93 |
| 5/13/2019 | $18.86 | $23.36 | 6/26/2019 | $24.17 | $24.91 |
| 5/14/2019 | $21.35 | $23.26 | 6/27/2019 | $24.72 | $24.91 |
| 5/15/2019 | $23.45 | $23.27 | 6/28/2019 | $25.92 | $24.93 |
| 5/16/2019 | $24.02 | $23.30 | 7/1/2019 | $26.40 | $24.96 |
| 5/17/2019 | $23.72 | $23.32 | 7/2/2019 | $25.82 | $24.97 |
| 5/20/2019 | $24.80 | $23.38 | 7/3/2019 | $26.11 | $24.99 |
| 5/21/2019 | $26.11 | $23.48 | 7/5/2019 | $26.17 | $25.01 |
| 5/22/2019 | $25.41 | $23.55 | 7/8/2019 | $25.00 | $25.01 |
| 5/23/2019 | $24.62 | $23.58 | 7/9/2019 | $23.93 | $24.99 |
| 5/24/2019 | $24.90 | $23.63 | 7/10/2019 | $22.91 | $24.96 |
| 5/28/2019 | $23.03 | $23.61 | | | |

## WHAT PAYMENT ARE THE ATTORNEYS FOR THE CLASS SEEKING? HOW WILL THE LAWYERS BE PAID?

59. Plaintiffs' Counsel have not received any payment for their services in pursuing claims against the Defendants, nor have Plaintiffs' Counsel been reimbursed for their out-of-pocket

expenses. Before final approval of the Settlement, Lead Counsel will apply to the Court for an award of attorneys' fees for all Plaintiffs' Counsel in an amount not to exceed one-third (33-1/3%) of the Settlement Fund. At the same time, Lead Counsel also intends to apply for reimbursement of Litigation Expenses in an amount not to exceed $450,000, which may include an application for reimbursement of the reasonable lost wages, costs and expenses incurred by Lead Plaintiffs directly related to their prosecution of this Action. The Court will determine the amount of any award of attorneys' fees or reimbursement of Litigation Expenses. Such sums as may be approved by the Court will be paid from the Settlement Fund. Class Members are not personally liable for any such fees or expenses.

<div style="border:1px solid black; background:#e0e0e0; text-align:center">

**WHAT IF I DO NOT WANT TO BE A MEMBER OF THE CLASS?
HOW DO I EXCLUDE MYSELF?**

</div>

60.    Each Class Member or Settlement Class Member will be bound by all determinations and judgments in this lawsuit, whether favorable or unfavorable, unless such person or entity mails or delivers a written request for exclusion, addressed to Health Insurance Innovations Securities Settlement, Exclusions c/o Epiq, P.O. Box 5657, Portland, OR 97228-5657. The exclusion request must be received no later than _____, 2021. You will not be able to exclude yourself after that date. Each request for exclusion must (a) state the name, address and telephone number of the person or entity requesting exclusion, and in the case of entities the name and telephone number of the appropriate contact person; (b) state that such person or entity "requests exclusion from the Class or Settlement Class in *Julian Keippel v. Health Insurance Innovations, Inc., et al.*, No. 8:19-cv-00421"; (c) state the number of HIIQ shares that the person or entity requesting exclusion purchased/acquired and/or sold during the Class Period or Settlement Class Period, as well as the dates and prices of each such purchase/acquisition and sale, and the number of HIIQ shares held at the beginning of the Class Period (and Settlement Class Period); and (d) be signed by the person or entity requesting exclusion or an authorized representative. A request for exclusion shall not be effective unless it provides all the information called for in this paragraph and is received within the time stated above, or is otherwise accepted by the Court.

61.    If you do not want to be part of the Class or Settlement Class, you must follow these instructions for exclusion even if you have pending, or later file, another lawsuit, arbitration, or other proceeding relating to any Released Plaintiffs' Claim against any of the Defendants' Releasees.

62.    If you ask to be excluded, you will not be eligible to receive any payment out of the Net Settlement Fund.

63.    HIIQ has the right to terminate the Settlement if valid requests for exclusion are received from persons and entities entitled to be members of the Class or Settlement Class in an amount that exceeds an amount agreed to by Lead Plaintiffs and HIIQ, as set forth in a confidential Supplemental Agreement.

| WHEN AND WHERE WILL THE COURT DECIDE WHETHER TO APPROVE THE SETTLEMENT?  DO I HAVE TO COME TO THE HEARING? MAY I SPEAK AT THE HEARING IF I DON'T LIKE THE SETTLEMENT? |
| --- |

64. Class Members or Settlement Class Members do not need to attend the Settlement Hearing. The Court will consider any submission made in accordance with the provisions below even if a Class Member or Settlement Class Member does not attend the hearing.  You can participate in the Settlement without attending the Settlement Hearing.

65. The Settlement Hearing will be held on _____, 2021 at __:__ _.m., in Courtroom 15B of the Sam Gibbons United States Courthouse, 801 North Florida Avenue, Tampa, Florida 33602, or by telephonic, video conferencing or other electronic means, as posted on the website of the Claims Administrator. The Court reserves the right to approve the Settlement, the Plan of Allocation, Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses and/or any other matter related to the Settlement at or after the Settlement Hearing without further notice to the members of the Class or Settlement Class.

66. Any Class Member or Settlement Class Member who or which does not request exclusion may object to the Settlement, the proposed Plan of Allocation or Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses.  Objections must be in writing. You must also serve the papers on the Lead Counsel representatives and on the Defendants' Counsel representative at the addresses set forth below so that the papers are received on or before _____, 2021.

| Clerk's Office | Lead Counsel Representatives | Defendants' Counsel Representative |
| --- | --- | --- |
| U.S. District Court, Middle District of Florida No. 8:19-cv-00421 Sam Gibbons United States Courthouse 801 N. Florida Ave. Tampa, FL 33602 | Brandon T. Grzandziel Adam D. Warden Saxena White P.A. 7777 Glades Road Suite 300 Boca Raton, FL 33434 | Michael Matthews Lauren Valiente Foley & Lardner LLP 100 North Tampa Street, Suite 2700 Tampa, FL 33602-5810 |

67. Any objection (a) must state the name, address and telephone number of the person or entity objecting and must be signed by the objector; (b) must contain a statement of the objection or objections, and the specific reasons for each objection, including any legal and evidentiary support the Class Member or Settlement Class Member wishes to bring to the Court's attention; and (c) must include documents sufficient to prove membership in the Class or Settlement Class, including the number of HIIQ shares that the objecting Class Member or Settlement Class Member purchased/acquired and/or sold during the Class Period or Settlement Class Period, as well as the dates and prices of each such purchase/acquisition and sale, and the number of HIIQ shares held at the beginning of the Class Period or Settlement Class Period.  You may not object to the Settlement, the Plan of Allocation or Lead Counsel's motion for attorneys' fees and reimbursement

of Litigation Expenses if you exclude yourself from the Class or Settlement Class or if you are not a member of the Class or Settlement Class.

68. You may file a written objection without having to appear at the Settlement Hearing. You may not, however, appear at the Settlement Hearing to present your objection unless you first file and serve a written objection in accordance with the procedures described above, unless the Court orders otherwise.

69. If you wish to be heard orally at the hearing in opposition to the approval of the Settlement, the Plan of Allocation or Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses, and if you timely file and serve a written objection as described above, you must also file a notice of appearance with the Clerk's Office and serve it on Lead Counsel and Defendants' Counsel at the addresses set forth in ¶ 66 above so that it is received on or before _____, 2021. Persons who intend to object and desire to present evidence at the Settlement Hearing must include in their written objection or notice of appearance the identity of any witnesses they may call to testify and exhibits they intend to introduce into evidence at the hearing. Such persons may be heard orally at the discretion of the Court.

70. You are not required to hire an attorney to represent you in making written objections or in appearing at the Settlement Hearing. However, if you decide to hire an attorney, it will be at your own expense, and that attorney must file a notice of appearance with the Court and serve it on Lead Counsel and Defendants' Counsel at the addresses set forth in ¶ 66 above so that the notice is received on or before _____, 2021.

71. The Settlement Hearing may be adjourned by the Court without further written notice to the Class or Settlement Class. If you intend to attend the Settlement Hearing, you should confirm the date and time with Lead Counsel.

72. Unless the Court orders otherwise, any Class Member or Settlement Class Member who does not object in the manner described above will be deemed to have waived any objection and shall be forever foreclosed from making any objection to the proposed Settlement, the proposed Plan of Allocation or Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses. Class Members or Settlement Class Members do not need to appear at the Settlement Hearing or take any other action to indicate their approval.

| WHAT IF I BOUGHT HIIQ COMMON STOCK ON SOMEONE ELSE'S BEHALF? |
| --- |

73. If you purchased or otherwise acquired HIIQ common stock during the Class Period or Settlement Class Period for the beneficial interest of persons or organizations other than yourself, you must either (a) within seven (7) calendar days of receipt of this Notice, request from the Claims Administrator sufficient copies of the Notice and Claim Form (the "Notice Packet") to forward to all such beneficial owners and within seven (7) calendar days of receipt of those Notice Packets forward them to all such beneficial owners; or (b) within seven (7) calendar days of receipt of this Notice, provide a list of the names and addresses of all such beneficial owners to Health Insurance Innovations Securities Settlement c/o Epiq, P.O. Box 5657, Portland, OR 97228-5657. If you choose the second option, the Claims Administrator will send a copy of the Notice and the Claim Form to the beneficial owners. Upon full compliance with these directions, such nominees may seek reimbursement of their reasonable expenses actually incurred, by providing the Claims

Administrator with proper documentation supporting the expenses for which reimbursement is sought. Copies of this Notice and the Claim Form may also be obtained from the website maintained by the Claims Administrator, www. HealthInsuranceInnovationsSecuritiesSettlement.com, or by calling the Claims Administrator toll-free at 1-855-914-4697.

**CAN I SEE THE COURT FILE?  WHOM SHOULD I CONTACT IF I HAVE QUESTIONS?**

74.    This Notice contains only a summary of the terms of the proposed Settlement.  For more detailed information about the matters involved in this Action, you are referred to the papers on file in the Action, including the Stipulation, which are available online via the Public Access to Court Electronic Records (PACER) system at https://pacer.uscourts.gov/; to the extent permitted in light of the Court's COVID-19 procedures may be inspected during regular office hours at the Office of the Clerk, United States District Court for the Middle District of Florida, 801 N. Florida Ave., Tampa, FL 33602; or will be provided by Lead Counsel upon request.  Additionally, copies of the Stipulation and any related orders entered by the Court will be posted on the website maintained by the Claims Administrator, www. HealthInsuranceInnovationsSecuritiesSettlement.com.

All inquiries concerning this Notice and the Claim Form should be directed to:

| | | |
|---|---|---|
| Health Insurance Innovations Securities Settlement c/o Epiq P.O. Box 5657 Portland, OR 97228-5657 1-855-914-4697 | and/or | Brandon T. Grzandziel Adam D. Warden SAXENA WHITE P.A. 7777 Glades Road, Suite 300 Boca Raton, FL 33434 (561) 394-339 bgrzandziel@saxenawhite.com awarden@saxenawhite.com |

**DO NOT CALL OR WRITE THE COURT, THE OFFICE OF THE CLERK OF THE COURT, DEFENDANTS OR THEIR COUNSEL REGARDING THIS NOTICE.**

Dated: _____, 2020

By Order of the Court
United States District Court
Middle District of Florida

HIIQ Securities Settlement          Toll-Free Number: 855-914-4697
Claims Administrator               Website: www.HealthInsuranceInnovationsSecuritiesSettlement.com
PO Box 5657                        Email: info@HealthInsuranceInnovationsSecuritiesSettlement.com
Portland, OR 97228-5657

Objection/Exclusion Deadline:          __/__/2021
Settlement Fairness Hearing:           __/__/2021
Deadline to File a Claim:              __/__/2021

<<Mail ID>>
<<Name1>>
<<Name2>>
<<Address1>>
<<Address2>>
<<City>><<State>><<Zip>>
<<Foreign Country>>

## PROOF OF CLAIM AND RELEASE FORM

TO BE ELIGIBLE TO RECEIVE A SHARE OF THE NET SETTLEMENT FUND IN CONNECTION WITH THE SETTLEMENT OF THIS LITIGATION, YOU MUST COMPLETE AND SIGN THIS PROOF OF CLAIM AND RELEASE FORM ("PROOF OF CLAIM") AND EITHER MAIL IT BY PREPAID, FIRST-CLASS MAIL TO THE ABOVE ADDRESS, OR SUBMIT IT ONLINE AT THE SETTLEMENT WEBSITE, WWW.HEALTHINSURANCEINNOVATIONSSECURITIESSETTLEMENT.COM. **THE CLAIM FORM MUST BE POSTMARKED OR SUBMITTED ONLINE NO LATER THAN _____ __, 2021.**

FAILURE TO SUBMIT YOUR PROOF OF CLAIM BY THE DATE SPECIFIED WILL SUBJECT YOUR CLAIM TO REJECTION AND MAY PRECLUDE YOU FROM BEING ELIGIBLE TO RECOVER ANY MONEY IN CONNECTION WITH THE SETTLEMENT.

**DO NOT MAIL OR DELIVER YOUR PROOF OF CLAIM TO THE COURT, THE PARTIES TO THIS LITIGATION, OR THEIR COUNSEL. SUBMIT YOUR PROOF OF CLAIM ONLY TO THE CLAIMS ADMINISTRATOR AT THE ADDRESS SET FORTH ABOVE.**

| TABLE OF CONTENTS | PAGE # |
|---|---|
| PART I – CLAIMANT IDENTIFICATION | 2 |
| PART II – SCHEDULE OF TRANSACTIONS IN HIIQ COMMON STOCK | 3 |
| PART III – RELEASE AND CERTIFICATION | 4-5 |
| PROOF OF CLAIM INSTRUCTIONS | 6 |

1

Before completing this form, please read the detailed instructions on page 6.  When filling out this form, type or print in the boxes below in CAPITAL LETTERS; do not use red ink, pencils or staples

## PART I:        CLAIMANT IDENTIFICATION

Beneficial Owner's First Name

Beneficial Owner's Last Name

Co-Beneficial Owner's First Name

Co-Beneficial Owner's Last Name

Entity Name (if claimant is not an individual)

Representative or Custodian Name (if different from Beneficial Owner(s) listed above)

Account Number (if filing for multiple accounts, file a separate Proof of Claim for each account)

Address1 (street name and number)

Address2 (apartment, unit or box number)

City                                                                                    State   Zip Code

Foreign Country (only if not USA)

Last 4 digits of Social Security Number                    Last 4 digits of Taxpayer Identification Number

OR

Telephone Number (home)                              Telephone Number (work)

Email ddress

Claimant Account Type (check appropriate box):

☐        Individual (includes joint owner accounts)       ☐   Pension Plan       ☐   Trust
☐        Corporation                                                           ☐   Estate
☐        IRA/401K                                                              ☐   Other _____ (please specify)

2

**PART II:** **SCHEDULE OF TRANSACTIONS IN HEALTH INSURANCE INNOVATIONS INC. ("HIIQ") COMMON STOCK**

A.      Number of HIIQ common stock held at the close of trading on September 24, 2017:

B.      Purchases or other acquisitions of HIIQ common stock from September 25, 2017 through April 11, 2019, inclusive *(must be documented)*:

| Trade Date (list chronologically) (MMDDYY) | Number of Shares Purchased or Acquired | Purchase Price per Share | Total Purchase Price* | Transaction Type (P/R)** |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

*Excluding taxes, fees and commissions
** P=Purchase, R=Receipt (transfer in)

C.      Purchases from April 12, 2019 through July 10, 2019. State the total number of HIIQ common stock purchased after the opening of trading on April 12, 2019 through and including the close of trading on July 10, 2019. (Must be documented.) If none, write "zero" or "0".[1]

D.      Sales of HIIQ common stock from September 25, 2017 through July 10, 2019, inclusive *(must be documented)*:

| Trade Date (list chronologically) (MMDDYY) | Number of Shares Sold or Delivered | Sale Price per Share | Total Sale Price* | Transaction Type (S/D)** |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

*Excluding taxes, fees and commissions
** S=Sale, D=Delivery (transfer out)

E.      Number of shares of HIIQ common stock held at the close of trading on July 10, 2019 (if none, enter "0"; if other than zero, must be documented):

**IF YOU NEED ADDITIONAL SPACE TO LIST YOUR TRANSACTIONS PLEASE PHOTOCOPY THE APPROPRIATE PAGE(S), WRITE YOUR NAME ON THE COPY AND CHECK THIS BOX:** ☐

---

[1] Please note: Information requested with respect to your purchases of HIIQ common stock from after the opening of trading on April 12, 2019, through and including the close of trading on July 10, 2019 (Section C.) is needed in order to balance your claim. Purchases during this period, however, are not eligible under the Settlement and will not be used for purposes of calculating your Recognized Loss pursuant to the Plan of Allocation.

**PART III:**     **RELEASE AND CERTIFICATION**

SUBMISSION TO JURISDICTION OF COURT AND ACKNOWLEDGMENTS

I (We) submit this Proof of Claim and Release under the terms of the Stipulation ("Stipulation") described in the Notice of (I) Pendency of Class Action, Certification of Settlement Class, and Proposed Settlement of Class Action; (II) Settlement Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice") and the Order Preliminarily Approving Proposed Settlement and Providing for Notice.[2] I (We) also submit to the jurisdiction of the United States District Court for the Middle District of Florida, with respect to my (our) claim as a Settlement Class Member and for purposes of enforcing the releases set forth herein. I (We) further acknowledge that I am (We are) bound by and subject to the terms of any judgment that may be entered in the Action. I (We) agree to furnish additional information to the Claims Administrator to support this claim if requested to do so. I (We) have not submitted any other claim covering the same purchases or sales of HIIQ common stock during the Settlement Class Period and know of no other person having done so on my (our) behalf.

RELEASES

1.       I (We) hereby acknowledge full and complete satisfaction of, and do hereby fully, finally, and forever settle, release, and discharge from the Released Claims each and all of the "Defendants' Releasees," defined as Defendants (Health Insurance Innovations, Inc. n/k/a Benefytt Technologies, Inc., Gavin Southwell, and Michael D. Hershberger) and their respective current and former officers, directors, insurers, principals, agents, parents, affiliates, subsidiaries, divisions, departments, joint ventures, successors, predecessors, assigns, assignees, employees, associates, co-insurers, reinsurers, accountants, attorneys, spouses, heirs, executors, trustees, general or limited partners or partnerships, limited liability companies, members, stockholders, underwriters, personal or legal advisors or representatives, estates, administrators, or other individuals or entities in which Defendants have a controlling interest or which is related to or affiliated with the respective Defendants, any members of their immediate families, or any trusts for which any of them are trustees, settlors, or beneficiaries, and the predecessors, successors, administrators and assigns of each of the foregoing.

2.       I (We) hereby acknowledge that "Released Claims" includes all "Released Defendants' Claims" and all "Released Plaintiffs' Claims." "Released Defendants' Claims" means as against Lead Plaintiffs, Plaintiffs, Lead Counsel or any Class Member or Settlement Class Member, all claims and causes of action of every nature and description, whether known claims or Unknown Claims, whether arising under federal, state, common or foreign law, that arise out of or relate in any way to the institution, prosecution, or settlement of the claims asserted in the Action. Released Defendants' Claims do not include any claims relating to the enforcement of the Settlement or any claims against any person or entity who or which submits a request for exclusion from the Class or Settlement Class that is accepted by the Court. "Released Plaintiffs' Claims" means all claims, demands, losses, rights, obligations, damages, liabilities, actions, suits, matters, issues, and causes of action of any nature whatsoever, whether known or Unknown Claims, in law or in equity, accrued or unaccrued, fixed or contingent, direct, individual or representative, of every nature and description, that have been or could have been asserted in this Action or could in the future be asserted in any forum, whether foreign or domestic, whether arising under federal, state, local, common, or foreign law or any other law, rule, or regulation, by Lead Plaintiffs, any member of the Class or Settlement Class, or their successors, assigns, executors, administrators, representatives, attorneys, and agents, in their capacities as such, whether brought directly or indirectly against any of the Defendants, which (a) arise out of, are based upon, or relate to in any way, in whole or in part, any of the allegations, acts, transactions, facts, events, matters, occurrences, statements, disclosures, publications, disseminations, presentations, press releases, representations or omissions or failures to act involved, set forth, alleged or referred to, in this Action, or which could have been alleged in this Action, or which could be asserted in the future, in the Action or in any other action in any court or forum, and (b) arise out of, are based upon, or relate to in any way to the purchase, acquisition, holding, sale, or disposition of any HIIQ securities during the Class Period or the Settlement Class Period. Released Plaintiffs' Claims do not include: (i) any claims relating to the enforcement of the Settlement; and (ii) any claims of any person or entity who or which submits a request for exclusion from the Class or Settlement Class that is accepted by the Court.

3.       I (We) hereby acknowledge that "Unknown Claims," as used herein, means any Released Plaintiffs' Claims which any Lead Plaintiff or any other Class Member or Settlement Class Member does not know or suspect to exist in his, her or its favor at the time of the release of such claims, and any Released Defendants' Claims which any Defendant or any other Defendants' Releasee does not know or suspect to exist in his, her, or its favor at the time of the release of such claims, which, if known by him, her or it, might have affected his, her or its decision(s) with respect to this Settlement, including but not limited to whether to object to the Settlement or seek exclusion from the Class or Settlement Class. With respect to any and all Released Claims, the Parties stipulate and agree that, upon the Effective Date of the Settlement, Lead Plaintiffs and

---

[2] All capitalized terms used in this Proof of Claim and Release that are not otherwise defined herein shall have the meanings ascribed to them in the Stipulation.

4

Defendants shall expressly waive, and each of the other Class Members and Settlement Class Members and each of the other Plaintiffs' Releasees and Defendants' Releasees shall be deemed to have waived, and by operation of the Judgment, shall have expressly waived, any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law or foreign law, which is similar, comparable, or equivalent to California Civil Code §1542, which provides:

> A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

Lead Plaintiffs and the Class Members and Settlement Class Members may hereafter discover facts in addition to or different from those which he, she, or it now knows or believes to be true with respect to the subject matter of the Released Claims, but Lead Plaintiffs shall expressly, fully, finally, and forever settle and release, and each Class Member and Settlement Class Member shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever settled and released, any and all Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct which is negligent, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such additional or different facts. Lead Plaintiffs and Defendants acknowledge, and each of the other Class Members and Settlement Class Members and each of the other Plaintiffs' Releasees and Defendants' Releasees shall be deemed by operation of law to have acknowledged, that the foregoing waiver was separately bargained for and a key element of the Settlement.

5.      The releases herein shall be of no force or effect unless and until the Court approves the Stipulation and the Stipulation becomes effective on the Effective Date (as defined in the Stipulation).

6.      I (We) hereby warrant and represent that I (we) have not assigned or transferred or purported to assign or transfer, voluntarily or involuntarily, any matter released pursuant to this release or any other part or portion thereof.

7.      I (We) hereby warrant and represent that I (we) have included information about all of my (our) transactions in HIIQ common stock which occurred during the Settlement Class Period.

I (We) declare under penalty of perjury under the laws of the United States of America that the foregoing information supplied by the undersigned is true and correct.

Executed this _____ day of _____, in _____, _____.
          (Month / Year)     (City)    (State / Country)

| | |
|---|---|
| [ Signature box ] | Date: [ MM ] - [ DD ] - [ YY ] |
| Signature of Claimant | |

[ Print Name box ]

Print Name of Claimant

[ Title box ]

Title of Person Signing on Behalf of Claimant

| | |
|---|---|
| [ Signature box ] | Date: [ MM ] - [ DD ] - [ YY ] |
| Signature of Joint Claimant, if any | |

[ Print Name box ]

Print Name of Joint Claimant

5

_____
Title of Person Signing on Behalf of Claimant

# PROOF OF CLAIM INSTRUCTIONS

A. This Proof of Claim has been sent to you because you may be a member of the Settlement Class in this matter. To participate, you must complete and sign this Proof of Claim and provide supporting documents for any eligible transactions you claim. If you fail to file a properly addressed Proof of Claim and supporting documents, your claim may be rejected, and you may be determined to be ineligible for any payment from the Net Settlement Fund.

B. Submission of this Proof of Claim does not assure that you will share in the proceeds of the Net Settlement Fund created in this Action.

C. YOU MUST COMPLETE AND SUBMIT YOUR PROOF OF CLAIM BY MAIL ADDRESSED TO THE CLAIMS ADMINISTRATOR AS LISTED BELOW OR ONLINE AT THE SETTLEMENT WEBSITE, WWW.HEALTHINSURANCEINNOVATIONSSECURITIESSETTLEMENT.COM. THE CLAIM FORM MUST BE POSTMARKED OR SUBMITTED ONLINE NO LATER THAN _____ __, 2021.

D. If you are NOT a member of the Settlement Class, as defined in the Notice, DO NOT submit a Proof of Claim.

E. If you are a member of the Settlement Class and you do not timely request to be excluded from the Settlement Class, you are bound by the terms of any judgment entered in the Action, WHETHER OR NOT YOU SUBMIT A PROOF OF CLAIM.

F. Use the section of this form entitled "Claimant Information" to identify each owner of record. THIS CLAIM MUST BE FILED BY THE ACTUAL BENEFICIAL OWNER(S), OR THE LEGAL REPRESENTATIVE OF SUCH OWNER(S) OF SHARES UPON WHICH THIS CLAIM IS BASED.

G. Use the section of this form entitled "Schedule of Transactions" to supply all required details of your transaction(s). If you need more space or additional schedules, attach separate sheets giving all of the required information in substantially the same form. Sign and print or type your name on each additional sheet.

H. Complete a separate claim form for each account in which you qualify.

I. Provide all of the requested information with respect to the HIIQ common stock that you acquired at any time on or between September 25, 2017 and April 11, 2019, inclusive, whether such transactions resulted in a profit or a loss. Failure to report all such transactions may result in the rejection of your claim.

J. List each transaction in the Settlement Class Period in chronological order, by trade date, beginning with the earliest. You must accurately provide the month, day and year of each transaction you list.

K. Documentation of your transactions in HIIQ common stock must be attached to your claim. Failure to provide this documentation could delay verification of your claim or result in rejection of your claim.

L. The above requests are designed to provide the minimum amount of information necessary to process the most simple claims. The Claims Administrator may request additional information as required to efficiently and reliably calculate your losses.

***Proof of Claim forms must be postmarked and mailed to HIIQ Securities Settlement, Claims Administrator, PO Box 5657, Portland, OR 97228-5657 or submitted online at the Settlement Website, www.HealthInsuranceInnovationsSecuritiesSettlement.com. The Claim Form must be postmarked or submitted online no later than _____ __, 2021.***

ATTENTION NOMINEES AND BROKERAGE FIRMS: If you are filing claim(s) electronically on behalf of beneficial owners, detailed instructions are available on the Settlement website at **www.HealthInsuranceInnovationsSecuritiesSettlement.com** along with the formatted electronic filing template. You may also send an email to **info@HealthInsuranceInnovationsSecuritiesSettlement.com** requesting this information.

Reminder Checklist
1. Sign the Certification section of the Proof of Claim on page 5.
2. Remember to attach supporting documentation.
3. Do not send original documents.
4. Keep a copy of your Proof of Claim and all documents submitted for your records.

5. If you desire an acknowledgment of receipt of your Proof of Claim form, send your Proof of Claim by Certified Mail, Return Receipt Requested.

6. If you move, please send the Claims Administrator your new address.

<div align="center">

ACCURATE CLAIMS PROCESSING CAN TAKE A SIGNIFICANT
AMOUNT OF TIME. THANK YOU FOR YOUR PATIENCE.

