# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

|  |  |
|---|---|
| JULIAN KEIPPEL, Individually and On Behalf of All Others Similarly Situated,<br><br>                   Plaintiff,<br><br>v.<br><br>HEALTH INSURANCE INNOVATIONS, INC. n/k/a BENEFYTT TECHNOLOGIES, INC., GAVIN SOUTHWELL, and MICHAEL D. HERSHBERGER,<br><br>            Defendants. | CASE NO. 8:19-CV-00421-WFJ-CPT<br><br>CLASS ACTION |

# LEAD PLAINTIFFS' MOTION FOR
# FINAL APPROVAL OF CLASS ACTION SETTLEMENT
# AND PLAN OF ALLOCATION,
# AND INCORPORATED MEMORANDUM OF LAW

**TABLE OF CONTENTS**

I.  INTRODUCTION.................................................................................1

II.  THE SETTLEMENT WARRANTS FINAL APPROVAL .....................5

    A.  Lead Plaintiffs and Lead Counsel Adequately Represented the Class .....................................................................................6

    B.  The Settlement is the Product of Arm's-Length Negotiations ..........7

    C.  The Relief Provided to the Settlement Class Is Adequate...............10

        1.  The Size of the Settlement Supports Approval....................10

        2.  The Risks of Continued Litigation Support Approval..........11

        3.  The Proposed Method for Distributing Relief to the Settlement Class is Effective..................................................16

        4.  Lead Counsel's Fee Request is Fair and Reasonable ..........17

    D.  All Settlement Class Members Are Treated Equitably ...................18

    E.  The Remaining Eleventh Circuit Factors are Satisfied...................18

        1.  The Likelihood of Success at Trial Supports Final Approval of the Settlement..................................................................19

        2.  The Settlement Amount is Reasonable Considering the Range of Possible Recoveries.........................................................19

        3.  The Stage of Proceedings at Which Settlement was Achieved Strongly Supports Final Approval.......................................20

        4.  The Favorable Response to the Settlement from the Class Supports Final Approval....................................................21

III.  THE PLAN OF ALLOCATION IS FAIR AND REASONABLE .........22

IV.    NOTICE TO THE SETTLEMENT CLASS SATISFIED RULE 23 AND DUE PROCESS .................................................................................23

V.    THE SETTLEMENT CLASS SHOULD BE FINALLY CERTIFIED ...25

VI.    CONCLUSION ....................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ..........................................................................7

*Aranaz v. Catalyst Pharm. Partners Inc.*,
  2014 WL 11870214 (S.D. Fla. Dec. 3, 2014) ...................................24

*Bennett v. Behring Corp.*,
  737 F.2d 982 (11th Cir. 1984) .......................................................5, 6

*Berman v. Gen. Motors LLC*,
  2019 WL 6163798 (S.D. Fla. Nov. 18, 2019)...............................8, 21

*Carpenters Health & Welfare Fund v. Coca-Cola Co.*,
  2008 WL 11336122 (N.D. Ga. Oct. 20, 2008) ..........................20, 23

*Christine Asia Co., Ltd. v. Yun Ma*,
  2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019)............................16, 18

*Deas v. Russell Stover Candies, Inc.*,
  2005 WL 8158201 (N.D. Ala. Dec. 22, 2005)...................................19

*Guevoura Fund Ltd. v. Sillerman*,
  2019 WL 6889901 (S.D.N.Y. Dec. 18, 2019) ...........................15, 17

*Howard v. Chanticleer Holdings, Inc.*,
  2014 WL 12600501 (S.D. Fla. Aug. 14, 2014)..................................22

*In re Auto. Parts Antitrust Litig.*,
  2019 WL 7877812 (E.D. Mich. Dec. 20, 2019).................................22

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*,
  2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) ...................................16

*In re BellSouth Corp. Sec. Litig.*,
  2007 WL 9676400 (N.D. Ga. Apr. 9, 2007) ....................................17

iv

*In re Checking Acct. Overdraft Litig.*,
    830 F. Supp. 2d 1330 (S.D. Fla. 2011)..................................................9, 11, 20

*In re China Med. Corp. Sec. Litig.*,
    2014 WL 12581781 (C.D. Cal. Jan. 7, 2014)....................................................8

*In re China Sunergy Sec. Litig.*,
    2011 WL 1899715 (S.D.N.Y. May 13, 2011) ..................................................2

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
    2020 WL 256132 (N.D. Ga. Mar. 17, 2020)...........................................passim

*In re Healthsouth Corp. Sec. Litig.*,
    334 F. App'x 248 (11th Cir. 2009)..................................................................18

*In re HealthSouth Corp. Sec. Litig.*,
    572 F.3d 854 (11th Cir. 2009) ..........................................................................5

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
    233 F.R.D. 306 (E.D.N.Y. 2006) .......................................................11, 13, 14

*In re NetBank, Inc. Sec. Litig.*,
    2011 WL 13353222 (N.D. Ga. Nov. 9, 2011)................................................11

*In re Rayonier Inc. Sec. Litig.*,
    2017 WL 4542852 (M.D. Fla. Oct. 5, 2017)...........................................10, 17

*In re Sunbeam Sec. Litig.*,
    176 F. Supp. 2d 1323 (S.D. Fla. 2001)....................................................19, 21

*In re Veeco Instruments Inc. Sec. Litig.*,
    2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007)....................................................9

*Jairam v. Colourpop Cosmetics*, LLC,
    2020 WL 5848620 (S.D. Fla. Oct. 1, 2020) ....................................................9

*Kirkpatrick v. J.C. Bradford Co.*,
    827 F.2d 718 (11th Cir. 1987) ..........................................................................6

*Kuhr v. Mayo Clinic Jacksonville*,
    2020 WL 5912350 (M.D. Fla. Oct. 6, 2020)..................................................23

v

*Lipuma v. Am. Express Co.*,
    406 F. Supp. 2d 1298 (S.D. Fla. 2005) ............................................................21

