## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| JULIAN KEIPPEL, Individually and On Behalf of All Others Similarly Situated,<br><br>           Plaintiff,<br><br>v.<br><br>HEALTH INSURANCE INNOVATIONS, INC. n/k/a BENEFYTT TECHNOLOGIES, INC., GAVIN SOUTHWELL, and MICHAEL D. HERSHBERGER,<br><br>           Defendants. | CASE NO. 8:19-CV-00421-WFJ-CPT<br><br>CLASS ACTION |

**DECLARATION OF BRANDON T. GRZANDZIEL IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND LEAD PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES**

**TABLE OF CONTENTS**

I.      Preliminary Statement .................................................................................1

II.     BAckground of the Action ..........................................................................7

        A.      Summary of the Allegations..............................................................7

        B.      Relevant Procedural History ...........................................................10

                1.      Commencement of the Action and Appointment of Lead
                        Plaintiffs..................................................................................10

                2.      Lead Plaintiffs' Consolidated Amended Class Action
                        Complaint and Defendants' Motion to Dismiss......................11

                3.      Lead Plaintiffs' Discovery Efforts..........................................12

                4.      Class Certification Briefing and Discovery .............................15

        C.      Mediation, Settlement, and Negotiation of Settlement
                Documents.......................................................................................16

                1.      Mediation Before Jed D. Melnick, Esq...................................16

                2.      The Settlement Agreement and Preliminary Approval.............17

III.    THE RISKS OF CONTINUED LITIGATION .........................................18

        A.      Risks in Proving Liability...............................................................19

        B.      Risks to Establishing Loss Causation and Damages .........................20

        C.      Post-Trial Risks .............................................................................22

IV.     LEAD  PLAINTIFFS'  COMPLIANCE  WITH  THE  COURT'S
        PRELIMINARY  APPROVAL  ORDER  REQUIRING  THE
        ISSUANCE OF NOTICE ..........................................................................23

V.      ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT AND
        CLASS REACTION TO DATE ................................................................25

VI.     THE FEE AND EXPENSE APPLICATION.............................................28

        A.      Lead Counsel's Request for an Award of Fees .................................28

i

1.    The Time, Labor, Difficulty and Skill Involved Support the Requested Fee Award ..........................................................31

2.    The Outstanding Result Achieved and the Reasonableness of the Fee Request Support the Requested Fee Award..............33

3.    The Risks and Economics of the Litigation Support the Requested Fee Award..............................................................34

4.    The Reaction of the Settlement Class to the Fee and Expense Applications ..............................................................36

5.    Awards in Similar Actions and a Lodestar Cross-Check Support the Requested Fee Award .............................................37

B.    Lead Counsel's Request for Reimbursement of Litigation Expenses .....................................................................................40

C.    Lead Plaintiffs' Reimbursement Requests ...........................................42

VII.    CONCLUSION .......................................................................................43

## <u>EXHIBIT LIST</u>

| EX. NO. | DESCRIPTION |
| --- | --- |
| 1 | Declaration of Jed D. Melnick |
| 2 | Declaration of Jordan Broker on Behalf of Epiq Class Action & Claims Solutions, Inc. |
| 3 | Declaration of Jay Turner on Behalf of City of Birmingham Retirement and Relief System |
| 4 | Declaration of Jodi Cox on Behalf of Oklahoma Municipal Retirement Fund |
| 5 | Summary of Plaintiffs' Counsel's Lodestar and Expenses |
| 5A | Declaration of Joseph E. White, III on Behalf of Saxena White |
| 5B | Declaration of Mitchell M.Z. Twersky on Behalf of Abraham, Fruchter & Twersky |
| 6 | *City Pension Fund for Firefighters & Police Officers in City of Miami Beach v. Aracruz Celulose S.A.,* No. 08-cv-23317, ECF No. 201 at 7 (S.D. Fla. July 17, 2013) |
| 7 | *In re HD Supply Holdings, Inc. Securities Litig.*, No. 1:17-cv-02587-ELR, ECF No. 102 at 2 (N.D. Ga. July 21, 2020) |
| 8 | *Mosser v. TD Bank, N.A.* (*In re Checking Account Overdraft Litig.*), MDL No. 1:09-md-2036-JLK, ECF No. 3339 at 27 (S.D. Fla. Mar. 18, 2013) |
| 9 | *In re Cryolife, Inc. Sec. Litig.*, No. 1:02-cv-1868-BBM, ECF No. 276 at 9-10 (N.D. Ga. Nov. 9, 2005) |
| 10 | *In re Wellbutrin SR Antitrust Litig.*, Nos. 04–5525, 05–396, ECF No. 413 at 14 (E.D. Pa. Nov. 21, 2011) |
| 11 | *Schleicher v. Wendt*, No. 1:02-cv-1332, ECF No. 458 at 5-6 (S.D. Ind. Feb. 17, 2011) |
| 12 | *In re Regions Morgan Keegan Sec., Derivative & ERISA Litig.*, No. 2:07-cv-02830, ECF No. 345 at 21 (W.D. Tenn. Aug. 5, 2013) |

I, BRANDON T. GRZANDZIEL, declare and state as follows:

I am an attorney licensed to practice in Florida. I am a Director at the law firm Saxena White P.A. ("Saxena White"), which serves as counsel for Lead Plaintiffs Oklahoma Municipal Retirement Fund ("OKMRF") and City of Birmingham Retirement and Relief System ("City of Birmingham") in this Action.

I have personal knowledge of the matters set forth herein based on my active supervision of and participation in the prosecution and resolution of the Action, and if I were called upon as a witness, I could and would testify competently thereto.

I respectfully submit this Declaration in support of Lead Plaintiffs' motion for final approval of the proposed Settlement.[1] The proposed Settlement will resolve all claims asserted in this Action against Defendants.

I also respectfully submit this Declaration in support of Lead Plaintiffs' motion (i) for an award of attorneys' fees representing one-third of the Settlement Fund; (ii) for reimbursement of Lead Counsel's and additional plaintiffs' counsel's (together "Plaintiffs' Counsel") expenses in the amount of $377,837.59; and (iii) for reimbursement of Lead Plaintiffs' costs and expenses of $14,573.30 in the aggregate for the time and effort Lead Plaintiffs expended in representing the Settlement Class.

## I.   PRELIMINARY STATEMENT

1.      On December 3, 2020, the Court granted preliminary approval of the proposed $11 million cash settlement with Defendants. ECF No. 101. Since then, the

---

[1] Unless otherwise indicated herein, all capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement dated December 2, 2020 (the "Stipulation") (ECF No. 100-2); all citations and internal quotation marks are omitted; and all emphasis is added.

Court-approved Claims Administrator has notified potential members of the Settlement Class of the Settlement by mail in accordance with the Preliminary Approval Order. Summary Notice was also published through *Investor's Business Daily* and over PR Newswire.

2.    This declaration does not seek to detail each and every event that occurred in the course of the litigation. Rather, it highlights certain key events leading to the Settlement, and the basis upon which Lead Plaintiffs and Lead Counsel recommend its approval. Under any measure, the Settlement is an excellent result for the Settlement Class. Indeed, the $11 million Settlement Amount far exceeds the inflation-adjusted median of $6.3 million in securities class action settlements in the Eleventh Circuit from 2010 through 2019 (Cornerstone Research, *Securities Class Action Settlements, 2019 Review and Analysis* (2020) at 20), and represents approximately 17% to 34% of the Settlement Class's potential estimated recoverable damages[2]—multiples above the 2020 median recovery in securities class actions of roughly 1.7% of estimated damages. *See* Janeen McIntosh and Svetlana Starykh, "Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review" (NERA Jan. 25, 2021) at 20, fig. 16. This recovery is particularly notable in light of HIIQ's ability-to-pay issues, including limited cash available to contribute to any settlement, and the virtual exhaustion of

---

[2] In consultation with Chad Coffman, CFA, of Global Economics Group, a highly experienced economics and market efficiency expert, Lead Plaintiffs calculated estimated maximum recoverable damages of $31.9 million to $63.3 million.

Defendants directors and officers insurance tower by the time that the Settlement was reached.