</div>

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| JULIAN KEIPPEL, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>HEALTH INSURANCE INNOVATIONS, INC. n/k/a BENEFYTT TECHNOLOGIES, INC., GAVIN SOUTHWELL, and MICHAEL D. HERSHBERGER,<br><br>Defendants. | CASE NO. 8:19-CV-00421-WFJ-CPT<br><br>CLASS ACTION<br><br>EXHIBIT A-3 |

**SUMMARY NOTICE OF (I) PENDENCY OF CLASS ACTION AND PROPOSED SETTLEMENT OF CLASS ACTION; (II) SETTLEMENT HEARING; AND (III) MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

**TO:   All persons and entities who, during the period from September 25, 2017 through April 11, 2019, inclusive, purchased or otherwise acquired Health Insurance Innovations, Inc. ("HIIQ") common stock, and were allegedly damaged thereby:**

**PLEASE READ THIS NOTICE CAREFULLY, YOUR RIGHTS WILL BE AFFECTED BY A CLASS ACTION LAWSUIT PENDING IN THIS COURT.**

YOU ARE HEREBY NOTIFIED, pursuant to Rule 23 of the Federal Rules of Civil Procedure and an Order of the United States District Court for the Middle District of Florida, that the above-captioned litigation (the "Action") has been certified as a class action on behalf of the Class and Settlement Class, except for certain persons and entities who are excluded from the Class and Settlement Class as set forth in the full printed Notice Of (I) Pendency Of Class Action And Proposed Settlement of Class Action; (II) Settlement Hearing; And (III) Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses (the "Notice").

YOU ARE ALSO NOTIFIED that Lead Plaintiffs in the Action have reached a proposed settlement of the Action for $11,000,000.00 in cash (the "Settlement") that, if approved, will resolve all claims in the Action.

A hearing will be held on _____, 2021 at __:__ _.m., at the United States District Court for the Middle District of Florida, Sam Gibbons United States Courthouse, 801 North Florida Avenue, Courtroom 15B, Tampa, Florida 33602, or by telephonic, video

conferencing or other electronic means, as posted on the website of the Claims Administrator. The hearing will determine (i) whether the proposed Settlement should be approved as fair, reasonable, and adequate; (ii) whether the Action should be dismissed with prejudice against Defendants, and the Releases specified and described in the Stipulation And Agreement Of Settlement (and in the Notice) should be granted; (iii) whether the proposed Plan of Allocation should be approved as fair and reasonable; and (iv) whether Lead Counsel's application for an award of attorneys' fees and reimbursement of Litigation Expenses should be approved. If you file a written objection and notice of appearance before the hearing, you may ask to be heard orally at the hearing or you may appear at the hearing through an attorney you retain.

This Summary Notice relates to a proposed Settlement of claims in a pending securities class action lawsuit brought by investors alleging, among other things, that Defendants HIIQ, Michael D. Hershberger, and Gavin Southwell (collectively, the "Defendants") violated the federal securities laws by making alleged misrepresentations or omissions regarding compliance and customer complaints, which Defendants deny.

**If you purchased HIIQ common stock from September 25, 2017 through April 11, 2019 and were damaged thereby, your rights will be affected by the pending Action and the Settlement, and you may be entitled to share in the Settlement Fund**. If you have not yet received the Notice and Claim Form, you may obtain copies of these documents by contacting the Claims Administrator at Health Insurance Innovations Securities Settlement c/o Epiq, P.O. Box 5657, Portland, OR 97228-5657. Copies of the Notice and Claim Form can also be downloaded from the website maintained by the Claims Administrator, www.HealthInsuranceInnovationsSecuritiesSettlement.com.

In order to be potentially eligible to receive a payment under the proposed Settlement, you must submit a Claim Form online at the Settlement website or by mail. The Claim Form must be submitted or ***postmarked* no later than** _____**, 2021**. If you do not submit a proper Claim Form, you will not be eligible to share in the distribution of the net proceeds of the Settlement but you will nevertheless be bound by any judgments or orders entered by the Court in the Action.

If you wish to exclude yourself, you must submit a request for exclusion such that it is ***received* no later than** _____**, 2021**, in accordance with the instructions set forth in the Notice. If you properly exclude yourself, you will not be bound by any judgments or orders entered by the Court in the Action and you will not be eligible to share in the proceeds of the Settlement.

Any objections to the proposed Settlement, the proposed Plan of Allocation, or Lead Counsel's motion for attorneys' fees and reimbursement of expenses, must be filed with the Court and delivered to representatives of Lead Counsel and Defendants' Counsel such that they **are *received* no later than** _____**, 2021**, in accordance with the instructions set forth in the Notice.

**Please do not contact the Court, the Clerk's office, HIIQ, or Defendants' Counsel regarding this notice. All questions about this notice, the proposed Settlement, or your eligibility to participate in the Settlement should be directed to Lead Counsel or the Claims Administrator.**

2

Requests for the Notice and Claim Form should be made to:

Health Insurance Innovations Securities Settlement
c/o Epiq
P.O. Box 5657
Portland, OR 97228-5657

Inquiries, other than requests for the Notice and Claim Form, should be made to Lead Counsel:

SAXENA WHITE P.A.
Brandon T. Grzandziel
7777 Glades Road, Suite 300
Boca Raton, FL 33434
bgrzandziel@saxenawhite.com

Dated: _____, 2020

By Order of the Court
United States District Court
Middle District of Florida

3

# Exhibit 4: Stipulation and Agreement for Settlement

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| JULIAN KEIPPEL, Individually and On Behalf of All Others Similarly Situated, | CASE NO. 8:19-CV-00421-WFJ-CPT |
| Plaintiff, | <u>CLASS ACTION</u> |
| v. | |
| HEALTH INSURANCE INNOVATIONS, INC. n/k/a BENEFYTT TECHNOLOGIES, INC., GAVIN SOUTHWELL, and MICHAEL D. HERSHBERGER, | |
| Defendants. | |

## <u>STIPULATION AND AGREEMENT OF SETTLEMENT</u>

This Stipulation and Agreement of Settlement, dated as of December 2, 2020 (the "Stipulation") is entered into between (a) plaintiffs Oklahoma Municipal Retirement Fund ("Oklahoma") and City of Birmingham Retirement and Relief System ("Birmingham" and, together with Oklahoma, "Lead Plaintiffs"), on behalf of themselves and the Class and Settlement Class (defined below); and (b) defendant Health Insurance Innovations, Inc., n/k/a Benefytt Technologies, Inc. ("HIIQ" or the "Company"), and defendants Gavin Southwell ("Southwell") and Michael Hershberger ("Hershberger" and, together with Southwell, the "Individual Defendants," and together with HIIQ, "Defendants"), and embodies the terms and conditions of the settlement of the above-captioned action (the "Action").[1]   Subject to the

---

[1]  All terms with initial capitalization not otherwise defined herein shall have the meanings ascribed to them in ¶ 1 herein.  The singular forms of nouns and pronouns include the plural and vice versa.

approval of the Court and the terms and conditions expressly provided herein, this Stipulation is intended to fully, finally and forever compromise, settle, release, resolve, and dismiss with prejudice the Action and all claims asserted therein against Defendants as set forth below.

WHEREAS:

A.    On February 18, 2019, this Action was commenced in the United States District Court for the Middle District of Florida, styled *Julian Keippel v. Health Insurance Innovations, Inc., et al.*, Case No. 8:19-cv-00421-WFJ-CPT.  ECF No. 1.

B.    By Order dated May 13, 2019, the Court appointed Oklahoma and Birmingham as Lead Plaintiffs and approved Lead Plaintiffs' selection of Saxena White P.A. ("Saxena White") as Lead Counsel for the class.  ECF No. 21.

C.    On July 19, 2019, Lead Plaintiffs filed their Consolidated Class Action Complaint (the "Complaint") on behalf of a putative class of HIIQ shareholders, asserting claims against Defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and against the Individual Defendants under Section 20(a) of the Exchange Act.  ECF No. 30.  The Complaint alleges, among other things, that during the alleged class period, Defendants made false and misleading statements or omissions; that HIIQ's stock price was artificially inflated as a result of Defendants' false and misleading statements or omissions; and that HIIQ's stock price declined when the truth regarding Defendants' alleged false and misleading statements or omissions was revealed.

D.    On August 28, 2019, Defendants moved to dismiss the Complaint for failure to state a claim.  ECF No. 41.  On October 7, 2019, Lead Plaintiffs opposed Defendants' motion

2

to dismiss. ECF No. 47. On October 28, 2019, Defendants filed their reply in further support of their motion to dismiss. ECF No. 49.

E. On November 4, 2019, the Court issued an Order denying in full Defendants' motion to dismiss. ECF No. 51.

F. The Court entered a Case Management and Scheduling Order on December 3, 2019. ECF No. 55. At the Parties' request, certain deadlines in the Case Management and Scheduling Order were modified by the Court on March 27, 2020 and September 4, 2020. ECF Nos. 68 and 92.

G. From December 2019 through September 2020, counsel for Lead Plaintiffs and Defendants engaged in extensive fact discovery. Among other things, Lead Plaintiffs served document requests and requests for admissions on Defendants. Defendants produced a total of approximately 230,000 pages to Lead Plaintiffs, and Lead Plaintiffs also received approximately 1.7 million pages from a third party. In response to discovery requests served by Defendants, Lead Plaintiffs also produced over 3,800 pages.

H. On May 21, 2020, Lead Plaintiffs filed their motion for class certification, together with the expert report of Chad Coffman, CFA, opining on market efficiency. ECF No. 70. Lead Plaintiffs' motion for class certification sought certification of a class period from September 25, 2017 through April 11, 2019, inclusive. *Id*. On July 2, 2020, after deposing Lead Plaintiffs' market efficiency expert as well as representatives of both Lead Plaintiffs, Defendants filed their opposition to class certification (ECF No. 80). On August 13, 2020, Lead Plaintiffs filed their reply in further support of class certification. ECF No. 83. On

August 25, 2020, the Court held a hearing and heard oral argument from Lead Plaintiffs and Defendants on Lead Plaintiffs' motion for class certification.  ECF No. 88.

I.  On August 28, 2020, the Court issued its order on class certification.  ECF No. 90.  The court granted class certification and certified the following class: "All persons or entities that purchased or otherwise acquired HIIQ common stock between September 25, 2017 through February 18, 2019, inclusive, and who were damaged thereby."  The class period certified by the Court shortened the class period proposed in the Complaint by moving the ending date from April 11, 2019 to February 18, 2019.  At the time this Settlement was agreed to by the Parties, Lead Plaintiffs had a pending motion for reconsideration asking the Court to move the class period end date to April 11, 2019, which motion has not been ruled on by the Court (and will not be decided on its merits given the Settlement, but will instead be denied as moot, without prejudice pending the Judgment).

J.  On September 3, 2020, the Parties participated in a Court-ordered mediation, with Jed D. Melnick, Esq. of JAMS serving as a mediator.  In advance of the mediation, the Parties submitted and exchanged detailed mediation statements and exhibits, which addressed, among other things, issues related to liability, loss causation, and damages.  The full-day mediation was conducted live, remotely via videoconference.  The session ended without an agreement to settle.  Following the mediation, counsel continued to engage in extensive arm's-length discussions and negotiations concerning a possible settlement of the Action, with the aid of Mr. Melnick.  On October 21, 2020, the Parties reached an agreement in principle to settle and release all claims asserted against the Defendants in the Action in return for a cash payment of $11,000,000 for the benefit of the Class and Settlement Class, subject to certain

4

terms and conditions, including the execution of a customary stipulation and Court approval. The Parties promptly informed the Court of the agreement to settle.

K.      This Stipulation (together with the exhibits hereto and the Supplemental Agreement) has been duly executed by the undersigned signatories on behalf of their respective clients and reflects the final and binding settlement agreement between the Parties.

L.      Based upon their investigation, prosecution and mediation of the case, Lead Plaintiffs and Lead Counsel have concluded that the terms and conditions of this Stipulation are fair, reasonable and adequate to Lead Plaintiffs and the other members of the Class and Settlement Class, and in their best interests.  The Parties agree that certification of the Settlement Class, for settlement purposes only, is appropriate. Nothing in this Stipulation shall serve in any fashion, either directly or indirectly, as evidence or support for certification of a class beyond what was previously certified by the Court's August 28, 2020 Order other than for settlement purposes, and the Parties intend that the provisions herein concerning certification of a Settlement Class shall have no effect whatsoever in the event the Settlement does not become Final.  Based on Lead Plaintiffs' direct oversight of the prosecution of this matter, and with the advice of their counsel, each of the Lead Plaintiffs has agreed to settle and release the claims raised in the Action against the Defendants pursuant to the terms and provisions of this Stipulation, after considering:  (a) the substantial financial benefit that Lead Plaintiffs and the other members of the Class and Settlement Class will receive under the proposed Settlement; (b) the significant risks of continued litigation and trial against Defendants; and (c) the desirability of permitting the settlement to be consummated as provided by the terms of this Stipulation.

M.      This Stipulation constitutes a compromise of matters that are in dispute between the Parties.  Defendants are entering into this Stipulation solely to eliminate the uncertainty, burden and expense of further protracted litigation.  Each of the Defendants denies any wrongdoing, and this Stipulation shall in no event be construed or deemed to be evidence of or an admission or concession on the part of any of the Defendants with respect to any claim or allegation of any fault or liability or wrongdoing or damage whatsoever, or any infirmity in the defenses that Defendants have, or could have, asserted.  Defendants expressly deny that Lead Plaintiffs have asserted any valid claims as to any of them, and expressly deny any and all allegations of fault, liability, wrongdoing or damages whatsoever.  Defendants further expressly deny, *inter alia*, that they made any material misstatements or omissions in HIIQ's public filings, press releases, conference calls, presentations, or other public statements, that Lead Plaintiffs or the Class or Settlement Class have suffered any damages, that the prices of HIIQ securities were artificially inflated by reasons of alleged misrepresentations, non-disclosures or otherwise, and that Lead Plaintiffs or the Class or Settlement Class were harmed by any conduct alleged in the Action or that could have been alleged therein.  Mr. Southwell and Mr. Hershberger further assert that, at all relevant times, they acted in good faith and in a manner they reasonably believed to be in the best interests of the Company and its shareholders.  Similarly, this Stipulation shall in no event be construed or deemed to be evidence of or an admission or concession on the part of any Lead Plaintiff of any infirmity in any of the claims asserted in the Action, or an admission or concession that any of the Defendants' defenses to liability had any merit.  Each of the Parties recognizes and acknowledges, however, that the Action has been initiated, filed and prosecuted by Lead Plaintiffs in good faith and defended by

6

Defendants in good faith, that the Action is being voluntarily settled with the advice of counsel, and that the terms of the Settlement are fair, adequate and reasonable.

NOW, THEREFORE, it is hereby STIPULATED AND AGREED, by and among Lead Plaintiffs (individually and on behalf of all other members of the Class and the Settlement Class) and Defendants, by and through their respective undersigned attorneys and subject to the approval of the Court pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, that, in consideration of the benefits flowing to the Parties from the Settlement, all Released Plaintiffs' Claims as against the Defendants' Releasees and all Released Defendants' Claims as against the Plaintiffs' Releasees shall be settled and released, upon and subject to the terms and conditions set forth below.

## DEFINITIONS

1. As used in this Stipulation, any exhibits attached hereto, and the Supplemental Agreement made a part hereof, the following capitalized terms shall have the following meanings:

  a. "Action" means the action styled *Julian Keippel v. Health Insurance Innovations, Inc., et al.*, No. 8:19-cv-00421 (M.D. Fla.).

  b. "Authorized Claimant" means a Class Member or Settlement Class Member who submits a Proof of Claim and Release Form to the Claims Administrator that is approved by the Court for payment from the Net Settlement Fund.

  c. "Claim" means a Proof of Claim and Release Form submitted to the Claims Administrator.

d. "Claim Form" or "Proof of Claim and Release Form" means the form, substantially in the form attached hereto as Exhibit A-2, that a Claimant must complete and submit should that Claimant seek to share in a distribution of the Net Settlement Fund.

e. "Claimant" means a Class Member or Settlement Class Member who or which submits a Claim Form to the Claims Administrator seeking to be eligible to share in the proceeds of the Settlement Fund.

f. "Claims Administrator" means the firm Epiq Class Action & Claims Solutions, Inc. retained by Lead Plaintiffs and Lead Counsel, subject to approval of the Court, to provide all notices approved by the Court to potential Class Members and Settlement Class Members and to administer the Settlement.

g. "Class" shall have the same definition as in the August 28, 2020 Order (ECF No. 90).

h. "Class Distribution Order" means an order entered by the Court authorizing and directing that the Net Settlement Fund be distributed, in whole or in part, to Authorized Claimants.

i. "Class Member" means each person and entity who or which is a member of the Class.

j. "Class Period" means the period between September 25, 2017 and February 18, 2019, inclusive.

k. "Complaint" means the Consolidated Class Action Complaint For Violations Of The Federal Securities Laws filed by Lead Plaintiffs on July 19, 2019.

8

l.  "Court" means the United States District Court for the Middle District of Florida.

m.  "Defendants" means HIIQ and the Individual Defendants.

n.  "Defendants' Counsel" means Foley & Lardner LLP.

o.  "Defendants' Releasees" means Defendants and their respective current and former officers, directors, insurers, principals, agents, parents, affiliates, subsidiaries, divisions, departments, joint ventures, successors, predecessors, assigns, assignees, employees, associates, co-insurers, reinsurers, accountants, attorneys, spouses, heirs, executors, trustees, general or limited partners or partnerships, limited liability companies, members, stockholders, underwriters, personal or legal advisors or representatives, estates, administrators, or other individuals or entities in which Defendants have a controlling interest or which is related to or affiliated with the respective Defendants, any members of their immediate families, or any trusts for which any of them are trustees, settlors, or beneficiaries, and the predecessors, successors, administrators and assigns of each of the foregoing.

p.  "Effective Date" with respect to the Settlement means the first date by which all of the events and conditions specified in ¶ 36 of this Stipulation have been met and have occurred or have been waived.

q.  "Escrow Account" means an account maintained at Western Alliance Bank wherein the Settlement Amount shall be deposited and held in escrow under the control of Lead Counsel.

r.  "Escrow Agent" means Western Alliance Bank.

s.     "Escrow Agreement" means the agreement between Lead Counsel and the Escrow Agent setting forth the terms under which the Escrow Agent shall maintain the Escrow Account.

t.     "Final," with respect to the Judgment, or any other judgment or court order, means: (i) if no appeal is filed, the expiration date of the time provided for filing or noticing any appeal under the Federal Rules of Appellate Procedure, *i.e.*, thirty (30) days after entry of the judgment or order; or (ii) if there is an appeal from the judgment or order, (a) the date of final dismissal of all such appeals, or the final dismissal of any proceeding on certiorari or otherwise, or (b) the date the judgment or order is finally affirmed on an appeal, the expiration of the time to file a petition for a writ of certiorari or other form of review, or the denial of a writ of certiorari or other form of review, and, if certiorari or other form of review is granted, the date of final affirmance following review pursuant to that grant.  However, any appeal or proceeding seeking subsequent judicial review pertaining solely to an order issued with respect to (i) attorneys' fees, costs or expenses, (ii) the plan of allocation of Settlement proceeds (as submitted or subsequently modified); or (iii) the procedures for determining Authorized Claimants' recognized claims, or distribution of the Net Settlement Fund to Authorized Claimants, shall not in any way delay or preclude a judgment from becoming Final.

u.     "HIIQ" or "the Company" means Health Insurance Innovations, Inc., n/k/a Benefytt Technologies, Inc.

v.     "Individual Defendants" means Gavin Southwell and Michael Hershberger.

w.     "Judgment" means the final judgment, substantially in the form attached hereto as Exhibit B, to be entered by the Court approving the Settlement (or in such other form as may be approved in writing by all of the Parties acting by and through their respective counsel of record in the Action).

x.     "Lead Counsel" means Saxena White P.A.

y.     "Lead Plaintiffs" means Oklahoma Municipal Retirement Fund and City of Birmingham Retirement and Relief System.

z.     "Litigation Expenses" means costs and expenses incurred in connection with commencing, prosecuting and settling the Action (which may include the costs and expenses of Lead Plaintiffs directly related to their representation of the Class and Settlement Class), for which Lead Counsel intend to apply to the Court for reimbursement from the Settlement Fund.

aa.     "Net Settlement Fund" means the Settlement Fund less: (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court; and (iv) any attorneys' fees awarded by the Court.

bb.     "Notice" means the Notice of (i) Pendency of Class Action and Proposed Settlement; (ii) Settlement Fairness Hearing; and (iii) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses, substantially in the form attached hereto as Exhibit A-1, which is to be mailed to Class Members and Settlement Class Members.

cc.     "Notice and Administration Costs" means the costs, fees and expenses that are incurred by the Claims Administrator and/or Lead Counsel in connection with: (i) providing notices to the Class and Settlement Class; and (ii) administering the Settlement,

11

including but not limited to the Claims process, as well as the costs, fees and expenses incurred in connection with the Escrow Account.

dd. "Officer" means any officer as that term is defined in Securities and Exchange Act Rule 16a-1(f).

ee. "Parties" means Defendants and Lead Plaintiffs, on behalf of themselves and the Class and Settlement Class.

ff. "Plaintiffs' Counsel" means Lead Counsel and all other legal counsel who, at the direction and under the supervision of Lead Counsel, performed services on behalf of the Class and Settlement Class in the Action.

gg. "Plaintiffs' Releasees" means Lead Plaintiffs, all other plaintiffs in the Action, their respective attorneys, and all other Class Members and Settlement Class Members.

hh. "Plan of Allocation" means the proposed plan of allocation of the Net Settlement Fund set forth in the Notice.

ii. "Preliminary Approval Order" means the order, substantially in the form attached hereto as Exhibit A, to be entered by the Court preliminarily approving the Settlement and directing that notice of the Settlement be provided to the Class and Settlement Class.

jj. "PSLRA" means the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4, as amended.

kk. "Released Claims" means all Released Defendants' Claims and all Released Plaintiffs' Claims.

ll. "Released Defendants' Claims" means as against Lead Plaintiffs, Plaintiffs, Lead Counsel or any Class Member or Settlement Class Member, all claims and causes of action of every nature and description, whether known claims or Unknown Claims, whether arising under federal, state, common or foreign law, that arise out of or relate in any way to the institution, prosecution, or settlement of the claims asserted in the Action. Released Defendants' Claims do not include any claims relating to the enforcement of the Settlement or any claims against any person or entity who or which submits a request for exclusion from the Class or Settlement Class that is accepted by the Court.

mm. "Released Plaintiffs' Claims" means all claims, demands, losses, rights, obligations, damages, liabilities, actions, suits, matters, issues, and causes of action of any nature whatsoever, whether known or Unknown Claims, in law or in equity, accrued or unaccrued, fixed or contingent, direct, individual or representative, of every nature and description, that have been or could have been asserted in this Action or could in the future be asserted in any forum, whether foreign or domestic, whether arising under federal, state, local, common, or foreign law or any other law, rule, or regulation, by Lead Plaintiffs, any member of the Class or Settlement Class, or their successors, assigns, executors, administrators, representatives, attorneys, and agents, in their capacities as such, whether brought directly or indirectly against any of the Defendants, which (a) arise out of, are based upon, or relate to in any way, in whole or in part, any of the allegations, acts, transactions, facts, events, matters, occurrences, statements, disclosures, publications, disseminations, presentations, press releases, representations or omissions or failures to act involved, set forth, alleged or referred to, in this Action, or which could have been alleged in this Action, or which could be asserted

13

in the future, in the Action or in any other action in any court or forum, and (b) arise out of, are based upon, or relate to in any way to the purchase, acquisition, holding, sale, or disposition of any HIIQ securities during the Class Period or the Settlement Class Period. Released Plaintiffs' Claims do not include: (i) any claims relating to the enforcement of the Settlement; and (ii) any claims of any person or entity who or which submits a request for exclusion from the Class or Settlement Class that is accepted by the Court.

nn.  "Releasee(s)" means each and any of the Defendants' Releasees and each and any of the Plaintiffs' Releasees.

oo.  "Releases" means the releases set forth in ¶¶ 4-7 of this Stipulation.

pp.  "Settlement" means the settlement between Lead Plaintiffs, Class, and Settlement Class and Defendants on the terms and conditions set forth in this Stipulation.

qq.  "Settlement Amount" means eleven million dollars ($11,000,000.00) in cash.  Except as provided for in ¶ 46, Defendants shall not have any obligation whatsoever to pay any amount over and above the principal amount of eleven million dollars ($11,000,000.00) in cash.

rr.  "Settlement Class" means all persons or entities that purchased or otherwise acquired HIIQ common stock between September 25, 2017 through April 11, 2019, inclusive, and who were allegedly damaged thereby. Excluded from the Settlement Class are Defendants, the officers and directors of HIIQ, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

14

ss.     "Settlement Class Member" means each person and entity who or which is a member of the Settlement Class.

tt.     "Settlement Class Period" means the period from September 25, 2017 through April 11, 2019, inclusive.

uu.     "Settlement Fund" means the Settlement Amount plus any and all interest earned thereon.

vv.     "Settlement Hearing" means the hearing set by the Court under Rule 23(e)(2) of the Federal Rules of Civil Procedure to consider final approval of the Settlement.

ww.     "Summary Notice" means the Summary Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses, substantially in the form attached hereto as Exhibit A-3, to be published as set forth in the Preliminary Approval Order.

xx.     "Taxes" means (i) all federal, state and/or local taxes of any kind (including any interest or penalties thereon, and any estimated taxes) on any income earned by the Settlement Fund, including but not limited to any taxes or tax detriments that might be imposed upon Defendants or Defendants' Releasees with respect to any income earned by the Settlement Fund for any period during which the Settlement Fund does not qualify as a "Qualified Settlement Fund" for federal or state income tax purposes, which if imposed shall be reimbursed from the Settlement Fund to Defendants or Defendants' Releasees within fourteen (14) days of written demand for such reimbursement; (ii) the expenses and costs incurred in connection with determining the amount of, and paying, any taxes owed by the Settlement Fund (including,

15

without limitation, expenses of tax attorneys and accountants); and (iii) all taxes imposed on payments by the Settlement Fund, including withholding taxes.

yy.    "Unknown Claims" means any Released Plaintiffs' Claims which any Lead Plaintiff or any other Class Member or Settlement Class Member does not know or suspect to exist in his, her or its favor at the time of the release of such claims, and any Released Defendants' Claims which any Defendant or any other Defendants' Releasee does not know or suspect to exist in his, her, or its favor at the time of the release of such claims, which, if known by him, her or it, might have affected his, her or its decision(s) with respect to this Settlement, including but not limited to whether to object to the Settlement or seek exclusion from the Class or Settlement Class.  With respect to any and all Released Claims, the Parties stipulate and agree that, upon the Effective Date of the Settlement, Lead Plaintiffs and Defendants shall expressly waive, and each of the other Class Members and Settlement Class Members and each of the other Plaintiffs' Releasees and Defendants' Releasees shall be deemed to have waived, and by operation of the Judgment, shall have expressly waived, any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law or foreign law, which is similar, comparable, or equivalent to California Civil Code §1542, which provides:

> A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

Lead Plaintiffs and the Class Members and Settlement Class Members may hereafter discover facts in addition to or different from those which he, she, or it now knows or believes to be true with respect to the subject matter of the Released Claims, but Lead Plaintiffs shall expressly, fully,

16

finally, and forever settle and release, and each Class Member and Settlement Class Member shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever settled and released, any and all Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct which is negligent, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such additional or different facts. Lead Plaintiffs and Defendants acknowledge, and each of the other Class Members and Settlement Class Members and each of the other Plaintiffs' Releasees and Defendants' Releasees shall be deemed by operation of law to have acknowledged, that the foregoing waiver was separately bargained for and a key element of the Settlement.

## CERTIFICATION OF SETTLEMENT CLASS

2. Solely for purposes of this Stipulation and the Settlement and for no other purpose, Defendants and Lead Plaintiffs on behalf of themselves and each of the Class Members and Settlement Class Members stipulate and agree to: (a) certification of the Settlement Class pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3); (b) appointment of Lead Plaintiffs, Oklahoma and Birmingham as Settlement Class Representatives; and (c) appointment of Saxena White P.A. as Settlement Class Counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure. In the event that the Settlement upon the terms and conditions set forth in this Stipulation is not approved by the Court, is terminated, or the Effective Date (*see* ¶ 36) does not occur for any reason, the certification of the Settlement Class automatically shall be revoked without requiring any additional action by the Parties or the

Court (provided however, that any such revocation shall not revoke certification of the Class as defined and certified by the Court in its August 28, 2020 Order).  In such event, Defendants reserve their right to object for any and all reasons to the certification of the Settlement Class or to the appointment of Lead Plaintiffs as Settlement Class representatives or to the appointment of Saxena White P.A. as Settlement Class Counsel, and this Stipulation shall not be used or considered in any way in connection with class certification or class representation.