*Lowry v. Andrx Corp.*,
    2008 WL 11331829 (S.D. Fla. Apr. 4, 2008) ................................................25

*Meredith Corp. v. SESAC, LLC*,
    87 F. Supp. 3d 650 (S.D.N.Y. 2015) ...............................................................22

*Nelson v. Mead Johnson & Johnson Co.*,
    484 F. App'x 429 (11th Cir. 2012) ............................................................9, 20

*Perez v. Asurion Corp.*,
    501 F. Supp. 2d 1360 (S.D. Fla. 2007) ..............................................................9

*Ressler v. Jacobson*,
    149 F.R.D. 651 (M.D. Fla. 1992) ....................................................................21

*Ressler v. Jacobson*,
    822 F. Supp. 1551 (M.D. Fla. 1992) ................................................................14

*Robbins v. Koger Props., Inc.*,
    116 F.3d 1441 (11th Cir. 1997) .......................................................................16

*Strube v. Am. Equity Inv. Life Ins. Co.*,
    226 F.R.D. 688 (M.D. Fla. 2005) ....................................................................11

*Tan Chao v. William*,
    2020 WL 763277 (2d Cir. Jan. 2, 2020) ........................................................16

*Thorpe v. Walter Inv. Mgmt. Corp.*,
    2016 WL 10518902 (S.D. Fla. Oct. 17, 2016) ..........................................11, 19

*Wal-Mart Stores, Inc. v. Visa U.S.A.*,
    396 F.3d 96 (2d Cir. 2005) ..............................................................................24

*Yang v. Focus Media Holding Ltd.*,
    2014 WL 4401280 (S.D.N.Y. Sept. 4, 2014) ................................................4, 8

*Zuckerman v. Smart Choice Auto. Grp., Inc.*,
    2001 WL 686879 (M.D. Fla. May 3, 2001) .....................................................14

**STATUTES**

15 U.S.C. § 78u-4(a)(7) ........................................................................24

**RULES**

Fed. R. Civ. P............................................................................passim

**OTHER AUTHORITIES**

Cornerstone Research, *Securities Class Action Settlements,*
    2019 Review and Analysis (2020) ..................................................10

Janeen McIntosh and Svetlana Starykh, "Recent Trends in Securities Class
    Action Litigation: 2020 Full Year Review (NERA Jan. 25, 2021)...................10

Theodore Eisenberg, Geoffrey Miller, and Roy Germano, *Attorneys' Fees in Class
    Actions: 2009-2013,* 92 N.Y.U. L. Rev. 937 (Oct. 2017), ....................................1

Lead Plaintiffs Oklahoma Municipal Retirement Fund ("OKMRF") and City of Birmingham Retirement and Relief System ("City of Birmingham") (together, "Lead Plaintiffs" or "Plaintiffs"), respectfully submit this Unopposed Motion for (1) final approval of the proposed settlement resolving the Action in exchange for payment of $11 million in cash for the benefit of the Settlement Class (the "Settlement"), and (2) approval of the proposed plan of allocation of the proceeds of the Settlement.[1]

## I.   INTRODUCTION

After over a year and a half of hard-fought litigation, Lead Plaintiffs have agreed to settle this action for a cash payment of $11,000,000 for the benefit of the Settlement Class. As discussed in greater detail below, Lead Plaintiffs respectfully submit that the Settlement is an excellent result for the Settlement Class and that final approval of the settlement is warranted, based on the following factors:

The Outstanding Results: Under any measure, the $11 million Settlement is an exceptional result, representing between 17% to 34% of the Settlement Class's maximum estimated aggregate damages of $31.9 million to $63.3 million – multiples higher than the typical recovery in securities class actions. Janeen McIntosh and Svetlana Starykh, "Recent Trends in Securities Class Action Litigation: 2020 Full-

---

[1] Lead Plaintiffs respectfully refer the Court to the accompanying Declaration of Brandon Grzandziel in Support of Lead Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement and Plan of Allocation and Lead Plaintiffs' Unopposed Motion for Attorneys' Fees and Litigation Expenses ("Grzandziel Declaration" or "Grzandziel Decl."), filed herewith, for a detailed description of the case and the Settlement. Unless otherwise indicated, all capitalized terms have the same meanings as in the Stipulation and Agreement of Settlement, dated December 2, 2020 (ECF No. 100-2), or the Grzandziel Declaration. "¶__" references are to the Grzandziel Declaration. Unless otherwise indicated, all emphasis has been added, and all internal citations and quotation marks have been omitted.

Year Review" (NERA Jan. 25, 2021) at 20, fig. 16 (median recovery in securities class actions in 2020 was approximately 1.7% of estimated damages); *In re China Sunergy Sec. Litig.*, 2011 WL 1899715, at *5 (S.D.N.Y. May 13, 2011) (noting an average recovery of 3% to 7% of estimated damages). This recovery is particularly notable in light of HIIQ's ability-to-pay issues, including the limited cash available to contribute to any settlement, and the virtual exhaustion of Defendants' directors and officers insurance tower by the time that the Settlement was reached.

Extensive Litigation Efforts: The Parties reached the Settlement only after vigorous litigation, by which time Lead Plaintiffs and Lead Counsel had developed a thorough understanding of the strengths and weaknesses of the claims and defenses in the Action. The $11 million Settlement was achieved after Lead Counsel: (1) conducted an extensive investigation of all potential claims that could be asserted against HIIQ and its executives or others, (2) conducted interviews with fact witnesses in connection with the pre-filing investigation, (3) filed an amended complaint based on the results of that investigation, (4) opposed Defendants' motion to dismiss, which was denied in full, (5) engaged in extensive discovery, including the review and analysis of over 1.9 million pages of documents, and deposition practice, (6) briefed a motion for class certification and defended the depositions of each of Lead Plaintiffs' representatives and their expert witness, which led to certification of the Class, (7) participated in a formal full-day mediation and extensive follow-up negotiations after the case did not settle at mediation, and (8) negotiated and drafted appropriate documentation of the Settlement, including the Stipulation and the Notices to be

issued to potential Class Members. ¶¶19-33. Thus, the Settlement is the culmination of substantial investigation, discovery practice, document review, vigorous litigation, and a thorough mediation process with a nationally regarded private mediator.