3.    The recovery is even more noteworthy when weighed against the risks of continued litigation. As set forth more fully below, Defendants had argued that their statements accurately described the state of HIIQ's compliance and its rate of customer complaints at the time the statements were made, and that scienter could not be established. With respect to loss causation and damages, Defendants argued that the November 2, 2018 corrective disclosure (the FTC's announcement of the enforcement action against Simple Health) revealed nothing relating to HIIQ's compliance, and that the November 27, 2018 Aurelius Value short-seller report contained already-public information.  Further, damages were significantly reduced when the Court shortened the class period end date from April 11, 2019 to February 18, 2019, thereby excluding three of the five corrective disclosures alleged in the Complaint from the Class Period (March 13, 2019, March 25, 2019, and April 12, 2019)—including the largest single-day share price drop as a percentage of market share, the March 13, 2019 announcement of an investigation by the U.S. House of Representatives Energy & Commerce Committee, which caused HIIQ's stock price to decline by 17.2%. Compl. ¶¶ 136-139.

4.    While Lead Plaintiffs believed that they had strong arguments to respond to these points, there is no question that Defendants' arguments could easily have been accepted by this Court at summary judgment, or by a jury at trial. And if the Court or jury ultimately concluded that Defendants' statements regarding the Company's

3

compliance and rate of customer complaints were not materially false or otherwise actionable, or that the stock price declines were not causally related to actionable false or misleading statements, the potential recovery would be reduced dramatically—and potentially to zero. Even a favorable jury verdict would have been subjected to an inevitable and lengthy appeals process, the conclusion of which would have been highly uncertain. Accordingly, even if Lead Plaintiffs had prevailed at trial, it is highly questionable as to whether Lead Plaintiffs would have recovered more than (or even as much as) the substantial Settlement Amount.

5.      In light of these arguments and the other risks inherent in continued litigation, Lead Counsel respectfully submits that the Settlement represents an outstanding recovery for the Settlement Class that is supported by each of the factors applied in courts in the Eleventh Circuit in approving class action settlements, including the factors set forth in Fed. R. Civ. P. 23(e)(2), as well as the additional factors set forth in *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984). *See In re Equifax Inc. Customer Data Sec. Breach Litig.*, 2020 WL 256132, at *5-11 (N.D. Ga. Mar. 17, 2020) (analyzing fairness of class action settlement under both Rule 23(e)(2) factors and *Bennett* factors). This is especially true given that the Settlement was obtained before a highly uncertain trial and appeals process, offering a certain, immediate, and substantial cash recovery for the Settlement Class.

6.      In addition, the Settlement is the result of Lead Plaintiffs' and Lead Counsel's extensive litigation efforts, which included: (1) conducting an extensive investigation of all potential claims that could be asserted against HIIQ and its

executives or others; (2) conducting interviews with fact witnesses in connection with the pre-filing investigation; (3) filing an amended complaint based on the results of that investigation; (4) successfully opposing Defendants' motion to dismiss, which was denied in full; (5) engaging in comprehensive fact discovery, including the review and analysis of over 1.9 million pages of documents, and deposition practice; (6) briefing a motion for class certification, which resulted in certification of the Class; (7) participating in a formal full-day mediation before Mr. Jed D. Melnick, Esq., an independent and experienced mediator, along with extensive follow-up negotiations after the case did not settle at mediation; and (8) negotiating and drafting appropriate documentation of the Settlement, including the Stipulation and the Notices to be issued to potential Class Members. It was only after all of this that the Parties reached an agreement to settle this Action.

7.    Lead Plaintiffs supervised Lead Counsel, participated in all aspects of the litigation, remained informed throughout the settlement negotiations, and ultimately approved the Settlement.

8.    In addition to seeking the Court's final approval of the Settlement, Lead Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable. To prepare the Plan of Allocation, Lead Plaintiffs engaged Chad Coffman of Global Economics Group, a highly experienced economics and market efficiency expert with extensive experience in preparing similar plans. Under the proposed Plan of Allocation, the Net Settlement Fund will be distributed on a *pro rata* basis to members

of the Settlement Class who timely submit valid proofs of claim based on their "Recognized Loss" amount as calculated pursuant to the Plan.

9.    Lead Counsel also requests an award of attorneys' fees for its efforts, which resulted in a substantial recovery for the Settlement Class in the face of significant risks, and for reimbursement of its litigation expenses. Specifically, Lead Counsel is applying for an attorneys' fee award of one-third of the Settlement Fund (*i.e.,* one-third of the Settlement Amount, plus interest earned thereon), and for reimbursement of litigation expenses in the amount of $377,837.59, to be paid from the Settlement Fund. Lead Counsel's requested fee is well within the range of fees routinely approved by courts in this Circuit in comparable securities class actions with settlement funds of similar sizes and is amply supported by each of the factors set forth in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), as followed by the Eleventh Circuit in *Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768 (11th Cir. 1991), as well as the additional factors often applied by Courts in this District and Circuit. *See Equifax,* 2020 WL 256132, at *32-*40 (applying *Johnson* factors and others in analyzing fee application). The reasonableness of Lead Counsel's requested one-third fee is also confirmed by a lodestar cross-check, which yields a negative multiplier of 0.76 — meaning that the value of Plaintiffs' Counsel's time is substantially higher than the amount of the fee requested, which courts have recognized fully supports the reasonableness of the fee. *See Guevoura Fund Ltd. v. Sillerman*, 2019 WL 6889901, at *18 (S.D.N.Y. Dec. 18, 2019) ("Courts have repeatedly recognized that the reasonableness of the fee request" is reinforced where "'the percentage fee would

6

represent a negative multiplier of the lodestar.'"); *see also Thorpe v. Walter Inv. Mgmt. Corp.*, 2016 WL 10518902, at \*7 (S.D. Fla. Oct. 17, 2016) (finding 3.58 lodestar multiplier—and 33% fee—reasonable, and citing authority for multipliers ranging from 2.26 to 4.5).

10.    This Declaration describes (a) the efforts undertaken by Plaintiffs' Counsel to prosecute the Action; (b) the events leading up to the Settlement with Defendants, and the risks that Lead Plaintiffs and Lead Counsel considered in determining that the Settlement provides an outstanding recovery for the Settlement Class; (c) the Notice provided to members of the Settlement Class; (d) the proposed Plan of Allocation for the Settlement; and (e) Lead Plaintiffs' and Lead Counsel's fee and expense application.

## II.    BACKGROUND OF THE ACTION

### A.    Summary of the Allegations

11.    During the Class Period, HIIQ[3] sold short-term "health insurance products" with limited benefits through a network of third-party distributors and call centers. Due to the products' limited value and heavy scrutiny by regulators, HIIQ acknowledged that it was critical that the Company's third-party call centers be truthful in selling those products, and that customer complaints were a "key metric" for investors. Indeed, Defendants repeatedly stressed that HIIQ's stringent compliance standards were key to the Company's positive financial results. Defendants specifically cited HIIQ's call

---

[3] Since this case was originally filed, HIIQ has changed its name to Benefytt Technologies, Inc., and has changed its business model.

7

center (or "distributor") compliance as an example of those stringent compliance standards, representing throughout the Class Period that HIIQ "facilitated [its] distributors' compliance" and had achieved "best-in-class" and "market-leading" compliance that was the "foundation" of HIIQ and a "significant barrier to entry" to competitors. Defendants emphatically assured investors that there was a "very low," "incredibly low," and "absolutely tiny, tiny number" of complaints about HIIQ's "leading third-party distributors," and that it was "nearly impossible to improve" the low level of complaints because the call centers "are very good at explaining these products."

12.    The Complaint[4] alleges that HIIQ was heavily involved in every material aspect of the business of its most lucrative call center, Simple Health, which accounted for up to half of HIIQ's revenues. But as an FTC enforcement action and related federal receivership proceedings revealed, Simple Health was "a classic bait-and-switch scam" that "was never legally viable" because "deception permeated the . . . entire business relationship with . . . customers." The Complaint alleges that HIIQ was not only aware of Simple Health's deceptive sales practices, but HIIQ also recruited and trained Simple Health sales agents to use misleading sales scripts and aggressive, boiler room-type sales tactics. As the FTC found, these sales scripts were "replete with deceptive statements and high-pressure sales tactics."