## **PRELIMINARY APPROVAL OF SETTLEMENT**

3.      Promptly upon execution of this Stipulation, Lead Plaintiffs will move for preliminary approval of the Settlement and the scheduling of a hearing for consideration of final approval of the Settlement, which motion shall be unopposed by Defendants. Concurrently with the motion for preliminary approval, Lead Plaintiffs shall apply to the Court for, and Defendants shall agree to, entry of the Preliminary Approval Order, substantially in the form attached hereto as Exhibit A.  All proceedings in the Action shall be stayed, other than proceedings necessary to carry out or enforce the terms and conditions of the Stipulation. Pending final determination whether the Settlement should be approved, Defendants, Lead Plaintiff, Lead Counsel, and all members of the Class and Settlement Class are barred and enjoined from commencing, instituting, intervening in or participating in, prosecuting or continuing to prosecute any action or other proceeding in any court of law or equity, arbitration tribunal, or administrative forum, or other forum of any kind or character (whether brought directly, in a representative capacity, derivatively, or in any other capacity), that asserts any of the Released Claims against any of the Releasees.

18

## <u>RELEASE OF CLAIMS</u>

4.      The obligations incurred pursuant to this Stipulation are in consideration of: (i) the full and final disposition of the Action; and (ii) the Releases provided for herein.

5.      As a material condition of the Settlement, pursuant to the Judgment, without further action by anyone, upon the Effective Date of the Settlement, Lead Plaintiffs and each of the other Class Members and Settlement Class Members, on behalf of themselves, and their respective heirs, executors, administrators, predecessors, successors, assigns, assignees, employees, associates, insurers, co-insurers, reinsurers, spouses, trustees, general or limited partners or partnerships, limited liability companies, members, stockholders, underwriters, personal or legal advisors or representatives, estates, or other individuals or entities in which they have a controlling interest or which is related to or affiliated with them, any members of their immediate families, or any trusts for which any of them are trustees, settlors, or beneficiaries, and the predecessors, successors, administrators and assigns of each of the foregoing, in their capacities as such, and anyone claiming through or on behalf of any of them, regardless of whether they execute and deliver a Proof of Claim and Release and regardless of whether they share in the Settlement Fund, shall be deemed to have, and by operation of this Stipulation, of law, and of the Judgment shall have, fully, finally and forever compromised, settled, released, resolved, relinquished, waived, dismissed and discharged each and every Released Plaintiffs' Claim against the Defendants' Releasees, and covenant not to commence, institute, intervene in, participate in, or prosecute, and shall forever be barred and enjoined from commencing, instituting, intervening in or participating in, or prosecuting, any or all of the Released Plaintiffs' Claims against any of the Defendants' Releasees in any court of law or equity, arbitration

tribunal, administrative forum, or other forum of any kind or character, whether brought directly, in a representative capacity, derivatively, or in any other capacity.

6. Pursuant to the Judgment, without further action by anyone, upon the Effective Date of the Settlement, Defendants, on behalf of themselves, and their respective heirs, executors, administrators, predecessors, successors, and assigns, in their capacities as such, shall be deemed to have, and by operation of this Stipulation, of law, and of the Judgment shall have, fully, finally, and forever compromised, settled, released, resolved, relinquished, waived, and discharged each and every Released Defendants' Claim against the Plaintiffs' Releasees, and shall forever be barred and enjoined from prosecuting any or all of the Released Defendants' Claims against any of the Plaintiffs' Releasees. This release shall not apply to any person or entity who or which submits a request for exclusion from the Class or Settlement Class that is accepted by the Court.

7. Upon the Effective Date, this Stipulation shall operate conclusively as an estoppel, res judicata, bar, full defense, and any other theory of claim preclusion or issue preclusion or similar defense, argument, or counterclaim in the event, and to the extent, of any claim, demand, action, or proceeding brought by a Lead Plaintiff, Class Member, or Settlement Class Member against any of the Defendants' Releasees with respect to any Released Plaintiffs' Claims, or brought by a Defendant against any of the Plaintiffs' Releasees with respect to any Released Defendants' Claim.

8. Notwithstanding ¶¶ 4-7 above, nothing in the Judgment shall bar any action by any of the Parties to enforce or effectuate the terms of this Stipulation or the Judgment.

9.      The Judgment shall, among other things, provide for the dismissal with prejudice of the Action against the Defendants, without costs to any Party, except for the payments expressly provided for herein.

## THE SETTLEMENT CONSIDERATION

10.      In consideration of the Settlement and the release of the Released Plaintiffs' Claims against Defendants and the other Defendants' Releasees, Defendants shall cause the Settlement Amount to be deposited into the Escrow Account within twenty (20) business days following the date of entry by the Court of an order preliminarily approving this Settlement, provided that Lead Counsel has first provided Defendants' Counsel with: (a) a W-9 for the Escrow Account, and (b) wire or check mailing instructions for payment to the Escrow Account.   The Settlement Amount represents the entirety of the Defendants' financial obligations under this Stipulation and in connection with this Settlement, meaning that the Settlement Amount includes all attorneys' fees and expenses, Notice and Administration Costs, Taxes, and costs of any kind whatsoever associated with the Settlement.   The full payment of the entire Settlement Amount into the Escrow Account in accordance with this paragraph fully discharges Defendants' financial obligations under this Stipulation and in connection with the Settlement, meaning that none of the Defendants shall have any other obligation to make any payment into the Escrow Account or to any Class Member or Settlement Class Member, or any other person, under this Stipulation or as part of the Settlement once the payment described in this paragraph has been made.

21

Case 1:19-cv-10412-JMF Document 106-21 Filed 12/03/22 Page 18 of 306
Case 1:19-cv-10412-JMF Document 100-21 Filed 12/02/22 Page 211 of 306
PageID 2374

## USE OF SETTLEMENT FUND

11. Subject to the terms and conditions of this Stipulation and the Settlement, the Settlement Fund shall be used to pay: (a) any Taxes; (b) any Notice and Administration Costs; (c) any Litigation Expenses awarded by the Court; and (d) any attorneys' fees or other amounts awarded by the Court. The balance remaining in the Settlement Fund, that is, the Net Settlement Fund, shall be distributed to Authorized Claimants as provided in ¶¶ 20-33 below, or as otherwise ordered by the Court.

12. Except as provided herein or pursuant to orders of the Court, the Net Settlement Fund shall remain in the Escrow Account prior to the Effective Date. All funds held by the Escrow Agent shall be deemed to be in the custody of the Court, and shall remain subject to the jurisdiction of the Court until such time as the funds shall be distributed or returned pursuant to the terms of this Stipulation or further order of the Court. The Escrow Agent shall invest any funds in the Escrow Account exclusively in United States Treasury Bills (or a mutual fund invested solely in such instruments) and shall collect and reinvest all interest accrued thereon, except that any residual cash balances up to the amount that is insured by the FDIC may be deposited in any account that is fully insured by the FDIC. In the event that the yield on United States Treasury Bills is negative, in lieu of purchasing such Treasury Bills, all or any portion of the funds held by the Escrow Agent may be deposited in any account that is fully insured by the FDIC or backed by the full faith and credit of the United States. Additionally, if short-term placement of the funds is necessary, all or any portion of the funds held by the Escrow Agent may be deposited in any account that is fully insured by the FDIC or backed by the full faith and credit of the United States. Defendants bear no risk,

responsibility, or liability relating to the costs or risks relating to the investment of the Settlement Fund and/or the Net Settlement Fund.

13.     The Parties agree that the Settlement Fund is intended to be a Qualified Settlement Fund within the meaning of Treasury Regulation § 1.468B-1 and that Lead Counsel, as administrators of the Settlement Fund within the meaning of Treasury Regulation § 1.468B-2(k)(3), shall be solely responsible for filing or causing to be filed all informational and other tax returns or other tax-related documents as may be necessary or appropriate (including, without limitation, the returns described in Treasury Regulation § 1.468B-2(k)) for the Settlement Fund.  Lead Counsel shall also be responsible for causing payment to be made from the Settlement Fund of any Taxes owed with respect to the Settlement Fund.  The Defendants' Releasees shall not have any liability or responsibility for any Taxes.  Upon written request, HIIQ will provide to Lead Counsel the statement described in Treasury Regulation § 1.468B-3(e).  Lead Counsel, as administrators of the Settlement Fund within the meaning of Treasury Regulation § 1.468B-2(k)(3), shall timely make such elections as are necessary or advisable to carry out this paragraph, including, as necessary, making a "relation back election," as described in Treasury Regulation § 1.468B-1(j), to cause the Qualified Settlement Fund to come into existence at the earliest allowable date, and shall take or cause to be taken all actions as may be necessary or appropriate in connection therewith.

14.     All Taxes shall be timely paid out of the Settlement Fund by the Escrow Agent without further order of the Court pursuant to the disbursement instructions to be set forth in the Escrow Agreement.  Any tax returns prepared for the Settlement Fund (as well as the election set forth therein) shall be consistent with the previous paragraph and in all events shall

23

reflect that all Taxes on the income earned by the Settlement Fund shall be paid out of the Settlement Fund as provided herein. The Defendants and the other Defendants' Releasees shall have no responsibility or liability for the acts or omissions of the Claims Administrator, the Escrow Agent, Lead Counsel, or their agents with respect to the reporting or payment of Taxes, and the Settlement Fund shall indemnify and hold each of the Defendants and Defendants' Releasees harmless for Taxes (including, without limitation, Taxes payable by reason of any such indemnification).

15. The Settlement is not a claims-made settlement. Upon the occurrence of the Effective Date, unless the Settlement is not approved or is terminated as provided for herein, no Defendants' Releasee, or any other person or entity who or which paid any portion of the Settlement Amount, shall have any right to the return of the Settlement Fund or any portion thereof for any reason whatsoever, including without limitation, the number of Claim Forms submitted, the collective amount of recognized claims of Authorized Claimants, the percentage of recovery of losses, or the amounts to be paid to Authorized Claimants from the Net Settlement Fund.

16. Notwithstanding the fact that the Effective Date of the Settlement has not yet occurred, Lead Counsel may pay from the Settlement Fund, without further approval from Defendants or further order of the Court, Notice and Administration Costs actually incurred and paid or payable, which shall not exceed $200,000. In the event that the Settlement is terminated pursuant to the terms of this Stipulation, all Notice and Administration Costs properly paid or incurred, including any related fees, shall not be returned or repaid to any of

24

the Defendants' Releasees, or any other person or entity who or which paid any portion of the Settlement Amount.

## ATTORNEYS' FEES AND LITIGATION EXPENSES

17. Lead Counsel will apply to the Court for a collective award of attorneys' fees to Plaintiffs' Counsel to be paid from (and out of) the Settlement Fund once funded. Lead Counsel also will apply to the Court for reimbursement of Litigation Expenses, which may include a request for reimbursement of Lead Plaintiffs' costs and expenses directly related to their representation of the Class and Settlement Class, to be paid from (and out of) the Settlement Fund. Lead Counsel's application for an award of attorneys' fees or Litigation Expenses is not the subject of any agreement between Defendants and Lead Plaintiffs other than what is set forth in this Stipulation.

18. Any attorneys' fees and Litigation Expenses that are awarded by the Court shall be paid to Lead Counsel from the Settlement Fund immediately upon award, notwithstanding the existence of any timely filed objections thereto, or potential for appeal therefrom, or collateral attack on the Settlement or any part thereof, subject to Lead Counsel's obligation to make appropriate refunds or repayments to the Settlement Fund if the Settlement is terminated pursuant to the terms of this Stipulation or if, as a result of any court order, appeal, or further proceedings on remand, or successful collateral attack, the award of attorneys' fees or Litigation Expenses is reduced or reversed, and such order reducing or reversing the award has become Final. Lead Counsel shall make the appropriate refund or repayment in full (including interest thereon at the same rate as would have been earned had those sums remained in the Escrow Account) no later than thirty (30) days after: (a) receiving from Defendants' Counsel

25

notice of the termination of the Settlement; or (b) any order reducing or reversing the award of attorneys' fees or Litigation Expenses has become Final. An award of attorneys' fees or Litigation Expenses is not a necessary term of this Stipulation and is not a condition of the Settlement embodied herein. Neither Lead Plaintiffs nor Lead Counsel may cancel or terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees or Litigation Expenses.

19. Defendants' Releasees shall have no responsibility for or liability whatsoever with respect to the payment, allocation, or award of attorneys' fees or Litigation Expenses. The attorneys' fees and Litigation Expenses that are awarded to Plaintiffs' Counsel shall be payable solely from the Settlement Fund in the Escrow Account.

## NOTICE AND SETTLEMENT ADMINISTRATION

20. As part of the Preliminary Approval Order, Lead Plaintiffs shall seek appointment of a Claims Administrator. The Claims Administrator shall administer the Settlement, including, but not limited to, the process of receiving, reviewing, and approving or denying Claims, under Lead Counsel's supervision and subject to the jurisdiction of the Court. Other than HIIQ's obligation to provide shareholder information as provided in ¶ 21 below, none of the Defendants nor any other Defendants' Releasees shall have any involvement in or any responsibility, authority, or liability whatsoever for the selection of the Claims Administrator, the Plan of Allocation, the administration of the Settlement, the Claims process, or disbursement of the Net Settlement Fund, and shall have no liability whatsoever to any person or entity, including, but not limited to, Lead Plaintiffs, any other Class Members or Settlement Class Members, or Lead Counsel, in connection with the foregoing. Defendants'

26

Counsel shall cooperate in the administration of the Settlement to the extent reasonably necessary to effectuate its terms.

21.     In accordance with the terms of the Preliminary Approval Order to be entered by the Court, Lead Counsel shall cause the Claims Administrator to mail the Notice and Proof of Claim and Release Form to those members of the Class and Settlement Class as may be identified through reasonable effort.  Lead Counsel shall also cause the Claims Administrator to have the Summary Notice published in accordance with the terms of the Preliminary Approval Order to be entered by the Court.  For the purposes of identifying and providing notice to the Class and Settlement Class, within seven days of the date of entry of the Preliminary Approval Order, HIIQ shall provide or cause to be provided to the Claims Administrator (at no cost to the Settlement Fund, Lead Counsel, or the Claims Administrator) records reasonably available to HIIQ or its transfer agent concerning the identity and last known address of Class Members and Settlement Class Members, in electronic form or other form as is reasonably available to HIIQ or its transfer agent, which information the Claims Administrator shall treat and maintain as confidential.

22.     The Claims Administrator shall receive Claims and determine first, whether the Claim is a valid Claim, in whole or part, and second, each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's recognized claim compared to the total recognized claims of all Authorized Claimants (as set forth in the Plan of Allocation set forth in the Notice attached hereto as Exhibit A-1, or in such other plan of allocation as the Court approves).

23.     The Plan of Allocation proposed in the Notice is not a necessary term of the Settlement or of this Stipulation and it is not a condition of the Settlement or of this Stipulation that any particular plan of allocation be approved by the Court.  Lead Plaintiffs and Lead Counsel may not cancel or terminate the Settlement (or this Stipulation) based on this Court's or any appellate court's ruling with respect to the Plan of Allocation or any other plan of allocation in this Action, and any order or proceeding relating to the Plan of Allocation shall not operate to terminate or cancel the Stipulation or affect the finality of the approval of the Settlement.  Defendants and the other Defendants' Releasees shall not object in any way to the Plan of Allocation or any other plan of allocation in this Action.  No Defendant, nor any other Defendants' Releasee, shall have any involvement with or liability, obligation, or responsibility whatsoever in connection with the Plan of Allocation or any other Court-approved plan of allocation.

24.     Any Class Member or Settlement Class Member who does not submit a valid Claim Form by the deadline set by the Court (unless and to the extent the deadline is extended by the Court) will not be entitled to receive any distribution from the Net Settlement Fund, but will, nevertheless, upon the occurrence of the Effective Date, be bound by all of the terms of this Stipulation and Settlement (including the terms of the Judgment) and the Releases provided for herein and therein, and will be permanently barred and enjoined from bringing any action, claim, or other proceeding of any kind against any of the Defendants or any of the other Defendants' Releasees with respect to the Released Plaintiffs' Claims.

25.     Any Class Member or Settlement Class Member who or which does not timely and validly request exclusion from the Class or Settlement Class in the manner stated in the

28

Preliminary Approval Order: (a) shall be deemed to have waived his, her or its right to be excluded from the Class or Settlement Class; (b) shall be forever barred from requesting exclusion from the Class or Settlement Class in this or any other proceeding; (c) shall be bound by the provisions of this Stipulation, the Settlement, and all proceedings, determinations, orders and judgments in the Action relating to the Settlement, including, but not limited to, the Judgment, and the Releases provided for therein whether favorable or unfavorable to the Class or Settlement Class; and (d) shall be barred from commencing, maintaining or prosecuting any of the Released Plaintiffs' Claims against any of the Defendants' Releasees.

26. Lead Counsel shall be responsible for supervising the administration of the Settlement and the disbursement of the Net Settlement Fund subject to Court approval. No Defendant, or any other Defendants' Releasee, shall be responsible for, have any liability for, or permitted to review, contest or object to any Claim Form, or any decision of the Claims Administrator or Lead Counsel with respect to accepting or rejecting any Claim for payment by a Class Member or Settlement Class Member. Lead Counsel shall have the right, but not the obligation, to waive what they deem to be formal or technical defects in any Claim Forms submitted in the interests of achieving substantial justice.

27. The Net Settlement Fund shall be distributed to Authorized Claimants only after the later of the Effective Date; the Court having approved a plan of allocation in an order that has become Final; and the Court issuing a Class Distribution Order that has become Final.

28. For purposes of determining the extent, if any, to which a Class Member or Settlement Class Member shall be entitled to be treated as an Authorized Claimant, the following conditions shall apply:

29

a.      Each Class Member or Settlement Class Member shall be required to submit a Claim Form, substantially in the form attached hereto as Exhibit A-2, supported by such documents as are designated therein, including proof of the Claimant's loss, or such other documents or proof as the Claims Administrator or Lead Counsel, in their discretion, may deem acceptable;

b.      All Claim Forms must be submitted by the date set by the Court in the Preliminary Approval Order and specified in the Notice, unless extended by the Court. Any Class Member or Settlement Class Member who fails to submit a Claim Form by such date shall be forever barred from receiving any distribution from the Net Settlement Fund or payment pursuant to this Stipulation (unless by Order of the Court such Class Member's or Settlement Class Member's Claim Form is accepted), but shall in all other respects be bound by all of the terms of this Stipulation and the Settlement, including the terms of the Judgment and by the Releases provided for herein and therein, and will be permanently barred and enjoined from bringing any action, claim, or other proceeding of any kind against any Defendants' Releasees with respect to any Released Plaintiffs' Claim.  Provided that it is mailed by the claim-submission deadline, a Claim Form shall be deemed to be submitted when postmarked, if received with a postmark indicated on the envelope and if mailed by first-class mail and addressed in accordance with the instructions thereon.  In all other cases, the Claim Form shall be deemed to have been submitted on the date when actually received by the Claims Administrator;

c.      Each Claim Form shall be submitted to and reviewed by the Claims Administrator who shall determine in accordance with this Stipulation and the plan of allocation the extent, if any, to which each Claim shall be allowed, subject to review by the Court pursuant to subparagraph (e) below as necessary;

d.      Claim Forms that do not meet the submission requirements may be rejected.  Prior to rejecting a Claim in whole or in part, the Claims Administrator shall communicate with the Claimant in writing, to give the Claimant the chance to remedy any curable deficiencies in the Claim Form submitted.  The Claims Administrator shall notify, in a timely fashion and in writing, all Claimants whose Claim the Claims Administrator proposes to reject in whole or in part, setting forth the reasons therefor, and shall indicate in such notice that the Claimant whose Claim is to be rejected has the right to a review by the Court if the Claimant so desires and complies with the requirements of subparagraph (e) below; and

e.      If any Claimant whose Claim has been rejected in whole or in part desires to contest such rejection, the Claimant must, within fourteen (14) days after the date of receipt of the notice required in subparagraph (d) above, serve upon the Claims Administrator a notice and statement of reasons indicating the Claimant's grounds for contesting the rejection along with any supporting documentation, and requesting a review thereof by the Court.  If a dispute concerning a Claim cannot be otherwise resolved, Lead Counsel shall thereafter present the request for review to the Court, on reasonable notice to Defendants' Counsel.

29.     Each Claimant shall be deemed to have submitted to the jurisdiction of the Court with respect to the Claimant's Claim, and the Claim will be subject to investigation and discovery under the Federal Rules of Civil Procedure, provided, however, that such investigation and discovery shall be limited to that Claimant's status as a Class Member or Settlement Class Member and the validity and amount of the Claimant's Claim. No discovery shall be allowed on the merits of this Action or of the Settlement in connection with the processing of Claim Forms, nor shall there be any discovery from Defendants or Defendants' Releasees.

30.     Lead Counsel will apply to the Court, on reasonable notice to Defendants' Counsel, for a Class Distribution Order: (a) approving the Claims Administrator's administrative determinations concerning the acceptance and rejection of the Claims submitted; (b) approving payment of any administration fees and expenses associated with the administration of the Settlement from the Escrow Account; and (c) if the Effective Date has occurred, directing payment of the Net Settlement Fund to Authorized Claimants from the Escrow Account. If cost-effective, subsequent redistributions of the funds remaining in the Net Settlement Fund, after deduction of costs and expenses as described above and subject to the same conditions, will take place in six-month intervals. If further re-distribution of the funds remaining in the Net Settlement Fund is not cost-effective the remaining balance of the Net Settlement Fund shall be donated to a secular, not-for profit organization(s) to be recommended by Lead Counsel and approved by the Court.

31.     Payment pursuant to the Class Distribution Order shall be final and conclusive against all Class Members and Settlement Class Members. All Class Members or Settlement

32

Class Members who do not submit a Claim or whose Claims are not approved by the Court for payment shall be barred from participating in distributions from the Net Settlement Fund, but otherwise shall be bound by all of the terms of this Stipulation and the Settlement, including the terms of the Judgment to be entered in this Action, and by the Releases provided for herein and therein, and will be permanently barred and enjoined from bringing any action against any and all Defendants' Releasees with respect to any and all of the Released Plaintiffs' Claims.

32. No Claimant, Class Member, or Settlement Class Member shall have any claim against Lead Plaintiffs, Plaintiffs' Counsel, Defendants' Counsel, any Parties' damages experts, the Claims Administrator (or any other agent designated by Lead Counsel), or the Defendants' Releasees based on any investments, costs, expenses, administration, allocations, calculation, payments, the withholding of taxes (including interest and penalties) owed by the Settlement Fund (or any losses incurred in connection therewith), or distributions that are made substantially in accordance with this Stipulation and the Settlement, the plan of allocation approved by the Court, or further orders of the Court.

33. All proceedings with respect to the administration, processing and determination of Claims and the determination of all controversies relating thereto, including disputed questions of law and fact with respect to the validity of Claims, shall be subject to the jurisdiction of the Court. All Class Members, Settlement Class Members, and Parties to this Settlement expressly waive trial by jury (to the extent any such right may exist) and any right of appeal or review with respect to such determinations.

Case 9:19-cv-80420-WPD Document 210 Filed 12/03/22 Page 1 of 306
Case 1:19-cv-01041-RPT Document 100-21 Filed 12/03/20 Page 35 of 83 Page 806
PageID 2386

**TERMS OF THE JUDGMENT**

34.     If the Settlement contemplated by this Stipulation is approved by the Court, Lead Counsel and Defendants' Counsel shall request that the Court enter a Judgment, substantially in the form attached hereto as Exhibit B.

35.     The Judgment shall, as a material condition of the Settlement, contain a bar order ("Bar Order") substantially in the form set forth in ¶ 11 of Exhibit B that permanently bars, enjoins, and restrains any individual or entity from commencing, prosecuting, or asserting any claims, future claims, or claims over against any of the Defendants' Releasees, and by the Defendants' Releasees against any individual or entity, whether asserted in the Action or any other proceeding, in this Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere, for (a) contribution or indemnity (or any other claim or claim over, however denominated, whether as a claim, cross-claim, counterclaim, third-party claim, or otherwise, on whatsoever theory) based upon, arising out of, or related to the claims or allegations asserted by Plaintiffs in the Action, or (b) any other claim of any type, whether arising under state, federal, common or foreign law, for which the injury claimed is that person's or entity's actual or threatened liability to Plaintiffs and/or members of the Class or Settlement Class; *provided, however*, the order shall not preclude the Defendants from seeking to enforce any rights or claims they may have under their applicable insurance policies or that the Individual Defendants may have based on the charter and by-laws of HIIQ or their agreements with HIIQ.  Moreover, nothing in the Bar Order shall be construed to impair, negate, diminish, or adversely affect any rights of Defendants' Releasees or their successors or assigns under or with respect to any insurance

34

policies, including, but without limitation, any rights to seek to recover or to recover insurance proceeds or payments under any insurance policies with respect to amounts paid pursuant to the Settlement or incurred in connection with the Action, or any other actual or alleged loss or liability, and Defendants' Releasees expressly reserve all rights, claims, positions, arguments, contentions, and defenses with respect to such matters. The Bar Order shall be the broadest permitted under the PSLRA and common law. The Bar Order shall also provide that any final verdict or judgment that may be obtained against any individual or entity subject to the Bar Order shall be reduced by the greater of: (a) an amount that corresponds to the percentage of responsibility of the Defendants for common damages; or (b) the amount paid by or on behalf of the Defendants to the Class or Class Member, or the Settlement Class or Settlement Class Member, for common damages. If the Judgment fails to include any material part of the Bar Order, or if appellate review of the Bar Order is sought and on such review any material part of the Bar Order is vacated, modified or reversed, then Lead Plaintiffs, provided they unanimously agree, and Defendants, provided they unanimously agree, shall each have the right to terminate the Settlement and this Stipulation as specified in ¶ 39 below.

### CONDITIONS OF SETTLEMENT AND EFFECT OF DISAPPROVAL, CANCELLATION OR TERMINATION

36. The Effective Date of the Settlement shall be deemed to occur on the occurrence or waiver of all of the following events:

a. the Court has entered the Preliminary Approval Order, substantially in the form set forth in Exhibit A attached hereto, as required by ¶ 3 above;

b. the Settlement Amount has been deposited into the Escrow Account in accordance with the provisions of ¶ 10 above;

35

c. the time for Defendants to exercise their option to terminate the Settlement pursuant to the provisions of this Stipulation (including the Supplemental Agreement described in ¶ 43 below) has expired or otherwise been waived;

d. the time for Lead Plaintiffs to exercise their option to terminate the Settlement pursuant to the provisions of this Stipulation has expired or otherwise been waived; and

e. the Court has approved the Settlement as described herein, following notice to the Class and Settlement Class and a hearing, as prescribed by Rule 23 of the Federal Rules of Civil Procedure, and entered the Judgment and the Judgment has become Final.

37. Upon the occurrence of all of the events referenced in ¶ 36 above, any and all remaining interest or right of Defendants in or to the Settlement Fund, if any, shall be absolutely and forever extinguished and the Releases herein shall be effective.

38. If (i) Defendants exercise their right to terminate the Settlement as provided in this Stipulation; (ii) Lead Plaintiffs exercise their right to terminate the Settlement as provided in this Stipulation; (iii) the Court disapproves the Settlement; or (iv) the Effective Date as to the Settlement otherwise fails to occur, then:

a. The Settlement and the relevant portions of this Stipulation shall be canceled and terminated.

b. Lead Plaintiffs and Defendants shall revert to their respective positions in the Action as of December 1, 2020.

36

c.      The terms and provisions of this Stipulation, with the exception of this ¶ 38 and ¶¶ 16, 18, 44, 65 and 66, shall have no further force and effect with respect to the Parties and shall not be used in the Action or in any other proceeding for any purpose, and any Judgment or order entered by the Court in accordance with the terms of this Stipulation shall be treated as vacated, *nunc pro tunc*.

d.      Within seven (7) days after joint written notification of termination is sent by Defendants' Counsel and Lead Counsel to the Escrow Agent, the Settlement Fund (including accrued interest thereon and any funds received by Lead Counsel consistent with ¶ 18 above), less any expenses and any costs which have properly either been disbursed or incurred and chargeable to Notice and Administration Costs and less any Taxes paid or due or owing, shall be refunded by the Escrow Agent to Defendants, to be provided in the event of a termination.  In the event that the funds received by Lead Counsel consistent with ¶ 18 above have not been refunded to the Settlement Fund within the seven days specified in this paragraph, those funds shall be refunded by the Escrow Agent to Defendants pursuant to the Defendants' instructions, to be provided in the event of a termination, immediately upon those funds' deposit into the Escrow Account consistent with ¶ 18 above. The Escrow Agent or its designee shall apply for any tax refund owed to the Settlement Fund and pay the proceeds, after deduction of any fees or expenses reasonably incurred in connection with such application(s) for refund, to HIIQ.