The Risks Involved: In reaching the Settlement, Lead Plaintiffs and Lead Counsel considered the numerous risks associated with continuing the litigation, including the risks of recovering less than the Settlement Amount after substantial delay or of no recovery at all. Lead Plaintiffs and Lead Counsel believe their case against Defendants is strong, but acknowledge Defendants had credible arguments concerning liability. For example, with respect to the fundamental question of whether the challenged statements were false or misleading, Defendants argued, among other things, that HIIQ's public statements accurately reflected the quality of compliance and the number of upheld customer complaints. While Lead Plaintiffs had responses to those arguments, these defenses, which Defendants would have continued to press, created a real risk that Lead Plaintiffs could ultimately recover materially less than the Settlement Amount—or nothing at all. Defendants also argued that Lead Plaintiffs could not establish scienter because the Individual Defendants, HIIQ's CEO and CFO, reasonably believed that HIIQ had "best in class" compliance, especially in light of HIIQ's public announcements on recent investments in its compliance and customer service processes. Moreover, even if Lead Plaintiffs successfully proved these elements and liability at trial, Defendants vigorously contested loss causation and damages. These and many other risks support the reasonableness of the Settlement.

3

Arm's-Length Settlement Negotiations: The Settlement is the product of the Parties' hard fought, arm's-length negotiations, comprising a full-day mediation session and extensive follow-up negotiations conducted under the auspices of Jed Melnick of JAMS, a "highly qualified mediator" whose involvement "strongly supports a finding that negotiations were conducted at arm's length and without collusion." *Yang v. Focus Media Holding Ltd*., 2014 WL 4401280, at *5 (S.D.N.Y. Sept. 4, 2014); Grzandziel Decl. ¶¶32-33. Mr. Melnick fully supports the Settlement as fair, reasonable and adequate and in the best interests of the proposed Settlement Class Members. Grzandziel Decl. Ex. 1 (Declaration of Jed Melnick In Support of Approval of the Class Action Settlement).

Based on the results achieved, the risks of litigating this Action, and the substantial delay that would result from the continued litigation of this case through trial and the inevitable subsequent appeals, Lead Plaintiffs and Lead Counsel strongly believe that the Settlement is a highly favorable result. The $11 million Settlement achieved by Lead Plaintiffs and Lead Counsel avoids the risks and uncertainties of continued litigation and provides an immediate and substantial financial benefit for the Settlement Class. Accordingly, Lead Plaintiffs respectfully submit that the Court should approve the Settlement as fair, adequate and reasonable.

Lead Plaintiffs also request that the Court approve the proposed Plan of Allocation for the Net Settlement Fund. The Plan of Allocation is designed to equitably distribute the Settlement Fund proceeds on a *pro rata* basis to Authorized Claimants. It was prepared with the assistance of Lead Plaintiffs' expert, who

calculated the alleged artificial inflation in the prices of HIIQ common stock during the Settlement Class Period, and is substantially similar to numerous other plans that have been approved in this District and around the country as fair, adequate, and reasonable.

## II.   THE SETTLEMENT WARRANTS FINAL APPROVAL

The Eleventh Circuit and courts nationwide recognize that there is a "strong judicial policy favoring settlement." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984); *see also In re HealthSouth Corp. Sec. Litig.*, 572 F.3d 854, 862 (11th Cir. 2009) ("Public policy strongly favors the pretrial settlement of class action lawsuits.").

Rule 23(e)(2) of the Federal Rules of Civil Procedure provides that the Court should determine whether a proposed settlement is "fair, reasonable, and adequate" after considering whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). In conjunction with these factors, courts in the Eleventh Circuit examine: "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the anticipated complexity, expense and duration of litigation; (5) the opposition to the settlement; and (6) the stage of proceedings at which the settlement

was achieved." *Bennett,* 737 F.2d at 986.

This Court has already made a preliminary finding that the Settlement is "fair, reasonable, and adequate to the Settlement Class" under these factors in its Order Preliminarily Approving Settlement and Providing for Notice ("Preliminary Approval Order") (subject to further consideration at the Settlement Hearing). *See* ECF No. 101 at ¶2. As set forth below, the $11 million Settlement readily satisfies each of the applicable factors.

### A.    Lead Plaintiffs and Lead Counsel Adequately Represented the Class

In evaluating the adequacy of representation, courts in this District consider (1) whether class representatives have interests antagonistic to the interests of other class members; and (2) whether class counsel has the necessary qualifications and experience to lead the litigation. *See, e.g., Kirkpatrick v. J.C. Bradford Co.*, 827 F.2d 718, 726 (11th Cir. 1987); *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 2020 WL 256132, *5 (N.D. Ga. Mar. 17, 2020).

Lead Plaintiffs and Lead Counsel easily meet both of these criteria. Indeed, the Court has previously found that Lead Plaintiffs and Lead Counsel have adequately represented the Settlement Class. *See* ECF No. 101 at ¶1(b). Lead Plaintiffs asserted claims that are typical of and coextensive with those of other Settlement Class Members and have no interests antagonistic to the interests of other members of the Settlement Class. Lead Plaintiffs and the other Settlement Class Members all purchased HIIQ common stock during the Class Period and were allegedly damaged by the same alleged false and misleading statements. And, if Lead Plaintiffs were

required to prove their claims at trial, they would also prove the Settlement Class's claims. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) (the investor class "will prevail or fail in unison" because claims are based on common misrepresentations and omissions).

Moreover, Lead Plaintiff and Lead Counsel have adequately represented the Settlement Class in their vigorous prosecution of the Action and in the negotiation and achievement of the Settlement. Lead Counsel Saxena White is highly qualified and experienced in securities litigation, as set forth in its firm resume (*see* Ex. 5A to the Grzandziel Decl.) and was able to successfully conduct the litigation against skilled opposing counsel and obtain a favorable settlement.  As described in further detail in the Grzandziel Declaration, Lead Counsel vigorously prosecuted the Settlement Class's claims and expended significant time and effort throughout the litigation. Accordingly, the Settlement Class was adequately represented.