13.    Through a series of partial corrective disclosures, the truth about HIIQ's compliance failures and its reliance on customer deception and Simple Health began to

---

[4] As used herein, "Complaint" or the "Amended Complaint" refers to the Consolidated Class Action Complaint filed by Lead Plaintiffs and Lead Counsel on July 19, 2019 (ECF No. 30).

emerge. On November 2, 2018, the FTC announced that it had obtained a temporary restraining order shutting down Simple Health because it was selling HIIQ's *"sham health insurance."* HIIQ's share price plummeted over 20% over the next two trading days. In the wake of these revelations, however, Defendants attempted to distance HIIQ from Simple Health and minimize the importance of their relationship, assuring investors that "HIIQ maintains an active internal compliance team," which securities analysts credited and relied upon.

14.    A series of additional corrective disclosures revealed HIIQ's active role in the Simple Health fraud and the nature of Defendants' "highly misleading" statements to investors. On November 27, 2018, research firm Aurelius Value published a report with additional details related to the relationship between HIIQ, Simple Health, and Simple Health's founder and CEO Steven Dorfman. In response to this news, HIIQ's share price fell 5.8%.  Further, on March 13, 2019, the U.S. House of Representatives Committee on Energy and Commerce announced it was investigating several insurance companies, including HIIQ, for selling "junk health insurance plans." In response, HIIQ's stock price declined 17.2%. The truth was further revealed in a voluminous filing in the FTC action on March 25, 2019, which allegedly revealed evidence of HIIQ's involvement in Simple Health's business and Defendants' awareness of Simple Health's fraudulent activities. Documents included in the filing purported that Simple Health's compliance department "is always in constant contact with HII[Q]'s compliance department." Following these revelations, HIIQ's stock price fell 7.4%. On April 12, 2019, the court-appointed Receiver over Simple Health (the "Receiver") filed the

9

"Receiver's First Interim Report" in the FTC enforcement action, which was the result of over five months of investigation. The Receiver's report stated that, "[i]n short, the FTC is correct. [Simple Health's] business model is largely a classic bait-and-switch scam . . . ." In response to the revelations in the Receiver's report, HIIQ's stock price declined by 7.6% on April 12, 2019. All told, HIIQ's common stock lost approximately 62% of its value to close at $23.85 per share at the end of the Class Period—wiping out over $550 million in market capitalization.

### B.    Relevant Procedural History

#### 1.    Commencement of the Action and Appointment of Lead Plaintiffs

15.    On February 18, 2019, the initial complaint in this Action was filed by an individual investor, styled *Julian Keippel v. Health Insurance Innovations, Inc., et al.* ECF No. 1.

16.    On April 22, 2019, Lead Plaintiffs filed a motion for appointment as Lead Plaintiffs and for approval of their selection of Saxena White as Lead Counsel. ECF No. 6. Also on April 22, 2019, another pension fund, the Employees Retirement System of the Puerto Rico Electric Power Authority ("ERS-PREPA"), moved for appointment as lead plaintiff. ECF No. 8.

17.    On May 6, 2019, ERS-PREPA withdrew its motion for appointment as lead plaintiff and informed the Court that it supported the appointment of OKMRF and City of Birmingham as Lead Plaintiffs in the Action. ECF No. 18.

10

18.    On May 13, 2019, the Court entered an order appointing OKMRF and City of Birmingham as Lead Plaintiffs and appointing Saxena White as Lead Counsel. ECF No. 21. On May 23, 2019, the Court set a schedule for Lead Plaintiffs to file their amended complaint and briefing of any motion to dismiss brought by Defendants. ECF No. 28.

### 2.    Lead Plaintiffs' Consolidated Amended Class Action Complaint and Defendants' Motion to Dismiss

19.    Prior to filing the Amended Complaint, Lead Counsel conducted an extensive investigation that included, *inter alia*, (1) a thorough review and analysis of SEC filings, analyst reports, investor conference call transcripts, and media articles relating to HIIQ, (2) consultation with an insurance industry expert, (3) consultation with an expert in loss causation and damages, who analyzed the movement and pricing data of HIIQ common stock, and (4) interviews with numerous former employees of HIIQ, including key personnel in HIIQ's customer service department who were directly aware of the level of customer complaints received by HIIQ.

20.    On July 19, 2019, Lead Plaintiffs filed the Amended Complaint (ECF No. 30), asserting claims against Defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and against the Individual Defendants (HIIQ CEO Gavin Southwell and CFO Michael Hershberger) under Section 20(a) of the Exchange Act. The Complaint alleged, among other things, that throughout the Settlement Class Period, Defendants made false and misleading statements or omissions concerning HIIQ's compliance

11

function and number of complaints received (as detailed above); that HIIQ's stock price was artificially inflated as a result of Defendants' alleged false and misleading statements; and that HIIQ's stock price declined when the truth regarding Defendants' alleged misrepresentations was revealed.

21.    Defendants moved to dismiss the Complaint on August 28, 2019 (ECF No. 41), which Lead Plaintiffs opposed on October 7, 2019. ECF No. 47. One week after the Defendants filed their October 28, 2019 reply brief (ECF No. 49), the Court issued an order denying in full Defendants' motion to dismiss on November 4, 2019. ECF No. 51.

### 3.    Lead Plaintiffs' Discovery Efforts

22.    From December 2019 through September 2020, counsel for Lead Plaintiffs and Defendants engaged in extensive fact discovery. Shortly after the Court denied Defendants' motion to dismiss, the parties met and conferred on discovery and scheduling and prepared a Joint Case Management Report, which they filed with the Court on November 26, 2019. ECF No. 54. Lead Plaintiffs served their first set of requests for production on the Defendants on December 6, 2019. Beginning in January 2020, the parties met and conferred multiple times and exchanged extensive correspondence regarding the scope of Defendants' document production. Lead Counsel also drafted and negotiated proposals for search terms and custodians.

23.    Defendants ultimately produced approximately 230,000 pages of documents. Lead Plaintiffs also subpoenaed Simple Health's court-appointed Receiver, and in response received approximately 1.7 million pages of documents

12

related to Simple Health. In addition, Lead Plaintiffs served requests for admission, which Defendants responded to. With respect to discovery served on Lead Plaintiffs, Defendants served interrogatories and requests for production, and Defendants also subpoenaed several of the Lead Plaintiffs' investment consultants and asset managers. The Parties met and conferred on the scope of Lead Plaintiffs' document production and on issues related to the interrogatories, and Lead Plaintiffs ultimately produced over 3,800 pages of documents to Defendants.

24.    Lead Counsel devoted substantial time to reviewing and analyzing these documents, including in preparation for fact witness depositions that were scheduled prior to the Parties reaching the Settlement. Through their analysis of these documents, Lead Counsel were able to develop significant insight into HIIQ's compliance function and the key departments and personnel likely to have been involved in the events that gave rise to this Action.

25.    The productions came in a wide variety of formats and materials, necessitating detailed analyses of voluminous and convoluted spreadsheets and other complex compilations of data. To analyze and process this vast amount of information within the discovery period, Lead Counsel required an effective and efficient discovery plan. This plan utilized a sophisticated document review platform that leveraged machine learning, and a dedicated team of attorneys experienced in electronic document discovery and deposition and trial preparation.

26.    In order to prepare for the review of documents, attorneys on the litigation team prepared a highly detailed coding manual and protocol, which included

13

detailed case information as well as instructions on analyzing documents. Attorneys were trained to analyze and then code documents both for level of responsiveness or importance to the case (e.g. "Hot," "Warm," "Relevant," "Not Relevant") and for case issues (e.g. "Customer Complaints," "Sales Tactics and Call Scripts," "HIIQ/Simple Health Relationship"), as well as for any technical issues with the documents, and to draft summaries or comments regarding important documents.

27.   Throughout document discovery, senior attorneys on the litigation team met regularly with attorneys to discuss the review and to go over "Hot" documents, while other attorneys drafted memoranda on subject matters of importance to assist senior attorneys in their understanding of the case. Senior attorneys also revised and updated the coding manual and protocol as discovery developed. Attorneys also collected key documents and drafted witness memoranda in preparation for potential depositions.