39.      It is further stipulated and agreed that Lead Plaintiffs, provided they unanimously agree, and Defendants, provided they unanimously agree, shall each have the

right to terminate the Settlement and this Stipulation, by providing written notice of their election to do so (the "Termination Notice") to the other Parties to this Stipulation within thirty (30) days of: (a) the Court's final refusal to enter the Preliminary Approval Order in any material respect; (b) the Court's final refusal to approve the Settlement or any material part thereof; (c) the Court's final refusal to enter the Judgment in any material respect as to the Settlement; or (d) the date upon which the Judgment is modified or reversed in any material respect. However, any decision or proceeding, whether in this Court or any appellate court, with respect to an application for attorneys' fees or reimbursement of Litigation Expenses or with respect to any plan of allocation, shall not be considered material to the Settlement, shall not affect the finality of any Judgment, and shall not be grounds for termination of the Settlement.

40.     In addition to the grounds set forth in ¶ 39 above, HIIQ shall have the unilateral right to terminate the Settlement, at HIIQ's option in its sole and absolute discretion, in the event that Class Members or Settlement Class Members timely and validly requesting exclusion from the Class or Settlement Class meet the conditions set forth in the confidential supplemental agreement with Lead Plaintiffs (the "Supplemental Agreement"), in accordance with the terms of that Agreement as set forth in ¶¶ 41-43 below.

**OPT-OUTS & OPT-OUT THRESHOLD**

41.     All persons and entities who are entitled to be Class Members or Settlement Class Members ("Potential Members") shall have the right to exclude themselves, or opt out, from the Class or Settlement Class. Such Potential Members who wish to elect to opt out must submit a request for exclusion that satisfies the requirements set forth in the Notice to the

38

Claims Administrator by the Opt-out Deadline (as defined in the Notice). All Potential Members who validly opt out shall be excluded from any and all rights and obligations under the Settlement, but those who do not opt out in the manner and time prescribed in this Stipulation shall be deemed to be members of the Class or Settlement Class regardless of whether such person or entity timely files a Proof of Claim. Lead Plaintiffs, Lead Counsel, Defendants, and Defendants' Counsel shall take no action to encourage opt-outs or advise Potential Members of the Class or Settlement Class to opt out of the Class or Settlement Class.

42.     No later than seven (7) days following the Opt-out Deadline, the Claims Administrator shall provide to Defendants' Counsel and Lead Counsel copies of all exclusion requests.

43.     Simultaneously herewith, Lead Counsel and Defendants' Counsel are executing a Supplemental Agreement setting forth certain conditions under which this Settlement may be unilaterally terminated by HIIQ, in its sole and absolute discretion, if the number of shares by Potential Members who exclude themselves from the Class or Settlement Class by timely submitting valid exclusion requests exceeds the Opt-out Threshold (as defined in the Supplemental Agreement). The Supplemental Agreement shall not be filed with the Court unless a dispute arises with respect to its terms or application or if the Court requires disclosure of the Supplemental Agreement or some or all of its contents. If required by the Court, the Supplemental Agreement and/or any of its terms may be disclosed to the Court *in camera* for purposes of approval of the Settlement, but such disclosure shall be carried out to the fullest extent possible in accordance with the practices of the Court so as to preserve the confidentiality of the Supplemental Agreement, particularly the Opt-out Threshold. In the

39

Case 1:19-cv-00420-JMF Document 100-21 Filed 12/03/22 Page 1 of 32
Case 1:19-cv-00420-JMF Document 100-21 Filed 12/03/22 Page 1 of 32
PageID 2392

event that the Court requires the Supplemental Agreement or some or all of its contents to be publicly disclosed including in the Notice and/or filed with the Court, all terms of the Supplemental Agreement other than those relating to confidentiality shall remain in full force and effect, and any such requirement by the Court for disclosure of the Supplemental Agreement or some or all of its contents shall not constitute a basis for any Party to void the Settlement. Although the terms of the Supplemental Agreement are not explicitly set forth herein, they are a material and integral part of this Stipulation. In the event of a termination of this Settlement pursuant to the Supplemental Agreement, this Stipulation and Settlement shall become null and void and of no further force and effect, except that the provisions of ¶ 38 (and, by incorporation in ¶ 38, ¶¶ 16, 18, 44, 65 and 66) above shall survive termination.

## NO ADMISSION OF WRONGDOING

44. Neither this Stipulation (whether or not consummated), including the exhibits hereto and the Plan of Allocation contained therein (or any other plan of allocation that may be approved by the Court), the Judgment, the Supplemental Agreement, the negotiations leading to the execution of this Stipulation, nor any proceedings taken pursuant to or in connection with this Stipulation or the Settlement (including any arguments proffered in connection therewith):

a. shall be (i) offered or received against any of the Defendants' Releasees as evidence of, or construed as, or deemed to be evidence of any presumption, concession, or admission by any of the Defendants' Releasees with respect to (a) the truth of any fact alleged by Lead Plaintiffs; (b) the validity of any claim or alleged damages that were or could have been asserted in this Action or in any other litigation;

40

(c) the deficiency of any defense that has been or could have been asserted in this Action or in any other litigation; or (d) any liability, negligence, fault, or other wrongdoing of any kind of any of the Defendants' Releasees; or (ii) in any way used or referred to for any other reason against any of the Defendants' Releasees, in any civil, criminal, or administrative action or proceeding (including any arbitration) other than such proceedings as may be necessary to effectuate the provisions of this Stipulation;

b.        shall be (i) offered against any of the Plaintiffs' Releasees as evidence of, or construed as, or deemed to be evidence of any presumption, concession or admission by any of the Plaintiffs' Releasees (a) that any of their claims are without merit, that any of the Defendants had meritorious defenses, or that damages recoverable under the Complaint would not have exceeded the Settlement Amount; or (b) with respect to any liability, negligence, fault or wrongdoing of any kind; or (ii) in any way referred to for any other reason as against any of the Plaintiffs' Releasees, in any civil, criminal, or administrative action or proceeding (including any arbitration) other than such proceedings as may be necessary to effectuate the provisions of this Stipulation; or

c.        shall be construed against any of the Releasees as an admission, concession, or presumption that the consideration to be given hereunder represents the amount which could be or would have been recovered after trial; *provided, however*, that if this Stipulation is approved by the Court, the Parties and the Releasees and their respective counsel may refer to it to effectuate the protections from liability granted

41

hereunder or otherwise to enforce the terms of the Settlement, and Defendants and/or the Defendants' Releasees may file the Stipulation and/or the Judgment in any action that might be brought against them to support a defense, claim, or counterclaim based on principles of res judicata, collateral estoppel, release and discharge, good faith settlement, judgment bar or other bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense, claim, argument, or counterclaim.

## MISCELLANEOUS PROVISIONS

45.     All of the exhibits attached hereto are hereby incorporated by reference as though fully set forth herein.  Notwithstanding the foregoing, in the event that there exists a conflict or inconsistency between the terms of this Stipulation and the terms of any exhibit attached hereto or the Supplemental Agreement, the terms of the Stipulation shall prevail.

46.     As set forth in the Class Action Fairness Act of 2005 ("CAFA"), HIIQ shall timely serve a CAFA notice within ten (10) calendar days of the filing of this Stipulation with the Court.  HIIQ shall be responsible only for the costs of service of the CAFA notice.

47.     In the event of the entry of a final order of a court of competent jurisdiction determining the transfer of money to the Settlement Fund or any material portion thereof to be a preference, voidable transfer, fraudulent transfer, or similar transaction and any material portion thereof is required to be returned, then, at the election of Lead Plaintiffs, Lead Plaintiffs and Defendants shall jointly move the Court to vacate and set aside the Releases given and the Judgment, in which event the Releases and Judgment shall be null and void, and the Parties shall be restored to their respective positions in the litigation as provided in ¶ 38 above and any cash amounts in the Settlement Fund (less any Taxes paid, due or owing with respect to the

42

Settlement Fund and less any Notice and Administration Costs actually and properly incurred, paid or payable) shall be returned as provided in ¶ 38.

48.     The Parties intend this Stipulation and the Settlement to be a final and complete resolution of all disputes asserted or which could be asserted by Lead Plaintiffs and any other Class Members or Settlement Class Members against the Defendants' Releasees with respect to the Released Plaintiffs' Claims.  Accordingly, except in the event of the termination of this Settlement, Lead Plaintiffs, and their counsel, and Defendants, and their counsel, agree not to assert in any forum that this Action was brought by Lead Plaintiffs or defended by Defendants in bad faith and without a reasonable basis.  No Party shall assert any claims of any violation of Rule 11 of the Federal Rules of Civil Procedure relating to the institution, prosecution, defense, or settlement of this Action.  The Parties agree that the amounts paid and the other terms of the Settlement were negotiated at arm's length and in good faith by the Parties, including through a mediation process, and reflect the Settlement that was reached voluntarily after extensive negotiations and consultation with experienced legal counsel, who were fully competent to assess the strengths and weaknesses of their respective clients' claims or defenses.

49.     While retaining their right to deny that the claims asserted in the Action were meritorious, Defendants and their counsel, in any statement made to any media representative or in any public forum (whether or not for attribution) will not assert that the Action was commenced or prosecuted in bad faith, nor will they deny that the Action was commenced and prosecuted in good faith and is being settled voluntarily after consultation with competent legal counsel.   Likewise, while retaining their right to assert their claims in the action were

43

meritorious, Lead Plaintiffs and their counsel, in any statement made to any media representative (whether or not for attribution) or in any public forum will not assert that Defendants' defenses were asserted in bad faith, nor will they deny that Defendants defended the Action in good faith and that the action is being settled voluntarily after consultation with competent legal counsel. In all events, Lead Plaintiffs, and their counsel, and Defendants, and their counsel, shall not make any accusations of wrongful or actionable conduct by either Party concerning the prosecution, defense, and resolution of the Action, and shall not otherwise suggest that the Settlement constitutes an admission of any claim or defense alleged.

50. The terms of the Settlement, as reflected in this Stipulation including the exhibits thereto and the Supplemental Agreement, may not be modified or amended, nor may any of its provisions be waived, except by a writing signed on behalf of both Lead Plaintiffs and Defendants (or their successors-in-interest).

51. All time periods set forth herein shall be computed in calendar days unless otherwise expressly provided. In computing any period of time prescribed or allowed by the terms of this Stipulation or by order of Court, the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday, in which case the period shall run until the end of the next day that is not one of the aforementioned days. As used in the preceding sentence, "legal holiday" includes New Year's Day, Martin Luther King, Jr. Day, Presidents' Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans' Day, Thanksgiving Day, Christmas Day and any other day appointed as a federal holiday.

52.     The headings herein are used for the purpose of convenience only and are not meant to have legal effect, though the introduction, "Whereas" clauses, and every other part of this Stipulation, the attached exhibits, and the Supplemental Agreement are meant to have legal effect.

53.     The administration and consummation of the Settlement as embodied in this Stipulation shall be under the authority of the Court, and the Court shall retain jurisdiction for the purpose of entering orders providing for awards of attorneys' fees and Litigation Expenses to Plaintiffs' Counsel, and enforcing the terms of this Stipulation, including the Plan of Allocation (or such other plan of allocation as may be approved by the Court) and the distribution of the Net Settlement Fund to Class Members and/or Settlement Class Members.

54.     The waiver by one Party of any breach of this Stipulation by any other Party shall not be deemed a waiver of any other prior or subsequent breach of this Stipulation.

55.     This Stipulation and its exhibits and the Supplemental Agreement constitute the entire agreement among Lead Plaintiffs and Defendants concerning the Settlement and this Stipulation and its exhibits.  All Parties acknowledge that no other agreements, representations, warranties, or inducements have been made by any Party hereto concerning this Stipulation, its exhibits, or the Supplemental Agreement other than those contained and memorialized in such documents.

56.     This Stipulation may be executed in one or more counterparts and exchanged among the Parties by facsimile or email of the .pdf or .tif image of the signature. The signatures so transmitted shall be given the same effect as the original signatures.  All executed counterparts and each of them shall be deemed to be one and the same instrument.

57.     This Stipulation shall be binding upon and inure to the benefit of the successors and assigns of the Parties, including any and all Releasees and any corporation, partnership, or other entity into or with which any Party hereto may merge, consolidate, or reorganize.

58.     The construction, interpretation, operation, effect, and validity of this Stipulation, the Supplemental Agreement, and all documents necessary to effectuate it shall be governed by the internal laws of the State of Florida without regard to conflicts of laws, except to the extent that federal law requires that federal law govern.

59.     Any action arising under or to enforce this Stipulation, or any portion thereof, shall be commenced and maintained only in the Court, except as may be necessary to defend against or respond to an action in any other forum against Defendants' Releasees that might be brought against them, to support a defense, claim, or counterclaim based on principles of res judicata, collateral estoppel, release and discharge, good faith settlement, judgment bar or other bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense, claim, argument, or counterclaim.

60.     This Stipulation shall not be construed more strictly against one Party than another merely by virtue of the fact that it, or any part of it, may have been prepared by counsel for one of the Parties, it being recognized that it is the result of arm's-length negotiations among the Parties and all Parties have contributed substantially and materially to the preparation of this Stipulation.

61.     All counsel and any other person executing this Stipulation and any of the exhibits hereto and the Supplemental Agreement, or any related Settlement documents, warrant and represent that they have the full authority to do so and that they have the authority to take

46

appropriate action required or permitted to be taken pursuant to the Stipulation to effectuate its

terms.

62.     Lead Counsel and Defendants' Counsel agree to cooperate fully with one

another in seeking Court approval of the Preliminary Approval Order and the Settlement, as

embodied in this Stipulation, and to use best efforts promptly to agree upon and execute all

such other documentation as may be reasonably required to obtain final approval by the Court

of the Settlement.

63.     If any Party is required to give notice to another Party under this Stipulation,

such notice shall be in writing and shall be deemed to have been duly given upon receipt of

hand delivery, facsimile, or email transmission, with confirmation of receipt.  Notice shall be

provided as follows:

| | |
|---|---|
| If to Lead Plaintiffs or Lead Counsel: | Saxena White P.A.<br>Attn:  Brandon Grzandziel<br>7777 Glades Road, Suite 300<br>Boca Raton, FL 33434<br>Telephone: (561) 394-3399<br>Email:  bgrzandziel@saxenawhite.com |
| If to Defendants: | Foley & Lardner LLP<br>Attn: Michael Matthews<br>100 North Tampa Street, Suite 2700<br>Tampa, FL 33602-5810<br>Telephone: (813) 229-2300<br>Email: mmatthews@foley.com |

64.     Except as otherwise provided herein, each Party shall bear its own costs.

65.     Whether or not the Stipulation is approved by the Court and whether or not the

Settlement is consummated, or the Effective Date occurs, the Parties and their counsel shall

47

use their best efforts to keep all negotiations, discussions, acts performed, agreements, drafts, documents signed, and proceedings in connection with the Stipulation confidential.

66.     All agreements made and orders entered during the course of this Action relating to the confidentiality of information, including but not limited to the February 26, 2020 Stipulation and Order for the Protection of Confidential Information (ECF No. 64), shall survive this Settlement.

67.     No opinion or advice concerning the tax consequences of the proposed Settlement to individual Class Members or Settlement Class Members is being given or will be given by the Parties or their counsel, nor is any representation or warranty in this regard made by virtue of this Stipulation.  Each Class Member's or Settlement Class Member's tax obligations, and the determination thereof, are the sole responsibility of the Class Member or Settlement Class Member, and it is understood that the tax consequences may vary depending on the particular circumstances of each individual Class Member or Settlement Class Member.

**IN WITNESS WHEREOF,** the Parties hereto have caused this Stipulation to be executed, by their duly authorized attorneys, as of December 2, 2020.

| | |
|---|---|
| **SAXENA WHITE P.A.** | **FOLEY & LARDNER LLP** |
| By: _/s/ Joseph E. White, III_ | By: _/s/ Michael P. Matthews_ |
| Maya Saxena | Michael P. Matthews |
| Joseph E. White, III | Lauren Valiente |
| Brandon T. Grzandziel | 100 North Tampa Street, Suite 2700 |
| Adam D. Warden | Tampa, FL 33602-5810 |
| 7777 Glades Road, Suite 300 | Telephone: (813) 229-2300 |
| Boca Raton, Florida 33434 | mmatthews@foley.com |
| Telephone: (561) 394-3399 | lvaliente@foley.com |
| msaxena@saxenawhite.com | |
| jwhite@saxenawhite.com | *Counsel for Defendants* |

48

bgrzandziel@saxenawhite.com
awarden@saxenawhite.com

Steven B. Singer
10 Bank Street, 8th Floor
White Plains, New York 10606
Telephone: (914) 437-8551
ssinger@saxenawhite.com

*Lead Counsel for Lead Plaintiffs, the Class, and the
Settlement Class*

# Exhibit A

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

<table>
<tr><td>JULIAN KEIPPEL, Individually and On Behalf of All Others Similarly Situated,<br><br>                Plaintiff,<br><br>v.<br><br>HEALTH INSURANCE INNOVATIONS, INC. n/k/a BENEFYTT TECHNOLOGIES, INC., GAVIN SOUTHWELL, and MICHAEL D. HERSHBERGER,<br><br>                Defendants.</td><td>CASE NO. 8:19-CV-00421-WFJ-CPT<br><br><u>CLASS ACTION</u><br><br><br><br>**EXHIBIT A**</td></tr>
</table>

## [PROPOSED] ORDER PRELIMINARILY APPROVING SETTLEMENT AND PROVIDING FOR NOTICE

WHEREAS, a putative class action is pending in this Court entitled *Julian Keippel v. Health Insurance Innovations, Inc., et al.*, Case No. 8:19-cv-00421-WFJ-CPT (the "Action");

WHEREAS, (a) Oklahoma Municipal Retirement Fund and City of Birmingham Retirement and Relief System (collectively, "Lead Plaintiffs"), and (b) defendants Health Insurance Innovations, Inc., n/k/a Benefytt Technologies, Inc. ("HIIQ" or the "Company"), Gavin Southwell, and Michael Hershberger (together with HIIQ, "Defendants"), have entered into a Stipulation and Agreement of Settlement dated December 2, 2020 (the "Stipulation"), subject to approval of this Court (the "Settlement");

WHEREAS, Lead Plaintiffs have made an application, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for an order preliminarily approving the Settlement in accordance with the Stipulation and allowing notice to Class Members and Settlement Class Members, as more

fully described herein;

WHEREAS, on August 28, 2020, the Court granted class certification of the following class with the following Class Period: "All persons or entities that purchased or otherwise acquired HIIQ common stock between September 25, 2017 through February 18, 2019, inclusive, and who were damaged thereby";

WHEREAS, the Class Period certified by the Court shortened the class period proposed in the Complaint by moving the ending date from April 11, 2019 to February 18, 2019; and, pending before the Court is Lead Plaintiffs' motion for reconsideration asking the Court to move the class period end date to April 11, 2019, which motion has not been ruled on by the Court, will not be decided on its merits given the Settlement, and is denied as moot, without prejudice pending the Judgment;

WHEREAS, the Court has read and considered: (a) Lead Plaintiffs' motion for preliminary approval of the Settlement, and the papers filed and arguments made in connection therewith; and (b) the Stipulation and the exhibits attached thereto; and

WHEREAS, unless otherwise defined herein, all capitalized words contained herein shall have the same meanings as they have in the Stipulation;

NOW THEREFORE, IT IS HEREBY ORDERED:

1. **<u>Certification of Settlement Class</u>** – The Court preliminarily certifies, solely for purposes of effectuating the Settlement and for no other purpose, pursuant to Rule 23(a) and (b)(3), a Settlement Class consisting of "all persons or entities that purchased or otherwise acquired HIIQ common stock between September 25, 2017 through April 11, 2019, inclusive, and who were allegedly damaged thereby" (the "Settlement Class"). Excluded from the Settlement Class are Defendants, the officers and directors of HIIQ, members of their

2

immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest. Also excluded from the Settlement Class and the Class are those Potential Members who timely and validly request exclusion from the Settlement Class or the Class pursuant to the requirements set forth in the Notice to the Claims Administrator by the Opt-out Deadline (as defined in the Notice).

a.     Pursuant to Rule 23 and for purposes of effectuating the Settlement and for no other purpose, the Court preliminarily certifies Lead Plaintiffs Oklahoma Municipal Retirement Fund and City of Birmingham Retirement and Relief System as Settlement Class Representatives for the Settlement Class, and preliminarily appoints Saxena White P.A. as Lead Counsel for the Settlement Class. Lead Counsel is authorized to act on behalf of the Settlement Class with respect to all acts required by, or which may be undertaken pursuant to, the Stipulation or such other acts that are reasonably necessary to consummate the proposed Settlement set forth in the Stipulation.

b.     With respect to the Settlement Class, the Court preliminarily finds, solely for purposes of effectuating the Settlement and no other purpose, that the prerequisites for a class action under Rules 23(a) and (b)(3) have been satisfied. The members of the Settlement Class are so numerous that joinder of all Settlement Class Members in the class action is impracticable and there are questions of law and fact common to the Settlement Class. The claims of Lead Plaintiffs are typical of the claims of the Settlement Class, and Lead Plaintiffs and their counsel have fairly and adequately represented and protected the interests of all of the Settlement Class Members. There are questions of law

3

and fact common to the Settlement Class Members that predominate over any questions affecting only individual members. A class action is also superior to other available methods for the fair and efficient adjudication of the controversy, considering: (a) the interests of the members of the Settlement Class in individually controlling the prosecution of the separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by members of the Settlement Class; (c) the desirability or undesirability of continuing the litigation of these claims in this particular forum; and (d) the difficulties likely to be encountered in the management of the class action.

2.      **Preliminary Approval of the Settlement** – The Court hereby preliminarily approves the Settlement, as embodied in the Stipulation, as being fair, reasonable, and adequate, and preliminarily approves the proposed Plan of Allocation described in the Notice, subject to the right of any Class Member or Settlement Class Member to challenge the fairness, reasonableness, and adequacy of the Settlement, the Stipulation, or the proposed Plan of Allocation, and subject to further consideration at the Settlement Hearing to be conducted as described below.

3.      **Settlement Hearing** – The Court will hold a settlement hearing (the "Settlement Hearing") on _____, 2021 at __:__ _.m. in Courtroom 15B, of the Sam Gibbons United States Courthouse, 801 North Florida Avenue, Tampa, Florida 33602, or by telephonic, video conferencing or other electronic means, as posted on the website of the Claims Administrator, for the following purposes: (a) to determine whether the proposed Settlement on the terms and conditions provided for in the Stipulation is fair, reasonable and adequate, and should be approved by the Court; (b) to determine whether a Judgment substantially in the

4

form attached as Exhibit B to the Stipulation should be entered dismissing the Action with prejudice against Defendants; (c) to determine whether the proposed Plan of Allocation for the proceeds of the Settlement is fair and reasonable and should be approved; (d) to determine whether the motion by Lead Counsel for an award of attorneys' fees and reimbursement of Litigation Expenses should be approved; and (e) to consider any other matters that may be properly brought before the Court in connection with the Settlement. Notice of the Settlement and the Settlement Hearing shall be given as set forth in paragraph 5 of this Order.

4.     The Court may adjourn the Settlement Hearing without further notice and may approve the proposed Settlement with such modifications as the Parties may agree to, if appropriate, without further notice.

5.     **<u>Retention of Claims Administrator and Manner of Giving Notice</u>** – Lead Counsel are hereby authorized to retain Epiq Class Action & Claims Solutions, Inc. ("Epiq" or the "Claims Administrator") to supervise and administer the notice procedure in connection with the proposed Settlement as well as the processing of Claims as more fully set forth below. Notice of the Settlement and the Settlement Hearing shall be given by Lead Counsel as follows:

(a)     within seven (7) days of the date of entry of this Order, HIIQ shall provide or cause to be provided to the Claims Administrator (at no cost to the Settlement Fund, Lead Counsel, the Claims Administrator, the Class, or the Settlement Class) records reasonably available to HIIQ or its transfer agent concerning the identity and last known address of Class Members and Settlement Class Members, in electronic form or other form as is reasonably available to HIIQ or its transfer agent, which information the Claims Administrator shall treat and maintain as confidential;

5

(b)      not later than twenty-five (25) business days after the date of entry of this Order (the "Notice Date"), the Claims Administrator shall cause a copy of the Notice and the Claim Form, substantially in the forms attached hereto as Exhibits A-1 and A-2, respectively (the "Notice Packet"), to be mailed by first-class mail to potential Class Members and Settlement Class Members at the addresses set forth in the records which HIIQ caused to be provided, or who otherwise may be identified through further reasonable effort;

(c)      contemporaneously with the mailing of the Notice Packet, the Claims Administrator shall cause copies of the Notice and the Claim Form to be posted on a website to be developed for the Settlement, from which copies of the Notice and Claim Form can be downloaded;

(d)      not later than ten (10) days after the Notice Date, the Claims Administrator shall cause the Summary Notice, substantially in the form attached hereto as Exhibit A-3, to be published once in *Investor's Business Daily* and to be transmitted once over the *PR Newswire*; and

(e)      not later than seven (7) days prior to the Settlement Hearing, Lead Counsel shall file with the Court proof, by affidavit or declaration, of such mailing and publication.

6.      **Approval of Form and Content of Notice** – The Court (a) approves, as to form and content, the Notice, the Claim Form, and the Summary Notice, attached hereto as Exhibits A-1, A-2, and A-3, respectively, and (b) finds that the mailing and distribution of the Notice and Claim Form and the publication of the Summary Notice in the manner and form set forth in paragraph 5 of this Order (i) is the best notice practicable under the circumstances; (ii)

6

constitutes notice that is reasonably calculated, under the circumstances, to apprise Class Members and Settlement Class Members of the pendency of the Action, of the effect of the proposed Settlement (including the Releases to be provided thereunder), of Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses, of the Class Members' and Settlement Class Members' right to object to the Settlement, the Plan of Allocation or Lead Counsel's motion for attorneys' fees and reimbursement of Litigation Expenses, of their right to exclude themselves from the Class or Settlement Class, and of their right to appear at the Settlement Hearing; (iii) constitutes due, adequate and sufficient notice to all persons and entities entitled to receive notice of the proposed Settlement; and (iv) satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause), the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4, as amended, and all other applicable law and rules. The date and time of the Settlement Hearing shall be included in the Notice and Summary Notice before they are mailed and published, respectively.

7. **Nominee Procedures** – Brokers and other nominees who purchased or otherwise acquired HIIQ common stock during the Class Period or Settlement Class Period for the benefit of another person or entity shall (a) within seven (7) calendar days of receipt of the Notice request from the Claims Administrator sufficient copies of the Notice Packet to forward to all such beneficial owners and within seven (7) calendar days of receipt of those Notice Packets forward them to all such beneficial owners; or (b) within seven (7) calendar days of receipt of the Notice, send a list of the names and addresses of all such beneficial owners to the Claims Administrator in which event the Claims Administrator shall promptly mail the Notice Packet to such beneficial owners. Upon full compliance with this Order, such nominees may

7

seek reimbursement of their reasonable expenses actually incurred in complying with this Order by providing the Claims Administrator with proper documentation supporting the expenses for which reimbursement is sought. Such properly documented expenses incurred by nominees in compliance with the terms of this Order shall be paid from the Settlement Fund, with any disputes as to the reasonableness or documentation of expenses incurred subject to review by the Court.

8. **Participation in the Settlement** – Class Members and Settlement Class Members who wish to participate in the Settlement and to be potentially eligible to receive a distribution from the Net Settlement Fund must complete and submit a Claim Form in accordance with the instructions contained therein. Unless the Court orders otherwise, all Claim Forms must be postmarked no later than one hundred twenty (120) days after the Notice Date. Notwithstanding the foregoing, Lead Counsel may, at their discretion, accept for processing late Claims provided such acceptance does not delay the distribution of the Net Settlement Fund. By submitting a Claim, a person or entity shall be deemed to have submitted to the jurisdiction of the Court with respect to his, her, or its Claim and the subject matter of the Settlement.