## B.    The Settlement is the Product of Arm's-Length Negotiations

In weighing approval of a class action settlement, the Court must consider whether the settlement "was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B).

The Settlement here was reached only after extensive arm's-length negotiations between the Parties, which were conducted with the assistance of an experienced mediator. The mediation process included the exchange of detailed mediation statements and a full-day mediation session under the auspices of Jed D. Melnick. ¶¶ 32-33. Mr. Melnick is an acclaimed, widely-respected JAMS mediator who has mediated hundreds of complex disputes with aggregate values in the billions of

dollars—including numerous securities class actions against Fortune 500 companies. *See In re China Med. Corp. Sec. Litig.,* 2014 WL 12581781, at *5 (C.D. Cal. Jan. 7, 2014) ("Mr. Melnick's involvement in the settlement supports the argument that it is non-collusive"). After no agreement was reached at the initial mediation session, the Parties engaged in several more weeks of discussions with the mediator before reaching the Settlement. ¶33.

These facts strongly support the conclusion that the Settlement is fair. *E.g., Yang,* 2014 WL 4401280, at *5 ("The participation of this highly qualified mediator [Mr. Melnick] strongly supports a finding that negotiations were conducted at arm's length and without collusion."); *Berman v. Gen. Motors LLC*, 2019 WL 6163798, at *4 (S.D. Fla. Nov. 18, 2019) ("the Settlement was reached with the assistance of a neutral mediator with substantial experience mediating class actions, which further demonstrates the absence of collusion").

In addition, Lead Plaintiff and Lead Counsel were sufficiently knowledgeable about the strengths and weaknesses of the case before reaching the agreement to settle. Lead Counsel had conducted an extensive investigation regarding the alleged fraud; prepared and filed a detailed, 102-page amended complaint; fully briefed Defendants' motion to dismiss; reviewed and analyzed 1.9 million pages of documents, including documents produced by Defendants and by Simple Health's court-appointed receiver, a third party to the litigation; consulted extensively with experts; briefed class certification in full (including defending the depositions of their market efficiency expert and Lead Plaintiffs' representatives) and certified a Class of investors, and

deposed HIIQ's former head of broker compliance. ¶¶19-33.

Accordingly, the Court should give considerable weight to the judgment of Lead Plaintiff and Lead Counsel that the Settlement is in the best interests of the Settlement Class. Indeed, "[i]n evaluating a proposed class action settlement, the Court will not substitute its business judgment for that of the parties." *In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d 1330, 1341 (S.D. Fla. 2011). Lead Counsel's substantial experience in cases of this nature gives further weight to its judgment that the Settlement is fair and reasonable. *See Jairam v. Colourpop Cosmetics*, LLC, 2020 WL 5848620, at *3 (S.D. Fla. Oct. 1, 2020) ("In evaluating a proposed class action settlement, 'the district court may rely upon the judgment of experienced counsel for the parties.'") (quoting *Nelson v. Mead Johnson & Johnson Co.*, 484 F. App'x 429, 434 (11th Cir. 2012)); *see also Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1384 (S.D. Fla. 2007) ("[a] district court properly considers the judgment of experienced counsel when asked to approve a class action settlement"). Finally, the fact that Lead Plaintiffs are sophisticated institutional investors, of the type favored by Congress when it passed the PSLRA, strengthens the force of its recommendation that the Settlement be approved. *See In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007) ("a settlement reached . . . under the supervision and with the endorsement of a sophisticated institutional investor . . . is 'entitled to an even greater presumption of reasonableness[.]'").

**C.    The Relief Provided to the Settlement Class Is Adequate**

**1.    The Size of the Settlement Supports Approval**

Lead Plaintiffs and Lead Counsel have achieved an outstanding benefit for the

Settlement Class, whether measured in absolute terms or as a percentage of estimated

recoverable damages. The $11 million cash Settlement is nearly double the inflation-

adjusted median of $6.3 million in securities class action settlements in the Eleventh

Circuit from 2010 through 2019,[2] which weighs strongly in favor of approval. *See, e.g.,*

*In re Rayonier Inc. Sec. Litig.*, 2017 WL 4542852, at *2 (M.D. Fla. Oct. 5, 2017) (fact

that settlement—achieved by same Lead Counsel as in this action— exceeded median

recovery in the Eleventh Circuit favored approval).

This result is also impressive as a percentage of estimated maximum recoverable

damages, which Lead Plaintiffs—after consulting with Chad W. Coffman of Global

Economics Group, a highly experienced economics and market efficiency expert—

have estimated to range from $31.9 million to $63.3 million. ¶2, note 2. Accordingly,

the $11 million Settlement represents anywhere from 17% to 34% of the realistic

maximum recoverable damages, and, thus, is roughly 10 to 20 times larger, as a

percentage of damages, than similarly-sized securities fraud cases in 2020, where the

median recovery was just 1.7% of damages.[3] Moreover, as discussed further below,

even assuming success at trial, Plaintiffs' chances of achieving a judgment anywhere

---

[2] *See* Cornerstone Research, *Securities Class Action Settlements, 2019 Review and Analysis* (2020) at 20.
[3] *See* Janeen McIntosh and Svetlana Starykh, "Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review" (NERA Jan. 25, 2021) at 17 fig. 15; 20 fig. 16; https://www.nera.com/ publications/archive/2021/recent-trends-in-securities-class-action-litigation--2020-full-y.html.

near the upper end of its damages range would be remote. Indeed, settlements valued at much lower percentages of damages are routinely not only approved but praised by courts. *See, e.g., Thorpe v. Walter Inv. Mgmt. Corp.*, 2016 WL 10518902, at *3 (S.D. Fla. Oct. 17, 2016) (settlement worth 5.5% of maximum damages was "an excellent recovery"). Thus, the Settlement is an exceptional recovery for the Settlement Class.