28.   Many of the documents produced to Lead Plaintiffs were highly technical spreadsheets and presentations that were laden with health insurance jargon and terms of art, and these documents required additional research in order to enhance our understanding of the case.

29.   At the time this case settled, Lead Plaintiffs had deposed HIIQ's former head of broker compliance and had noticed depositions of an additional twelve fact witnesses, including the Individual Defendants.

14

#### 4.    Class Certification Briefing and Discovery

30.    On May 21, 2020, Lead Plaintiffs filed their motion for class certification, together with the expert report of Chad Coffman, CFA, opining on market efficiency. ECF No. 70. Lead Plaintiffs' motion for class certification sought certification of a class period from September 25, 2017 through April 11, 2019, inclusive. *Id.* On May 28, 2020, Defendants served Rule 30(b)(6) deposition notices on Lead Plaintiffs City of Birmingham and OKMRF. Lead Counsel objected, and the parties thereafter met and conferred on the scope of these notices. Defendants deposed City of Birmingham's representative on June 12, 2020 and deposed OKMRF's representative on June 23, 2020. On June 15, 2020, Defendants deposed Mr. Coffman with respect to his class certification expert report. On July 2, 2020, after deposing Lead Plaintiffs' market efficiency expert as well as representatives of both Lead Plaintiffs, Defendants filed their opposition to class certification. ECF No. 80. Notably, the Defendants only contested the final end date of the class period; Defendants did not oppose the appointment of Lead Plaintiffs as class representatives or Saxena White as Lead Counsel. *Id.* at n. 1. On August 13, 2020, Lead Plaintiffs filed their reply in further support of class certification. ECF No. 83.

31.    On August 25, 2020, the Court held a hearing and heard nearly two hours of oral argument from Lead Plaintiffs and Defendants on Lead Plaintiffs' motion for class certification. ECF No. 88. The Court issued its order on class certification on August 28, 2020, appointing Lead Plaintiffs as Class Representatives and certifying the following class: "All persons or entities that purchased or otherwise acquired HIIQ

15

common stock between September 25, 2017 through February 18, 2019, inclusive, and who were damaged thereby." ECF No. 90. The class period certified by the Court shortened the class period asserted in the Complaint by moving the ending date from April 11, 2019 to February 18, 2019. Lead Plaintiffs moved for reconsideration of the Court's class certification decision on September 11, 2020, which argued that the proper end date for the Class Period was April 11, 2019. ECF No. 94.[5]

### C.    Mediation, Settlement, and Negotiation of Settlement Documents

### 1.    Mediation Before Jed D. Melnick, Esq.

32.    After class certification was granted, and while Lead Plaintiffs were still actively pursuing fact discovery, the Parties participated in a private mediation. The Parties selected as mediator Jed. D. Melnick, Esq., of JAMS, an accomplished and widely-respected neutral. In advance of the mediation, the Parties submitted detailed mediation statements that addressed, among other things, issues related to liability, loss causation, and damages.

33.    The Parties participated in a full-day, remote mediation on September 3, 2020. The session ended without an agreement to settle. Following the mediation, counsel continued to engage in extensive arm's-length discussions and negotiations concerning a possible settlement of the Action with Mr. Melnick. On October 21, 2020, the Parties reached an agreement in principle to settle and release all claims

---

[5] At the time this Action settled, the Court had not ruled on the motion for reconsideration. In light of the announced Settlement and the Court's preliminary approval of the Settlement, the Court entered an order terminating the motion for reconsideration on December 16, 2020. ECF No. 103.

asserted against the Defendants in the Action in return for a cash payment of $11 million for the benefit of the Settlement Class. The Parties then negotiated the full settlement terms set forth in the Stipulation.

**2.    The Settlement Agreement and Preliminary Approval**

34.    On December 3, 2020, Lead Plaintiffs filed their unopposed Motion for (I) Preliminary Approval of Class Action Settlement, (II) Certification of the Settlement Class, and (III) Approval of Notice to the Class, and Incorporated Memorandum of Law. ECF No. 100. In support of their motion, Lead Plaintiffs also filed: (1) the Stipulation (ECF No. 100-2); (2) a proposed preliminary approval order (ECF No. 100-1, Ex. A); (3) their proposed Notice of Pendency of Class Action and Proposed Settlement of Class Action; Settlement Hearing, and Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (ECF No. 100-1, Ex. A-1); (4) their proposed Proof of Claim and Release Form (ECF No. 100-1, Ex. A-2); (5) their proposed Summary Notice (ECF No. 100-1, Ex. A-3); and (6) a proposed final approval order (ECF No. 100-2, Ex. B).

35.    The same day, this Court issued an order certifying the Class for settlement purposes, preliminarily approving the Settlement, and approving the proposed Notice, Summary Notice, and Claim Form (the "Preliminary Approval Order"). ECF No. 101. The Preliminary Approval Order further: (1) authorized notice to be given to Settlement Class Members through mailing of the Notice and Claim Form, posting of the Notice and Claim Form on a Settlement website, publication of the Summary Notice in *Investor's Business Daily*, and transmission over PR Newswire;

17

(2) established procedures and deadlines by which Settlement Class Members could participate in the Settlement, request exclusion from the Settlement Class, or object to the Settlement, the proposed Plan of Allocation, or the fee and expense application; (3) set a schedule for the filing of final approval papers in support of the proposed Settlement, Plan of Allocation, and Lead Plaintiffs' motion for attorneys' fees and expenses; and (4) set a hearing to determine whether the Settlement should be granted final approval as fair, adequate and reasonable, which hearing is set for March 23, 2021.

## III.   THE RISKS OF CONTINUED LITIGATION

36.   The Settlement provides the Class with an immediate cash benefit of $11 million, representing not only a substantial portion of their recoverable damages, but a high percentage of maximum damages for a securities class action. Had Lead Plaintiffs continued litigating the Action, they would have faced substantial risks at each step of the process—including at summary judgment and trial—and, even if they had reached trial (which would require substantial additional time and expense), there is no guarantee they would have recovered *anything*, let alone a benefit of this size. Moreover, Lead Plaintiffs would have faced inevitable post-trial motions and appeals that would further delay the Class receiving any monetary benefit, and that would present additional risk that any judgment could be reduced in size or reversed entirely. Accordingly, Lead Plaintiffs believe that the Settlement represents an excellent result for the Class when weighed against the risks of continued litigation, which are discussed further below.

## A.    Risks in Proving Liability

37.    Lead Plaintiffs would have faced substantial risks at summary judgment and at trial, including the risk that Lead Plaintiffs would not be able to establish the elements of falsity, scienter and loss causation, any one of which could have undermined the viability of the Action in its entirety.

38.    Defendants have maintained throughout the Action that none of the alleged false statements were false at the time they were made. While Lead Plaintiffs prevailed over these arguments at the motion to dismiss stage, they would face different standards and a more fully developed record on summary judgment and at trial, and would also face a jury that might credit Defendants' arguments over theirs.

39.    For example, Defendants have maintained that, at the times they made the alleged false statements that their compliance was "best in class" and that their number of customer complaints was "incredibly low," these statements were correct and accurately reflected the quality of compliance and the number of upheld customer complaints. Defendants would likely cite to contemporaneous publicly disclosed information as well as internal data which purportedly showed that HIIQ had heavily invested in its compliance and customer service processes in recent years, and that the Individual Defendants' reasonable belief that HIIQ had "best in class" compliance undercuts an inference of scienter. Defendants would likely further argue that, even accounting for all customer complaints made to the Company and not just customer complaints upheld by state departments of insurance, the complaint ratio was immaterial.

19

40.     As a further defense to scienter, Defendants would also likely argue that HIIQ did not approve or condone the use of any deceptive trade practices by its third-party call centers, and that when HIIQ learned of any potential improper sales practices, it quickly intervened to stop them. Indeed, based on filings in the FTC enforcement action against Simple Health, Defendants would almost certainly argue that Simple Health actively sought to hide its illicit activities from HIIQ by failing to disclose regulatory investigations and by editing customer calls prior to sending the recordings to HIIQ for review.