9. Each Claim Form submitted must satisfy the following conditions: (a) it must be properly completed, signed, and submitted in a timely manner in accordance with the provisions of the preceding paragraph; (b) it must be accompanied by adequate supporting documentation for the transactions and holdings reported therein, in the form of broker confirmation slips, broker account statements, an authorized statement from the broker containing the transactional and holding information found in a broker confirmation slip or account statement, or such other documentation as is deemed adequate by Lead Counsel or the

8

Claims Administrator; (c) if the person executing the Claim Form is acting in a representative capacity, a certification of his, her, or its current authority to act on behalf of the Class Member or Settlement Class Member must be included in the Claim Form to the satisfaction of Lead Counsel or the Claims Administrator; and (d) the Claim Form must be complete, must contain no material deletions or modifications of any of the printed matter contained therein, and must be signed under penalty of perjury.

10. Any Class Member or Settlement Class Member who or which does not timely and validly submit a Claim Form or whose Claim is not otherwise approved by the Court: (a) shall be deemed to have waived his, her, or its right to share in the Net Settlement Fund; (b) shall be forever barred from participating in any distributions therefrom; (c) shall be bound by the provisions of the Stipulation and the Settlement and all proceedings, determinations, orders and judgments in the Action relating thereto, including, without limitation, the Judgment and the Releases provided for therein, whether favorable or unfavorable; and (d) will be barred from commencing, maintaining, or prosecuting any of the Released Plaintiffs' Claims against each and all of the Defendants' Releasees, as more fully described in the Stipulation and Notice. Notwithstanding the foregoing, late Claim Forms may be accepted for processing as set forth in paragraph 8 above.

    a. **Exclusion** – Any member of the Class or Settlement Class who wishes to exclude himself, herself, or itself from the Class or Settlement Class must request exclusion in writing within the time and in the manner set forth in the Notice, which shall provide that: (a) any such request for exclusion from the Class or Settlement Class must be mailed or delivered such that it is received no later than twenty-one (21) days prior to the Settlement Hearing, to: Health Insurance Innovations Securities Settlement,

9

Exclusions, P.O. Box 5657, Portland, Oregon, 97228-5657, and (b) each request for exclusion must (i) state the name, address, and telephone number of the person or entity requesting exclusion, and in the case of entities, the name and telephone number of the appropriate contact person; (ii) state that such person or entity "requests exclusion from the Class in *Julian Keippel v. Health Insurance Innovations, Inc., et al.*, No. 8:19-cv-00421"; (iii) state the number of shares of HIIQ common stock that the person or entity requesting exclusion purchased/acquired and sold during the Class Period or Settlement Class Period, as well as the dates and prices of each such purchase/acquisition and sale, and the number of shares held at the beginning of the Class Period or Settlement Class Period; and (iv) be signed by the person or entity requesting exclusion or an authorized representative. A request for exclusion shall not be effective unless it provides all the required information and is received within the time stated above, or is otherwise accepted by the Court.

11. Any person or entity who or which timely and validly requests exclusion in compliance with the terms stated in this Order and is excluded from the Class or Settlement Class shall not be a Class Member or Settlement Class Member, shall not be bound by the terms of the Settlement or any orders or judgments in the Action, and shall not receive any payment out of the Net Settlement Fund.

12. Any Class Member or Settlement Class Member who does not timely and validly request exclusion from the Class or Settlement Class in the manner stated in this Order: (a) shall be deemed to have waived his, her, or its right to be excluded from the Class or Settlement Class; (b) shall be forever barred from requesting exclusion from the Class or Settlement Class in this or any other proceeding; (c) shall be bound by the provisions of the

10

Stipulation and Settlement and all proceedings, determinations, orders and judgments in the Action, including, but not limited to, the Judgment and the Releases provided for therein, whether favorable or unfavorable; and (d) will be barred from commencing, maintaining, or prosecuting any of the Released Plaintiffs' Claims against any of the Defendants' Releasees, as more fully described in the Stipulation and Notice.

13. **<u>Appearance and Objections at Settlement Hearing</u>** – Any Class Member or Settlement Class Member who does not request exclusion may enter an appearance in the Action, at his, her, or its own expense, individually or through counsel of his, her, or its own choice, by filing with the Clerk of Court and delivering a notice of appearance to representatives of both Lead Counsel and Defendants' Counsel, at the addresses set forth in paragraph 14 below, such that it is received no later than twenty-one (21) days prior to the Settlement Hearing, or as the Court may otherwise direct. Any Class Member or Settlement Class Member who does not enter an appearance will be represented by Lead Counsel.

14. Any Class Member or Settlement Class Member who does not request exclusion may file a written objection to the proposed Settlement, the proposed Plan of Allocation, or Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses and appear and show cause, if he, she, or it has any cause, why the proposed Settlement, the proposed Plan of Allocation or Lead Counsel's motion for attorneys' fees and reimbursement of Litigation Expenses should not be approved; *provided, however*, that no Class Member or Settlement Class Member shall be heard or entitled to contest the approval of the terms and conditions of the proposed Settlement, the proposed Plan of Allocation, or the motion for attorneys' fees and reimbursement of Litigation Expenses unless that person or entity has filed a written objection with the Court and served copies of such objection on Lead

11

Counsel and Defendants' Counsel at the addresses set forth below such that they are received no later than twenty-one (21) days prior to the Settlement Hearing.

| **Lead Counsel** | **Defendants' Counsel** |
|:---:|:---:|
| Saxena White P.A. | Foley & Lardner LLP |
| Brandon T. Grzandziel | Michael Matthews |
| 7777 Glades Road, Suite 300 | 100 North Tampa Street, Suite 2700 |
| Boca Raton, FL 33434 | Tampa, FL 33602-5810 |

15. Any objections, filings and other submissions by the objecting Class Member or Settlement Class Member: (a) must state the name, address, and telephone number of the person or entity objecting and must be signed by the objector; (b) must contain a statement of the objection or objections, and the specific reasons for each objection, including any legal and evidentiary support; and (c) must include documents sufficient to prove membership in the Class or Settlement Class including the number of shares of HIIQ common stock that the objecting Class Member or Settlement Class Member purchased/acquired and sold during the Class Period or Settlement Class Period, as well as the dates and prices of each such purchase/acquisition and sale, and the number of shares held at the beginning of the Class Period or Settlement Class Period. Objectors who enter an appearance and desire to present evidence at the Settlement Hearing in support of their objection must include in their written objection or notice of appearance the identity of any witnesses they may call to testify and any exhibits they intend to introduce into evidence at the hearing.

16. Any Class Member or Settlement Class Member who or which does not make his, her, or its objection in the manner provided herein shall be deemed to have waived his, her, or its right to object to any aspect of the proposed Settlement, the proposed Plan of Allocation, and Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation

Expenses and shall be forever barred and foreclosed from objecting to the fairness, reasonableness, or adequacy of the Settlement, the Plan of Allocation, or the requested attorneys' fees and Litigation Expenses, or from otherwise being heard concerning the Settlement, the Plan of Allocation, or the requested attorneys' fees and Litigation Expenses in this or any other proceeding.

17. **Stay** – Until otherwise ordered by the Court, the Court stays all proceedings in the Action other than proceedings necessary to carry out or enforce the terms and conditions of the Stipulation. Pending final determination whether the Settlement should be approved, Defendants Lead Plaintiff, Lead Counsel, and all members of the Class and Settlement Class are barred and enjoined from commencing, instituting, intervening in or participating in, prosecuting or continuing to prosecute any action or other proceeding in any court of law or equity, arbitration tribunal, or administrative forum, or other forum of any kind or character (whether brought directly, in a representative capacity, derivatively, or in any other capacity), that asserts any of the Released Claims against any of the Releasees, as defined in the Stipulation.

18. **Settlement Administration Fees and Expenses** – All reasonable costs incurred in identifying Class Members and Settlement Class Members, and notifying them of the Settlement as well as in administering the Settlement shall be paid as set forth in the Stipulation without further order of the Court. Notwithstanding the foregoing, prior to the Effective Date, such Notice and Administration Costs paid shall not exceed $200,000 without further approval of the Court.

19. **Settlement Fund** – The contents of the Settlement Fund held by Western Alliance Bank, for which Western Alliance Bank will serve as the Escrow Agent, shall be

13

deemed and considered to be *in custodia legis* of the Court, and shall remain subject to the jurisdiction of the Court, until such time as they shall be distributed pursuant to the Stipulation or further order(s) of the Court.

20.	**Taxes** – Lead Counsel are authorized and directed to prepare any tax returns and any other tax reporting form for or in respect to the Settlement Fund, to pay from the Settlement Fund any Taxes owed with respect to the Settlement Fund, to apply for any tax refund owed to the Settlement Fund, and to otherwise perform all obligations with respect to Taxes and any reporting or filings in respect thereof without further order of the Court in a manner consistent with the provisions of the Stipulation.

21.	**Termination of Settlement** – If the Settlement is terminated as provided in the Stipulation, the Settlement is not approved, or the Effective Date of the Settlement otherwise fails to occur, this Order shall be vacated, rendered null and void, and be of no further force and effect, except as otherwise provided by the Stipulation, and this Order shall be without prejudice to the rights of Lead Plaintiffs, the other Class Members, Settlement Class Members, and Defendants, and the Parties shall revert to their respective positions in the Action as of December 1, 2020 as provided in the Stipulation.

22.	**Use of this Order** – Neither this Order nor the Stipulation (whether or not consummated), including the exhibits thereto and the Plan of Allocation contained therein (or any other plan of allocation that may be approved by the Court), the Supplemental Agreement, and the documents prepared to effectuate this Settlement, the negotiations leading to the execution of the Stipulation, nor any proceedings taken pursuant to or in connection with the Stipulation or the Settlement (including any arguments proffered in connection therewith):

14

(a) shall (i) be offered or received against any of the Defendants'
Releasees as evidence of, or construed as, or deemed to be evidence of any presumption,
concession, or admission by any of the Defendants' Releasees with respect to, (aa) the
truth of any fact alleged by Lead Plaintiffs; (bb) the validity of any claim or alleged
damages that were or could have been asserted in the Action or in any other litigation;
(cc) the deficiency of any defense that has been or could have been asserted in this Action
or in any other litigation; or (dd) any liability, negligence, fault, or other wrongdoing of
any kind of any of the Defendants' Releasees; or (ii) in any way used or referred to for
any other reason as against any of the Defendants' Releasees, in any civil, criminal, or
administrative action or proceeding (including any arbitration), other than such
proceedings as may be necessary to effectuate the provisions of the Stipulation;

(b) shall be (i) offered against any of the Plaintiffs' Releasees, as evidence
of, or construed as, or deemed to be evidence of any presumption, concession, or
admission by any of the Plaintiffs' Releasees (aa) that any of their claims are without
merit, that any of the Defendants' Releasees had meritorious defenses, or that damages
recoverable under the Complaint would not have exceeded the Settlement Amount; or
(bb) with respect to any liability, negligence, fault, or wrongdoing of any kind; or (ii) in
any way referred to for any other reason as against any of the Plaintiffs' Releasees, in any
civil, criminal, or administrative action or proceeding (including any arbitration), other
than such proceedings as may be necessary to effectuate the provisions of the Stipulation;
or

(c) shall be construed against any of the Releasees as an admission,
concession, or presumption that the consideration to be given under the Settlement

15

represents the amount which could be or would have been recovered after trial; *provided, however*, that if the Stipulation is approved by the Court, the Parties and the Releasees and their respective counsel may refer to it to effectuate the protections from liability granted thereunder or otherwise to enforce the terms of the Settlement, and Defendants and/or the Defendants' Releasees may file the Stipulation, this Order, and/or the Judgment in any action that might be brought against them to support a defense, claim, or counterclaim based on principles of res judicata, collateral estoppel, release and discharge, good faith settlement, judgment bar or other bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense, claim, argument, or counterclaim.

23. **Supporting Papers** – Lead Counsel shall file the opening papers in support of the proposed Settlement, the Plan of Allocation, and Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses no later than thirty-five (35) days prior to the Settlement Hearing; and Lead Plaintiffs and Lead Counsel are authorized to file reply papers, which shall be filed no later than seven (7) days prior to the Settlement Hearing.

24. **CAFA Notice** – Defendants shall, no later than ten (10) days following the filing of the Stipulation with the Court, serve notice of the proposed Settlement upon those who are entitled to such notice pursuant to and in compliance with the requirements of the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1715. HIIQ shall be responsible only for the costs of service of the CAFA notice. At least fourteen (14) days before the Settlement Hearing, Defendants shall cause to be served on Lead Counsel and filed with the Court proof, by affidavit or declaration, regarding compliance with CAFA § 1715(b).

16

25. The Court retains jurisdiction to consider all further applications arising out of or connected with the proposed Settlement.

SO ORDERED this _____ day of _____, 2020.

_____
The Honorable William F. Jung
United States District Judge

17

# Exhibit A-1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| JULIAN KEIPPEL, Individually and On Behalf of All Others Similarly Situated, | CASE NO. 8:19-CV-00421-WFJ-CPT |
| Plaintiff, | CLASS ACTION |
| v. | |
| HEALTH INSURANCE INNOVATIONS, INC. n/k/a BENEFYTT TECHNOLOGIES, INC., GAVIN SOUTHWELL, and MICHAEL D. HERSHBERGER, | EXHIBIT A-1 |
| Defendants. | |

## NOTICE OF (I) PENDENCY OF CLASS ACTION AND PROPOSED SETTLEMENT OF CLASS ACTION; (II) SETTLEMENT HEARING; AND (III) MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

### *A Federal Court authorized this Notice. This is not a solicitation from a lawyer.*

**NOTICE OF PENDENCY OF CLASS ACTION:** You are hereby notified, pursuant to Rule 23 of the Federal Rules of Civil Procedure and an Order of the United States District Court for the Middle District of Florida, that the lawsuit *Keippel v. Health Insurance Innovations, Inc. n/k/a Benefytt Technologies, Inc., et al.*, No. 8:19-cv-00421-WFJ-CPT (M.D. Fla.) (the "Action") has been certified as a class action on behalf of a Class and Settlement Class, except for certain persons and entities that are excluded from the Class by definition as set forth below.

**NOTICE OF SETTLEMENT:** Please also be advised that the Court-appointed Lead Plaintiffs, Oklahoma Municipal Retirement Fund ("Oklahoma") and City of Birmingham Retirement and Relief System ("Birmingham" and, together with Oklahoma, "Lead Plaintiffs"), on behalf of themselves and the Class and Settlement Class (as defined in paragraph 18 below), have reached a proposed settlement of the Action for $11,000,000.00 in cash that, if approved, will resolve all claims in the Action (the "Settlement"). Your rights may be affected if, during the period from September 25, 2017, through April 11, 2019, inclusive, you purchased or otherwise acquired

1

common stock issued by Health Insurance Innovations, Inc. ("HIIQ" or the "Company"), and were allegedly damaged thereby.[1]

**PLEASE READ THIS NOTICE CAREFULLY. This Notice explains important rights you may have, including the possible receipt of cash from the Settlement. If you are a member of the Class or Settlement Class, your legal rights will be affected whether or not you act.**

**If you have any questions about this Notice, the proposed Settlement, or your eligibility to participate in the Settlement, please DO NOT contact HIIQ, any other Defendants in the Action, their counsel, or the Court. All questions should be directed to Lead Counsel or the Claims Administrator (see paragraph 74 below).**

1.    **Description of the Action:** This Notice relates to a proposed Settlement of claims in a pending securities class action brought by investors alleging, among other things, that defendants HIIQ, Gavin Southwell ("Southwell") and Michael Hershberger ("Hershberger and, together with Southwell, the "Individual Defendants," and together with HIIQ, "Defendants") violated the federal securities laws by making alleged misrepresentations or omissions, which Defendants deny. A more detailed description of the Action is set forth in paragraphs 4-12 below. The proposed Settlement, if approved by the Court, will settle claims of the Class and Settlement Class, as defined in paragraph 21 below.

2.    **Statement of Recovery:** Subject to Court approval, Lead Plaintiffs have agreed to settle the Action in exchange for a settlement payment of $11,000,000.00 in cash (the "Settlement Amount") to be deposited into an escrow account. The Net Settlement Fund (i.e., the Settlement Amount plus any and all interest earned thereon (the "Settlement Fund") less (a) any Taxes, (b) any Notice and Administration Costs, (c) any Litigation Expenses awarded by the Court, and (d) any attorneys' fees awarded by the Court) will be distributed in accordance with a plan of allocation that is approved by the Court, which will determine how the Net Settlement Fund shall be allocated among members of the Class and Settlement Class. The proposed plan of allocation (the "Plan of Allocation") is set forth in paragraphs 41-58 below.

3.    **Estimate of Average Amount of Recovery Per Security:** Based on Lead Plaintiffs' damages expert's estimates of the number of shares of HIIQ common stock purchased during the Class Period and Settlement Class Period that may have been affected by the alleged conduct at issue in the Action, and assuming that all Class Members and Settlement Class Members elect to participate in the Settlement, the estimated average recovery (before the deduction of any Court-approved fees, expenses and costs as described herein) per allegedly damaged share is $0.52. Class Members and Settlement Class Members should note, however, that the foregoing average recovery per share is only an estimate. Some Class Members and Settlement Class Members may recover more or less than this estimated amount depending on, among other factors, when and at what prices they purchased/acquired or sold their HIIQ common stock, and the total number and recognized loss amount of valid Claim Forms submitted. Distributions to Class Members and

---

[1]  All capitalized terms used in this Notice that are not otherwise defined herein shall have the meanings ascribed to them in the Stipulation and Agreement of Settlement (the "Stipulation"), which is available at www.HealthInsuranceInnovationsSecuritiesSettlement.com.

Settlement Class Members will be made based on the Plan of Allocation set forth herein (see paragraphs 41-58 below) or such other plan of allocation as may be ordered by the Court.

4. **Average Amount of Alleged Damages Per Security:** The Parties do not agree on the average amount of alleged damages per share that would be recoverable if Lead Plaintiffs were to prevail in the Action. Among other things, Defendants deny the assertion that they violated the federal securities laws or that any damages were suffered by any members of the Class or Settlement Class as a result of their conduct. The range of the potential recovery is discussed in greater detail in paragraph 5 below.

5. **Attorneys' Fees and Expenses Sought:** Plaintiffs' Counsel, which have been prosecuting the Action on a wholly contingent basis since its inception, have not received any payment of attorneys' fees for their representation of the Class or Settlement Class and have advanced the funds to pay expenses necessarily incurred to prosecute this Action. Court-appointed Lead Counsel Saxena White P.A. will apply to the Court for an award of attorneys' fees in an amount not to exceed one-third (33-1/3%) of the Settlement Fund. In addition, Lead Counsel will apply for reimbursement of Litigation Expenses paid or incurred in connection with the institution, prosecution and resolution of the claims against the Defendants, in an amount not to exceed $450,000, which may include an application for reimbursement of the reasonable costs and expenses incurred by Lead Plaintiffs directly related to their representation of the Class and Settlement Class. Any fees and expenses awarded by the Court will be paid from the Settlement Fund. Class Members and Settlement Class Members are not personally liable for any such fees or expenses. Estimates of the average recovery per allegedly damaged HIIQ share, if the Court approves Lead Counsel's fee and expense application, is $0.32 per allegedly damaged share.

6. **Identification of Attorneys' Representatives:** Lead Plaintiffs, the Class, and Settlement Class are represented by Joseph E. White, III, Brandon Grzandziel, and Adam D. Warden of Saxena White P.A., 7777 Glades Road, Suite 300, Boca Raton, FL 33434, (561) 394-3399, jwhite@saxenawhite.com, bgrzandziel@saxenawhite.com, and awarden@saxenawhite.com; and Steven B. Singer of Saxena White P.A., 10 Bank Street, 8th Floor, White Plains NY, 10606, ssinger@saxenawhite.com.

7. **Reasons for the Settlement:** Lead Plaintiffs' principal reason for entering into the Settlement is the substantial immediate cash benefit for Class Members and Settlement Class Members without the risk or the delays inherent in further litigation. Moreover, the substantial cash benefit provided under the Settlement must be considered against the significant risk that a smaller recovery – or indeed no recovery at all – might be achieved after further contested motions, a trial of the Action and the likely appeals that would follow a trial. This process could be expected to last several years. Defendants, who deny all allegations of wrongdoing or liability whatsoever, are entering into the Settlement solely to eliminate the uncertainty, burden and expense of further protracted litigation.

Before agreeing to the Settlement, Lead Counsel conducted extensive investigation and research into the merits of the Action. This investigation included consultation with experts concerning the amount of damages allegedly suffered by the Class and Settlement Class; detailed review of HIIQ's public filings, including SEC filings, press releases, and other public statements; locating and interviewing fact witnesses; collecting and reviewing more than 1.9 million pages of

documents; taking oral discovery, and researching the applicable law with respect to the claims asserted in the complaint filed in this Action and the potential defenses thereto.

| YOUR LEGAL RIGHTS AND OPTIONS IN THE SETTLEMENT: | |
|---|---|
| **SUBMIT A CLAIM FORM BY MAIL OR ONLINE AT THE SETTLEMENT WEBSITE POSTMARKED OR SUBMITTED NO LATER THAN _____, 2021.** | This is the only way to be potentially eligible to receive a payment from the Settlement Fund. If you are a Class Member or Settlement Class Member and you submit a claim form, you will be bound by the Settlement as approved by the Court and you will give up any Released Plaintiffs' Claims (defined in paragraph 22 below) that you have against Defendants and the other Defendants' Releasees (defined in paragraph 23 below), so it is in your interest to submit a Claim Form. |
| **EXCLUDE YOURSELF BY SUBMITTING A WRITTEN REQUEST FOR EXCLUSION SO THAT IT IS *RECEIVED* NO LATER THAN _____, 2021.** | If you exclude yourself, you will not be eligible to receive any payment from the Settlement Fund. This is the only option that allows you to be part of any other lawsuit against any of the Defendants or the other Defendants' Releasees concerning the Released Plaintiffs' Claims. |
| **OBJECT TO THE SETTLEMENT BY SUBMITTING A WRITTEN OBJECTION SO THAT IT IS *RECEIVED* NO LATER THAN _____, 2021.** | If you do not like the proposed Settlement, the proposed Plan of Allocation, or the request for attorneys' fees and reimbursement of Litigation Expenses, you may write to the Court and explain why you do not like them. You cannot object to the Settlement, the Plan of Allocation or the fee and expense request unless you are a Class Member or Settlement Class Members, and do not exclude yourself. |
| **ATTEND A HEARING ON _____, 2021 AT __:__ __.M., AND FILE A NOTICE OF INTENTION TO APPEAR SO THAT IT IS *RECEIVED* NO LATER THAN _____, 2021.** | Filing a written objection and notice of intention to appear by _____, 2021, allows you to speak in Court, at the discretion of the Court, about the fairness of the proposed Settlement, the Plan of Allocation, and/or the request for attorneys' fees and reimbursement of Litigation Expenses. If you submit a written objection, you may (but you do not have to) attend the hearing and, at the discretion of the Court, speak to the Court about your objection. |
| **DO NOTHING.** | If you are a member of the Class or Settlement Class and you do not submit a valid Claim Form, you will not be eligible to receive any payment from the Settlement Fund. You will, however, remain a member of the Class or Settlement Class, which means that you give up your right to sue about the claims that are resolved by the Settlement and you will be bound by any judgments or orders entered by the Court in the Action. |

## WHAT THIS NOTICE CONTAINS

Why Did I Get This Notice?                                                                    Page __
What Is This Case About?                                                                       Page __
How Do I Know If I Am Affected By The Settlement?
Who Is Included In The Class and Settlement Class?                                             Page __
What Are Lead Plaintiffs' Reasons For The Settlement?                                          Page __
What Might Happen If There Were No Settlement?                                                 Page __
How Are Class Members and Settlement Class Members Affected By The Action
    And The Settlement?                                                                        Page __
How Do I Participate In The Settlement?  What Do I Need To Do?                                 Page __
How Much Will My Payment Be?                                                                   Page __
What Payment Are The Attorneys For The Class and Settlement Class Seeking?
  How Will The Lawyers Be Paid?                                                                Page __
What If I Do Not Want To Be A Member Of The Class or Settlement Class?
    How Do I Exclude Myself?                                                                   Page __
When And Where Will The Court Decide Whether To Approve The Settlement?
    Do I Have To Come To The Hearing?  May I Speak At The Hearing If I
    Don't Like The Settlement?                                                                 Page __
What If I Bought HIIQ Common Stock On Someone Else's Behalf?                                   Page __
Can I See The Court File?  Whom Should I Contact If I Have Questions?                          Page __

## WHY DID I GET THIS NOTICE?

1.    The Court directed that this Notice be mailed to you because you or someone in your family or an investment account for which you serve as a custodian may have purchased or otherwise acquired HIIQ common stock during the period from September 25, 2017 through April 11, 2019, inclusive.  The Court has directed us to send you this Notice because, as a potential Class Member or Settlement Class Member, you have a right to know about your options before the Court rules on the proposed Settlement.  Additionally, you have the right to understand how this class action lawsuit may generally affect your legal rights.  If the Court approves the Settlement, and the Plan of Allocation (or some other plan of allocation), the Claims Administrator selected by Lead Plaintiffs and approved by the Court will make payments pursuant to the Settlement after any objections and appeals are resolved.

2.    The purpose of this Notice is to inform you of the existence of this case, that it is a class action, how you might be affected, and how to exclude yourself if you wish to do so.  It is also being sent to inform you of the terms of the proposed Settlement, and of a hearing to be held by the Court to consider the fairness, reasonableness, and adequacy of the Settlement, the proposed Plan of Allocation and the motion by Lead Counsel for an award of attorneys' fees and reimbursement of Litigation Expenses (the "Settlement Hearing").  See paragraph 65 below for details about the Settlement Hearing, including the date and location of the hearing.

3.    The issuance of this Notice is not an expression of any opinion by the Court concerning the merits of any claim in the Action, and the Court still has to decide whether to approve the Settlement.  If the Court approves the Settlement and a plan of allocation, then payments to Authorized Claimants will be made after any appeals are resolved and after the completion of all claims processing.  Please be patient, as this process can take some time to complete.

## WHAT IS THIS CASE ABOUT?

4.     On February 18, 2019, this Action was commenced in the United States District Court for the Middle District of Florida, styled *Julian Keippel v. Health Insurance Innovations, Inc., et al.*, Case No. 8:19-cv-00421-WFJ-CPT.

5.     By Order dated May 13, 2019, the Court appointed Oklahoma Municipal Retirement Fund and City of Birmingham Retirement and Relief System as Lead Plaintiffs and approved Lead Plaintiffs' selection of Saxena White P.A. ("Saxena White") as Lead Counsel.

6.     On July 19, 2019, Lead Plaintiffs filed their Consolidated Class Action Complaint (the "Complaint"), on behalf of the Class, asserting claims against Defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and against the Individual Defendants under Section 20(a) of the Exchange Act.  The Complaint alleges, among other things, that Defendants: (1) made allegedly false and misleading statements or omissions claiming HIIQ had "best-in-class" and "market leading" compliance; and (2) made allegedly false and misleading statements or omissions about the purportedly "incredibly low" number of customer complaints upheld by state departments of insurance. The Complaint further alleges that HIIQ's stock price was artificially inflated as a result of Defendants' alleged false and misleading statements, and that HIIQ's stock price declined when the truth regarding Defendants' alleged misrepresentations was revealed.  By Order dated November 4, 2019, the Court denied in full Defendants' motion to dismiss for failure to state a claim.

7.     From December 2019 through September 2020, counsel for Lead Plaintiffs and Defendants engaged in extensive fact discovery.  Among other things, in response to document requests and subpoenas for the production of documents served by Lead Plaintiffs, Lead Plaintiffs reviewed and analyzed more than 1.9 million pages of documents. In response to discovery requests served on Lead Plaintiffs, Lead Plaintiffs produced over 3,800 pages of documents to Defendants.  In addition, Lead Plaintiffs deposed HIIQ's former head of broker compliance, and Defendants deposed Lead Plaintiffs' representatives.