### 2.    The Risks of Continued Litigation Support Approval

In assessing whether the proposed Settlement is fair, reasonable, and adequate, the Court should view the Settlement "in light of the risks of continued litigation." *Equifax,* 2020 WL 256132, at *7; *see also Strube v. Am. Equity Inv. Life Ins. Co.*, 226 F.R.D. 688, 697-98 (M.D. Fla. 2005) (analyzing "whether the possible rewards of continued litigation with its risks and costs are outweighed by the benefits of settlement"); *Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1345 (court need not determine if the settlement "is the best possible deal, nor whether class members will receive as much from a settlement as they might have recovered from victory at trial."). Indeed, courts have routinely recognized, "the complexity of securities class action litigation is notably difficult and notoriously uncertain." *In re NetBank, Inc. Sec. Litig.*, 2011 WL 13353222, at *3 (N.D. Ga. Nov. 9, 2011). Accordingly, "[c]lass action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation." *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006).

Here, there is no question that continued litigation would have been costly, risky, and protracted. Indeed, even though Lead Plaintiffs prevailed at the pleading

stage, the Court substantially shortened the Class Period, excluding more than half of the alleged corrective disclosures and significantly reducing class-wide damages. While Lead Plaintiffs moved for reconsideration of that decision, there was serious doubt as to whether the Court would reverse its opinion. And even though the Court granted class certification, there are no guarantees that class action status would be maintained. *See* Rule 23(c)(1) ("An order that grants or denies class certification may be altered or amended before final judgment"). Lead Plaintiffs cannot completely disregard the possibility that the Court would later decertify the action, particularly given the already-truncated Class Period.

Further, Lead Plaintiffs still had to prove their claims. Defendants deny that their public statements contained any material misstatements or omissions, and deny allegations of fault, liability, wrongdoing, and damages. Defendants would have continued to argue that their public statements were not false or misleading because such statements accurately reflected the quality of compliance and the number of customer complaints upheld by state insurance regulators. ECF No. 41-1 at 9-16. Further, Defendants would likely have argued that HIIQ had heavily invested in its compliance and customer service processes in recent years and that the Individual Defendants' reasonable belief that HIIQ had "best in class" compliance undercuts an inference of scienter.

Defendants would also likely argue that HIIQ did not approve or condone the use of any deceptive trade practices by its third-party call centers, and that when HIIQ learned of any potential improper sales practices, it quickly intervened to stop them.

12

Moreover, based on filings in the FTC enforcement action against Simple Health, Defendants would almost certainly argue that Simple Health actively sought to hide its illicit activities from HIIQ by failing to disclose regulatory investigations and by editing customer calls prior to sending the recordings to HIIQ for review. Defendants would likely further argue that, even accounting for all customer complaints made to the Company and not just customer complaints upheld by state departments of insurance, the complaint ratio was immaterial. While Lead Plaintiffs were prepared with arguments to respond to these contentions, they recognize that Defendants' arguments posed significant risk at summary judgement and trial that could have undermined the viability of the entire Action.

With respect to loss causation and damages, Defendants argued that the November 2, 2018 corrective disclosure (the FTC's announcement of the enforcement action against Simple Health) did not contain any allegations against HIIQ or contain any corrective information relating to HIIQ's compliance, customer service, or customer complaints. ECF No. 41, at 23. According to Defendants, because the FTC action in no way corrected any prior alleged false or misleading statement by HIIQ, it was not a corrective disclosure. *Id.* Moreover, Plaintiffs' damages related to this first corrective disclosure were based on a two-day stock drop: Friday, November 2, 2018, the day of the FTC's announcement, and continuing into the next trading session on Monday, November 5, 2018. But defendants in securities class actions invariably argue that stock price declines in multi-day event windows such as this are not causally related to the initial announcement, particularly those event windows spanning

13

weekends. Lead Plaintiffs expected that Defendants would make that argument here, and if the Court or a jury were to eliminate the stock drop on November 5, 2018, Plaintiffs' damages would significantly decrease even further.

With respect to the second alleged corrective disclosure, the November 27, 2018 Aurelius Value short-seller report, Defendants previously argued that the report contained already-public information and would likely continue to do so. *Id.* Further, damages were significantly reduced when the Court shortened the Class Period end date from April 11, 2019 to February 18, 2019, thereby excluding from the Class Period three of the five corrective disclosures alleged in the Complaint (March 13, 2019, March 25, 2019, and April 12, 2019)—including the largest single-day share price drop as a percentage of market share, the March 13, 2019 announcement of an investigation by the U.S. House of Representative Energy & Commerce Committee, which caused HIIQ's stock price to decline by 17.2%. Complaint, ¶¶136-139.

While Lead Plaintiffs believe they had credible counterarguments on each of these points, the fact remains that the Court at summary judgment, or the jury at trial, could have lent such arguments substantial weight, thereby significantly reducing or eliminating recoverable damages and undermining the viability of the entire Action. Courts in this District have recognized that, even with the aid of expert testimony, disputes over damages present a substantial risk before a jury, even in a successful trial outcome. *See Zuckerman v. Smart Choice Auto. Grp., Inc.*, 2001 WL 686879, at *10 (M.D. Fla. May 3, 2001) ("The determination of damages . . . is a complicated and uncertain process, typically involving conflicting expert opinions."); *Ressler v. Jacobson*, 822 F.

14

Supp. 1551, 1554 (M.D. Fla. 1992) ("In the 'battle of experts,' it is impossible to predict with any certainty which arguments would find favor with the jury.").