41.     While Lead Plaintiffs defeated Defendants' arguments on falsity and scienter at the motion to dismiss stage, Defendants would have continued to contend that their statements were not false when made. Moreover, regardless of merit, a jury might subjectively agree with Defendants' characterizations of the facts and of their statements rather than Lead Plaintiffs' characterizations. Accordingly, the need to prove falsity at trial presented significant risks to Plaintiffs' liability case.

**B.     Risks to Establishing Loss Causation and Damages**

42.     Even if Lead Plaintiffs could prevail in demonstrating liability, this case presented challenges in proving loss causation and damages, and, at trial, Plaintiffs would face considerable risk that any judgment they were awarded could be a fraction of their estimated damages or could be lower than the amount of the Settlement.

43.     As a preliminary matter, damages were already significantly reduced when the Court shortened the class period end date from April 11, 2019 to February 18, 2019. By shortening the class period, the Court eliminated three of the five

20

corrective disclosures and corresponding share price drops alleged in the Complaint (which occurred on March 13, 2019, March 25, 2019, and April 12, 2019)—including the largest single-day share price drop as a percentage of market share, the March 13, 2019 announcement of an investigation by the U.S. House of Representative Energy & Commerce Committee, which caused HIIQ's stock price to decline by 17.2%.

44.    In addition, Defendants would argue that the November 2, 2018 corrective disclosure—the FTC's announcement of the enforcement action against Simple Health—contained no allegations against HIIQ and contained no corrective information relating to HIIQ's compliance, customer service, or customer complaints. Moreover, Plaintiffs' alleged damages related to this first corrective disclosure were based on a two-day stock drop: Friday, November 2, 2018, the day of the FTC's announcement, and continuing into the next trading session on Monday, November 5, 2018. But defendants in securities class actions invariably argue that stock price declines in multi-day event windows such as this are not causally related to the initial announcement, particularly when occurring over weekends as here. Lead Plaintiffs expected that Defendants would make that argument here, and if the Court or a jury were to eliminate the stock price drop on November 5, 2018, Plaintiffs' damages would decrease even further. With respect to the second alleged corrective disclosure, the November 27, 2018 Aurelius Value short-seller report, Defendants would continue to argue that the report contained already-public information.

21

45.    Thus, even if Plaintiffs were to prevail in all other aspects of their case, there was a possibility that their available damages would have been dramatically reduced in any judgment.

### C.    Post-Trial Risks

46.    Even if Lead Plaintiffs were to prevail at summary judgment and at trial, and even if the jury were to award a judgment that is meaningfully larger than the $11 million benefit obtained in the Settlement, Plaintiffs and the Class would still have faced additional risks. Defendants would likely have challenged the damages of each class member in prolonged post-trial proceedings. Moreover, Defendants would likely have appealed any judgment, giving them the opportunity to reassert each of their arguments before a new tribunal.

47.    Along with those challenges, HIIQ's ability to pay posed additional risks for recovering on any judgment.  Since this case was originally filed, HIIQ has changed its business model to offer Medicare-related insurance products, and in August 2020, was acquired and taken private. According to filings with the SEC before being taken private, HIIQ itself had only limited cash available to contribute to any settlement or other recovery. Defendants' directors' and officers' insurance was also virtually exhausted by the time the Settlement was reached, and would likely be fully exhausted if litigation continued.

22

48.     Given the extent of the litigation risks in this matter, the $11 million Settlement is an exceptional recovery for the Settlement Class, and Lead Counsel believes it is fair, reasonable, adequate, and in the best interests of the Settlement Class.

## IV.    LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING THE ISSUANCE OF NOTICE

49.     Lead Plaintiffs have fully complied with all requirements of the Preliminary Approval Order to date.

50.     First, pursuant to the Preliminary Approval Order, Lead Counsel instructed its Court-approved Claims Administrator, Epiq, to disseminate the Notice and Claim Form by mail and to publish the Summary Notice. The Notice and Summary Notice informed Class Members of the terms of the Settlement and Plan of Allocation and of their rights to participate in the Settlement, object to the Settlement, or exclude themselves from the Settlement Class. To disseminate the Notice, Epiq obtained information from HIIQ and from various banks, brokers and other nominees regarding the names and addresses of potential Class members. *See* Declaration of Jordan Broker Regarding (A) Mailing of Notice and Claim Form; (B) Publication of Summary Notice; (C) Call Center Services; (D) Posting of Notice and Claim Form on Settlement Website; and (E) Report on Objections or Requests for Exclusion Received to Date ("Epiq Declaration," attached hereto as Ex. 2).

51.     This method of providing notice, previously approved by the Court, is appropriate because it directs notice in a "reasonable manner to all class members who would be bound by the propos[ed judgment]." Fed. R. Civ. P. 23(e)(1)(B). The Notice

23

advises members of the Settlement Class of the essential terms of the Settlement, sets forth the procedure for objecting to or opting out of the Settlement, and provides specifics on the date, time, and place for the final approval hearing. The Notice also contains information regarding Lead Counsel's fee and expense application and the proposed plan of allocating the Settlement proceeds among members of the Settlement Class.

52.    As explained in the accompanying memorandum of law in support of final approval of the Settlement, the Notice fairly apprises members of the Settlement Class of their rights with respect to the Settlement, and therefore is the best notice practicable under the circumstances, and complies with the Court's Preliminary Approval Order, Federal Rule of Civil Procedure 23, and due process.

53.    Epiq began disseminating the Notice and Claim Form (together, the "Notice Packet") to potential Class members and nominee owners on January 11, 2021. Epiq Declaration ¶5. As of February 15, 2021, Epiq had disseminated a total of 21,918 Notice Packets to potential Class members and nominees. Epiq Declaration ¶11.

54.    On January 18, 2021, in accordance with the Preliminary Approval Order, Epiq caused the Summary Notice to be published in *Investors' Business Daily* and to be transmitted over PR Newswire. Epiq Declaration ¶12.

55.    Lead Counsel also caused Epiq to establish a dedicated settlement website, www.HealthInsuranceInnovationsSecuritiesSettlement.com, to provide potential Class Members with information concerning the Settlement and access to

24

downloadable copies of the Notice and Claim Form, as well as copies of the Stipulation, Preliminary Approval Order, and Complaint. Epiq Declaration ¶¶15-16. That website became operational on January 11, 2021. *Id.* Finally, copies of the Notice and Claim Form, along with copies of the Stipulation, Preliminary Approval Order, and Complaint, were also posted to Lead Counsel's website.

56.    The deadline for Class Members to file objections to the Settlement, Plan of Allocation, and/or Lead Plaintiffs' request for fees and expenses, or to request exclusion from the Class is March 2, 2021. As of February 15, 2021, Lead Counsel has received no requests for exclusion from the Settlement Class, and no objections to the Settlement, Plan of Allocation, or Lead Plaintiffs' Motion for Attorneys' Fees and Litigation Expenses. Epiq Declaration ¶¶17, 18, 20. Lead Counsel will file reply papers to address any objections or exclusions on March 16, 2021. Preliminary Approval Order ¶23.

## V.    ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT AND CLASS REACTION TO DATE

57.    Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (i.e., the Settlement Fund less any (a) Taxes, (b) Notice and Administration Costs, (c) Litigation Expenses awarded by the Court, (d) attorneys' fees awarded by the Court, and (e) any other fees approved by the Court) must submit a valid Claim Form with all required information postmarked no later than May 11, 2021. As set forth in the Notice, the Net Settlement Fund will be distributed among

25

Settlement Class Members who submit eligible claims according to the plan of allocation approved by the Court.

58.    Lead Counsel consulted with Lead Plaintiffs' damages expert in developing the proposed plan of allocation for the Net Settlement Fund (the "Plan of Allocation"). Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as a result of the conduct alleged in the Complaint.

59.    The Plan of Allocation is set forth at ¶¶41-58 of the Notice. As described in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover at trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement. Notice ¶41. Instead, the calculations under the plan are only a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund.

60.    In developing the Plan of Allocation, Lead Plaintiffs' damages expert calculated the estimated amount of artificial inflation in HIIQ common stock during the Settlement Class Period allegedly caused by Defendants' alleged false and misleading statements and material omissions. In calculating the estimated artificial inflation, Lead Plaintiffs' damages expert considered price changes in HIIQ common stock in reaction to certain public announcements allegedly revealing the truth concerning Defendants' alleged misrepresentations and material omissions, adjusting for price changes on those days that were attributable to market or industry forces.