8.     On May 21, 2020, Lead Plaintiffs filed their motion for class certification, which was fully briefed on August 13, 2020. In their motion Lead Plaintiffs sought to certify a class period ranging from September 25, 2017 through April 11, 2019, inclusive (the "Settlement Class Period"). By Order dated August 28, 2020, the Court granted class certification and certified a class period ranging from September 25, 2017 through February 18, 2019, inclusive (the "Class Period"). The Court defined the class as: "All persons or entities that purchased or otherwise acquired HIIQ common stock between September 25, 2017 and February 18, 2019, inclusive, and who were damaged thereby. Excluded from the class are Defendants, the officers and directors of HIIQ, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest." At the time that the Settlement was reached, Lead Plaintiffs had filed and were briefing a motion for reconsideration arguing that the Class Period as certified was incorrectly shortened and should properly be extended to end on April 11, 2019 (which motion has not been decided and will not be decided on its merits given the Settlement).

6

9.     Lead Plaintiffs and Defendants participated in a full-day mediation session on September 3, 2020 with Jed D. Melnick, Esq. of JAMS, conducted remotely via videoconference. The session ended without an agreement to settle. Following the mediation, counsel continued to engage in extensive arm's-length discussions and negotiations concerning a possible settlement of the Action, with the aid of a mediator. On October 21, 2020, the Parties reached an agreement in principle to settle and release all claims asserted against the Defendants in the Action in return for a cash payment of $11,000,000.00 for the benefit of Class Members and Settlement Class Members, subject to certain terms and conditions, including the execution of a customary stipulation and Court approval. The parties promptly informed the Court of the agreement to settle.

10.     Based on their investigation, discovery, prosecution and mediation of the case, Lead Plaintiffs and Lead Counsel have concluded that the terms and conditions of the Stipulation are fair, reasonable and adequate to Lead Plaintiffs and the other members of the Class and Settlement Class, and in their best interests.  Based on Lead Plaintiffs' oversight of the prosecution of this matter and with the advice of their counsel, each of the Lead Plaintiffs has agreed to settle and release the claims raised in the Action pursuant to the terms and provisions of the Stipulation, after considering: (a) the substantial financial benefit that members of the Class and Settlement Class will receive under the proposed Settlement; (b) the significant risks and costs of continued litigation and trial against Defendants; and (c) the desirability of permitting the proposed Settlement to be consummated as provided by the terms of the Stipulation.

11.     The Stipulation and the Settlement constitute a compromise of matters that are in dispute among the Parties.  Defendants have entered into the Stipulation solely to eliminate the uncertainty, burden and expense of further protracted litigation.  Each of the Defendants denies any wrongdoing, and the Settlement and Stipulation shall in no event be construed or deemed to be evidence of or an admission or concession on the part of any of the Defendants with respect to any claim or allegation of any fault, liability, wrongdoing, or damage whatsoever, or any infirmity in the defenses that the Defendants have, or could have, asserted.  Defendants expressly deny that Lead Plaintiffs have asserted any valid claims as to any of them, and expressly deny any and all allegations of fault, liability, wrongdoing, or damages whatsoever.  The Stipulation and the Settlement also shall in no event be construed or deemed to be evidence of or an admission or concession on the part of any Lead Plaintiff of an infirmity in any of the claims asserted in the Action, or an admission or concession that any of the Defendants' defenses to liability had any merit.

12.     On _____, 2020, the Court preliminarily approved the Settlement, authorized this Notice to be disseminated to potential Class Members and Settlement Class Members, and scheduled the Settlement Hearing to consider, among other things, whether to grant final approval to the Settlement.

---

**HOW DO I KNOW IF I AM AFFECTED BY THE SETTLEMENT?**
**WHO IS INCLUDED IN THE CLASS?**

---

13.     If you are a member of the Class or Settlement Class, you are subject to the Settlement, unless you timely request to be excluded.  As set forth in ¶ 8 above, the Class consists of:

7

All persons or entities that purchased or otherwise acquired HIIQ common stock between September 25, 2017 and February 18, 2019, inclusive, and who were damaged thereby.

As set forth in ¶ 8 above, the Settlement Class consists of:

All persons or entities that purchased or otherwise acquired HIIQ common stock between September 25, 2017 and April 11, 2019, inclusive, and who were damaged thereby.

Excluded from both the Class and Settlement Class are Defendants, the officers and directors of HIIQ, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest. Also excluded are any persons and entities who or which exclude themselves by submitting a timely and valid request for exclusion that is accepted by the Court. See "What If I Do Not Want To Be A Member Of The Class? How Do I Exclude Myself?" on page __ below.

Both Class Members and Settlement Class Members will be potentially eligible to receive a payment from the Settlement Fund in accordance with the Plan of Allocation (set forth at ¶¶ 41-58 below) in exchange for giving up any Released Plaintiffs' Claims (defined in ¶ 22 below) against Defendants and Defendants' Releasees.

**PLEASE NOTE: RECEIPT OF THIS NOTICE DOES NOT MEAN THAT YOU ARE A CLASS MEMBER OR SETTLEMENT CLASS MEMBER, OR THAT YOU WILL BE ENTITLED TO RECEIVE PROCEEDS FROM THE SETTLEMENT. IF YOU ARE A CLASS MEMBER OR SETTLEMENT CLASS MEMBER AND YOU WISH TO BE POTENTIALLY ELIGIBLE TO PARTICIPATE IN THE DISTRIBUTION OF PROCEEDS FROM THE SETTLEMENT, YOU ARE REQUIRED TO SUBMIT THE CLAIM FORM THAT IS BEING DISTRIBUTED WITH THIS NOTICE AND THE REQUIRED SUPPORTING DOCUMENTATION AS SET FORTH THEREIN POSTMARKED OR SUBMITTED ONLINE NO LATER THAN _____, 2021.**

| WHAT ARE LEAD PLAINTIFFS' REASONS FOR THE SETTLEMENT? |
|---|

14. Lead Plaintiffs and Lead Counsel believe that the claims asserted against Defendants have merit. They recognize, however, the expense and length of continued proceedings necessary to pursue their claims against Defendants through further motion practice, trial and appeals, as well as the very substantial risks they would face in establishing liability and damages. Lead Plaintiffs and Lead Counsel recognized that Defendants had numerous avenues of attack that could preclude a recovery. For example, Defendants would assert that their statements were not materially false and misleading, and that even if they were, they did not cause any damage to the Class. Even if the hurdles to establishing liability were overcome, the amount of damages that could be attributed to the allegedly false statements would be hotly contested. Lead Plaintiffs would have to prevail at several stages – reconsideration of the class certification order, motions for summary judgment, trial, and if they prevailed on those, on the appeals that were likely to follow. Thus, there were very significant risks attendant to the continued prosecution of the Action.

15. In light of these risks, the amount of the Settlement and the immediacy of recovery to the Class and Settlement Class, Lead Plaintiffs and Lead Counsel believe that the proposed Settlement

is fair, reasonable and adequate, and in the best interests of the Class and Settlement Class. Lead Plaintiffs and Lead Counsel believe that the Settlement provides a substantial benefit to the Class and Settlement Class, namely $11,000,000 in cash (less the various deductions described in this Notice), as compared to the risk that the claims in the Action would produce a smaller or no recovery after summary judgment, trial and appeals, possibly years in the future.

16. Defendants have denied the claims asserted against them in the Action and deny having engaged in any wrongdoing or violation of law of any kind whatsoever. Defendants have agreed to the Settlement solely to eliminate the burden and expense of continued litigation. Accordingly, as noted above, the Settlement may not be construed as an admission of any wrongdoing by Defendants.

## WHAT MIGHT HAPPEN IF THERE WERE NO SETTLEMENT?

17. If there were no Settlement and Lead Plaintiffs failed to establish any essential legal or factual element of their claims against Defendants, neither Lead Plaintiffs nor the other members of the Class or Settlement Class would recover anything from Defendants. Also, if Defendants were successful in proving any of their defenses, either at summary judgment, at trial or on appeal, the Class and/or the Settlement Class could recover substantially less than the amount provided in the Settlement, or nothing at all.

## HOW ARE CLASS MEMBERS AFFECTED BY THE ACTION AND THE SETTLEMENT?

18. As a Class Member or Settlement Class Member, you are represented by Lead Plaintiffs and Lead Counsel, unless you enter an appearance through counsel of your own choice at your own expense. You are not required to retain your own counsel, but if you choose to do so, such counsel must file a notice of appearance on your behalf and must serve copies of his or her appearance on the attorneys listed in the section entitled, "When And Where Will The Court Decide Whether To Approve The Settlement?" below.

19. If you are a Class Member or Settlement Class Member and do not wish to remain a Class Member or Settlement Class Member, you may exclude yourself from the Class or Settlement Class by following the instructions in the section entitled, "What If I Do Not Want To Be A Member Of The Class or Settlement Class? How Do I Exclude Myself?" below.

20. If you are a Class Member or Settlement Class Member and you wish to object to the Settlement, the Plan of Allocation, or Lead Counsel's application for attorneys' fees and reimbursement of Litigation Expenses, and if you do not exclude yourself from the Class or Settlement Class, you may present your objections by following the instructions in the section entitled, "When And Where Will The Court Decide Whether To Approve The Settlement?" below.

21. If you are a Class Member or Settlement Class Member and you do not exclude yourself from the Class or Settlement Class, you will be bound by any orders issued by the Court. If the Settlement is approved, the Court will enter a judgment (the "Judgment"). The Judgment will dismiss with prejudice the claims against Defendants and will provide that, upon the Effective Date of the Settlement, Lead Plaintiffs and each of the other Class Members and Settlement Class Members, on behalf of themselves, and their respective heirs, executors, administrators,

9

predecessors, successors, assigns, assignees, employees, associates, insurers, co-insurers, reinsurers, spouses, trustees, general or limited partners or partnerships, limited liability companies, members, stockholders, underwriters, personal or legal advisors or representatives, estates, or other individuals or entities in which they have a controlling interest or which is related to or affiliated with them, any members of their immediate families, or any trusts for which any of them are trustees, settlors, or beneficiaries, and the predecessors, successors, administrators and assigns of each of the foregoing, in their capacities as such, and anyone claiming through or on behalf of any of them, regardless of whether they execute and deliver a Proof of Claim and Release and regardless of whether they share in the Settlement Fund, shall be deemed to have, and by operation of the Stipulation, of law, and of the Judgment shall have, fully, finally and forever compromised, settled, released, resolved, relinquished, waived, dismissed, covenanted not to commence, institute, intervene in, participate in, or prosecute, and discharged each and every Released Plaintiffs' Claim (as defined in paragraph 22 below) against the Defendants and the other Defendants' Releasees (as defined in paragraph 23 below), and shall forever be barred and enjoined from commencing, instituting, intervening in or participating in, or prosecuting any or all of the Released Plaintiffs' Claims against any of the Defendants' Releasees in any court of law or equity, arbitration tribunal, administrative forum, or other forum of any kind or character, whether brought directly, in a representative capacity, derivatively, or in any other capacity.

22.     "Released Plaintiffs' Claims" means all claims, demands, losses, rights, obligations, damages, liabilities, actions, suits, matters, issues, and causes of action of any nature whatsoever, whether known or Unknown Claims, in law or in equity, accrued or unaccrued, fixed or contingent, direct, individual or representative, of every nature and description, that have been or could have been asserted in this Action or could in the future be asserted in any forum, whether foreign or domestic, whether arising under federal, state, local, common, or foreign law or any other law, rule, or regulation, by Lead Plaintiffs, any member of the Class or Settlement Class, or their successors, assigns, executors, administrators, representatives, attorneys, and agents, in their capacities as such, whether brought directly or indirectly against any of the Defendants, which (a) arise out of, are based upon, or relate to in any way, in whole or in part, any of the allegations, acts, transactions, facts, events, matters, occurrences, statements, disclosures, publications, disseminations, presentations, press releases, representations or omissions or failures to act involved, set forth, alleged or referred to, in this Action, or which could have been alleged in this Action, or which could be asserted in the future, in the Action or in any other action in any court or forum, and (b) arise out of, are based upon, or relate to in any way the purchase, acquisition, holding, sale, or disposition of any HIIQ common stock during the Class Period or Settlement Class Period. Released Plaintiffs' Claims do not include: (i) any claims relating to the enforcement of the Settlement; and (ii) any claims of any person or entity who or which submits a request for exclusion from the Class or Settlement Class that is accepted by the Court.

23.     "Defendants' Releasees" means Defendants and their respective current and former officers, directors, insurers, principals, agents, parents, affiliates, subsidiaries, divisions, departments, joint ventures, successors, predecessors, assigns, assignees, employees, associates, co-insurers, reinsurers, accountants, and attorneys spouses, heirs, executors, trustees, general or limited partners or partnerships, limited liability companies, members, stockholders, underwriters, personal or legal advisors or representatives, estates, administrators, or other individuals or entities in which Defendants have a controlling interest or which is related to or affiliated with the respective Defendants, any members of their immediate families, or any trusts for which any of them are trustees,

settlors, or beneficiaries, and the predecessors, successors, administrators and assigns of each of the foregoing.

24. "Unknown Claims" means any Released Plaintiffs' Claims that any Lead Plaintiff or any other Class Member or Settlement Class Member does not know or suspect to exist in his, her or its favor at the time of the release of such claims, and any Released Defendants' Claims (as defined in Paragraph 31 below) that any Defendant or any other Defendants' Releasee does not know or suspect to exist in his, her, or its favor at the time of the release of such claims, which, if known by him, her or it, might have affected his, her or its decision(s) with respect to this Settlement, including but not limited to whether to object to the Settlement or seek exclusion from the Class or Settlement Class. With respect to any and all Released Claims, the Parties stipulate and agree that, upon the Effective Date of the Settlement, Lead Plaintiffs and Defendants shall expressly waive, and each of the other Class Members and Settlement Class Members and each of the other Plaintiffs' Releasees and Defendants' Releasees shall be deemed to have waived, and by operation of the Judgment, shall have expressly waived, any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law or foreign law, which is similar, comparable, or equivalent to California Civil Code §1542, which provides:

> A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

Lead Plaintiffs and the Class Members and Settlement Class Members may hereafter discover facts in addition to or different from those which he, she, or it now knows or believes to be true with respect to the subject matter of the Released Claims, but Lead Plaintiffs shall expressly, fully, finally, and forever settle and release, and each Class Member and Settlement Class Member shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever settled and released, any and all Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct which is negligent, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such additional or different facts. Lead Plaintiffs and Defendants acknowledge, and each of the other Class Members and Settlement Class Members, and each of the other Plaintiffs' Releasees and Defendants' Releasees shall be deemed by operation of law to have acknowledged, that the foregoing waiver was separately bargained for and a key element of the Settlement.

25. The Judgment will also provide that, upon the Effective Date of the Settlement, Defendants, on behalf of themselves, and their respective heirs, executors, administrators, predecessors, successors, and assigns, in their capacities as such, shall be deemed to have, and by operation of the Stipulation, of law, and of the Judgment shall have, fully, finally, and forever compromised, settled, released, resolved, relinquished, waived, and discharged each and every Released Defendants' Claim (as defined in paragraph 26 below) against any of the Plaintiffs' Releasees (as defined in paragraph 27 below), and shall forever be barred and enjoined from prosecuting any or all of the Released Defendants' Claims against any of the Plaintiffs' Releasees.

11

26. "Released Defendants' Claims" means all claims and causes of action of every nature and description, whether known claims or Unknown Claims, whether arising under federal, state, common, or foreign law, that arise out of or relate in any way to the institution, prosecution, or settlement of the claims asserted in the Action against the Defendants. Released Defendants' Claims do not include any claims relating to the enforcement of the Settlement and any claims against any person or entity who or which submits a request for exclusion from the Class or Settlement Class that is accepted by the Court.

27. "Plaintiffs' Releasees" means Lead Plaintiffs, all other plaintiffs in the Action, their respective attorneys, and all other Class Members and Settlement Class Members.

28. The Judgment will also provide that, upon the Effective Date, the Stipulation shall operate conclusively as an estoppel, res judicata, bar, full defense, and any other theory of claim preclusion or issue preclusion or similar defense, argument, or counterclaim in the event, and to the extent, of any claim, demand, action, or proceeding brought by a Lead Plaintiff, Class Member, or Settlement Class Member against any of the Defendants' Releasees with respect to any Released Plaintiffs' Claim, or brought by a Defendant against any of the Plaintiffs' Releasees with respect to any Released Defendants' Claim.

29. The Judgment shall, among other things, provide for the dismissal with prejudice of the Action against the Defendants, without costs to any Party, except for the payments expressly provided for in the Stipulation.

## HOW DO I PARTICIPATE IN THE SETTLEMENT? WHAT DO I NEED TO DO?

30. To be potentially eligible for a payment from the proceeds of the Settlement, you must be a member of the Class or Settlement Class and you must timely complete and return the Claim Form with adequate supporting documentation. The Claim Form and documentation can be submitted by mail or online at the Settlement website, www.HealthInsuranceInnovationsSecuritiesSettlement.com. The Claim Form must be postmarked or submitted online no later than _____, 2021. A Claim Form is included with this Notice, or you may obtain one from the website maintained by the Claims Administrator for the Settlement, www.HealthInsuranceInnovationsSecuritiesSettlement.com, or you may request that a Claim Form be mailed to you by calling the Claims Administrator toll free at 1-855-914-4697. Please retain all records of your ownership of and transactions in HIIQ common stock, as they may be needed to document your Claim. If you request exclusion from the Class or Settlement Class or do not submit a timely and valid Claim Form, you will not be eligible to share in the Net Settlement Fund.

## HOW MUCH WILL MY PAYMENT BE?

31. At this time, it is not possible to make any determination as to how much any individual Class Member or Settlement Class Member may receive from the Settlement.

32. Pursuant to the Settlement, Defendants have agreed pay eleven million dollars ($11,000,000.00) in cash. The Settlement Amount will be deposited into an escrow account. The Settlement Amount plus any interest earned thereon is referred to as the "Settlement Fund." If the Settlement is approved by the Court and the Effective Date occurs, the "Net Settlement Fund" (that

12

is, the Settlement Fund less (a) all federal, state and/or local taxes (including any interest or penalties thereon) on any income earned by the Settlement Fund, the reasonable costs incurred in connection with determining the amount of and paying taxes owed by the Settlement Fund (including reasonable expenses of tax attorneys and accountants), and all taxes imposed on payments by the Settlement Fund, including withholding taxes; (b) the costs and expenses incurred in connection with providing notice of the Settlement and administering the Settlement; and (c) any attorneys' fees and Litigation Expenses awarded by the Court) will be distributed to Class Members and Settlement Class Members who submit valid Claim Forms, in accordance with the proposed Plan of Allocation or such other plan of allocation as the Court may approve.

33.   The Net Settlement Fund will not be distributed unless and until the Court has approved the Settlement and a plan of allocation, and the time for any petition for rehearing, appeal or review, whether by certiorari or otherwise, has expired.

34.   Neither Defendants nor any other person or entity that paid any portion of the Settlement Amount on their behalf are entitled to get back any portion of the Settlement Fund once the Court's order or judgment approving the Settlement becomes final.  Defendants shall not have any liability, obligation or responsibility for the administration of the Settlement, the disbursement of the Net Settlement Fund or the plan of allocation.

35.   Approval of the Settlement is independent from approval of a plan of allocation.  Any determination with respect to a plan of allocation will not affect the Settlement, if approved.

36.   Unless the Court otherwise orders, any Class Member or Settlement Class Member who fails to submit a Claim Form postmarked or submitted online on or before _____, 2021, shall be fully and forever barred from receiving payments pursuant to the Settlement but will in all other respects remain a Class Member or Settlement Class Member and be subject to the provisions of the Stipulation, including the terms of any Judgment entered and the releases given.  This means that each Class Member or Settlement Class Member releases the Released Plaintiffs' Claims (as defined in paragraph 22 above) against the Defendants' Releasees (as defined in paragraph 23 above) and will be permanently barred, enjoined and prohibited from filing, prosecuting, or pursuing any of the Released Plaintiffs' Claims against any of the Defendants' Releasees whether or not such Class Member or Settlement Class Member submits a Claim Form.

37.   Participants in and beneficiaries of a plan covered by ERISA ("ERISA Plan") should NOT include any information relating to their transactions in HIIQ common stock held through the ERISA Plan in any Claim Form that they may submit in this Action.  They should include ONLY the HIIQ common stock that they purchased, acquired, or sold outside of the ERISA Plan.

38.   The Court has reserved jurisdiction to allow, disallow, or adjust on equitable grounds the Claim of any Class Member or Settlement Class Member.

39.   Each Claimant shall be deemed to have submitted to the jurisdiction of the Court with respect to his, her or its Claim Form.

40.   Only Class Members or Settlement Class Members will be potentially eligible to share in the distribution of the Net Settlement Fund.  Persons and entities that are excluded from the Class and/or Settlement Class by definition or that exclude themselves from the Class and/or Settlement

Class pursuant to request will not be eligible to receive a distribution from the Net Settlement Fund and should not submit Claim Forms.

## **PROPOSED PLAN OF ALLOCATION**

41.    The objective of the Plan of Allocation is to equitably distribute the Net Settlement Fund among Authorized Claimants who suffered economic losses as a proximate result of the alleged wrongdoing.  The calculations made pursuant to the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Class Members or Settlement Class Members might have been able to recover after a trial.  Nor are the calculations pursuant to the Plan of Allocation intended to be estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement.  The computations under the Plan of Allocation are only a method to weigh the claims of Authorized Claimants against one another for the purposes of making pro rata allocations of the Net Settlement Fund.

42.    The Plan of Allocation was created with the assistance of a consulting damages expert and reflects the assumption that Defendants' alleged materially false and misleading statements and material omissions proximately caused the price of HIIQ common stock to be artificially inflated throughout the Class Period and Settlement Class Period.  In calculating the estimated artificial inflation allegedly caused by Defendants' alleged misrepresentations and omissions, Lead Plaintiffs' damages expert considered price changes in HIIQ common stock in reaction to certain public announcements allegedly revealing the truth concerning Defendants' alleged misrepresentations and material omissions, adjusting for price changes that were attributable to market or industry forces.

43.    In order to have recoverable damages, the disclosure of the allegedly misrepresented information must be the cause of the decline in the price of HIIQ common stock.  In this case, Lead Plaintiffs allege that Defendants made false statements and omitted material facts during the period between September 25, 2017 and April 11, 2019, inclusive, which had the effect of artificially inflating the price of HIIQ common stock.[2]  Lead Plaintiffs further allege that corrective information was released to the market on: November 2, 2018, November 27, 2018, March 13, 2019, March 25, 2019, and April 12, 2019, which partially removed the artificial inflation from the price of HIIQ common stock on November 2, 2018, November 5, 2018, November 27, 2018, March 13, 2019, March 26, 2019, and April 12, 2019.

44.    Recognized Loss Amounts are based primarily on the difference in the amount of alleged artificial inflation in the prices of HIIQ common stock at the time of purchase or acquisition and at the time of sale, or the difference between the actual purchase price and sale price.  Accordingly, in order to have a Recognized Loss under the Plan of Allocation, a Class Member or Settlement Class Member who or which purchased or otherwise acquired HIIQ common stock during the period from September 25, 2017 through and including April 11, 2019 must have held those shares

---

[2] Because the Class Period certified by the Court ends on February 18, 2019, claims relating to the alleged corrective disclosures on March 13, 2019, March 25, 2019, and April 12, 2019 were not included in the Class Period. At the time that the Settlement was reached, Lead Plaintiffs had filed and were briefing a motion for reconsideration arguing that the Class Period as certified was incorrectly shortened and should properly be extended to end on April 11, 2019. Due to the substantial litigation risk these claims faced, the artificial inflation amounts on those corrective disclosures have been discounted by 95% (multiplied by 5%).

through at least one of the dates where new corrective information was released to the market and partially removed the artificial inflation from the price of HIIQ common stock.

## Calculation of Recognized Loss Amounts

45.    Based on the formula stated below, a Recognized Loss Amount will be calculated for each purchase or acquisition of HIIQ common stock that is listed on the Claim Form and for which adequate documentation is provided.  If a Recognized Loss Amount calculates to a negative number or zero under the formula below, that number will be zero.

46.    For each share of HIIQ common stock purchased or otherwise acquired during the period from September 25, 2017 through and including April 11, 2019, and:

     i.     sold before November 2, 2018, 12:09 p.m. ET, the Recognized Loss Amount will be $0.00.

     ii.     sold from November 2, 2018 at or after 12:09 p.m. ET through and including April 11, 2019, the Recognized Loss Amount will be *the lesser of:* (i) the amount of artificial inflation per share on the date of purchase/acquisition as stated in Table A below minus the amount of artificial inflation per share on the date of sale as stated in Table A below; (ii) the purchase/acquisition price minus the sale price.

     iii.     sold from April 12, 2019 through and including the close of trading on July 10, 2019, the Recognized Loss Amount will be *the least of:* (i) the amount of artificial inflation per share on the date of purchase/acquisition as stated in Table A below; (ii) the purchase/acquisition price minus the average closing price between April 12, 2019 and the date of sale as stated in Table B below; or (iii) the purchase/acquisition price minus the sale price.

     iv.     held as of the close of trading on July 10, 2019, the Recognized Loss Amount will be *the lesser of:* (i) the amount of artificial inflation per share on the date of purchase/acquisition as stated in Table A below; or (ii) the purchase/acquisition price minus $24.96.[3]

## Additional Provisions

---

[3] Pursuant to Section 21D(e)(1) of the Exchange Act, "in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." Consistent with the requirements of the Exchange Act, Recognized Loss Amounts are reduced to an appropriate extent by taking into account the closing prices of HIIQ common stock during the "90-day look-back period," April 12, 2019 through and including July 10, 2019.  The mean (average) closing price for HIIQ common stock during this 90-day look-back period was $24.96.

47. **Calculation of Claimant's "Recognized Claim":** A Claimant's "Recognized Claim" will be the sum of his, her, or its Recognized Loss Amounts as calculated above with respect to HIIQ common stock.

48. **FIFO Matching:** If more than one purchase/acquisition or sale of HIIQ common stock was made during the period from September 25, 2017 through and including April 11, 2019, all purchases/acquisitions and sales will be matched on a First In, First Out ("FIFO") basis. Sales in the Class Period or Settlement Class Period will be matched first against any holdings at the beginning of the Class Period or Settlement Class Period, and then against purchases/acquisitions in chronological order, beginning with the earliest purchase/acquisition made.

49. **"Purchase/Sale" Dates:** Purchases or acquisitions and sales of HIIQ common stock will be deemed to have occurred on the "contract" or "trade" date as opposed to the "settlement" or "payment" date. The receipt or grant by gift, inheritance, or operation of law of HIIQ common stock during the period from September 25, 2017 through and including April 11, 2019 shall not be deemed a purchase, acquisition or sale of HIIQ common stock for the calculation of a Claimant's Recognized Loss Amount, nor shall the receipt or grant be deemed an assignment of any claim relating to the purchase/acquisition/sale of HIIQ common stock unless (i) the donor or decedent purchased or otherwise acquired or sold HIIQ common stock during the period from September 25, 2017 through and including April 11, 2019; (ii) the instrument of gift or assignment specifically provides that it is intended to transfer such rights; and (iii) no Claim was submitted by or on behalf of the donor, on behalf of the decedent, or by anyone else with respect to such shares of HIIQ common stock.

50. **Short Sales:** The date of covering a "short sale" is deemed to be the date of purchase or acquisition of the HIIQ common stock. The date of a "short sale" is deemed to be the date of sale of the HIIQ common stock. In accordance with the Plan of Allocation, however, the Recognized Loss Amount on "short sales" and the purchases covering "short sales" is zero.

51. In the event that a Claimant has an opening short position in HIIQ common stock, the earliest purchases or acquisitions of HIIQ common stock during the period from September 25, 2017 through and including April 11, 2019 will be matched against such opening short position and not be entitled to a recovery until that short position is fully covered.

52. **Common Stock Purchased/Sold Through the Exercise of Options:** With respect to HIIQ common stock purchased or sold through the exercise of an option, the purchase/sale date of the common stock is the exercise date of the option and the purchase/sale price is the exercise price of the option.

53. **Determination of Distribution Amount:** If the sum total of Recognized Claims of all Authorized Claimants who are entitled to receive payment out of the Net Settlement Fund is greater than the Net Settlement Fund, each Authorized Claimant shall receive his, her, or its pro rata share of the Net Settlement Fund. The pro rata share will be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund.

54. If the Net Settlement Fund exceeds the sum total amount of the Recognized Claims of all Authorized Claimants entitled to receive payment out of the Net Settlement Fund, the excess

amount in the Net Settlement Fund will be distributed pro rata to all Authorized Claimants entitled to receive payment.

55.  If an Authorized Claimant's Distribution Amount calculates to less than $10.00, no distribution will be made to that Authorized Claimant.