In addition, moving forward, the Action would have continued to present significant cost and risks, as pre-trial proceedings would further involve "preparation of complex expert reports and discovery of the expert witnesses; the negotiation and completion of a complex and voluminous pre-trial order; and extensive briefing on motions for summary judgment, motions to strike experts and other motions in limine likely to be made," and a costly and labor intensive trial would be followed by "inevitable post-trial motions and appellate proceedings." *Guevoura Fund Ltd. v. Sillerman*, 2019 WL 6889901, *7 (S.D.N.Y. Dec. 18, 2019). Consequently, at "[e]ach step of the way, expenses would continue to accumulate, further decreasing the funds available to Class Members" if the litigation was to continue. *Id.*

Moreover, Lead Plaintiffs also faced significant risks of recovering on any judgment they obtained based on HIIQ's ability to pay.  Since this case was originally filed, HIIQ has changed its name, has changed its business model, and according to filings with the SEC before being taken private, the Company had only limited cash available to contribute to any settlement or other recovery. In light of these considerations and the fact that the remaining proceeds of Defendants' Directors' and Officers' insurance tower were virtually exhausted by the time of the Settlement, the Settlement represents an exceptional recovery for the Settlement Class.

In sum, even after a successful trial, there was no guarantee that Plaintiffs would have obtained a judgment greater than or even equivalent to the $11 million

Settlement, and, indeed, there was a very significant risk that years of continued litigation might yield a smaller recovery—or no recovery at all—after trial or the inevitable appeals.[4] These risks strongly support approval of the Settlement.

### 3. The Proposed Method for Distributing Relief to the Settlement Class is Effective

Under Rule 23(e)(2)(C)(ii), courts consider "the effectiveness of [the] proposed method of distributing relief to the class." Here, as demonstrated below in Section III, the method for processing Settlement Class Members' claims and distributing relief to eligible claimants includes well established, effective procedures for processing claims submitted by potential Settlement Class Members and efficiently distributing the Net Settlement Fund. Epiq, the Court-approved claims administrator, will process claims under the guidance of Lead Counsel, allow claimants an opportunity to cure any deficiencies in their claims or request the Court to review a denial of their claims, and, lastly, mail Authorized Claimants their pro rata share of the Net Settlement Fund (per the Plan of Allocation), after Court approval. Claims processing like the method proposed here is standard in securities class action settlements and has been long found to be effective. *Christine Asia Co., Ltd. v. Yun Ma*, 2019 WL 5257534, at *14 (S.D.N.Y. Oct. 16, 2019), *appeal withdrawn sub nom. Tan Chao v. William*, 2020 WL 763277 (2d Cir. Jan. 2, 2020).

---

[4] *See, e.g., Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing jury verdict of $81 million for plaintiffs); *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2011 WL 1585605, at *38 (S.D. Fla. Apr. 25, 2011) (granting defendants' motion for judgment as a matter of law following plaintiffs' verdict).

### 4.    Lead Counsel's Fee Request is Fair and Reasonable

Lead Counsel has applied for a fee of one-third of the Settlement Fund. As set forth in more detail in the Memorandum of Law in Support of Lead Plaintiffs' Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses, such a fee is highly reasonable in light of the work performed and the results obtained, and is comparable to other settlements in complex class actions approved in the Eleventh Circuit and nationwide. *See, e.g., Rayonier*, 2017 WL 4542852, at *3 (awarding 30% of $73 million settlement obtained while class certification motion was pending); *In re BellSouth Corp. Sec. Litig.,*, 2007 WL 9676400, at *1 (N.D. Ga. Apr. 9, 2007) (30% of $35 million settlement reached during discovery); *see also Equifax*, 2020 WL 256132, at *34 (noting that "[a]wards of up to 33% of the common fund are not uncommon in the Eleventh Circuit" in complex class actions, and that, in the Eleventh Circuit, the average fee was 30% and the median fee was 33% between 2009 and 2013).

Moreover, although this Circuit does not primarily rely on the lodestar method to calculate fees, the requested fee represents a negative multiplier of 0.76 of Plaintiffs' Counsel's lodestar, meaning that the value of Plaintiffs' Counsel's time is substantially higher than the amount of the fee requested, which courts have recognized fully supports the reasonableness of the fee. *See Guevoura*, 2019 WL 6889901, at *18 ("Courts have repeatedly recognized that the reasonableness of the fee request" is

reinforced where "'the percentage fee would represent a negative multiplier of the lodestar.'").[5]

### D.   All Settlement Class Members Are Treated Equitably

As set forth in the Stipulation (¶¶20-32) and *infra*, at Sec. III, the Plan of Allocation—which was developed in consultation with Lead Plaintiffs' damages expert—treats all Settlement Class Members equitably. Under the Plan of Allocation, the Authorized Claimants shall receive their *pro rata* share of the Net Settlement Fund based upon their recognized claim compared to the total recognized claims of all Authorized Claimants. *See* Notice, ECF No. 101-1, ¶¶ 41-58. *See Christine Asia Co., Ltd.,* 2019 WL 5257534 at *15 (finding plan of allocation entitling class members to *pro rata* share to treat all class members equitably).

### E.   The Remaining Eleventh Circuit Factors are Satisfied

In addition to the factors set forth in Rule 23, courts in the Eleventh Circuit are further guided by the factors set forth in *Bennett. Equifax,* 2020 WL 256132, at *10. Many of these factors overlap substantially with those in Rule 23. *See Id*. Each of these factors supports final approval of the Settlement.

---

[5] In accordance with Rule 23(e)(3), Lead Plaintiffs note that the Parties have entered into a confidential agreement establishing certain conditions under which HIIQ may terminate the Settlement if a certain number of potential Settlement Class Members request exclusion (or "opt-out") of the Settlement. Stipulation, Dkt. No. 100-2, ¶40. This type of agreement is standard in securities class action settlements and has no negative impact on the fairness of the Settlement. *See In re Healthsouth Corp. Sec. Litig.*, 334 F. App'x 248, 250 n.4 (11th Cir. 2009) (approving of similar agreement and noting that "[t]he threshold number of opt outs required to trigger the blow provision is typically not disclosed and is kept confidential to encourage settlement and discourage third parties from soliciting class members to opt out.").