26

61.     Claimants who purchased and sold all of their HIIQ shares before the first alleged corrective disclosure on November 2, 2018, or who purchased and sold all of their HIIQ shares between two dates on which artificial inflation was allegedly removed from the price of HIIQ stock (that is, they did not hold the shares over a date where artificial inflation was allegedly removed from the stock price) will have no Recognized Loss under the Plan of Allocation with respect to those transactions because the level of artificial inflation is the same between the corrective disclosures, and any loss suffered on those sales would not be the result of the alleged misstatements in the Action.

62.     In accordance with the PSLRA, Recognized Loss Amounts for shares of HIIQ common stock sold during the 90-day period after the end of the Settlement Class Period are further limited to the difference between the purchase price and the average closing price of the stock from the end of the Settlement Class Period to the date of sale. Notice ¶46(iv), n. 3. Recognized Loss amounts for HIIQ common stock still held as of the close of trading on July 10, 2019—i.e., the end of the 90-day period— will be the lesser of (a) the amount of artificial inflation on the date of purchase or (b) the difference between the purchase price and $24.96, the average closing price for the stock during that 90-day period. Notice ¶46.

63.     The sum of a Claimant's Recognized Loss Amounts for all their purchases of HIIQ common stock during the Settlement Class Period is the Claimant's "Recognized Claim." Notice ¶47. The Plan of Allocation also limits Claimants based on whether they had an overall market loss in their transactions in HIIQ common

27

stock during the Settlement Class Period. The Net Settlement Fund will be allocated to Authorized Claimants on a pro rata basis based on the relative size of their Recognized Claims. Notice ¶53.

64.     In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on damages they suffered on purchases of HIIQ common stock that were attributable to the misconduct alleged in the Complaint. Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

65.     As noted above, 21,918 copies of the Notice, which contains the Plan of Allocation and advises Settlement Class Members of their right to object to the proposed Plan of Allocation, have been sent to potential Settlement Class Members and nominees. *See* Epiq Declaration.  To date, no member of the Settlement Class has filed an objection to the Settlement, Plan of Allocation, or Lead Plaintiffs' Motion for Attorneys' Fees and Litigation Expenses. Epiq Declaration ¶20.

## VI.     THE FEE AND EXPENSE APPLICATION

### A.     Lead Counsel's Request for an Award of Fees

66.     In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying to the Court, on behalf of all Plaintiffs' counsel, for an award of attorneys' fees of one-third of the Settlement Fund (or $3,666,666.67, plus interest earned at the same rate as the Settlement Fund) (the "Fee Application"). Lead Counsel also seeks payment of litigation expenses that Plaintiffs' Counsel

incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $377,837.59 (the "Expense Application"). Lead Counsel further requests the reimbursement of costs related to representation of the Class to each Lead Plaintiff, in accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(4). In support of these applications, Lead Counsel has submitted the attached Declaration of Brandon T. Grzandziel in Further Support of Lead Plaintiffs' Motion for Attorneys' Fees and Litigation Expenses, Filed on Behalf of Saxena White P.A. ("Fee and Expense Declaration") (attached hereto as Ex. 5A). The Fee and Expense Declaration lists the lodestar of Lead Counsel, including the amount of time spent by each attorney and professional support staff member on the case, and the expenses for which Lead Counsel seek reimbursement.[6]

67.   Lead Plaintiffs support Lead Counsel's fee request, and their Declarations are attached as Exs. 3 and 4. The support and approval of court-appointed lead plaintiffs weighs heavily in favor of approval of a fee request. *See City of St. Clair Shores Gen. Emps.' Ret. Sys. v. Lender Processing Servs., Inc.*, 2014 WL 12621611, at *2 (M.D. Fla. Mar. 4, 2014) (approving fee request that was "reviewed and approved as fair and reasonable by Lead Plaintiff, a sophisticated institutional investor that was directly involved in the prosecution and resolution of the claims and who has a substantial interest in ensuring that any fees paid to Lead Plaintiff's Counsel

---

[6] Additionally, Plaintiffs' Counsel have submitted the Declaration of Mitchell Twersky in support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses as Ex. 5B hereto, which summarizes lodestar and expenses for additional counsel Abraham, Fruchter & Twersky in this case.

29

are duly earned and not excessive"); *In re Carter's, Inc. Sec. Litig.,* 2012 WL 12877943, at *2 (N.D. Ga. May 31, 2012) (same).

68.   Based on the factors discussed below, and on the legal authorities discussed in the accompanying Motion for Attorneys' Fees, Lead Counsel respectfully submit that the request for fees and expenses should be granted.

69.   Lead Counsel's request for a fee based on a percentage of the Settlement Fund is in line with the most typical method of awarding attorney fees in securities and other complex class actions in the Eleventh Circuit and in federal courts nationwide. This method of calculating Lead Counsel's fee is favored because it aligns the attorneys' interest in being paid a fair fee with the interest of the Settlement Class in achieving the maximum recovery efficiently and in the shortest amount of time.

70.   Courts in the Eleventh Circuit apply the *Johnson* factors in analyzing whether a requested percentage fee award is reasonable: (1) the time and labor required; (2) the novelty and difficulty of the relevant questions; (3) the skill required to properly carry out the legal services; (4) the preclusion of other employment by the attorney as a result of his acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the clients or the circumstances; (8) the results obtained, including the amount recovered for the clients; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and the length of the professional relationship with the clients; and (12) fee awards in similar cases. *Equifax*, 2020 WL 256132, at *32; *Johnson*, 488 F.2d at 717-19. Additionally, courts in this Circuit consider factors such as "the

number of objections from class members, the risks undertaken by class counsel, and the economics of handling class actions." *Equifax*, 2020 WL 256132, at *32. As discussed below, and as elaborated more fully in the Motion for Attorneys' Fees, these factors strongly support Lead Counsel's requested award of one-third of the Settlement Fund.

### 1.   The Time, Labor, Difficulty and Skill Involved Support the Requested Fee Award

71.   Lead Counsel are highly skilled and experienced securities litigators, who expended a substantial amount of time and effort litigating the Action—an action that presented special challenges that were not easy to overcome.

72.   First, while Lead Plaintiffs believe they developed a strong case, Defendants' fraud was not obvious at the outset, and there were no existing regulatory actions against HIIQ off of which Lead Plaintiffs could "piggy back." Thus, the case required an extensive investigation, in-depth discovery, and highly skilled advocacy to reach the achieved result.

73.   In spite of the large stock drop after the November 2, 2018 disclosure that wiped out $160 million in market capitalization, only one other movant sought appointment as lead plaintiff, suggesting that Defendants' fraud was not plain to see, and that the case was not highly desirable on its face.

74.   Successfully pleading securities fraud here presented special challenges that required skilled lawyering. As discussed herein, the case presented a number of complex and difficult issues—particularly in proving loss causation and damages.

Lead Counsel's investigation and interviews with numerous confidential witnesses helped Lead Plaintiffs allege additional facts related to the customer complaints, and HIIQ's knowledge of these complaints, that enabled the Complaint to overcome Defendants' motion to dismiss.

75.    As described further *supra*, Lead Plaintiffs engaged in an extensive investigation and drafted a 102-page Amended Complaint, and successfully opposed Defendants' motion to dismiss. Lead Counsel engaged in extensive discovery negotiations, including multiple meet-and-confers with Defendants and substantial amounts of correspondence. Lead Counsel also subpoenaed a key third party, Simple Health's Receiver, and obtained documents highly relevant to Plaintiffs' claims. Lead Counsel reviewed and analyzed a total of 1.9 million pages of documents, consulted with an insurance industry expert in order to better understand the issues in the case, and deposed HIIQ's former head of broker compliance. Lead Counsel also fully briefed their motion for class certification and defended depositions of their own market efficiency expert as well as representatives of each Lead Plaintiff.