56.  After the initial distribution of the Net Settlement Fund, the Claims Administrator will make reasonable and diligent efforts to have Authorized Claimants cash their distribution checks. To the extent any monies remain in the Net Settlement Fund six (6) months after the initial distribution, if Lead Counsel, in consultation with the Claims Administrator, determine that it is cost-effective to do so, the Claims Administrator will conduct a re-distribution of the funds remaining after payment of any unpaid fees and expenses incurred in administering the Settlement, including for such re-distribution, to Authorized Claimants who have cashed their initial distributions and who would receive at least $10.00 from such re-distribution. Additional re-distributions to Authorized Claimants who have cashed their prior checks and who would receive at least $10.00 on such additional re-distributions may occur thereafter if Lead Counsel, in consultation with the Claims Administrator, determine that additional re-distributions, after the deduction of any additional fees and expenses incurred in administering the Settlement, including for such re-distributions, would be cost-effective. At such time as it is determined that the re-distribution of funds remaining in the Net Settlement Fund is not cost-effective, the remaining balance will be contributed to non-sectarian, not-for-profit, 501(c)(3) organization(s), to be recommended by Lead Counsel and approved by the Court.

57.  Payment pursuant to the Plan of Allocation, or such other plan of allocation as may be approved by the Court, will be conclusive against all Authorized Claimants.  No person shall have any claim against Lead Plaintiffs, Plaintiffs' Counsel, Lead Plaintiffs' damages expert, Lead Plaintiffs' consulting experts, Defendants, Defendants' Counsel, or any of the other Plaintiffs' Releasees or Defendants' Releasees, or the Claims Administrator or other agent designated by Lead Counsel arising from distributions made substantially in accordance with the Stipulation, the plan of allocation approved by the Court, or further Orders of the Court. Lead Plaintiffs, the Defendants, and their respective counsel, and all other Defendants' Released Parties, shall have no responsibility or liability whatsoever for the investment or distribution of the Settlement Fund or the Net Settlement Fund; the plan of allocation; the determination, administration, calculation, or payment of any Claim or nonperformance of the Claims Administrator; the payment or withholding of Taxes; or any losses incurred in connection therewith.

58.  The Plan of Allocation stated herein is the plan that is being proposed to the Court for its approval by Lead Plaintiffs after consultation with their damages expert. The Court may approve this plan as proposed or it may modify the Plan of Allocation without further notice to the Class. Any Orders regarding any modification of the Plan of Allocation will be posted on the case website.

**Table A**

**Estimated Artificial Inflation with Respect to Transactions in HIIQ Common Stock**
**September 25, 2017 through April 11, 2019**

| Date Range | Artificial Inflation Per Share |
|---|---|
| September 25, 2017 – November 2, 2018 (prior to 12:09 p.m. ET)[4] | $13.89 |
| November 2, 2018 (at or after 12:09 p.m. ET) – November 4, 2018 | $9.79 |
| November 5, 2018 – November 27, 2018 (prior to 10:37 a.m. ET)[5] | $2.65 |
| November 27, 2018 (at or after 10:37 a.m. ET) – March 13, 2019 (prior to 1:43 p.m. ET)[6] | $0.58 |
| March 13, 2019 (at or after 1:43 p.m. ET) – March 25, 2019 | $0.23 |
| March 26, 2019 – April 11, 2019 | $0.11 |

---

[4] For purposes of this Plan of Allocation, the Claims Administrator will assume that any HIIQ common stock transactions on November 2, 2018 at any price equal to or less than $48.63 per share occurred after the corrective information was released to the market at 12:09 p.m. ET on that day, and any HIIQ common stock transactions at any price greater than $48.63 per share occurred prior to the release of the corrective information at 12:09 p.m. ET on November 2, 2018.

[5] For purposes of this Plan of Allocation, the Claims Administrator will assume that any HIIQ common stock transactions on November 27, 2018 at any price equal to or less than $32.20 per share occurred after the corrective information was released to the market at 10:37 a.m. ET on that day, and any HIIQ common stock transactions at any price greater than $32.20 per share occurred prior to the release of the corrective information at 10:37 a.m. ET on November 27, 2018.

[6] For purposes of this Plan of Allocation, the Claims Administrator will assume that any HIIQ common stock transactions on March 13, 2019 at any price equal to or less than $38.20 per share occurred after the corrective information was released to the market at 1:43 p.m. ET on that day, and any HIIQ common stock transactions at any price greater than $38.20 per share occurred prior to the release of the corrective information at 1:43 p.m. ET on March 13, 2019.

18

## Table B

| | | | | | |
|---|---|---|---|---|---|
| **90-Day Look-back Table for HIIQ Common Stock**<br>**Closing Price and Average Closing Price**<br>**April 12, 2019 through July 10, 2019** | | | | | |
| **Date** | **Closing Price** | **Average Closing Price between April 12, 2019 and Date Shown** | **Date** | **Closing Price** | **Average Closing Price between April 12, 2019 and Date Shown** |
| 4/12/2019 | $23.85 | $23.85 | 5/29/2019 | $23.31 | $23.60 |
| 4/15/2019 | $23.43 | $23.64 | 5/30/2019 | $23.47 | $23.60 |
| 4/16/2019 | $24.20 | $23.83 | 5/31/2019 | $25.79 | $23.66 |
| 4/17/2019 | $23.95 | $23.86 | 6/3/2019 | $26.62 | $23.74 |
| 4/18/2019 | $23.85 | $23.86 | 6/4/2019 | $28.74 | $23.88 |
| 4/22/2019 | $24.85 | $24.02 | 6/5/2019 | $28.72 | $24.01 |
| 4/23/2019 | $26.12 | $24.32 | 6/6/2019 | $28.75 | $24.14 |
| 4/24/2019 | $24.75 | $24.38 | 6/7/2019 | $29.70 | $24.28 |
| 4/25/2019 | $24.55 | $24.39 | 6/10/2019 | $30.50 | $24.44 |
| 4/26/2019 | $25.12 | $24.47 | 6/11/2019 | $28.92 | $24.55 |
| 4/29/2019 | $25.43 | $24.55 | 6/12/2019 | $28.38 | $24.64 |
| 4/30/2019 | $23.32 | $24.45 | 6/13/2019 | $27.78 | $24.71 |
| 5/1/2019 | $21.88 | $24.25 | 6/14/2019 | $27.87 | $24.78 |
| 5/2/2019 | $21.56 | $24.06 | 6/17/2019 | $26.36 | $24.82 |
| 5/3/2019 | $23.76 | $24.04 | 6/18/2019 | $25.67 | $24.84 |
| 5/6/2019 | $25.85 | $24.15 | 6/19/2019 | $25.67 | $24.85 |
| 5/7/2019 | $21.94 | $24.02 | 6/20/2019 | $26.58 | $24.89 |
| 5/8/2019 | $21.72 | $23.90 | 6/21/2019 | $26.09 | $24.91 |
| 5/9/2019 | $21.15 | $23.75 | 6/24/2019 | $26.13 | $24.94 |
| 5/10/2019 | $20.32 | $23.58 | 6/25/2019 | $24.43 | $24.93 |
| 5/13/2019 | $18.86 | $23.36 | 6/26/2019 | $24.17 | $24.91 |
| 5/14/2019 | $21.35 | $23.26 | 6/27/2019 | $24.72 | $24.91 |
| 5/15/2019 | $23.45 | $23.27 | 6/28/2019 | $25.92 | $24.93 |
| 5/16/2019 | $24.02 | $23.30 | 7/1/2019 | $26.40 | $24.96 |
| 5/17/2019 | $23.72 | $23.32 | 7/2/2019 | $25.82 | $24.97 |
| 5/20/2019 | $24.80 | $23.38 | 7/3/2019 | $26.11 | $24.99 |
| 5/21/2019 | $26.11 | $23.48 | 7/5/2019 | $26.17 | $25.01 |
| 5/22/2019 | $25.41 | $23.55 | 7/8/2019 | $25.00 | $25.01 |
| 5/23/2019 | $24.62 | $23.58 | 7/9/2019 | $23.93 | $24.99 |
| 5/24/2019 | $24.90 | $23.63 | 7/10/2019 | $22.91 | $24.96 |
| 5/28/2019 | $23.03 | $23.61 | | | |

---

### WHAT PAYMENT ARE THE ATTORNEYS FOR THE CLASS SEEKING? HOW WILL THE LAWYERS BE PAID?

59.   Plaintiffs' Counsel have not received any payment for their services in pursuing claims against the Defendants, nor have Plaintiffs' Counsel been reimbursed for their out-of-pocket

19

expenses.  Before final approval of the Settlement, Lead Counsel will apply to the Court for an award of attorneys' fees for all Plaintiffs' Counsel in an amount not to exceed one-third (33-1/3%) of the Settlement Fund.  At the same time, Lead Counsel also intends to apply for reimbursement of Litigation Expenses in an amount not to exceed $450,000, which may include an application for reimbursement of the reasonable lost wages, costs and expenses incurred by Lead Plaintiffs directly related to their prosecution of this Action.  The Court will determine the amount of any award of attorneys' fees or reimbursement of Litigation Expenses.  Such sums as may be approved by the Court will be paid from the Settlement Fund.  Class Members are not personally liable for any such fees or expenses.

### WHAT IF I DO NOT WANT TO BE A MEMBER OF THE CLASS? HOW DO I EXCLUDE MYSELF?

60.    Each Class Member or Settlement Class Member will be bound by all determinations and judgments in this lawsuit, whether favorable or unfavorable, unless such person or entity mails or delivers a written request for exclusion, addressed to Health Insurance Innovations Securities Settlement, Exclusions c/o Epiq, P.O. Box 5657, Portland, OR 97228-5657.  The exclusion request must be received no later than _____, 2021.  You will not be able to exclude yourself after that date.  Each request for exclusion must (a) state the name, address and telephone number of the person or entity requesting exclusion, and in the case of entities the name and telephone number of the appropriate contact person; (b) state that such person or entity "requests exclusion from the Class or Settlement Class in *Julian Keippel v. Health Insurance Innovations, Inc., et al.*, No. 8:19-cv-00421"; (c) state the number of HIIQ shares that the person or entity requesting exclusion purchased/acquired and/or sold during the Class Period or Settlement Class Period, as well as the dates and prices of each such purchase/acquisition and sale, and the number of HIIQ shares held at the beginning of the Class Period (and Settlement Class Period); and (d) be signed by the person or entity requesting exclusion or an authorized representative.  A request for exclusion shall not be effective unless it provides all the information called for in this paragraph and is received within the time stated above, or is otherwise accepted by the Court.

61.    If you do not want to be part of the Class or Settlement Class, you must follow these instructions for exclusion even if you have pending, or later file, another lawsuit, arbitration, or other proceeding relating to any Released Plaintiffs' Claim against any of the Defendants' Releasees.

62.    If you ask to be excluded, you will not be eligible to receive any payment out of the Net Settlement Fund.

63.    HIIQ has the right to terminate the Settlement if valid requests for exclusion are received from persons and entities entitled to be members of the Class or Settlement Class in an amount that exceeds an amount agreed to by Lead Plaintiffs and HIIQ, as set forth in a confidential Supplemental Agreement.

> **WHEN AND WHERE WILL THE COURT DECIDE WHETHER TO APPROVE THE SETTLEMENT? DO I HAVE TO COME TO THE HEARING? MAY I SPEAK AT THE HEARING IF I DON'T LIKE THE SETTLEMENT?**

64. Class Members or Settlement Class Members do not need to attend the Settlement Hearing. The Court will consider any submission made in accordance with the provisions below even if a Class Member or Settlement Class Member does not attend the hearing. You can participate in the Settlement without attending the Settlement Hearing.

65. The Settlement Hearing will be held on _____, 2021 at __:__ _.m., in Courtroom 15B of the Sam Gibbons United States Courthouse, 801 North Florida Avenue, Tampa, Florida 33602, or by telephonic, video conferencing or other electronic means, as posted on the website of the Claims Administrator. The Court reserves the right to approve the Settlement, the Plan of Allocation, Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses and/or any other matter related to the Settlement at or after the Settlement Hearing without further notice to the members of the Class or Settlement Class.

66. Any Class Member or Settlement Class Member who or which does not request exclusion may object to the Settlement, the proposed Plan of Allocation or Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses. Objections must be in writing. You must also serve the papers on the Lead Counsel representatives and on the Defendants' Counsel representative at the addresses set forth below so that the papers are received on or before _____, 2021.

| Clerk's Office | Lead Counsel Representatives | Defendants' Counsel Representative |
|---|---|---|
| U.S. District Court, Middle District of Florida No. 8:19-cv-00421 Sam Gibbons United States Courthouse 801 N. Florida Ave. Tampa, FL 33602 | Brandon T. Grzandziel Adam D. Warden Saxena White P.A. 7777 Glades Road Suite 300 Boca Raton, FL 33434 | Michael Matthews Lauren Valiente Foley & Lardner LLP 100 North Tampa Street, Suite 2700 Tampa, FL 33602-5810 |

67. Any objection (a) must state the name, address and telephone number of the person or entity objecting and must be signed by the objector; (b) must contain a statement of the objection or objections, and the specific reasons for each objection, including any legal and evidentiary support the Class Member or Settlement Class Member wishes to bring to the Court's attention; and (c) must include documents sufficient to prove membership in the Class or Settlement Class, including the number of HIIQ shares that the objecting Class Member or Settlement Class Member purchased/acquired and/or sold during the Class Period or Settlement Class Period, as well as the dates and prices of each such purchase/acquisition and sale, and the number of HIIQ shares held at the beginning of the Class Period or Settlement Class Period. You may not object to the Settlement, the Plan of Allocation or Lead Counsel's motion for attorneys' fees and reimbursement

21

of Litigation Expenses if you exclude yourself from the Class or Settlement Class or if you are not a member of the Class or Settlement Class.

68.     You may file a written objection without having to appear at the Settlement Hearing.  You may not, however, appear at the Settlement Hearing to present your objection unless you first file and serve a written objection in accordance with the procedures described above, unless the Court orders otherwise.

69.     If you wish to be heard orally at the hearing in opposition to the approval of the Settlement, the Plan of Allocation or Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses, and if you timely file and serve a written objection as described above, you must also file a notice of appearance with the Clerk's Office and serve it on Lead Counsel and Defendants' Counsel at the addresses set forth in ¶ 66 above so that it is received on or before _____, 2021.  Persons who intend to object and desire to present evidence at the Settlement Hearing must include in their written objection or notice of appearance the identity of any witnesses they may call to testify and exhibits they intend to introduce into evidence at the hearing.  Such persons may be heard orally at the discretion of the Court.

70.     You are not required to hire an attorney to represent you in making written objections or in appearing at the Settlement Hearing.  However, if you decide to hire an attorney, it will be at your own expense, and that attorney must file a notice of appearance with the Court and serve it on Lead Counsel and Defendants' Counsel at the addresses set forth in ¶ 66 above so that the notice is received on or before _____, 2021.

71.     The Settlement Hearing may be adjourned by the Court without further written notice to the Class or Settlement Class.  If you intend to attend the Settlement Hearing, you should confirm the date and time with Lead Counsel.

72.     Unless the Court orders otherwise, any Class Member or Settlement Class Member who does not object in the manner described above will be deemed to have waived any objection and shall be forever foreclosed from making any objection to the proposed Settlement, the proposed Plan of Allocation or Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses.  Class Members or Settlement Class Members do not need to appear at the Settlement Hearing or take any other action to indicate their approval.

## WHAT IF I BOUGHT HIIQ COMMON STOCK ON SOMEONE ELSE'S BEHALF?

73.     If you purchased or otherwise acquired HIIQ common stock during the Class Period or Settlement Class Period for the beneficial interest of persons or organizations other than yourself, you must either (a) within seven (7) calendar days of receipt of this Notice, request from the Claims Administrator sufficient copies of the Notice and Claim Form (the "Notice Packet") to forward to all such beneficial owners and within seven (7) calendar days of receipt of those Notice Packets forward them to all such beneficial owners; or (b) within seven (7) calendar days of receipt of this Notice, provide a list of the names and addresses of all such beneficial owners to Health Insurance Innovations Securities Settlement c/o Epiq, P.O. Box 5657, Portland, OR 97228-5657.  If you choose the second option, the Claims Administrator will send a copy of the Notice and the Claim Form to the beneficial owners.  Upon full compliance with these directions, such nominees may seek reimbursement of their reasonable expenses actually incurred, by providing the Claims

22

Administrator with proper documentation supporting the expenses for which reimbursement is sought. Copies of this Notice and the Claim Form may also be obtained from the website maintained by the Claims Administrator, www. HealthInsuranceInnovationsSecuritiesSettlement.com, or by calling the Claims Administrator toll-free at 1-855-914-4697.

## CAN I SEE THE COURT FILE?  WHOM SHOULD I CONTACT IF I HAVE QUESTIONS?

74.   This Notice contains only a summary of the terms of the proposed Settlement.  For more detailed information about the matters involved in this Action, you are referred to the papers on file in the Action, including the Stipulation, which are available online via the Public Access to Court Electronic Records (PACER) system at https://pacer.uscourts.gov/; to the extent permitted in light of the Court's COVID-19 procedures may be inspected during regular office hours at the Office of the Clerk, United States District Court for the Middle District of Florida, 801 N. Florida Ave., Tampa, FL 33602; or will be provided by Lead Counsel upon request.  Additionally, copies of the Stipulation and any related orders entered by the Court will be posted on the website maintained by the Claims Administrator, www. HealthInsuranceInnovationsSecuritiesSettlement.com.

All inquiries concerning this Notice and the Claim Form should be directed to:

| Health Insurance Innovations Securities Settlement c/o Epiq P.O. Box 5657 Portland, OR 97228-5657 1-855-914-4697 | and/or | Brandon T. Grzandziel Adam D. Warden SAXENA WHITE P.A. 7777 Glades Road, Suite 300 Boca Raton, FL 33434 (561) 394-339 bgrzandziel@saxenawhite.com awarden@saxenawhite.com |

**DO NOT CALL OR WRITE THE COURT, THE OFFICE OF THE CLERK OF THE COURT, DEFENDANTS OR THEIR COUNSEL REGARDING THIS NOTICE.**

Dated: _____, 2020

By Order of the Court
United States District Court
Middle District of Florida

# Exhibit A-2

HIIQ Securities Settlement
Claims Administrator
PO Box 5657
Portland, OR 97228-5657

Toll-Free Number:  855-914-4697
Website:  www.HealthInsuranceInnovationsSecuritiesSettlement.com
Email: info@HealthInsuranceInnovationsSecuritiesSettlement.com

Objection/Exclusion Deadline:        __/__/2021
Settlement Fairness Hearing:         __/__/2021
Deadline to File a Claim:            __/__/2021

<<Mail ID>>
<<Name1>>
<<Name2>>
<<Address1>>
<<Address2>>
<<City>><<State>><<Zip>>
<<Foreign Country>>

## PROOF OF CLAIM AND RELEASE FORM

TO BE ELIGIBLE TO RECEIVE A SHARE OF THE NET SETTLEMENT FUND IN CONNECTION WITH THE SETTLEMENT OF THIS LITIGATION, YOU MUST COMPLETE AND SIGN THIS PROOF OF CLAIM AND RELEASE FORM ("PROOF OF CLAIM") AND EITHER MAIL IT BY PREPAID, FIRST-CLASS MAIL TO THE ABOVE ADDRESS, OR SUBMIT IT ONLINE AT THE SETTLEMENT WEBSITE, WWW.HEALTHINSURANCEINNOVATIONSSECURITIESSETTLEMENT.COM. **THE CLAIM FORM MUST BE POSTMARKED OR SUBMITTED ONLINE NO LATER THAN _____ __, 2021.**

FAILURE TO SUBMIT YOUR PROOF OF CLAIM BY THE DATE SPECIFIED WILL SUBJECT YOUR CLAIM TO REJECTION AND MAY PRECLUDE YOU FROM BEING ELIGIBLE TO RECOVER ANY MONEY IN CONNECTION WITH THE SETTLEMENT.

**DO NOT MAIL OR DELIVER YOUR PROOF OF CLAIM TO THE COURT, THE PARTIES TO THIS LITIGATION, OR THEIR COUNSEL. SUBMIT YOUR PROOF OF CLAIM ONLY TO THE CLAIMS ADMINISTRATOR AT THE ADDRESS SET FORTH ABOVE.**

**TABLE OF CONTENTS**                                                    **PAGE #**

**PART I – CLAIMANT IDENTIFICATION** ................................................................................. 2
**PART II – SCHEDULE OF TRANSACTIONS IN HIIQ COMMON STOCK**........................................... 3
**PART III – RELEASE AND CERTIFICATION** .........................................................................4-5
**PROOF OF CLAIM INSTRUCTIONS** ....................................................................................6

1

Before completing this form, please read the detailed instructions on page 6.  When filling out this form, type or print in the boxes below in CAPITAL LETTERS; do not use red ink, pencils or staples

## PART I:      __CLAIMANT IDENTIFICATION__

Beneficial Owner's First Name

Beneficial Owner's Last Name

Co-Beneficial Owner's First Name

Co-Beneficial Owner's Last Name

Entity Name (if claimant is not an individual)

Representative or Custodian Name (if different from Beneficial Owner(s) listed above)

Account Number (if filing for multiple accounts, file a separate Proof of Claim for each account)

Address1 (street name and number)

Address2 (apartment, unit or box number)

City                                                                                           State    Zip Code

Foreign Country (only if not USA)

Last 4 digits of Social Security Number            Last 4 digits of Taxpayer Identification Number

OR

Telephone Number (home)                          Telephone Number (work)

Email ddress

Claimant Account Type (check appropriate box):

☐      Individual (includes joint owner accounts)    ☐  Pension Plan      ☐  Trust
☐      Corporation                                    ☐  Estate
☐      IRA/401K                                        ☐  Other _____ (please specify)

2

**PART II:** **SCHEDULE OF TRANSACTIONS IN HEALTH INSURANCE INNOVATIONS INC. ("HIIQ") COMMON STOCK**

A.  Number of HIIQ common stock held at the close of trading on September 24, 2017:

☐☐☐☐☐☐

B.  Purchases or other acquisitions of HIIQ common stock from September 25, 2017 through April 11, 2019, inclusive *(must be documented)*:

| Trade Date (list chronologically) (MMDDYY) | Number of Shares Purchased or Acquired | Purchase Price per Share | Total Purchase Price* | Transaction Type (P/R)** |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

*Excluding taxes, fees and commissions
** P=Purchase, R=Receipt (transfer in)

C.  Purchases from April 12, 2019 through July 10, 2019. State the total number of HIIQ common stock purchased after the opening of trading on April 12, 2019 through and including the close of trading on July 10, 2019. (Must be documented.) If none, write "zero" or "0".[1]

☐☐☐☐☐☐

D.  Sales of HIIQ common stock from September 25, 2017 through July 10, 2019, inclusive *(must be documented)*:

| Trade Date (list chronologically) (MMDDYY) | Number of Shares Sold or Delivered | Sale Price per Share | Total Sale Price* | Transaction Type (S/D)** |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

*Excluding taxes, fees and commissions
** S=Sale, D=Delivery (transfer out)

E.  Number of shares of HIIQ common stock held at the close of trading on July 10, 2019 (if none, enter "0"; if other than zero, must be documented):

☐☐☐☐☐☐

**IF YOU NEED ADDITIONAL SPACE TO LIST YOUR TRANSACTIONS PLEASE PHOTOCOPY THE APPROPRIATE PAGE(S), WRITE YOUR NAME ON THE COPY AND CHECK THIS BOX:** ☐

---

[1] Please note: Information requested with respect to your purchases of HIIQ common stock from after the opening of trading on April 12, 2019, through and including the close of trading on July 10, 2019 (Section C.) is needed in order to balance your claim. Purchases during this period, however, are not eligible under the Settlement and will not be used for purposes of calculating your Recognized Loss pursuant to the Plan of Allocation.

**PART III:**     **RELEASE AND CERTIFICATION**

SUBMISSION TO JURISDICTION OF COURT AND ACKNOWLEDGMENTS

I (We) submit this Proof of Claim and Release under the terms of the Stipulation ("Stipulation") described in the Notice of (I) Pendency of Class Action, Certification of Settlement Class, and Proposed Settlement of Class Action; (II) Settlement Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice") and the Order Preliminarily Approving Proposed Settlement and Providing for Notice.[2] I (We) also submit to the jurisdiction of the United States District Court for the Middle District of Florida, with respect to my (our) claim as a Settlement Class Member and for purposes of enforcing the releases set forth herein. I (We) further acknowledge that I am (We are) bound by and subject to the terms of any judgment that may be entered in the Action. I (We) agree to furnish additional information to the Claims Administrator to support this claim if requested to do so. I (We) have not submitted any other claim covering the same purchases or sales of HIIQ common stock during the Settlement Class Period and know of no other person having done so on my (our) behalf.

RELEASES

1.          I (We) hereby acknowledge full and complete satisfaction of, and do hereby fully, finally, and forever settle, release, and discharge from the Released Claims each and all of the "Defendants' Releasees," defined as Defendants (Health Insurance Innovations, Inc. n/k/a Benefytt Technologies, Inc., Gavin Southwell, and Michael D. Hershberger) and their respective current and former officers, directors, insurers, principals, agents, parents, affiliates, subsidiaries, divisions, departments, joint ventures, successors, predecessors, assigns, assignees, employees, associates, co-insurers, reinsurers, accountants, attorneys, spouses, heirs, executors, trustees, general or limited partners or partnerships, limited liability companies, members, stockholders, underwriters, personal or legal advisors or representatives, estates, administrators, or other individuals or entities in which Defendants have a controlling interest or which is related to or affiliated with the respective Defendants, any members of their immediate families, or any trusts for which any of them are trustees, settlors, or beneficiaries, and the predecessors, successors, administrators and assigns of each of the foregoing.

2.          I (We) hereby acknowledge that "Released Claims" includes all "Released Defendants' Claims" and all "Released Plaintiffs' Claims." "Released Defendants' Claims" means as against Lead Plaintiffs, Plaintiffs, Lead Counsel or any Class Member or Settlement Class Member, all claims and causes of action of every nature and description, whether known claims or Unknown Claims, whether arising under federal, state, common or foreign law, that arise out of or relate in any way to the institution, prosecution, or settlement of the claims asserted in the Action. Released Defendants' Claims do not include any claims relating to the enforcement of the Settlement or any claims against any person or entity who or which submits a request for exclusion from the Class or Settlement Class that is accepted by the Court. "Released Plaintiffs' Claims" means all claims, demands, losses, rights, obligations, damages, liabilities, actions, suits, matters, issues, and causes of action of any nature whatsoever, whether known or Unknown Claims, in law or in equity, accrued or unaccrued, fixed or contingent, direct, individual or representative, of every nature and description, that have been or could have been asserted in this Action or could in the future be asserted in any forum, whether foreign or domestic, whether arising under federal, state, local, common, or foreign law or any other law, rule, or regulation, by Lead Plaintiffs, any member of the Class or Settlement Class, or their successors, assigns, executors, administrators, representatives, attorneys, and agents, in their capacities as such, whether brought directly or indirectly against any of the Defendants, which (a) arise out of, are based upon, or relate to in any way, in whole or in part, any of the allegations, acts, transactions, facts, events, matters, occurrences, statements, disclosures, publications, disseminations, presentations, press releases, representations or omissions or failures to act involved, set forth, alleged or referred to, in this Action, or which could have been alleged in this Action, or which could be asserted in the future, in the Action or in any other action in any court or forum, and (b) arise out of, are based upon, or relate to in any way to the purchase, acquisition, holding, sale, or disposition of any HIIQ securities during the Class Period or the Settlement Class Period. Released Plaintiffs' Claims do not include: (i) any claims relating to the enforcement of the Settlement; and (ii) any claims of any person or entity who or which submits a request for exclusion from the Class or Settlement Class that is accepted by the Court.

3.          I (We) hereby acknowledge that "Unknown Claims," as used herein, means any Released Plaintiffs' Claims which any Lead Plaintiff or any other Class Member or Settlement Class Member does not know or suspect to exist in his, her or its favor at the time of the release of such claims, and any Released Defendants' Claims which any Defendant or any other Defendants' Releasee does not know or suspect to exist in his, her, or its favor at the time of the release of such claims, which, if known by him, her or it, might have affected his, her or its decision(s) with respect to this Settlement, including but not limited to whether to object to the Settlement or seek exclusion from the Class or Settlement Class. With respect to any and all Released Claims, the Parties stipulate and agree that, upon the Effective Date of the Settlement, Lead Plaintiffs and

---

[2] All capitalized terms used in this Proof of Claim and Release that are not otherwise defined herein shall have the meanings ascribed to them in the Stipulation.