### 1. The Likelihood of Success at Trial Supports Final Approval of the Settlement

The "first and most important *Bennett* factor is the likelihood of success at trial." *Thorpe*, 2016 WL 10518902, at *2-3. This factor "is evaluated in the context of the relief proposed by the settlement." *Id.* at *3. As set forth, *supra*, at section II(C)(2), the many risks Lead Plaintiffs would face before, during, and after trial weigh in favor of final approval of the Settlement. Defendants would have vigorously contested falsity, scienter and loss causation at summary judgment and trial. Defendants' success on any one of these bases would have presented the risk of a substantially reduced recovery, or no recovery whatsoever. Accordingly, this factor strongly weighs in favor of final approval.

### 2. The Settlement Amount is Reasonable Considering the Range of Possible Recoveries

"The second and third factors in the Eleventh's Circuit's *Bennett* analysis call for the Court to determine 'the possible range of recovery' and then ascertain where within that range 'fair, adequate, and reasonable settlements lie.'" *Deas v. Russell Stover Candies, Inc.,* 2005 WL 8158201, at *11 (N.D. Ala. Dec. 22, 2005); *see also In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1331 (S.D. Fla. 2001) (these factors "are easily combined").

As set forth above, the $11 million cash Settlement is well within the range of reasonableness under the circumstances to warrant final approval of the Settlement and the issuance of notice to the Settlement Class. Realistic maximum damages in the case ranged from $31.9 million to $63.3 million, and Defendants raised a number of

credible arguments concerning falsity, scienter, loss causation and damages throughout the litigation that, if accepted, would have substantially reduced or eliminated altogether recoverable damages, further underscoring the valuable benefits obtained through the proposed Settlement. *See Carpenters Health & Welfare Fund v. Coca-Cola Co.*, 2008 WL 11336122, *8 (N.D. Ga. Oct. 20, 2008) ("the determination of loss causation and damages is a complicated and uncertain process" with "highly unpredictable" results at trial). Indeed, particularly in light of the falsity, scienter, loss causation and damages risks described further *supra* at section II(C)(2), the $11 million Settlement—estimated to be anywhere from 17% to 34% of maximum damages—is likely "in the high range of what could have been obtained had the parties continued to litigate." *Equifax,* 2020 WL 256132, at *10.

In assessing the reasonableness of the settlement, the Court can "rely upon the judgment of experienced counsel and, absent fraud, 'should be hesitant to substitute its own judgment for that of counsel.'" *Carpenters Health & Welfare Fund*, 2008 WL 11336122, at *8; *see also Nelson v. Mead Johnson & Johnson Co.*, 484 F. App'x 429, 434 (11th Cir. 2012) (same). Here, Lead Counsel conducted "significant investigation and discovery" and "were more than sufficiently prepared to negotiate and enter into the Settlement." *Checking Acct. Overdraft Litig.,* 830 F. Supp. 2d at 1345.

### 3.    The Stage of Proceedings at Which Settlement was Achieved Strongly Supports Final Approval

In assessing the stage of the proceedings at which a settlement is achieved, the relevant inquiry is whether the parties "had access to sufficient information to

20

adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation." *Berman*, 2019 WL 6163798, at *8; *accord Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1324 (S.D. Fla. 2005).

Here, the Settlement was reached after over a year and a half of hard-fought litigation, and after Lead Plaintiffs conducted an extensive investigation and substantial fact and expert discovery, including a review and analysis of over 1.9 million pages of documents and deposition practice. ¶¶19-33. Lead Plaintiffs also successfully opposed Defendants' motion to dismiss, fully briefed a motion for class certification, submitted a detailed expert report on market efficiency, and participated in extensive settlement negotiations. ¶¶19-33. In sum, by the time the Settlement was reached, Lead Plaintiffs had sufficient information to assess the strengths and weaknesses of their claims and were "well aware of the other side's position and the merits thereof." *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d at 1332.

### 4. The Favorable Response to the Settlement from the Class Supports Final Approval

The positive reaction of class members, and the absence of substantial objections, "is strong evidence of the propriety and acceptability of that request." *Ressler v. Jacobson*, 149 F.R.D. 651, 656 (M.D. Fla. 1992). The Court-ordered deadline for submitting objections and requests for exclusions is March 2, 2021. *See* ECF No. 101, ¶¶10, 13. To date, no objections to, or requests for exclusion from, the Settlement have been received. Decl. of Jordan Broker ("Epiq Decl."), filed herewith as Ex. 2 to the Grzandziel Decl., at ¶¶18, 20. Lead Plaintiffs will file reply papers on March 16,

2021, after the exclusion and objection deadline has passed, to further address this factor.

## III.   THE PLAN OF ALLOCATION IS FAIR AND REASONABLE

As with settlements, courts in this Circuit assess whether plans of allocation are "fair and reasonable." *Howard v. Chanticleer Holdings, Inc.*, 2014 WL 12600501, at *9 (S.D. Fla. Aug. 14, 2014). Under this analysis, the Court's "principal obligation in approving a plan of allocation is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund." *In re Auto. Parts Antitrust Litig.*, 2019 WL 7877812, at *1 (E.D. Mich. Dec. 20, 2019). Moreover, a plan of allocation "need not be perfect," and "need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 667 (S.D.N.Y. 2015).

Here, the proposed Plan of Allocation, which has been preliminarily approved by the Court, fairly and reasonably distributes the Net Settlement Fund on a *pro rata* basis among claimants based on their respective Recognized Losses. In developing the Plan of Allocation, Lead Plaintiffs' damages expert calculated the estimated alleged amount of artificial inflation in the per share closing price of HIIQ common stock, which allegedly was proximately caused by Defendants' alleged false and misleading statements and omissions. Notice, ECF No. 101-1, ¶¶ 41-58.