76.    The labor-intensiveness of this case also precluded Lead Counsel from pursuing other matters. As is often the case with complex securities class actions, the attorneys involved would often have to spend significant stretches of time focusing exclusively or near-exclusively on litigating this Action. The investigation, pleading, briefing, and discovery work required by the highly complex and technical matters in this case often required the careful attention of experienced senior attorneys at Saxena White and could not be left solely to junior attorneys or staff.

32

77.     As set forth more fully in Saxena White's firm resume, attached hereto as part of Ex. 5A, Lead Counsel are highly skilled and experienced litigators who specialize in securities class actions. Saxena White has achieved numerous investor class action and derivative action settlements worth tens or hundreds of millions of millions of dollars each, and the lawyers who prosecuted this case have collectively achieved billions of dollars in settlements on behalf of investors.[7]

78.     Lead Counsel believe that all of these factors support the Requested Fee Award.

### 2.    The Outstanding Result Achieved and the Reasonableness of the Fee Request Support the Requested Fee Award

79.     The $11 million Settlement achieved in this Action is an excellent result for the Class by any measure. As elaborated further in the Motion for Attorneys' Fees, the Settlement represents from 17% to 34% of the Settlement Class's maximum estimated aggregate damages—far more than is typically achieved in a securities class action.

80.     Moreover, as elaborated more fully in the Motion for Attorneys' Fees, the requested fee is well within the range typically awarded by this District and other courts in the Eleventh Circuit in complex class actions.

---

[7] Recent settlements obtained by Lead Counsel include *In re Wells Fargo & Co. S'holder Derivative Litig.*, 2020 WL 1786159 (N.D. Cal. Apr. 7, 2020) ($240 million settlement plus substantial corporate governance relief); *In re Wilmington Tr. Sec. Litig.*, 2018 WL 6046452, at *8 (D. Del. Nov. 19, 2018) ($210 million common fund in securities class action); *In re Rayonier Inc. Sec. Litig.*, 2017 WL 4542852, at *1 (M.D. Fla. Oct. 5, 2017) ($73 million common fund in securities class action).

### 3.   The Risks and Economics of the Litigation Support the Requested Fee Award

81.   The risks undertaken by counsel in this matter and the economic considerations of litigating a complex securities class action such as this one favor approval of the Requested Fee Award.

82.   First, as with all contingency fee cases, Lead Plaintiffs faced a substantial risk that they would obtain no fee whatsoever. From the outset, Lead Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Lead Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable litigation costs that a case like this requires. With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Plaintiffs' Counsel received no compensation during the one-and-a-half year-long course of the Action and have collectively incurred $377,837.59 in litigation expenses in prosecuting the Action for the benefit of the Class, in addition to considerably more expenditure on overhead costs for the attorneys, staff, and resources needed to litigate this action.

83.   Courts have repeatedly recognized that it is in the public interest to have experienced and qualified counsel privately enforce the securities laws. However, as recognized by Congress through the passage of the PSLRA, vigorous private

34

enforcement of the federal securities laws can only occur if private plaintiffs, and particularly institutional investors, take an active role in protecting the interests of investors. If this important public policy is to be carried out, Plaintiffs' Counsel should be adequately compensated, taking into account the substantial risks undertaken in prosecuting securities class actions.

84.     At each step of the process, Lead Counsel faced a substantial risk that the litigation could end either without remuneration to them or with remuneration far less than the time, effort, and expense put in by Lead Counsel. Lead Counsel could have had their Complaint dismissed by the Court after expending the substantial effort needed to perform their investigation and draft their Complaint. And even after surviving that hurdle, were litigation to continue, Lead Plaintiffs could face a granting of summary judgment to Defendants, a total loss at trial, or—even in the event of a victory at trial—a reversal on appeal. Any of these occurrences would have deprived Lead Counsel of the opportunity to earn any fee whatsoever for their years of work and expenditure.

85.     Moreover, even without a total dismissal of the case or a total loss at trial, Lead Plaintiffs have faced, and would continue to face, risks that their case could be reduced in size and value. For example, if the second day of the two-day window following the November 2, 2018 disclosure date were to be eliminated—whether at summary judgment or trial—the pool of available damages would be a fraction of what it was at the time of the Settlement, meaning that Lead Counsel would earn at best a small fraction of the Requested Fee Award for its substantial work and time.

86.    Additionally, securities class actions such as this one are not only time- and labor-intensive, but require substantial up-front cost outlays. Lead Counsel not only had to pay for its standard overhead expenses during the entirety of the litigation, but had to cover costs and expenses, including substantial electronic discovery costs and the fees of both an insurance industry expert and a market efficiency expert, all without guarantee of any recovery.

### 4.    The Reaction of the Settlement Class to the Fee and Expense Applications

87.    The positive reaction of the Settlement Class to the Fee and Expense Applications further supports final approval. The Notice advised Settlement Class Members that Lead Counsel would apply for fees not to exceed one-third of the Settlement Fund, and that the deadline for filing objections to the fee application is March 2, 2021. To date, no member of the Settlement Class has filed an objection to the Settlement, Plan of Allocation, or Lead Plaintiffs' Motion for Attorneys' Fees and Litigation Expenses. Epiq Declaration ¶20.

88.    Moreover, Lead Plaintiffs are each sophisticated institutional investors that closely supervised and monitored the prosecution and the settlement of the Action. Lead Plaintiffs have evaluated Lead Counsel's fee and expense application and believe it to be reasonable. As discussed in the declarations submitted by Lead Plaintiffs, they believe that the requested fee is fair and reasonable in light of the work counsel performed and the risks of the litigation. *See* Exs. 3 and 4.

### 5.     Awards in Similar Actions and a Lodestar Cross-Check Support the Requested Fee Award

89.     As set forth more fully in the Motion for Attorneys' Fees, Lead Counsel's request for an award of one-third of the Settlement Fund is in line with fees recently awarded in similar securities class actions and other complex class actions in this District, Circuit, and around the country. *See, e.g., Fernandez v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 2017 WL 7798110, at \*4 (S.D. Fla. Dec. 18, 2017) (collecting cases); Theodore Eisenberg, Geoffrey Miller & Roy Germano, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. Rev. 937, 951 (Oct. 2017) (finding that, over a four year period, the mean fee award in the Eleventh Circuit was 30% and the median award was 33%); *Hanley v. Tampa Bay Sports & Entm't LLC*, 2020 WL 2517766, at \*6 (M.D. Fla. Apr. 23, 2020) ("district courts in the Eleventh Circuit routinely approve fee awards of one-third of the common settlement fund"); *In re Flowers Foods, Inc. Sec. Litig.*, 2019 WL 6771749, at \*2 (M.D. Ga. Dec. 11, 2019) (awarding one-third of $21 million settlement as "consistent with awards in similar cases"); *In re Walter Energy, Inc. Sec. Litig.*, 2016 WL 7230505, at \*2 (N.D. Ala. May 3, 2016) (awarding 33% of $25 million settlement as "consistent with awards in similar cases"); *Thorpe*, 2016 WL 10518902 at \*10-11 (awarding 33.3% of $24 million settlement).[8]

---

[8] *See also In re BHP Billiton Ltd. Sec. Litig.*, 2019 WL 1577313 (S.D.N.Y. Apr. 10, 2019) (awarding 30% of $50 million securities class action settlement); *Seaman*, 2019 WL 4674758, at \*3 (awarding 33% of $54 million settlement, and noting one-third contingent fees are "common" in complex class actions in the Fourth Circuit); *Vista Healthplan, Inc. v. Cephalon, Inc.*, 2020 WL 1922902, at \*28 (E.D. Pa. Apr. 21, 2020) (awarding one-third of $65.8 million fund and noting one-third fees are "well within the range of reasonable fees, on a percentage basis, in the Third Circuit.").

90.     As set forth in the Motion for Attorneys' Fees, a lodestar "cross-check" also confirms the reasonableness of Lead Counsel's fee request. Attached hereto as Exhibits 5A and 5B are declarations from Plaintiffs' Counsel in support of an award of attorneys' fees and reimbursement of Litigation Expenses, which include schedules detailing Plaintiffs' Counsel's lodestar amount (by showing each specific timekeeper, title, time, hourly rate and lodestar), as well as the expenses incurred, listed by category.