4

Defendants shall expressly waive, and each of the other Class Members and Settlement Class Members and each of the other Plaintiffs' Releasees and Defendants' Releasees shall be deemed to have waived, and by operation of the Judgment, shall have expressly waived, any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law or foreign law, which is similar, comparable, or equivalent to California Civil Code §1542, which provides:

> A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

Lead Plaintiffs and the Class Members and Settlement Class Members may hereafter discover facts in addition to or different from those which he, she, or it now knows or believes to be true with respect to the subject matter of the Released Claims, but Lead Plaintiffs shall expressly, fully, finally, and forever settle and release, and each Class Member and Settlement Class Member shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever settled and released, any and all Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct which is negligent, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such additional or different facts. Lead Plaintiffs and Defendants acknowledge, and each of the other Class Members and Settlement Class Members and each of the other Plaintiffs' Releasees and Defendants' Releasees shall be deemed by operation of law to have acknowledged, that the foregoing waiver was separately bargained for and a key element of the Settlement.

5.       The releases herein shall be of no force or effect unless and until the Court approves the Stipulation and the Stipulation becomes effective on the Effective Date (as defined in the Stipulation).

6.       I (We) hereby warrant and represent that I (we) have not assigned or transferred or purported to assign or transfer, voluntarily or involuntarily, any matter released pursuant to this release or any other part or portion thereof.

7.       I (We) hereby warrant and represent that I (we) have included information about all of my (our) transactions in HIIQ common stock which occurred during the Settlement Class Period.

I (We) declare under penalty of perjury under the laws of the United States of America that the foregoing information supplied by the undersigned is true and correct.

Executed this _____ day of _____, in _____, _____.
                              (Month / Year)                    (City)              (State / Country)

|  |
|---|
| |

Signature of Claimant

Date: [ ][ ] – [ ][ ] – [ ][ ]
      M  M     D  D     Y  Y

|  |
|---|
| |

Print Name of Claimant

|  |
|---|
| |

Title of Person Signing on Behalf of Claimant

|  |
|---|
| |

Signature of Joint Claimant, if any

Date: [ ][ ] – [ ][ ] – [ ][ ]
      M  M     D  D     Y  Y

|  |
|---|
| |

Print Name of Joint Claimant

5

_____

Title of Person Signing on Behalf of Claimant

# PROOF OF CLAIM INSTRUCTIONS

A. This Proof of Claim has been sent to you because you may be a member of the Settlement Class in this matter. To participate, you must complete and sign this Proof of Claim and provide supporting documents for any eligible transactions you claim. If you fail to file a properly addressed Proof of Claim and supporting documents, your claim may be rejected, and you may be determined to be ineligible for any payment from the Net Settlement Fund.

B. Submission of this Proof of Claim does not assure that you will share in the proceeds of the Net Settlement Fund created in this Action.

C. YOU MUST COMPLETE AND SUBMIT YOUR PROOF OF CLAIM BY MAIL ADDRESSED TO THE CLAIMS ADMINISTRATOR AS LISTED BELOW OR ONLINE AT THE SETTLEMENT WEBSITE, WWW.HEALTHINSURANCEINNOVATIONSSECURITIESSETTLEMENT.COM. THE CLAIM FORM MUST BE POSTMARKED OR SUBMITTED ONLINE NO LATER THAN _____ __, 2021.

D. If you are NOT a member of the Settlement Class, as defined in the Notice, DO NOT submit a Proof of Claim.

E. If you are a member of the Settlement Class and you do not timely request to be excluded from the Settlement Class, you are bound by the terms of any judgment entered in the Action, WHETHER OR NOT YOU SUBMIT A PROOF OF CLAIM.

F. Use the section of this form entitled "Claimant Information" to identify each owner of record. THIS CLAIM MUST BE FILED BY THE ACTUAL BENEFICIAL OWNER(S), OR THE LEGAL REPRESENTATIVE OF SUCH OWNER(S) OF SHARES UPON WHICH THIS CLAIM IS BASED.

G. Use the section of this form entitled "Schedule of Transactions" to supply all required details of your transaction(s). If you need more space or additional schedules, attach separate sheets giving all of the required information in substantially the same form. Sign and print or type your name on each additional sheet.

H. Complete a separate claim form for each account in which you qualify.

I. Provide all of the requested information with respect to the HIIQ common stock that you acquired at any time on or between September 25, 2017 and April 11, 2019, inclusive, whether such transactions resulted in a profit or a loss. Failure to report all such transactions may result in the rejection of your claim.

J. List each transaction in the Settlement Class Period in chronological order, by trade date, beginning with the earliest. You must accurately provide the month, day and year of each transaction you list.

K. Documentation of your transactions in HIIQ common stock must be attached to your claim. Failure to provide this documentation could delay verification of your claim or result in rejection of your claim.

L. The above requests are designed to provide the minimum amount of information necessary to process the most simple claims. The Claims Administrator may request additional information as required to efficiently and reliably calculate your losses.

***Proof** of **Claim forms must be postmarked and mailed to HIIQ Securities Settlement, Claims Administrator, PO Box 5657, Portland, OR 97228-5657 or submitted online at the Settlement Website, www.HealthInsuranceInnovationsSecuritiesSettlement.com. The Claim Form must be postmarked or submitted online no later than _____ __, 2021.***

ATTENTION NOMINEES AND BROKERAGE FIRMS: If you are filing claim(s) electronically on behalf of beneficial owners, detailed instructions are available on the Settlement website at **www.HealthInsuranceInnovationsSecuritiesSettlement.com** along with the formatted electronic filing template. You may also send an email to **info@HealthInsuranceInnovationsSecuritiesSettlement.com** requesting this information.

_____

Reminder Checklist
1. Sign the Certification section of the Proof of Claim on page 5.
2. Remember to attach supporting documentation.
3. Do not send original documents.
4. Keep a copy of your Proof of Claim and all documents submitted for your records.

5. If you desire an acknowledgment of receipt of your Proof of Claim form, send your Proof of Claim by Certified Mail, Return Receipt Requested.

6. If you move, please send the Claims Administrator your new address.

ACCURATE CLAIMS PROCESSING CAN TAKE A SIGNIFICANT
AMOUNT OF TIME. THANK YOU FOR YOUR PATIENCE.

# Exhibit A-3

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| JULIAN KEIPPEL, Individually and On Behalf of All Others Similarly Situated,<br><br>                Plaintiff,<br><br>v.<br><br>HEALTH INSURANCE INNOVATIONS, INC. n/k/a BENEFYTT TECHNOLOGIES, INC., GAVIN SOUTHWELL, and MICHAEL D. HERSHBERGER,<br><br>                Defendants. | CASE NO. 8:19-CV-00421-WFJ-CPT<br><br><br>CLASS ACTION<br><br><br>EXHIBIT A-3 |

**SUMMARY NOTICE OF (I) PENDENCY OF CLASS ACTION AND PROPOSED SETTLEMENT OF CLASS ACTION; (II) SETTLEMENT HEARING; AND (III) MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

**TO: All persons and entities who, during the period from September 25, 2017 through April 11, 2019, inclusive, purchased or otherwise acquired Health Insurance Innovations, Inc. ("HIIQ") common stock, and were allegedly damaged thereby:**

**PLEASE READ THIS NOTICE CAREFULLY, YOUR RIGHTS WILL BE AFFECTED BY A CLASS ACTION LAWSUIT PENDING IN THIS COURT.**

YOU ARE HEREBY NOTIFIED, pursuant to Rule 23 of the Federal Rules of Civil Procedure and an Order of the United States District Court for the Middle District of Florida, that the above-captioned litigation (the "Action") has been certified as a class action on behalf of the Class and Settlement Class, except for certain persons and entities who are excluded from the Class and Settlement Class as set forth in the full printed Notice Of (I) Pendency Of Class Action And Proposed Settlement of Class Action; (II) Settlement Hearing; And (III) Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses (the "Notice").

YOU ARE ALSO NOTIFIED that Lead Plaintiffs in the Action have reached a proposed settlement of the Action for $11,000,000.00 in cash (the "Settlement") that, if approved, will resolve all claims in the Action.

A hearing will be held on _____, 2021 at __:__ _.m., at the United States District Court for the Middle District of Florida, Sam Gibbons United States Courthouse, 801 North Florida Avenue, Courtroom 15B, Tampa, Florida 33602, or by telephonic, video

conferencing or other electronic means, as posted on the website of the Claims Administrator. The hearing will determine (i) whether the proposed Settlement should be approved as fair, reasonable, and adequate; (ii) whether the Action should be dismissed with prejudice against Defendants, and the Releases specified and described in the Stipulation And Agreement Of Settlement (and in the Notice) should be granted; (iii) whether the proposed Plan of Allocation should be approved as fair and reasonable; and (iv) whether Lead Counsel's application for an award of attorneys' fees and reimbursement of Litigation Expenses should be approved. If you file a written objection and notice of appearance before the hearing, you may ask to be heard orally at the hearing or you may appear at the hearing through an attorney you retain.

This Summary Notice relates to a proposed Settlement of claims in a pending securities class action lawsuit brought by investors alleging, among other things, that Defendants HIIQ, Michael D. Hershberger, and Gavin Southwell (collectively, the "Defendants") violated the federal securities laws by making alleged misrepresentations or omissions regarding compliance and customer complaints, which Defendants deny.

**If you purchased HIIQ common stock from September 25, 2017 through April 11, 2019 and were damaged thereby, your rights will be affected by the pending Action and the Settlement, and you may be entitled to share in the Settlement Fund**. If you have not yet received the Notice and Claim Form, you may obtain copies of these documents by contacting the Claims Administrator at Health Insurance Innovations Securities Settlement c/o Epiq, P.O. Box 5657, Portland, OR 97228-5657. Copies of the Notice and Claim Form can also be downloaded from the website maintained by the Claims Administrator, www.HealthInsuranceInnovationsSecuritiesSettlement.com.

In order to be potentially eligible to receive a payment under the proposed Settlement, you must submit a Claim Form online at the Settlement website or by mail. The Claim Form must be submitted or *postmarked* **no later than** _____**, 2021**. If you do not submit a proper Claim Form, you will not be eligible to share in the distribution of the net proceeds of the Settlement but you will nevertheless be bound by any judgments or orders entered by the Court in the Action.

If you wish to exclude yourself, you must submit a request for exclusion such that it is ***received*** **no later than** _____**, 2021**, in accordance with the instructions set forth in the Notice. If you properly exclude yourself, you will not be bound by any judgments or orders entered by the Court in the Action and you will not be eligible to share in the proceeds of the Settlement.

Any objections to the proposed Settlement, the proposed Plan of Allocation, or Lead Counsel's motion for attorneys' fees and reimbursement of expenses, must be filed with the Court and delivered to representatives of Lead Counsel and Defendants' Counsel such that they **are *received* no later than** _____**, 2021**, in accordance with the instructions set forth in the Notice.

**Please do not contact the Court, the Clerk's office, HIIQ, or Defendants' Counsel regarding this notice. All questions about this notice, the proposed Settlement, or your eligibility to participate in the Settlement should be directed to Lead Counsel or the Claims Administrator.**

Requests for the Notice and Claim Form should be made to:

Health Insurance Innovations Securities Settlement
c/o Epiq
P.O. Box 5657
Portland, OR 97228-5657

Inquiries, other than requests for the Notice and Claim Form, should be made to Lead Counsel:

SAXENA WHITE P.A.
Brandon T. Grzandziel
7777 Glades Road, Suite 300
Boca Raton, FL 33434
bgrzandziel@saxenawhite.com

Dated: _____, 2020

By Order of the Court
United States District Court
Middle District of Florida

3

# Exhibit B

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

|  |  |
|---|---|
| JULIAN KEIPPEL, Individually and On Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>v.<br><br>HEALTH INSURANCE INNOVATIONS, INC. n/k/a BENEFYTT TECHNOLOGIES, INC., GAVIN SOUTHWELL, and MICHAEL D. HERSHBERGER,<br><br>                    Defendants. | CASE NO. 8:19-CV-00421-WFJ-CPT<br><br>CLASS ACTION<br><br>EXHIBIT B |

**[PROPOSED] JUDGMENT APPROVING CLASS ACTION SETTLEMENT
AND ORDER OF DISMISSAL WITH PREJUDICE**

WHEREAS, a putative class action is pending in this Court entitled *Julian Keippel v. Health Insurance Innovations, Inc., et al.*, Case No. 8:19-cv-00421-WFJ-CPT (the "Action");

WHEREAS, (a) Oklahoma Municipal Retirement Fund and City of Birmingham Retirement and Relief System (collectively, "Lead Plaintiffs"), and (b) defendants Health Insurance Innovations, Inc., n/k/a Benefytt Technologies, Inc. ("HIIQ" or the "Company"), Gavin Southwell, and Michael Hershberger (the "Individual Defendants," and together with HIIQ, "Defendants"), have entered into a Stipulation and Agreement of Settlement dated December 2, 2020 (the "Stipulation"), that provides for a complete dismissal with prejudice of the claims asserted against Defendants in the Action on the terms and conditions set forth in the Stipulation, subject to the approval of this Court (the "Settlement");

1

WHEREAS, unless otherwise defined in this Judgment, the capitalized terms herein shall have the same meaning as they have in the Stipulation, and they are incorporated herein by reference;

WHEREAS, by Order dated _____, 2020 (the "Preliminary Approval Order"), this Court: (a) preliminarily approved the Settlement; (b) ordered that notice of the proposed Settlement be provided to potential Class Members and Settlement Class Members; (c) provided Class Members and Settlement Class Members with the opportunity either to exclude themselves or to object to the proposed Settlement; and (d) scheduled a hearing regarding final approval of the Settlement;

WHEREAS, due and adequate notice has been given;

WHEREAS, the Court conducted a hearing on _____, 2021 (the "Settlement Hearing") to consider, among other things, (a) whether the terms and conditions of the Settlement are fair, reasonable and adequate, and should therefore be approved; and (b) whether a judgment should be entered dismissing the Action with prejudice as against the Defendants; and

WHEREAS, the Court having reviewed and considered the Stipulation, all papers filed and proceedings held herein in connection with the Settlement, all oral and written comments received regarding the Settlement, and the record in the Action, and good cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED:**

1. **<u>Jurisdiction</u>** – The Court has jurisdiction over the subject matter of the Action, and all matters relating to the Settlement, as well as personal jurisdiction over all of the Parties and each of the Class Members and Settlement Class Members.

2

2.     **Incorporation of Settlement Documents** – This Judgment incorporates and makes a part hereof:  (a) the Stipulation and (b) the Notice and the Summary Notice, both of which were previously filed with the Court.

3.     **Notice** – The Court finds that the dissemination of the Notice and the publication of the Summary Notice:  (a) were implemented in accordance with the Preliminary Approval Order; (b) constituted the best notice practicable under the circumstances; (c) constituted notice that was reasonably calculated, under the circumstances, including individual notice to all Class Members and Settlement Class Members who could be identified through reasonable efforts, to apprise Class Members and Settlement Class Members of (i) the pendency of the Action; (ii) the effect of the proposed Settlement (including the Releases to be provided thereunder); (iii) Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses; (iv) their right to object to any aspect of the Settlement, the Plan of Allocation and/or Lead Counsel's motion for attorneys' fees and reimbursement of Litigation Expenses; (v) their right to exclude themselves from the Class or Settlement Class; and (vi) their right to appear at the Settlement Hearing; (d) constituted due, adequate, and sufficient notice to all persons and entities entitled to receive notice of the proposed Settlement; and (e) satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause), the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4, as amended, and all other applicable law and rules.

4.     **Certification of Settlement Class** – Solely for purposes of Settlement and for no other purpose, pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), the Court hereby grants certification of the Settlement Class consisting of "All Persons or entities that purchased or otherwise acquired HIIQ common stock between September 25, 2017 through April 11, 2019

3

inclusive." Excluded from the Settlement Class are Defendants, the officers and directors of HIIQ, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest. Also excluded from the Settlement Class and the Class are those Potential Members who timely and validly requested exclusion from the Settlement Class or the Class pursuant to the requirements set forth in the Notice to the Claims Administrator by the Opt-out Deadline (as defined in the Notice). A list of such Potential Members who filed timely, complete and valid requests for exclusion from the Class and Settlement Class is attached hereto as Exhibit 1. The reasons for such certification are further set forth in the Court's prior Preliminary Approval Order that preliminarily certified this Settlement Class, none of which reasons have been undermined by anything the Court has heard since. Solely for purposes of the Settlement and for no other purpose, the Court also certifies Lead Plaintiffs Oklahoma Municipal Retirement Fund and City of Birmingham Retirement and Relief System as Settlement Class Representatives for the Settlement Class, and appoints Saxena White P.A. as Lead Counsel for the Settlement Class.

5. **<u>Final Settlement Approval and Dismissal of Claims</u>** – Pursuant to, and in accordance with, Rule 23 of the Federal Rules of Civil Procedure, this Court hereby fully and finally approves the Settlement set forth in the Stipulation in all respects (including, without limitation: the amount of the Settlement; the Releases provided for therein; and the dismissal with prejudice of the claims asserted against Defendants in the Action), and finds that the Settlement is, in all respects, fair, reasonable and adequate to the Class and Settlement Class.

4

The Parties are directed to implement, perform and consummate the Settlement in accordance with the terms and provisions contained in the Stipulation.

6.      The Action and all of the claims asserted against Defendants in the Action are hereby dismissed with prejudice.  The Parties shall bear their own costs and expenses, except as otherwise expressly provided for in the Stipulation.

7.      **Binding Effect** – The terms of the Stipulation and of this Judgment shall be forever binding on Defendants, Lead Plaintiffs and all other Class Members and Settlement Class Members (regardless of whether or not any individual Class Member or Settlement Class Member submits a Claim Form or seeks or obtains a distribution from the Net Settlement Fund), as well as their respective successors, assigns, heirs, predecessors, executors, administrators, representatives, attorneys, and agents.  The persons and entities listed on Exhibit 1 hereto are excluded from the Class or Settlement Class pursuant to request and are not bound by the terms of the Stipulation or this Judgment.

8.      **Releases** – The Releases set forth in paragraphs 4-7 of the Stipulation, together with the definitions contained in paragraph 1 of the Stipulation relating thereto, are expressly incorporated herein in all respects.  The Releases are effective as of the Effective Date.  Accordingly, this Court orders that:

(a)     Without further action by anyone, and subject to paragraph 10 below, upon the Effective Date of the Settlement, Lead Plaintiffs and each of the other Class Members and Settlement Class Members, on behalf of themselves, and their respective heirs, executors, administrators, predecessors, successors, assigns, assignees, employees, associates, insurers, co-insurers, reinsurers, spouses, trustees, general or limited partners or partnerships, limited liability companies, members, stockholders, underwriters, personal or legal advisors or representatives,

5

estates, or other individuals or entities in which they have a controlling interest or which is related to or affiliated with them, any members of their immediate families, or any trusts for which any of them are trustees, settlors, or beneficiaries, and the predecessors, successors, administrators and assigns of each of the foregoing, in their capacities as such, and anyone claiming through or on behalf of any of them, regardless of whether they execute and deliver a Proof of Claim and Release and regardless of whether they share in the Settlement Fund, shall be deemed to have, and by operation of the Stipulation, of law, and of this Judgment shall have, fully, finally, and forever compromised, settled, released, resolved, relinquished, waived, dismissed and discharged each and every Released Plaintiffs' Claim against the Defendants' Releasees, and covenant not to commence, institute, intervene in, participate in, or prosecute, and shall forever be barred and enjoined from commencing, instituting, intervening in or participating in, or prosecuting, any or all of the Released Plaintiffs' Claims against any of the Defendants' Releasees in any court of law or equity, arbitration tribunal, administrative forum, or other forum of any kind or character, whether brought directly, in a representative capacity, derivatively, or in any other capacity. This Release shall not apply to any person or entity listed on Exhibit 1 hereto.

(b)     Without further action by anyone, and subject to paragraph 9 below, upon the Effective Date of the Settlement, Defendants, on behalf of themselves, and their respective heirs, executors, administrators, predecessors, successors, and assigns, in their capacities as such, shall be deemed to have, and by operation of the Stipulation, of law, and of the Judgment shall have, fully, finally, and forever compromised, settled, released, resolved, relinquished, waived, and discharged each and every Released Defendants' Claim against the Plaintiffs' Releasees, and shall forever be barred and enjoined from prosecuting any or all of the Released Defendants'

Claims against any of the Plaintiffs' Releasees. This Release shall not apply to any person or entity listed on Exhibit 1 hereto.

9.     Upon the Effective Date, the Stipulation shall operate conclusively as an estoppel, res judicata, bar, and full defense, or any other theory of claim preclusion or issue preclusion or similar defense, argument, or counterclaim in the event, and to the extent, of any claim, demand, action, or proceeding brought by a Lead Plaintiff, Class Member or Settlement Class Member against any of the Defendants' Releasees with respect to any Released Plaintiffs' Claims, or brought by a Defendant against any of the Plaintiffs' Releasees with respect to any Released Defendants' Claims.

10.     Notwithstanding paragraphs 8(a) through 8(b) and 9 above, nothing in this Judgment shall bar any action by any of the Parties to enforce or effectuate the terms of the Stipulation or this Judgment.

11.     **<u>Bar Order</u>** – Upon the Effective Date, all claims, future claims, and claims over by any individual or entity against any of the Defendants' Releasees, and by the Defendants' Releasees against any individual or entity, for (a) contribution or indemnity, however denominated, whether as a claim, cross-claim, counterclaim, third-party claim, or otherwise, on whatsoever theory, based upon, arising out of, or related to the claims or allegations asserted by Plaintiffs in the Action, or (b) any other claim of any type, whether arising under state, federal, common or foreign law, for which the injury claimed is that person's or entity's actual or threatened liability to Plaintiffs and/or members of the Class or Settlement Class, whether asserted in the Action or any other proceeding, in this Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere, are permanently barred, enjoined, restrained, extinguished, and discharged to the

7

fullest extent permitted by law (the "Bar Order"); *provided, however,* that the Bar Order shall not preclude the Defendants from seeking to enforce any rights or claims they may have under their applicable insurance policies or any right of indemnification or contribution that the Individual Defendants may have under contract or based on the charter and by-laws of HIIQ or their agreements with HIIQ. Moreover, nothing in this Bar Order shall be construed to impair, negate, diminish, or adversely affect any rights of Defendants' Releasees or their successors or assigns under or with respect to any insurance policies, including, but without limitation, any rights to seek to recover or to recover insurance proceeds or payments under any insurance policies with respect to amounts paid pursuant to the Settlement or incurred in connection with the Action, or any other actual or alleged loss or liability, and Defendants' Releasees expressly reserve all rights, claims, positions, arguments, contentions, and defenses with respect to such matters. This Bar Order shall be interpreted and applied as the broadest permitted under the PSLRA and common law.

12. **<u>Judgment Reduction</u>** – Any final verdict or judgment that may be obtained against any individual or entity subject to the Bar Order shall be reduced by the greater of: (a) an amount that corresponds to the percentage of responsibility of the Defendants for common damages; or (b) the amount paid by or on behalf of the Defendants to the Class or Settlement Class, or a Class Member or Settlement Class Member for common damages.

13. **<u>Rule 11 Findings</u>** – The Court finds and concludes that the Parties and their respective counsel have complied in all respects with the requirements of Rule 11 of the Federal Rules of Civil Procedure in connection with the institution, prosecution, defense, and settlement of the Action.

14. **<u>No Admissions</u>** – Neither this Judgment, nor the Stipulation (whether or not consummated), including the exhibits thereto and the Plan of Allocation contained therein (or any other plan of allocation that may be approved by the Court), the Supplemental Agreement, the negotiations leading to the execution of the Stipulation, nor any proceedings taken pursuant to or in connection with the Stipulation and/or the Settlement (including any arguments proffered in connection therewith):

(a) shall be offered or received against any of the Defendants' Releasees as evidence of, or construed as, or deemed to be evidence of any presumption, concession, or admission by any of the Defendants' Releasees with respect to the truth of any fact alleged by Lead Plaintiffs or the validity of any claim or alleged damages that were or could have been asserted or the deficiency of any defense that has been or could have been asserted in this Action or in any other litigation, or of any liability, negligence, fault, or other wrongdoing of any kind of any of the Defendants' Releasees or in any way used or referred to for any other reason as against any of the Defendants' Releasees, in any civil, criminal or administrative action or proceeding (including any arbitration), other than such proceedings as may be necessary to effectuate the provisions of the Stipulation;

(b) shall be offered against any of the Plaintiffs' Releasees, as evidence of, or construed as, or deemed to be evidence of any presumption, concession or admission by any of the Plaintiffs' Releasees that any of their claims are without merit, that any of the Defendants' Releasees had meritorious defenses, or that damages recoverable under the Complaint would not have exceeded the Settlement Amount or with respect to any liability, negligence, fault or wrongdoing of any kind, or in any way referred to for any other reason as against any of the Plaintiffs' Releasees, in any civil, criminal or administrative action or proceeding (including any

9

arbitration), other than such proceedings as may be necessary to effectuate the provisions of the Stipulation; or

(c)     shall be construed against any of the Releasees as an admission, concession, or presumption that the consideration to be given under the Settlement represents the amount which could be or would have been recovered after trial; provided, however, that the Parties and the Releasees and their respective counsel may refer to this Judgment and the Stipulation to effectuate the protections from liability granted hereunder and thereunder or otherwise to enforce the terms of the Settlement, and Defendants and/or the Defendants' Releasees may file the Stipulation and/or the Judgment in any action that might be brought against them to support a defense, claim, or counterclaim based on principles of res judicata, collateral estoppel, release and discharge, good faith settlement, judgment bar or other bar or reduction, and any other theory of claim preclusion or issue preclusion or similar defense, claim, argument, or counterclaim.

15.     **<u>Retention of Jurisdiction</u>** – Without affecting the finality of this Judgment in any way, this Court retains continuing and exclusive jurisdiction over:  (a) the Parties for purposes of the administration, interpretation, implementation and enforcement of the Settlement; (b) the disposition of the Settlement Fund; (c) any motion for an award of attorneys' fees and/or Litigation Expenses by Lead Counsel in the Action that will be paid from the Settlement Fund; (d) any motion to approve the Plan of Allocation (or any other plan of allocation relating to the Action); (e) any motion to approve the Class Distribution Order; and (f) the Class Members and Settlement Class Members for all matters relating to the Action.

16.     Separate orders shall be entered regarding approval of a plan of allocation and the motion of Lead Counsel for an award of attorneys' fees and reimbursement of Litigation

Expenses. Such orders shall in no way affect or delay the finality of this Judgment and shall not affect or delay the Effective Date of the Settlement.

17. **Modification of the Agreement of Settlement** – Without further approval from the Court, the Parties are hereby authorized to agree to and adopt such amendments or modifications of the Stipulation or any exhibits attached thereto to effectuate the Settlement that are approved of in writing by all the Parties acting by and through their respective counsel of record in the Action so long as they: (a) are not materially inconsistent with this Judgment; and (b) do not materially limit the rights of Class Members or Settlement Class Members in connection with the Settlement. Without further order of the Court, Lead Plaintiffs and Defendants may agree to reasonable extensions of time to carry out any provisions of the Settlement.

18. **Termination of Settlement** – If the Settlement is terminated as provided in the Stipulation or the Effective Date of the Settlement otherwise fails to occur, this Judgment shall be vacated, rendered null and void and be of no further force and effect, except as otherwise provided by the Stipulation, and this Judgment shall be without prejudice to the rights of Lead Plaintiffs, the other Class Members or Settlement Class Members, and Defendants, and the Parties shall revert to their respective positions in the Action as of December 1, 2020, as provided in the Stipulation.

19. **Entry of Final Judgment** – There is no just reason to delay the entry of this Judgment as a final judgment in this Action. Accordingly, the Clerk of the Court is expressly directed to immediately enter this final judgment dismissing this Action with prejudice.

11

SO ORDERED this _____ day of _____, 2021.


_____
The Honorable William F. Jung
United States District Judge

**Exhibit 1**

**[List of Persons and Entities Excluded from the Settlement Class and Class Pursuant to**

**Request]**