In calculating the estimated artificial inflation caused by Defendants' alleged misrepresentations and omissions, Lead Plaintiffs' expert considered price changes in HIIQ common stock in reaction to certain public announcements allegedly revealing

the truth concerning Defendants' alleged misrepresentations and material omissions, adjusting for price changes that were attributable to market or industry forces. Similar plans of allocation are commonly used and approved in class actions and represent a widely recognized means of fairly distributing settlement funds to class members. *See, e.g. Carpenters Health & Welfare Fund*, 2008 WL 11336122, at *5 (similar plan of allocation developed by damages expert found fair and reasonable because it "treats all Settlement Class Members in a similar manner—ensuring that everyone entitled to a distribution under the Plan of Allocation who submits a valid and timely claim gets a *pro rata* share of the Net Settlement Fund in the proportion that his, her, or its Recognized Claim bears to the total of all Recognized Claims").

Moreover, to date, after mailing 21,918 copies of the Notice Packet, no Settlement Class Member has objected to the Plan of Allocation. This fact supports approval.

## IV. NOTICE TO THE SETTLEMENT CLASS SATISFIED RULE 23 AND DUE PROCESS

The Notice to the Settlement Class—the form of which has already been approved by this Court—satisfied the requirements of Rule 23, which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *Kuhr v. Mayo Clinic Jacksonville*, 2020 WL 5912350, at *9 (M.D. Fla. Oct. 6, 2020). The Notice also satisfied Rule 23(e)(1), which requires that notice of a settlement must "fairly apprise the prospective members of the class of the terms of the

proposed settlement and of the options that are open to them in connection with the proceedings." *Wal-Mart Stores, Inc. v. Visa U.S.A.*, 396 F.3d 96, 114 (2d Cir. 2005). Put another way, the Notice satisfies the requirements of Rule 23 and due process because it "clearly and concisely explains the nature of the action and the rights of class members, thereby satisfying the requirements of Rule 23 and due process." *Equifax,* 2020 WL 256132, at *27.

Both the substance of the Notice and the method of its dissemination to potential members of the Class satisfied these standards. The Court-approved Notice includes all the information required by Federal Rule of Civil Procedure 23(c)(2)(B) and the PSLRA, 15 U.S.C. § 78u-4(a)(7). In accordance with the Court's Preliminary Approval Order, Epiq began mailing copies of the Notice and Claim Form to potential Class Members on January 11, 2021. *See* Epiq Decl. at ¶5. As of February 15, 2021, Epiq had disseminated 21,918 copies of the Notice Packet to potential Class Members and nominees. *See Id*. ¶11. In addition, Lead Counsel caused the Summary Notice to be published in *Investors' Business Daily* and transmitted over the PR Newswire on January 18, 2021. *See Id.* ¶12. This combination of individual mail to all Class Members who could be identified with reasonable effort, supplemented by notice in an appropriate, widely-circulated publication, and transmitted over a newswire, was "the best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B). *See Aranaz v. Catalyst Pharm. Partners Inc.*, 2014 WL 11870214, at *2-3 (S.D. Fla. Dec. 3, 2014) (notice distributed by first class mail to all class members "who can be identified with reasonable effort . . . constitute[s] the best notice practicable under the

circumstances; and constitute[s] due and sufficient notice to all persons and entities entitled thereto"); *see also Lowry v. Andrx Corp.*, 2008 WL 11331829, at *2 (S.D. Fla. Apr. 4, 2008) (approving substantially similar notice method).

## V.     THE SETTLEMENT CLASS SHOULD BE FINALLY CERTIFIED

On December 3, 2020, the Court granted Lead Plaintiffs' motion for preliminary approval of the Settlement, and preliminarily certified the Settlement Class for settlement purposes under Rule 23 of the Federal Rules of Civil Procedure. ECF No. 101 at ¶2. Nothing has changed to alter the propriety of certification of the proposed Settlement Class for settlement purposes and thus, for the reasons set forth in Lead Plaintiffs' preliminary approval papers (ECF No. 100 at 6-8), Lead Plaintiffs respectfully request that the Court grant final certification of the Settlement Class.

## VI.    CONCLUSION

For all the foregoing reasons, Lead Plaintiffs respectfully submit that the proposed Settlement and Plan of Allocation readily meet all of the requirements under Rule 23, the PSLRA, and Eleventh Circuit precedent. Accordingly, Lead Plaintiffs respectfully request that the Court grant final approval of the proposed Settlement and Plan of Allocation as fair, reasonable, and adequate.[6]

---

[6] A proposed order granting final approval of the Settlement was submitted in conjunction with the motion for Preliminary Approval. ECF No. 100-2. An updated proposed order with respect to final approval (with information regarding requests for exclusion) and a proposed order granting final approval of the Plan of Allocation will be submitted with Lead Plaintiffs' reply brief in further support of this motion, which will be filed on March 16, 2021.

## LOCAL RULE 3.01(g) CERTIFICATION

Counsel for Lead Plaintiffs certifies that they have conferred with counsel for Defendants, and Defendants (i) support final approval of the Settlement; and (ii) take no position with respect to the Court's approval of the Plan of Allocation.

Dated: February 16, 2021

Respectfully submitted,

**SAXENA WHITE P.A.**

*/s/ Brandon T. Grzandziel*
Maya Saxena (Fla. Bar 35494)
Joseph E. White, III (Fla. Bar 621064)
Brandon T. Grzandziel (Fla. Bar 58732)
Adam Warden (Fla. Bar 873691)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
brandon@saxenawhite.com
awarden@saxenawhite.com

Steven B. Singer (*pro hac vice*)
10 Bank Street
8th Floor
White Plains, NY 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com

*Lead Counsel for Lead Plaintiffs and the Class*

**ABRAHAM, FRUCHTER AND TWERSKY, LLP**

Mitchell M.Z. Twersky (*pro hac vice*)
One Penn Plaza, Suite 2805
New York, NY 10119
Tel: (212) 279-5050
Fax: (212) 279-3655
mtwersky@aftlaw.com

*Additional Counsel*

26

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 16, 2021, a copy of the foregoing was filed with the Clerk of the Court using the CM/ECF electronic notification system, which will send a notice of electronic filing to all parties of record.

*/s/ Brandon T. Grzandziel*
Brandon T. Grzandziel

27