91.     As set forth in Exhibits 5A-5B, Plaintiffs' Counsel expended a total of 9,480.75 hours in the prosecution and investigation of this action up through October 21, 2020. The resulting lodestar is $4,815,428.75. In light of this, the requested fee of one-third of the Settlement Fund, or $3,666,666.67, yields a negative multiplier of 0.76. Such a multiplier is well below the range of multipliers awarded by courts in this Circuit and around the country in comparable securities class actions, is fair and reasonable based upon the significant risks in this litigation, and by Lead Counsel's substantial efforts to obtain the highly favorable Settlement – which far exceeds the rate of recovery for most securities class actions. *See, e.g., Smith v. Floor & Decor Outlets of Am., Inc.*, 2017 WL 11495273, at *4 (N.D. Ga. Jan. 10, 2017) (2.5 multiplier was "well within the accepted range" and supported 1/3 fee award); *Thorpe*, 2016 WL 10518902, at *7 (finding 3.58 lodestar multiplier—and 33.3% fee—reasonable, and citing authority for multipliers ranging from 2.26 to 4.5); *Columbus Drywall & Insulation, Inc. v. Masco Corp.*, 2012 WL 12540344, at *5 (N.D. Ga. Oct. 26, 2012) (one-third fee of $75 million fund "would represent a multiplier of approximately four times

38

lodestar, which is well within the range of approved fees.").[9] Moreover, courts have repeatedly recognized that a negative multiplier supports the reasonableness of a fee request. *See In re NetBank, Inc. Sec. Litig.,* 2011 WL 13353222, at *3 (N.D. Ga. Nov. 9, 2011) (negative multiplier confirms that 34% fee award was proper); *Guevoura Fund Ltd.*, 2019 WL 6889901, at *18 (reasonableness of a fee request is reinforced where "the percentage fee would represent a negative multiplier of the lodestar," supporting "an award at the higher end of the spectrum").

92.     As stated in Exhibits 5A-5B, the lodestar summaries were prepared from daily time records regularly prepared and maintained in the ordinary course of business. Plaintiffs' Counsel's hourly rates are the same as, or comparable to, the regular current rates charged for their services in non-contingent matters and/or the rates submitted by comparable firms for lodestar cross-checks in other securities class action fee applications that have been granted in this Circuit and others. *See, e.g.*, *Chieftain Royalty Co. v. Marathon Oil Co.*, 2019 WL 7758915, at *12 (E.D. Ok. Mar. 8, 2019) (recognizing "partner rates ranging from $850 - $1,150 per hour" in shareholder and other complex litigation and citing cases and studies); *In re Amgen Inc. Sec. Litig.*, 2016 WL 10571773, at *9 (C.D. Cal. Oct. 25, 2016) (in securities class action, approving hourly rates of $750-985 for partners, $500-800 for of counsel/senior counsel, and $300-725 for other attorneys).

---

[9] Moreover, Lead Counsel will incur substantial additional hours and resources overseeing the Settlement claims administration process.

93.     Additionally, as shown in Exhibit 3 to Exhibit 5A (Lead Counsel's firm resume), many of the firms' attorneys – at all levels – have worked for Lead Counsel for years and have extensive experience in securities class action litigation. Each attorney that prosecuted this action performed substantive work that directly benefitted the Settlement Class. The time spent by each attorney was reasonable, non-duplicative, beneficial to effective and efficient litigation, and was important to Plaintiffs' Counsel's and Lead Plaintiffs' ability to understand the strengths and weaknesses of the case in order to negotiate intelligently and evaluate the Settlement, which ultimately led to the successful and favorable resolution of the case.

94.     In sum, based on the excellent result achieved for the Settlement Class, the quality of work performed, and the risks of prosecuting the action against Defendants, Lead Counsel submits that its request for a one-third fee award is fair, reasonable, and consistent with other similar cases in this Circuit.

**B.      Lead Counsel's Request for Reimbursement of Litigation Expenses**

95.     Lead Counsel seeks reimbursement of $377,837.59 in litigation expenses. Lead Counsel respectfully submits that these expenses were reasonable and necessary considering the complexity of the litigation, and that reimbursement of these expenses would be appropriate and fair to the Class.

96.     Courts in this District and Circuit have held that counsel in complex class actions are entitled to be reimbursed for reasonable expenses of the exact type incurred here, such as "court reporter fees; document and database reproduction and analysis;

40

e-discovery costs; expert witness fees; travel for meetings and hearings; paying the mediator; and other customary expenditures." *Equifax*, 2020 WL 256132 at *40.

97.    Lead Counsel incurred these expenses at substantial risk to itself, and with no guarantee of receiving any reimbursement, or, indeed, any remuneration whatsoever. Lead Counsel could not have effectively prosecuted the Action without incurring these expenses. For example, Lead Counsel engaged the services of KL Discovery to host its database of electronically stored information (ESI) produced in this action, and Lead Counsel could not have managed electronic discovery of this volume without the services of such a vendor.

98.    Similarly, effective prosecution of the Action required the services of multiple experts—including (i) Robert M. Willis, a former Commissioner of the Department of Insurance for the District of Columbia with over forty years of experience in the insurance industry, who aided Lead Plaintiffs' understanding of how customer complaints related to insurance are handled by state regulators, and (ii) Chad Coffman, an economics and market efficiency expert whose expert report was required in order to for Lead Plaintiffs to meet their burden on class certification. Mr. Coffman and his firm, Global Economics Group, LLC, also provided an assessment of damages, and, using their in-depth damages analysis, developed the Plan of Allocation.

99.    Moreover, the expenses incurred by Lead Plaintiffs in this action were reasonable and in line with typical expenses incurred in a securities class action that

41

has progressed to this stage of litigation. *See, e.g., Rayonier,* 2017 WL 4542852 at *3 (approving award of $616,806.40 in expenses at similar stage of litigation).

100.    The requested expense reimbursement of $377,837.59 is also less than the $450,000 upper limit provided for in the Notice, and moreover, no potential Settlement Class members have objected to the requested expense reimbursement to date.

101.    Finally, approval of the Settlement is independent from approval of Lead Counsel's request for attorneys' fees and reimbursement of Litigation Expenses. Accordingly, any determination with respect to Lead Counsel's fee award will not affect the Settlement, if approved.

### C.    Lead Plaintiffs' Reimbursement Requests

102.    In accordance with the PSLRA, Lead Plaintiffs OKMRF and City of Birmingham seek reimbursement of their reasonable costs and expenses incurred directly in connection with their representation of the Settlement Class, in the amounts of $7,069.55, and $7,503.75 respectively. The amount of time and effort devoted to this Action by the representatives of Lead Plaintiffs—who expended considerable time and effort in actively supervising the litigation over a multi-year period, including by collecting and producing numerous documents; preparing for and attending their depositions; and participating in ongoing settlement discussions—is detailed in the accompanying Lead Plaintiff Declarations. Exs. 3 and 4.

103.    Lead Plaintiffs respectfully submit that the reimbursement requested is fully consistent with congressional intent, as expressed in the PSLRA, of encouraging institutional and other highly experienced plaintiffs to take an active role in bringing

and supervising actions of this type. As set forth in the Lead Plaintiff Declarations, each of the Lead Plaintiffs has, throughout the litigation of the Action, been fully committed to pursuing the interests of the Settlement Class. Lead Plaintiffs have actively and effectively complied with all of the many demands that arose during the litigation and the Settlement of this Action. Lead Plaintiffs' efforts are precisely the type that courts have found to support reimbursement to class representatives, and fully supports Lead Plaintiffs' request for reimbursement.

## VII.    CONCLUSION

104.    For all the reasons discussed above, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate. Lead Counsel further submit that the requested fee in the amount of one-third of the Settlement Fund should be approved as fair and reasonable, and the request for reimbursement of total litigation costs and expenses in the total amount of $377,837.59 should also be approved. Finally, Lead Plaintiffs submit that, in accordance with the PSLRA, reimbursement to Lead Plaintiffs in the total amount of $14,573.30 should also be approved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 16th day of February, 2021, at Boca Raton, Florida.


/s/ Brandon T. Grzandziel
Brandon T. Grzandziel


43

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of February 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing all counsel of record.

_/s/ Brandon T. Grzandziel_
Brandon T. Grzandziel